**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles, Pa. Id. No. 17928
Kimberly Donaldson Smith, Pa. Id. No. 84116
Christina Donato Saler, Pa. Id. No. 92017
Benjamin F. Johns, Pa. Id. No. 201373
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Phone (610) 642-8500
Fax (610) 649-3633

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, on behalf of itself and all others similarly situated, | Civil Action No. _____ |
| Plaintiff, | CLASS ACTION COMPLAINT ECF |
| v. | |
| ORRSTOWN FINANCIAL SERVICES, INC., ORRSTOWN BANK, ANTHONY F. CEDDIA, JEFFREY W. COY, MARK K. KELLER, ANDREA PUGH, THOMAS R. QUINN, JR., GREGORY A. ROSENBERRY, KENNETH R. SHOEMAKER, GLENN W. SNOKE, JOHN S. WARD, and JOEL R. ZULLINGER, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF § 11 OF THE SECURITIES ACT OF 1933 AND § 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 |
| Defendants. | DEMAND FOR JURY TRIAL |

## INTRODUCTION

1.      Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Plaintiff") brings this class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of two Classes, against Orrstown Financial Services, Inc. ("Orrstown" or the "Company"), Orrstown Bank (the "Bank") and Orrstown's officers and directors, (the "Defendants").  The claims asserted herein stem from Defendants' issuance of materially untrue and/or misleading statements and omissions in violation of the federal securities laws.

2.      The "Securities Act Class" consists of all persons and/or entities who purchased Orrstown common stock in connection with, or traceable to, Orrstown's February 23, 2010 Registration Statement and March 24, 2010 Prospectus Supplement (collectively these, and the documents incorporated therein by reference, the "Registration Statement" or "Offering Documents").  The Securities Act Class seeks remedies under Sections 11, 12(a) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, against Orrstown, certain of its officers and/or directors, and the Bank, for the materially untrue and misleading statements and omissions contained in the Registration Statement.

3.      The "Exchange Act Class" consists of all persons or entities who purchased Orrstown common stock on the open market between March 24, 2010 and October 27, 2011, inclusive (the "Class Period"),  seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Orrstown, the Bank and certain of its officers and/or directors.

2

4.      Plaintiff, on behalf of itself and the two Classes it seeks to represent, makes the allegations contained in this Complaint upon information and belief (except as to those allegations specifically pertaining to Plaintiff and Plaintiff's counsel, which are made with personal knowledge).  Plaintiff bases its information and belief upon the investigation conducted by Plaintiff's counsel, which included a review of the U.S. Securities and Exchange Commission ("SEC") filings by Orrstown, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

5.      In the Registration Statement and during the Class Period, Orrstown issued materially false and misleading statements regarding the Company's lending practices and financial results.  Specifically, the Registration Statement contained misleading statements concerning the stringent nature of the Bank's credit practices and underwriting standards, the quality of its loan portfolio, and the intended use of the proceeds from the March 2010 Offering. After the Offering closed, Orrstown purposefully misled the Class about these same matters, which false statements caused Orrstown's stock to trade at artificially inflated prices during the Class Period, reaching a closing price high of $28.64 per share on April 6, 2011.

6.      It was not until the Company released financial quarterly results and a letter to investors on October 27, 2011, that the full truth about Orrstown's business was revealed. Orrstown shocked the market with news that because of its tremendous losses, it was suspending its dividend indefinitely at the direction of the federal banking regulator. In reaction to this news, on October 27, 2011, Orrstown's share price fell by $3.91 per share, or 29.6 %, to close at $9.29

3

per share on extraordinarily heavy trading volume.  Prior to this time, the Bank's stock had only experienced a similar drop in July 2011 after news of a second quarter loss was reported and the Company's outsourcing the credit review process to an independent party.  Thus, on October 27, 2011, it was the news of regulator involvement coupled with poor financial results that devastated the stock price.

7.      The truth was that, among other things: the Bank's loan portfolio consisted of risky, impaired loans; the Bank's underwriting and credit administration policies, procedures and controls were not stringent or conservative, and were wholly inadequate; the Bank's credit risk management practices were inadequate; the Bank failed to maintain internal controls and programs that would identify adequate allowances for loan and lease losses; and the Bank's management (its level of experience and oversight) was insufficient.

8.      Defendants' assurances about the quality of the Bank's management, underwriting procedures, and internal controls, that were publicly made in the March 2010 Offering and throughout the Class Period, and also on October 27, 2011 when Thomas R. Quinn, Orrstown's President and CEO announced that the Bank is still "safe and sound," were a facade. In January 2012, Orrstown reported losses for 2011 of $23 million, making it the only major publicly traded midstate-based bank to lose money in 2011, and on March 12, 2012 it revised the loss upward to $32 million. Most recently, on March 23, 2012, Orrstown announced that it had signed a consent order with the Pennsylvania Department of Banking ("Department of Banking") and a written agreement with the Federal Reserve Bank of Philadelphia ("Federal Reserve") that required Orrstown to strengthen its board oversight and risk management and rid its portfolio of bad loans.  With the March 23, 2012 announcement, the investing public was made aware of facts from which a reasonable inference can be drawn that as early as July 2010, Defendants

4

knew that the Department of Banking and the Federal Reserve were concerned about the Company's banking practices. *See infra* ¶¶ 118-121.

9.      Tellingly, within just two years of the March 2010 Offering which raised $37.5 million in capital, the Company has had to write off that same amount as complete losses and the competency of the Company's management is being evaluated by the Federal Reserve Bank and the Department of Banking (collectively the "Regulators").

10.     As a result of the foregoing, Orrstown common stock was sold in the Offering, and traded during the Class Period, at artificially inflated prices. However, once the full truth about Orrstown's practices was revealed to investors, the Company's share price dramatically declined, and Plaintiff and the other members of the Classes suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The Securities Act claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, [15 U.S.C. §§ 77k and 77o] and rules promulgated thereunder by the United States Securities and Exchange Commission ("SEC").

12.     The Exchange Act claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, [15 U.S.C. § 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

14.     Defendants named herein have sufficient minimum contacts with this District, state, and the United States so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and Section 22 of the Securities Act [15 U.S.C. § 77v] or Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants Orrstown and Orrstown Bank maintain their principal place of business in this District and the acts and practices complained of herein, including the dissemination to the public of the untrue statements of material facts, occurred in this District.

16.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

## PARTIES

### I.     Plaintiff

17.     Plaintiff SEPTA is a regional transportation authority that operates various forms of public transit serving Bucks, Chester, Delaware, Montgomery, and Philadelphia counties in Pennsylvania.  Plaintiff acquired Orrstown common stock in connection with, pursuant and/or traceable to, the Registration Statement for the March 2010 Offering, and also during the Class Period, as set forth in the certification attached hereto.   SEPTA was harmed as the result of Defendants' wrongdoing as alleged in this complaint.

### II.     Securities Act Defendants

18.     Defendant Orrstown is the holding company for its wholly owned subsidiary Orrstown Bank (the "Bank").  Orrstown is incorporated in Pennsylvania, and its executive offices are located at 77 East Kings Street, Shippensburg, Pennsylvania.  The Company was organized on November 17, 1987, for the purpose of acquiring the Bank.  On March 8, 1988, in a bank holding company reorganization transaction, the Company acquired 100% ownership of the

Bank.  Orrstown's primary activity consists of owning and supervising the Bank.  The Bank's five officers conduct the day-to-day management of the Company, and they are the Company's only employees.  As a holding company, Orrstown's operating revenues and net income are derived primarily from the Bank through the payment of dividends.  As of March 31, 2012, Orrstown had total assets of $1.45 billion, total shareholders' equity of $119.2 million, and total deposits of approximately $1.2 billion.

19.     Defendant Bank, a state-chartered Pennsylvania bank, was founded in 1919 and provides community banking and bank related services in South Central Pennsylvania.  The Bank has twenty-one branches, concentrated in Cumberland, Franklin and Perry Counties as well as one branch in Washington County, Maryland.  The Bank's commercial banking and trust business involve accepting demand, time and savings deposits, and granting loans.  The Bank grants commercial, residential, consumer and agribusiness loans within its geographic market.  Approximately 74% of the Bank's loan portfolio is comprised of commercial loans with the remaining portion segmented as follows: 13% residential mortgages; 12% home equity loans and lines; and 1% consumer loans.

20.     Defendant Thomas R. Quinn, Jr. is, and during the Class Period was, the President and Chief Executive officer of the Company and the Bank.  Quinn joined the Bank in May 2009, and, at all times material to the issues raised in the complaint, he served on the Enterprise Risk Management Committee which was formed in 2009.

21.     Defendant Bradley S. Everly was during the Class Period the Executive Vice President, Chief Executive Officer and Chief Financial Officer of the Bank.  He started with the Bank in 1997 and recently resigned on May 16, 2012.

7

22.    Defendant Joel R. Zullinger is, and during the Class Period, the Chairman of the Boards of Directors of the Company of the Bank.  He has been a Director since 1981, and, at all times material to the issues raised in the complaint, he served on the Enterprise Risk Management Committee which was formed in 2009.

23.    Defendant Jeffrey W. Coy is, and during the Class period was, the Vice Chairman of the Boards of Directors of the Company and the Bank.  He has been a Director since 1984, and, at all times material to the issues raised in the complaint, he served on the Enterprise Risk Management Committee which was formed in 2009.

24.    Defendant Kenneth R. Shoemaker is, and during the Class Period was, President Emeritus of the Bank and a Director and the Secretary of the Company and Bank.  Shoemaker has been a director since 1986, and, at all times material to the issues raised in the complaint, he served on the Enterprise Risk Management Committee which was formed in 2009.  He also served as President and Chief Executive Officer of the Company and Bank from 1987 to his retirement in May 2009.

25.    Defendant Anthony F. Ceddia is, and during the Class Period was, a Director of the Company and Bank.  He has been a Director since 1996, and at the time of the March 2010 Offering was a member of the Audit committee.

26.    Defendant Mark K. Keller is, and during the Class Period was, a Director of the Company and Bank.  He has been a Director since 2008.

27.    Defendant Andrea Pugh is, and during the Class Period was, a Director of the Company and Bank.  She has been a Director since 1996, and at the time of the March 2010 Offering was a member of the Audit committee.

28.     Defendant Gregory A. Rosenberry is, and during the Class Period was, a Director of the Company and Bank.  He has been a Director since 1997.

29.     Defendant Glenn W. Snoke is, and during the Class Period was, a Director of the Company and Bank.  He has been a Director since 1999.

30.     Defendant John S. Ward is, and during the class Period was, a Director of the Company and Bank.  He has been a Director since 1999, and at the time of the March 2010 Offering was a member of the Audit committee.

31.     Defendants Quinn, Zullinger, Everly, Shoemaker, Ceddia, Coy, Keller, Pugh, Rosenberry, Snoke and Ward are referred to herein as "Individual Securities Act Defendants."

32.     Defendants Quinn, Zullinger, Shoemaker and Coy were members of the Board of Directors' Enterprise Risk Management Committee which was formed in 2009 to provide additional oversight over seven risk areas: credit, operations, transaction, liquidity, market/interest rate, legal/compliance, strategies and reputation.

33.     The Individual Securities Act Defendants, as senior executive officers and/or directors of Orrstown and the Bank, were privy to confidential, non-public information concerning the Bank's internal operations, controls and financial condition.  They had access to material and adverse non-public information which, as discussed in detail below, revealed the failures of the Bank's loan underwriting processes and the deteriorating loan portfolio.  Because of their positions, the Individual Securities Act Defendants were able to critically review the Registration Statement to ensure accuracy and adequate disclosure.

34.     Each of the Individual Securities Act Defendants signed the materially untrue and misleading Registration Statement.

### III.     Exchange Act Defendants

35.     In addition to being Securities Act Defendants, Quinn, Everly, Zullinger, Shoemaker, Coy, Orrstown and the Bank are also Exchange Act Defendants.

36.     During the Class Period, Defendants Quinn and Everly, as senior executive officers and directors of Orrstown, were privy to confidential, non-public information concerning the Bank's internal operations, controls and financial condition.  Defendants Quinn, Zullinger, Shoemaker and Coy, as members of the Enterprise Risk management Committee, were privy to confidential, non-public information concerning the bank's internal operations, controls and financial condition.  Each of these individuals had access to material and adverse non-public information which, as discussed in detail below, revealed the failures of the Bank's loan underwriting processes, the deteriorating loan portfolio, and the disproval of the regulators. Because of their positions, Quinn, Everly, Zullinger, Shoemaker and Coy were able to and did control the content and timing of the various SEC filings, corporate press releases and other public statements pertaining to the Company at the time of the offering and throughout the Class Period.

### SECURITIES ACT AND EXCHANGE ACT CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Securities Act and Exchange Act Classes.

38.     The Securities Act Class consists of all those who purchased or otherwise acquired the common stock of Orrstown pursuant, or traceable to, the Company's March 2010 Offering and/or during the Class Period and who were damaged thereby.

39.     The Exchange Act Class consists of all those who purchased or otherwise acquired Orrstown common during the Class Period, and who were damaged thereby.

40.     Excluded from the Securities Act and Exchange Act Classes are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

41.     The members of the Securities Act and Exchange Act Classes are so numerous that joinder is impracticable.  Throughout the Class Period, Orrstown common stock shares were actively traded on the NASDAQ.  As of October 27, 2011 (the last day of the Class Period), the Company had approximately 8,053,269 shares of common stock issued and outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Securities Act and Exchange Act Classes.  Record owners and other members of the Securities Act and Exchange Act Classes may be identified from records maintained by Orrstown or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Plaintiff's claims are typical of the claims of the members of the Securities Act and Exchange Act Classes as all members of each class are similarly affected by Defendants' conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Securities Act and Exchange Act Classes and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b. whether the Exchange Act Defendants participated in and pursued the common course of conduct complained of herein;

c. whether the Registration Statement issued by Orrstown included statements/omissions that were materially untrue or misleading about Orrstown's internal controls, underwriting standards, loan portfolio quality, and financial condition;

d. whether the market price of Orrstown's common stock during the Class Period was inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and,

e. the extent to which the members of the Securities Act and Exchange Act Classes have sustained damages and the proper measure of damages.

45.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by some individual Securities Act and Exchange Act class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act and Exchange Act Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SECURITIES ACT ALLEGATIONS:
## MATERIALLY UNTRUE & MISLEADING STATEMENTS AND/OR OMISSIONS
## CONTAINED IN THE OFFERING DOCUMENTS

46.    The Securities Act claims contained in this portion of the Complaint specifically exclude any allegations of knowledge or scienter, and any allegation that could be construed as

alleging fraud or intentional or reckless misconduct. The Securities Act claims are rooted exclusively in theories of strict liability and negligence.

47.     Plaintiff's Securities Act allegations stem from materially untrue and misleading statements and omissions in Orrstown's Offering Documents concerning (a) the quality of management and its oversight; (b) the quality of the Bank's underwriting standards and loan review process; (c) the quality of the Bank's loan portfolio including the percentage of non-performing loans; (d) the required levels of loan reserves; and (e) the intended purpose for the proceeds from the offering.

48.     On April 29, 2009, Orrstown was listed on the NASDAQ and shortly thereafter Defendant Quinn replaced retiring Defendant Shoemaker to serve as the Company and Bank's President, Chief Executive Officer and Director. The March 2010 Offering represented Orrstown's first offering since the Company listed on the exchange and an integral part of Quinn's purported plan to aggressively grow the Bank's geographic reach and concentration in its already established markets through an increase of mortgage services and products.

49.     In the Registration Statement, Orrstown touted its historic success as the result of a "conservative business model." The Offering Documents provided favorable financial data for the years 2007 through 2009 which the Bank leveraged to support its representation to investors that the Bank had a "strong balance sheet." After reporting record earnings in 2009, the Registration Statement portrayed the Company as "well-positioned" to move forward and, with the proceeds of the offering, to build up its cash reserves so as to seek out new growth opportunities.

50.     The March 2010 Offering was well received. On March 29, 2010, Orrstown announced that it had completed its public offering of 1,481,481 million shares of common

stock, which were sold to the public at a price of $27.00 per share to raise net proceeds (after underwriting commissions and expenses) of $37.5 million.

51.     Following the offering, the Company made a series of incomplete and delayed disclosures throughout the Class Period that, when taken together, reveal that the Offering Documents were materially false and misleading. It is only by piecing together these disclosures and having been recently apprised of the Federal Reserve and the Department of Banking's joint investigation of the Bank and the resulting enforcement actions that were announced on March 23, 2012, that Plaintiff and members of the Securities Act Class are now able to recognize that the Offering Documents were a sham.

**I.      Materially Untrue and Misleading Statements and Omissions
         Regarding the Underwriting and Loan Review Procedures**

52.     In painting the picture of a well-run, disciplined Company on the move, the Offering Documents made a series of statements about the quality of the Bank's underwriting standards, credit review policies and internal controls:

> We view ***sound credit practices and stringent underwriting standards*** as an integral component of our continued success. In September 2009, we created the position of Chief Credit Officer to enhance our processes and controls, as well as clearly delineate independence between sales and credit. Form 424B Prospectus Supplement, filed 3/24/10, at 2 (emphasis added).

> Our ability to successfully grow will also depend on the continued availability of loan opportunities that meet ***our stringent underwriting standards***. Form 424B Prospectus Supplement, filed 3/24/10, at 13 (emphasis added).

> ***Conservative lending practices*** have resulted in strong asset quality metrics in a difficult credit environment. . . Form 8-K "Roadshow" Powerpoint Presentation, filed 3/16/10, at 4 (emphasis added).

> ***Global credit oversight*** by the Bank's Credit Administration Committee, which is comprised of ***four independent directors***.

14

Form 8-K "Roadshow" Powerpoint Presentation, filed 3/16/10, at 19 (emphasis added).

The Bank follows *conservative lending practices and continues to carry a high quality loan portfolio* with no unusual or undue concentrations of credit.  Form 10-K 2009 Annual Report, at 30 (emphasis added).

53.    The Offering Documents boasted the Company's low percentage of non-performing loans while highlighting its conservative approach to allocating sufficient loan reserves:

While certain borrowers have come under stress due to the economic conditions affecting our markets, we believe that this *disciplined approach to lending results in peer-leading asset quality metrics even in a difficult environment.* As of December 31, 2009, our non-performing assets to total assets ratio was 0.44%. Additionally, *we have proactively moved to address any problem credits and ensure that we are adequately reserved for any potential losses.* Form 424B Prospectus Supplement, filed 3/24/2010, at 2 (emphasis added).

In recognition of sustained loan growth and a continuation of its *historically prudent approach*, the Company added $3,600,000 to its loan loss reserve in the fourth quarter.  Form 8-K 4Q 2009 Operating Results, filed 1/28/2010, at 1 (emphasis added).

Commenting on the Bank's loan portfolio Mr. Quinn stated, "Our ratio of non-performing loans to end of period loans of 1.18% and net charge offs to average loans of 0.11% are well below peers and demonstrate our *continued focus on credit quality risk mitigation*."   Form 8-K 4Q 2009 Operating Results, filed 1/28/2010, at 1 (emphasis added).

The *quality of the Corporation's asset structure continues to be strong. A substantial amount of time is devoted by management to overseeing* the investment of funds in loans and securities and the formulation of policies directed toward the profitability and *minimization of risk associated* with such investments. Form 10-Q 4Q 2009, filed 3/15/2010, at 29 (emphasis added).

The Offering Documents also stated that Orrstown's "[e]mphasis on credit quality, return to shareholders, solid financial performance, and deliver[y] [of] peer-group leading results" is a

"highlight" for the investing public to consider.   Form 8-K "Roadshow" Powerpoint Presentation, filed 3/16/2010, at 28.

54.     In truth, however, the foregoing statements, were materially untrue or misleading when made or omitted to state material facts necessary to make the statements made not misleading because, *inter alia,*

> a.  by the end of 2009 and prior to the filing of the Offering Documents, the Bank's commercial loan portfolio had significant risk that required an internal review which resulted in the Company reporting in May of 2010 that it was reclassifying $23 million in loans as non-performing and that its loan loss ratio went from .8% for the year prior to 1.34%;
>
> b.  the loan review process, which included board oversight, was not for all loans but only for 60% of its loans such that the Company was omitting from review additional, highly risky loans;
>
> c.  the Company changed its criteria for classifying the performance of a loan so that the Company could delay reporting loans that were clearly non-performing until well after the March 2010 Offering; and
>
> d.  the Company's loan review process and personnel in place before and during the March 2010 Offering were inadequate in fairly assessing the credit worthiness of a borrower which required the Company to later outsource the loan and credit reviews to an independent party.

55.     The inadequacies of the Company's underwriting and loan review procedures were revealed in small doses to investors at different times throughout the Class Period and were counterbalanced by Management's assurances of stringent credit procedures and proactive

practices to ensure the Bank's vitality.   Such assurances include those made by Defendant

Quinn:

> I am pleased to announce that Orrstown Financial Services, Inc. has closed the ***first quarter of 2010 with exceptional results***. . . . We remain mindful of the economic challenges facing our customers and ***continued to add to our loan loss provision, which is in line with our conservative business model.***  First Quarter Report, "The Road Ahead: Paving the Way to Greater Success," dated 3/31/2010, at 1 (emphasis added).

> ***The momentum created with record earnings in 2009 and a strong first quarter 2010 have continued through the midpoint of the year.*** Indicators of the financial strength of our Company this quarter include: increasing our dividend; improving earnings 13% vs. the same quarter last year; and significantly reducing nonperforming assets since the first quarter of 2010. In addition to the financial achievements realized this quarter, we were also named the 39th best performing community bank in the nation by US Banker magazine. . . . Orrstown Bank has also been recognized locally as one of the 50 Fastest Growing Companies by the Central Penn Business Journal. . . . Our financial performance, local and national recognition are a testament to the hard work and support of our Board of Directors, Executive Management Team, and nearly 300 dedicated team members. ***Our solid core earnings position us well for the second half of 2010.*** Form 8-K 2Q2010 Operating Results, filed on 7/22/2010, at 1 (emphasis added).

> ***Despite a tough banking environment, we have been able to produce consistent operating results, bolster our reserves and capital, and continue our efforts in addressing asset quality.*** This forward momentum will continue to serve us well during the remainder of 2010 and into 2011.  Form 8-K 3Q2010 Operating Results, filed on 10/28/2010, at 1 (emphasis added).

> Our performance in 2010 resulted in the best earnings (net income up 24%) ever in the 91-year history of the organization.  Of course ***2010 was a challenging year for all community banks, but we nevertheless produced strong results*** which will be substantially above local peer levels once the year-end results are compiled. Additionally, ***we bolstered our reserves, added meaningfully to capital and were intensively focused on asset quality, which we believed remains quite solid***.  Form 8-K 4Q2010 Operating Results, filed on 1/27/2011, at 1 (emphasis added).

> ***We are pleased to have increased our dividend and still retain capital from earnings, while continuing to conservatively add to reserve coverage of problem assets.*** Total nonperforming assets continue to decline and were down 6.5% at March 31 from end of year levels. ***We believe our capital position is quite robust and should provide us with a significant platform to enhance our strong organic growth.*** Form 8-K 1Q2011 Operating Results, filed on 4/28/2011, at 1 (emphasis added).

The Company also exclusively laid blame for loan impairments on a "persistent soft economy," especially in the real estate market along the Interstate-81 footprint from the Harrisburg, Pennsylvania area south to Hagerstown, Maryland where the Bank had extended its commercial loans. Indeed, analyst reports and the market daily trading records reflect that the Company's disclosures were not of a nature to drive down Orrstown's share price until the end of the Class Period. *See infra* ¶¶ 60-66 (Part III).

## II.    Materially Untrue and Misleading Statements and Omissions Regarding the Effectiveness of Management

56.    The Offering Documents "highlighted" the quality of management as a compelling "rationale" for investors to purchase Orrstown stock:

> ***Deep and experienced management team*** with ***strong*** community ties, ***operational ability and proven track record*** of acquisition integration. Form 8-K "Roadshow" Powerpoint Presentation, filed 3/16/10, at 4, 7 (emphasis added).

> We view the current market environment as being full of opportunity for those institutions with a ***strong balance sheet <u>and</u> management***. Form 424B Prospectus Supplement, filed 3/24/10, at S-2 (emphasis added).

The Offering Documents also stated that management fostered a ***"disciplined credit culture,"*** Form 8-K "Roadshow" Powerpoint Presentation, filed 3/16/10, at 19 (emphasis added), and exercised significant oversight:

> ***Members of senior management are involved heavily*** in customer interaction and business development and ***play an integral role*** in

18

promoting Orrstown's brand and capabilities.   Form 424B
Prospectus Supplement, filed 3/24/10, at S-2 (emphasis added).

57.    In truth, however, the foregoing statements, were materially untrue or misleading
when made or omitted to state material facts necessary to make the statements made not
misleading because, *inter alia*, senior management did not implement internal controls and
processes that would have prevented the Bank from (a) extending risky commercial loans
throughout 2009 and 2010, resulting in a 7% growth in their commercial loan portfolio and
further concentrating the Company's overall loan portfolio in commercial loans and (b)
periodically stress testing all existing commercial loans to ensure that the Company's financial
reporting accurately reflected the amount of non-performing loans and loan loss reserves which
would have indicated to investors the riskiness of the Bank's loan portfolio and potential for net-
charge-offs.

58.    Management's failures were revealed in small doses to investors at different times
throughout the Class Period and were counterbalanced by Management's assurances of proactive
practices to ensure the Bank's vitality with blame placed for loan impairments on a "persistent
soft economy." *See supra* ¶ 55 (Quinn's assurances).

59.    The disclosures made in late July 2011 and on October 27, 2011, however,
revealed systemic problems that management was incapable of fixing because (a) management
had been intimately involved in a lending relationship that resulted in a $8.5 million charge-off;
(b) the Company required assistance of an independent third-party to provide credit review "to
mitigate the Company's risk of loss" and (b) regulators were forced to intervene to prevent the
Company from engaging in unsafe and unsound banking practices. *See infra* ¶¶ 60-66 (Part III).

19

III.    **Defendants' Delayed and Incomplete Disclosures Render
        the Offering Documents Materially False and Misleading**

60.    The Offering Documents were misleading and untrue.  This became apparent after three revealing disclosures were made within three months of each other in 2011.

61.    After the market closed on Thursday, July 14, 2011, the Company filed a Form 8-K to announce a "material impairment" in that the Company had been notified by its bankrupted-borrower Yorktown Funding, Inc. ("Yorktown") that, because the Bank is the holder of an unsecured nonpriority claim for pre-petition indebtedness, Yorktown would not make any debt service payments during the pendency of Yorktown's Chapter 11 case.  As a result, the Company determined that Yorktown was a total loss and charged off $8,598,216.  On this news, the stock price dropped by 23% to close on Monday, July 18, 2011 at $20.06.

62.    The Company's lending relationship with Yorktown highlighted to investors fundamental flaws and lapses in the Company's underwriting and management-led loan review process that existed prior to and during the March 2010 Offering. As described in the Offering Documents, the "credit approval process is structured in a manner such that all major decisions regarding loans need to be ***approved by a committee of senior management and board members***." Form 424B Prospectus Supplement, filed 3/24/10, at S-2 (emphasis added).  The loan review process had the following levels of oversight:

   a.  Oversight and management of the process by the Chief Credit Officer;

   b.  No individual lender had a maximum lending authority exceeding $350,000;

   c.  The Chief Commercial Officer had a maximum lending authority limit of $500,000;

   d.  The Chief Credit Officer had a maximum lending authority limit of $1 million with no single credit over $500,000;

> e.  All other loans had to be reviewed and ratified by the Loan Committee consisting
> of the Chief Executive Officer, Chief Credit Officer, Chief Commercial Officer,
> Chief Financial Officer and two directors; and
>
> f.  The Credit Administration Committee, consisting of four independent directors,
> provides ongoing credit oversight and annually reviews all loan relationships with
> an aggregate committed exposure of greater than or equal to $750,000.

*Id.*  The credit extensions made to Yorktown reached $9.5 million by 2009 and were of a size that triggered review by the Chief Credit Officer, the Loan Committee, and the Chief Administration Committee.  Despite this level of management involvement and purported oversight, the Securities Act Defendants permitted continued, escalating credit extensions to Yorktown, a financier for residential real estate developers, during a time when other commercial banks had stopped extending precisely those types of loans.  The Company's lending to Yorktown belies statements made in the Offering Documents as to the Company's stringent credit oversight and conservative lending practices.

63.  Following the Yorktown charge-off news, on Thursday, July 28, 2011, the Company filed its Form 8-K providing 2Q2011 operating results.  The results revealed that for the first time in the Company's history it was posting a quarterly loss. The Company also admitted that the Bank's underwriting and review departments had been expanded to include additional personnel but most notably that the Company had to ***"outsource[] certain credit review responsibilities in order to mitigate the Company's risk of loss, and to reduce its level of nonaccrual and classified loan."***  This news was more fully reported with the filing of the 10Q on August 9, 2011.  Between the time the Yorktown announcement was digested by the

investing public and the release of the 2Q2011 10Q, Orrstown's stock had sunk almost 11% to a $17.87 share price and continued on a downward trend.

64.     Then after the market closed on October 26, 2011, the Company's filed an 8-K announcing 3Q2011 operating results.  The Company reported that the Federal Reserve refused to approve the Company's payment of a cash quarterly dividend.  The Federal Reserve took this step to prevent the Company from engaging in an unsafe and unsound banking practice which would further deplete the Company's capital base.  In addition, the 8-K reported that the Company had $9.4 million of charge-offs in that quarter alone and that there were "decreases in asset quality ratios, including elevated levels of nonaccrual loans, restructured loans and delinquencies."  Form 8-K 3Q2011 Operating Results, filed 10/26/2011, at 2.  On October 27, 2011, the Company filed an 8-K with a letter from Defendant Quinn to Orrstown's shareholders in which he told shareholders that despite the second quarter loss and the federal regulator's intervention, the Bank continued to be "safe and sound."  The market reacted swiftly to these two filings, and the share price dropped by approximately 30% to close at $9.20 a share.

65.     As illustrated by the stock price chart below, the disclosures made in July and October 2011 concerning the Federal Reserve's intervention resonated with investors, as did the fact that the Company needed to hire an independent third party to take over its loan review because the Company's management-led internal processes had failed the Company.



66.    The disclosures made available to the investing public in July and October 2011,

*see supra*, evidenced that the Offering Documents were misleading and untrue.

**SECURITIES ACT CLAIMS FOR RELEIF**

**COUNT I**
**(For Violations of § 11 of the Securities Act**
**Against Orrstown and the Bank)**

67.    This Securities Act claim expressly excludes and disclaims any allegation that

could be construed as alleging fraud or intentional or reckless misconduct.

68.     As result of each of the statements and omissions alleged above in the Section entitled "Securities Act Allegations: Materially Untrue & Misleading Statements and/or Omissions Contained in the Offering Documents," the Registration Statement was materially untrue and/or misleading and omitted to state other facts necessary to make the statements made not misleading.

69.     Orrstown and the Bank are strictly liable for the material misstatements and omissions in the Registration Statement issued by them.

70.     Less than three years elapsed from the time the securities upon which this Count is bought were sold to the public to the time of the filing of this action.  Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

71.     Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

72.     By reason of the conduct herein alleged, Orrstown and the Bank violated Section 11 of the Securities Act.

**COUNT II**
**(For Violations of § 11 of the Securities Act Against**
**the Individual Securities Act Defendants)**

73.     This Securities Act claim expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

74.     Each of the Individual Securities Act Defendants signed the Registration Statement.

75.     The Individual Securities Act Defendants owed to the purchasers of the stock, including Plaintiff and the members of the Securities Act Class, the duty to make a reasonable

and diligent investigation of the statements contained in the Registration Statement at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

76.     The Individual Securities Act Defendants each failed to make a reasonable and diligent investigation and/or did not possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.  The Individual Securities Act Defendants named in this Count acted negligently in issuing the Registration Statement which made materially false and misleading written statements to the investing public and misrepresented or failed to disclose, *inter alia*, the facts set forth above.

77.     Plaintiffs and the Securities Act Class purchased shares of Orrstown pursuant to the March 2010 Offering and were damaged when revelations about Orrstown's risky loan portfolio  and underwriting standards were revealed and resulted in the stock price dropping as alleged herein.

78.     Less than three years elapsed from the time the securities upon which this Count is brought were sold to the public to the time of the filing of this action.  Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

79.     Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

80.     By reason of the conduct herein alleged, the Individual Securities Defendants violated Section 11 of the Securities Act.

## COUNT III
### (For Violations of Section 12(a)(2) of the Securities Act Against All Defendants)

81.     This Securities Act claim expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

82.     The Exchange Act Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Registration Statement.

83.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  Defendants' actions of solicitation include participating in the preparation and dissemination of the materially untrue and misleading Registration Statement.

84.     Defendants owed to the purchasers of Orrstown's common stock, including Plaintiff and other members of the Securities Act Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

85.     The Securities Act Defendants should have known, in the exercise of reasonable care, of the misstatements and omissions contained in the Registration Statement.

86.     Plaintiff and other members of the Securities Act Class purchased or otherwise acquired Orrstown's securities pursuant to and/or traceable to the defective Registration Statement.  Plaintiff and members of the Securities Act Class did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

87.     Plaintiffs, individually and representatively, hereby offers to tender to the Defendants that stock which Plaintiffs and other Securities Act Class members continue to own,

26

on behalf of all members of the Securities Act Class who continue to own such stock, in return for the consideration paid for the stock together with interest thereon. Securities Act Class members who have sold their Orrstown stock are entitled to rescissory damages.

88.     By reason of the conduct alleged herein, the Securities Act Defendants violated, and/or controlled, a person who violated § 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Securities Act Class who hold Orrstown securities purchased in the March 2010 Offering have the right to rescind and recover the consideration paid for their Orrstown securities, and hereby elect to rescind and tender their Orrstown securities to the Defendant sued herein. Plaintiffs and Securities Act Class members who have sold their Orrstown securities are entitled to recissory damages.

89.     Less than three years elapsed from the time the securities upon which this Count is bought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

90.     Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

91.     By reason of the conduct herein alleged, the Securities Act Defendants violated Section 12(a)(2) of the Securities Act.

**COUNT IV**
**(For Violations of § 15 of the Securities Act Against the**
**Individual Securities Act Defendants)**

92.     This Securities Act claim expressly excludes and disclaims any allegations that could be construed as alleging fraud or intentional or reckless misconduct.

27

93.     This claim is brought against the Individual Securities Act Defendants, each of whom was a controlling person of Orrstown by virtue of their position as directors and/or senior officers of the Company and Bank, by the Class of persons and entities who purchased Orrstown stock pursuant or traceable to the Registration Statement for the March 2010 Offering.

94.     The Company and Bank are liable under Section 11 of the Securities Act as set forth above in Count I.

95.     The Individual Securities Act Defendants by virtue of their position as directors and/or senior offices of the Company and Bank had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in the unlawful acts and conduct alleged in Count I.

96.     The Individual Securities Act Defendants were culpable participants in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and having otherwise participated in the process that allowed the March 2010 Offering to be successfully completed.  These Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company as well as the contents of the Registration Statement at the time of the March 2010 Offering.   These Defendants should have been provided with unlimited access to copies of the Registration Statement and, therefore, had the ability to either prevent issuance of the Registration Statement or cause it to be corrected.

97.     For their failures to issue a materially true, complete and non-misleading Registration Statement, the Individual Securities Act Defendants are liable under Section 15 of the Securities Act for the Company's primary violation of Section 11 of the Securities Act.

98.     Plaintiff and the Securities Act Class were damaged when they purchased shares of Orrstown in the March 2010 Offering and harmed when Orrstown's shares dropped as a result of the truth about the status of Orrstown's inadequate internal controls and underwriting standards, impaired loan portfolio, and deteriorating financial condition as a result of increased loan loss reserves and charge-offs.

## EXCHANGE ACT ALLEGATIONS:
## FRAUDULENT CONDUCT AND COURSE OF BUSINESS

99.     The Exchange Act Defendants are liable for: (1) making false statements; or (2) failing to disclose adverse facts know by them about Orrstown.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Orrstown common stock on the open market was a success, as it: (1) deceived the investing public regarding Orrstown's internal controls, underwriting standards, loan portfolio, and financial condition; (2) artificially inflated the prices of Orrstown common stock; and (3) caused the Exchange Act Class to purchase Orrstown at inflated prices.

100.    The Exchange Act Defendants maintained and perpetuated the artifice of a healthy, robust Company that was smartly growing by filing with the SEC false quarterly reports, press materials and marketing presentation materials throughout 2010 and mid-2011.

101.    In connection with the March 2010 Offering, the Exchange Act Defendants "highlighted" the quality of management as a compelling "rationale" for the public to invest in Orrstown:

> ***Deep and experienced management team*** with ***strong*** community ties, ***operational ability and proven track record*** of acquisition integration.  Form 8-K "Roadshow" Powerpoint Presentation, filed 3/16/10, at 4, 7 (emphasis added).

> We view the current market environment as being full of opportunity for those institutions with a ***strong balance sheet <u>and</u> management***. Form 424B Prospectus Supplement, filed 3/24/10, at S-2 (emphasis added).

The Offering Documents also stated that management fostered a ***"disciplined credit culture,"*** Form 8-K "Roadshow" Powerpoint Presentation, filed 3/16/10, at 19 (emphasis added), and exercised significant oversight:

> ***Members of senior management are involved heavily*** in customer interaction and business development and ***play an integral role*** in promoting Orrstown's brand and capabilities.   Form 424B Prospectus Supplement, filed 3/24/10, at S-2 (emphasis added).

102.    The Exchange Act Defendants made statements touting the purported quality of the Bank's underwriting standards, credit review policies and internal controls:

> We view ***sound credit practices and stringent underwriting standards*** as an integral component of our continued success. In September 2009, we created the position of Chief Credit Officer to enhance our processes and controls, as well as clearly delineate independence between sales and credit. Form 424B Prospectus Supplement, filed 3/24/10, at 2 (emphasis added).

> Our ability to successfully grow will also depend on the continued availability of loan opportunities that meet ***our stringent underwriting standards***.  Form 424B Prospectus Supplement, filed 3/24/10, at 13 (emphasis added).

> ***Conservative lending practices*** have resulted in strong asset quality metrics in a difficult credit environment. . . Form 8-K "Roadshow" Powerpoint Presentation, filed 3/16/10, at 4 (emphasis added).

> ***Global credit oversight*** by the Bank's Credit Administration Committee, which is comprised of ***four independent directors***. Form 8-K "Roadshow" Powerpoint Presentation, filed 3/16/10, at 19 (emphasis added).

> The Bank follows ***conservative lending practices and continues to carry a high quality loan portfolio*** with no unusual or undue

30

concentrations of credit.  Form 10-K 2009 Annual Report, filed 3/15/2010 at 30 (emphasis added).

103.   Similarly, the Exchange Act Defendants made statements focusing investors on the Company's purported low percentage of non-performing loans while highlighting management's conservative approach to allocating sufficient loan reserves:

> While certain borrowers have come under stress due to the economic conditions affecting our markets, we believe that this *disciplined approach to lending results in peer-leading asset quality metrics even in a difficult environment.* As of December 31, 2009, our non-performing assets to total assets ratio was 0.44%. Additionally, *we have proactively moved to address any problem credits and ensure that we are adequately reserved for any potential losses.* Form 424B Prospectus Supplement, filed 3/24/2010, at 2 (emphasis added).

> In recognition of sustained loan growth and a continuation of its *historically prudent approach*, the Company added $3,600,000 to its loan loss reserve in the fourth quarter.  Form 8-K 4Q 2009 Operating Results, filed 1/28/2010, at 1 (emphasis added).

> Commenting on the Bank's loan portfolio Mr. Quinn stated, "Our ratio of non-performing loans to end of period loans of 1.18% and net charge offs to average loans of 0.11% are well below peers and demonstrate our *continued focus on credit quality risk mitigation.*"   Form 8-K 4Q 2009 Operating Results, filed 1/28/2010, at 1 (emphasis added).

> The *quality of the Corporation's asset structure continues to be strong. A substantial amount of time is devoted by management to overseeing* the investment of funds in loans and securities and the formulation of policies directed toward the profitability and *minimization of risk associated* with such investments. Form 10-Q 4Q 2009, filed 3/15/2010, at 29 (emphasis added).

104.   The Exchange Act Defendants told the investing public that the Company's "[e]mphasis on *credit quality*, return to shareholders, solid financial performance, and deliver[y] [of] *peer-group leading results*" is a "highlight" for them to consider.  Form 8-K "Roadshow" Powerpoint Presentation, filed 3/16/2010, at 28 (emphasis added).

105.    At the May 6, 2010 annual shareholder meeting, Defendant Quinn told investors that the Company's conservative practices would continue even though Quinn was aggressively pushing the Bank to extend more loans:

> We will continue our trend of strong financial performance mixed with ***conservative lending practices***.
>
> We will continue to invest in our business with ***responsible growth*** as a byproduct.

Form 8-K Annual Slide Presentation, filed 5/5/2010, at 65 (emphasis added).

106.    Defendant Quinn's theme continued into November 2010, when he spoke at the "2010 East Coast Financial Services Conference" hosted by Sandler O'Neill + Partners L.P. who was one of two underwriters on the March 2010 Offering.

107.    On November 10 and 11, 2010, Defendant Quinn repeated statements made in March 2010 to tell investment managers and other financial services providers that when considering whether to invest in Orrstown, there are ***"compelling investment considerations"*** because at Orrstown, there is an ***"emphasis on credit quality, return to shareholders, solid financial performance, and delivering peer-group leading results."*** Form 8-K Presentation, filed on 11/10/10, at 24 (emphasis added).

108.    Defendant Quinn also represented to the investing public that the Company's "[e]mphasis on growing mortgage business . . . resulted in 11% increase in total volume from $78 million 1Q-3Q '09 to $87 million 1Q-3Q '10." Form 8-K Presentation, filed on 11/10/10, at 6 (emphasis added).

109.    As reported in the 2010 Annual Report, to accomplish this mortgage growth and lending to homeowners, the Bank launched three new mortgage products and expanded loan staff and technologies.  Specifically, the Bank implemented a new technology system that allows

customers to apply for mortgages electronically which purportedly creates efficiency, speed, and simplifies the process.  The 2010 Annual Report states:

> During 2010, we implemented a centralized consumer underwriting solution, which enables us to *process loans more efficiently, providing our customers with faster turnaround times*. As a result, we increased our mortgage origination sales force and plan to add additional talent in 2011. Our team is supported by a state of the art system that enables them to take applications at the customer's home or business via laptop. Additionally, we added several new mortgage products including Federal Home Administration (FHA), Veterans Administration (VA) and USDA Guaranteed Rural Housing programs. *During 2010, customers now have the ability to apply for mortgages electronically. Consumer loan pre-approvals are instant, and most loan decisions are made within 24 hours.* After approval, the entire process is simplified and expedited, enabling Orrstown Bank to handle a much larger volume of lending without significant increases in support staff.

Form 10-K 2010 Annual Report, filed on 3/14/2011, at 4 (emphasis added).

110.    The Company's push to generate more loans had implications on the underwriting process.  As noted, "loan decisions are made within 24 hours."  Despite this condensed review period, the Company reported no new process that ensured underwriting compliance.  *See* Form 10-K 2010 Annual Report, filed on 3/14/2011, at 4 (emphasis added).

111.    To the contrary, the Company lowered one of the underwriting benchmarks for determining credit worthiness and risk.  In 2009, for home equity loans, home equity lines of credit and other consumer loans which are secured by the consumer's residence, the Company required a loan-to-value (LTV) of no greater than 80% of the value of the secured real estate. However, in 2010, Orrstown raised the LTV to 90%.  *Compare* Form 10-K 2009 Annual Report, filed on 3/15/2010, at 4 *with* Form 10-K 2010 Annual Report, filed on 3/11/2011, at 4.

112.    Further, as for the Bank's commercial loan portfolio which makes up 75% of the Bank's entire portfolio, $259,000 was the average value for commercial loans originated in 2010. This meant that, per the Company's loan level review process, these loans were extended without any oversight by the Chief Credit Officer, the Loan Committee, and the Chief Administration Committee.  Form 10-K 2010 Annual Report, filed on 3/11/2011, at 4.

113.    In February 2011 and March 2011, Defendant Quinn spoke at two different investment conferences for investment managers and other financial services providers were present.  Again, Defendant Quinn "highlighted" Orrstown's *"emphasis on credit quality"* and *"emphasis on growing mortgages."*  Form 8K Presentation, filed 2/2/11, at 7, 24; Form 8-K, Presentation, filed 3/2/2011, at 7, 24 (emphasis added)

114.    On February 10, 2011, Defendant Quinn continued to tout the Company's success: "Over the past several years our Company has seen remarkable results and experienced significant growth.  We recently announced the highest earnings ever in the history of the organization and also reported that we surpassed the $1.5 billion asset mark for the year ending December 31, 2010."  Form 8-K Press Release, filed on 2/10/2011.

115.    The Company's report of "significant growth" in 2010 was accompanied by an increase in non-performing loans.  This increase, which was at its high-water mark in the 1Q2010, actually declined in subsequent 2010 quarters, providing investors with financial data reassurance that the Company was competently managing the credit risks of its portfolio.

116.    In reporting on the credit quality of its loans in 2010 and then throughout the Class Period, the Company repeatedly assured investors that the "*Company continues to be diligent in its handling of nonperforming and other risk assets*" and is working to *"reduce the level of risk assets."*  Form 10-Q for 3Q2010, filed 11/5/2010, at 25 (emphasis added).  Then, in

34

reporting on the operating results of 4Q2010, Defendant Quinn stated: "[W]e bolstered our services, added meaningfully to capital and were *intensively focused on asset quality*, which we believe *remains quite solid*." Form 8-K Press Release, filed 1/27/2011 (emphasis added). There was no indication that the levels of non-performing loans were due to the failure of the Company's internal controls and loan review process. In fact, the 8-K Presentation Materials filed on 2/2/2011, reassured investors that there were no problems with internal controls because the Company had a *"deep and experienced management team."* 8-K Powerpoint Presentation Materials, filed 2/2/2011, at 24. As a result, throughout the Class Period these assurances caused Orrstown to trade at artificially inflated prices.

117.    One month later, the Exchange Act Defendants repeated the same statements made on February 2, 2011. *Compare* 8-K Presentation Materials, filed 2/2/2011 *with* 8-K Presentation Materials, filed on 3/1/2011. The Exchange Act Defendants represented to a conference of investment managers and the investing public that, when compared against its peers, the Company was performing well: it had *"excellent return ratios,"* had *"reduced"* non-performing loans and assets while *"growing"* both its assets and deposits. 8-K Presentation Materials, filed on 3/1/2011, at 5, 10, 15-16, 23 (emphasis added). The Exchange Act Defendants also stated that the Bank continued to place an *"emphasis on credit quality, return to shareholders, solid financial performance, and delivering peer-group leading results." Id.* at 24 (emphasis added).

118.    Although known by the Company but unknown by the market, at the precise time that the Exchange Act Defendants were touting the Company's financial health and credit practices in March 2011, the Bank's primary regulators – the Federal Reserve Bank and the

Department of Banking – were poised to launch a joint investigation into the Company's banking practices.

119.    The Regulators officially kicked-off their non-public investigation on March 31, 2011. The Regulators refer to their investigation as the Joint Report of Examination by the Bureau and the Federal Reserve (the "Joint Examination").

120.    The Joint Examination scrutinized every aspect of the Company's management, internal controls, underwriting and lending practices by examining, *inter alia*, (i) the board's supervision of the Bank's major operations, (ii) the adequacy of the Bank's management structure and the competency of senior officers; (iii) efficacy of the Bank's credit risk management practices; (iv) timeliness of the Bank's loan portfolio reports submitted to the board; (v) efficacy of the Bank's loan underwriting and credit administration procedures; (vi) conformance of appraisals with generally accepted appraisal standards; (vii) efficacy of the Bank's loan workout process; (viii) reliability of the Bank's loan grading system; and (ix) the acceptability of the Bank's volume of criticized loans, concentrations of credit, and levels of non-performing loans.  *See* 8-K Current Report, filed on 3/23/2011, at Agreement 2-8.

121.    Although the Regulators' Joint Examination did not officially commence until March 31, 2011, a reasonable inference can be drawn that the Regulators had put the Company on notice as early as July 2010 that the Company's management and banking practices raised concerns. In the 10Qs for the first two quarters of 2010, the Company made the following statement:

> ***Management is not aware of any current recommendations by regulatory authorities which, if implemented, would have a material effect on the Corporation's liquidity, capital resources or operations.***

Later 10Qs do not carry this statement, and the Company fails to explain why this statement is omitted from later 10Qs.  Now with the benefit of information acquired in March 2012, it is apparent that the omission of this "management is not aware" language reflected that Defendants had knowledge of the Regulators' concerns and intent to investigate the Bank's underwriting and other credit-related practices as early as July 2010.

122.    Despite knowledge of the Bank's lack of prudent internal controls that led to the Regulator's intense scrutiny of its banking practices and management, the Company continued to falsely portray itself throughout 2010 and 2011 as a conservative lender, diligent in assessing loan quality.  Because of these false assurances, Orrstown continued to trade throughout the Class Period at artificially inflated prices.

123.    In the Company's Form 8-K announcing operation results for 2Q2011 (filed on 7/28/2011) followed by the Form 10-Q for 2Q2011, the Company reported its first ever quarterly loss but then falsely stated: "Generally speaking, the Company follows conservative lending practices and continues to carry a high quality loan portfolio with no unusual or undue concentrations of credit."  Form 10-Q 2Q2011, filed on 8/9/11, at 41.  The Company also continued to maintain that it had "conservative underwriting standards."  *Id*. at 42.  These statements are at complete odds with contemporaneous reports that (i) the Bank would charge-off $8.5 million related to the management-approved loans to Yorktown Funding, Inc.; and (ii) the fact that in response to the Regulator's investigation, the Company retained an ***outside firm*** in July 2011 to provide ***independent loan reviews*** to fairly ascertain the quality and risk level of the Company's loan portfolio.  Form 8-K 2Q2011 Operation Results, filed on 7/28/2011.

124.    It was not until after the market closed on October 26, 2011, however, that investors were finally put on notice of the Regulator's scrutiny of the Company and concerns

that the Company was engaging in unsafe and unsound banking practices.  With the filing of the Company's Form 8-K Press Release on 3Q2011 Operating Results, the Company revealed that the Federal Reserve would not authorize the Company's declaration of a cash dividend for the quarter.  In consideration of the Company's financial condition, the Federal Reserve Board will only deny approval of a dividend if payment of such a dividend represents an unsafe or unsound practice.  By refusing to authorize Orrstown's payment of a quarterly dividend, the Federal Reserve Board concluded that it would be an unsafe or unsound practice for Orrstown to make such a declaration.

125.   On October 27, 2011, the Company quickly filed a letter with the SEC addressed to shareholders.  Form 8-K Current Report, filed on 10/27/2011.  Quinn sought to assure shareholders but in so doing he falsely stated that the Company remained "safe and sound."

126.   The market reacted to news of the Regulators' concerns with the Bank's practices and the Company's inability to declare a cash dividend.  On October 27, 2011, Orrstown's stock fell 29.6% to $9.29.

127.   On March 23, 2012, the Department of Banking and Federal Reserve issued enforcement actions against Orrstown and the Bank in the forms of a "Consent Order" and "Written Agreement" respectively.  Form 8-K Current Report, filed on 3/23/12.  These enforcement actions mirror each other.  As summarized by the Company:

> Pursuant to the Agreement, the Company and the Bank agreed to, among other things, (i) adopt and implement a plan, acceptable to the Reserve Bank, to *strengthen oversight of management and operations*; (ii) adopt and implement a plan, acceptable to the Reserve Bank, to *reduce the Bank's interest in criticized or classified assets*; (iii) adopt a plan, acceptable to the Reserve Bank, to *strengthen the Bank's credit risk management practices*; (iii) adopt and implement a program, acceptable to the Reserve Bank, for the *maintenance of an adequate allowance for loan and lease losses*; (iv) adopt and implement a written plan, acceptable to the

Reserve Bank, to *maintain sufficient capital on a consolidated basis for the Company and on a stand-alone basis for the Bank*; and (v) *revise the Bank's loan underwriting and credit administration policies*. The Bank and the Company also agreed not to declare or pay any dividend without prior approval from the Reserve Bank, and the Company agreed not to incur or increase debt or to redeem any outstanding shares without prior Reserve Bank approval.

The Agreement will continue until terminated by the Reserve Bank. . . .

Additionally, on March 22, 2010 [sic], the Board of Directors of the Bank entered into a Consent Order (the "Order") with the Commonwealth of Pennsylvania, Department of Banking, Bureau of Commercial Institutions (the "Department of Banking"). Pursuant to the Order, the Bank has agreed to, among other things, subject to review and approval by the Department of Banking, (i) adopt and implement a plan to *strengthen oversight of management and operations*; (ii) adopt and implement a plan to plan   to *reduce the Bank's interest in criticized or classified assets*; (iii) adopt and implement a program for the *maintenance of an adequate allowance for loan and lease losses*; (iv) and adopt and implement a *capital plan which include specific benchmark capital ratios to be met at each quarter end*; and (v) adopt a plan to strengthen the Bank's *credit  risk management practices*.   The Bank also agreed not to declare or pay any dividend without prior approval of the Department of Banking.

The Order will continue until terminated by the Department of Banking . . .

Additional regulatory restrictions require prior approval before appointing or changing the responsibilities of directors and senior executive officers, entering into any employment agreement or other agreement or plan providing for the payment of a "golden parachute payment" or the making of any golden parachute payment.  Also, the Bank's FDIC assessment will increase.

Thomas R. Quinn, Jr., President and Chief Executive Officer, stated "our Board of Directors and management *have already taken, and are continuing to take,* all steps necessary to ensure we have strong and fully compliant plans, policies and programs that address the items contained in these agreements. *We understand that the environment and the economy are mandating enhancements to prior industry norms. These agreements are not related to any new findings by our regulators and we believe we*

39

> *have already initiated actions and made substantial progress with*
> *many of their provisions.*

Form 8-K Current Report, filed on 3/23/12 (emphasis added).

128.    The force and effect of the Regulators' actions indicate that the Exchange Act Defendants had been engaged in unsound and unsafe practices that resulted in severe damage to the Company.

129.    These enforcement actions reveal that during the Class Period the Exchange Act Defendants were engaging in unsafe and unsound banking practices and became aware of the severity of the Regulators' concerns with respect to the Bank's banking practices and internal controls as early as July 2010 (*see supra* ¶¶ 118-121), yet they continued to make false statements about, *inter alia*, the quality of their underwriting practices and loan portfolio which caused Orrstown common stock to trade at artificially inflated prices.

130.    Each of the Exchange Act Defendants' statements that are identified above and were made throughout 2010 and 2011 concerning Orrstown's financial condition, underwriting standards, loan portfolio quality, and internal controls were materially untrue and misleading. The Exchange Act Defendants knew and/or acted with severe reckless disregard for the truth because Orrstown was not and had not been "conservatively" extending loans using "stringent underwriting standards" with proper internal oversight and the balance sheet was not "strong" because of the dramatically increasing levels of and related costs for the non-performing loans.

131.    In response to the enforcement actions and continued poor results, the market has reacted.  Orrstown's common stock is trading at approximately $8 per share, and shareholders' equity has been eroding.  Orrstown's loss in shareholders' equity is magnified by the fact that in 1Q2012, the Company charged off $36.5 million in total losses which is almost the precise amount of capital the Company raised just two years prior through the March 2010 Offering.

132.     The truth, which was known by the Defendants but concealed from the investing public during the Class Period, was as follows:

a.  the Bank's underwriting standards and procedures were neither stringent or conservative such that the Bank extended loans in 2009 through 2010 that were inherently risky with a high degree of default;

b.  at the time they were preparing the Registration Statement, Defendants knew that the intended purpose for the proceeds of the March 2010 Offering was not as simply stated in the Registration Statement but rather would be needed to maintain capital levels and offset the charge-offs and loan loss reserves related to the non-performing loans the Company would have to report in the future;

c.  as early as 1Q2010, Defendants were aware that the Company would need to record precedential increases in non-performing loans and increases in loan loss reserves which indicated failures in the Bank's underwriting processes and internal controls and jeopardized the strength of the Company's balance sheet;

d.  the Bank was aware as early as July 2010 that the Department of Banking and Federal Reserve had concerns that the Bank and Company were engaging in unsound and unsafe practices yet failed to materially alter its lending practices; and

e.  the Company was aware as early as March 31, 2011 that the Department of Banking and the Federal Reserve had formally launched their investigation into the Company's banking practices which included scrutiny of management's competency.

41

133.    As a result of Defendants' false statements, Orrstown's common stock traded at artificially inflated levels during the Class Period.  However, when the truth about Orrstown's practices was revealed to investors, the Company's share price dramatically declined.

## ADDITIONAL EXCHANGE ACT ALLEGATIONS

### I.      Loss Causation

134.    During the Class Period, as detailed therein, Defendants made false and misleading statements and engaged in a course of conduct to deceive that artificially inflated the prices of Orrstown common stock, and operated as a fraud or deceit on the Exchange Act Class by misrepresenting, throughout the Class Period, the quality of the Company's lending practices, loan portfolio and financial condition.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Orrstown's common stock fell precipitously.  As a result of the their purchases of Orrstown common stock during the Class Period, Plaintiff and the members of the Exchange Act Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

### II.     Scienter

135.    During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statement they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In so doing, Defendants committed acts, and practice and participated in a course of business that operated as a fraud or deceit on purchasers of Orrstown common stock during the Class Period.

### III.   No Safe Harbor

136.   Orrstown's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

137.   Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Orrstown who knew that the FLS was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections by Defendant expressly related to, or stated to be dependent, on those historic or present tense statements when made.

### IV.   Efficient Market

138.   At all relevant times, the market for Orrstown stock was an efficient market for the following reasons, among others:

      a.   Orrstown securities met the requirements for listing, were listed, and actively traded on the NASDAQ, a high efficient market;

      b.   As a regulated issuer, Orrstown filed period public reports with the SEC and the NASDAQ;

43

    c.  Orrstown securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

    d.  Orrstown regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

139.  As a result, the market for Orrstown securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Orrstown's stock price.  Under these circumstances, all purchasers of Orrstown securities during the Class Period suffered similar injury after the true facts were revealed.

140.  Orrstown's own filings indicate its recognition that once Orrstown's common stock began trading on the NASDAQ in April 2009, there was an efficient market for Orrstown securities which did not exist prior when Orrstown traded on the OTC Bulletin Board.  Form 10-K 2009 Annual Report, filed on 3/15/2010, at 19.

## EXCHANGE ACT CLAIMS FOR RELIEF

### COUNT V
### (For Violations of § 10(b) of the Exchange Act Against the Exchange Act Defendants: Orrstown, the Bank, Quinn and Everly)

141.  Plaintiff brings this claim on behalf of themselves and the members of the Exchange Act Class against the Exchange Act Defendants – Orrstown, the Bank, Quinn and Everly.

142.     During the Class Period, Defendants disseminated or approved the false statements specified herein, which they knew to be or recklessly disregarded as to whether they were misleading, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

143.     During the Class Period, the Exchange Act Defendants collectively and individually, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and the other members of the Exchange Act Class; (b) artificially inflate and maintain the market price of Orrstown common stock; and (c) cause Plaintiff and other members of the Class to purchase Orrstown stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Exchange Act Defendants, each took the actions set forth herein.

144.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Orrstown common stock. Plaintiff and the class would not have purchased Orrstown common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants; misleading statements.

145.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Exchange Act Class suffered damages in connection with their purchases of Orrstown common stock during the Class Period.

**COUNT VI**
**(For Violation of § 20(a) of the Exchange Act**
**Against the Quinn and Everly)**

146.     Plaintiff incorporates paragraphs 1 through 83 by reference.

45

147.   The Defendants Quinn and Everly acted as controlling persons of Orrstown within the meaning of Section 20(a) of the Exchange Act. By virtue of their power to control public statements about Orrstown, Defendants Quinn and Everly had the power and authority to control Orrstown and its employees. By reason of such conduct, Quinn and Everly are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

A.   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding Plaintiff and members of the Classes damages and interest;

C.   Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.   Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  May 25, 2012                    Respectfully submitted,

                              **CHIMICLES & TIKELLIS LLP**

                              */s/ Benjamin F. Johns*  _____
                              Nicholas E. Chimicles
                              Kimberly Donaldson Smith
                              Christina Donato Saler
                              Benjamin F. Johns
                              One Haverford Centre
                              361 West Lancaster Avenue

46

Haverford, PA 19041
Telephone: (610) 642-8500
Fax: (610) 649-3633
nick@chimicles.com
kimdonaldsonsmith@chimicles.com
cdsaler@chimicles.com
bfj@chimicles.com