**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles, Pa. Id. No. 17928
Kimberly Donaldson Smith, Pa. Id. No. 84116
Christina Donato Saler, Pa. Id. No. 92017
Benjamin F. Johns, Pa. Id. No. 201373
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Phone (610) 642-8500
Fax (610) 649-3633

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, on behalf of itself and all others similarly situated, | Civil Action No. 1:12-civ-00993 |
| Plaintiff, | **PLAINTIFF SEPTA'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| v. | **ECF** |
| ORRSTOWN FINANCIAL SERVICES, INC., ORRSTOWN BANK, ANTHONY F. CEDDIA, JEFFREY W. COY, MARK K. KELLER, ANDREA PUGH, THOMAS R. QUINN, JR., GREGORY A. ROSENBERRY, KENNETH R. SHOEMAKER, GLENN W. SNOKE, JOHN S. WARD, BRADLEY S. EVERLY, JOEL R. ZULLINGER, JEFFREY W. EMBLY, SMITH ELLIOTT KEARNS & COMPANY, LLC, SANDLER O'NEILL & PARTNERS L.P., and JANNEY MONTGOMERY SCOTT LLC, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

I.  INTRODUCTION ...................................................................... 1

II. COUNTER HISTORY OF THE CASE ................................................ 4

III. COUNTER STATEMENT OF FACTS ........................................... 6

    A.  Orrstown's Leadership ........................................................ 6

    B.  The March 2010 Offering ................................................... 9

        1.  *Risky Lending Practices Led to Impaired Commercial Portfolio* ............................... 10

        2.  *The Underwriter Defendants' Role in the March 2010 Offering* ..................................... 14

    C.  Portfolio Becomes Further Impaired After the Offering and Triggers Regulatory Intervention. ................................. 16

    D.  Regulatory Enforcement Actions Force Curative Disclosures Which Impact Orrstown's Stock Price. ........................... 19

    E.  The Auditor Defendant's Reports ..................................... 22

IV. COUNTER STATEMENT OF QUESTIONS INVOLVED ........................ 27

V.  ARGUMENT ...................................................................... 31

    A.  Plaintiff Has Standing to Assert Securities Act and Exchange Act Claims ............................. 31

    B.  Rule 12(b)(6) Standard of Review ..................................... 33

C.      Plaintiff Satisfies the PSLRA and
Rule 9(b) Pleading Standards ................................................................ 35

D.      Plaintiff Adequately Alleged Securities Act
Claims Against the Orrstown Defendants
and Underwriter Defendants. ............................................................. 38

         *1.*      *The Offering Documents Included Materially
False and Misleading Statements.* ............................................ 40

                 a.      Plaintiff Adequately Alleged Materially
Misleading Statements and Omissions
Regarding the Credit, Underwriting
and Loan Review Procedures ........................................ 42

                 b.      Plaintiff Adequately Alleged Materially
Misleading Statements and Omissions Regarding
the Effectiveness of Management .................................. 48

         *2.*      *Rule 9(b) Does Not Apply to
Plaintiff's Section 11 Claims* .................................................... 51

         *3.*      *Plaintiff Has Adequately Described
the Confidential Witnesses* ....................................................... 56

         *4.*      *The Alleged Statements Are Not Mere Puffery* ........................ 62

         *5.*      *The Bespeaks Caution Doctrine and PSLRA
Safe Harbor Do Not Provide Immunity for the
Alleged False and Misleading Statements
in the Offering Documents* ....................................................... 65

                 a.      The Bespeaks Caution Doctrine ..................................... 66

                 b.      The PSLRA's Safe Harbor Does Not Apply ................. 70

         *6.*      *Each of the Defendants Are Liable for
Violating the Securities Act* ..................................................... 75

a.      Plaintiff Adequately Alleges
Violations of Section 12(a)............................................75

b.      Plaintiff Adequately Alleges Claims Under
Section 15 against the Individual Defendants ...............75

E.      Plaintiff Adequately Alleges Exchange Act
Claims Against the Orrstown Exchange Act Defendants ..................77

1.      *Law Applicable to the Exchange Act Claims*............................79

2.      *The Amended Complaint Sufficiently
Pleads Material Misstatements and Omissions
by the Orrstown Exchange Act Defendants.* .............................81

a.      The Orrstown Exchange Act Defendants ......................81

b.      The Material Misstatements and Omissions...................84

i.      *Plaintiff Has Alleged Particularized
Facts Demonstrating that Defendants
Made False and Misleading Statements* ..............85

ii.     *Plaintiff Has Alleged that the False
and Misleading Statements Are Actionable* .........93

3.      *The Amended Complaint Adequately Pleads that
Defendants Acted with the Requisite Scienter.* .......................105

4.      *Plaintiff Adequately States a Claim for Control
Person Liability Under the Exchange Act.* ............................118

F.      Plaintiff Adequately Alleges that SEK Has Violated
the Securities Act and the Exchange Act .........................................118

1.      *Plaintiff Has Adequately Pleaded a Securities Act
Section 11 Claim Against SEK.*.............................................121

a.      SEK Concedes that Rule 9(b) Does Not Apply ...........121

b.      Plaintiff Sets Forth a *Prima Facie* Section 11 Claim with Allegations that SEK Made False Statements in the Registration Statement ....................122

c.      SEK's Misstatements Were Representations of *Facts* Not Opinions ...................................................131

2.      *Scienter is Not an Element of a Section 11 Claim* .................135

3.      *The Misstatements Were Not Based on Hindsight* .................135

4.      *SEK's Affirmative Defenses to the Section 11 Claim are Premature* .............................................................136

5.      *Plaintiff Has Adequately Alleged an Exchange Act Section 10(b) Claim Against SEK* ....................................137

a.      Plaintiff Adequately Pled Actionable Material Misstatements.................................................138

b.      The "Bespeaks Caution" Defense is Unavailing ..........144

c.      The Allegations Provide a Strong Inference that SEK Acted With the Requisite Scienter ...............147

6.      *Plaintiff Adequately Alleges Loss Causation* ..........................155

VI.    CONCLUSION...........................................................................158

# TABLE OF AUTHORITIES

## Cases

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ........................................................................105

*In re Adams Golf, Inc. Sec. Litig.,*
    381 F.3d 267 (3d Cir. 2004) ...............................................................55, 145

*In re Adams Golf Sec. Litig.,*
    (D. Del. 2001), *affm'd. and rev'd in part*,
    381 F.3d 267 (3d Cir. 2004) ...........................................................39, 42, 51

*In re Am. Bank Note Holographics, Inc. Sec. Litig.,*
    93 F. Supp. 2d 424 (S.D.N.Y. 2000) .........................................................114

*In re Ambac Fin. Grp., Inc. Sec. Litig.,*
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ............... 116, 125, 127, 128, 137, 140

*In re American Business Financial Servs., Inc. Noteholders Litig.,*
    No. 05-0232,
    2008 U.S. Dist. LEXIS 61450,
    2008 WL. 3405580 (E.D. Pa. Aug. 11, 2008) ...........................................149

*Amorosa v. Ernst & Young LLP,*
    672 F. Supp. 2d 493 (S.D.N.Y. 2009) .......................................................132

In re Anadigics, Inc., Sec. Litig.,
    2011 U.S. Dist. LEXIS 112587 (D.N.J. Sept. 30, 2011).........................71, 72

*Anwar v. Fairfield Greenwich, Ltd.,*
    728 F. Supp. 2d 372 (S.D.N.Y. 2010) .......................................................137

*Armstrong v. Am. Pallet Leasing Inc.,*
    678 F. Supp. 2d 827 (N.D. Iowa 2009) .....................................................129

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)....................................................................33, 34, 81

*In re Atlas Air Worldwide Holdings, In S.E.C. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................50, 136

*Bacon v. Stiefel Labs., Inc.,*
  677 F. Supp. 2d 1331 (S.D. Fla. 2010) .......................................................95

*Baron v. Smith,*
  285 F. Supp. 2d 96 (D. Mass. 2003),
  *aff'd*, 380 F.3d 49 (1st Cir. 2004) ...............................................................95

*Basic, Inc. v. Levinson,*
  485 U.S. 224 (1988).........................................................................40, 81, 93

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.,*
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) .......................... 94, 119, 135, 148, 149

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007).....................................................................33, 34, 80, 81

*Bily v. Arthur Young & Co.,*
  834 P.2d 745 (Cal. 1992) ...........................................................................131

*Blackstone Realty LLC v. Fed. Deposit Ins. Corp.,*
  244 F.3d 193 (1st Cir. 2001).........................................................................80

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3d Cir. N.J. 1997).........................................................*passim*

*In re Cabletron Sys., Inc.,*
  311 F.3d 11 (1st Cir. 2002).................................................76, 106, 107, 154

*Caiola v. Citibank, N.A.,*
  295 F.3d 312 (2d Cir. 2002) .........................................................................95

*Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.,*
  394 F.3d 126 (3d Cir. 2004) ...................................................................56, 62

*California Pub. Emples. Ret. Sys. v. Chubb Corp.,*
  2002 U.S. Dist. LEXIS 27189 (D.N.J. June 25, 2002)..................................62

*In re Carter-Wallace, Inc. Sec. Litig.,*
  220 F.3d 36 (2d Cir. 2000) ........................................................107

*In re Cendant Corp.,*
  60 F. Supp. 2d 354 (D.N.J. 1999)................................................76

*In re Cendant Corp. Derivative Action Litig.,*
  189 F.R.D. 117 (D.N.J. 1999) ....................................................33

*Chalverus v. Pegasystems, Inc.,*
  59 F. Supp. 2d 226 (D. Mass. 1999)..........................................112

*Chambers v. Time Warner, Inc.,*
  282 F.3d 147 (2d Cir. 2002) .......................................................80

*Chill v. General Elec. Co.,*
  101 F.3d 263 (2d Cir. 1996) ......................................................107

*Christidis v. First Pennsylvania Mortgage Trust,*
  717 F.2d 96 (3d Cir. 1983) ........................................................130

*In re Citigroup Bond Litig.,*
  723 F. Supp. 2d 568 (S.D.N.Y. 2010) ..................................46, 128

*City of Livonia Employees' Ret. Sys. v. Wyeth,*
  284 F.R.D. 173 (S.D.N.Y. 2012)..................................................32

*City of Monroe Employees Retirement System v. Bridgestone Corp.,*
  399 F.3d 651 (6th Cir. 2005) ...............................................97, 115

*City of Omaha Police & Fire Ret. Sys. v. LHC Group, Inc.,*
  2013 U.S. Dist. LEXIS 36318 (W.D. La. Mar. 15, 2013)............51

*City of Roseville Emples. Ret. Sys. v. Textron, Inc.,*
  810 F. Supp. 2d 434 (D.R.I. 2011) ............................................105

*In re Craftmatic Sec. Litig.,*
  890 F.2d 628 (3d Cir. 1989) .......................................................50

*In re Credit Suisse-AOL Sec. Litig.,*
    465 F. Supp. 2d 34 (D.Mass. 2006)............................................................104

*In re Discovery Labs. Sec. Litig.,*
    2006 U.S. Dist. LEXIS 79823 (E.D. Pa. Nov. 1, 2006) ...............................64

*In re Donald J. Trump Casino Sec. Litig.,*
    7 F.3d 357 (3d Cir. 1993) ..........................................................................146

*Dura Pharm. Inc., v. Broudo,*
    544 U.S. 336 (2005)....................................................................................155

*EP Medsystems, Inc. v. Echocath, Inc.,*
    235 F.3d 865 (3d Cir. N.J. 2000)...............................................40, 41, 68, 157

*Ehlert v. Singer,*
    245 F.3d 1313 (11th Cir. 2001) ..........................................................55, 123

*Emergent Capital Inv. Mgmt, LLC v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003) ......................................................................158

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
    235 F. Supp. 2d 549 (S.D. Tex. 2002)........................................................119

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)....................................................................................129

*Escott v. BarChris Constr. Corp.,*
    283 F. Supp. 643 (S.D.N.Y. 1968) ....................................................137, 158

*Fait v. Regions Financial Corp.,*
    655 F.3d 105 (2d Cir. 2011) ........................................................................52

*In re Fannie Mae 2008 Sec. Litig.,*
    742 F. Supp. 2d 382 (S.D.N.Y. 2010) ........................................................156

*Fecht v. Price Co.,*
    70 F.3d 1078 (9th Cir. Cal. 1995).........................................................70, 113

*First Nationwide Bank v. Gelt Funding Corp.,*
    27 F.3d 763 (2d Cir. 1994) ........................................................................157

*In re Flonase Antitrust Litig.,*
    815 F. Supp. 2d 867 (E.D. Pa. 2011) ...........................................................32

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. Pa. 2009) ..................................................................33

*Freudenberg v. ETrade Financial Corp.,*
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................................103

*Fulton Bank, N.A. v. UBS Sec., LLC,*
    2011 U.S. Dist. LEXIS 128820 (E.D. Pa. Nov. 7, 2011) ..............................37

*Gaer v. Educ. Mgmt. Corp.,*
    2011 U.S. Dist. LEXIS 153539 (W.D. Pa. Aug. 30, 2011) ....................56, 61

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000) ................................................................99, 105

*Garfield v. NDC Health Corp.,*
    466 F.3d 1255 (11th Cir. 2006) ..................................................................113

*Gebhardt v. ConAgra Foods, Inc.,*
    335 F.3d 824 (8th Cir. 2003) ........................................................................42

*Glazer Capital Mgmt., LP v. Magistri,*
    549 F.3d 736 (9th Cir. 2008) ..............................................................116, 117

*In re Global Crossing, Ltd. Sec. Litig.,*
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) ........................................................133

*Gould Elecs. v. United States,*
    220 F.3d 169 (3d Cir. 2000) ........................................................................34

*Gould v. Winstar Commc'ns Inc.,*
    692 F.3d 148 (2d Cir. 2012) ......................................................................156

*In re Grand Casinos, Inc., Sec. Litig.,*

988 F. Supp. 1273 (D. Minn. 1997) ............................................................113

*In re Hamilton Bankcorp, Inc. Sec. Litig.*,
   194 F. Supp. 2d 1353 (S.D. Fla. 2002) ......................................................112

*Harris v. Ivax Corp.*,
   182 F.3d 799 (11th Cir. 1999) ........................................................................98

*In re Health Mgmt. Inc. Sec. Litig.*,
   970 F. Supp. 192, 203 (E.D.N.Y. 1997) .....................................................112

*In re Healthsouth Corp. Sec. Litig.*,
   No. 03-1500, 2009 U.S. Dist. LEXIS 90607
   (N.D. Ala. Sept. 30, 2009) ............................................................................124

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ........................................................................113

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ........................................................................51, 54, 132

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
   2013 U.S. Dist. LEXIS 43774 (S.D.N.Y. Mar. 27, 2013) ............................66

*In re IBIS Tech. Sec. Litig.*,
   422 F. Supp. 2d 294 (D. Mass. 2006) ..........................................................114

*In re IBM Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998) ...........................................................................99

*In re IKON*,
   277 F.3d at 673 ..............................................................................................148

*Indiana Elec. Workers' Pension Fund v. Shaw Group, Inc.*,
   537 F.3d 527 (5th Cir. 2008) ........................................................................110

*Indiana State Dist. Council of Laborers and HOD Carriers Pension and
   Welfare Fund v. Omnicare, Inc.*,
   No. 12-5287, 2013 WL. 2248970 (6th Cir. May 23, 2013) ...................54, 55

*In re Initial Pub. Offering Sec. Litig.,*
383 F. Supp. 2d 566 (S.D.N.Y. 2005) ........................................................81

*In re Initial Pub. Offering Sec. Litig.,*
544 F. Supp. 2d 277 (S.D.N.Y. 2008) ......................................................155

*Institutional Investors Group v. Avaya, Inc.,*
564 F.3d 242 (3d Cir. 2009) ....................................... 57, 71, 72, 73, 98, 106

*Janus Capital Grp., Inc. v. First Derivative Traders, U.S.,*
131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011)..................................................84

*Jones v. Corus Bankshares, Inc.,*
701 F. Supp. 2d 1014 (N.D. Ill. 2010)...........................................46, 99, 102

*Joyce v. Bobcat Oil & Gas, Inc.,*
2008 U.S. Dist. LEXIS 27181 (M.D. Pa. Apr. 3, 2008).........................35, 37

*Kalnit v. Eichler,*
264 F.3d 131 (2d Cir. 2001) ......................................................................80

*Kardon v. National  Gypsum Co.,*
69 F. Supp. 512 (E.D. Pa. 1946).................................................................79

*Katz v. Image Innovations Holdings, Inc.,*
542 F. Supp. 2d 269 (S.D.N.Y. 2008) ......................................................135

*Kost v. Kozakiewicz,*
1 F.3d 176 (3d Cir. Pa. 1993) ....................................................................34

*Lattanzio v. Deloitte & Touche, LLP,*
476 F.3d 147 (2d Cir. 2007) ....................................................................133

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.,*
No. 02-C-5893, 2004 U.S. Dist. LEXIS 4659
(N.D. Ill. Mar. 19, 2004)..........................................................................155

*In re Lernout & Hauspie Sec. Litig.,*
230 F. Supp. 2d 152, 165, 168 (D. Mass. 2002) .......................................112

*Litwin v. Blackstone Group, L.P.,*
    634 F.3d 706 (2d Cir. 2011) ..........................................................................94

*Local 703, I B of T. Grocery & Food Emples. Welfare Fund,*
    2011 U.S. Dist. LEXIS 60761 (N.D. Ala. June 7, 2011) ........................45, 64

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
    513 F.3d 702 (7th Cir. Ill. 2008)..............................................71, 98, 100, 116

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.,*
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) .........................................................116

*Matrixx Initiatives, Inc. v. Siracusano,*
    131 S. Ct. 1309 (2011)..........................................................................81, 106

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.,*
    MDL No. 1658 (SRC), 2011 WL. 3444199 (D.N.J. Aug. 8, 2011)..............95

*Miss. Pub. Emps.' Ret. Sys. v. Boston Scientific Corp.,*
    523 F.3d 75 (1st Cir. 2008)............................................................................79

*In re Morgan Stanley Mortgage Pass-through Certificates Litigation,*
    592 F.3d 347 (2d Cir. 2012) ..........................................................................51

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.,*
    331 F.3d 406 (3d Cir. 2003) ..........................................................................36

*Morse v. Lower Merion Sch. Dist.,*
    132 F.3d 902 (3d Cir. 1997) ..........................................................................34

*In re NAHC, Inc. Sec. Litig.,*
    306 F.3d 1314 (3d Cir. 2002) ........................................................................42

*N.M. State Inv. Council v. Ernst & Young LLP,*
    641 F.3d 1089 (9th Cir. 2011) .....................................................................119

*In re Netbank, Inc. Securities Litigation,*
    2009 U.S. Dist. LEXIS 69030
    (N.D. Ga. Jan. 29, 2009)..............................................................................102

*In re New Century,*
      588 F. Supp. 2d 1206 (C.D. Cal. 2008)...................................................*passim*

*Novak v. Kasaks,*
      216 F.3d 300 (2d Cir. 2000) .......................................... 78, 99, 107, 111, 138

*In re Optimal U.S. Litig.,*
      837 F. Supp. 2d 244 (S.D.N.Y. 2011) .........................................................138

*Oshiver v. Levin, Fishbein, Sedran & Berman,*
      38 F.3d 1380 (3d Cir. Pa. 1994) ...................................................................33

*In re Oxford Health Plans, Inc. Sec. Litig.,*
      51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) ...................................................112

*In re PDI Sec. Litig.,*
      2005 U.S. Dist. LEXIS 18145 (D.N.J. Aug. 16, 2005) .................................57

*In re PMA Capital Corp. Sec. Litig.,*
      2005 U.S. Dist. LEXIS 15696
      (E.D. Pa. Jul. 27, 2005 )......................................................101, 102, 128, 134

*In re PMI Group, Inc.,*
      2009 U.S. Dist. LEXIS 56709 (N.D. Cal. July 1, 2009) ...............................63

*P. Schoenfeld Asset Management LLC v. Cendant Corp.,*
      142 F. Supp. 2d 589 (D.N.J. 2001)..............................................................120

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,*
      998 F.2d 1192 (3d Cir. 1993) .......................................................................34

*Phillips v. Scientific Atlanta, Inc.,*
      239 F. Supp. 2d 1351 (N.D. Ga. 2002)..........................................................66

*Phillips v. Scientific-Atlanta. Inc.,*
      374 F.3d 1015 (11th Cir. 2004) ...................................................................115

*Powers v. Eichen,*
      977 F. Supp. 1031 (S.D. Cal. 1997) ............................................................113

*In re Prudential Secs. Inc. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ................................................................66

*Quaker Oats Co.*,
129 F.3d at 317 (3d Cir.1997) ....................................................................41

*In re RAIT Fin. Trust Sec. Litig.*,
2008 U.S. Dist. LEXIS 103549 (E.D. Pa. Dec. 22, 2008) ...........................50

*Rahman v. Kid Brands, Inc.*,
2012 U.S. Dist. LEXIS 31406 (D.N.J. Mar. 8, 2012) ................................116

*In re Ramp Corp. Sec. Litig.*,
No. 05-6521, 2006 U.S. Dist. LEXIS 49579
(S.D.N.Y. July 21, 2006) ...........................................................................143

*In re Ravisent Techs., Inc. Sec. Litig.*,
2004 U.S. Dist. LEXIS 13255 (E.D. Pa. July 12, 2004) ..............................62

*Reisinger v. Luzerne County*,
712 F. Supp. 2d 332 (M.D. Pa. 2010)....................................................33, 34

*In re Reliance Sec. Litig.*,
91 F. Supp. 2d 706 (D. Del. 2000) .....................................................76, 141

*In re Rent-Way Secs. Litig.*,
209 F. Supp. 2d 493 (W.D. Pa. 2002) .........................................................57

*In re Resource Am. Sec. Litig.*,
No. CIV. 98-5446,
2000 WL. 1053861 (E.D. Pa. July 26, 2000) ............................................113

*Rolo v. City Investing Co. Liquidating Trust*,
155 F.3d 644 (3d Cir. 1998) .......................................................................37

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) .......................................................................66

*Rosky v. Farha,*
    2009 U.S. Dist. LEXIS 107531
    (M.D. Fla. Mar. 30, 2009) ..........................................................................112

*Rubke v. Capital Bancorp Ltd.,*
    551 F.3d 1156 (9th Cir. 2009) ......................................................................52

*SEC v. Carriba Air, Inc.,*
    681 F.2d 1318 (11th Cir. 1982) ....................................................................40

*In re SLM Corp. Sec. Litig.,*
    740 F. Supp. 2d 542 (S.D.N.Y. 2010) .........................................................102

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris
    Cos.,*
    75 F.3d 801 (2d Cir. 1996) ...........................................................................80

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977) .......................50, 144

*In re Scholastic Corp. Sec. Litig.,*
    252 F.3d 63 (2d Cir. 2001) .........................................................................138

*Scritchfield v. Paolo,*
    274 F. Supp. 2d 163 (D.R.I. 2003) .............................................................101

*Shalala v. Guernsey Mem. Hosp.,*
    514 U.S. 87 (1995).....................................................................................131

*Shapiro v. UJB Fin. Corp.,*
    964 F.2d 272 (3d Cir. 1992) ..................................................................95, 141

*Shaw v. Digital Equip. Corp.,*
    82 F.3d 1194 (1st Cir. 1996).........................................................................79

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994) .................................................................114, 138

*In re Sierra Wireless, Inc. Sec. Litig.,*
    482 F. Supp. 2d 365 (S.D.N.Y. 2007) ...........................................................99

*Simmons Invest., Inc. v. Conversational Computing, Inc.*,
    2011 U.S. Dist. LEXIS 15962
    (D. Kan. Feb. 17, 2011 ) ............................................................................ 104

*Sloman v. Presstek, Inc.*,
    No. 06-cv-377-JD,
    2007 DNH 115 (D.N.H. 2007) ..................................................................... 111

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
    604 F. Supp. 2d 332 (D. Mass. 2009) ............................................................ 96

*South Cherry St., LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. N.Y. 2009) ................................................................. 114

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...................................................................... 111

*Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) .............................................................. 103, 115

*In re StockerYale Sec. Litig.*,
    453 F. Supp. 2d 345 (D.N.H. 2006) ............................................................. 111

*In re Stone & Webster, Inc. Securities Litigation*,
    414 F.3d 187 (1st Cir. 2005) ........................................................... 98, 99, 100

*Stratte-McClure v. Stanley*,
    784 F. Supp. 2d 373 (S.D.N.Y. 2011) ......................................................... 111

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ....................................................... 37, 55, 75, 148

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976) .......................... 40, 70

*In re Taxable Mun. Bonds Litig.*,
    Civ. A. No. MDL 863,
    1994 WL. 532079 (E.D. La. Sept. 26, 1994) ................................................ 101

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital,*
    531 F.3d 190 (2nd Cir. 2008) .....................................................................115

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (U.S. 2007) ..................................................................*passim*

*In re Top Tankers, Inc. Sec. Litig.,*
    528 F. Supp. 2d 408 (S.D.N.Y. 2007) ........................................................147

*Underland v. Alter,*
    2012 U.S. Dist. LEXIS 133155 (E.D. Pa. Sept. 18, 2012).................123, 125

*Underland v. Alter,*
    2012 U.S. Dist. LEXIS 98450 (E.D. Pa. July 16, 2012) ..................39, 43, 71

*Underland v. Alter,*
    2011 U.S. Dist. LEXIS 102896 (E.D. Pa. Sept. 9, 2011)............................126

*In re Unicapital Corp. Sec. Litig.,*
    149 F. Supp. 2d 1353 (S.D. Fla. 2001)..........................................................51

*Virginia Bankshares, Inc. v. Sandberg,*
    501 U.S. 1083 (1991) .............................................................53, 70, 104, 134

*In re Viropharma, Inc., Sec. Litig.,*
    2003 U.S. Dist. LEXIS 5623
    (E.D. Pa. Apr. 3, 2003) ...............................................................................133

*In re Vivendi Universal, S.A. Sec. Litig.,*
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ..........................................................99

*Wachovia Eq. Sec. Litig. v. Wachovia Corp.,*
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ........................................................133

*Wagner v. First Horizon Pharm. Corp.,*
    464 F.3d 1273 (11th Cir. 2006) .....................................................................55

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.,*
    694 F. Supp. 2d 1192 (W.D. Wash. 2009) ..................................124, 125, 128

*In re Wells Fargo Sec. Litig.,*
    12 F.3d 922 (9th Cir. 1993) ..........................................................................46

*In re Westinghouse Sec. Litig.,*
    90 F.3d 696 (3d Cir. Pa. 1996) ...............................................68, 69, 141, 145

*White v. Kolinsky,*
    2011 U.S. Dist. LEXIS 54746
    (D. N.J. May 18, 2011) ..............................................................................158

*White v. Westinghouse Elec. Co.,*
    862 F.2d 56 (3d Cir. 1988) ..........................................................................93

*Winer Family Trust v. Queen,*
    503 F.3d 319 (3d Cir. 2007) ...................................................................31, 32

*In re WorldCom, Inc. Sec. Litig.,*
    352 F. Supp. 2d 472 (S.D.N.Y. 2005) ................................................132, 133

*Zaluski v. United American Healthcare Corp.,*
    527 F.3d 564 (6th Cir. 2008) .....................................................................100

## **Statutes**

15 U.S.C. §§ 7241(a) & (a)(4)(A)..........................................................................110

15 U.S.C. § 77k .......................................................................................................51

15  U.S.C. § 77k(a) ..................................................................................................38

15 U.S.C. § 77k(a)(1)..............................................................................................122

15 U.S.C. § 77k(a)(4)..............................................................................................132

15 U.S.C. §§ 77k(b)(3)............................................................................................136

15 U.S.C. § 77l(a) ....................................................................................................51

15 U.S.C. § 77l(a)(2)...........................................................................................39, 75

15 U.S.C. § 78j-1(a)(1) .............................................................119

15 U.S.C. § 78j(b) .......................................................................79

15 U.S.C. § 78u-4(b)(1) .......................................................56, 81

15 U.S.C. § 78u-4(b)(2) ..............................................................35

15 U.S.C. § 78u-5(c)(1) ..............................................................71

15 U.S.C. § 78u-5(c)(1)(B) .......................................................102

17 C.F.R. §210.4-01(a)(1).........................................................125

17 C.F.R. §229.308 (2011) .......................................................119

17 C.F.R. § 240.10b-5........................................................77, 79

Fed. R. Civ. P. 8 .........................................................................52

Fed. R. Civ. P. 9(b) ............................................................36, 138

Fed. R. Civ. P. 12(b) .......................................33, 137, 145, 158

Plaintiff, Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Plaintiff"), shareholder of Orrstown Financial Services, Inc. ("Orrstown"), the holding company for Defendant Orrstown Bank (the "Bank"), herein responds to and opposes all Defendants'[1] Motions to Dismiss titled: (a) Orrstown Defendants' Motion to Dismiss SEPTA's Amended Complaint and Memorandum in Support [Dkt. Nos. 53, 54, 55, 60, 61] ("Orrstown Br."); (b) Underwriter Defendants' Motion to Dismiss Amended Complaint and Memorandum in Support, [Dkt. Nos. 58, 59] ("Underwriters Br."); and (c) Defendant Smith Elliott Kearns & Company, LLC's Motion to Dismiss and Memorandum of Law in Support [Dkt. Nos. 56, 57] ("SEK Br.") (collectively, "Defendants' Motions"). The Amended Complaint, filed on March 4, 2013 [Dkt. No. 40], is referred to herein as the "Complaint" or "*Am. Compl, ¶ --*".[2]

## I.   __INTRODUCTION.__

The allegations in the Complaint belie the conclusory and unsupported arguments made in Defendants' Motions. Defendants make strained attempts to portray their conduct, and the material financial and operational problems at

---

[1]   Defendants are: Orrstown, the Bank, Thomas R. Quinn, Jr., Bradley S. Everly, Joel R. Zullinger, Jeffrey W. Coy, Kenneth R. Shoemaker, Anthony F. Ceddia, Mark K. Keller, Andrea Pugh, Gregory A. Rosenberry, Glenn W. Snoke, John S. Ward, Jeffrey W. Embly, Sandler O'Neill & Partners, L.P., Janney Montgomery Scott, LLP, and Smith Elliott Kearns & Company LLC.

[2]   Any terms not specifically defined herein are presumed to hold the same definition set forth in the Amended Complaint.

Orrstown that were unknown to the investors, as innocuous.   Their efforts, however, are transparent and unpersuasive in the face of the Complaint's allegations.   In explicit detail, the Complaint alleges the false and misleading public statements made by Defendants, each Defendants' role, why (based on Plaintiff's investigation, including information from Confidential Witnesses) the statements were false, and why the falsity of such statements was known or knowable to Defendants.

Defendants were operating the Bank inconsistent with its underwriting standards and loan approval procedures, contrary to Defendants' public statements. For example, the Bank's Loan Committee routinely approved loans that did not meet the credit requirements of the Loan Policy.   In fact, loans were extended because a Defendant's next door neighbor *"needs this"* loan, or the borrower's father *surely* would not let his kid's loans go bad.   In an attempt to aggressively grow the Bank's business, loan officers often usurped the credit analyst's role, such that there was a lack of independence in the Bank's underwriting and loan sales functions.   Contrary to the Company's public reports, there was a glut of risky commercial loans, concentrated especially in the Hagerstown, Maryland market, which either needed to be reclassified as Risk Assets or were on the verge of becoming Risk Assets.   Unbeknownst to the public, in mid-2010, Defendants adopted a type of workaround, termed the "eight point internal risk rating system,"

which had the intended effect of materially and artificially lowering and forestalling the proper classification of troubled loans and the allocation of provisions for the Bank's loan losses.  Behind closed doors, the Federal and State banking regulators were expressing material concerns with Orrstown's management and their banking practices, but to the public, Defendants portrayed a very different picture, even paying an *increased* quarterly cash dividend to shareholders, encouraging new investments by investors and concealing the material problems at the Bank.

Defendants were operating the Bank as if they owned it; they were the "hometown" bank guys, lending money to their friends and community, at their whim. The problem for Defendants was, this was not their Bank, it was not a private company.  It was sold to and owned by the public, by shareholders who invested in it based on public reports about its financial and operational conditions. The shareholders were told that the Bank was to be, and was, operated in accordance with policies and procedures that would protect the Bank and investors. The investors were simply not told the truth.

This is a classic case of thousands of investors being duped by corporate insiders to invest and lose millions of dollars in a Company that was not what it was portrayed to be.  Such conduct is actionable under the Federal Securities Laws.

## II.   <u>COUNTER HISTORY OF THE CASE.</u>

On May 25, 2012, Plaintiff SEPTA, the regional rail system for the City of Philadelphia and surrounding counties, commenced this federal securities class action against Orrstown, the Bank, and the Individual Defendants (collectively the "Orrstown Defendants").  (Dkt. No. 1).

This class action is brought pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of two Classes of Orrstown shareholders.  The "Securities Act Class" consists of all persons and/or entities who purchased Orrstown common stock pursuant to, or traceable to, Orrstown's February 8, 2010 Registration Statement and March 24, 2010 Prospectus Supplement (*i.e.*, the Offering Documents) issued in connection with the March 2010 Offering.  *Am. Compl.* ¶ 17.  The "Exchange Act Class" consists of all persons or entities that purchased Orrstown common stock on the open market between March 15, 2010 and April 5, 2012, inclusive (the "Class Period").  *Id.* ¶ 18.

On June 18, 2012, upon the parties' stipulation and the Court's order, the Orrstown Defendants' responsive pleading(s) and the filing of the motion for class certification were postponed to accommodate the procedural pretrial requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *Order filed 6/18/2012* (Dkt. No. 24).  Sixty days after the filing of the Complaint, Plaintiff

motioned the Court to be appointed Lead Plaintiff and to approve Plaintiff's selection of Chimicles & Tikellis LLP ("C&T") to serve as Lead Counsel. *Pl.'s Mot. for Lead Plaintiff and Mem.* (Dkt. Nos. 28, 29). The Court appointed SEPTA Lead Plaintiff and approved SEPTA's selection of C&T as Lead Counsel. *Order filed 8/21/2013* (Dkt. No. 33).

Following SEPTA's appointment as Lead Plaintiff, the parties conferred upon an initial case management schedule, submitted it to the Court and the first Scheduling Order was filed on September 27, 2012, which set the date for the filing of Plaintiff's amended complaint, provided a briefing schedule on any dispositive motion(s) filed by Defendants, and stayed discovery. *Order filed 9/27/2012* (Dkt. No. 35). The parties sought the Court's approval to modify this schedule on two separate occasions to allow the parties to discuss Plaintiff's claims and Defendants' available defenses. *See Orders filed 10/26/2012 and 1/10/2013* (Dkt. Nos. 37, 39).

On March 4, 2013, SEPTA timely filed its Amended Complaint to include additional factual information derived from Lead Counsel's investigation. (Dkt. No. 40). This investigation also resulted in SEPTA naming additional defendants, including former Bank officer Jeffrey W. Embly, Orrstown's outside auditor Smith Elliott, and the underwriters in the March 2012 Offering (Sandler O'Neill and Janney). On May 28, 2013, each of the defendants moved to dismiss SEPTA's

Amended Complaint.  Plaintiff respectfully submits this *Omnibus Opposition* to the Defendants' Motions.

## III.  <u>COUNTER STATEMENT OF FACTS.</u>[3]

Orrstown Bank operates in the South Central Pennsylvania region, with twenty-one branches located in Cumberland, Franklin and Perry Counties, and one branch in Hagerstown, Maryland.  *Am. Compl.* ¶ 27.  In 1987, Orrstown Financial Services was formed to acquire the Bank as a wholly owned subsidiary and the two entities share the same board of directors.[4]  *Id.* ¶ 26.  In April 2009, Orrstown listed on the NASDAQ under the ticker symbol "ORRF," and one year later it commenced a subsequent offering of approximately 1.4 million shares at $27.00 per share.  *Id.* ¶ 136.   The March 2010 Offering raised over $40 million from investors, including Plaintiff SEPTA.  *Id.*  ¶¶ 25, 141.  SEPTA invested $121,860 in Orrstown common stock in the March 2010 Offering.  *Id.*, Ex. A (Dkt. # 40).  Then, throughout 2010 and into 2011, SEPTA purchased 10,057 shares of Orrstown common stock in the open market, investing an additional $247,193.  *Id.*

### A.  <u>Orrstown's Leadership.</u>

At all times relevant to Plaintiff's claims, the leadership of Orrstown remained unchanged, with each of the Individual Defendants holding executive

---

[3]   This is a summary of the facts and allegations which are set forth more fully in the Amended Complaint.

[4]   Given this corporate structure, Plaintiff uses "Orrstown," the "Bank," and "Company" interchangeably.

and/or directorship roles.  Defendant Quinn, who joined Orrstown in May 2009, just one month after the Bank was listed on the NASDAQ, has since served as its CEO and President.  *Am. Compl.* ¶ 28.  Quinn also was a member of the Enterprise Risk Management Committee (which was formed in 2009), and the Bank's Loan Committee.  Quinn is the most visible member of Orrstown's management team; he actively marketed the March 2010 Offering, communicates directly to the market on the financial condition of the Bank, and has given interviews to the media in the wake of the Federal and State regulators' enforcement actions and ongoing supervision. *See, e.g., id.* ¶¶ 161, 168.

Defendant Everly served as a director of the Company and was the CFO until his departure in May 2012, after the Regulators' enforcement actions were issued.  *Am. Compl.* ¶¶ 29, 150-151.  As the CFO, Everly was a permanent member of the Loan Committee and joined Quinn in marketing the March 2010 Offering to investment managers and investors.  *Id.* ¶¶ 88, 168.

During the Class Period, Embly held different titles such as Senior Executive Vice President, COO and Chief Credit Officer.  *Am. Compl.* ¶¶ 29, 150-151.  He had joined Quinn and Everly in marketing the March 2010 Offering, and he held a permanent seat on the Loan Committee. *Id.*  As alleged, Embly permitted extensions of credit against the recommendations of the Bank's Loan Committee. *Id.* ¶ 96.  When serving as Chief Credit Officer, he ran the Loan Committee

meetings, and took over for Defendant Snoke who had previously chaired this committee. Defendant Embly also left the Company after the Regulators' scathing enforcement actions were issued. *Id.* ¶ 151.

Defendants Zullinger, Shoemaker and Coy are Directors and members of the Enterprise Risk Management Committee. *Am. Compl.* ¶¶ 30-33. Each of these defendants have served on the board for more than 10 years. *Id.* Defendant Shoemaker is Quinn's predecessor, so upon Quinn's arrival, Shoemaker took on the role of President Emeritus of the Bank. Shoemaker resigned his directorship around the time the Regulators issued their enforcement action. *Id.* ¶¶ 32, 39.

Given their positions, unique access to information and decision making, Plaintiff asserted Securities Act and Exchange Act claims against Defendants Quinn, Everly, Embly, Snoke, Zullinger, Shoemaker and Coy.

The remaining individual defendants, Ceddia, Keller, Pugh, Rosenberry and Ward, are directors of Orrstown. *Am. Compl.* ¶¶ 33-36, 38. Each of them, at different times during the Class Period and prior to the March 2010 Offering, were voting members of the Loan Committee. *Id.* ¶ 88. Each of these individual defendants also participated in the preparation, review and dissemination of the Registration Statement and Prospectus used to market Offering. *Id.* ¶¶ 44-45. With the exception of Embly, each of them also signed the Registration Statement. *Id.* ¶¶ 44, 231, 226. Throughout the Class Period, each of Orrstown's quarterly

reports filed with the U.S. Securities and Exchange Commission ("SEC") were signed by Quinn and Everly, and the annual reports were signed by Quinn, Everly, Zullinger, Snoke and Coy. *Id.* ¶¶ 284-285.

### B.   The March 2010 Offering.

The March 2010 Offering was sold to investors using a Registration Statement and Prospectus (collectively the "Offering Documents") which incorporated by reference Orrstown's 2009 Annual Report, Form 10-K, filed on March 15, 2010, and other prior filings with the SEC.  Each of the Individual Defendants, with the exception of Embly, signed the Registration statement. *Am. Compl.* ¶ 226.  In the Offering Documents, the Orrstown Defendants presented the Bank as enjoying historic success due to its "conservative business model" and "well-positioned" to move forward and further grow the Bank's loan portfolios. *Id.* ¶ 137.   The Orrstown Defendants touted the Individual Defendants' management-level supervision of the lending process, strict underwriting standards, and effective internal controls. *Id.* ¶¶ 165-168, 172.   The Offering Documents stated that these "stringent," "sound" and "conservative" practices and oversight enabled Orrstown to build and maintain a "high quality loan portfolio." *Id.* ¶ 165.  These same statements were repeated when Defendants Quinn, Everly and Embly were marketing the March 2010 Offering and met with investment bankers and potential investors. *Id.* ¶ 168.  The Offering Documents, however, did

not reveal that the Bank had actually been engaging in risky lending practices such that loans were becoming impaired and that the offering proceeds were not intended to seek out growth opportunities, but instead bailout the Bank's deteriorating commercial loan portfolio. *Id.* ¶¶ 2-3 This picture of a well-run, disciplined company on the move is disproved by the closed door workings of the Bank.

### 1.   *Risky Lending Practices Led to Impaired Commercial Portfolio.*

To manage and avoid credit risks in approving loans, the Bank had a Loan Policy that required potential borrowers meet certain credit benchmarks to qualify for credit extensions. *Am. Compl.* ¶ 86.   For example, the Loan Policy's underwriting criteria for commercial loans included that a potential borrower's cash flow satisfied at a minimum a Debt Service Ratio of 1.2 on the loan and the collateral's value satisfied the Policy's stated loan to value ratio ("LTV"). *Id.* ¶ 92, 94.  The Loan Policy allowed "exceptions" in approving credit to borrowers who did not satisfy the Loan Policy's standard credit requirements but the Loan Policy prohibited from taking on excessive risk. *Id.* ¶ 91.  Further, the exceptions were only to be used as a justification for approving a loan *if* the borrower had an excellent credit history with the Bank, *if* the loan would be over-collateralized or *if* the borrower satisfied other recognized exceptions listed in the Loan Policy. *Id.* ¶ 91.  Importantly, the Loan Policy indicated that ***at least two of the listed***

*exceptions should be met* before the Loan Committee approves a loan and that excessive credit risks must be avoided. *Id.*

In evaluating whether a prospective borrower satisfied the Loan Policy, the Bank's Credit Analyst Group worked with the loan officers to gather data from the potential borrowers and then the Credit Analyst Group prepared credit "packets" that would document whether the potential borrower satisfied the Loan Policy. *Am. Compl.* ¶ 80. Depending upon the size of the loan, the Loan Policy required various levels of approval and involvement by the officers and directors of the Bank who sat on the Loan Committee and Credit Administration Committee. *Id.* ¶¶ 78, 84. During all times relevant to Plaintiff's claims, Defendants Quinn, Embly, Everly and Snoke had permanent seats on the Loan Committee with each of the other Individual Defendants as rotating members. *Id.* ¶¶ 78, 88. Defendant Embly, as the Chief Credit Officer and then Chief Operating Officer, was the most influential member of the Loan Committee. *Id.* ¶ 91.

The Bank's loan approval process was deeply flawed. Confidential Witness #3 ("CW#3") was a credit analyst with the Bank from 2007 through February 2012, and, during CW#3's tenure, CW#3 was promoted to Senior Credit Manager in 2009 which required CW#3 to participate in Loan Committee meetings. *Am. Compl.* ¶ 58. CW#3 observed that the Bank's Credit Analyst Group was generally understaffed, undertrained and hindered by a lack of loan data (such as tax returns

and updated appraisals) from prospective borrowers which made it impossible for the credit analysts to construct the potential borrower's cash flow or to determine the value of the collateral.  *Id.* ¶¶ 79-81, 83.  Confidential Witness #1 ("CW#1") was a credit analyst from 2008 through 2011, and CW#1 also recalls the lack of training that the Bank provided and the difficulties that credit analysts had in trying to conduct their analysis.  Specifically, CW#1 recalls the loan approval process was further compromised by the interference of loan officers, such as Terry Reiber, who at times modified the credit analysts' review to make the borrower appear more credit-worthy.[5]  *Id.* ¶ 84.

CW#3 recalls participating in Loan Committee meetings in which the Loan Committee, at the direction of Defendant Embly, approved loans that the Credit Analysts Group concluded failed to satisfy the Loan Policy requirements such as the crucial Debt Service Ratio.  *Id.* ¶ 91.  Embly, according to CW#3, would push risky loans through that Reiber had brokered in Hagerstown and loans in which the applicant was part of the "Old Boys Club" of Chambersburg.  *Id.* ¶ 90.  To do so, Embly would claim that these risky loans satisfied an "exception" of the Loan Policy but these exceptions were often arbitrary and frivolous.  *Id.* ¶ 90.

---

[5]    Terry L. Reiber was hired in late 2005 to aggressively develop commercial lending relationships in the Hagerstown, Maryland market.  As confirmed by CW#1 and CW#3, Reiber heavily influenced the loan approval process for the loans that were made in 2005 through 2009 such that the Bank was extending large commercial loans to risky borrowers, who in many cases, simply did not have the wherewithal to satisfy the debt service on the loans.  *Am. Compl.* ¶ 76.

This breakdown of the Bank's lending review is most evident in the Bank's commercial lending in the Hagerstown, Maryland market, and also with the Bank's lending relationship with certain borrowers such as the Azadis, Shaool Family, Chambersburg Developers and Yorktown Funding. *Am. Compl.* ¶¶ 75-77, Part B. By mid-2009, after Reiber had "retired," Orrstown hired Brian Selders as his replacement who immediately recognized that a vast majority of the commercial loans that Reiber "had left him" were of very poor quality. *Id.* ¶ 76. Soon after Selders arrived and assessed the situation, many of the Hagerstown loans began to show signs of impairment and the Bank initiated an Internal Review in November 2009 in an attempt to proactively conceal the increasing deterioration of the commercial loan portfolio. *Am. Compl.* ¶ 99; *see also id.* at ¶¶ 109-112 (discussing Azadi loans), 127-129 (discussing Yorktown loans).

The Internal Review's stated purpose was to "utilize[] risk-rating criteria established in the Loan Policy in order to spot deteriorating trends and detect conditions which might indicate potential problem loans." *Am. Compl.* ¶ 100. The Internal Review was mirroring the analysis that the Bank's Loan Review Officer was to do on a regular basis. This duplicative work was needed because the Bank's Loan Review Officer simply did not have the experience or training to critically evaluate the loans to determine their risk rating and necessity for loan loss allocations. *Id.* ¶¶ 82, 99-100. The Internal Review was not much better. *Id.*

¶¶ 101-103.  There was an inherit structural bias in that the Internal Review team was neither capable or motivated to delve into the updated adverse credit data for each commercial loan and make determinations that would directly implicate themselves or their supervisors, *i.e.*, the Individual Defendants, in pushing through risky loans and failing to implement internal controls to avoid risky lending practices.  *Id.* ¶¶ 101-103.

The Internal Review resulted in Orrstown increasing the allowance for loan loss reserves by only $3.5 million which was reported in the 2009 Form 10-K.  *Id.* ¶ 105.  The allocation was purposefully inadequate to protect Orrstown's balance sheet and pales in comparison to the $113.7 million in Risk Assets that the Bank has classified since the Offering and the asset sale of 237 distressed loans totaling $119.8 million.  *Id.* ¶ 77 & n.9.  The Internal Review team did not follow Orrstown's stated methodology for assessing loan loss provisions because Orrstown did not want to jeopardize the March 2010 Offering that was planned for just one week after the release of the 2009 Form 10-K.  *Id.* ¶ 104-105.

### 2.    *The Underwriter Defendants' Role in the March 2010 Offering.*

The Offering Documents provided financial data for the Company for the years 2007 through 2009, and included the 2009 Form 10-K which reported the results of the Internal Review.  *Am. Compl.* ¶¶ 136-137.  As the underwriters for the Offering, the Underwriter Defendants were responsible for working with the

Orrstown Defendants to prepare the Offering Documents and set a realistic, marketable price for the offered shares. *Id.* ¶¶ 138-139. Importantly, in setting this price, the Underwriter Defendants' due diligence required them to critically evaluate Orrstown's SEC filings, the data and results of the Internal Review, and to discuss with the Individual Defendants the March 22, 2010 announcement that Orrstown had an unsecured non-priority claim for over $8.5 million in the Yorktown bankruptcy. *Id.* ¶¶ 138-140. Regardless of these responsibilities, the Underwriter Defendants did not require the Orrstown Defendants disclose in the Offering Documents that the Loan Committee frequently approved loans against the recommendation of the Credit Analyst Group and that the loan loss reserves were not calculated in accordance with the Bank's stated methodology. *Id.* ¶¶ 138-140. Moreover, the Underwriter Defendants had access to non-public information that would have revealed the Bank's declining loan portfolio and belied the Offering Document's statement that Orrstown intended to use the proceeds of the offering for "general purposes" to build up cash reserves and seek out new growth. *Id.* ¶ 137. Rather, the Orrstown Defendants needed to offset the yet to be disclosed losses due to increases in the Bank's Risk Assets, so that the Bank would retain its Tier 1 capital ratios required by federal banking regulatory guidelines in order to maintain the designation of a "well-capitalized" bank. *Id.* ¶ 3.

The Underwriter Defendants and Orrstown Defendants decided to price the offered shares at $27 per share.  *Id.* ¶ 141.  From the proceeds of the March 2010 Offering, Orrstown paid out $2.2 million in fees to the Underwriter Defendants.  *Id.* ¶ 45.

## C.     Portfolio Becomes Further Impaired After the Offering and Triggers Regulatory Intervention.

Orrstown's risky lending practices, in violation of the Loan Policy, continued into 2010, well after the Offering, even as Defendants were confronted with the need to disclose the increase in the Bank's Risk Assets.  *Am. Compl.* ¶ 256.  Just five weeks after the March 2010 Offering closed, the Company reported an increase of $21 million in Risk Assets for the first quarter of 2010, but only a $1.4 million increase in loan loss reserves from the prior quarter end December 31, 2009.  *Id.* ¶¶ 245-245.  This disclosure set into motion a series of significant events.

*First*, Orrstown adopted a new *eight point internal risk rating system*, which gave the Bank the discretion to use several different rating levels until it would ultimately have to move a troubled loan into the nonperforming category.  *Am. Compl.* ¶ 247.  Consequently, the Bank no longer identified as "impaired" its "performing substandard loans."  *Id..*  This change in policy, which was not revealed until 2011, was implemented to facilitate Defendants' concealment of, and their misleading investors about, the magnitude of impaired loans, in particular

the Hagerstown-based loans such as the Azadi loans.  *Id.* ¶¶ 247-248.  The impact of the eight point internal risk rating system is illustrated by comparing the Company's reporting throughout 2010:

|  | **1Q2010** | **2Q 2010** | **3Q2010** | **4Q2010** |
|---|---|---|---|---|
| **Total Risk Assets** | $ 32,822,000 | $ 23,015,000 | $ 20,481,000 | $ 18,437,000 |
| **Reserve for Loan Losses** | 12,020,000 | 14,582,000 | 15,386,000 | 16,020,000 |

As the chart illustrates, *after* the Orrstown Exchange Act Defendants implemented the eight point risk rating system in First Quarter 2010, Orrstown's Risk Assets significantly decrease, and, yet, only slight increases in loan loss reserves are recorded, so that Orrstown is able to preserve the Bank's reported net income and depict a healthier company.  By using the eight point risk rating system, Orrstown continued to understate its Risk Assets and loan loss reserves throughout 2010 and 2011, while Orrstown continued to represent the Bank as performing well above its peers.  *Am. Compl.* ¶¶ 257-259, 275.

*Second*, the Orrstown Defendants' actions with respect to the March 2010 Offering and implementation of the eight point risk rating system drew the attention of the Regulators, the Federal Reserve Bank and the Pennsylvania Department of Banking.  *Am. Compl.* ¶¶ 142-143.  By the Third Quarter of 2010, the Regulators were taking a more critical look at Orrstown outside of the normal

examinations and were onsite at the Bank's Operation Center by November-December 2010. *Id.*

By March 2011, unbeknownst to the investing public, the Regulators "officially" launched their "Joint Investigation." *Am. Compl.* ¶¶142, 144. Through the Joint Investigation, the Regulators scrutinized every aspect of the Company's management, internal controls, underwriting and lending practices by examining, *inter alia*, (i) the board's supervision of the Bank's major operations, (ii) the adequacy of the Bank's management structure and the competency of senior officers; (iii) efficacy of the Bank's credit risk management practices; (iv) timeliness of the Bank's loan portfolio reports submitted to the board; (v) efficacy of the Bank's loan underwriting and credit administration procedures; (vi) conformance of appraisals with generally accepted appraisal standards; (vii) efficacy of the Bank's loan workout process; (viii) reliability of the Bank's loan grading system; and (ix) the acceptability of the Bank's volume of criticized loans, concentrations of credit, and levels of Risk Assets. *Am. Compl.* ¶ 144.

With the Regulator's scrutiny of the Bank's internal controls, the Orrstown Defendants had to outsource its loan review process to an independent firm to "identify gaps in the underwriting process, credit administration and problem loan identification and monitoring." *Am. Compl.* ¶¶ 145, 264. In July 2011, the Bank positioned this review process as a responsible effort taken by management to

ensure good risk management; never signaling the internal turmoil with the existence of the Joint Examination, nor revealing the true state of the deteriorating commercial loan portfolio or the Bank's inability to adequately assess loan risks. *Id.* ¶ 145.  Soon after Orrstown made this disclosure, the Bank was learning that the Azadis' default on $16 million of commercial loans was imminent.  *Id.* ¶¶ 188, 264.  Under the pressure of the Regulators, in July 2011, the Bank disclosed that its Risk Assets had shot up to $54.5 million, but concealed the direness of the Bank's financial health by declaring a cash dividend at a ***4.6% increase*** over the third quarter from the prior year.  *Id.* ¶¶ 264-265.

### D. Regulatory Enforcement Actions Force Curative Disclosures Which Impact Orrstown's Stock Price.

The Regulators became increasingly concerned that Orrstown was engaging in unsafe and unsound banking practices;  in late October 2011, they refused to approve Orrstown's declaration of a quarterly dividend.  *Am. Compl.* ¶¶ 147, 266-267.  On this news,, the market reacted negatively and Orrstown's share price dropped; Defendant Quinn, however, continued to mislead investors, erroneously characterizing the Bank as "safe and sound."  *Id.* ¶¶ 268-270.  Under the watchful eye of the Regulators, the Orrstown Defendants could no longer obscure the lack of internal controls, the deterioration of the loan portfolio and escalating loan loss reserves; by late January 2012, Orrstown issued a press release announcing another quarterly loss and a one-time non-cash goodwill impairment charge of a staggering

$19.4 million. *Id.* ¶ 271. Again, Defendant Quinn sought to temper this bad financial news by falsely stating that the Company had effective internal controls to address the "asset quality issues." *Id.* ¶¶ 271-274. By March 12, 2012, the Orrstown Defendants were close to reaching an agreement with the Regulators concerning the results of the Joint Investigation, and Orrstown had to restate its earnings for Fiscal Year 2011 to identify an additional asset impairments increase of $13.7 million. *Id.* ¶ 274. Then, two days later on March 15, 2012, Defendants finally admitted in the 2011 Form 10-K filed with the SEC that Orrstown had a material weakness in its internal controls for risk rating loans and allocation of adequate loan losses, but falsely and misleadingly blamed external factors for such problems. *Id.* ¶¶ 148, 275-278. Then on March 23, 2012 and March 30, 2012, the Orrstown Defendants disclosed the Written Agreements with the Regulators which revealed the Regulators' ongoing supervision and plan for Orrstown that were aimed at improving its internal controls and to ensure that Defendants no longer engaged in unsafe and unsound banking practices. *Id.* ¶¶ 149-150, 280.

In connection with the March 2010 Offering and at all other times during the Class Period, Defendants made untrue and misleading statements concerning the quality of the Bank's financial and operation condition, its commercial loan

portfolio, effectiveness of its loan lending practices to minimize Risk Assets, [6] the sufficiency of its loan loss reserves, [7] and its oversight by management of the credit review and approval process.  *See* Appendix A (Securities Act – Alleged False and Misleading Statements) and Appendix B (Exchange Act – Alleged False and Misleading Statements) attached hereto, and discussed herein in Sections D and E. These statements form the basis for SEPTA's asserted claims of federal securities violations.

Because of the undisclosed risky and impaired loans that comprised the Bank's loan portfolio throughout the Class Period, the ongoing manipulations of the Loan Policy, misstating of the adequacy of the Bank's loan loss reserves, and the utter lack of control over the Bank's underwriting and loan process, the price of Orrstown stock at the time of the March 2010 Offering and throughout the Class Period was grossly overstated by as much as 80%.  *Am. Compl.* ¶ 281.

---

[6]     The Company defines "Risk Assets" as including nonperforming loans, nonaccrual loans, substandard loans, loans past 90 days and still accruing, special mention loans and all other classified loans.   This definition is purposefully narrow to avoid capturing the performing loans within the commercial portfolio that are inherently risky and show indicia of future impairment, *i.e.*, troubled loans.

[7]     The Company defines loan loss reserves and a methodology. *Am. Compl.* ¶ 104.  Plaintiff alleged that in violation of GAAP, the Company failed to follow this methodology in allocating loan loss reserves and then later created a new, highly unreasonable methodology, *i.e.*, the ***eight point internal risk rating system***, to obfuscate the true levels of risk assets and required loan loss reserves. *Am. Compl.* ¶ 5.

### E.    The Auditor Defendant's Reports.

Auditor Defendant SEK is an audit firm registered with the Public Company Accounting Oversight Board ("PCAOB") and holds itself out as an expert in "financial institutions". *Am. Compl.* ¶¶ 49, 52.   SEK is involved in the local business communities of several towns in Pennsylvania, including Chambersburg where Orrstown is based, and Hagerstown, Maryland (where the majority of the Bank's troubled loans arose).   *Id.* SEK has longstanding relationships with Orrstown and its management, particularly Bradley S. Everly, the former Executive Vice President, Chief Executive Officer and Chief Financial Officer who resigned from his position at Orrstown on May 14, 2012 after an independent consultant approved by the Regulators was evaluating his and other executives' competency and effectiveness. *Id.* ¶¶ 151-152.

SEK has served as Orrstown's public auditor for over 16 years and during that time it has earned for itself millions of dollars in fees.  As Orrstown's auditor, SEK was required, and agreed, to perform its audits in accordance with PCAOB standards, which has adopted Generally Accepted Audit Standards ("GAAS"), and the Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Id.* ¶¶ 49-52.  These audit standards require auditors to follow certain protocols and conduct various levels of testing to ensure accuracy and integrity in financial reporting and internal

controls over financial reporting. *Id.* ¶¶ 179-86. The auditor is required to obtain an understanding of how management develops an estimate and use one or more of the following approaches to test that understanding:

> a. review and test the process used by management to develop the estimate;
>
> b. develop an independent expectation of the estimate to corroborate the reasonableness of management's estimate; and/or
>
> c. review subsequent events or transactions occurring prior to the date of the auditor's report.

*Id.* ¶ 179. In auditing Orrstown, SEK claimed that it had performed the necessary testing to confirm that the estimates were reasonable and accurate and fairly represented the financial health of the Company. *Id.* ¶¶ 177, 294-295, 300, 305. SEK also claimed that it had tested and evaluated the design and operating effectiveness of internal controls over financial reporting based on assessed risk. *Id.* ¶¶ 177, 294-295, 300, 305. Thus, for example, during the 2010 audit, when Orrstown reported its estimate of loan assets to auditor SEK, SEK was supposed to perform certain tests to verify and confirm that the loans exist, the methods used by management to value the loans are appropriate, and that proper controls are in place to avoid and detect inaccuracies or fraud in estimating the loan assets. *Id.* ¶¶ 301-303. Similarly, when Orrstown reported its estimate of loan loss reserves, SEK was supposed to verify the reasonableness of this statement by reviewing and testing the facts used to support the analysis. *Id.* ¶¶ 301-303. Since loan assets

comprised 77%, 73% and 64% of the Bank's total assets as of December 31, 2008, 2009, and 2010, respectively, SEK would have spent the majority of its time reviewing the Bank's loan assets and loss reserves, facts underlying assumptions made in the estimates of loan valuations and loss reserves as well as the methodology and processes surrounding the calculation of these critical measures of a Bank's financial well-being.

According to CW#2, by late 2010, federal and state bank regulators began an onsite investigation of Orrstown that led to the formal Joint Investigation beginning on March 31, 2011 which culminated on March 22, 2013 with the Regulators' enforcement actions in the form of a "Written Agreement" and "Consent Order" with the Bank.  *Id.* ¶¶ 149-150; Declaration of Kimberly Donaldson Smith ("Decl.") at Exs. A (Written Agreement) and B (Consent Order).[8]  SEK knew or was reckless in not knowing about the investigation.  That Joint Investigation gave the Regulators, and SEK, "the reason to believe that the Bank had engaged in unsafe or unsound banking practices or violations of law or policy" which required the appointment of an independent consultant to develop a written analysis and assessment of the Bank's management needs and adequately qualified and trained personnel.  *Am. Compl.* ¶¶ 149-150; *see* Decl. Ex. B (Consent

---

[8] The Federal Reserve's Written Agreement with the Bank and the Pennsylvania Department of Bank's Consent Order are virtually identical in all material aspects. Accordingly, for ease of reference, Plaintiff will only cite to the Written Agreement.

Order).  The Bank was ordered to immediately formulate a plan to reduce the Bank's risk position in each loan relationship that exceeded $750,000 which was also classified "substandard" or "doubtful."  *Id*. at 6.  The Bank was also ordered to eliminate from its financial statements by all assets classified as a "Loss" in the Regulators' enforcement actions.  *Id.* at 8.  The Bank was ordered to write a plan to strengthen its credit risk management practices and at a minimum, adopt procedures that: (1) help identify, limit and manage concentrations of credit and other credit risks; (2) develop a system for "accurate" and "timely" risk ratings; (3) stress testing of loan and portfolio segments.  *Id.* at 11.  Orrstown had unsound practices related to lending, underwriting, risk management and unqualified Management.

Had SEK followed the audit protocols and procedures it was required to as a certified public account of public companies, it would have recognized by at the latest 2009 of the mounting financial problems at Orrstown, the unsafe banking practices and inadequate controls around financial reporting of such key estimates, like the value of the Bank's loan portfolio and its loan loss reserves.  In fact, it was impossible for SEK not to know after 16 years of auditing the Bank that management had failed to implement certain critical protocols and procedures over loan and risk valuations.  *Am. Compl.* ¶ 183 (discussing the Bank's 2009 Internal Review).    Instead, SEK repeatedly issued a clean and unqualified audit opinion

certifying the adequacy of Orrstown's internal controls and the accuracy of Orrstown's financial statements for the years ending December 31, 2008, 2009 and 2010. *Id.* ¶ 294. In fact, SEK certified the accuracy of all Orrstown financials dating back to at least 1996 when Orrstown stock was trading over-the-counter. CFO Everly had also been at the helm of Orrstown in 1996 until he (and most of the Bank's management team) exited after the Regulators' issued their enforcement action on March 23, 2012.

SEK knew that by March 2012, the Company had to disclose the existence of the Regulators' Joint Investigation and their anticipated enforcement actions, *i.e.*, the Consent Order and Agreement. Without any warning to investors, on March 15, 2012, SEK issued an adverse opinion about Orrstown's internal controls related to risky loan assets and loan loss reserve. *Id.* ¶ 305. A week later on March 23, 2012, Orrstown announced that it had been under regulatory scrutiny and the existence of the Report, the Agreement and the Consent Order. *Id.* ¶ 275.

As the facts revealed, SEK had issued a clean and unqualified audit certification on March 11, 2011 ***while the Regulators' Joint Investigation was ongoing***. Indeed, CW#2 confirmed that the investigation had started by at least by November 2010. *Id.* ¶ 143. Moreover, there is evidence that Regulators had concerns by May 2010, as Orrstown quietly removed from its Form 10-Q a disclosure about whether Orrstown had any knowledge of adverse regulatory

issues.  *Id.* ¶ 143.  Orrstown and SEK both knew about the investigation and the weak and inadequate, yet failed to inform investors.

In light of the Regulator's intense scrutiny of the Bank, SEK admitted that:

> the following material weakness has been identified and included in management's assessment.  ***The Company did not have a timely and effective process to prepare and report information related to loan ratings and the allowance of loan losses allocations*** . . . . ***In our opinion, because of the effects of the material weakness described above on the achievement of the objectives of the control criteria, Orrstown Financial Services, Inc. and its wholly-owned subsidiary has not maintained effective internal control over financial reporting as of December 31, 2011*** . . . .

*Id.* ¶ 305 (emphasis added).  ***Critically***, nothing had changed in the Bank's internal controls from the time SEK issued its last clean audit opinion to the time SEK issued this adverse opinion.  Indeed, after a mere ***16 months*** or so, Regulators easily uncovered the material, systemic, pervasive and long-standing problems at Orrstown that SEK failed to detect in ***16 <u>years</u>***.

## IV.   COUNTER STATEMENT OF QUESTIONS INVOLVED.

**A.**   Whether Plaintiff has adequately alleged violations of Sections 11 and 12 of the Securities Act Orrstown, the Bank, Quinn, Everly, Embly, Ceddia, Coy, Keller, Pugh, Rosenberry, Shoemaker, Snoke, Ward and Zullinger, where Plaintiff pleads that the Offering Documents pursuant to which Orrstown conducted its March 2012 Offering made materially false and

misleading statements and failed to disclose (i) the Loan Committee's propensity to approve risky commercial loans contrary to the borrower not satisfying the Loan Policy criteria and against the recommendations of the Bank's Credit Analyst Group; (ii) the commercial loan portfolio was not of high quality as significant loans extended in the Hagerstown market and other areas were showing signs of impairment; (iii) there was an inadequate allocation of loan loss reserves given the risk level of a significant portion of the commercial loan portfolio; and (iv) the intended purpose for the capital raise was not for "general purposes" but rather to offset the anticipated losses due to the increases in the Bank's Risk Assets, so that the Bank would retain its Tier 1 capital ratios required by federal banking Regulatory guidelines.

**B.**   Whether Plaintiff has adequately alleged violations of Section 15 of the Securities Act against Quinn, Everly, Embly, Ceddia, Coy, Keller, Pugh, Rosenberry, Shoemaker, Snoke, Ward and Zullinger (the "Individual Defendants"), where Plaintiff pleads that the Individual Defendants by virtue of their positions as directors and/or senior officers controlled the Bank and Orrstown and are therefore complicit in and responsible for Orrstown and the Bank's violations of Section 11 and 12 of the Securities Act.

**C.**     Whether Plaintiff has adequately alleged violations of Section 11 of the Securities Act against SEK where Plaintiff pleads that SEK's audit report and opinion, which were incorporated by reference in the Offering Documents pursuant to which Orrstown conducted its March 2012 Offering, made materially false and misleading statements for which SEK lacked a reasonable basis because SEK failed to conduct its audit in accordance with PCAOB standards and FASB Statement No. 5.

**D.**     Whether Plaintiff has adequately alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Orrstown, the Bank, Quinn, Everly, Embly, Zullinger, Shoemaker, Coy, and Snoke (the "Orrstown Exchange Act Defendants") where Plaintiff pleads that they made false and material misstatements about the financial and operational condition of Orrstown when they knew that (i) they disregarded, and had approved risky loans in contravention of, the Loan Policy; (ii) the commercial loan portfolio was seriously deteriorating with significant increases in Risk Assets; (iii) they concocted and used the eight point risk rating system to delay reporting impaired loans and making of necessary allocations for loan loss reserves; (iv) management was inadequate; and (v) their payment of a dividend in July 2011, historical and then-current lending practices, and

eight point risk rating system had concerned the Regulators and triggered the Joint Investigation.

**E.**     Whether Plaintiff has adequately alleged violations of Section 20(a) of the Exchange Act against Quinn, Everly and Embly where Plaintiff pleads that these individual defendants by virtue of their positions as directors and/or senior officers controlled the Bank and Orrstown and are therefore complicit in and responsible for Orrstown and the Bank's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**F.**     Whether Plaintiff has adequately alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against SEK where Plaintiff pleads that SEK incorrectly certified Orrstown and the Bank's Financial Statements for years 2009, 2010 and 2011 as being free of material misstatements and opined that the Company's internal controls were effective and without material weaknesses in 2009 and 2010 despite knowing or recklessly disregarding facts indicating that (i) Orrstown's financial controls for classifying impaired loans and allocation for loan loss reviews was faulty; and (ii) Orrstown's financial statements were false and misleading as they grossly understated Risk Assets, loan loss reserves and net income during the Class Period.

## V.    ARGUMENT.

### A.    Plaintiff Has Standing to Assert Securities Act and Exchange Act Claims.

Plaintiff purchased Orrstown common stock in the March 2010 Offering and then subsequently throughout 2010 and into 2011 during the Class Period (*i.e.*, March 15, 2010 through April 5, 2012), and has been damaged by Defendants' violations of the federal securities laws. *See Am. Compl.* at PSLRA Verification (detailing 17 separate transactions with total purchase of 14,574 shares).   The Orrstown Defendants argue that Plaintiff "lacks standing to represent all of the members of the purported [Exchange Act] class of persons or entities" who purchased after May 9, 2011 through the end of the Class Period.   Orrstown Defs. Br. at 7.[9]   The Orrstown Defendants are wrong.

The only authority that the Orrstown Defendants rely upon is *Winer Family Trust v. Queen*, 503 F. 3d 319, 324 (3d Cir. 2007).  *Winer,* however, does not apply here.  In *Winer,* the lead plaintiff had purchased 5,000 shares of Pennexx securities on May 22, 2002, and filed a federal class action on behalf of a class of shareholders who had purchased the securities between February 8, 2002 and June 12, 2003.  *Id.* at 323.  The district court had dismissed all of the plaintiff's claims with respect to statements made at the time of his purchase, and substantially

---

[9]     It should be noted that Exchange Act Defendant SEK has not made this baseless argument.

shortened the proposed class period, to a period *during which the plaintiff had not purchased.* Therefore, in *Winer,* there were no misstatements made at the time of the plaintiff's purchase and he had not been harmed. The District Court and Third Circuit held that the plaintiff in *Winer,* therefore, did not have standing, since he was not harmed. *Id.* at 325.

　　None of Plaintiff's claims have been dismissed by the Court, and Plaintiff purchased stock throughout the alleged Class Period. In making this argument, the Orrstown Defendants also misunderstand Article III standing, which the Plaintiff has. Article III of the Constitution requires that in order to have standing to assert her claims a plaintiff must show: (1) injury-in-fact, which is an invasion of a legally protected interest that is concrete and particularized, and actual or imminent; (2) causation; and (3) likelihood that the injury will be redressed by a favorable decision.  *In re Flonase Antitrust Litig.*, 815 F. Supp. 2d 867, 874 (E.D. Pa. 2011).  Moreover, to have standing in a federal securities class action, "a class representative must have purchased the same securities as the class members it purports to represent." *City of Livonia Employees' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 177 (S.D.N.Y. 2012) (analyzing whether plaintiff was adequate under Rule 23).  Therefore, Plaintiff, who has purchased stock in the Offering **and** during the alleged Class Period, at times when Defendants made materially false and

misleading statements, has standing to assert claims under both the Securities Act and the Exchange Act.

## B.   Rule 12(b)(6) Standard of Review.

This standard is well known and not subject to dispute.  A Rule 12(b)(6) motion to dismiss should only be granted if the complaint is void of "sufficient factual matter" and fails to state, on its face, a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007).  The Third Circuit has established a two-part analysis for district courts to use when evaluating a motion to dismiss which separates "the factual and legal elements of a claim" in order to test the "legal sufficiency of the complaint."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. Pa. 2009); *accord Reisinger v. Luzerne County*, 712 F. Supp. 2d 332, 343 (M.D. Pa. 2010).

First, in reviewing a grant for a motion to dismiss under Rule 12(b)(6), the district court is required to accept all allegations and well-pleaded facts in the complaint as true, and draw "all reasonable inferences" therefrom, and "view them in the light most favorable to the plaintiff." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1391 (3d Cir. Pa. 1994); *In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 127 (D.N.J. 1999).  Thus, "bald-assertions" and "legal conclusions are not entitled to the same deference as well-pled facts."

*Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906, 908 (3d Cir. 1997); *accord Reisinger v. Luzerne County*, 712 F. Supp. 2d 332, 344 (M.D. Pa. 2010).

Second, in order to survive a motion to dismiss, a complaint does not require "detailed factual allegations" but rather a showing of a plausible claim for relief that raises "above the speculative level." *Twombly,* 550 U.S. at 555. Allegations are sufficiently pleaded when the reviewing court, relying on its judicial "experience and common sense," can draw reasonable inferences based on pleaded factual content. *Iqbal,* 129 S. Ct. at 1950.[10] It is the burden of the moving party to show that no claim has been stated upon which relief can be granted by proving that the plaintiff has failed to "set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." *Kost v. Kozakiewicz*, 1 F.3d 176, 189 (3d Cir. Pa. 1993); *see also Gould Elecs. V. United States,* 220 F.3d 169, 178 (3d Cir. 2000).

Plaintiff's Amended Complaint is the product of hundreds of hours of investigation into Orrstown's SEC filings, the loans made by Orrstown and actual lending documents, and also hours of interviews conducted in Orrstown's backyard

---

[10]    *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record. . . . [A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.")

with former employees, borrowers and related business persons.   Plaintiff's allegations are simply not "rambling"; rather, the Complaint alleges specific, important facts and detail which more than adequately support Plaintiff's claims and preclude dismissal.

### C.   **Plaintiff Satisfies the PSLRA and Rule 9(b) Pleading Standards.**

Plaintiff must comply with the pleading standards of the PSLRA and the pleading standard of Rule 9(b) where the allegations sound in fraud.   For those false and misleading statements that Plaintiff alleges violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (collectively "Section 10(b) claims"), the "PSLRA imposes a special pleading requirement relevant to the element of scienter in a 10b-5 claim" in that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]." 15 U.S.C. § 78u-4(b)(2); *Joyce v. Bobcat Oil & Gas, Inc.*, 2008 U.S. Dist. LEXIS 27181, 4 (M.D. Pa. Apr. 3, 2008).   The PSLRA's heightened pleading standard is applicable only to the Exchange Act because Sections 11, 12(a)(2) and 15 of the Securities Act **do not** require proof that the defendants acted with a particular state of mind.   *See infra* Section V.D.2.

The Supreme Court has stated that the PSLRA's pleading standard is satisfied when "the inference of scienter [is] more than merely 'reasonable' or 'permissible' – it must be cogent . . . and at least as compelling as any opposing

inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues &*

*Rights*, Ltd., 127 S. Ct. 2499, 2510-11 (U.S. 2007).  In drawing an inference, the

Supreme Court has advised the lower courts that "strength of an inference cannot

be decided in a vacuum" but rather,

> a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. . . . [The] allegations must be considered collectively; *the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint*. . . . In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

*Id*. (emphasis added).  Importantly, the Supreme Court stated that the "*inference*

*that the defendant acted with scienter need not be irrefutable*, *i.e.,* of the 'smoking-

gun' genre, or even the 'most plausible of competing inferences.'"  *Id*. at 2510

(internal citations omitted) (emphasis added).

In applying the PSLRA standard to Plaintiff's Section 10(b) claims, the

court must also balance the similar pleading requirements of Rule 9(b) which

provides that a party alleging fraud "must state with particularity the circumstances

constituting fraud." Fed. R. Civ. P. 9(b).  The sole purpose of the heightened

pleading requirement of Rule 9(b) "is to provide notice, not to test the factual

allegations of the claim."  *Morganroth & Morganroth v. Norris, McLaughlin &*

*Marcus*, P.C., 331 F.3d 406, 414 n.2 (3d Cir. 2003) (citation omitted).  The Third

Circuit, therefore, has repeatedly held that "Rule 9(b)'s demand for specificity

exists to enable defendants to prepare a defense to the allegations." *See, e.g.*, *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 659 (3d Cir. 1998). Thus, it is required "at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue.'" *Joyce*, 2008 U.S. Dist. LEXIS 27181 at 5-6 (quoting *In re: Suprema Specialties*, 438 F.3d at 276) (internal quotations omitted)).

When a plaintiff alleges a fraudulent scheme, as SEPTA has done so here, courts have also "recognized the impracticality of requiring the plaintiff to plead the facts of each individual claim, particularly where the claims are numerous and extend over the course of several years." *Fulton Bank, N.A. v. UBS Sec., LLC*, 2011 U.S. Dist. LEXIS 128820, *19 (E.D. Pa. Nov. 7, 2011). Furthermore, because the PSLRA does not permit discovery prior to a ruling on a motion to dismiss, this "normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control*." In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417-1418 (3d Cir. N.J. 1997).

Although demanding, Plaintiff has adequately satisfied the applicable pleading standards for each of its federal securities claims.

### D.    Plaintiff Adequately Alleged Securities Act Claims Against the Orrstown Defendants and Underwriter Defendants.[11]

Plaintiff has alleged that the Offering Documents used to sell 1.4 million shares of Orrstown stock in the March 2010 Offering and raise $40 million from investors who comprise the members of the Class, contained approximately 17 false and misleading statements concerning the Bank's lending practices, financial condition and internal controls. *See* Appendix A.    Under the Securities Act, Plaintiff may assert Sections 11, 12(a) and 15 claims against the Orrstown Defendants[12] and the Underwriter Defendants for the alleged false and misleading Offering Documents.

Section 11 of the Securities Act creates a private cause of action for "any person acquiring [a] security" for which a ***registration statement*** contained an untrue statement of material fact or an omission of a material fact that is required to be stated therein or necessary to make the statement therein not misleading.   15 U.S.C. § 77k(a).   A Section 11 claim can be brought against "every person who signed the registration statement, the issuer of the securities, the issuer's directors

---

[11]    Plaintiff responds to Auditor Defendant SEK's Securities Act arguments in Section V.F., *infra.*

[12]    Plaintiff has asserted Securities Act claims against each of the Individual Defendants – Quinn, Everly, Embly, Snoke, Zullinger, Shoemaker, Coy, Ceddia, Keller, Pugh and Ward – because of their positions within the Company that enabled them to have control over the contents of the alleged false and misleading Offering Documents that were issued to market the March 2010 Offering. *Am. Compl.* ¶¶ 44, 226.

or partners, the underwriters of the offering, and accountants named as having prepared or signed the registration statement." *In re Adams Golf, Sec. Litig.*, 176 F. Supp. 2d 216, 222-223 (D. Del. 2001), *affm'd and rev'd in part*, 381 F.3d 267 (3d Cir. 2004) (citing 15 U.S.C. § 77k(a)).  Section 12(a)(2) of the Securities Act also provides for a private right action against those persons, such as the Orrstown Defendants and the Underwriter Defendants, who offer or sell a security "by means of a ***prospectus*** or oral communication" that includes an untrue statement of fact or omits to state a material fact necessary in order to make the statements not misleading.  15 U.S.C. § 77l(a)(2) (emphasis added).

Section 15 of the Securities extends liability to "control" persons and is predicated upon a primary violation of Sections 11 and 12.  *In re Adams Golf*, *Sec. Litig.*, 176 F. Supp. 2d at 223.  "Sections 11 and 12(a)(2) are Securities Act siblings with roughly parallel elements."  *Underland v. Alter*, 2012 U.S. Dist. LEXIS 98450, *10 (E.D. Pa. July 16, 2012) (internal citation omitted).  In adequately pleading that the Offering Documents (which Plaintiff has defined to include the registration statement, prospectus and all documents incorporated by reference therein) were false and misleading under Section 11, Plaintiff has also adequately pleaded violations of Sections 12(a) and 15.  As demonstrated below and herein, Defendants' motions to dismiss the Securities Act claims should be denied.

### 1.      *The Offering Documents Included Materially False and Misleading Statements.*

The Orrstown Defendants and Underwriter Defendants argue that Plaintiff has failed to adequately allege that the Offering Documents contained statements that were materially false and misleading.  Prevailing case law indicates otherwise. A misrepresentation or omitted fact "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 872 (3d Cir. N.J. 2000) (quoting and discussing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)).  The test for materiality is therefore "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1323 (11th Cir. 1982).  Or said another way, whether there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*).

It is indisputable that a reasonable person in deciding whether to invest in Orrstown securities would "attach importance" to the fact that prior to and during the time of the March 2010 Offering, the Orrstown Defendants failed to follow the Bank's own Loan Policy and had approved risky commercial loans, that the

commercial loan portfolio had deteriorated with increasing levels of impaired loans,  Orrstown failed to effectively stress test its loans and make accurate risk ratings, that loan loss reserves were inadequate given the deterioration in credit quality in the commercial portfolio, and that Orrstown lacked adequate internal controls. *Am. Compl.* ¶¶ 169, 171, 173.   Casting reasonableness aside, Defendants have challenged the materiality of the alleged false and misleading statements arguing that the statements are either mere corporate puffery or protected by issued cautionary statements.  Orrstown Br. at 13-17, 22-47; Underwriters Br. at 20-25. By all accounts, Defendants arguments must fail.  *See infra* Sections V.D.4 (The Alleged Statements Are Not Puffery) and V.D.5 (Bespeaks Caution Doctrine and PSLRA Safe Harbor Do Not Provide Immunity for the Alleged False and Misleading Statements in the Offering Documents).

Materiality is a mixed question of law and fact that is not normally appropriate for resolution at the motion to dismiss stage. *EP Medsystems, Inc.*, 235 F.3d at 875. "Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Quaker Oats Co.*, 129 F.3d at 317 (3d Cir.1997)). Furthermore, "[m]ateriality must be determined as of the date of the alleged omission because the importance of the misrepresented facts should not be judged

with the advantage of hindsight." *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831 (8th Cir. 2003) (internal citations and quotations omitted); *accord In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

The alleged false and misleading statements made in the Offering Documents cannot be labeled "obviously unimportant." These statements go to the heart of the Company and the systemic and pervasive failures that ***existed prior to and at the time*** the Offering Documents were disseminated and digested by the market.   Accepting Plaintiff's allegations as true and construing them in the light most favorable to Plaintiff, as the Court must on a motion to dismiss, Plaintiff has adequately alleged materially false and misleading statements and omissions to survive Defendants' challenge.

> **a.    Plaintiff   Adequately   Alleged   Materially   Misleading Statements   and   Omissions   Regarding   the   Credit, Underwriting and Loan Review Procedures.**

It is the Defendants duty "under the securities laws to disclose in its Registration Statement and Prospectus [*i.e.*, the Offering Documents] all material facts with respect to [Orrstown] that were known or knowable at the time of the [March 2010 Offering]."   *In re Adams Golf, Sec. Litig.*, 176 F. Supp. 2d at 227. When defendants "voluntarily disclose information, they have a duty to disclose additional material facts only to the extent that the volunteered disclosure was misleading as to a material fact."   *Underland*, 2012 U.S. Dist. LEXIS 98450 at

*10.   The Orrstown Defendants and Underwriter Defendants have not fulfilled their disclosure duties.   As detailed in the Amended Complaint, during the time period that the Orrstown Defendants were gearing up for the March 2010 Offering and the Underwriter Defendants were engaged in their due diligence for the offering, the systemic ongoing failures at the Bank were, essentially, coming home to roost.   These systemic failures both *known and knowable* were not disclosed in the Offering Documents but instead the exact opposite was conveyed to investors by the alleged false and misleading statements that the Bank had:

> "sound credit practices and stringent underwriting standards" (*Am. Compl.* ¶ 165a-c, 168a-c);

> "a high quality loan portfolio with no unusual or undue concentrations of credit" and "ratio of nonperforming loans . . . well below peers and demonstrate our continued focus on credit quality risk mitigation" and "asset structure continues to be strong" (*Am. Compl.* ¶¶ 165c, 166c, 167a 168a);

> effectively "monitors and evaluates loan customers using risk-rating criteria established in the Loan Policy in order to spot deteriorating trends" (*Am. Compl.* ¶ 165d);

> "adequately reserved for any potential losses" with adding "$3,600,000 to its loan loss reserve in the fourth quarter" so "allowance for loan losses is ample" (*Am. Compl.* ¶¶ 166a, 166b, 167b).

*See* Appendix A (indexing alleged false and material statements in the Offering Documents).

Plaintiff has alleged some of the known and knowable facts that make those statements false and misleading at the time the Offering Documents were released. By mid-2009, the Orrstown Defendants knew that well over a hundred loans had been made to borrowers in the Hagerstown market with Terry Reiber as the loan officer. *Am. Compl.* ¶¶ 76-77. As recalled by CW#1 and CW#3, the Credit Analyst Group had recommended against extending many of these loans because the borrowers lacked credit-worthiness but the loans were made anyway in contravention of the Bank's Loan Policy, and by this time the Orrstown Defendants had been put on notice by Brian Selders, Reiber's replacement, that the Hagerstown loans were of very poor quality and showing signs of impairment, such as large commercial borrowers the Azadis. *Id.* ¶¶ 73, 76-77, 79-95. In November 2009, the Orrstown Defendants began an Internal Review which was to reevaluate risk ratings on the Bank's commercial loans and the requisite loan loss allocations. *Id.* ¶¶ 99-100. In conducting the Internal Review on 60% of the Bank's commercial loans, the Orrstown Defendants and Underwriter Defendants had in their possession up-to-date credit data on the Bank's commercial loans which revealed the true extent of the commercial loan portfolio's deterioration, the impairment of the loans, the inadequacy of the loan loss reserves and at bottom, the ramifications of the Orrstown Defendants' ongoing risky lending practices in violation of the Loan Policy. *Id.* ¶¶ 102-103.

By March 15, 2010, *all of this and more was known or knowable* to the Orrstown Defendants and Underwriter Defendants because (i) the Internal Review had concluded which had gathered current credit adverse data on 60% of the Bank's commercial loans (*Am. Compl.* ¶¶ 103, 105), (ii) the Azadis had informed the Bank that it could not satisfy its debt service on their millions of dollars of commercial loans (*id.* ¶¶ 110-112), (iii) large borrower Yorktown had filed for bankruptcy exposing the Bank to millions of dollars in losses on loans that were inherently risky from the start (*id.* ¶¶ 130-132), and (iv) the loan loss reserves were inadequate given the deterioration of the loan portfolio.   These are *some* of the facts Plaintiff has alleged that make the alleged statements in the Offering Documents false and misleading, *i.e.*, *id.* ¶¶ 165a-d, 166a-c, 167a-b, 168a-c (*See* Appendix A), concerning the Bank's credit, underwriting and loan review procedures.

Plaintiff's facts are more than sufficient at the pleadings stage to establish a *prima facie* case for a Section 11 violation.   Moreover, with respect to the loan losses reserves which Orrstown makes false and misleading statements about in the Offering Documents, *see Am. Compl.* ¶165d, 166a-b, 167b (*see* Appendix A), courts have held that it is sufficient to allege that the speaker ignored obvious signs when commenting on a financial metric in which management has discretionary authority.   For example, in *Local 703, I B of T. Grocery & Food Emples. Welfare*

*Fund v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 60761, *20 (N.D. Ala. June 7, 2011), the Court concluded that it was sufficient to plead

> facts showing that the defendants had information that did not support defendants' opinions [concerning loan loss reserves, such as that] … defendants improperly handled and classified loans, defendants were aware of the collapsing commercial real estate market in Florida yet continued to push for more growth there, and continued to ignore … reports signaling a negative risk-adjusted bottom line.

*See also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993) ("deliberate failure to recognize problem loans, thus understating the [loan loss] reserve, constitute[d] an actionable omission or misrepresentation of existing fact . . . cannot be dismissed as a mere matter of internal mismanagement"); *In re Citigroup Bond Litig.*, 723 F. Supp. 2d 568, 592 (S.D.N.Y. 2010) (same); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1019 (N.D. Ill. 2010) ("[P]laintiff here has alleged specific, concrete reasons for his contention that Corus should have known that its reserves were inadequate and needed to be increased, and that Corus's statements about the adequacy of its reserves were misleading.").

The Orrstown Defendants and Underwriter Defendants ignore the facts and instead surgically parse each statement so that they are arguing about discrete words taken entirely out of context. They argue, for example, "Plaintiff pleads no facts from which it could possibly be inferred that, at the time of the March 2010 offering [sic], Orrstown did not believe that its past lending practices were

'conservative' or that its loan portfolio was of 'high quality.'" Underwriter Br. at 34; *accord* Orrstown Br. at 31). This argument is disingenuous at best given Plaintiff's fact laden allegations derived from CW#1 and CW#3's experiences with the loan review and approval process prior to the March 2010 Offering. They also make the global arguments that the statements are nothing more than corporate puffery and, even if not puffery, the statements are not actionable under the bespeaks caution doctrine and the PSLRA's safe harbor provision. Orrstown Br. at 13-17; Underwriters Br. at 23-25. Finally, they argue that the information derived from Confidential Witnesses is unreliable such that the Court should draw no inferences from it in Plaintiff's favor. Orrstown Br. at 17-22; Underwriters Br. at 29-31. Each of these arguments is discussed and refuted below.[13] Accordingly, because none of their arguments support a finding that the alleged statements are not materially false and misleading, Defendants' motions to dismiss Securities Act claims on these statements, *i.e.*, *Am. Compl.* ¶¶ 165a-d, 166a-c, 167a-b, 168a-c (*see* Appendix A), must fail.

---

[13]     *See infra* Sections V.D.3 (Plaintiff Has Adequately Described the Confidential Witnesses); V.D.4 (The Alleged Statements Are Not Puffery) and V.D.5 (Bespeaks Caution Doctrine and PSLRA Safe Harbor Do Not Provide Immunity for the Alleged False and Misleading Statements in the Offering Documents).

**b.   Plaintiff   Adequately   Alleged   Materially   Misleading Statements and Omissions Regarding the Effectiveness of Management.**

Plaintiff alleges that there are four statements in the Offering Documents concerning the effectiveness of management that are false and misleading.  These statements, *i.e.*, *Am. Compl.* ¶ 172a-d (*see* Appendix A), were repeated in the Offering Documents and by Defendants Quinn, Everly and Embly when they met with investment bankers and prospective investors to market the March 2012 Offering.  The alleged false and misleading statements conveyed to investors that Orrstown was being effectively run by a highly "experienced management team" with "strong operation ability" that implemented and maintained a "disciplined credit culture" because the team was "heavily involved" in all aspects of the lending process by "exercise[ing] significant oversight." *Am. Compl.* ¶ 172a-d (*see* Appendix A).

The facts, as alleged, which were known or knowable at the time the Offering Documents were disseminated, disprove each of these alleged misstatements statements.  The management team caused the Bank to take on excessive risk.  As CW#1 and CW#3 revealed, the Individual Defendants who each participated on the Loan Committee allowed Defendant Embly to dominate the Loan Committee meetings and adopt a credit culture that was not disciplined but rather dangerous. *Am. Compl.* ¶ 173.   During this time period, the Loan

Committee frequently disregarded the Credit Analyst Group's recommendations against extending credit, approved loans where the borrowers were not credit-worthy under the Loan Policy (*e.g.*, failed to satisfy Debt Service Ratio, loan to value rations were unacceptably high, etc.), and made special accommodations, contrary to the loan policy for certain borrowers such as the Azadis, Shaool Family, Chambersburg Borrowers and Yorktown.  *Id.* ¶¶ 76-77, 80, 83-96, 107-113, 117-124, 127-133.

The Orrstown Defendants also failed to monitor or minimize risk.  The commercial loan portfolio was not effectively and periodically stress tested because the Bank would often fail to secure updated credit data on its borrowers. *Am. Compl.*  ¶¶ 82-83.   Further, the Bank's Loan Review Officer responsible for stress testing had no formal training, practical experience or even an educational background to qualify him for the position.  *Id.* ¶¶ 82-83.   When the Bank did conduct its Internal Review, it failed to properly risk rate the loans such that the loan loss reserves were inadequate for the Bank's level of credit risk at that time. *Id.* ¶¶ 102-105.

The Orrstown Defendants and Underwriter Defendants ignore these well-pleaded facts and their implications.  They argue that these statements are inactionable corporate puffery and forward-looking statements.  But, these arguments fail.  *See infra* Section V.D.4-5.  The Underwriter Defendants also

incorrectly argue that Plaintiff is really complaining of corporate mismanagement for which the Securities Act can provide no relief.  Underwriter Br. at 18-19. Plaintiff does not dispute that the courts have held acts of corporate mismanagement do no violate the federal securities laws,[14] but the courts do not take the myopic and impractical view that the Underwriter Defendants argue here.

The Third Circuit has emphasized that although acts of corporate mismanagement do not violate the federal securities law, Congress passed the Securities Act to "ensure the full and fair disclosure of information in securities transactions."  *In re RAIT Fin. Trust Sec. Litig.*, 2008 U.S. Dist. LEXIS 103549, *33 (E.D. Pa. Dec. 22, 2008) (discussing the holding in *In re Craftmatic Sec. Litig.*, 890 F.2d at 638 n. 14).  Thus, if a plaintiff adequately pleads a claim under the federal securities act based upon facts that could also support a finding that corporate mismanagement has occurred, courts will allow the federal securities claim to proceed.  *See In re RAIT Fin. Trust Sec. Litig.*, 2008 U.S. Dist. LEXIS 103549 at *33-34 (finding plaintiffs adequately alleged Section 11 claim); *In re Atlas Air Worldwide Holdings, In S.E.C. Litig.*, 324 F. Supp.2d 474, 494 n.11 (S.D.N.Y. 2004) ("Although 'poor business judgment is not actionable under' federal securities laws, a plaintiff has alleged more than mere corporate mismanagement when he has adequately alleged that the defendant made false

---

[14]     *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977); *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 638 n.14 (3d Cir. 1989).

statements. . .”); *City of Omaha Police & Fire Ret. Sys. v. LHC Group, Inc.*, 2013 U.S. Dist. LEXIS 36318, 22 (W.D. La. Mar. 15, 2013) (“The court finds the allegations in the AC are more than allegations of mismanagement and therefore are actionable [under the Exchange Act].”).  Even if the egregious facts presented here could constitute a derivative corporate claim, Plaintiff can still, and has, adequately alleged federal securities claims against the Defendants.

### 2.     *Rule 9(b) Does Not Apply to Plaintiff's Section 11 Claims.*

In contrast to claims brought pursuant to Section 10(b) of the Exchange Act, claims under Sections 11 and 12 of the Securities Act do not require allegations of scienter, reliance or loss causation.  *See In re Morgan Stanley Mortgage Pass-through Certificates Litigation*, 592 F.3d 347, 358 (2d Cir. 2012); *In re Adams Golf Sec. Litig.*, 176 F. Supp. 2d at 239.

Rather, Section 11 claims are held to a strict liability standard where a registration statement or a prospectus: (1) contains an untrue statement of material fact; (2) omits to state a material fact; or (3) omits to state a material fact necessary to make the statements therein not misleading. 15 U.S.C. §77k; 15 U.S.C. §77l(a). Thus, if the registration statement or prospectus is false or misleading, liability is “***virtually absolute***, even for innocent misstatements.” *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 n.14 (1983) (emphasis added); *accord In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1363 (S.D. Fla. 2001) (citing

*Huddleston*, 459 U.S. at 381-82) (stating Sections 11 and 12 do not require pleading or proof of an intent to defraud or even knowledge that misrepresentations or omissions had been made).

Nonetheless, Defendants incorrectly argue that the Rule 9(b) pleading standard, not Rule 8,[15] applies to Plaintiff's Section 11 claims because the alleged actionable statements in the Offering Documents are "opinions," such that Plaintiff should be required to allege that the Defendants knew that the opinion was false or had no reasonable basis for the opinion at the time it was made.  *See* Orrstown Br. at 12-13; Underwriters Br. at 16-18; SEK Br. at 15-16, 30.  This is tantamount to a showing of *scienter* which is ***not*** an element of a Section 11 strict liability claim.

Defendants essentially asks this Court to adopt the pleading standard adopted by the Second Circuit in *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011) and the Ninth Circuit in *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009) (holding that a Section 11 complaint which fails to allege that the defendant did not actually believe the false statement or hold the opinion at issue would be dismissed).  Both *Fait* and *Rubke* are outgrowths of the decision in

---

[15]    The notice pleading standard of Rule 8 requires that plaintiffs set forth a "short and plain statement" of its claims.  The Orrstown Defendants actually argue that Plaintiff has not satisfied Rule 8 because Plaintiff's Amended Complaint was too "wordy."  Indeed, it required thousands of words for Plaintiff to provide a fulsome recitation of the facts that support Plaintiff's claims.

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991),[16] but *Virginia Bankshares* arose out of an appeal of a jury verdict on a Section 14(a) claim finding that management's belief about the fairness of a merger was unsupported by facts exiting at the time the opinion was made.  It is not applicable to a Section 11 strict liability claim.

---

[16]     In *Virginia Bankshares*, the plaintiff alleged that the board made false and misleading statements when it told investors that the merger was "fair" and that the offer price was "high" for the shares.  501 U.S. at 1088-89.  A jury found in favor of the minority investors.  A different group of investors in a related action moved for summary judgment based on the jury's verdict, which the district court granted and the Fourth Circuit Court of Appeals affirmed.  *Id.* at 1089.  On appeal, the defendant argued that its statements of opinion or belief should not be actionable where the proxy enables investors to draw their own independent conclusions.  *Id.* at 1090.  The Court rejected the argument and held that opinions or beliefs are not *per se* inactionable under Section 14(a) of the Exchange Act if there is a substantial likelihood that a reasonable shareholder would consider the statement important on how to vote.  *Id.*

> Provable facts either furnish good reasons to make a conclusory commercial judgment, or they count against it, and expressions of such judgments can be uttered with knowledge of truth or falsity just like more definitive statements, and defended or attacked through the orthodox evidentiary process that either substantiates their underlying justifications or tends to disprove their existence.

*Id.* at 1093 (citing *Day v. Avery*, 548 F.2d 1018 (D.C. Cir. 1976) (finding committee's "opinion" could be an actionable misrepresentation)).

Significantly, Defendants' proposed rule of law **has not been adopted by the Third Circuit**[17] and was **flatly rejected by the Sixth Circuit** recently in *Indiana State Dist. Council of Laborers and HOD Carriers Pension and Welfare Fund v. Omnicare, Inc.*, No. 12–5287, 2013 WL 2248970 (6th Cir. May 23, 2013).   The Sixth Circuit held that a claim alleging a false statement of opinion or belief in a registration statement may proceed under Section 11 of the Securities Act despite the absence of allegations suggesting that the defendants did not actually hold the opinion or believe the statement.   *Id.* at 1-12.   The Sixth Circuit noted that the Supreme Court in *Virginia Bankshares* assumed knowledge of falsity and effectively treated § 14(a) like a statute requiring *scienter*, which is not required in a Section 11 claim.   *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983) (holding Section 11 claims do not require a show of *scienter* (*i.e.*, an intent to defraud or any level of knowledge that misrepresentations or omissions were made)). Furthermore, in rejecting arguments that the plaintiff's claims sounded in fraud and were opinions that required proof of subjective and objective falsity, the Sixth Circuit unambiguously stated: "**No matter the framing,** once a false statement has been made, a defendant's knowledge is not relevant to a strict liability claim." *Omnicare, Inc.*, No. 12–5287, 2013 WL 2248970 at *10, 10-12

---

[17]     In *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428 (3d Cir. 1997), the Third Circuit adopted the *Virginia Bankshares* standard for purposes of a Section 10(b) claim which, unlike Section 11, requires proof of *scienter*.

(emphasis added).   Liability on a Section 11 claim, therefore, is "*virtually absolute*, even for innocent misstatements."   *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (emphasis added).   Such a claim can be asserted against the issuer, underwriter and the accountant who prepared or certified the false financial statement included in the Offering Documents.   *Ehlert*, 245 F.3d at 1315 (citing 15 U.S.C. §77k(a)).   Thus, *Virginia Bankshares* "has very limited application to § 11; a provision which the Court has already held to create strict liability."   *Indiana State,* 2013 WL 2248970 at *12 (citing *Huddleston*, 459 U.S. at 381–82).

The Court should soundly reject Defendants' invitation to impose a *scienter* requirement on Plaintiff's Section 11 claims and burden Plaintiff with a higher pleading standard neither required by Congress nor a majority of the Circuit Courts. Plaintiff's Section 11 claims have been pleaded such that they are "rooted exclusively in theories of strict liability and negligence."   *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 (3d Cir. 2004).   *See, e.g.*, *Am. Compl.* ¶¶ 162-164, 200, 211, 222.   The Third Circuit Court of Appeals has held that when "individual defendants are accused in separate claims of the same complaint of having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims."   *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 272 (3d Cir.

2006).    Even if this Court concludes that the Rule 9(b) standard applies to Plaintiff's Securities Act claims, Plaintiff has satisfied this standard. [18]

### 3.    Plaintiff Has Adequately Described the Confidential Witnesses.

It is well established in the Third Circuit that confidential sources may provide essential non-public information that a court may rely upon in drawing inferences as to the adequacy of plaintiff's claims, if the plaintiff "provide[s] some indicia of [the confidential sources'] reliability."  *Gaer v. Educ. Mgmt. Corp.*, 2011 U.S. Dist. LEXIS 153539, *73 (W.D. Pa. Aug. 30, 2011) (citation omitted) (finding confidential witnesses could not be relied upon for information about company-wide practices because they were only privy to the practices at a few of the company's locations).   Since the PSLRA does not require identification of a confidential source (15 U.S.C. § 78u-4(b)(1)), courts simply require a plaintiff  to "sufficiently describe the source to support the probability that the source possesses the information alleged."  *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 156 (3d Cir. 2004) (concluding confidential witnesses could not be relied upon because the plaintiffs "fail to allege when these sources were employed by Chubb, when they obtained the information they allegedly possess, and whether

---

[18]    Plaintiff maintains that even if this Court were to find that the higher pleading standard of Rule 9(b) applies to Plaintiff's Securities Act claims, the Amended Complaint adequately pleads violations of the Securities Act with the requisite specificity discussed *supra* Section III (Counter Statement of Facts).  If, however, the Court were to conclude otherwise, Plaintiff respectfully requests the opportunity to replead its Securities Act claims.

their supposed knowledge is first or second hand"). *See also In re Rent-Way Secs. Litig.*, 209 F. Supp. 2d 493, 510 (W.D. Pa. 2002) (applying the *Novak* approach as adopted by the Third Circuit, the court held plaintiffs' have appropriately described the positions formerly held by each of these sources as well as the basis of the sources' personal knowledge).

Here, Plaintiff has provided the requisite specificity for each of its confidential witnesses such that the Court can rely upon the information that they have provided in deciding the motion *sub judice*. *Am. Compl.* ¶¶ 56-58, 61 (describing CW#1, CW#2, CW#3, and CW#6). Plaintiff gathered compelling information from four former employees of the Bank because each of them held positions within the Bank during the relevant time period that gave them first-hand access to the Bank's credit review and loan approval process. *Cf. In re PDI Sec. Litig.*, 2005 U.S. Dist. LEXIS 18145, *52-53 (D.N.J. Aug. 16, 2005) (finding confidential sources could not be considered reliable where plaintiff failed to describe their employment position with the defendant or their ability to have access to the information alleged).

The Orrstown Defendants seek to discredit the Confidential Witnesses because they were not upper level management and did not risk their jobs by "sa[ying] anything to anyone in senior management . . . about the alleged negligence or misfeasance they supposedly witnesses." Orrstown Br. at 20.

Similarly, the Underwriter Defendants argue that because these witnesses were not upper management they could not know the workings of the Loan Committee. Underwriters Br. at 29-31.  These arguments are contrary to the allegations about the Confidential Witnesses who were involved in the loan review and approval process.

CW#1 was a credit analyst in the three-member Credit Analyst Group that reviewed ***all*** of the commercial loan applications that went through the Bank. CW#1 held this position from February 2008 through August 2011, so CW#1 was involved in the credit review and approval process prior to, during and after the March 2010 Offering, and throughout a half of the Class Period.   *Am. Compl.* ¶ 56. In CW#1's position, CW#1 was required to review credit data with CW#1 colleagues and complete loan review packets that were sent to the Loan Committee for approval. Defendants argue that because CW#1 did not participate in the Loan Committee, CW#1 could not possibly know what was really going on with the loan review process.  That is a ridiculous argument.  CW#1 reviewed credit data for the commercial loans such that ***CW#1 knew when***: a borrower's cash flow did not satisfy the Debt Service Ratio; the loan to value ratios on the loan's collateral were inadequate; the borrower failed to provide the needed credit data; the Credit Analyst Group recommended against extending credit on a loan application; the loan officers, such as Terry Reiber, interfered with the loan review process to make

the borrowers appear more credit-worthy that they actually were; and when the Loan Committee approved the loans that did not satisfy the Loan Policy and were rejected by the Credit Analyst Group as not credit-worthy. *See e.g., Am. Compl.* ¶¶ 76, 77, 84, 87, 130, 234, 235.

CW#2 became an employee of the Bank in April 2010, right after the March 2010 Offering closed, and was hired to supervise the Credit Department which encompassed the Credit Analyst Group. *Am. Compl.* ¶ 57. CW#2 left the bank approximately one year later, so he was present during half of the Class Period. While at the Bank, CW#2 reviewed the credit analysts' credit review packets, would make the recommendations on whether to extend credit, and participated in the Loan Committee meetings as a voting member. *Id.* In this position, CW#2 observed the same things as CW#1 with respect to the loan review and approval process but also participated in the Loan Committee meetings and directly observed the Individual Defendants violating the Loan Policy.[19] *See, e.g., id.* ¶ 77, 120, 234, 235, 257.

CW#3, like CW#1, was an employee of the Bank prior to and after the March 2010 Offering. At the Bank, CW#3, served as a credit analyst initially and

---

[19]    As noted above, Defendants repeatedly misstate the pleaded facts about the Confidential Witnesses. For example, the Underwriter Defendants repeatedly state that only one of the Confidential Witnesses participated in the Loan Committee meetings. As Plaintiff pleaded, both CW#2 and CW#3 participated in the Loan Committee meetings with CW#3 serving as a "voting" member. *Compare* Underwriter Defendants' Br. at 29-31 *with Am. Compl.* ¶¶ 57-58.

was promoted to Senior Credit Manager in 2009.   In this new position, CW#3 oversaw the junior credit analyst and attended Loan Committee meetings from 2009 to April 2010 to answer questions concerning the recommendations that the Credit Analyst Group would make on loan applications. *Am. Compl.* 58.  CW#3's position with the Bank enabled him to observe, prior to and during the March 2010 Offering, the Loan Committee's handling of loans and, specifically, Defendant Embly's role in pushing for approval of loans that did not satisfy the Loan Policy. Thus, CW#3 was very well positioned to observe the failings of the Bank that disprove the alleged actionable statements.

CW#6 was an employee of the Bank after the March 2010 Offering and worked in the Bank's compliance department from January 2011 through April 2012. *Am. Compl.* ¶ 61.  CW#6 was based at the Bank's Operations Center and had direct contact with the Special Asset Group that was formed in mid-2011 to remediate the bad loans that were plaguing the Bank.   Because of CW#6's position, he met with the independent firm that the Regulators insisted the Bank retain to provide assistance with the loan approval process and participated in training sessions in which the firm lectured on how to fairly ascertain the quality and risk level of the Bank's commercial loans.  *Id.* ¶ 145.  CW#6 provided insightful information concerning the tension between Defendants Quinn and the Asset Management Group related to disclosing of increased Risk Assets. *Id.* ¶ 148.

The remaining witnesses, CW#4 and CW#5 were not employees of the Bank but rather commercial borrowers of the Bank that hail from the Hagerstown market. *Am. Compl.* ¶¶ 59-60. Like the Azadis (*see Am. Compl.* ¶ 62, 52-55), these witnesses provide insight into the Bank's lending practices from the perspective of the borrowers. CW#4 was a struggling commercial borrower in the Hagerstown market who Terry Reiber wooed and secured millions of dollars of credit for, even though this borrower's collateral and business prospects were poor. *Id.* ¶¶ 59-60. CW#4 confirmed that by late 2010-early 2011, the Bank was in triage mode and seeking to restructure all of its bad loans such as those with CW#4 and the $5.8 million in loans with the Azadis. *Id.* ¶ 257. From CW#5, Plaintiff learned of the tight rein that the Regulators had over the Orrstown Defendants in the March 2012 timeframe such that they would not permit the Bank to make large commercial extensions of credit even to credit-worthy existing customers such as CW#5. *Id.* ¶¶ 60, 151.

Defendants' pejorative treatment of the Confidential Witnesses is entirely inappropriate but not entirely surprising given the significant information that they have provided to Plaintiff. Through these Confidential Witnesses' position with and relationship to the Bank and direct access to relevant information during the relevant time period, Plaintiff has demonstrated requisite indicia of reliability for each of the witnesses. *See Gaer*, 2011 U.S. Dist. LEXIS 153539 at *73.

Furthermore, Plaintiff has not relied solely upon the Confidential Witnesses but "on other facts" that provide an "adequate basis for believing the defendants' statements were false" such as the loan documents obtainable through public repositories, the Regulators' enforcements actions and other publicly available materials.  *Chubb Corp.,* 394 F.3d at 146 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012, 121 S. Ct. 567 (2000)).

### 4.    The Alleged Statements Are Not Mere Puffery.

"Material statements, by definition, cannot be considered puffery." *California Pub. Emples. Ret. Sys. v. Chubb Corp.*, 2002 U.S. Dist. LEXIS 27189, 34 (D.N.J. June 25, 2002). Conversely, puffery refers to statements that an investor would readily discount because they are either "vague expressions of hope by corporate managers" or inconsequential in their optimism.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1427-1428.  "Examples of statements which could be called puffery include a broker calling a bond 'marvelous,' or saying a stock is so 'red hot' that the investor 'could not lose.'" *In re Ravisent Techs., Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 13255, 31 (E.D. Pa. July 12, 2004).  Here, the alleged statements are not hyperbolic or obvious expressions of optimism such that an investor would discount them as puffery.  *See* Appendix A (indexing alleged actionable statements).  Rather, they are statements made about factual matters – *i.e.*, financial metrics, *e.g.*, "we are adequately reserved for potential losses" (*Am.*

*Compl.* ¶ 166a); the Bank's business model, *e.g.*, "the Bank follows conservative lending practices" (*id.* ¶ 165c); and internal controls, e.g., "the Loan Review Officer continually monitors and evaluates loan customers utilizing risk-rating criteria established in the Loan Policy" – which were material to the investors decision whether to purchase Orrstown stock or simply take a pass.

In *In re New Century,* 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008), the court reviewed statements that were very similar to those made by Orrstown.   In finding the statements actionable, the *In re New Century* court explained that statements such as "higher credit quality," "improved underwriting controls and appraisal review process," and "strict underwriting and risk management disciplines," cannot be "chalked up to 'mere puffery'":

> The allegations suggest New Century's repeated assurances of strong credit quality and strict underwriting practices. Even in the sub-prime world, there must be a basis for distinction between loans to at-risk borrowers that meet basic standards of good lending practice and loans that plainly do not. Those standards may provide the measure for evaluating Defendants' statements. ***Here, Plaintiffs offer New Century's statements that it observed standards of high-quality credit and underwriting, and set those statements against detailed allegations of practices that utterly failed to meet those standards. That is sufficient to plead false and misleading statements.***

*Id*. at 1226 (emphasis added). *See also In re PMI Group, Inc.*, 2009 U.S. Dist. LEXIS 56709 (N.D. Cal. July 1, 2009) (holding that defendant's statements such

as "very careful risk selection," and "high credit quality," among others, were false and misleading where the defendant was not adequately evaluating risk).

Courts have also held that a defendant's puffery arguments will be rejected where a plaintiff comes forth with information from a confidential witness that supports plaintiff's claims that disproving facts were known or knowable to the defendants at the time the alleged actionable statements were made. *Local 703, I B of T. Grocery & Food Emples. Welfare Fund*, 2011 U.S. Dist. LEXIS 60761 at *23-25(N.D. Ala. June 7, 2011) ("plaintiffs have brought forth statements by CWs alleging a scheme [in violation of Exchange Act], with defendants' knowledge, that strayed from the legitimate company procedures. Thus, statements by defendants' such as – "[w]e believe that we are prudently managing our credit risk in establishing the necessary reserves" – are more than puffery.")

In a last ditch effort to argue the statements are puffery, Defendants seize upon the words "we believe" which is akin to "we view" to assert that these words transform the very definite statements about the Bank's financial condition into mere puffery. *Am. Compl.* ¶¶ 165a ("we view"), 166a ("we believe"), 172b ("we view"). This argument has been soundly rejected. *In re Discovery Labs. Sec. Litig.*, 2006 U.S. Dist. LEXIS 79823, 48 (E.D. Pa. Nov. 1, 2006) ("Defendants seem to ask us to find that the ***mere inclusion*** of a word such as 'believe' or

'might' is sufficient to create a general statement of optimism [*i.e.*, puffery]. We disagree." (emphasis added)).

Given the legal authority discussed herein, Plaintiff's factual allegations and the import of the alleged actionable statements, Defendants argument that the statements are mere corporate puffery should be rejected.

### 5. *The Bespeaks Caution Doctrine and PSLRA Safe Harbor Do Not Provide Immunity for the Alleged False and Misleading Statements in the Offering Documents.*

The Orrstown Defendants and Underwriter Defendants rely heavily on the argument that the alleged false and misleading statements in the Offering Documents do not violate the Securities Act because there were plenty of cautionary statements in Orrstown's SEC filings.[20]  The cautionary statements, however, when viewed either under the judicially created bespeaks caution doctrine or the PSLRA's safe harbor provision, only implicate the materiality of a statement when the cautionary statements are meaningful and on point. Orrstown's vanilla cautionary statements do not have the talismanic effect, as Defendants argue, to render the alleged false and misleading statements immaterial.

---

[20]    In reading the Orrstown Defendants' papers, one cannot help but think of Shakespeare's Hamlet where Queen Gertrude utters, "The lady doth protest too much, methinks."  Act III, Scene II.

### a.    The Bespeaks Caution Doctrine.

"This doctrine is limited to forward looking statements and does not apply to historical or present facts." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 U.S. Dist. LEXIS 43774 (S.D.N.Y. Mar. 27, 2013) (denying motion to dismiss because plaintiffs adequately pleaded Section 10b claim). It is for this reason that that boilerplate, generic warnings about a future event cannot suffice when specific, known risks are omitted. As aptly stated by the Southern District of New York, "[t]he doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *see also Phillips v. Scientific Atlanta, Inc.*, 239 F. Supp. 2d 1351, 1362 (N.D. Ga. 2002), *aff'd*, at 374 F. 3d 1015 (11th Cir. 2004), (finding bespeaks caution doctrine inapplicable because false statements were not forward-looking and, even if they were, the defendants "did not caution against the more specific risks known to them at the time the statements were made"); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").

Here, the cautionary statements were all generic statements that warned of future risks, for example, of "potential effects of the global financial crisis" and of

"the general economic slowdown." Such statements were detached from the then-state affairs at the Bank and not directly related to the alleged false and misleading statements in the Offering Documents.   *Compare* Appendix A (indexing the Offering Documents' false and misleading statements), attached hereto, *with* Underwriters Br. at 4-5, 13 (indexing cautionary statements). Indeed, Defendants were warning of a possible "ditch" when really the "Grand Canyon" was upon them.

The Offering Documents should have but failed to warn that (i) the Loan Policy was frequently overridden to extend credit to non-credit worthy commercial borrowers especially in the Hagerstown market, (ii) that the Loan Review Officer responsible for risk rating loans was inexperienced and incapable of accurately assessing the risk level on loans such that the Bank was under-rating risk levels, (iii) that the Bank often ignored or failed to obtain current adverse credit data on its borrowers, (iv) the Board's oversight of the credit review process was dominated by Defendant Embly who approved loans based upon unsubstantiated and arbitrary exceptions to the Loan Policy, and (iv) that the Bank failed to follow its methodology premised upon GAAP standards for allocating loan loss reserves. *Am. Compl.*   ¶¶ 169, 173.  Without this level of specificity, the bespeaks caution doctrine is inapplicable.  The Bank's generalized cautionary statements did not relate directly to the alleged false and misleading statements to negate the import

of these statements as investors considered them in the total mix of material information. *EP Medsystems, Inc.*, 235 F.3d 865 at 874-875 (discussing the Third Circuit's refusal to apply the bespeaks caution doctrine when the cautionary language did not "directly relate" or lacked the specificity to "negate" the complained of statements).

Even the Orrstown Defendants cautionary statements regarding the loan losses are ineffectual.   For example, Orrstown states in the Offering Documents that it "can give no assurance that [its] allowance for loan losses is or will be sufficient to absorb actual loan losses."  This cautionary statement of the obvious cannot be elevated to a "substantive and tailored" warning to investors that (i) Orrstown was not at that time following its stated methodology for allocating loan losses and (ii) its loan loss reserves at that time were woefully inadequate given the impaired but unreported condition of its risky commercial loans.  *Am. Compl.* ¶¶ 104-105.

Both the Defendants' generic cautionary statements and Plaintiff's alleged actionable statements concerning the adequacy of the Bank's allocation for loan losses are remarkably similar to the those in *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 708-709 (3d Cir. Pa. 1996).  On appeal, the *Westinghouse* court reversed the district court's dismissal of the plaintiff's Securities Act claims because it

concluded that the cautionary statements did not sufficiently counter the alleged

misrepresentations.  *Id*. at 709.  The Third Circuit reasoned,

> In our view, ***a reasonable investor would be very
> interested in knowing, not merely that future economic
> developments might cause further losses, but that (as
> plaintiffs allege) current reserves were known to be
> insufficient under current economic conditions.*** A
> reasonable investor might well be willing to  take some
> chances with regard to the future of the economy, ***but
> might be quite unwilling to invest in a company that
> knew that its reserves were insufficient under current
> conditions and knew it would be taking another major
> write-down in the near future (as plaintiffs allege).***
> Thus, notwithstanding the cautionary language stressed
> by defendants, we think that there is a substantial
> likelihood that defendants' alleged misrepresentations --
> *i.e.*, that the loan loss reserves were established in
> compliance with GAAP and were believed to be
> adequate to cover expected future losses given the then-
> existing economic conditions -- would have assumed
> actual significance to a reasonable investor
> contemplating the purchase of securities.  We therefore
> cannot say that the cautionary language rendered the
> alleged misrepresentations immaterial as a matter of law.

*Id*. at 709-710 (emphasis added).  Just as in *Westinghouse*, the exact same can be

said here – an investor may discount the unknown future risks that the global

recession may bring but would consider very carefully disclosures, if they had been

made, that Orrstown repeatedly violated its own Loan Policy to extend risky loans

that at the time of the March 2010 Offering, were showing signs of severe

impairment and the Bank was failing to properly risk rate loans and make the necessary loan loss allocations.

Importantly, "[i]nclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading … [unless] reasonable minds could not disagree as to whether the mix of information in the document is misleading." *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. Cal. 1995) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)); *see also TSC Indus.*, 426 U.S. at 450, 96 S. Ct. at 2133 (materiality can be decided as a matter of law only if "reasonable minds cannot differ"). Here, at a minimum, it should be decided whether the boilerplate warnings were sufficient to disclose Orrstown's complete divergence from its Loan Policy to extend risky commercial loans, its concentration of credit in risky borrowers who Defendant Embly championed, its failure to implement internal controls and processes to effectively stress test the Bank's loan to make accurate risk ratings and adequate loan loss allocations. If decided by the Court or trier of fact, a reasonable conclusion is that the Offering Documents' boilerplate warnings were inadequate in light of the alleged false and misleading statements.

### b.    The PSLRA's Safe Harbor Does Not Apply.

As a statutory extension of the judicially created bespeaks caution doctrine, the PSLRA codified the safe harbor provision which provides that no liability for a

securities violation will attach if (1) the statement is forward-looking and (2) is accompanied by meaningful cautionary statements, is immaterial or is made without actual knowledge that the statement was false and misleading. 15 U.S.C. § 78u-5(c)(1). "This safe harbor was designed to protect statements discussing revenue projections and future business plans from causing liability." *In re Anadigics, Inc.*, Sec. Litig., 2011 U.S. Dist. LEXIS 112587, *53 (D.N.J. Sept. 30, 2011). The developed case law has put fine parameters on the application of the safe harbor provision.

Courts have held when the alleged false and misleading statement is "a mixed present/future statement [it] is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) (quoting and discussing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. Ill. 2008). As the *Tellabs* court explained: "The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement." *Tellabs Inc.*, 513 F.3d at 705 (holding the safe harbor did not apply to the statement that product sales were "still going strong" to the extent that the statement pertained to current sales). Courts have also held that cautionary language will not trigger safe harbor protection unless the cautionary statements

are "extensive" and "specific" and not a "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks." *In re Anadigics, Inc., Sec. Litig.*, 2011 U.S. Dist. LEXIS 112587, 55 (D.N.J. Sept. 30, 2011).

None of the alleged false and misleading statements in the Offering Documents (*see* Appendix A) are purely forward-looking statements but rather are either statements relating to the present affairs of the Company (*see* ¶¶ 166a-b, 167b, 168a-c) or are at most "mixed present/future" statements (*see* ¶¶ 165a, 165b-d, 166c, 167a, 172a-d).[21]  For those statements relating to the ***present*** affairs of the Company, the safe harbor is simply not applicable (*Avaya, Inc.*, *supra,* 564 F.3d at 255) and Defendants cannot seek to have these statements dismissed out on this basis alone.  But even if statements ¶¶ 166a-b, 167b, 168a-c are construed as not pertaining to present affairs, the cautionary statements contained in the Offering Documents cannot provide protection because they are nothing more than "vague disclaimers" as they warn of the obvious, *e.g.*, "deterioration of one or more [of its performing loans] could result in a significant increase in our nonperforming loans and our provisions of loan losses"; "deterioration in the economic conditions in [the] market areas [Orrstown serves] could materially adversely affect our operations and increase loan delinquencies";  "many economists believe that the

---

[21]    As noted above, Plaintiff discusses SEK's false and misleading statements in the Offering Document in responds at Section 11, *infra*, so those allegedly actionable statements are not referenced here.

deterioration in income producing commercial real estate is likely to worsen"; "[t]he potential effects of the current global financial crisis are difficult to forecast and mitigate."   Underwriters Br. at 12-13 (listing these cautionary statements).

Similarly, for those alleged false and misleading statements that the Court may deem *"mixed present/future"* (*see* ¶¶ 165a, 165b-d, 166c, 167a, 172a-d), the safe harbor is not applicable to the present statements (*Avaya, Inc.*, *supra,* 564 F.3d at 255). The future statements also do not receive the protection of the safe harbor because the cautionary statements contained in the Offering Documents are "vague disclaimers" and not "extensive" or "specific" enough to neutralize the false and misleading statements pertaining to systemic failings of the Bank that were entirely independent of the recession-based warnings:

- the lack of credit-worthiness of the Bank's borrowers who received tens of millions of dollars of loans, especially those Hagerstown commercial loans, *e.g.*, the Azadi loans and Shaool Family, that Terry Reiber pushed through the credit review process (*Compare*  ¶ 166a (the alleged false and misleading statement concerning **present** affairs) and ¶¶  165b-c (the alleged false and misleading statements concerning **present/future** affairs) *with* Compl. ¶¶ 76-77, 80-95, 169 (facts disproving statements);

- the continued violations of the Loan Policy that did not reflect "proactive" efforts to manage "problem credits" because the Bank was taking on excessive risk by extending credit to non-credit worthy borrowers, was not effectively risk rating loans based upon available adverse credit data or setting aside adequate loan loss reserves for loans that were impaired (*Compare*  ¶¶ 166b, 167b, and 168a-c (the alleged false and misleading statements concerning **present** affairs) and ¶¶  165a, 165d, 166c, 167a (the alleged false and misleading statements concerning **present/future** affairs)  *with* Compl. ¶¶ 76-77, 80-95, 169 (facts disproving statements); and

- the inadequacy of the Company's management team – *i.e.*, the Individual Defendants that participated in the Loan Committee meetings, Credit Administration Committee and the Risk Management Committee – who made decisions that were contrary to the Loan Policy and the Bank's existing methodology for rating risks and allocating loan loss reserves.  *Compare*  ¶¶ 172a-d (the alleged false and misleading statements concerning **present** affairs) and ¶ 167a (the alleged false and misleading statement concerning **present/future** affairs) *with* Compl. ¶¶ 76-77, 80-95, 173-174 (facts disproving statements).

The law supports a finding that neither the safe harbor nor the bespeaks caution doctrine (*see supra*) can provide Defendants with a free pass on the false and misleading statements contained in the Offering Documents.

### 6.    Each of the Defendants Are Liable for Violating the Securities Act.

#### a.    Plaintiff Adequately Alleges Violations of Section 12(a).

Section 12(a) imposes liability on sellers, offerors and/or solicitors of purchasers of securities offered pursuant to a materially false and misleading prospectus.  15 U.S.C. § 77l(a)(2).  Here, Orrstown's Prospectus for the March 2010 Offering is part of the Offering Documents discussed *infra*.  Because Plaintiff has adequately alleged that the Offering Documents contain false and material misleading statements, and that Orrstown Defendants and Underwriters were responsible for the truthfulness of the Offering Documents, Plaintiff's Section 12(a)(2) claim asserted against the Orrstown Defendants and Underwriter Defendants are viable.

#### b.    Plaintiff Adequately Alleges Claims Under Section 15 against the Individual Defendants

Section 15 imposes derivative liability on one who "controls any person liable under Section 11 or 12."  *Underland*, 2012 U.S. Dist. LEXIS 98450 at 10.  A plaintiff must show that the defendant controlled another person or entity and that the controlled person or entity committed a predicate offense under the Securities Act. *See In re Suprema Specialties*, 438 F.3d at 284.  Courts should give "heavy

consideration . . . to the power or potential power to influence and control the activities or a person, as opposed to the actual exercise thereof." *See In re Cendant Corp.*, 60 F. Supp. 2d 354, 367 (D.N.J. 1999).   Courts have repeatedly held that whether a defendant exerts control over another defendant is a question of fact that requires an intensive factual analysis that cannot ordinarily be resolved on a motion to dismiss.  *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 731 (D. Del. 2000); *see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir. 2002) ("[c]ontrol is a question of fact that will not ordinarily be resolved summarily at the pleading stage.").

Here, Plaintiff has adequately pleaded Section 11 and 12(a) claims against the Orrstown Defendants and Underwriter Defendants.   Plaintiff has also sufficiently alleged that the Individual Defendants controlled Orrstown and the Bank, primary violators of Section 11 and 12(a).  *Am. Compl.* ¶¶ 223-227.  Each of the Individual Defendants were directors and/or officers of the Company prior to and during the time the Offering Documents were issued.  With the exception of Defendant Embly, the Individual Defendants each signed the Registration Statement that contained the alleged false and misleading statements.  Plaintiff also alleged that each of the Individual Defendants were voting members on the Loan Committee at different times prior to and during the March 2010 Offering, and therefore they made decisions contrary to the Loan Policy by allowing the Bank to

take on excessive credit risk. With these pleaded facts, Plaintiff has sufficiently set forth allegations to overcome Defendants' motion to dismiss the Section 15 claim and to allow discovery to proceed on this issue.

**E.   Plaintiff Adequately Alleges Exchange Act Claims Against The Orrstown Exchange Act Defendants.[22]**

Plaintiff asserts that purchasers of Orrstown common stock between March 15, 2010 and April 5, 2012 (the "Class Period") were deceived and misled about the true financial and operational condition of Orrstown, and were, therefore, misled about the nature and value of the investment they were making in Orrstown. Plaintiff asserts the Orrstown Exchange Act Defendants' conduct violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act" or "1934 Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

The Orrstown Exchange Act Defendants argue that the Complaint fails to state a claim under the 1934 Act for two primary reasons.  Orrstown Br. at 47-71. First, because Plaintiff does not sufficiently allege that Defendants made any actionable omission or misrepresentations of material fact during the Class Period. Second, even if Plaintiff had pled such a misrepresentation, it has not pled specific

---

[22]   Plaintiff responds to Auditor Defendant SEK's arguments in Section F, *infra*.

facts which would support an inference that the Orrstown Exchange Act Defendants acted with the requisite level of scienter.

The Amended Complaint stands in stark contrast to Defendants' unsupported posturing and overstatements. Rather, its facts are drawn from a substantial amount of investigation done by Plaintiff (including, discussions with Confidential Witnesses[23] and analysis of hundreds of loan records, public documents and SEC filings), and it states with particularity the statements made by Defendants and why they are false and misleading. *See, Am. Compl. ¶¶ 229-292.* Plaintiff does not merely rely on speculation or rank inferences. Instead, the compelling, well-pled facts alleged in the Complaint, which are summarized *supra*, demonstrate a pattern of fraudulent conduct, and how the public and investors were misled about the magnanimous problems occurring at Orrstown. Orrstown shareholders were deceived about fundamental metrics at the heart of Orrstown's business and its financial and operational health. And, the Orrstown Exchange Act Defendants were not passive or blind to the deception, but instead were actively involved in the wrongdoing and the subsequent concealment of the wrongdoing that was destroying Orrstown's business; unequivocally, they made public

---

[23] The confidential witnesses have been "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). *See*, *supra*, Section V.D.3.

statements that were designed to mislead and conceal the true state of affairs at Orrstown.   Contrary to Defendants' unsubstantiated and baseless arguments, the Amended Complaint sufficiently pleads Exchange Act claims against the Orrstown Exchange Act Defendants, and Plaintiff should now be afforded the opportunity to proceed to discovery to prove them.[24]

### 1.    *Law Applicable to the Exchange Act Claims.*

Section 10(b) of the Securities Exchange Act of 1934 makes it illegal to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b).   Under Rule 10b-5, promulgated by the SEC under Section 10(b), one may not "make any untrue statement of a material fact or [] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.   Although Section 10(b) does not expressly provide for a private right of action, courts have long recognized an implied private right of action under Section 10(b) and Rule 10b-5.   *See Kardon v. National*

---

[24]   As courts have explained, even when PSLRA pleading standards apply, "'in determining the adequacy of a complaint . . . we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.'" *Miss. Pub. Emps.' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) (*quoting Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996)).

*Gypsum Co.*, 69 F. Supp. 512 (E.D. Pa. 1946) (first case to recognize implied private right of action under Section 10(b)).

To state a cause of action for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must assert facts showing that "the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (*quoting San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996)).

In addressing Defendants' motion to dismiss addressed to the Exchange Act claims, the Court must accept as true all well-pleaded facts in support of the claim and make all reasonable inferences in the plaintiffs' favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Blackstone Realty LLC v. Fed. Deposit Ins. Corp.*, 244 F.3d 193, 197 (1st Cir. 2001). The Complaint survives a motion to dismiss, when it alleges facts sufficient to demonstrate "a plausible entitlement to relief." *Twombly*, 550 U.S. at 559.  As discussed *supra,* the PSLRA, 15 U.S.C. §78u-4(b), establishes pleading standards for plaintiffs asserting claims for securities fraud under the Exchange Act.   Nevertheless, the Court should not dismiss the Complaint if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  In ruling on a motion to dismiss, the Court is to "assess the legal feasibility of the complaint, not to assay

the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted).  As the Supreme Court has explained, notwithstanding the judges views of the facts before them, courts may not disregard or discount properly pled factual allegations. *See, Iqbal*, 129 S. Ct. at 1940; *Twombly*, 550 U.S. at 556.

> ### 2.    *The Amended Complaint Sufficiently Pleads Material Misstatements and Omissions by the Orrstown Exchange Act Defendants.*

Plaintiff prevails on its Section 10(b) claim, as Plaintiff has sufficiently alleged that the Orrstown Exchange Act Defendants made statements that were "'***misleading*** as to a ***material*** fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (*quoting Basic Inc*, 485 U.S. at 238).  Plaintiff adequately pleads that the Orrstown Exchange Act Defendants made numerous material false statements in, and/or omitted material information from, Orrstown's public filings, and the "reason or reasons why the statement [or omission was] misleading." 15 U.S.C. § 78u-4(b)(1).

> ### a.    **The Orrstown Exchange Act Defendants.**

The Orrstown Exchange Act Defendants alleged to have violated the Exchange Act are comprised of the following entities and individuals:

- **Orrstown**; the issuer and holding company for its wholly-owned subsidiary Orrstown Bank. *Am. Compl. ¶¶* 26, 54-55.

- **Orrstown Bank**; the PA state-chartered bank, with its Operations Center located in Chambersburg, PA, which, among other things, makes commercial, residential, consumer and agribusiness loans within its South Central Pennsylvania and Hagerstown Maryland geographic market. Approximately 75% of the Bank's loan portfolio is concentrated in commercial loans. *Am. Compl. ¶¶* 27, 54-55.

- **Quinn**; the President and Chief Executive officer of Orrstown and the Bank. *Am. Compl. ¶¶* 28, 54-55. Quinn served on the Bank's Enterprise Risk Management Committee and Loan Committee. *Id.*

- **Everly**; the Executive Vice President, Chief Executive Officer and Chief Financial Officer of the Bank who resigned on May 16, 2012. *Am. Compl. ¶¶* 29, 54-55. Everly served on the Bank's Loan Committee. *Id.*

- **Zullinger;** the Chairman of the Boards of Directors of Orrstown and the Bank. *Am. Compl. ¶¶* 30, 54-55. Zullinger served on the Bank's Enterprise Risk Management Committee. *Id.*

- **Coy**; the Vice Chairman of the Boards of Directors of the Company and the Bank. *Am. Compl. ¶¶* 31, 54-55. Coy served on the Enterprise Risk Management Committee. *Id.*

- **Shoemaker;** President Emeritus of the Bank, a Director and the Secretary of Orrstown and Bank. *Am. Compl. ¶¶* 32, 54-55. Shoemaker served on the Enterprise Risk Management Committee, and while he served as Chief Executive Officer of the Bank prior to May 2009, he also served on the Bank's Loan Committee. *Id.*

- **Snoke;** Director of the Company and Bank. *Am. Compl. ¶¶* 37, 54-55. He served on the Bank's Loan Committee, and prior to Everly's appointment to Chief Credit Officer, Snoke chaired the Loan Committee. *Id.*

- **Embly;** the Senior Executive Vice President and Chief Operating Officer of Orrstown, and, at certain relevant times, the Executive Vice President and Chief Credit Officer of the Bank. *Am. Compl. ¶¶* 42,

54-55.   He served on the Bank's Loan Committee.   *Id.* Embly resigned on September 18, 2012.  *Id.*

Defendants Quinn, Zullinger, Shoemaker and Coy were members of the Board of Directors' Enterprise Risk Management Committee which was formed in 2009 to provide additional oversight over seven risk areas: credit, operations, transaction, liquidity, market/interest rate, legal/compliance, strategies and reputation.  *Am. Compl.* ¶¶ 39, 152.  As members of this Committee, they were responsible for, and privy to confidential, non-public information concerning, the Bank's internal operations, controls and financial condition.

Furthermore, Defendants Quinn, Everly, Embly and Snoke (as well as Zullinger and Coy as rotating members), were members of the Loan Committee during the Class Period.   *Id., supra.*   The Loan Committee made all major decisions regarding loans.   *Am. Compl.* ¶¶ 78-98.   And, as alleged, several Confidential Witnesses, including CW#3 who sat on the Loan Committee, confirmed that the Loan Committee was actively involved in disregarding the Bank's Loan Policy, taking excessive risks in approving loans and extending credit using unjustified exceptions to creditworthiness requirements, disregarding recommendations, and participating in and perpetuating the "Old Boys Club" mentality, among other things. *Id.* ¶¶ 58, 78-98.

Each of the Orrstown Exchange Act Defendants: (a) had access to material and adverse non-public information by virtue of their positions and memberships

on key committees (including the Loan Committee and the Enterprise Risk Management Committee), which information directly pertained to the Company's and their contrary public statements about the Bank's loan underwriting and credit approval processes, the Bank's loan portfolio, the Regulators' censure, and the Bank's internal operations, controls and financial condition; and (b) were able to and did control the content and timing of the various SEC filings, corporate press releases and other public statements pertaining to the Company at the time of the Offering and throughout the Class Period, and were signatories thereof. *Am. Compl.* ¶¶ 26-32, 42, 54-55, 285-287.

"For the purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders, U.S.*, 131 S.Ct. 2296, 2302, 180 L. Ed. 2d 166 (2011). The Orrstown Exchange Act Defendants were the makers of the misstatements, and Defendants do not serious contend or demonstrate otherwise. *See also,* Section E.2.b, *infra*.

### b.    The Material Misstatements and Omissions.

The Orrstown Exchange Act Defendants defrauded purchasers of Orrstown common stock during the Class Period about the quality of Orrstown's internal controls, credit review and underwriting standards, loan portfolio, adequacy of loan loss reserves, and financial condition, causing them to lose millions of dollars.

*See, e.g., Am. Compl.* ¶¶ 5-13, 188-192, 281.   Throughout the Class Period, the Orrstown Exchange Act Defendants maintained and perpetuated, through their SEC filings, the artifice of a healthy, robust Company that was smartly growing, that had adequate financial reporting and internal controls.  *Id.* ¶¶ 72-161.

This could not have been farther from the truth.  Beginning in September 2009, the Orrstown Exchange Act Defendants were confronting failures in the Bank's credit review and loan approval process; they were faced with adverse credit data revealing the Bank's need to reclassify loans as impaired and allocate additional loan loss reserves, and they understood the problems to have been perpetuated by an utter failure to maintain adequate internal controls, including that the Company's executives and directors were permitted to run the Bank at their whim, and no independence was maintained between the sales department and those responsible for approving the proposed loans.  *Am. Compl.* ¶¶ 72-161; 231.  Such misstatements are actionable under the Exchange Act.

### i. *Plaintiff Has Alleged Particularized Facts Demonstrating that Defendants Made False and Misleading Statements*.

Plaintiff alleges that the following statements from the Company's 2009 Form 10-K Annual Report filed March 10, 2009: misled shareholders about the quality of the Bank's underwriting standards, credit review policies and internal controls; misleadingly touted a low percentage of Risk Assets; and, falsely

described management's historical and current approach to lending and allocating

sufficient loan loss reserves as conservative (*Am. Compl.* ¶¶ 232-233):

- "The Bank follows **conservative lending practices and continues to carry a high quality loan portfolio** with no unusual or undue concentrations of credit."[25]

- "The **quality of the Corporation's asset structure continues to be strong.** A substantial amount of time is devoted by management to overseeing the investment of funds in loans and securities and the formulation of policies directed toward the profitability and **minimization of risk associated** with such investments."[26]

- "The Corporation's loan loss history has been much better than peer standards and analysis of the current credit risk position is favorable. **The allowance for loan losses is ample given the current composition of the loan portfolio and adequately covers the credit risk management sees under present economic conditions**."

- "Following the [Internal] review process, management increased the allowance by $3.1 million in order **to better reflect the deterioration in local, regional and national economic conditions.** …. Management deems the total of the allocated and unallocated portions of the allowance for loan losses **to be adequate to absorb losses at this time**."

Plaintiff specifically alleged (contrary to Defendants' self-serving characterizations to the contrary, Orrstown Br. at 48-50) how and why such statements were materially untrue or misleading:  (a) Orrstown's credit review and loan approval process was, at that time, wholly inadequate and failed to comply

---

[25]    This same false and misleading statement also appears in Orrstown's 2010 Form 10-K Annual Report, filed March 11, 2011, and its Form 10-Q, 2nd Q 2011, filed August 9, 2011.  *Am. Compl.* ¶¶ 255b and 262.

[26]    This same false and misleading statement also appears in Orrstown's 2010 Form 10-K Annual Report, filed March 11, 2011.  *Am. Compl.* ¶ 255a.

with Orrstown's Loan Policy, as confirmed by CW#s 1, 2 and 3 (*Am. Compl.* ¶¶ 72-135); (b) the Bank's credit review process was carried out by inexperienced, overworked analysts who were making recommendations based on insufficient credit data (*id.* ¶¶ 78-92); (c) the Bank's loan officers unduly influenced the loan approval process for less than creditworthy borrowers (*id.* ¶¶ 93-98); (d) commercial loans were extended, contrary to the Loan Policy, without the approval scrutiny necessary to adequately evaluate credit risks, and in the face of borrowers telling Defendant Embly that  they were having problems (*id.* ¶¶ 106-135); and, (e) in light of the foregoing, pointing to the economic conditions was blatantly misleading.[27]

Plaintiff alleges that the following statements made (orally and in written presentations) during the Company's May 2010 shareholder meeting, which were also contained in documents publicly filed with the SEC, similarly misled investors (*Am. Compl.* ¶¶ 239-243):

- Defendant Zullinger's statements that:  due to the "***poor economy***…we have also had a higher level of loan losses than we have in the past. . ." and "We ***have a strong and experienced management team*** that can capitalize on any opportunities we are presented with and also deal with the economic and regulatory environment we are facing."

---

[27]    For discussion as to the misstatements concerning impaired loans and loan loss reserves, and the false and misleading financial reporting (*Am. Compl.* ¶¶ 284-292) *see* Section V.F., *infra* (Plaintiff's Response to Auditor Motion to Dismiss).

- Defendant Embly's presentation about Orrstown's "Credit Quality Review," its "Proactive & Thorough Approach to Credit," its "Disciplined Credit Culture" and its loan performance being far superior to that of its peers.

- Defendant Quinn's statements that Orrstown had historically and would continue conservative lending practices and responsible growth.

Easily debunking Defendants' characterizations of these allegations as having been made in a "conclusory fashion" (Orrstown Br. at 50-51), Plaintiff, rather, specifically alleged that these statements about economic conditions, the Company's management team, and the approach to credit were false because the Loan Committee habitually extended credit to borrowers who did not satisfy the Bank's credit requirements, especially the crucial Debt Service Ratio; the Loan Policy was utterly undermined by loan officers, such as Terry Reiber, who were permitted to unduly influence the credit review and approval process to extend credit to risky borrowers; loans were reviewed and extended by employees lacking the necessary educational background and formal training; and, Embly, had in fact, caused the Company to take unwarranted or excessive risks in approving commercial loans and invoking frivolous "exceptions" to the Loan Policy. *Am. Compl. ¶ 243; see also, id. ¶¶ 72-161.*

Plaintiff also alleges that the following statements made (orally and in writing) from the second quarter 2010 through first quarter 2011, misled investors (*Am. Compl. ¶¶ 249-255*):

- The Company's July 22, 2010 statement that it had ***"significantly reduc[ed] nonperforming assets"*** and had a ***"solid core earnings position."***

- The Company's November 5, 2010 statement that the ***"Company continues to be diligent in its handling of nonperforming and other risk assets"***…

- Defendant Quinn's November 2010 statement (at a conference hosted by Defendant Sandler O'Neill) that at Orrstown there is an ***"emphasis on credit quality, return to shareholders, solid financial performance, and delivering peer-group leading results."***

- Defendant Quinn's 4th quarter 2010 report in which he stated: "[W]e …were intensively focused on asset quality, which we believe ***remains quite solid."***

- Defendant Quinn's February 2011 and March 2011 statements during investment conferences that Orrstown has a "deep and experienced management team," with an "emphasis on credit quality."

- March 11, 2011 statements in Orrstown's 2010 Form 10-K that: (i) "The quality of the Company's asset structure continues to be strong"; (ii) The "Company follows ***conservative lending practices*** and continues to carry a high quality loan portfolio with no unusual concentrations of credit."; (iii) "Credit risk is mitigated through ***conservative underwriting standards***, on-going risk credit review, and monitoring asset quality measures."; (iv) "The Bank ***has a loan review policy and program which is designed to reduce and control risk*** in the lending function."

In stark contrast to the Orrstown Exchange Act Defendants' characterizations of Plaintiff's allegations as not "cogent[]" or "compelling" (Orrstown Br. at 54-57), Plaintiff specifically alleged that these statements about conservative policies and no unusual concentrations of lending, undertaken by the "deep and experienced management team" were false because: (a) Orrstown's credit review and loan approval process was wholly inadequate and failed to

comply with Orrstown's Loan Policy (*Am. Compl. ¶¶* 72-135); (b) the Bank's Loan Committee had continued to extend risky large commercial loans to certain borrowers even though the loans did not satisfy the Loan Policy's credit requirements (*Am. Compl.* Part VI.B.3, and ¶¶ 247-248); (b) by late 2010, the Loan Committee approved in total over $21 million in loans to the Chambersburg Developers' in violation of the Bank's legal lending limit to affiliates (*id. ¶¶* 124-126); (c) In mid-2010, Defendants had (unbeknownst to investors) adopted the "eight point internal risk rating system" which had the intended effect of, and did, materially and artificially lower, and forestall, the proper classification of troubled loans and allocation of provisions for loan losses (*id. ¶¶* 244-248); (d) At this time, Defendants were scrambling to restructure many of its larger troubled loan relationships on questionable terms as part of its effort to obfuscate the true level of Risk Assets and needed provisions for loan loss reserves (*id. ¶¶* 107-135); and (e) the Regulators had put the Company on notice as early as July 2010 that its management and banking practices raised material concerns (*id.¶¶* 142-152).

Plaintiff further alleges that the following statements made in the second quarter of 2011 through 2012 falsely portrayed the Bank as a conservative lender, diligent in assessing loan quality and allocating loan loss reserves, with adequate financial and internal controls, and as being in sound financial and operational condition (*see, Am. Compl. ¶¶* 260-283):

- "Generally speaking, the Company *follows conservative lending practices and continues to carry a high quality loan portfolio with no unusual or undue concentrations of credit.*"

- Company maintains *"conservative underwriting standards."*

- Orrstown declared a $0.23 quarterly cash dividend, representing a 4.5% increase over the prior year period.

- On October 27, 2011, Defendant Quinn stated that the Company remained *"safe and sound."*

- On January 26, 2012, Defendant Quinn stated that the Company had effective internal controls to address "asset quality issues."

- "[T]he Company has experienced a *steady increase in risk assets from 2007 – 2011, which coincides with the downturn in the state and local economies, and softness in the real estate market.* The largest increase in risk elements was nonaccrual loans, which totaled $83,697,000 at December 31, 2011 compared to $13,896,000 at December 31, 2010, *an increase of $69,801,000.* All loan segments experienced increases in nonaccrual loans from year end December 31, 2010 to 2011, with commercial acquisition and development and non-owned occupied segments experiencing the greatest dollar and percentage increases, *reflective of softness in the real estate market* and corresponding decline in collateral values."

In stark contrast to the Orrstown Exchange Act Defendants' characterizations of Plaintiff's allegations as selective and misleading (Orrstown Br. at 57-63), Plaintiff specifically alleged that Defendants' issuance of the increased dividend, and these statements about conservative policies, the lack of unusual concentrations of lending, and Orrstown being run by a "deep and experienced management team," were false and misleading because: (a) the

Regulators' Joint Investigation, which had begun officially on March 31, 2011 but had really commenced the year prior, targeted specifically the Bank's internal controls and management and underwriting standards, among other things (*Am. Compl. ¶¶* 142-152); (b) blame was falsely directed to external factors, when Orrstown's credit review and loan approval process was wholly inadequate and failed to comply with Orrstown's Loan Policy (*id. ¶¶* 72-135); (c) in July 2011 a Special Assets Group ("SAG") was employed to actively engage in the identification and work out of problem credits, but the Company still at that time ***"failed to implement a structured process with appropriate controls to ensure that updated loan ratings were incorporated timely into the calculation of the Allowance for Loan Losses"*** (*id. ¶* 275); (d)  Defendant Quinn was not working effectively with SAG, and, in fact, disagreed with SAG's recommendations on downgrading particular loans (*id. ¶* 148); (e) by August 2011, the Azadis has expressed their desperate financial condition to Defendant Embly such that their material default was imminent (*id. ¶¶* 107-116); and (f) the increased quarterly dividend was paid specifically to conceal from investors the true financial condition and operations of Orrstown, and done in utter disregard of the Regulators' expressed concerns about such dividend (*id. ¶* 265).

Accepting, as the Court must, that the foregoing well-pled facts are true, and making any reasonable inferences in the Plaintiff's favor, Plaintiff has pled

particularized facts sufficient to demonstrate a plausible entitlement to relief under the Exchange Act.  Defendants have failed to demonstrate otherwise.

### ii. Plaintiff Has Alleged that the False and Misleading Statements Are Actionable.

Defendants use buzz-words such as immaterial, forward-looking, puffery, opinion and cautionary statements to describe the misstatements, but never develop, explain or demonstrate how they think those often invoked buzz-words actually apply to and render Plaintiff's allegations inactionable.  That is because they cannot.   Instead, Orrstown Defendants' argument merely consists of their reciting portions of the alleged misstatements, followed by their conclusion that they are puffery, forward-looking, etc.  *See* Orrstown Br. at 49, 50-52, 54, 59-60 (covered by cautionary); at 54 (forward-looking); at 54-55, 58 (puffery); and, at 53, 58 (opinion).  In any event, even if Defendants could muster up an explanation or inference for the Court, it would fail to support dismissal of the Action.

First, the materiality requirement is met here because there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic,* 485 U.S. at 231-32 (quoting *TSC Indus., Inc.,* 426 U.S. at 449).[28]  "In assessing materiality, courts are instructed to look at both quantitative

---

[28]      The Court's role at this stage is limited; unless a court finds as a matter of law that a reasonable investor would not have viewed the information as having

and qualitative factors." *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 497 (S.D.N.Y. 2011)). Importantly, "one factor affecting qualitative materiality is whether the misstatement or omission relates to a segment that plays a 'significant role' in the registrant's business." *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 720 (2d Cir. 2011) (citing SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999)).

The misstatements at issue relate directly to Orrstown's internal controls, credit review and underwriting standards, loan portfolio, quality of its management, adequacy of its loan loss reserves, and its financial condition. Such information is, indisputably, at the core of the type of information investors need in order to make informed investment decisions. Clearly, the investors found the misstatements material, because, once the truth about these precise facts became known, Orrstown's stock price dropped, and the members of the Class lost millions of dollars. *See, e.g., Am. Compl.* ¶¶ 5-13, 188-192, 281. Moreover, a well-established principle is that when, as here, affirmative statements are made about a particular company's norm or practice, Defendants have put that subject "in play"

---

significantly altered the "total mix" of information, materiality is a question of fact left for the jury. All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. See *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

and Defendants are bound to speak truthfully. *See, e.g., Galati v. Commerce Bancorp, Inc.*, 220 Fed. App'x 97, 102 (3d Cir. 2007) ("[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play' for purposes of Rule 10b-5.") (internal quotation marks omitted); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully."); *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, MDL No. 1658 (SRC), 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011) ("Once a defendant makes an affirmative statement or characterization about its business, it puts that subject 'in play' and assumes a duty, under the securities laws, to speak truthfully about that subject.").[29]   Furthermore, even if there was, for example, no requirement that Defendants reveal the bank regulators' involvement and investigation, the statements Defendants were making during the Class Period *in light of the Regulators' investigation* create a materially false impression of Orrstown's well-being.  *See, e.g., Baron v. Smith*, 285 F. Supp. 2d 96, 103 (D. Mass. 2003), *aff'd*, 380 F.3d 49 (1st Cir. 2004).

---

[29]    Once a defendant chooses to speak, "it ha[s] a duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) (emphasis added); *see also Bacon v. Stiefel Labs., Inc.*, 677 F. Supp. 2d 1331, 1343 (S.D. Fla. 2010) (noting "where a defendant does make voluntary statements, it must speak completely to avoid 'half-truths'") (internal quotation marks omitted).

Second, the challenged statements are not inactionable puffery, statements of optimism, forward looking or opinions, and are not afforded protection by any cautionary statements. Orrstown Br. at 49, 50-52, 54, 59-60 (covered by cautionary); at 54 (forward-looking); at 54-55, 58 (puffery); and, at 53, 58 (opinion).   "Courts have held that only purely forward-looking statements are entitled to protection as 'mere puffery.' Statements of present or historical fact are not mere 'puffery.'" *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009) (citations omitted)).    Plaintiff alleges misstatements about the <u>then-present</u> and <u>historical</u> financial and operating condition of Orrstown, and not merely optimistic statements and those amounting to puffery:

- "The Bank *follows* conservative lending practices and *continues* to carry a high quality loan portfolio with no unusual or undue concentrations of credit." *Am. Compl. ¶¶* 232-233.

- "The quality of the Corporation's asset structure *continues* to be strong." *Id.*

- "The Corporation's loan loss history *has been much better* than peer standards and analysis of *the current credit risk position* is favorable. The allowance for loan losses *is ample* given the current composition of the loan portfolio and *adequately covers* the credit risk management sees *under present economic conditions*."

- "Management deems … the allowance for loan losses *to be adequate to absorb losses at this time*." *Id.*

- Defendant Zullinger's statements that:  "We *have a strong and experienced management team* …" *id. ¶¶* 239-243)

- Defendant Embly's statement about "Proactive & Thorough Approach to Credit," and Orrstown's "Disciplined Credit Culture". *Id.*

- Defendant Quinn's statements that Orrstown had historically and would continue conservative lending practices and responsible growth. *Id.*

- The "Company ***continues to be diligent in its handling of nonperforming and other risk assets. . . .***" *Id.* ¶¶ 249-255)

- Defendant Quinn's statement: "[W]e …***were intensively focused*** on asset quality, which we believe ***remains quite solid.***" *Id.*

- "The quality of the Company's asset structure continues to be strong." *Id.*

- "Credit risk is mitigated through ***conservative underwriting standards***, on-going risk credit review, and monitoring asset quality measures." *Id.*

- "The Bank ***has a loan review policy and program which is designed to reduce and control risk*** in the lending function." *Id.*

*See also,* Section V.E.2.b.i (discussion of material misstatements).    As in *In re New Century,* 588 F.Supp.2d 1206, 1225 (C.D.Cal. 2008), in which the court found actionable a sub-prime lender's statements describing, *inter alia,* "'a strategy [of selecting borrowers with increasing credit scores],' 'strict underwriting and risk management disciplines,' and 'better credit quality'", the alleged misstatements are actionable.    Similarly, a tire manufacturer's press release indicating that "we continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality safe, tires" could support a securities claim when it turned out the tires were not so safe. *City of Monroe*

*Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005).

Even if any of the misstatements alleged by Plaintiff were deemed "mixed" statements of both present and future events, "[f]orward-looking conclusions often rest both on historical observations and assumptions about future events." *Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999). Therefore, "[t]he mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement." *In re Stone & Webster, Inc. Securities Litigation*, 414 F.3d 187, 213 (1st Cir. 2005).   Rather, "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Avaya, Inc.*, 564 F.3d at 256 (*quoting Makor Issues & Rights, Ltd. v. Tellabs Inc.* (*Tellabs II*), 513 F.3d 702, 705 (7th Cir. 2008).   For example, in *Tellabs II*, the Seventh Circuit interpreted a statement that sales of a product were "still going strong" as meaning "both that current sales were strong and that they would continue to be so, at least for a time, since the statement would be misleading if Tellabs knew that its sales were about to collapse." 513 F.3d at 705. The court held that safe harbor protection **_did not_** extend to any representation about current sales. *Id.*

Also, in *Stone & Webster*, the First Circuit interpreted a statement that the company "has on hand and has access to sufficient sources of funds to meet its anticipated . . . needs" as being a mixed statement. 414 F.3d at 207, 212. Notwithstanding the statement's referral to anticipated future needs for funds, "the alleged falsehood was in the fact that the statement claimed that the Company had access to ample cash at a time when the Company was suffering a dire cash shortage. The claim was not that the Company was understating its future cash needs." *Id.* at 213.[30]

Moreover, "if a corporation issues an optimistic statement that lacks a basis in fact or is undermined by non-disclosed facts of which the speaker is aware, the statement may be actionable under the securities laws." *See, e.g.*, *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 373 (S.D.N.Y. 2007) ") (*citing In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)). It is well-settled that "statements that would otherwise amount to puffery can be actionable if the speaker is aware that the statement is deceptive." *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1027-28 (N.D. Ill. 2010) (citing *Novak*, 216 F.3d at 315).[31]

---

[30]     "[E]ven where a statement is not actionable when considered individually, it can be actionable if it 'reinforce[s] factual misstatements and therefore contribute[s] to ongoing deception.'" *Corus Bankshares*, 701 F. Supp. 2d at 1027 (*quoting In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 726 (N.D. Ill. 2003)) (alterations in original).

[31]     "Whether the opinion or 'soft information' is indeed actionable 'depends on all relevant circumstances of the particular case,' and is generally not an

For example, in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, *supra,* the statement that sales were "still going strong" was not forward-looking because it "would be misleading if [defendant] knew that its sales were about to collapse." 513 F.3d at 705. In *In re Stone & Webster, Inc., Securities Litigation*, the statement that the defendant "has on hand and has access to sufficient sources of funds to meet its anticipated . . . needs" was not forward-looking because "[t]he part of the statement that speaks of the quantity of cash on hand speaks of a present fact." 414 F.3d 187, 207, 212 (1st Cir. 2005). However, even "[w]here a company does disclose that its statement is forward-looking, liability may still attach to the extent that the company made the statement in a misleading manner" because "if a company chooses to disclose information about the future, 'its disclosure must be full and fair[.]'" *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008) (citation omitted). "Therefore, once a company chooses to speak, it must 'provide complete and nonmisleading information with respect to subjects on which [it] undertakes to speak.'" *Id.* (*quoting, Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir.1998)).

Importantly, when viewed in the context discussed *supra*, the misstatements were actionable because of the importance that the market placed on Orrstown's

---

appropriate basis on which to dismiss a complaint at this stage of the action." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (quoting Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000)).

management and the quality of its underwriting and loans. *See, e.g., In re Taxable Mun. Bonds Litig.*, Civ. A. No. MDL 863, 1994 WL 532079, at *4 (E.D. La. Sept. 26, 1994) ("It is beyond question that the investing public places heavy reliance on the statements and opinions of corporate insiders.") (citations omitted); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 172, 176 (D.R.I. 2003) (noting that a company's statements "must not be assessed in a vacuum (*i.e.*, by plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery")).

Plaintiff also alleges that the misstatements, including the misstatements about Risk Assets and loan loss reserves, resulted from conditions which existed throughout the Class Period, and that the risk warning provided by Orrstown were meaningless, because such warnings portended the future, but did not alert investors about the conditions ***that then existed***.  For Defendants to flatly deem such misstatements as opinions and state that "statements of opinion are not actionable" is beyond cavil. Orrstown Br. at 53.  In fact, the alleged misstatements can be a basis for a Section 10(b) claim.  In fact, contrary to Defendants' posturing, "[s]tatements about loss reserves and their adequacy are not per se forward-looking." *In re PMA Capital Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 15696, at *19 (E.D. Pa. Jul. 27, 2005). After all, a financial institution which "deliberately hides its financial status by failing to provide adequate loss reserves could

significantly affect the behavior of a reasonable investor." *Id.* Further, while "[s]tatements regarding loan loss reserves necessarily include forward-looking projections about future defaults, 'statements regarding loss reserves are not projections [if] they are directed to the then-present state of the Company's financial condition.'" *In re SLM Corp. Sec. Litig.*, 740 F.Supp.2d 542, 556 (S.D.N.Y. 2010) (citation omitted, collecting cases).   The Plaintiff's allegations are akin to those in *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1020 (N.D. Ill. 2010), where the plaintiff alleged that there existed unfavorable information about the condition of the defendant's loan portfolio that contradicted the defendant's public statements about the portfolio.[32] The court held that such allegations plausibly suggested that the defendant had misled investors about the adequacy of *Corus'* reserves. *See Corus Bankshares, Inc.*, 701 F. Supp. 2d at 1020.[33]

---

[32]   The plaintiffs in *Corus Bankshares* alleged that, according to confidential sources (a former vice-president and senior construction manager), construction on condominiums financed by the defendant had fallen behind schedule, construction costs had skyrocketed, developers were unable to obtain additional financing needed to complete the condominiums, buyers who had placed down payments on units were walking away from their purchase commitments, among other things. *Id.*

[33]   Again, even where the safe harbor is triggered, it does not protect statements made with actual knowledge of falsity. *See*, 15 U.S.C. § 78u-5(c)(1)(B). Questions about whether Orrstown Exchange Act Defendants intended to mislead investors regarding loan loss reserves and whether related statements are false cannot now be resolved; it is often "imprudent . . . to grant Defendants' Motion to Dismiss

Falsity has been found to be <u>sufficiently</u> pled where a company only provides (similar to what Defendants attempt to rely on now) "general boilerplate risk warning" that "models might not accurately predict the future when it allegedly knew, but withheld from investors that its . . . models were fundamentally flawed." *See, In re Bear Sterns Companies, Inc. Securities & ERISA Litig.*, 763 F. Supp. 2d 423, 496 (S.D.N.Y. 2011, Jan. 19, 2011). General market disclaimers and vanilla assertions about possibilities (*e.g.* "business may be adversely affected by conditions in the financial markets and economic conditions generally") are simply <u>not sufficient</u> for a reasonable investor to make an informed decision. *See, Southland Sec. Corp. v. INSpire Ins. Solutions*, 365 F.3d 353, 372 (5th Cir. 2004).

Further, any purported risk warnings to which Defendants point were made at a time when Defendants were downplaying the very risks it now claims the warnings were meant to address. When companies issue general warnings about how, for example, their loans were dependent on all sorts of things that could happen in the market, they were also assuring investors the problems affecting the market generally were not affecting the company at that time. *See, Freudenberg v. E*Trade Financial Corp.*, 712 F.Supp.2d 171, 193-194 (S.D.N.Y. 2010) (Defendants' general statements that loan losses and securities impairments "'could

---

based on the safe harbor provision." *In re Netbank, Inc. Securities Litigation*, 2009 U.S. Dist. LEXIS 69030, 2009 WL 2432359 at *8 (N.D. Ga. Jan. 29, 2009).

be affected by market risks and were subject to change," do not insulate them from liability for their specific misstatements and omissions'"); *In re Credit Suisse-AOL Sec. Litig.*, 465 F.Supp.2d 34, 50 n. 17 (D.Mass. 2006) (fact that defendants continued to publish optimistic assessments of the company's financial position was "akin to a statement that the reader need not worry much about the generic risk disclosures that appeared from time to time").

Accordingly, even if the alleged misstatements were optimistic, puffery, forward looking, or opinions, such statements "may be material, though, if the speaker knew at the time the statements were made that they were untrue or had no reasonable basis in fact." *Simmons Invest., Inc. v. Conversational Computing, Inc.*, 2011 U.S. Dist. LEXIS 15962, at *16-17 (D. Kan. Feb. 17, 2011).  As the Supreme Court has observed, subjective characterizations or opinions "can be uttered with knowledge of truth or falsity just like more definitive statements," and "conclusory terms in a commercial context" may be "reasonably understood to rest on a factual basis that justifies them as accurate." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991).

The well-pled allegations of the Complaint set forth misstatements that are demonstrably false and actionable under the Exchange Act.

3.     *The Amended Complaint Adequately Pleads that Defendants Acted with the Requisite Scienter.*

The PSLRA sets forth that to establish liability under the Exchange Act and Rule 10b-5, the plaintiff must plead facts giving rise to a "strong inference" that "defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, (2007).   A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (*citing Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000).

Scienter must be examined by looking at the Complaint as a whole.  *City of Roseville Emples. Ret. Sys. v. Textron, Inc.*, 810 F. Supp. 2d 434, 440-441 (D.R.I. 2011).  Moreover, in analyzing scienter, courts must "accept all factual allegations in the complaint as true," and determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.  This holistic inquiry is mandatory. *See*

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011) ("[T]he court must review all the allegations holistically.") (internal quotation marks removed).[34]

Significantly, "[a] complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (footnote omitted). The scienter allegations need "not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citations omitted). The test is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.[35]   Furthermore, a court must "accept all factual allegations in the complaint as true." *Id.* at 322.   The Orrstown Exchange Act Defendants wholly disregard these fundamental legal principles, as well as the Complaint's allegations, in arguing that the Plaintiff fails to allege any facts that give rise to scienter.  Orrstown Br. at 63-71.

---

[34]      *See also Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 272 (3d Cir. 2009) (noting "it is the composite picture, not the isolated components, that judges must evaluate" under Tellabs); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-31 (1st Cir. 2002) (noting courts must "look at all of the facts alleged to see if they 'provide an adequate basis for believing that the defendants' statements were false'") (*quoting Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).

[35]      Under the heightened pleading standard required by the PSLRA, "[a] complaint will survive . . . if . . . the inference of scienter [is] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324.

First, Plaintiff has met the requirement for pleading of scienter "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307; *Tellabs, Inc.*, 551 U.S. at 319 n.3. A strong inference of defendants' egregious recklessness arises where they "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 310-11. (Citation omitted). "An egregious refusal to see the obvious" is a hallmark of severe recklessness. *See In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000) (*quoting Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (internal quotation marks and alterations omitted in original).  There is no "rigid formula for pleading scienter", and it requires a "fact-specific approach that proceeds case by case." *In re Cabletron*, 311 F.3d at 38.

Defendants' cursory and conclusory arguments about Plaintiff's failure to allege scienter (Orrstown Br. at 66-71) are unpersuasive. The Amended Complaint's allegations against the Orrstown Exchange Act Defendants, which are based on detailed accounts from relevant Confidential Witnesses and Plaintiff's investigation, including all reasonable inferences that can be drawn therefrom, demonstrate Defendants' actual knowledge and making of material misstatements to the public during the Class Period.  As discussed above, throughout the Class Period the Orrstown Exchange Act Defendants were directly involved with

Orrstown's loan portfolio and lending practices, the deficient loan approval process, troubled loans, and internal control failures, as officers, directors, members of the Loan Committee and/or Enterprise Risk Management Committee, and through their work with and oversight of SAG. The Complaint adequately that by December 2009 the Orrstown Exchange Act Defendants knew the following (*Am. Compl.* ¶¶ 72-135):

- the Bank had created the position of Chief Credit Officer, because the Bank's underwriting standards and loan approval procedures were neither stringent nor conservative, such that the Bank extended loans in 2007 through 2010 that were inherently risky with a high degree of default;

- the Loan Committee routinely approved loans that did not meet the credit requirements of the Loan Policy;

- the loan officers often usurped the credit analyst's role such that there was a lack of independence in the underwriting and loan sales functions;

- there was a glut of risky commercial loans, concentrated especially in the Hagerstown, Maryland market, that either needed to be reclassified as Risk Assets or were on the verge of becoming Risk Assets; and

- the Bank needed to significantly increase its loan loss reserves to adequately address the impaired loans.

The Orrstown Exchange Act Defendants were aware that the Bank's Loan Committee had continued to extend risky large commercial loans to certain borrowers, even though the loans did not satisfy the Loan Policy's credit requirements (*Am. Compl.* Part VI.B.3, and ¶¶ 247-248).   The Orrstown Exchange Act Defendants in mid-2010 adopted the "eight point internal risk rating system"

which is alleged to have had the intended effect of, and did, materially and artificially lowering, and forestall, the proper classification of troubled loans and allocation of provisions for loan losses (*id.* ¶¶ 244-248).   Also pertinent are Plaintiff's allegations about the tracking of "Troubled Asset Ratios" (*Am. Compl.* ¶ 278), allegations Defendants dismiss summarily.   Orrstown Br. at 63.   As demonstrated by their strident and repeated statements of how Orrstown compares favorably to its peers, the chart illustrates the reality that the Exchange Act Defendants were facing when Orrstown's troubled or impaired loans spiked in March 2010.   The subsequent creation and use of the eight point internal risk rating system prolonged the classification of impaired loans and allocations for loan loss reserves which permitted Defendants to create the false appearance that it was keeping pace with its peers.

The Complaint also alleges that the Orrstown Exchange Act Defendants knew of the restructuring of many of Orrstown's larger troubled loan relationships on questionable terms during the Class Period (*id.* ¶¶ 107-135).  It is also alleged that the Orrstown Exchange Act Defendants were aware as July 2010 that the Regulators had material concerns with management and their banking practices (*id.* ¶¶ 142-152).  In fact, it is alleged, that the Defendants caused the Bank to pay an increased, quarterly cash dividend in July 2011, over the Regulators strong disapproval. *Id.* ¶¶ 146-147. Just three months later, the Federal Reserve rejected

Defendants' request to declare a quarterly dividend.  *Id.*  Also, the Amended Complaint (at ¶¶ 285-288), alleges that Quinn and Everly, along with the other individual Orrstown Exchange Act Defendants Zullinger, Shoemaker, Snoke and Coy, signed Orrstown's 10Ks and 10Qs issued during the Class Period.  And, Quinn as Chief Executive Officer and Everly as Chief Financial Officer, certified the accuracy and truthfulness of the SEC filings.[36]  *Id.*

The public announcements in 2012 that finally revealed the timing and extent of the fraud also demonstrate Defendants' level of knowledge during the Class Period.  *Am. Compl.* ¶¶ 148-152)  The Company's March 15, 2012 filings admitted that the Company's failures to ***"maintain effective internal control over the process to prepare and report information related to loan ratings and its impact on the allowance of loan losses"*** persisted throughout 2011, as the Company scrambled to remediate while under the then-nonpublic scrutiny of the Regulators' Joint Investigation.  *Id.* Defendants have offered nothing to refute these concrete and detailed allegations about their intent to defraud and that they

---

[36]   Sarbanes-Oxley Act requires senior executives of public companies to "certify that they have 'evaluated the effectiveness of the issuer's internal controls'" and have "'presented in their report their conclusion about the effectiveness of their internal controls'." *Indiana Elec. Workers' Pension Fund v. Shaw Group, Inc.*, 537 F.3d 527, 545 (5th Cir. 2008) (citing, 15 U.S.C. §§ 7241(a) & (a)(4)(A)). These Defendants were specifically required to evaluate and attest to the adequacy of the internal controls.  They cannot now feign ignorance.

acted with a high degree of recklessness.[37] *See Novak*, 216 F.3d at 311(holding scienter established if allegations that Defendants "knew facts or had access to information suggesting their public statements were not accurate" or "failed to check information that they had a duty to monitor.").

Second, the Complaint's allegations give rise to a strong inference of scienter on the part of the Orrstown Exchange Act Defendants. Following *Tellabs*, several courts have held that averments regarding a company's "core operations" – like have been alleged here – contribute to an inference of scienter and can, in some cases, be sufficient on their own to meet a plaintiff's pleading burden. *See, e.g., South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis."); *Stratte-McClure v. Stanley*, 784 F. Supp. 2d 373, 389 (S.D.N.Y. 2011) ("While officers cannot be imputed with knowledge about all transactions which occur at a corporation, they do have a duty to familiarize themselves with the core operations of the Company.")

---

[37]     It is well-settled that, "[e]ven if the defendants did not consciously intend to defraud, the allegation that they were aware of material issues that would likely affect [Company] revenues . . . is sufficient to establish that they 'acted with a high degree of recklessness.'" *Sloman v. Presstek, Inc.*, No. 06-cv-377-JD, 2007 DNH 115, *22 (D.N.H. 2007) (quoting *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 357 (D.N.H. 2006)).

It has also been held that violation of a company's own policy – here the Loan Policy – supports an inference of scienter. *See, e.g.*, *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999). Moreover, the extensive Regulator scrutiny of Orrstown and its management during the Class Period contributes to a strong inference of Defendants' scienter. *See, e.g.*, *Rosky v. Farha*, 2009 U.S. Dist. LEXIS 107531, 24-25 (M.D. Fla. Mar. 30, 2009) ("Courts commonly hold that pending government investigations are relevant and provide notice of a possible fraud, *i.e.*, that the ***pendency of an investigation serves to suggest that a fraud may have occurred and may not be ignored***.") (emphasis added) (*citing In re Hamilton Bankcorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1359 n.4 (S.D. Fla. 2002); *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 165, 168 (D. Mass. 2002) (finding that an ongoing SEC inquiry was a red flag indicative of misconduct); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (finding that an active investigation by New York Attorney General was a relevant "red flag" to put auditor on notice of misconduct); *In re Health Mgmt. Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (finding that an SEC inquiry into company accounting practices was a "red flag" to put auditor on notice of suspicious activity)). Indeed, a person who signs or certifies a filing with the SEC is severely reckless if he "had reason to know, or

should have suspected, due to the presence of. . . 'red flags'" *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).

Furthermore, the shortness of time between Defendants' positive statement and the revelations of the contrary is "circumstantial evidence that the optimistic statements were false when made." *See Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995); *see also, Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (referencing *Greebel*'s non-exhaustive list of factors relevant to a finding of scienter, one of which is "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information"); *Powers v. Eichen*, 977 F. Supp. 1031, 1039 (S.D. Cal. 1997) ("The proximity of the 'bad news' to the dates that the Defendants made optimistic statements is circumstantial evidence that the Defendants knew that their optimistic statements were false."); *In re Grand Casinos, Inc., Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997) (finding it reasonable to infer that management knew of certain problems given the "short time frame" between an offering and the announcement of the problems).

Moreover, the Orrstown Exchange Act Defendants had the clear motive and opportunity to issue false statements at the time of the March 2010, in light of their need and desire to raise substantial capital.  This fact gives rise to a strong inference of scienter.  *In re Resource Am. Sec. Litig.*, No. CIV. 98-5446, 2000 WL 1053861, at *6 (E.D. Pa. July 26, 2000) ("[T]he Court concludes that the motive

alleged - that is, the desire to raise capital by means of a secondary public offering - gives rise to a 'strong inference' of scienter."); *In re IBIS Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006) (a strong inference of scienter was raised where, *inter alia*, plaintiffs alleged that defendants were motivated to delay an impairment charge in order to complete a stock offering); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 445 (S.D.N.Y. 2000) (holding that defendants' alleged motive to "enhance its ability to raise cash under [a] $ 30 million credit facility agreement . . . [is] a sufficient motive to raise an inference of fraudulent intent").

Motive can also be shown by "pointing to the 'concrete benefits that could be realized' from one or more of the allegedly misleading statements or nondisclosures; opportunity [can] shown by alleging 'the means' used and the 'likely prospect of achieving concrete benefits by the means alleged.'" *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 108 (2d Cir. N.Y. 2009) (*quoting Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). Since the Orrstown Exchange Act Defendants were able to dupe investors throughout 2011 and inflate and misstate the Company's financial condition, they, throughout 2011, continued to collect their annual salary.  But once the fraud was publicly exposed, and the Regulators had imposed their supervision, Defendants' Quinn, Everly and Embly were **no longer able** to take their end of year massive

bonuses, resulting in a **drastic decrease** in compensation for the year 2011. *Am. Compl.* ¶¶ 315-318.   And, in fact, Everly and Embly were thereafter forced to resign. *Id. See, Tellabs*, 551 U.S. at 325 (pecuniary "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference").

Finally, the foregoing allegations amply demonstrate scienter on the part of Orrstown and the Bank.  Defendants, in arguing to the contrary, grossly misstate the holding of the unpublished decision in *City of Roseville Emples. Ret. Sys. v. Horizon Lines, Inc.*, 442 Fed. Appx. 672, 676-677 (3d Cir. Del. 2011), cited in Orrs. Defs. Br. at 64, fn. 16.    The Fifth and Eleventh Circuits hold that plaintiffs must plead that, at least one individual, acting on behalf of the corporation, made a false statement, with the requisite state of mind, to sufficiently allege scienter on behalf of a corporate defendant. *See Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353,366-67 (5th Cir. 2004); *Phillips v. Scientific-Atlanta. Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004).   However, the Second, Sixth, Seventh, and Ninth Circuits have approved the viability of collective scienter doctrine,  under which a plaintiff can plead the requisite scienter against a corporate defendant without successfully pleading scienter against a specifically-named individual defendant. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*, 531 F.3d 190, 192 (2nd Cir. 2008); *City of*

*Monroe Employees Ret. Sys. v. Bridgestone,* 399 F.3d 651 (6th Cir. 2005); *Tellabs II*, 513 F.3d at 712; *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008).   Neither of these approaches is what Defendants appear to proffer as the applicable standard.   In any event, the Third Circuit in *Horizon* **did not** decide with which approach it agrees, *see Rahman v. Kid Brands, Inc.*, 2012 U.S. Dist. LEXIS 31406, 52-67 (D.N.J. Mar. 8, 2012). Plaintiff, nevertheless, has easily satisfied both.

Under the stricter standard, Plaintiff has successfully alleged scienter as to several of the Company's senior executives and directors. "Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010); *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants.").   And, the foregoing arguments demonstrate that the Amended Complaint has alleged a pervasive fraud at the highest levels of Orrstown, from which a strong inference of corporate scienter can be drawn under the collective scienter doctrine. *See, Tellabs II,* 513 F.3d at 712 ("[I]t is possible to draw a strong inference of corporate scienter without being able to name the

individuals who concocted and disseminated the fraud. Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false. . . ."); *In Glazer Capital Mgmt., LP*, 549 F.3d at 744 (Court found that, under certain facts, corporate scienter pleading was appropriate including when "a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication.")

In sum, each of the Orrstown Exchange Act Defendants' statements that are identified above and were made throughout 2010, 2011 and into 2012 concerning Orrstown's financial condition, underwriting standards, loan portfolio quality, and internal controls were materially untrue and misleading. The Orrstown Exchange Act Defendants knew that the statements made were false, and/or acted with severe reckless disregard for the truth, because – as confirmed by CW#1, CW#2, CW#3 and the Regulators – the Orrstown Exchange Act Defendants knew that Orrstown was not and had not been "conservatively" extending loans using "stringent underwriting standards" with proper internal oversight and the balance sheet was not "strong" because of the dramatically increasing levels of and related costs for

the Risk Assets and the needed increases of provisions for loan loss reserves.  *See Am. Compl.* Part VI.A-B, and Part X.B.   Accordingly, Plaintiff has sufficiently alleged that each of the Orrstown Exchange Act Defendants acted with the requisite scienter.

### 4.     *Plaintiff Adequately States a Claim for Control Person Liability Under the Exchange Act.*

Defendants seek dismissal of Plaintiff's claim under Section 20(a) against Defendants Quinn, Everly and Embly.   Orrstown. Br. at 71-72.   The sole basis given is that Plaintiff cannot establish a Section 10(b) violation, and Section 20(a) is a secondary, contingent claim.  *Id.* at 72-73.  Since Plaintiff has set forth a viable claim against all of the Orrstown Exchange Act Defendants under Section 10(b), dismissal of the Section 20(a) claim is unwarranted.

### F.     **Plaintiff Adequately Alleges that SEK Has Violated the Securities Act and the Exchange Act.**

Auditors are supposed to prevent accounting fraud and financial manipulations, not excuse them.  It is, therefore, indisputable that the certification of a company's financial results and internal controls by an "independent" auditor is a crucial component of maintaining integrity and transparency in securities markets:

> As the Supreme Court has stated, [b]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship

> with the client....[T]he independent certified public accountant cannot be content with a corporation's representations that its [financial statements] are adequate; the auditor is ethically and professionally obligated to ascertain for himself as far as possible whether the corporation's [financial statements] have been accurately stated.

*Bear Stearns*, 763 F. Supp. 2d 423, 512 (S.D.N.Y. 2011).   Sarbanes-Oxley imposed even more rigorous requirements on public auditors to certify not only the accuracy of the financial results they audit, but also the internal controls for financial reporting.   *See* 17 C.F.R. §229.308 (2011).   An auditor "owes its ultimate allegiance to the company creditors and stockholders, as well as to the investing public. By offering an 'unqualified' or 'clean' audit opinion, as [the auditor] did in its 2005 Opinion, [the auditor] provided the 'highest level of assurance.'"   *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1099 (9th Cir. 2011).

In enacting the PSLRA, "Congress expanded independent public accountants' watchdog duties," by requiring that "every audit must have 'procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts.'"   *In re Enron Corp. Sec., Derivative & ERISA Litig*., 235 F. Supp. 2d 549, 611 (S.D. Tex. 2002); 15 U.S.C. §78j-1(a)(1).

Unmoved by these standards, SEK spills considerable ink articulating its "no frills" audit philosophy. (SEK Br. at 9-13, 18.)   According to SEK, management

(not SEK) was responsible for ensuring a company's financials conform with GAAP, auditors are not required to "police against mismanagement" and it was not required to delve deeply into the client's accounting practices.  (SEK Br. at 18).  These rote excuses are insufficient as a matter of law and do not excuse SEK's violation of Sections 11 and 10(b).

SEK is not being sued because of an isolated failure to find a proverbial needle in a haystack.  Rather, SEK missed the most notorious issues that a financial institution can have, problems that were glaring to the Regulators which did not have the benefit of a 16-year audit relationship.  Indeed, during its 2010-2012 investigation, the Regulators found that the Bank was engaging in potentially unsound and unsafe practices, and needed to make drastic structural changes to its internal controls.  *See Am. Compl.* ¶¶144-145, 149-150.   These findings were based on business records and information known or at least available to SEK during its 2009, 2010 and 2011 audits of Orrstown.  The Bank lacked competent management and personnel and had in place inadequate controls over mostly every **critical** bank function: (1) underwriting; (2) risk management; (3) loan loss reserves and capital.  SEK knew or was reckless in not detecting the unsound practices employed by Orrstown.  *See, e.g., P. Schoenfeld Asset Management LLC v. Cendant Corp.*, 142 F.Supp.2d 589, 609 (D.N.J. 2001) (denying auditor's motion to dismiss the Section 10(b) claim because the auditor did not simply fail to

investigate a suspicious entry or become familiar with "some idiosyncratic aspect of [the defendant company's] business; rather, it is charged with reckless disregard of numerous-even hundreds-of unsupported entries, including manipulation of membership reserves, reversal of merger reserves and the use of large, unsupported 'topside' entries that were inconsistent with the books and ledgers of the various business units. . . demonstrating an egregious refusal to see the obvious or investigate the doubtful such that no reasonable accountant would have made the same decisions if confronted with the same facts").

SEK cannot avoid liability by downplaying its responsibilities as a public auditor much less deflect liability by arguing Plaintiff is trying to convert SEK's as an auditor into that of a business advisor.  If anything, SEK's rhetoric underscores its dismissive attitude towards its duty to the investing public.

### 1. *Plaintiff Has Adequately Pleaded a Securities Act Section 11 Claim Against SEK.*

#### a. SEK Concedes that Rule 9(b) Does Not Apply.

As the other Defendants have sought to impose the heightened pleading standards of Rule 9(b) upon Plaintiff's Section 11 claim, discussed *supra*, so too does SEK.  As noted above, Plaintiff's Section 11 claims are not subject to the heightened pleading standards of Rule 9(b) or that of the PSLRA.  *See supra* Section V.D.2.  SEK, however, concedes that Plaintiff adequately alleged negligence stating: "Plaintiff's theory may be sufficient to withstand scrutiny at the

pleading stage if it were alleging professional negligence." (SEK Br. at 18).  Thus, on the basis of SEK's own concession, and the well-pleaded allegations of a Section 11 claim, the Court should deny SEK's motion to dismiss Count II.

Even if the Court were to conclude that the Section 11 claims sound in fraud, Plaintiff nevertheless satisfies the heightened pleading requirements of Rule 9(b).

> **b.     Plaintiff Sets Forth a *Prima Facie* Section 11 Claim with Allegations that SEK Made False Statements in the Registration Statement.**

Section 11 specifically provides that auditors, like SEK, are liable for any misrepresentations in the Registration Statement prepared or certified by them. 15 U.S.C. § 77k(a)(1) and (4).  Plaintiff has set forth a *prima facie* case by alleging that SEK made material misrepresentations and omissions in a public registration statement associated with the offering of securities.   ***First***, SEK expressly "consented" to it being designated as an accounting "expert" in the Offering Documents. *Am. Compl.* ¶ 176.  The Offering Documents incorporate by reference the Company's Annual Report on Form 10-K for the year ended December 31, 2009, which for the reasons above were false and misleading.  *Id.* ¶¶ 176-77. SEK's statements in the 2009 Annual Report were false, misleading and lacked a reasonable basis. *Id.* ¶¶ 176-86.

***Second***, SEK represented that it had conducted its audit in accordance with the standards of the PCAOB standards when, in reality, SEK had failed to: "plan

and perform the audits" to obtain "reasonable assurance about whether the financial statements" were free of material misstatements and "whether effective internal control over financial reporting was maintained in all material respects." *Am. Compl.* ¶¶ 178-86; 297-99.  SEK failed to audit the Company's controls over, *inter alia*, loans, risk and loss reserves, in violation of FASB 5 and PCAOB standards (AU Section 342).   *Id.* ¶ 177.   Failing to perform an audit in conformance with PCAOB is actionable under the federal securities laws.   *See New Century*, 588 F. Supp. 2d at 1234, 1239 (affirming Section 10(b) and Section 11 claim against auditor for violating PCAOB).

**Third**, SEK certified the accuracy of Orrstown's financial statement for the period ending December 31, 2009 which falsely valued the Bank's loan assets, overinflated the Bank's net income, failed to adequately identify Risk Assets or set forth an adequate loan loss reserve, and overstated good will by tens of millions of dollars, all in violation of GAAP.  (*Am. Compl.* ¶¶ 11, 51, 177, 179-81, 230, 287-88, 291, 299, 304, 309, 330-34.  *See, e.g., Underland v. Alter*, No. 10-3621, 2012 U.S. Dist. LEXIS 133155 (E.D. Pa. Sept. 18, 2012) (holding section 11 claim adequately alleged against auditor for misstatements about a company's loan loss reserves) *and* 2012 U.S. Dist. LEXIS 98450 (E.D. Pa. July 16, 2012) (denying auditor's motion for reconsideration).  *See also Omnicare, Inc.*, 2013 WL 2248970 (6th Cir. May 23, 2013) (upholding Section 11 claim); *Ehlert v. Singer*, 245 F.3d

1313, 1315-16 (11th Cir. 2001); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1222 (W.D. Wash. 2009); *In re Healthsouth Corp. Sec. Litig.*, No. 03-1500, 2009 U.S. Dist. LEXIS 90607, at *3 (N.D. Ala. Sept. 30, 2009).

***Finally, and significantly,*** on March 15, 2010, SEK certified the effectiveness and adequacy of the Bank's internal controls over financial reporting in connection with its 2009 audit.  This certification was materially false and misleading and issued shortly after the Bank's Internal Review and on or around the commencement of the Regulators' investigation into the unsound practices of the Orrstown.  *Am. Compl.* ¶¶ 100-106, 142-143.  SEK's flippant assertion that weak internal controls are "irrelevant" (SEK Br. at 38-39) is belied by the facts.  SEK cannot persuasively assert that a financial institution's controls over the reporting of Risk Assets and loan loss reserves are "irrelevant".  This argument fails as a matter of law.  *See New Century*, 588 F. Supp. 2d at 1236.[38]  These

---

[38]      In *New Century*, the court found sufficient:

> allegations regarding KPMG's knowledge of internal control deficiencies with the allegations of misrepresentations.  Moreover, the allegations regarding inadequate and inexperienced staff, and the rapid discovery of the alleged accounting violations are further support for the several strong inferences that KPMG's audit contained deliberately reckless misstatements regarding New Century's accounting practices.

"irrelevant" factors led to the disappearance of 80% of the Company's market value. *Am. Compl.* ¶¶ 3-4, 281.

The weight of authority strongly supports treating SEK's representations as misstatements of fact. Under the regulations promulgated by the SEC concerning filings made under the 1933 Act, "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1). Moreover, a number of courts (including courts in this Circuit) have recognized that a failure to present loan loss reserves in compliance with GAAP is a misstatement of fact – not opinion. *See, e.g., Underland,* 2012 U.S. Dist. LEXIS 133155 at \*9 ; *In re Ambac Financial Group, Inc. Securities Litig.*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010); *In re Washington Mut., Inc. Securities, Derivative & ERISA Litigation*, 694 F. Supp. 2d 1192 (W.D. Wash. 2009) ("*WaMu*"); and *New Century*, 588 F. Supp. 2d at 1214.

In *Underland*, the Court found that the plaintiff adequately stated a Section 11 claim against the company's auditor because the company's audited financial statements contained materially misleading statements of fact, in that the financial statements the auditor "certified as compliant with GAAP in fact violated an identified GAAP standard. . . ."   2012 U.S. Dist. LEXIS 133155, at \*3.

---

588 F. Supp. 2d at 1236.

Specifically, the plaintiffs alleged that the auditor "violated GAAP when it failed to consider all past and present information when determining loan loss reserves and that the GAAP violation should have been evident to [the auditor] during its audit." *Id.* at *2. The auditor failed to verify that the company "had used accurate source data, had made reasonable assumptions, and had accounted for known or knowable past and present information," and therefore the auditor failed to ensure that the company's registration statements complied with GAAP. *Id.* at *21 (holding that in the amended complaint: "Plaintiffs have adequately alleged that KPMG certified that Advanta's loan loss reserve calculations conformed to GAAP when in fact they failed to incorporate past and present adverse credit trends and thus did not comply with FASB No. 5.").

*Underland* is remarkably similar to the facts. Like the plaintiff in *Underland*, Plaintiff alleges that in auditing the company, SEK violated the same GAAP and PCAOB provisions by issuing false certifications.[39] As alleged in the Amended Complaint, SEK violated Rule 3100 issued by PCAOB, AS No. 5, AU Section 342, and FASB Statement No. 5 in connection with its audit. *Am. Compl.*

---

[39]   SEK cites to and relies on an earlier decision in *Underland v. Alter*, No. 10-3621, 2011 U.S. Dist. LEXIS 102896  (E.D. Pa. Sept. 9, 2011) (SEK Br. at 41), but, notably, fails to disclose to this Court that the *Underland* plaintiff cured its complaint by adding the specific GAAP provision at issue.  Moreover, as set forth above, failure to specify GAAP and other audit violations are not a concern here as these violations are alleged with particularity. *Am. Compl.* ¶¶ 178-86.

¶¶ 178-86.  "SEK failed to verify that Orrstown has used accurate source data, had made reasonable assumptions, and had accounted for known or knowable past and present information when calculating its loan loss reserves, and therefore, failed to ensure that Orrstown's financial statements, incorporated into the Registration Statement, complied with GAAP."  *Am. Compl. ¶¶* 178-86.

In *Ambac Financial*, the plaintiff alleged that the company had issued false and misleading financial statements and violated GAAP in that the value of the asset portfolio was overstated and thus net income was overstated, the liabilities were understated, the loss reserves were inadequate and the company had failed to disclose known negative trends and that it had reduced its underwriting standards. 693 F. Supp. 2d 241 (S.D.N.Y. 2010).  The defendant finance company did not restate its financials following the disclosure of all of the accounting improprieties, including its understatement of liabilities, its exposure to a particular risky financial product and inadequate loss reserves.  *Id.* at 273 (upholding both Section 10(b) and Section 11 claims despite there being no restatement).  Rather, the *Ambac Financial* Court upheld the Section 11 claims because the plaintiffs had adequately alleged that the accounting improprieties described above were material misstatements and omissions.  *Id.*

Similarly in *WaMu* the plaintiffs' Section 11 claim against an auditor was sustained based on allegations that the auditor certified a bank's false allowance

for loan losses.  694 F. Supp. 2d at 1222-24.  Like SEK here, the auditor in *WaMu* argued that the financial statements at issue were "opinions," and that the plaintiffs were required to allege subjective falsity.  *Id.* at 1223.  However, the district court rejected that argument, holding that the auditor's representation that "the financial statements were presented in 'conformity with accounting principles generally accepted in the United States of America' is an actionable statement of fact" that was "false because the financial statements were not prepared in conformity with GAAP, given the improper understatement of the Allowance."  *Id.* at 1224 (citing *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 241, 243 (S.D.N.Y. 2004)).  *See also PMA Capital Corp.*, 2005 U.S. Dist. LEXIS 15696, at *51-52 (treating GAAP violations as factual misstatements); *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 592 (S.D.N.Y. 2010) (same).

As in *Underland*, *Ambac Financial* and *WaMu*, SEK failed to, *inter alia*, verify that managements' controls and systems were adequate or that management was making reasonable assumptions about risky loan assets or by significantly delaying the recognition of bad loans in failing to account for them properly in the loss reserve.  Orrstown's internal controls were woefully inadequate and its financial statements contained materially false and misleading statements relating to a number of line items including net income, liability, loan assets, goodwill, loan impairment and loss reserves.  Indeed, the importance of accurate loan valuations

and loan loss reserves for an investor in a financial institution cannot be understated where, as here, loans comprised the lion's share of the Bank's assets (*i.e.,* Orrstown loans comprised 77% of its assets as of 12/31/2008; 72.7% as of 12/31/2009; 64% as of 12/31/2010; and 67% as of 2011). *See, e.g.*, Def. Exs. C (Financial Statements for period ending 12/31/2009), L (Financial Statements for period ending 12/31/2010) and Q (Financial Statements for period ending 12/31/2011).

None of the cases cited by SEK supports its motion to dismiss the Section 11 claim. For example, in *Armstrong v. Am. Pallet Leasing Inc*., 678 F. Supp. 2d 827, 864 (N.D. Iowa 2009), unlike here, the plaintiffs failed to allege that the auditor had prepared or certified *any matter* in the registration statement. *Id.* (holding that the plaintiff failed to allege that corporation's auditors prepared or certified *any specific matter in any of corporation's registration statements*, as required to state a claim against auditors based on material misstatement or omission in a registration statement). Contrary to *Armstrong,* and as set forth above, the Amended Complaint alleges material misstatements in the Registration Statement that were certified by SEK.

SEK's reliance on *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976), is equally misplaced because the sole claim at issue there was whether an accounting firm could be held liable in a private action for damages under Section 10(b) of the

Exchange Act and Rule 10b-5, in the absence of *any* allegation of *scienter*, *i.e.*, on the basis of allegations of negligence in failing to conduct proper audits of a firm. Thus, this case had nothing to do with a strict liability Section 11 claim.

Similarly, SEK's relies on *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96 (3d Cir. 1983), but this is yet another case that does not involve a Section 11 claim.  Moreover, unlike the case at bar, the *Christidis* plaintiff failed to describe the mortgage trust's practices for calculating loss reserves or how it departed from those practices, holding "[i]t's defects is the complete absence of any disclosure of the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants knowingly departed from reasonable accounting practices."  *Id.* at 100.  The Amended Complaint, on the other hand, details the Bank's definition of "loan loss reserve," the methodology for calculating these reserves and the failure to adhere to the methodology, which eventually led to the insufficiency of those reserves.  *Am. Compl.* ¶¶ 104-105.  The Bank's loan loss reserves were inadequate based on known and likely defaults and the Regulators found that the Bank was engaging in unsound banking practices and poor oversight of its loan loss reserves.  *Am. Compl.* ¶ 182.  Despite that these poor practices were in place for years, SEK continued certifying the controls as adequate, including after its 2009 audit that was incorporated into the Registration Statement until 2012, following the Company's Internal Review and the

Regulators' investigation.  *Am. Compl.* ¶¶142-43; 186.  SEK finally admitted that Orrstown's internal controls over loan loss reserves previously found adequate, were, in fact, material weak and inadequate.  *Id.* ¶ 148.  Following this, the loan loss reserves of Orrstown tripled and then quadrupled when compared to pre-disclosure amounts.  *Id.* ¶¶274-275, 290-291.

SEK also cites to *Bily v. Arthur Young & Co.*, 834 P.2d 745 (Cal. 1992) (SEK Br. at 32), but that case involved auditor liability to investors under a negligent misrepresentation theory arising under California state law.  *Bily*, 3 Cal. 4th at 410 (holding investors do not have a claim for negligent misrepresentation under California state law except in limited circumstances and recognizing that auditors may incur liability to third persons under the federal securities law).  Finally, SEK cites to *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87 (1995) (SEK Br. at 32), which involves Medicare reimbursement.

Like *Bily, Shalala* is inapposite and has absolutely nothing to do with auditor liability under Section 11 of the Securities Act.   SEK has set forth legal authority yet none of it supports SEK's motion.  Plaintiff has adequately pleaded its Section 11 claim against SEK.

### c.      SEK's Misstatements Were Representations of *Facts* Not Opinions.

SEK argues that it cannot be held liable for an opinion.  SEK fundamentally misstates and underestimates the liability structure of Section 11.   Although

auditors may be liable for their own statements (*i.e.*, audit opinions), Section 11

principally imposes liability on auditors for the statements they certify (*i.e.,* facts).

Section 11 states, in relevant part, as follows:

> In case any part of the registration statement . . .
> contained an untrue statement of a material fact or
> omitted to state a material fact required to be stated
> therein or necessary to make the statements therein not
> misleading, any person acquiring such security . . . may .
> . . sue . . . *every accountant . . . , who has with his
> consent been named as having . . . certified any part of
> the registration statement . . . , with respect to the
> statement in such registration statement . . . , which
> purports to have been . . . certified by him.*

15 U.S.C. §77k(a)(4) (emphasis added).   In support of its motion to dismiss the

Section 11, SEK relies on *Herman & Maclean v. Huddleston*, 459 US 375, 381

(1983) but that case squarely supports Plaintiff's argument that Section 11 liability

attaches to an auditor for its certified audit opinions and that the pleading standards

for a Section 11 claim are minimal.  *Herman & MacLean v. Huddleston*, 459 U.S.

375, 381 n.11 and 382 (1983) ("Accountants are liable under Section 11 . . . for

those matters which purport to have been prepared or certified by them. . . . If a

plaintiff purchased a security issued pursuant to a registration statement, he need

only show a material misstatement or omission to establish his prima facie case.").

*See also In re WorldCom, Inc. Sec. Litig*., 352 F. Supp. 2d 472, 491 (S.D.N.Y.

2005) (same).   Thus, "audited financial statements are formally attributable to an

auditor at the time of their dissemination." *Amorosa v. Ernst & Young LLP*, 672 F.

Supp. 2d 493, 503 (S.D.N.Y. 2009) (citing *Lattanzio v. Deloitte & Touche, LLP*, 476 F.3d 147, 155 (2d Cir. 2007)); *see also WorldCom*, 352 F. Supp. 2d at 492 ("In sum, an accountant has responsibility under Section 11 for the accuracy of the financial statements she certifies."); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 348 (S.D.N.Y. 2004) (holding that auditor is liable for statements that it certified); *Wachovia Eq. Sec. Litig. v. Wachovia Corp.,* 753 F. Supp. 2d 326, 378-79 (S.D.N.Y. 2011) (denying auditor's motion to dismiss because "the Court ha[d] identified material misrepresentations in the 2006 and 2007 financial statements at issue.").

This is as Congress intended. "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Huddleston*, 459 U.S. at 381-82 (citing H.R. Rep. No. 85, 73d Cong., 1st Sess. 9 (1933)) (footnote omitted); *WorldCom*, 352 F. Supp. 2d at 491 (quoting *Huddleston*, 459 U.S. at 381-82). "This design reflects Congress' sense that accountants, along with underwriters and issuers, bear a 'moral responsibility to the public [that] is particularly heavy.'" *Id.* (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 581 (1995)). Because one could verify the truth or falsity of SEK's statement at the time it was made by looking at *objective data*, it was a statement of fact – not "opinion." *See In re Viropharma, Inc., Sec. Litig.*, 2003 U.S. Dist.

LEXIS 5623, *7 (E.D. Pa. Apr. 7, 2003) (statements are not forward-looking if their "truth or falsity" is "determinable at the time they were made"). By contrast, statements of "opinion" pertain to the "psychological fact of the speaker's belief in what he says." *See Va. Bankshares, Inc.*, 501 U.S. at 1095. Obviously, investors were not looking to SEK's psychological beliefs regarding Orrstown's financial statements. Rather, they were relying on the fact that SEK performed an audit and purportedly obtained a "reasonable assurance" that Orrstown's internal controls were adequate and that its financial results were presented in accordance with GAAP because, as a factual matter, the reliability of Orrstown's financial results was highly material. *See In re PMA Capital Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 15696, at *51-52 ("Whether or not a company sets loss reserves in compliance with GAAP can have 'significance to a reasonable investor contemplating the purchase of securities.'").

SEK's 2009 financial statement reflected hard numbers, not soft or forward looking statements about the state of Orrstown's business. SEK's statement that Orrstown's financial statements complied with GAAP is also a verifiable factual representation because as even SEK acknowledges (as it must), its statement meant that Orrstown's financial statements fell within a "range" dictated by the requirements of GAAP. *Burlington*, 114 F.3d at 1421 n.10 (stating that GAAP sets the "range of reasonable alternatives that management can use").

### 2.      Scienter is Not an Element of a Section 11 Claim.

SEK next argues that when misstatements are categorized as "opinions," a plaintiff should be required to allege that the auditor knew that the opinion was false or had no reasonable basis for the opinion at the time it was made.  SEK Br. at 30.  This is tantamount to a showing of *scienter* which is **not** an element of a Section 11 strict liability claim.  *See supra* Section V.D.2.   The Court should reject SEK's invitation to impose a *scienter* requirement on Plaintiff's Section 11 strict liability claim.

### 3.      The Misstatements Were Not Based on Hindsight.

Even if SEK's improper Section 11 pleading standard was adopted to impose a scienter requirement, Plaintiff adequately pleaded that SEK knew or was reckless in not knowing that the 2009 Financial Statement it certified was false and misleading at the time SEK made the certification on March 15, 2010.  *See, supra,* Section D.1.   The material misstatements were not based on facts revealed at a later time, *i.e.,* in "hindsight".  (SEK Br. at 40).  As stated in *Bear Stearns*, 763 F. Supp. 2d at 518: "[t]he key distinction between cases relating to hindsight and the allegations here is that multiple GAAP and GAAS violations have been described and red flags alleged."  *See also Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 275 (S.D.N.Y. 2008) ("The plaintiffs allege that [the auditor] was in a position at the time of the original audit to validate sales based on shipping

documentation, invoices, and other available information, so this is not, as [the auditor] argues, a case of alleging 'fraud by hindsight.'"); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474 (S.D.N.Y. 2004) (rejecting fraud by hindsight argument were drastic adjustments were made because the company failed to take into account information that was available to it when the results were issued).

SEK failed to review the underlying loan files, inquire about "exceptions" to the Loan Policy made by management, test whether the employees were adhering to the Loan Policy, review the adverse credit data obtained through the Internal Review, and request documentation on the Bank's large and repeat commercial borrowers, Risk Assets and the loan loss reserves.  SEK knew about the Bank's November 2009 Internal Review, had access to update to credit data on 60% of the commercial loan portfolio that revealed there internal problems at the Bank in managing Risk Assets and making adequate loan loss allocations by at least as late as 2009. *Am. Compl.* ¶ 183.

### 4.     *SEK's Affirmative Defenses to the Section 11 Claim are Premature.*

SEK also argues that its "opinions" were "reasonable" and "truly held." SEK Br. at 36.  The only instance where the auditor's state of mind may become an issue with respect to a Section 11 claim is in cases where the auditor seeks to prove certain recognized affirmative defenses permitted to only non-issuers, like

SEK. *See* 15 U.S.C. §§ 77k(b)(3) (providing that it is the auditor's burden to prove that "after reasonable investigation, [the auditor had] reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading;…."). *See, e.g., Ambac Financial*, 693 F. Supp. 2d at 275 (recognizing that KPMG is able to assert an affirmative defense to Securities Act claims based on their reasonable care or due diligence, but noting that "defendants bear the burden of demonstrating the applicability of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)")(citation omitted). *See also Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643 (S.D.N.Y. 1968) (rejecting the auditor's due diligence defense with respect to certain misstatements in audited financial statements).

### 5. *Plaintiff Has Adequately Alleged an Exchange Act Section 10(b) Claim Against SEK.*

In a private action under §10(b), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Burlington Coat Factory*, 114 F.3d at 1428; *Anwar v. Fairfield*

*Greenwich, Ltd.*, 728 F. Supp. 2d 372, 404 (S.D.N.Y. 2010) (quotation marks and citation omitted).   Although securities fraud actions are subject to the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b), "the pleading of detailed evidentiary matter in securities litigation" is not required.   *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).   *See also, supra* Section V.C. Rather, all that is required are facts sufficient "to support a reasonable belief" that defendants' statements were materially false or misleading.   *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000).   SEK contends that Plaintiff has failed to adequately pled a materially false statement, *scienter* and loss causation.   SEK is wrong.

### a.   Plaintiff Adequately Pled Actionable Material Misstatements.

"To satisfy the particularity requirement, a complaint must: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"   *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 249 (S.D.N.Y. 2011) (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).   *See also supra Section* V.E.2.   The Amended Complaint more than satisfies these requirements.

During the Class Period, SEK made materially false and misleading statements concerning, among other things, the accuracy of the financial

statements. *Am. Compl.* ¶¶ 288-291, 298-299, 303-304, 308-309.  SEK claims that Plaintiff does not identify a "single error" in Orrstown's financials certified by SEK as accurate in its 2009 and 2010 audit reports.  (SEK Br. at 17.)  To the contrary, Orrstown's 2009 and 2010 financial statements misreported the true value of its loan portfolio, understated its loan loss reserves, inflated its net income, and understated the amount of write-offs the banks should have taken with respect to bad loans.  *Am. Compl.* ¶¶ 288-291, 298-299, 303-304.  Indeed, Orrstown's 2009 and 2010 financials should have been in-line with the Company's later filed financials for the periods ending December 31, 2011 and 2012, the periods during and following the bank regulators' investigation and implementation of adequate internal controls with guidance by the independent consultant.  *Compare* Def. Ex. C Financial Statement for period ending December 31, 2009 *with* Def. Ex. Q (Financial Statement for period ending December 31, 2011) and Decl. Ex. C (Financial Statement for period ending December 31, 2012).[40]  This comparison shows that Orrstown's loan portfolio fell by 27%, evidencing that almost a third of the Bank's prior loans portfolio, or approximately $265 million, were likely high risk, subprime loans that were mischaracterized as healthy loans made following "conservative" underwriting process.  The Bank's loan loss reserve more than tripled in 2011 and quadrupled in 2012 when compared

---

[40]     To avoid burdening the Court with duplicative copies of exhibits, Plaintiff will, wherever possible, cite to the Orrstown Defendants' Appendix of Exhibits.

to the average annual loan loss reserve reported for the three preceding calendar years.  Orrstown was also required to write off all of its goodwill ($19.4 million). *Am. Compl.* ¶¶ 9, 271.

This vastly different portrayal of Orrstown's financial condition was based on financial problems, which were known or knowable by at least 2009, but were not reflected in Orrstown's financials until 2012 or even as late as 2013, when its financial statements for the periods ending December 31, 2011 and 2012 were released.  The Company lost 80% of its market value by April 2012 when the true state of financial affairs was revealed and absorbed by the market.  *Am. Compl.* ¶¶ 4, 281.  This evidence overwhelmingly shows that Orrstown's financials for the periods ending December 31, 2009 and 2010, were materially false and misleading.  The Bank was hiding its mounting bad loans, its risky loan practices and its inadequate loan loss reserve and SEK was complicit by issuing false unqualified and clean audit opinions about the Bank's financials.  *Id.* ¶¶ 298-299, 303-304, 308-309.

Moreover, a restatement of Orrstown's financials is not required to adequately allege that SEK's 2009 and 2010 Audit Reports were materially false and misleading.  *See, e.g., In re Ambac Financial Group, Inc. Securities Litig.*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010) (upholding auditor claims because, even though there was no restatement, failure to present loan loss reserves in compliance with

GAAP is a material misstatement) ("*Ambac Financial*").   SEK's claim that the failure of an auditor to restate its original opinion provides a "strong inference of subjective good faith," (SEK Br. at 38) is also not pertinent at the pleading stage as discovery may later reveal that SEK's self-serving decisions to not withdraw its earlier certifications or require a restatement, were also made with reckless disregard for the truth and in violation of GAAP and PCAOB standards.

As made clear by the Third Circuit in *Shapiro v. UJB Financial Corp.*, 964 F.2d 272 (3d Cir. 1992), a case SEK relies on, and later reiterated in *In re Westinghouse Sec. Litig.*:

> Although it is true that 'the economic judgments made in setting loan loss reserves can be validated only at some future date…., we made clear in UJB that 'if defendant characterizes loan loss reserves as 'adequate' or 'solid' even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud.

*Westinghouse*, 90 F.3d at 710 n.11 (citing *Shapiro*, 964 F.2d at 272.  *See also In re Reliance Securities Litigation*, 91 F.Supp.2d 706 (D. Del. 2000) (sustaining securities fraud claim against auditors for falsely certifying that corporation's financial statements were prepared in compliance with GAAP when auditor knew that the corporation's loan loss reserves were declining as percentage of net receivables while its loan loss rate was increasing).

Plaintiff also adequately pleaded that SEK made a materially false and misleading statement when it claimed that Orrstown's internal controls were adequate when, in reality, these controls were virtually nonexistent or materially weak. SEK does not even dispute this, nor can it do so. The Regulators found that Orrstown's internal controls required substantial structural overhaul. *See, e.g.,* Decl. Exs. A (Consent Order) and B (Written Agreement). Thus, by 2012 and in the face of regulatory scrutiny, SEK had no choice but to concede that the internal controls of the Bank were deficient despite that these were the ***same controls*** SEK had previously certified as adequate in its 2009 and 2010 Audit Opinions. *Am. Compl.* ¶¶ 230, 275. SEK did not explain why it was changing its opinion about Orrstown's internal controls. Thus, SEK's prior statements about the adequacy of Orrstown's internal controls were materially false and misleading. *See, e.g., In re New Century*, 588 F. Supp. 2d at 1206, 1215-16, 1233 (C.D. Cal. 2008) (upholding claims against auditor for its clean and unqualified audit opinion of bank's year-end financial statements in light of insufficient loan loss reserves, poor loan quality and weak internal controls, representing material misstatement).

Finally, contrary to SEK's contention, Plaintiff also adequately pled that SEK made a materially false and misleading statement when it claimed that it had conducted its audit in accordance with GAAS (now incorporated into PCAOB and GAAP. *See New Century*, 588 F. Supp. 2d at 1233 (allegations that auditor

violated PCAOB were sufficient to state a claim).   The Amended Complaint alleges that the Bank was struggling with problematic loans and had inadequate internal controls in 2009 and that by mid-2010 it was steeped in a regulatory investigation.   SEK could have looked at Orrstown's credit data and determined, as a matter of fact, whether these numbers reasonably approximated Orrstown's probable loan losses as required by FASB No. 5.   SEK also failed to verify that Orrstown made reasonable assumptions and had accounted for known or knowable past and present information when calculating its loan loss reserves, and therefore, failed to ensure that Orrstown's financial statements, incorporated into the Registration Statement, complied with GAAP.   *Am. Compl.* ¶¶180-81.

None of the cases cited by SEK stand for the proposition that allegations like those set forth above do not qualify as materially false and misleading.   For example, SEK repeatedly cites to *In re Ramp Corp. Sec. Litig.*, No. 05-6521, 2006 U.S. Dist. LEXIS 49579 (S.D.N.Y. July 21, 2006), but that case involved a secret bribe that had been disclosed by management two years after the fact and in response the auditor withdrew its prior opinions and resigned as auditor, reacting immediately and correctly to such a disclosure.   As set forth in Section III.D. & E., *supra*, Plaintiff alleges facts that strongly suggest that SEK knew that regulators were scrutinizing the Bank and its processes and controls as early as 2010.   The plaintiff in *Ramp* did not allege a single fact or warning that would have put the

auditor on notice of a possible bribe prior to when the manager disclosed receiving the bribe to the board of the company.  In fact, by its nature, a bribe is far more difficult to uncover than the types of significant and obvious structural and control weaknesses at the Bank.

SEK's reliance on *Santa Fe Industries v. Green*, 430 U.S. 462, 476 (1977), is equally misplaced because in that case the plaintiff alleged that the defendants' violation of Section 10(b) stemmed from a breach of their fiduciary duties.  The Supreme Court held that in order to plead a Section 10(b) clam the conduct must involve a manipulation or deception and, thus, because the allegations of the complaint contained no reference to misrepresentation or nondisclosure, unlike the instant case, the Supreme Court refused to recognize a federal cause of action.  *Id.*

Both Plaintiff's well-pleaded allegations and the law support rejection of SEK's motion to dismiss Plaintiff's Section 10(b) claims.

### b.    The "Bespeaks Caution" Defense is Unavailing.

Moreover, contrary to SEK's contention, the "bespeaks caution" defense is unavailing with respect to its misstatements made about the Bank's loan loss reserves.  Specifically, SEK purports that the statements above were not materially false or misleading because there were sufficient warnings about the subjectivity of loan loss reserves (SEK Br. at 33), and that they are inherently subjective. SEK Br.

at 31.  None of SEK's authority supports dismissal of Plaintiff's Section 10b claim at the pleading stage.

As the Third Circuit held in *Westinghouse*, 90 F.3d at 701, cautionary language about the subjectivity of loan loss reserves does "not sufficiently counter the alleged misrepresentations, *i.e.*, that the defendants knowingly and recklessly misrepresented the adequacy of the loan loss reserves."  *Id.* at 709.  The Third Circuit held, such misrepresentations were not immaterial and "would have assumed actual significance to a reasonable investor contemplating the purchase of securities."  *Id.* at 710 (reversing the dismissal of the plaintiffs' Sections 11 and 10(b) claims relating to loss reserves).  *See also In re Adams Golf, Inc. Secs. Litig.*, 381 F.3d at 274 ("Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal" and reversing court's finding that subject was clearly unimportant to investors).

Here, the Amended Complaint alleges in part that there were misstatements made about the loan loss reserves that could be objectively verified as false by known facts.  Thus, when the Bank implemented its new methodology for evaluating the creditworthiness of its loans, *i.e.*, the eight point risk rating system, it was intentionally and fraudulently delaying the recognition of bad debt and underreporting its loan loss reserves.  *Am. Compl.* ¶¶ 244-248.  As in *Westinghouse*, Plaintiff pleaded that SEK and the other Defendants knew or were

reckless in not knowing that the loan loss reserves would not cover current and expected future losses.

SEK's reliance on *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 376 (3d Cir. 1993), is misplaced because the *Trump* plaintiffs, unlike SEPTA, alleged only one misstatement about future earnings which was countenanced by direct warnings of the highly speculative nature of the investment. *Id.* at 373. The Third Court held that "materiality involves a context-specific analysis such that warnings and cautionary language will sometimes suffice to render the allegedly misleading misrepresentations or omissions immaterial as a matter of law." *Id.* at 373. However, "if the nature of the subject matter or the manner of presentation of an alleged misrepresentation or omission or its accompanying statements is such that for a reasonable investor the accompanying statements do not offset the misleading effect of the misrepresentation or omission, then bespeaks caution is unavailable as a defense." *Trump*, 7 F.3d at 373. In *Trump*, the Third Circuit concluded that despite the statement about potential future income meeting debt obligations, the prospectus "clearly and precisely cautioned that the bonds represented an *exceptionally risky*, *perhaps even speculative*, venture and *that the Partnership's ability to repay the bonds was uncertain*." *Id.*

Here, the fraud did not stem from management's inability to "predict loan losses" (SEK Br. at 33) but in the Bank's intentional concealment of *known*

problems with its loans portfolio and the inability of the Bank's reserve to cover known and anticipated losses.   Thus, SEK has no basis to claim that the misstatements about Orrstown's loan loss reserves were made immaterial by the "bespeaks caution" doctrine and nothing in the disclaimer of risk adequately offsets the false and misleading statements of management regarding the quality of its loan portfolio, its conservative banking practices and methodologies and the adequacy of its loan loss reserves.

> **c.     The Allegations Provide a Strong Inference that SEK Acted With the Requisite Scienter.**

In assessing whether *scienter* is sufficiently alleged, a court must consider "whether all of the facts alleged, taken collectively give rise to a strong inference of *scienter*…, not whether any individual allegation scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (U.S. 2007) ("[I]f a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged," plaintiffs have satisfied their pleading burden on a Section 10(b) claim).[41] SEK claims that Plaintiff has failed to allege *scienter* because the allegations of recklessness are mere blanket assertions.   SEK is wrong.

---

[41]   Moreover, "factual allegations giving rise to [a competing] inference must appear on the face of the complaint," not in an auditor's moving papers. *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 417 (S.D.N.Y. 2007).

To adequately allege *scienter* in the Third Circuit, the plaintiff must allege "that an auditor either lacked a genuine belief that its representations were supported by adequate information or engaged in auditing practices so shoddy that they amounted at best to a 'pretended audit.'" *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 281; *In re IKON*, 277 F.3d at 673, 677 n. 26 (the plaintiff must allege "that [the auditor]'s judgment at the moment exercised was sufficiently egregious such that a reasonable accountant reviewing the facts and figures should have concluded that [the company]'s financial statements were misstated and that as a result the public was likely to be misled").   Such allegations have traditionally supported a showing of auditor liability, "even in the face of assertions of good faith" by the auditor.  *Id.*

To meet this pleading standard, the plaintiff does not need to allege the existence of a "smoking gun," but rather the plaintiff may allege how specific and not insignificant accounting violations collectively raise an inference of *scienter*. *In re Suprema Specialties*, 438 F.3d at 279 (citing *McLean*, 599 F.2d at 1198).  A court may infer *scienter* from allegations that show: (1) the auditor "had both motive and opportunity" to commit fraud and/or (2) "strong circumstantial evidence of conscious misbehavior or recklessness."  *In re Burlington Coat Factory*, 114 F.3d at 1418.   A court may also infer *scienter* from allegations showing that the auditor "knew facts or had access to information suggesting that

their public statements were not accurate" or "failed to check information they had a duty to monitor." *WorldCom*, 2003 U.S. Dist. LEXIS 10863, at \*18-\*19 (citing *Novak*, 216 F.3d at 311). *See also Bear Stearns*, 763 F. Supp. 2d at 510 (sustaining auditor claims because auditor "disregarded specific 'red flags' that would have placed a reasonable auditor on notice that the Company was engaged in wrongdoing"); *In re American Business Financial Servs., Inc. Noteholders Litig.*, No. 05–0232, 2008 U.S. Dist. LEXIS 61450, 2008 WL 3405580, \*\*10-11, 24-27 (E.D. Pa. Aug. 11, 2008) (rejecting auditor's argument that the plaintiffs' failed to adequately allege *scienter* with multiple assertions of how the auditor violated GAAS standards).

In *American Business,* 2008 WL 3405580 at \*\*24-27, the court found sufficient allegations that the auditor acted with *scienter* where questions were raised about management's integrity, the company's financial condition and internal controls, including comment letters from the SEC, outstanding matters with the Pennsylvania Securities Commission, recurring negative cash flows from operations, poor liquidity and dependence on debt financing, management was dominated by a small group of individuals and performance measures compared to industry and peers. *Id.* at \*\*10-11. Similarly, in *Bear Stearns,* 763 F. Supp. 2d at 510, the court found that plaintiff adequately alleged that the auditor acted with *scienter* with allegations of warnings by the SEC, risk alerts related to the

Company's internal controls, weaknesses in the company's pricing and risk models, and weaknesses in management and personnel. *Id.* at 471, 518 (holding sufficient *scienter* allegations stemming from multiple GAAP and GAAS violations and red flags about management).

As in *Bear Sterns* and *American Business*, the Amended Complaint sets forth allegations of "highly suspicious facts and circumstances available to the auditor at the time of that audit" that are sufficient to "create a strong inference of *scienter* for purposes of alleging a claim under §10(b)," contrary to SEK's oversimplification of the facts alleged in the Amended Complaint. SEK knew, or was reckless in not knowing, that it was repeatedly certifying the adequacy of non-existent or deficient internal controls, disregarded weaknesses in the Bank's controls over underwriting, loan supervision and loan loss reserves, as well as weaknesses in its personnel and management. The warnings were numerous and significant. The Amended Complaint alleges that SEK knew about the Bank's November 2009 Internal Review of its loans. *Am. Compl.* ¶ 183. Regulators also began expressing concern over the Bank's practices by at least as early as May 2010, and likely earlier. *Id.* ¶¶ 142-143. CW#2 confirmed that regulators were conducting an on-site investigation at least as early as November 2010. *Id.* ¶ 143. Thus, significantly, SEK issued a clean and unqualified audit certification on March 11, 2011 after the Bank conducted an Internal Review and in the midst of

an evasive and ongoing **state and federal regulatory investigation** that began in mid-2010 but was undisclosed to the investing public.  Unless SEK conducted its 2010 audit wearing a blind-fold, it was impossible for SEK not to notice the significant problems at Orrstown.

The Regulators did not uncover some unknowable, minor infraction, but rather they made startling findings that required the Bank's retention of consultants to do independent loan reviews and a massive restructuring of the Bank's internal controls, which triggered significant management departures, starting with the CFO, Defendant Everly.  *Am. Compl.* ¶¶ 144-151; 263, 280.  This likely prompted the SEC to issue strong comment letters in 2011 relating to Orrstown's asset quality, credit risk management, allowance for loan losses, loan receivables, and fair value disclosures related to impaired loans.  *See* Decl. Ex. D-1 through D-3 (SEC Comment Letters, dated March 25, 2011, April 8, 2011, and May 4, 2011, respectively).    Then again, on August 23, 2012, the SEC questioned how management was "able to conclude that the disclosure controls and procedures were effective as of March 31, 2012 and as of June 30, 2012 in light of the fact that the Company ha[d] not fully remediated the material weaknesses in internal control over financial reporting relating to loan ratings and its impact on the allowance for loan losses."  *See* Decl. Ex. E (SEC Comment Letter, dated 8/23/2012).

The facts reveal that SEK knew of that the Company was being investigated the Regulators, that a significant percentage of the Bank's loan portfolio was in trouble, and that management was perpetuating the problem by failing to adhere to its stated methodologies around risk and loan loss reserves.  SEK also knew that the SEC was issuing comment letters, all of which heavily criticized the specific controls SEK certified as adequate.  SEK does not (and cannot) assert that the problems identified by the Regulators, and the SEC, were by their nature difficult to discover, or actively concealed from SEK, a self-professed expert in financial institutions.  *See* Decl. Ex. F (SEK Website Outtakes, last visited 7/22/013).  The problems at Orrstown were pervasive, long-term, open and obvious internally at the Company, as verified by several former Bank employees.  An audit expert with rudimentary knowledge of banks would not overlook such pervasive problems that were identifiable to an ordinary auditor.

SEK was also cognizant of the critical nature of the Bank's credit and risk assessments and the sheer size and significance of the loan assets and the frequency by which management made "exceptions" to the so-called Loan Policy. SEK knew that there was a "heavy concentration of commercial loans", "adverse credit data about borrowers" and there was "undue influence and control over loan decisions by management." *Am. Compl.* ¶ 182.  Valuations of loans, risk, loan loss reserves, underwriting standards and methodologies, exceptions to lending

policies, concentrations of lending activity in particular industries or geographies, are all core considerations for a bank.  SEK also likely knew or should have at least questioned Orrstown's eight point risk rating system which had the effect of delaying recognition of bad loans.  As alleged in the Amended Complaint, loan assets reflected nearly 70% of the total assets during the periods ending December 31, 2009, 2010, and 2011.  The millions of dollars in write-offs coupled with the 27% overall reduction in its loan portfolio once actual controls were put in place, all show that Orrstown was not as stable or financially strong as being portrayed in its 2009 and 2010 Forms 10-K.  These facts and considerations should have triggered some additional auditor scrutiny, particularly since SEK holds itself out to the public as an expert in financial institutions.  These facts support a strong inference that SEK acted with *scienter* when it disregarded its audit responsibilities and issued false statements about the adequacy of the Company's internal controls.

SEK also does not deny the allegations in the Amended Complaint about its motive and opportunity to commit fraud.  SEK has had an ongoing relationship as Orrstown's auditor for at least 16 years and, during that time, SEK developed friendships with the management at Orrstown, including the Bank's former CFO, Defendant Everly, who was removed soon after the Regulators issued their enforcement actions requiring critical evaluations of the competency of senior management.  *Am. Compl.* ¶¶ 150-151.  SEK is also intimately involved in the

local business community of both Chambersburg, Pennsylvania (where Orrstown is based) and Hagerstown, Maryland (where most of the bad loans originated). *See* Decl. Ex. F (SEK Website Outtakes).   SEK also knew that management's motivation in issuing the March 2012 Offering was to raise money to offset the Bank's poorly performing loan portfolio and inadequate loan loss reserve. *Am. Compl.* ¶ 3.  The Bank needed capital.  *Id.*  Thus, at stake was the existence of the Bank, and by extension, SEK's lucrative position as the Bank's auditor, SEK's business relationships and friendships, certain local clientele who were several of Orrstown's largest borrowers, and, significantly, its reputation as an "independent" auditor that specializes in "financial institutions" in the closely-knit business communities of Chambersburg and Hagerstown.

All of these factors support Plaintiff's inference that SEK acted with *scienter* when SEK falsely certified the adequacy of the Company's internal controls over the Bank's Risk Assets and loan loss reserves.   This lack of auditor "independence" coupled with the Bank's capital needs satisfy the motive requirement.  *See, e.g., In re Cabletron Sys. Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) ("[T]he complaint identifies concealment of the serious and worsening deterioration of Cabletron's financial health as a significant motive for the alleged fraud. . . . This is more than the usual concern by executives to improve financial results; the executives' careers and the very survival of the company were on the

line."); *see also In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 294 (S.D.N.Y. 2008) (allegation that defendants "raised additional capital through secondary offerings" was, with other allegations, sufficient to plead *scienter*); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-C-5893, 2004 U.S. Dist. LEXIS 4659, **28-29 (N.D. Ill. Mar. 19, 2004) (holding that plaintiff sufficiently alleged motive and opportunity where auditor was "under enormous pressure" to increase billable hours and auditor was involved "closely" in the company's various business ventures, thus "abrogated its independent status as an auditor" and "compromise[ed] its independence….").

Thus, the allegations of motive and opportunity coupled with the allegations of knowing and reckless disregard raise a strong and more plausible inference than that advocated by SEK (*i.e.*, that the failures in question were the product of, at most, negligence).  Thus, Plaintiff has adequately alleged *scienter*.

### 6.    *Plaintiff Adequately Alleges Loss Causation.*

To allege loss causation, a plaintiff must simply "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharm. Inc., v. Broudo*, 544 U.S. 336, 342 (2005).  This standard is "not meant to impose a great burden on the plaintiff" and a securities fraud complaint is sufficient so long as it sets forth what the alleged loss and causal connection to the fraud "might be."  *Id.* at 347.  In fact, a plaintiff is not even

required to allege that all of its loss is due to a defendant's misstatement or omission. *See Gould v. Winstar Commc'ns Inc.*, 692 F.3d 148, 162 (2d Cir. 2012) (holding that plaintiff need only establish facts that raise an "inference that some of the decline was substantially caused by the disclosures about the fraud itself"); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) (holding loss causation is sufficiently alleged by showing that it is "'plausible'" that plaintiff's loss "'was the result – at least in part'" of the fact that defendants concealed information).

Contrary to SEK's contention, the Amended Complaint adequately alleges that the disclosure of the fact that SEK's materially false certification of the financials and adequacy of the Bank's internal controls caused a decline in the price of Orrstown common stock. Specifically, Plaintiff alleges that Defendants' deception artificially inflated the Bank's stock by misrepresenting "the quality of the Company's lending practices, loan portfolio and financial condition" (*Am. Compl.* ¶ 311), and that when the Bank's true lending practices, loan portfolio and financial condition were revealed to the public, the Bank's "stock fell precipitously as a result of such revelations." *Id.* These allegations are sufficient to plead loss causation as a matter of law. Thus, contrary to SEK's contention, Plaintiff has adequately alleged a causal connection between SEK's misrepresentations, including that the internal controls of the Company were adequate, to SEK's later

admission that those same internal controls over critical bank functions were materially inadequate. *Id.* ¶¶ 311-12. As a result , Orrstown's stock price decreased by up to 80% .

SEK's contention that poor market conditions resulted in the decreased value of the Bank's stock is belied by the fact that the Bank was performing poorly and losing money while all of its other peers were turning a profit. *Am. Compl.* ¶ 9. Moreover, SEK's reliance on *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), is wholly misplaced as that case did not involve a GAAP violation or any securities claims, but rather addressed the speculative nature of a future injury under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *Id.* at 765. *First Nationwide* is also irrelevant because there was "a significant period of time [that] ha[d] elapsed between the defendant's actions and the plaintiff's injury" and therefore the court found that a future RICO injury would be too speculative and there was a "greater likelihood that the loss is attributable to events occurring in the interim." *Id.* at 772. In this case there were no intervening events or a significant lag time, the market reacted contemporaneously with the news – when finally revealed – that the Bank had material weaknesses in its internal controls.

Moreover, determining whether an alleged misstatement actually caused a plaintiff's loss is an intensely fact-based inquiry. *EP Medsystems, Inc.*, 235 F.3d

865 at 884 (3d Cir. 2000) (holding that "the causation issue becomes most critical at the proof stage and whether the plaintiff has proven causation is usually reserved for the trier of fact."); *White v. Kolinsky,* 2011 U.S. Dist. LEXIS 54746, *25 (D.N.J. May 18, 2011) (holding that plaintiff had adequately alleged loss causation and rejecting defendant's argument that the "intervening real estate crisis" caused investor loss as this is "precisely the sort of question of fact the Third Circuit has noted is usually reserved for the trier of fact").  Thus, if there is a question of whether the "loss was caused by an intervening event, like a general fall in the price . . . , the chain of causation . . . is a matter of proof at trial and not be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt, LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003).

Finally, SEK's attempt to raise its affirmative defenses at the pleading stage all fail.  *See Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643 (S.D.N.Y. 1968) (rejecting the auditor's due diligence defense with respect to certain misstatements in audited financial statements).  SEK's motion to dismiss should be rejected.

## VI.   <u>CONCLUSION.</u>

For all of the foregoing reasons, Defendants' Motions should be denied in their entirety.   In the alternative, should the Court find any infirmity in the allegations of the Amended Complaint, Plaintiff respectfully requests leave to amend.

Dated:  July 22, 2013                    Respectfully submitted,

**CHIMICLES & TIKELLIS LLP**

*/s/ Kimberly Donaldson Smith*
Nicholas E. Chimicles
Kimberly Donaldson Smith
Christina Donato Saler
Benjamin F. Johns
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Fax: (610) 649-3633
nick@chimicles.com
kimdonaldsonsmith@chimicles.com
cdsaler@chimicles.com
bfj@chimicles.com

| Am. Compl. ¶ | Securities Act<br><br>**Alleged False and Misleading Statements** |
|---|---|
| 165a | "We view sound credit practices and stringent underwriting standards as an integral component of our continued success. In September 2009, we created the position of Chief Credit Officer to enhance our processes and controls, as well as clearly delineate independence between sales and credit." Form 424B Prospectus Supplement, filed 3/24/10, at 2 (emphasis added). |
| 165b | "Our ability to successfully grow will also depend on the continued availability of loan opportunities that meet our stringent underwriting standards."  Form 424B Prospectus Supplement, filed 3/24/10, at 13 (emphasis added). |
| 165c | "The Bank follows conservative lending practices and continues to carry a high quality loan portfolio with no unusual or undue concentrations of credit."  Form 10-K 2009 Annual Report, file 3/15/2010, at 30 (emphasis added). |
| 165d | "Orrstown Bank employs a Loan Review Officer, who is independent from the loan origination function and reports directly to the Credit Administration Committee. The Loan Review Officer continually monitors and evaluates loan customers utilizing risk-rating criteria established in the Loan Policy in order to spot deteriorating trends and detect conditions which might indicate potential problem loans. The Loan Review Officer reports the results of the loan reviews at least quarterly to the Credit Administration Committee for approval and provides the basis for evaluating the adequacy of the allowance for loan losses."  Form 10-K 2009 Annual Report, filed 3/15/2010, at 30 (emphasis added). |
| 166a | "While certain borrowers have come under stress due to the economic conditions affecting our markets, we believe that this disciplined approach to lending results in peer-leading asset quality metrics even in a difficult environment. As of December 31, 2009, |

| Am. Compl. ¶ | Securities Act<br><br>**Alleged False and Misleading Statements** |
|---|---|
| | our nonperforming assets to total assets ratio was 0.44%. Additionally, we have proactively moved to address any problem credits and ensure that we are adequately reserved for any potential losses." Form 424B Prospectus Supplement, filed 3/24/2010, at 2 (emphasis added). |
| 166b | "In recognition of sustained loan growth and a continuation of its historically prudent approach, the Company added $3,600,000 to its loan loss reserve in the fourth quarter." Form 8-K 4Q 2009 Operating Results, filed 1/28/2010, at 1 (emphasis added). |
| 166c | "Our ratio of nonperforming loans to end of period loans of 1.18% and net charge offs to average loans of 0.11% are well below peers and demonstrate our continued focus on credit quality risk mitigation." Form 8-K 4Q 2009 Operating Results, filed 1/28/2010, at 1 (emphasis added). |
| 167a | "The quality of the Corporation's asset structure continues to be strong. A substantial amount of time is devoted by management to overseeing the investment of funds in loans and securities and the formulation of policies directed toward the profitability and minimization of risk associated with such investments." Form 10-K 2009 Annual Report, filed 3/15/2010, at 29 (emphasis added). |
| 167b | "The Corporation's loan loss history has been much better than peer standards and analysis of the current credit risk position is favorable. The allowance for loan losses is ample given the current composition of the loan portfolio and adequately covers the credit risk management sees under present economic conditions.  Management is prepared to make reserve adjustments that may become necessary as economic conditions continue to change."  Form 10-K 2009 Annual Report, filed 3/15/2010, at 35 (emphasis added). |
| 168a | ***"Conservative lending practices have resulted in strong asset quality metrics** in a difficult credit environment. . ."*  Form 8-K |

| *Am. Compl. ¶* | **Securities Act**<br><br>**Alleged False and Misleading Statements** |
|---|---|
|  | "Road Show" PowerPoint Presentation, filed 3/16/10, at 4 (emphasis added). |
| 168b | ***"Global credit oversight*** by the Bank's Credit Administration Committee, which is comprised of ***four independent directors***." Form 8-K "Road Show" PowerPoint Presentation, filed 3/16/10, at 19 (emphasis added). |
| 168c | Orrstown's ***"[e]mphasis on credit quality, return to shareholders, solid financial performance, and deliver[y] [of] peer-group leading results"*** is a ***"highlight"*** for the investing public to consider.  Form 8-K "Road Show" PowerPoint Presentation, filed 3/16/2010, at 28 (emphasis added). |
| 172a | ***"Deep and experienced management team*** with ***strong*** community ties, ***operational ability and proven track record*** of acquisition integration."  Form 8-K "Road Show" PowerPoint Presentation, filed 3/16/10, at 4, 7 (emphasis added). |
| 172b | "We view the current market environment as being full of opportunity for those institutions with a ***strong balance sheet and management***."  Form 424B Prospectus Supplement, filed 3/24/10, at S-2 (emphasis added). |
| 172c | In their Road Show marketing presentation, Defendants Quinn, Everly and Embly also stated that management fostered a ***"disciplined credit culture"*** and exercised significant oversight. Form 8-K "Road Show" PowerPoint Presentation, filed 3/16/10, at 19 (emphasis added). |
| 172d | ***"Members of senior management are involved heavily*** in customer interaction and business development and ***play an integral role*** in promoting Orrstown's brand and capabilities."  Form 424B Prospectus Supplement, filed 3/24/10, at S-2 (emphasis added) |

| *Am. Compl. ¶* | **Securities Act** <br><br> **Alleged False and Misleading Statements** |
|---|---|
| 177 | The management of Orrstown Financial Services, Inc. and its wholly-owned subsidiary (the "Corporation") is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control. *Our responsibility is to express an opinion on these financial statements and an opinion on the Corporation's internal control over financial reporting based on our audits.* <br><br> *We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects.* Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. *Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk.* Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions. <br><br> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ["GAAP"]. . . . <br> *In our opinion, the financial statements referred to above present* |

| Am. Compl. ¶ | **Securities Act**<br><br>**Alleged False and Misleading Statements** |
|---|---|
|  | *fairly, in all material respects, the financial position of Orrstown Financial Services, Inc. and its wholly-owned subsidiary as of December 31, 2009 and 2008*, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America. Also, *in our opinion, Orrstown Financial Services, Inc. and its wholly-owned subsidiary maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009*, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). |

| Am. Compl. ¶ | Exchange Act<br><br>**Alleged False and Misleading Statements** |
|---|---|
| 231 | The Bank created the position of Chief Credit Officer to purportedly "enhance [credit] processes and controls, as well as clearly delineate independence between sales and credit."  Form 10-K 2009 Annual Report, filed 3/15/2010 at 30. |
| 232a | "The Bank follows *conservative lending practices and continues to carry a high quality loan portfolio* with no unusual or undue concentrations of credit."  Form 10-K 2009 Annual Report, filed 3/15/2010 at 30 (emphasis added). |
| 232b | "The *quality of the Corporation's asset structure continues to be strong. A substantial amount of time is devoted by management to overseeing* the investment of funds in loans and securities and the formulation of policies directed toward the profitability and *minimization of risk associated* with such investments."  Form 10-K 2009 Annual Report, filed 3/15/2010, at 29 (emphasis added). |
| 233a | "The Corporation's loan loss history has been much better than peer standards and analysis of the current credit risk position is favorable. *The allowance for loan losses is ample given the current composition of the loan portfolio and adequately covers the credit risk management sees under present economic conditions*."  Form 10-K 2009 Annual Report, filed 3/15/2010, at 35 (emphasis added). |
| 233b | "*Following the [Internal] review process, management increased the allowance by $3.1 million in order to better reflect the deterioration in local, regional and national economic conditions.* All economic allocations were increased during 2009. . . . The unallocated portion of the reserve ensures that any additional unforeseen losses that are not otherwise identifiable will be able to be absorbed. It is intended to provide for imprecise estimates in assessing projected losses, uncertainties in economic conditions and |

| *Am. Compl. ¶* | Exchange Act<br><br>**Alleged False and Misleading Statements** |
|---|---|
| | allocating pool reserves. ***Management deems the total of the allocated and unallocated portions of the allowance for loan losses to be adequate to absorb losses at this time***." Form 10-K 2009 Annual Report, filed 3/15/2010, at 33 (emphasis added). |
| 239a | "As a poor economy would indicate, we have also had a higher level of loan losses than we have in the past, yet despite this, we have added to our loan loss reserve and still ended 2009 with an increase in income over 2008 and our first quarter of 2010 shows a substantial increase in income over the same period in 2009." Form 8-K Annual Slide Presentation, field 5/5/2010. |
| 239b | "We have a strong and experienced management team that can capitalize on any opportunities we are presented with and also deal with the economic and regulatory environment we are facing." Form 8-K Annual Slide Presentation, filed 5/5/2010. |
| 240 | Defendant Embly, Orrstown's then-Chief Credit Officer, discussed Orrstown's "Credit Quality Review," representing to investors that Orrstown takes a "Proactive & Thorough Approach to Credit" and has a "Disciplined Credit Culture." Form 8-K Annual Slide Presentation, field 5/5/2010. |
| 242a | "We will continue our trend of strong financial performance mixed with ***conservative lending practices***." Form 8-K Annual Slide Presentation, filed 5/5/2010, at 65 (emphasis added). |
| 242b | "We will continue to invest in our business with ***responsible growth*** as a byproduct." Form 8-K Annual Slide Presentation, filed 5/5/2010, at 65 (emphasis added). |
| 244 | "Our core fundamentals remain solid and we were pleased with our first quarter results given the challenging economic conditions." Form 8-K Press Release on 1Q2010 Operating Results, filed |

| Am. Compl. ¶ | Exchange Act<br><br>**Alleged False and Misleading Statements** |
|---|---|
| | 4/22/2010. |
| 249 | On July 22, 2010, the Company told investors that it had ***"significantly reduc[ed] nonperforming assets"*** and had a ***"solid core earnings position."*** Form 8-K Press Release of 2Q 2010 Operating Results, filed on 7/22/2010 (emphasis added). |
| 250 | On November 5, 2010, the Company told investors that the ***"Company continues to be diligent in its handling of nonperforming and other risk assets"*** and is working to ***"reduce the level of risk assets."*** Form10-Q for 3Q2010, filed 11/5/2010, at 25 (emphasis added). |
| 251 | At the conference, Defendant Quinn stated: there are ***"compelling investment considerations"*** when investing in Orrstown because at Orrstown there is an ***"emphasis on credit quality, return to shareholders, solid financial performance, and delivering peer-group leading results."*** Form 8-K, Presentation, filed on 11/10/10, at 24 (emphasis added). |
| 252 | "[W]e bolstered our services, added meaningfully to capital and were ***intensively focused on asset quality,*** which we believe ***remains quite solid."*** Form 8-K Press Release, filed 1/27/2011 (emphasis added). |
| 253 | Again, Defendant Quinn "highlighted" Orrstown's ***"deep and experienced management team," "emphasis on credit quality"*** and ***"emphasis on growing mortgages."*** Form 8K Presentation, filed 2/2/11, at 7, 24; Form 8-K, Presentation, filed 3/2/2011, at 7, 24 (emphasis added). |
| 253 | The Orrstown Exchange Act Defendants stated that, when compared against its peers, the Company was performing well:  it had ***"excellent return ratios,"*** had ***"reduced"*** Risk Assets while ***"growing"*** both its assets and deposits.  Form 8-K, Presentation |

| Am. Compl. ¶ | Exchange Act<br><br>**<u>Alleged False and Misleading Statements</u>** |
|---|---|
| | Materials, filed on 3/1/2011, at 5, 10, 15-16, 23 (emphasis added). |
| 253 | The Orrstown Exchange Act Defendants also stated that the Bank continued to place an ***"emphasis on credit quality, return to shareholders, solid financial performance, and delivering peer-group leading results."*** Form 8-K, Presentation Materials, filed on 3/1/2011, at 24. |
| 254 | "Over the past several years our Company has seen remarkable results and experienced significant growth.  We recently announced the highest earnings ever in the history of the organization and also reported that we surpassed the $1.5 billion asset mark for the year ending December 31, 2010."  Form 8-K Press Release, filed on 2/10/2011. |
| 255a | "***The quality of the Company's asset structure continues to be strong.*** A substantial amount of time is ***devoted by management to overseeing*** the investment of funds in loans and securities and the ***formulation of policies directed toward*** the profitability and ***minimization of risk associated*** with such investments."   Form 10-K 2010 Annual Report, filed 3/11/2011, at 40 (emphasis added). |
| 255b | "Company follows ***conservative lending practices*** and continues to carry a ***high quality loan portfolio with no unusual concentrations of credit***."  Form 10-K 2010 Annual Report, filed 3/11/2011, at 42 (emphasis added). |
| 255c | "***Credit risk is mitigated through conservative underwriting standards***, ***on-going risk credit review, and monitoring*** asset quality measures."  Form 10-K 2010 Annual Report, filed 3/11/2011, at 45 (emphasis added). |
| 255d | "The company continues to be ***diligent in its handling of nonperforming and other risk assets***. . . ."  Form 10-K 2010 Annual Report, filed 3/11/2011, at 46 (emphasis added). |

| *Am. Compl.* ¶ | **Exchange Act**<br><br>**Alleged False and Misleading Statements** |
|---|---|
| | |
| 255e | "The Bank has a loan review policy and program which is ***designed to reduce and control risk in the lending function***."  Form 10-K 2010 Annual Report, filed 3/11/2011, at 48 (emphasis added). |
| 262 | ***"Generally speaking, the Company follows conservative lending practices and continues to carry a high quality loan portfolio with no unusual or undue concentrations of credit***. . . . [The Company also continued to maintain that it had] *"**conservative underwriting standards.**"*  Form 10-Q 2Q2011, filed on 8/9/11, at 41, 42 (emphasis added). |
| 268 | Defendant Quinn stated that despite the Federal Reserve's would not authorize declaration of a quarterly dividend, the Company remained ***"safe and sound."***  Form 8-K Current Report, filed on 10/27/2011. |
| 271 | ***"Our Credit Administration department, processes, and procedures have been greatly enhanced*** since mid-2011 and the ***Special Asset Group is actively engaged in the identification and work out of problem credits*** in the manner most favorable to the Company. The ***re-engineering of our credit processes and procedures have made us a stronger bank*** that is well positioned for the future when conditions rebound."  Form 8-K Press Release on 4Q2011 Operational Results, filed 1/26/2012. |
| 276 | "[T]he Company has experienced a steady increase in risk assets from 2007 – 2011, which coincides with the downturn in the state and local economies, and softness in the real estate market. The largest increase in risk elements was nonaccrual loans, which totaled $83,697,000 at December 31, 2011 compared to $13,896,000 at December 31, 2010, an increase of $69,801,000. All loan segments experienced increases in nonaccrual loans from year end December 31, 2010 to 2011, with commercial acquisition and development and non-owned occupied segments experiencing the greatest dollar and |

| Am. Compl. ¶ | Exchange Act<br><br>**Alleged False and Misleading Statements** |
|---|---|
| | percentage increases, reflective of softness in the real estate market and corresponding decline in collateral values." Form 10-K 2011 Annual Report, filed 3/15/2012, at 48 (emphasis added). |
| 285 | "Based on my knowledge, the quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report." Form 10Q 1Q2010, filed 5/7/2010. |
| 285 | "Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report." Form 10Q 1Q2010, filed 5/7/2010. |
| 286 | "[T]he annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report." *See, e.g.*, Form 10-K 2010 Annual Report, filed 3/11/2010, at Quinn and Everly Certifications. |
| 286 | "Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report." *See, e.g.,* Form 10-K 2010 Annual Report, filed 3/11/2010, at Quinn and Everly Certifications. |
| 289 | "Bank policy related to the allowance for loan losses is considered to be a ***critical accounting policy*** because the allowance for loan losses represents a ***particularly sensitive accounting estimate***. The amount |

| *Am. Compl.* ¶ | **Exchange Act**<br><br>**Alleged False and Misleading Statements** |
|---|---|
| | of the allowance is based on management's evaluation of the collectability of the loan portfolio. . . ."  From 10-Q 1Q2010, filed 5/7/2010, at 19 (emphasis added). |
| 295 | "[T]he financial statements referred to above present fairly, in all material respects, the financial position of Orrstown Financial Services, Inc. and its wholly-owned subsidiary as of December 31, 2009 and 2008, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, Orrstown Financial Services, Inc. and its wholly-owned subsidiary maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)." Form 10-K 2009 Annual Report, filed 3/15/2010, at 47. |
| 300 | "[T]he financial statements referred to above present fairly, in all material respects, the financial position of Orrstown Financial Services, Inc. and its wholly-owned subsidiary as of December 31, 2010 and 2009, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2010 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, Orrstown Financial Services, Inc. and its wholly-owned subsidiary maintained, in all material respects, effective internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)." Form 10-K 2010 Annual Report, filed 3/11/2011, at 67. |
| 305 | "[T]he financial statements referred to above present fairly, in all material respects, the financial position of Orrstown Financial |

| *Am. Compl.* ¶ | **Exchange Act**<br><br>**Alleged False and Misleading Statements** |
|---|---|
|  | Services, Inc. and its wholly-owned subsidiary as of December 31, 2011 and 2010, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2011 in conformity with accounting principles generally accepted in the United States of America."  Form 10-K 2011 Annual Report, filed 3/15/2011, at 77. |
| 305 | "A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.  The following material weakness has been identified and included in management's assessment.  ***The Company did not have a timely and effective process to prepare and report information related to loan ratings and the allowance of loan losses allocations*** . . . . ***In our opinion, because of the effects of the material weakness described above on the achievement of the objectives of the control criteria, Orrstown Financial Services, Inc. and its wholly-owned subsidiary has not maintained effective internal control over financial reporting as of December 31, 2011*** . . . ."  Form 10-K 2011 Annual Report, filed 3/15/2011, at 77. |