**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SOUTHEASTERN PENNSYLVANIA | : | |
| TRANSPORTATION AUTHORITY, | : | |
|     Plaintiffs | : | |
| | : | No. 1:12-cv-00993 |
|     v. | : | |
| | : | (Judge Kane) |
| ORRSTOWN FINANCIAL SERVICES, | : | |
| INC., <u>et al.</u> | : | |
|     Defendants | | |

<u>**TABLE OF CONTENTS**</u>

I.     **BACKGROUND**

II.    **LEGAL STANDARD**

III.   **DISCUSSION**

      A.    **Factual Allegations**

           1.    **Expansion and March 2010 Offering**

           2.    **Post-March 2010 Offering**

           3.    **Defendant Auditor Smith Elliott Kearns**

      B.    **Legal Standard Applicable to Plaintiff's Claims**

           1.    **Securities Act**

           2.    **Exchange Act**

           3.    **Principles Governing Materiality Under the Acts**

                 a.    **Statements of Opinion or Belief**
                 b.    **Forward-Looking Statements**
                 c.    **Puffery**

C.      **Analysis**

    1.      **Securities Act Claims**

        a.      **Applicable Pleading Standard**

        b.      **Count I:      Defendants Orrstown and the Bank**
            i.      **Statements related to "underwriting standards, credit review policies, and internal controls"**
            ii.      **Statements related to loan loss reserves**
            iii.      **Statements regarding credit practices during Road Show PowerPoint Presentation**
            iv.      **Post-March 2010 Offering Statements related to credit procedures**
            v.      **Statements related to the effectiveness of management**

        c.      **Count II:      Individual Defendants, Defendant Smith Elliott Kearns, and Defendants Sandler O'Neil and Janney Scott**
            i.      **Individual Securities Defendants and Underwriter Defendants**
            ii.      **Auditor Defendant Smith Elliott Kearns**

        d.      **Count III:      Orrstown, the Bank, Individual Securities Act Defendants, Defendant Jeffrey Embly, and the Underwriter Defendants**

        e.      **Counr IV:      Section 15, Individual Securities Act Defendants**

    2.      **Exchange Act Claims**

        a.      **Count V: Section 10(b) and Rule 10b-5, Orrstown Exchange Act Defendants**
            i.      **Statements in the 2009 Annual Report**
            ii.      **Statements at the May 4, 2010 shareholder meeting and in the May 5, 2010 Form 8-K**
            iii.      **Statements regarding risk assets and loan loss reserves**
            iv.      **Statements from the second quarter 2010 through first quarter 2011**
            v.      **Statements from the second quarter 2011**
            vi.      **Statements from the third quarter 2011 through end of class period**
            vii.      **Financial reporting**

        **b.**       **Count VI: Section 10(b) and Rule 10b-5, Auditor Defendant**

        **c.**       **Count VII: Section 20(a), Orrstown Exchange Act Defendants Quinn, Everly, and Embly**

## IV.   CONCLUSION

### MEMORANDUM

Before the Court is a motion to dismiss filed on behalf of Defendants Orrstown Financial Services, Orrstown Bank, Anthony Ceddia, Jeffrey Coy, Mark Keller, Andrea Pugh, Thomas Quinn, Jr., Gregory Rosenberry, Kenneth Shoemaker, Glenn Snoke, John Ward, Bradley Every, Joel Zullinger, and Jeffrey Embly (Doc. No. 53); a motion to dismiss on behalf of Defendant Smith Elliott Kearns & Company LLC (Doc. No. 56); and a motion to dismiss on behalf of Defendants Sandler O'Neill & Partners, L.P. and Janney Montgomery Scott, LLC (Doc. No. 58). For the reasons that follow, the Defendants' motions will be granted**.**

## I.   BACKGROUND[1]

Defendant Orrstown Bank, (the "Bank"), a wholly-owned subsidiary of Defendant Orrstown Financial Services, LLC, ("Orrstown"), was founded in 1919 and provides community banking and bank related services in the South Central Pennsylvania region.  (Doc. No. 40 ¶¶ 26-27.)  The Bank has twenty-one branches, concentrated in Cumberland, Franklin, and Perry Counties, as well as one branch in Hagerstown, Maryland.  (Id. ¶ 27.)  Approximately seventy-five percent of the Bank's loan portfolio is concentrated in commercial loans.  (Id.)

In early 2010, Defendants Orrstown and the Bank raised almost $40 million from

---

[1] This brief overview is taken from the allegations of Plaintiff's amended class action complaint. (Doc. No. 40.) The precise factual allegations of the amended class action complaint will be set forth in Section III.A. below.

investors through the public offering of approximately 1.4 million shares of Orrstown common stock at $27.00 per share.  (<u>Id.</u> ¶ 1.)  However, following a series of revelations concerning the Bank's financial condition, on January 26, 2012, Defendant Orrstown reported losses of twenty-three million for the fourth quarter of 2011.  (<u>Id.</u> ¶ 9.)  On March 15, 2012, Defendant Orrstown disclosed that it had failed to "maintain effective internal control over the process to prepare and report information related to loan ratings and its impact on the allowance of loan losses."  (<u>Id.</u> ¶ 11.)  On March 23, 2012, Defendants Orrstown and the Bank, and their shared Board of Directors, revealed that they had entered into an agreement with the Federal Reserve Bank of Philadelphia and a consent order with the Commonwealth of Pennsylvania, Department of Banking, Bureau of Commercial Institutions.  (<u>Id.</u> ¶ 12.)  As part of the agreement and consent order, Defendants Orrstown and the Bank were required, among other things, to revise their loan underwriting and credit administration policies and strengthen their credit risk management practices.  (<u>Id.</u>)  On March 30, 2012, Orrstown mailed additional proxy materials to shareholders, informing them that it had faced significant challenges in 2011 and had been operating under the guidance of regulators to make structural changes.  On April 5, 2012, Orrstown stock closed at $8.20 per share.  (<u>Id.</u> ¶ 13.)

On May 5, 2012, Lead Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA"), on behalf of two classes, filed this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) against Defendants Orrstown, the Bank, certain of Orrstown's officers and directors, Smith Elliott Kearns & Company, LLC, Sandler O'Neill & Partners L.P. and Janney Montgomery Scott, LLC, alleging that Defendants issued materially untrue and/or misleading statements and omissions in violation of the federal securities laws.  (<u>Id.</u> ¶ 16.)

Plaintiff asserts claims on behalf of two classes: (1) the "Securities Act Class," which consists of all persons and/or entities who purchased Orrstown common stock pursuant to, or traceable to, Orrstown's February 8, 2010 registration statement and March 23, 2010 prospectus supplement issued in connection with Orrstown's secondary stock offering in March 2010 and were damaged thereby; and (2) the "Exchange Act Class," which consists of all persons or entities who purchased Orrstown common stock on the open market between March 15, 2010 and April 5, 2012 (the "class period") and were damaged thereby.  (Id. ¶¶ 17-18.)  Plaintiff SEPTA acquired Orrstown stock pursuant to the offering documents for the March 2010 offering, and also purchased Orrstown common stock on the open market during the class period.  (Id. ¶ 25.)

On March 4, 2013, Plaintiff filed an amended complaint.  (Doc. No. 40.)  On May 28, 2013, Defendants Orrstown, the Bank, and the Orrstown individual defendants (the "Orrstown Defendants") moved the Court to dismiss Plaintiff's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 53.)  On that same day, Defendant Smith Elliott Kearns & Company, LLC (the "Auditor Defendant") also moved the Court to dismiss Plaintiff's amended complaint for failure to state a claim (Doc. No. 56), as did Defendants Sandler O'Neill & Partners and Janney Montgomery Scott, LLC (the "Underwriter Defendants") (Doc. No. 58.). The Orrstown Defendants, the Auditor Defendant and the Underwriter Defendants filed briefs in support of their motions to dismiss.  (Doc. Nos. 57, 59, 60.)  On July 22, 2013, Plaintiff filed an omnibus brief in opposition to the motions to dismiss.  (Doc. No. 66.) Each group of defendants submitted a reply brief in response.  (Doc. Nos. 68, 71, 72.)  The Court heard oral argument on the collective motions to dismiss on April 29, 2014.  (Doc. No. 84.)

On March 25, 2015, the Court issued an Order requiring the parties to file briefs

addressing the impact of the United States Supreme Court's March 24, 2015 decision in

Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, No. 13-435 (U.S. Mar.

24, 2015), on the pending motions to dismiss. (Doc. No. 87.) Those briefs were filed on April

10, 2015. (Doc. Nos. 90, 91.) The matter is now ripe for disposition.

## II.    LEGAL STANDARD

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a

complaint's factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A complaint must

contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in

order to "give the defendant fair notice of what the ... claim is and the grounds upon which it

rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks omitted)

(interpreting Fed. R. Civ. P. 8(a)). Generally, a court considering a motion to dismiss pursuant

to Federal Rule of Civil Procedure 12(b)(6) must determine whether the complaint contains

sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."

Iqbal, 556 U.S. at 678.

Consistent with the Supreme Court's rulings in Twombly and Iqbal, the Third Circuit

requires district courts to engage in a two-part analysis when reviewing a Rule 12(b)(6) motion:

(1) first, a court should separate the factual and legal elements of a claim, accepting well-pleaded

factual matter and disregarding legal conclusions; (2) second, a court should determine whether

the remaining well-pled facts sufficiently demonstrate that a plaintiff has a "plausible claim for

relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting Iqbal, 556

U.S. at 679). Facial plausibility exists when the plaintiff pleads factual content "that allows the

court to draw a reasonable inference that the defendant is liable for the misconduct alleged."

6

Iqbal, 556 U.S. at 678 (internal citations omitted).

In conducting its analysis, a court must accept all well-pleaded factual allegations in the complaint as true for purposes of determining whether the complaint states a plausible claim for relief, and must view the factual allegations in the light most favorable to the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).  In this regard, a court may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

The court's determination on a Rule 12(b)(6) review is not whether the non-moving party "will ultimately prevail," but whether that party is "entitled to offer evidence to support the claims."  United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 302 (3d Cir. 2011) (internal citations omitted).  The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 663-64.

## III.   DISCUSSION

### A.   Factual allegations

#### 1.   Expansion and March 2010 offering

Plaintiff's complaint begins with Defendant Orrstown's expansion into the commercial loan market in Hagerstown, Maryland in early 2005, during which Plaintiff alleges that Orrstown Bank Senior Vice President of Business Development Terry Reiber "aggressively developed lending relationships" in the Hagerstown, Maryland market.  (Doc. No. 40 ¶¶ 73, 75.)  Plaintiff's complaint relies in part on information obtained from six confidential witnesses, all of whom had various relationships to Defendant Orrstown.  (Id. ¶¶ 56-61.)   Plaintiff alleges that Mr. Reiber

influenced the Bank's credit review and approval process in order to extend "large commercial loans to risky borrowers," many of whom ultimately defaulted.  (Id. ¶ 76.)  Plaintiff also alleges that the Bank's credit and loan procedures in place at the time were flawed, in that the loan review officer did not have any formal training, and the credit analysts were often working with incomplete packets of information.  (Id. ¶¶ 82-83.)  Plaintiff singles out Mr. Reiber's role in approving risky loans, alleging that he modified or independently prepared loan review packets.  (Id. ¶ 84.)  Relying on Confidential Witnesses #1 and #3, Plaintiff further alleges that the Bank's Loan Review Committee "routinely" approved loans that failed to satisfy their purported credit standards.  (Id. ¶ 87.)  For example, according to Plaintiff, Confidential Witness #3 recalled that the Loan Review Committee would approve commercial loans that Terry Reiber generated based upon "frivolous exceptions" (id. ¶ 90), and that the Loan Review Committee lowered the debt service ratio in order to approve "very risky loans in the Hagerstown and Chambersburg markets" (id. ¶ 92).  Citing the Bank's commercial lending relationships with the Azadi and Shaool families, as well as its lending relationships with the Chambersburg Developers and Yorktown Funding, Plaintiff contends that the Bank was not acting in a prudent manner by virtue of lending money to these borrowers, who eventually defaulted on their loans.  (Id. ¶¶ 109-33.)

Later, in November 2009, the Bank initiated an Internal Review in order to identify any potential weaknesses and deterioration in its loan portfolio.  (Id. ¶ 99.)  Plaintiff alleges that this internal review was "intended to portray to investors a false sense of assurance about the Bank's internal controls and quality of the loan portfolio."  (Id. ¶ 101.)  In support of this allegation, Plaintiff relies on information obtained from Confidential Witness #2, who stated that none of the members on the Internal Review team were "credit minded," meaning that the Internal

8

Review suffered from structural bias.  (Id. ¶¶ 102-05.)

Plaintiff alleges that despite these ongoing internal problems, Defendants nevertheless attempted to paint a picture of a "well-run, disciplined Company on the move" in the Offering Documents[2] related to the March 24, 2010 stock offering.[3]  Plaintiff avers that the Bank made false and misleading statements relating to underwriting standards, credit review policies, internal controls, and loan loss reserves.[4]  (Id. ¶¶ 165-67.)

Plaintiff additionally alleges that Defendants Quinn, Everly, and Embly made further false and misleading statements concerning the Bank's credit practices during their "Road Show PowerPoint Presentation," which Defendants used to market the March 2010 Offering directly to investment managers and other financial advisors, as well as the investing public.  (Id. ¶¶ 168-69.)    Finally, Plaintiff alleges that the Offering Documents contained false and misleading statements regarding the quality of Defendant Orrstown and the Bank's management.

## 2.     Post-March 2010 offering

---

[2] The March 2010 Offering was sold to investors using a Registration Statement, filed 2/8/10, and a Prospectus Supplement, filed 3/23/10, which incorporated by reference Orrstown's 2009 Annual Report, Form 10-K, filed 3/15/10, and other SEC filings, including 4Q 2009 Operating Results, Form 8-K, filed 1/28/10, and a "Road Show PowerPoint" Presentation, Form 8-K, filed 3/16/10.

[3] Plaintiff alleges that all of the Individual Securities Act Defendants (all of the Individual Defendants with the exception of Defendant Embly) were either officers or directors of Orrstown, each of whom signed the Registration Statement that formed the basis of the March 2010 Offering. With respect to the Exchange Act Defendants' financial reporting, Plaintiff alleges that Defendants Quinn and Everly signed and certified every class period 10Q quarterly financial report.  (Id. ¶ 285.)  Plaintiff further alleges that Defendants Quinn and Everly, along with the other individual Exchange Act Defendants Zullinger, Shoemaker, Snoke and Coy, signed and certified every class period 10K annual report.  (Id. ¶ 286.)

[4] Each of the specific statements alleged in Plaintiff's complaint to be false and misleading will be identified and addressed in the Court's analysis section.

After the March 2010 Offering closed, Plaintiff alleges that the Bank "continued to issue false statements about the Company's stringent credit procedures and misled investors about the reasons for the increase in provision for loan losses." (Id. ¶ 170)  According to Plaintiff, Defendant Orrstown made additional false and misleading statements at its annual shareholder meeting held on May 4, 2010, during which a slide show presentation was made. (Id. ¶ 239.) The meeting transcript and slide presentation were filed with the SEC as exhibits to a May 5, 2010 Form 8-K issued by Defendant Orrstown. (Id.)  Plaintiff's complaint highlights five statements made during that presentation (id. ¶¶ 239-42), which the Court will discuss later in this memorandum.

Plaintiff also alleges that Defendant Orrstown issued a false statement in a Form 8-K Press Release announcing its first quarter 2010 Operating Results. (Id. ¶ 244.)  Those Operating Results indicated a $21 million increase in Risk Assets but only a $1.4 million increase in loan loss reserves from the end of the prior year. (Id.)  According to Plaintiff, Defendants Orrstown and the Bank did not want to keep the additional $21 million of Risk Assets on Orrstown's book for long, as doing so would unseat them from their purported position as a bank that was superior to their peers in comparable financial and banking metrics, in particular with respect to the percentage of non-performing assets to its total assets, in contrast to their statements to investors. (Id. ¶ 246.)  Plaintiff alleges that Defendants Orrstown and the Bank formulated and implemented a scheme to defraud investors about the health and financial condition of Orrstown and to conceal and materially lower Orrstown's Risk Assets, adopting a new eight point internal risk rating system, which gave the Bank discretion to use several different rating levels until it would ultimately have to move a troubled loan into the nonperforming category. (Id. ¶ 247.)

Plaintiff alleges that as a consequence of this change, Defendant Orrstown no longer identified as "impaired" its "performing substandard loans."  (Id.)  Plaintiff asserts that this change in policy was not disclosed until Orrstown filed its 2010 Form 10-K in March 2011, and was implemented to facilitate the Defendants' concealment of, and their misleading investors about, the magnitude of impaired loans, in particular the Hagerstown-based and Azadi loans.  (Id.)

Plaintiff next alleges that the Defendants' filings for the second and third quarters of 2010 demonstrate significant decreases in Risk Assets and only slight increases in loan loss reserves upon implementation of this new risk rating system.  (Id. ¶ 248.)  Consequently, Plaintiff alleges that statements in Orrstown's Form 8-K Press Releases for 2Q 2010 and 3Q 2010 were false and misleading (id. ¶¶ 249-50), which the Court will discuss in detail later in this memorandum.

Plaintiff alleges that Defendant Quinn continued to mislead investors about the true state of Orrstown's financial condition when in November 2010 he spoke at the "2010 East Coast Financial Services Conference" hosted by Underwriter Defendant Sandler O'Neill & Partners L.P.  (Id. ¶ 251.)  Plaintiff also alleges that Defendant Quinn continued to make false and misleading statements when he spoke at two different investment conferences for investment managers and financial services providers in February and March 2011.  (Id. ¶ 253.)  Plaintiff further alleges that Defendant Quinn continued to falsely and misleadingly tout Orrstown's success in a Press Release dated February 10, 2011.  (Id. ¶ 254.)  Orrstown's false and misleading statements allegedly continued in its Form 10-K for the Year Ended 12/31/10, filed with the SEC on March 11, 2011.  (Id. ¶ 255.)

Plaintiff alleges that by late 2010, the Loan Committee had approved in total over $21

million in loans to the Chambersburg Developers' related entities from 2008 through late 2010. (Id. ¶ 256.)  Plaintiff alleges that, according to Confidential Witness #3, Defendants Orrstown and the Bank realized that they may have gone over the Bank's legal lending limit, and that in any event, the extension of credit to the Chambersburg Developers did not constitute "conservative lending" and represented an "unusual concentration[ ] of credit" in one group of borrowers.  (Id.)

Further, Plaintiff alleges that, according to Confidential Witnesses #1, #2, and #3, at the time, Orrstown was restructuring many of its larger troubled loan relationships as part of its effort to obfuscate the true level of Risk Assets and needed provisions for loan loss reserves.  (Id. ¶ 257.)  Plaintiff alleges that in late 2010, Confidential Witness #4 entered into a series of "Change in Terms Agreements" on $1.6 million of prior loans, all of which had been originally brokered by Terry Reiber in 2007, 2008 and 2009.  (Id.)

Plaintiff alleges that Orrstown's reports of "significant growth" in 2010 – for example, growth touted by Quinn in a February 2011 press release (id. ¶ 254) –  was accompanied by the increase over the year prior of Risk Assets, reaching a high-water mark in first quarter 2010 but declining in subsequent 2010 quarters when the Company applied the eight point internal risk rating system.  (Id. ¶ 258.)  Plaintiff avers that this "artificial" decline in Risk Assets and alleged "understatement" of loan loss reserves provided investors with financial data reassurance that the Bank was competently managing the credit risks in its portfolio, and failed to inform investors that the level of Risk Assets was due to the failure of the Bank's internal controls and loan review process.  (Id.)

Plaintiff alleges that unbeknownst to the Class, as early as July 2010, the Bank's primary

regulators -- the Federal Reserve Bank and the Commonwealth of Pennsylvania Department of Banking -- had put the Bank on notice that its management and banking practices raised material concerns.  (Id. ¶ 260.)  According to Plaintiff, the regulators commenced a Joint Examination of the Bank on March 31, 2011, to scrutinize the Bank's management and internal controls.  (Id.) Plaintiff alleges that subsequent to the initiation of the Joint Examination, the Bank's Form 8-K announcing Operating Results for 2Q2011, followed by the Form 10-Q for 2Q2011, contained false or misleading statements.  (Id. ¶ 262-63.)

Plaintiff alleges that after the market closed on October 26, 2011, Defendant Orrstown reported that the Federal Reserve Bank had refused to approve its declaration of a cash quarterly dividend for third quarter 2011.  (Id. ¶¶ 266-67.)  Plaintiff alleges that the Federal Reserve Bank only denies approval of a dividend if payment of the dividend represents an unsafe or unsound practice.  (Id. ¶ 267.)  Plaintiff alleges that Defendant Orrstown also filed a Form 8-K 3Q2011 Operating Results on that date, wherein it reported a "decrease[] in asset quality ratios, including elevated levels of nonaccrual loans, restructured loans and delinquencies."  (Id. ¶ 191.)  Plaintiff alleges that on October 27, 2011, Defendant Orrstown filed another Form 8-K containing a letter from Defendant Quinn to Orrstown shareholders, in which he falsely and misleadingly stated that Orrstown remained "safe and sound."  (Id. ¶ 268.)  Plaintiff alleges that the market "reacted swiftly to these two filings, and the share prices dropped to close at $9.20 per share."  (Id.)

Plaintiff further alleges that on January 26, 2012, the Bank issued a Press Release on 4Q2011 Operating Results, filed with the SEC on Form 8-K, indicating a quarterly net income loss and one-time non-cash goodwill impairment charge off of $19.4 million, as well as the continued suspension of the payment of a dividend.  (Id. ¶ 271.)  According to Plaintiff,

Defendant Quinn falsely stated that the Bank had effective internal controls to address the "asset quality issues." (Id.)  Plaintiff alleges that the market reacted to the reported news of continued losses and ongoing suspension of a quarterly dividend, with Orrstown stock closing at $7.94 on January 26, 2012, representing a 14.5% drop from the closing price on October 27, 2011.  (Id. ¶ 273.)

On March 15, 2012, the Bank filed its 2011 Annual Report, Form 10-K with the SEC, in which it allegedly conceded material weaknesses in its internal controls.  (Id. ¶ 275.)  Also included in the 2011 Annual Report was the "Report of Independent Registered Public Accounting Firm" by Defendant Smith Elliott Kearns & Company LLC ("SEK") in which, for the first time, Defendant SEK recognized publicly that Orrstown's internal controls were flawed. (Id.)  Plaintiff alleges that despite the significant disclosures made in the 2011 Annual Report, the Bank continued to blame its level of Risk Assets solely on external factors, such as softness in the real estate market.  (Id. ¶ 276.)

Plaintiff alleges that on or around Friday, March 30, 2012, Orrstown mailed to its shareholders and filed with the SEC additional proxy materials in which Orrstown admitted that the Bank faced "significant challenges in 2011" and the Bank's systemic problems required Orrstown to "heed[ ] the advice and guidance of the governmental agencies that regulate" the Bank, and to "have begun the process of stress testing many aspects of the organization." (Id. ¶ 280.)  Plaintiff alleges that this statement was in direct contrast to the information Orrstown disclosed to the Exchange Act Class during the class period.  (Id.)  By April 5, 2012, Orrstown stock closed at $8.20.  (Id.)  As a result of the drop in Orrstown stock price, Plaintiff alleges that it suffered significant losses and damages.  (Id. ¶ 281.)

Plaintiff alleges that following its Internal Review in late 2009, by early 2010 management could not ignore the new credit data gathered by the Internal Review for the Bank's larger commercial lending relationships and the communications from large borrowers like the Azadis and Yorktown Funding of financial difficulties. (Id. ¶ 288.) However, Plaintiff alleges that the Defendants did not want to sabotage the planned March 2010 Offering by issuing financial statements revealing a weakened loan portfolio with sharply increasing Risk Assets and provisions for loan loss reserves. (Id.) Accordingly, Plaintiff alleges that the Defendants reached a compromise position in that they reclassified some of the impaired loans and made some of the requisite allocations for loan loss reserves in 4Q2009, but forestalled accounting for the other impaired loans until after the March 2010 Offering closed. (Id.) Plaintiff alleges that after the March 2010 Offering closed, the Defendants employed the eight point internal risk rating system to further forestall classifying loans as Risk Assets and making loan loss reserve allocations that would have negatively impacted Orrstown's net income. (Id.) Plaintiff alleges that the regulators' Joint Examination forced Orrstown to admit in its 2011 Annual Report that its internal controls were flawed. (Id. ¶ 290.)

### 3.    Defendant Auditor Smith Elliott Kearns

Plaintiff also challenges Defendant SEK's statements in connection with its role as auditor of Orrstown's financial statements. Plaintiff alleges that during the class period, SEK issued unqualified or "clean" audit reports for the years ending December 31, 2009 and 2010 that incorrectly certified Orrstown and the Bank's class period financial statements as being free of material misstatements and opined that the Company's internal controls were effective and without any material weaknesses. (Id. ¶ 294.)

Plaintiff alleges that SEK affirmatively stated that it had conducted its 2009 and 2010 audits in accordance with Public Company Account Oversight Board ("PCAOB") standards. (Id. ¶¶ 296, 301.)  Accordingly, Plaintiff alleges that it was SEK's responsibility to apply PCAOB standard AU Section 342[5] in evaluating the reasonableness of Orrstown's loan loss reserves, which required SEK to "review and test the process used by management to develop the estimate," develop its own "independent expectation of the estimate" to cross-check management's estimate, and "review subsequent events" that would have impacted the credit relationships for which loan loss reserves were being allocated.  (Id.)  Further, Plaintiff alleges that AU Section 342, as well as Financial Accounting Standards Board ("FASB") Statement No. 5[6] and Auditing Standard No. 5 ("AS No. 5")[7] required SEK to delve into the recent and historic credit data for each of the Bank's loan relationships and integrate all relevant information coming from the Bank and regulators to thoroughly test management's estimates.  (Id.)

Plaintiff further alleges that if SEK performed its audit of Orrstown's 2009 and 2010 10-K Annual Reports in accordance with PCAOB auditing standards, as it stated it did, it is

---

[5] AU Section 342, Auditing Accounting Estimates, provides guidance as to how an auditor should test management's estimates and review and test management's process.  See AU Section 342 10-11.

[6] FASB Statement No. 5 is the primary guidance on accounting and reporting loss contingencies, including credit losses.  Statement No. 5 uses the terms "probable," "reasonably possible," and "remote" to identify "the likelihood that [a] future event or events will confirm the loss or impairment of an asset or the incurrence of a liability."  FASB Statement No. 5.

[7] AS No. 5 "establishes requirements and provides direction that applies when an auditor is engaged to perform an audit of management's assessment of the effectiveness of internal control over financial reporting ('audit of internal control') that is integrated with an audit of the financial statements.  Risk assessment underlies the entire audit process described in AS No. 5, including the determination of significant accounts and disclosures and relevant assertions, the selection of controls to test, and the determination of the extent of audit evidence necessary for a given control."  PCAOB Release No. 2012-006, 12/10/2012, at 1.

implausible that SEK did not have actual knowledge that Orrstown and the Bank's financial statements contained material understatements with respect to the classification of impaired loans and allocation of loan loss reserves, especially in light of the updated credit data gathered by the 2009 Internal Review.  (Id. ¶¶ 298, 303.)  Accordingly, Plaintiff alleges that SEK's unqualified audit reports for the years 2009 and 2010 were materially false and misleading because SEK failed to apply the standards of the PCAOB.  (Id. ¶¶ 299, 304.)  Plaintiff alleges that under the PCAOB standards, a reasonable auditor would have exercised professional skepticism and discovered that the financial statements contained material understatements of Risk Assets and that there was a material weakness in Orrstown's internal controls over the financial reporting of Risk Assets and loan loss reserve allocations such that the financial statements were not prepared in accordance with GAAP.  (Id.)

With regard to Orrstown's 2011 10-K Annual Report, Plaintiff alleges that SEK, while certifying compliance with GAAP,  expressed an adverse opinion about Orrstown's internal controls.  (Id. ¶ 305.)  As with the 2009 and 2010 annual reports, Plaintiff alleges that had SEK conducted its audit in accordance with the applicable standards, it must have been aware of Orrstown's material understatements of its Risk Assets.  (Id. ¶¶ 306-308.)  Plaintiff alleges that the 2011 audit report was false and misleading.  (Id. ¶ 309.)

Plaintiff alleges that as detailed previously, the Exchange Act Defendants made false and misleading statements and engaged in a course of conduct to deceive that artificially inflated the price of Orrstown stock, and operated as a fraud or deceit on the Exchange Act class by misrepresenting, throughout the class period, the quality of the Bank's lending practices, loan portfolio and financial condition.  (Id. ¶ 311.)  Plaintiff further alleges that when these

misrepresentations were revealed to the market, the price of Orrstown's common stock fell precipitously as a result of the revelations (id.), and as a result, Plaintiff and the members of the Exchange Act class suffered damages.  (Id. ¶ 312.)

Plaintiff alleges that during the class period, the Exchange Act Defendants had both the motive and opportunity to commit fraud (id. ¶ 313), and had actual knowledge of the misleading nature of the statements they made, or acted with reckless disregard for the true information known to them at that time.  (Id. ¶ 314.)  Plaintiff alleges that the Exchange Act Defendants benefitted from perpetuating the fraud of selling a "safe and sound" financial institution.  (Id. ¶ 315.)  Plaintiff alleges that Orrstown paid SEK fees for professional auditing services which SEK risked losing if it challenged management about its accounting irregularities.  (Id.)  Plaintiff further alleges that the Exchange Act Defendants financially benefitted by hiding the deteriorating condition of the Bank, as they received significant income and benefits in 2009 and 2010.  (Id.)  Specifically, Plaintiff alleges that once the regulators had imposed their supervision, Defendants Quinn, Everly and Embly were no longer able to receive bonuses, resulting in a drastic decrease in compensation for 2011.  (Id. ¶ 316.)  Plaintiff alleges that following the regulators' intervention and requirement that the Bank "adopt and implement a plan, acceptable to the [regulators], to strengthen oversight of management and operations[,]" and engage an independent consultant to evaluate the competency and effectiveness of management, with a report to be submitted to the regulators within 120 days of the execution of the enforcement actions taken on March 23, 2012, Defendants Embly and Everly resigned as employees and executives at Orrstown.  (Id. ¶ 317.)

Plaintiff also alleges that Exchange Act Defendants Zullinger, Shoemaker, Snoke and

Coy, directors of the Company who also sat at various times on the Loan Committee, Enterprise

Risk Management Committee and possibly the Credit Administration Committee, also benefitted

from misleading and deceiving the investing public about the true financial condition of

Orrstown, through the receipt of compensation.  (Id. ¶ 318.)

Plaintiff alleges that at all relevant times, the market for Orrstown stock was an efficient

market for the following reasons:

a.      Orrstown securities met the requirements for listing, were listed, and actively
        traded on the NASDAQ, a high efficient market;

b.      Orrstown counts Boenning & Scattergood, Inc., Stifel, Nicolaus & Company, Inc.
        and Defendant Janney as market makers for Orrstown securities on the
NASDAQ;

c.      As a regulated issuer, Orrstown filed periodic public reports with the SEC and the
        NASDAQ;

d.      Upon the filing of periodic public reports with the SEC of unexpected corporate
        events or news, Orrstown's stock price tends to react as alleged herein;

e.      Orrstown securities were followed by securities analysts employed by major
        brokerage firms who wrote reports which were distributed to the sales force and
        certain customers of their respective brokerage firms.  Each of these reports was
        publicly available and entered the public marketplace; and

f.      Orrstown regularly issued press releases which were carried by national
        newswires.  Each of these releases was publicly available and entered the public
        marketplace.  (Id. ¶ 321.)

Plaintiff alleges that as a result of these factors, the market for Orrstown securities promptly

digested current information with respect to Orrstown from all publicly available sources and

reflected such information in Orrstown's stock price.  (Id. ¶ 322.)   Plaintiff avers that under

these circumstances, all purchasers of Orrstown securities during the class period suffered

similar injury after the true facts were revealed.  (Id.)

B.      **Legal Standard Applicable to Plaintiff's Claims**

Relying on the factual allegations recounted above, Plaintiff alleges violations of the

Securities Act of 1933 ("Securities Act") and the Exchange Act of 1934 ("Exchange Act").  The

first four counts of Plaintiff's amended complaint allege claims pursuant to the Securities Act.

Plaintiff asserts in Count I that Defendants Orrstown and the Bank violated Section 11 of the

Securities Act.  (Id. ¶¶ 193-99.)  In Count II, Plaintiff alleges that the 11 Individual Securities

Act Defendants (all Individual Defendants with the exception of Defendant Embly), each of

whom signed the Registration Statement, as well as Defendant SEK, who audited the financial

statements included in the Registration Statement, and Defendants Sandler O'Neill & Partners,

L.P., ("Sandler O'Neill"), and Janney Montgomery Scott, LLC, ("Janney Montgomery"), who

are named as underwriters on the Registration Statement, "acted negligently in issuing the

Registration Statement which made materially false and misleading written statements to the

investing public and misrepresented or failed to disclose" the facts set out above, and violated

Section 11 of the Securities Act.  (Id. ¶¶ 200-10.)  Count III alleges that Defendants Orrstown,

the Bank, the Individual Securities Act Defendants, Defendant Embly, and Defendants Sandler

O'Neill and Janney Montgomery violated Section 12(a)(2) of the Securities Act.  (Id. ¶¶ 211-21.)

In Count IV, Plaintiff alleges that the Individual Securities Act Defendants are subject to

"control person" liability per Section 15 of the Securities Act.  (Id. ¶¶ 222-28.)

The last three counts of Plaintiff's amended complaint allege claims pursuant to the

Exchange Act.  Plaintiff asserts in Count V that Defendants Orrstown, the Bank, and Defendants

Quinn, Everly, Embly, Zullinger, Shoemaker, Snoke and Coy violated Section 10(b) and Rule

10b-5 by: (1) deceiving the investing public, including Plaintiff and other members of the

Exchange Act class; (2) artificially inflating and maintaining the market price of Orrstown common stock; and, (3) causing Plaintiff and other members of the Exchange Act class to purchase Orrstown stock at artificially inflated prices.  (Doc. No. 40 ¶ 326.)  Plaintiff and the Class allege that they would not have purchased Orrstown stock at the prices they paid, and, as a direct and proximate result of the Orrstown Exchange Act Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases of Orrstown stock, and this alleged conduct constitutes a violation of Section 10(b) and Rule 10b-5.  (Id. ¶¶ 324-28.) In Count VI, Plaintiff and the Exchange Act Class allege that Auditor Defendant SEK made, prepared, disseminated, and/or approved statements contained in reports and other documents which were false and misleading with respect to material facts, that these materially false and misleading statements proximately caused Plaintiff and the Class to purchase Orrstown's common stock at artificially inflated prices throughout the class period, and thus proximately caused Plaintiff and the Class to suffer damages, in violation of Section 10(b) and Rule 10b-5. (Id. ¶¶ 329-40.)  Count VII alleges that Defendants Quinn, Everly, and Embly acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, and therefore are liable for the alleged underlying violations of Section 10(b) and Rule 10b-5.  (Id. ¶¶ 341-47.)

### 1.    Securities Act

Plaintiff's claims arise under the Securities Act which creates federal duties related to the registration and disclosure of public offerings.  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 269 (3d Cir. 2006) (citations and quotation marks omitted).   Sections 11 and 12(a)(2) of the Securities Act "impose civil liability for the making of materially false statements in registration statements and prospectuses."  In re Adams Golf Inc. Sec. Litig., 381 F.3d 267, 273

(3d Cir. 2004);  see 15 U.S.C. §§ 77k, 77l(a)(2).   Additionally, Section 15 allows a plaintiff to

bring a claim for "control liability" against a person who controls a person liable for an

underlying violation of the Securities Act.  See In re Suprema, 438 F.3d at 284-85.

Section 11 of the Securities Act concerns material misstatements or omissions in

registration statements.  15 U.S.C. § 77k(a).  A Section 11 claim may be brought against the

issuer of securities, its directors or partners, underwriters, and accountants who prepared or

certified the registration statement.  Id.  Under Section 11, a plaintiff must allege that a

registration statement (1) contained an untrue statement of material fact, (2) omitted to state a

material fact required to be stated therein, or (3) omitted to state a material fact necessary to

make the statements therein not misleading.  In re Suprema, 430 F.3d at 269 (citations and

quotation marks omitted).  Section 11 does not require a plaintiff to allege that the defendants

possessed any scienter; rather, if a plaintiff purchases a security issued pursuant to a registration

statement, he or she need only show a material misstatement or omission to establish a prima

facie case.  Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).

Section 12(a)(2) provides civil liability for anyone who offers or sells a security "by

means of a prospectus or oral communication, which includes an untrue statement of a material

fact or omits to state a material fact necessary in order to make the statements . . . not

misleading," 15 U.S.C. § 77l(a)(2), and, like Section 11, is a "virtually absolute" liability

provision that does not require a plaintiff to allege that the defendants possessed scienter;  rather,

only that the plaintiff made the purchase pursuant to a materially false or misleading prospectus

or oral communication.  In re Adams Golf, 381 F.3d at 274 & n.7.

Section 11 and 12(a)(2) claims are generally not subject to the heightened pleading

standards set forth in the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule

of Civil Procedure 9(b), as "[f]raud . . . is not a necessary element to establish a prima facie

claim under Section 11 or Section 12(a)(2).  But claims under those provisions can be, and often

are, predicated on allegations of fraud . . . . where the plaintiff grounds these Securities Act

claims in allegations of fraud - and the claims thus 'sound in fraud' - the heightened pleading

requirements of Rule 9(b) apply."  In re Suprema, 438 F.3d at 269 (citing Cal. Pub. Emps.' Ret.

Sys. v. Chubb Corp., 394 F.3d 126, 161-63 (3d Cir. 2004) ("CALPERS")).  However, if the

allegations are pled separately and plaintiffs expressly premise Securities Act claims on

negligence rather than fraud, Rule 9(b) is inapplicable.  Id. at 272.

### 2.      Exchange Act

Section 10(b) of the Exchange Act prohibits the use of fraudulent schemes or devices in

connection with the purchase or sale of securities.  15 U.S.C. § 78j(b).  The private right of

action under Section 10(b) and Rule 10b-5 reaches beyond statements and omissions made in a

registration statement or prospectus or in connection with an initial distribution of securities, and

creates liability for false or misleading statements or omissions of material fact that affect trading

on the secondary market.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d

Cir. 1997).  To implement the statute, the Securities and Exchange Commission promulgated

Rule 10b-5.  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195-96 (1976).  In relevant part, Rule

10b-5 makes it unlawful for an individual "[t]o make any untrue statement of a material fact or to

omit to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading . . . in connection with the purchase

or sale of any security."  17 C.F.R. § 240.10b-5(b).

To state a claim for securities fraud under Section 10 of the Exchange Act and Rule 10b-5, a plaintiff must plead the following: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen, Inc. v. Conn. Retirement Plans & Trust Fund, 133 S.Ct. 1184, 1192 (2013) (internal citation omitted).

Claims brought under the Exchange Act pursuant to Section 10(b) and Rule 10b-5 must meet a heightened pleading standard pursuant to the PSLRA and Federal Rule of Civil Procedure 9(b). See 15 U.S.C. §§ 78u-4(b)(1), (b)(2); Fed. R. Civ. P. 9(b). The PSLRA "imposes another layer of factual particularity to allegations of securities fraud," In re Rockefeller Ctr. Prop., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002), and requires claims brought under the Exchange Act to:

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). If this requirement is not met, "the court shall . . . dismiss the complaint." Id. at 4(b)(3)(A). "[U]nless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations - inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." In re Rockefeller, 311 F.3d at 224.

Additionally, Rule 9(b) requires a plaintiff pleading fraud-based claims to state with "particularity" the "circumstances constituting fraud or mistake." CALPERS, 394 F.3d at 144.

Courts rigorously apply the particularity requirement in securities fraud cases.  In re Burlington,

114 F.3d at 1417.  Under Rule 9(b), a plaintiff asserting a securities fraud claim must allege "the

who, what, when, where and how: the first paragraph of any newspaper story."  In re Advanta

Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (internal citations omitted) abrogated on

other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007).

   In addition to pleading with particularity a material misrepresentation or omission by the

defendant, an Exchange Act plaintiff must also adequately plead scienter.  Scienter is a "mental

state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst, 180 F.3d at 534-35.

Under the PSLRA's second pleading requirement for Exchange Act claims, a plaintiff must

"state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind."  15 U.S.C. § 78u-4(b)(2).  The scienter standard requires a plaintiff to

allege facts giving rise to a "strong inference" of "either reckless or conscious behavior."  In re

Advanta, 180 F.3d at 534-35.

   The Supreme Court interpreted the meaning of scienter's "strong inference" requirement

in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), where the Court held that

courts must weigh "plausible nonculpable explanations for the defendant's conduct" against the

"inferences favoring the plaintiff."  551 U.S. at 324.  A "strong inference" of scienter is one that

is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Id. at

314; see also id. at 324 ("The inference that the defendant acted with scienter need not be

irrefutable, i.e., of the 'smoking gun' genre, or even the most plausible of competing inferences."

(internal quotation marks omitted)).  The pertinent question is "whether all of the facts alleged,

taken collectively, give rise to a strong inference of scienter, not whether any individual

allegation, scrutinized in isolation, meets that standard."  Id. at 323;  see also id. at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

An Exchange Act plaintiff must also plead a connection between the misrepresentation or omission and the purchase or sale of a security, see Blue Chip Stamps et al. v. Manor Drug Stores, etc., 421 U.S. 723 (1975), and reliance.  See Amgen, 133 S.Ct. at 1192.  In Basic, Inc. v. Levinson, 484 U.S. 224 (1988), in a proposed class action securities fraud context, the Supreme Court held that plaintiffs can invoke a rebuttable presumption of reliance based on what is known as the "fraud on the market" theory.  Under that theory, "the market price of shares traded on well-developed markets reflects all publicly available information available, hence, any material misrepresentation."  Id. at 246.  Under that doctrine, a court can assume an investor relies on public misstatements whenever he "buys or sells stock at the price set by the market."  Id. at 247.  Finally, an Exchange Act plaintiff must allege economic loss and loss causation, i.e., a causal connection between the material misrepresentation and the loss.  15 U.S.C. § 78u-4(b)(4).

Section 20(a) imposes joint and several liability on any individual who exercises control over a "controlled person" who violates Section 10(b).  15 U.S.C. § 78t(a).  Accordingly, liability under Section 20(a) is contingent upon sufficiently pleading an underlying violation of Section 10(b) by the controlled person, such that a plaintiff must not only plead that "one person controlled another person," but also that the 'controlled person' is liable under [Section 10(b)]."  City of Roseville Emp. Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404, 413 (D. Del. 2009) (citing In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004)).  Section 20(a) applies

26

to corporations as well as individuals.  <u>Institutional Investors Grp. v. Avaya, Inc.</u>, 564 F.3d 242,

252 (3d Cir. 2009).

Although, as noted above, claims brought under the Securities Act generally require a

lower pleading standard than those brought under the Exchange Act, the standard for pleading "a

material misrepresentation or omission" is the same under both acts.  <u>See</u> <u>In re Trump Casino</u>

<u>Sec. Litig.</u>, 7 F.3d 357, 369 (3d Cir. 1992) (citing <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S.

438 (1976); <u>Craftmatic Sec. Litig. v. Kraftsow</u>, 890 F.2d 628, 639 (3d Cir. 1989)).

Not all misrepresentations or omissions in connection with public offerings are

actionable.  Rather, a plaintiff's right to recover under either act is limited by doctrine of

materiality, and the exceptions developed for statements of opinion, forward-looking statements

and puffery.   Accordingly, the Court now turns to an examination of these principles of

materiality to determine whether Plaintiff's claims must be dismissed under prevailing standards.

### 3.      Principles Governing Materiality Under the Acts

The Supreme Court in <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438  (1976) defined

materiality within the proxy solicitation context of Section 14(a) of the Exchange Act.

Subsequently the Court made the <u>TSC</u> standard applicable to actions brought under Section 10

and Rule 10b-5 of the Exchange Act, <u>see</u> <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 232 (1988), and

the Third Circuit has made the standard applicable as well to claims under Sections 11 and

12(a)(2) of the Securities Act.  <u>See</u> <u>Craftmatic</u>, 890 F.2d at 641 n. 18.  As the Supreme Court

defined materiality in <u>TSC</u>, a misrepresentation or omitted fact is material "if there is a

substantial likelihood that a reasonable shareholder would consider it important" in making an

investment decision. <u>TSC</u>, 426 U.S. at 449.   For a misrepresentation or omission to be material,

"there must be a substantial likelihood that the disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.  Materiality must be determined as of the date of the alleged misstatement or omission, not with the benefit of hindsight.  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002).

Materiality is a mixed question of law and fact, "and the delicate assessments of the inference a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." Shapiro v. UJB Financial Corp., 964 F.2d 272, 280 n.11 (3d Cir. 1992) (citing TSC, 426 U.S. at 450); see Weiner v. Quaker Oats Co., 129 F.3d 310, 317 (3d Cir. 1997) ("the emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings").  "Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." Shapiro, 964 F.2d at 280 n.11 (citation omitted).

As the Third Circuit noted in Craftmatic, the task of determining materiality can be especially difficult when the statement at issue concerns "soft" information.  Craftmatic, 890 F.2d at 642.  "The term soft information refers to statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates and forecasts." Id.

### a.      Statements of Opinion or Belief

Courts have long grappled with the application of the "materially false or misleading

28

statement" standard as it applies to statements of opinion or beliefs.[8]  The Supreme Court

recently clarified the issue of how Section 11 of the Securities Act pertains to statements of

opinion in its decision in Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,

No. 13-435 (U.S. Mar. 24, 2015) ("Omnicare").   In Omnicare, the Court held that under the

Securities Act, a statement of opinion does not constitute an untrue statement of a material fact

simply because the opinion ultimately proves to be incorrect.  Slip. Op. at 6.  However, opinion

statements are not immune from liability under the Securities Act and may be considered

material misstatements or omissions under several particular circumstances.

The Court analyzed the status of opinion statements under the two clauses of Section 11's

disclosure provision, which provides for liability if a registration statement (1) contained an

untrue statement of a material fact, or (2) omitted to state a material fact required to be stated

therein or necessary to make the statements therein not misleading.  15 U.S.C. § 77k(a).  The

Court held that under the first clause of Section 11, an opinion can constitute an untrue statement

of a material fact if (1) the opinion is not sincerely held, or, in other words, is subjectively

disbelieved, or (2) the opinion contains an embedded statement of untrue material facts.

Omnicare, Slip. Op. at 9.

Further, the Court held that under the "omissions" clause of Section 11, a statement of

pure opinion can subject an issuer to liability if a registration statement "omits material facts

about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts

---

[8]  See Alexander Coley, When is a Belief or Opinion False?: Indiana State Dist. Council
v. Omnicare and the Contested Section 11 Pleading Standard, 5 Cal. L. Rev. Circuit 336 (2014);
Samuel L. Moultrie, It's Not Simply a Matter of Opinion: Pleading Standards Under Section 11
for Untrue or Misleading Opinions, Bus. L. Today 1 (May 2014); Wendy Gerwick Couture,
Opinions Actionable as Securities Fraud, 73 La. L. Rev. 381, 381-446 (2013).

conflict with what a reasonable investor would take from the statement itself." Id. at 12.  The

Court opined that an opinion statement is not necessarily misleading "when an issuer knows, but

fails to disclose, some fact cutting the other way," as a reasonable investor "does not expect that

*every* fact known to an issuer supports its opinion statement." Id. at 13.   The Court explained

that "whether an omission makes an expression of opinion misleading always depends on

context," noting that an investor reads each statement within a registration statement "whether of

fact or opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently

conflicting information." Id. at 14.  Accordingly, in order to state a claim under Section 11's

omissions clause for a statement of opinion,

> "[t]he investor must identify particular (and material) facts going to the basis for
> the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the
> knowledge it did or did not have – whose omission makes the opinion statement
> at issue misleading to a reasonable person reading the statement fairly and in
> context."

Id. at 18.

The Court in Omnicare also discussed the difference between a statement of fact and an

opinion statement.  A fact is "a thing done or existing," and an opinion is "a belief[,] a view."

Id. at 6 (citation omitted). Most importantly, the Court noted that a statement of fact expresses

certainty about a thing, while a statement of opinion does not.  Id.  However, the Court

recognized that some opinion statements beginning with the words "I believe," or something

similar, can contain embedded statements of fact.  Id. at 8-9.  The Court used the example of a

CEO stating "I believe our TVs have the highest resolution available because we use a patented

technology to which our competitors do not have access," as a statement that can be read to

affirm not only the speaker's state of mind, but also the underlying verifiable fact that the

company uses a patented technology.  Id.  Accordingly, as revealed by its discussion of opinion statements in Omnicare, the Court contemplates three types of statements potentially giving rise to Section 11 liability:  (1) statements of fact, (2) statements of pure opinion, and (3) statements of opinion containing embedded statements of fact.

### b.    Forward-Looking Statements

Statements such as projections, estimates, and forecasts that are deemed "forward-looking" may be immaterial as a matter of law.  The PSLRA contains a safe harbor provision that applies to forward-looking statements under the Securities and Exchange Acts.  15 U.S.C. § 78u-5(c)(1); In re Aetna Sec. Litig., 617 F.3d 273, 277 (3d Cir. 2010).  The statutory definition of forward-looking statements includes, inter alia, "projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic or operational performance."  Id. at 279.  The safe harbor applies to statements that are forward-looking as defined by the statute, provided that they are "(1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading."  In re Aetna, 617 F.3d at 278-79.

Forward-looking statements not specifically identified as such and therefore protected by the PSLRA's safe harbor provision may nevertheless be protected under the "bespeaks caution" doctrine, adopted by the Third Circuit in In re Trump, 7 F.3d 357 (3d Cir. 1993).  Under this doctrine, "cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law."  Id. at 371.  The "bespeaks caution" doctrine requires a court to examine "a misrepresentation or omission in the complete context in which the author conveys it."  Id.; EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865, 872 (3d Cir. 2000).  As the Third

Circuit stated in In re Trump, for the doctrine to be applicable, the cautionary language must

relate directly to the statement on which investors claim to have relied:

> [A] vague or blanket (boilerplate) disclaimer which merely warns
> the reader that the investment has risks will ordinarily be inadequate
> to prevent misinformation.  To suffice, the cautionary statements
> must be substantive and tailored to the specific future projections,
> estimates, or opinions in the prospectus which the plaintiffs
> challenge.

7 F.3d at 371-72; see In re Westinghouse Sec. Litig., 90 F.3d 696, 710 (3d Cir. 1996) (reversing

dismissal of a suit based on alleged misstatements in a prospectus, and holding that

"notwithstanding the cautionary language" in the prospectus, the alleged misrepresentations

about the adequacy of loan loss reserves likely "would have assumed actual significance to a

reasonable investor contemplating the purchase of securities").

   The Third Circuit has confirmed that the "bespeaks caution" doctrine applies only to

forward-looking statements.  EP Medsystems, 235 F.3d at 874 ("[b]y its terms, the 'bespeaks

caution' doctrine, is directed only to forward-looking statements").[9]  As the PSLRA safe harbor

---

[9] Other Courts of Appeals have held similarly.  See Grossman v. Novell, Inc., 120 F.3d
1112, 1123 (10th Cir. 1997) (holding "bespeaks caution" doctrine inapplicable to alleged
statements relating to the company's increased market share, pace of merger integration, and
"smooth" merger); In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1408 (9th Cir. 1996) ("By
definition, the bespeaks caution doctrine applies only to affirmative, forward-looking
statements."); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996) (explaining that a
statement may contain "both a forward-looking aspect and an aspect that encompasses a
representation of present fact," and "[t]o the extent plaintiffs allege that the . . . statement
encompasses the latter representation of present fact, and that such a representation was false or
misleading when made, the surrounding cautionary language could not have rendered the
statement immaterial as a matter of law.") (emphasis omitted); Harden v. Raffensperger, Hughes
& Co., Inc., 65 F.3d 1392, 1405-06 (7th Cir. 1995) (refusing to apply "bespeaks caution" doctrine
to statement of "hard fact" regarding the company's plans to restore profitability to its day-to-
day operations"); Rubinstein v. Collins, 20 F.3d 160, 167 (5th Cir. 1994) (discussing the
"bespeaks caution" doctrine's applicability to "predictive statements"); but cf. Harris v. Ivax
Corp., 182 F.3d 799, 805-06 (11th Cir. 1999) (holding that statements made on the last day of a

and bespeaks caution doctrines apply only to forward-looking statements, such doctrines cannot

protect (at least in their entirety) representations that are mixed present/future statements.  "[A]

mixed present/future statement is not entitled to the safe harbor with respect to the part of the

statement that refers to the present."  Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242,

255 (3d Cir. 2009) (quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 705 (7th

Cir. 2008) (where court found that the statement that sales were "still going strong" was not

entitled to protection of the safe harbor with respect to the statement's representation regarding

current sales)); accord In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 213 (1st Cir. 2005)

("[T]he mere fact that a statement contains some reference to a projection of future events cannot

sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-

forward-looking aspects of the statement").

### c.      Puffery

In addition to the protections offered to statements of opinion or belief and forward-

looking statements, a defendant may not be liable for any alleged misrepresentation if it consists

of nothing more than corporate puffery, that is, vague and non-specific expressions of corporate

optimism on which reasonable investors would not have relied.   The Third Circuit discussed the

puffery doctrine at length in In re Advanta, 180 F.3d 525 (3d Cir. 1999).  In that case,

shareholders claimed that Advanta, a credit card company, publicly touted its strong financial

health and "risk-adjusted pricing strategy," which targeted customers with good credit.  Id. at

537.  In its annual report, Advanta stated, "[w]hile we added substantially to our account base,

our credit quality remained excellent. . . . Our emphasis on gold cards – and targeting of better

---

quarter concerning the results for the quarter are forward-looking).

quality customers – helps us maintain an enviable credit quality profile." Id.  Advanta also

issued other statements, including "Advanta's credit quality continues to be among the best in

the industry," Advanta's strengths included " an experienced management team, technological

expertise," "Advanta continued to produce better-than-industry credit measures, and achieved

excellent growth and returns throughout our core businesses."  Id. at 537-38.

The plaintiffs alleged that during the time period when Advanta was issuing the positive

portrayals, it implemented policies relaxing its underwriting and monitoring procedures and

"superior credit risk customers were switching to other credit card companies at rates that would

have a materially negative impact on the Company's reported earnings."  Id. at 538.

Specifically, plaintiffs alleged that it had begun offering "teaser" rates to new customers with

poor credit.  Id. at 537.  Advanta's positive portrayals were not borne out when the new

customers defaulted, causing a $20 million quarterly loss.  Id. at 528.   Plaintiffs argued that the

juxtaposition of these alleged facts against the positive portrayals demonstrated that the

statements were materially misleading when made.  The Third Circuit disagreed, holding that

Advanta's positive portrayals were vague, and "even if arguably misleading, do not give rise to a

federal securities claim because they are not material . . . ."  Id. at 538.

The Third Circuit addressed the puffery doctrine more recently in In re Aetna, 617 F.3d

272 (3d Cir. 2010), a class action claim brought against an insurance company alleging a

fraudulent scheme where defendant misled investors about Aetna's pricing of insurance policies

and then sold shares of Aetna's stock before the scheme was revealed to the public.  Id. at 274.

Specifically, the plaintiffs claimed that the defendant falsely characterized Aetna's pricing of

medical insurance premiums as "disciplined" during a time when Aetna allegedly relaxed its

34

underwriting criteria in an effort to underprice competitors and gain market share.  Id.  Among the challenged statements were "we continue to adhere to a disciplined pricing policy," "[w]e have a very strong amount of 'pricing discipline,'" [we] "continue to maintain discipline and rigor in everything we do at Aetna," Aetna's priority is "to exhibit commitment to disciplined pricing."  Id. at 275-76.  The Third Circuit applied Advanta and found that the references to Aetna's pricing policy were immaterial as they were "too vague to ascertain anything on which a reasonable investor might rely."  Id. at 284.   Guided by these principles, the Court turns to an analysis of Plaintiff's claims.

> ### C.      Analysis
>
> #### 1.      Securities Act Claims
>
> ##### a.      Applicable Pleading Standard

As an initial matter, as discussed above, the Court must determine whether Plaintiff's Securities Act claims "sound in fraud" or negligence to determine the proper pleading standard applicable to Plaintiff's claims - that is, whether Plaintiff must meet the particularity requirements dictated by Federal Rule of Civil Procedure 9(b) and the PSLRA for its Securities Act claims. The Third Circuit held in In re Suprema that "where . . . individual defendants are accused in separate claims of the same complaint as having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims."  Id. at 273.  In In re Suprema the plaintiff carefully separated its allegations of negligence from its allegations of fraud against the same defendants by "pleading its Section 11 and Section 12(a)(2) claims in negligence before – and wholly apart from – pleading its fraud-based Section 10(b) claims."  Id.

Here Plaintiff's complaint separates the factual allegations supporting its Securities Act claims from those supporting its Exchange Act claims, pleading its Section 11 and 12(a)(2) claims before its Section 10(b) claims, and prefacing its Securities Act allegations by stating "[t]he Securities Act claims in this portion of the Complaint specifically exclude any allegations of knowledge or scienter, and any allegations that could be construed as alleging fraud or intentional or reckless misconduct." (Doc. No. 40 ¶¶ 162-63.) Accordingly, under the pleading standards discussed in In re Suprema, the Court finds that Plaintiff has pled its Securities Act claims in a manner sufficient "to avoid triggering Rule 9(b)." In re Suprema, 438 F.3d at 273.

### b.      Count I: Defendants Orrstown and the Bank

Plaintiff alleges that Defendants Orrstown and the Bank issued materially untrue and misleading statements (or omissions) in the Offering Documents. (Doc. No. 40 ¶ 195.) Defendants Orrstown and the Bank move to dismiss Count I of Plaintiff's complaint on the grounds that Plaintiff fails to state a claim upon which relief can be granted. (Doc. No. 53.) Defendants' primary argument is that the statements identified in the amended complaint are not actionable, because (1) the prospectus supplement contained extensive and specific cautionary language and discussion of risk factors, (2) the challenged statements are immaterial as a matter of law, and (3) Plaintiff does not allege that Defendant Orrstown's disclosures were untrue and misleading when made. (Doc. No. 60.) Plaintiff argues that its complaint meets the applicable pleading standards. (Doc. No. 66.) The Court will address each argument and challenged statement in turn.

As an initial matter, Defendants Orrstown and the Bank argue that Plaintiff selects "isolated statements from Orrstown's Prospectus Supplement and claims that they were untrue

36

and misleading when made," and in doing so, ignores the abundant cautionary disclosures surrounding the challenged statements.  (Doc. No. 60 at 32.)  Defendants cite several statements in the prospectus supplement in support of their argument that the allegedly false and misleading statements are protected under the bespeaks caution doctrine because Defendants disclosed the specific risks of which Plaintiff now complains.[10]  (Doc. No. 60 at 32-34.)  Plaintiff argues that these "generic" cautionary statements are not sufficiently related to the alleged false and misleading statements, citing In re Westinghouse Sec. Litig., 90 F.3d 696 (3d Cir. 1996), to support their argument that the cautionary statements lack the specificity necessary to shield Defendants from liability.  (Doc. No. 66 at 87-89.)

Defendants Orrstown and the Bank next argue that the allegedly false and misleading statements on which Plaintiff relies to plead its Section 11 claim are immaterial as a matter of law, or protected by the PSLRA's safe harbor provision.  (Doc. No. 60 at 37.)  Plaintiff argues that none of the alleged statements are "purely forward-looking statements, but rather are either statements relating to the present affairs of the Company or are at most 'mixed present/future statements,'" and thus the safe harbor provision does not apply.  (Doc. No. 66 at 92.) Defendants take each of the alleged statements in turn, and the Court will do likewise.

i.    Statements related to "underwriting standards, credit review policies, and internal controls"

The first group of statements Plaintiff alleges were false and misleading relate to

---

[10] The Court notes that in considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, it may consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  Pension Ben. Guar. Corp. v. White Consol. Industries, Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  The Court may also "consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  Id.

statements made about Defendant Orrstown Bank's "underwriting standards, credit review policies and internal controls." (Doc. No. 40 ¶ 165.)

The first statement Plaintiff challenges is the following: "We view sound credit practices and stringent underwriting standards as an integral component of our continued success. In September 2009, we created the position of Chief Credit Officer to enhance our processes and controls, as well as clearly delineate independence between sales and credit." (Id. ¶ 165(a)) (citing Doc. No. 55-7 at 11). Under the standards described by the Supreme Court in Omnicare, the first sentence in the statement appears to relate to an opinion or belief held by the Bank as to what factors it believes will contribute to its success. In its Supplemental Filing in Further Support of its Opposition to Defendants' Motion to Dismiss (Doc. No. 91) ("Plaintiff's Supplemental Filing"), Plaintiff argues that the statement is an opinion with embedded facts – namely, that the Bank represented that it employed "sound credit practices and stringent underwriting standards." (Doc. No. 91 at 7.) However, under Omnicare, such representations constitute corporate puffery rather than misleading statements of material fact if the "facts" are not determinate or verifiable. See Omnicare, Slip. Op. at 7 (in discussing the example of a CEO's assertion that a company manufactures TVs with the "highest resolution on the market," the Court stated that such a representation is "not mere puffery, but a determinate or verifiable statement"). Here, the representations of "sound" credit practices and "stringent" underwriting standards are too vague to be capable of verification, and are therefore accurately characterized as puffery, or a positive portrayal so vague as to be immaterial to a reasonable investor. See In re Advanta, 180 F.3d at 538 ("positive portrayals" reporting "previous successes and expressing confidence in . . . prospects for future growth" were no more than puffery). Plaintiff does not

allege that the second sentence of the statement - that Defendant Orrstown Bank created the position of Chief Credit Officer  - is false.

The second statement challenged by Plaintiff is the following: "Our ability to successfully grow will also depend on the continued availability of loan opportunities that meet our stringent underwriting standards." (Doc. No. 40 ¶ 165(b)) (citing Doc. No. 55-7 at 33).  This statement is forward-looking, as it pertains to Defendant Orrstown Bank's future ability to grow, and is also qualified by the availability of loan opportunities.  Moreover, as Defendants point out, it is accompanied by the following statement contained in the same paragraph: "[w]hile we believe we have the resources and internal systems in place to successfully achieve and manage our future growth, there can be no assurance growth opportunities will be available or that we will successfully manage our growth."  (Doc. No. 60 at 39) (citing Doc. No. 55-7 at 33). Accordingly, the Court finds that this statement falls within the PSLRA safe harbor for forward-looking statements, and is further shielded from liability under the bespeaks caution doctrine because it is "accompanied by meaningful cautionary statements."  In re Trump, 7 F.3d at 364. Moreover, as noted above, the characterization of the Bank's underwriting standards as "stringent" is so vague as to constitute puffery.  See In re Advanta, 180 F.3d at 538.

Plaintiff next challenges the following statement: "The Bank follows conservative lending practices and continues to carry a high quality loan portfolio with no unusual or undue concentrations of credit."  (Doc. No. 40 ¶ 165(c)) (citing Doc. No. 55-4 at 32).  The Court rejects the Orrstown Defendants' characterization of this as a forward-looking statement, because it relates to Defendant Orrstown Bank's current state of affairs in that it states that the Bank "follows conservative lending practices," and "continues to carry a high quality loan portfolio

with no unusual or undue concentrations of credit." (Id.) (emphasis added).  Accordingly, the

Defendants cannot claim the protections of the safe harbor or bespeaks caution doctrine with

respect to this statement.   However, the characterizations of its lending practices as

"conservative" and loan portfolio as "high quality" represent vague statements that constitute

immaterial puffery, and are thus not actionable.  See In re Aetna, 617 F.3d at 284 ("General

statements about the company's dedication to 'disciplined' pricing and commitment to

'discipline and rigor' could not have meaningfully altered the total mix of information available

to the investing public.  We therefore find the statements immaterial as a matter of law."); In re

Advanta, 180 F.3d at 538 (the statement that Advanta's "credit card asset quality statistics

continue to be better than industry averages" held to be immaterial puffery).

        Moreover, to the extent the statement can be considered a statement of present fact as to

the loan portfolio's lack of "unusual or undue concentrations of credit," the Court finds that

Plaintiff has not alleged a factual basis supporting a reasonable inference as to the material

falsity or misleading nature of the statement, in light of the many facts disclosed by the Bank in

the Offering Documents pertaining to the contents of its loan portfolio.   In its 2009 Annual

Report, filed March 15, 2010, Orrstown reported that its loan portfolio had deteriorated during

the year, and warned that further deterioration in the portfolio was possible in light of certain

risks.  (See Doc. No. 55-4 at 35.) Specifically, the 2009 Annual Report disclosed that Orrstown's

allowance for loan losses had increased by more than 44% during the year, from .87% of total

loans to 1.26% of total loans. (Doc. No. 55-4  at 35.)  Management had decided to increase the

loan loss reserve after conducting an "expanded review" of the Bank's commercial loan portfolio

"in order to better reflect the deterioration in local, regional and national economic conditions."

(Id. at 35.)  The annual report also disclosed an approximately 860% increase in "nonperforming

loans," or "loans for which interest income is not accrued due to concerns about the collectability

of interest and/or principal" or "loans whose terms have been renegotiated to provide a reduction

or deferral of interest or principal because of deterioration in the financial position of the

borrower" – from .05% of outstanding loans at the end of 2008 to .48% of outstanding loans at

the end of 2009.  (Id. at 37.)

In addition to the information disclosed above, Orrstown also disclosed that "[d]uring

January 2010" the Company was "informed that a commercial credit aggregating approximately

$5.0 million that was current and performing at December 31, 2009, was having problems and

would become nonperforming during the first quarter of 2010," and that Orrstown had

"specifically allocated $2.0 million of the December 31, 2009 allowance for loan losses to this

credit."  (Id. at 36.)  Orrstown disclosed that although it was "pursuing a workout plan" with

respect to this borrower, it did "not anticipate resolving the matter until second quarter 2010,"

and that therefore "nonperforming loans at March 31, 2010 may increase significantly."  (Id.)

Orrstown also disclosed that 35% of the Bank's total loans at the end of 2009 were "loans

secured by commercial real estate," (id. at 14), and that such loans "are generally for larger

amounts and may involve a greater degree of risk than one-to-four family residential mortgage

loans."  (Id.)  Orrstown disclosed that as of December 31, 2009, it had "50 loan relationships,

aggregating $307.5 million that were performing according to their original terms with

outstanding balances that exceeded $3.0 million," but "the deterioration of one or more of these

loans" could negatively affect the Bank.  Orrstown explained that "many economists believe that

deterioration in income-producing commercial real estate [was] likely to worsen," and that due

to the "current general economic slowdown, these loans represent higher risk . . . and could require us to increase our allowance for loan losses."  (Id.)

Orrstown further disclosed that "due to the current economic conditions, customers may be unable or unwilling to borrow money or repay funds already borrowed," (id. at 11), and disclosed the geographic concentration of Orrstown's business, as approximately 87% of its lending was concentrated in South Central Pennsylvania and Washington County, Maryland, and that because of that, "[a] further deterioration in the economic condition in these markets could materially adversely affect our operations and increase loan delinquencies."  (Id. at 14.) Accordingly, because Orrstown disclosed many specific facts concerning its assertion that its loan portfolio did not contain "unusual or undue concentrations of credit," the Court finds that Plaintiff has failed to allege facts supporting a reasonable inference as to the material falsity or misleading nature of this statement.

Plaintiff next challenges the statement that:

"Orrstown Bank employs a Loan Review Officer, who is independent from the loan origination function and reports directly to the Credit Administration Committee.  The Loan Review Officer continually monitors and evaluates loan customers utilizing risk-rating criteria established in the Loan Policy in order to spot deteriorating trends and detect conditions which might indicate potential problem loans. The Loan Review Officer reports the results of the loan reviews at least quarterly to the Credit Administration Committee for approval and provides the basis for evaluating the adequacy of the allowance for loan losses."  (Doc. No. 40 ¶ 165(d)) (citing Doc. No. 55-4 at 7).

Plaintiff does not allege that Defendant Orrstown Bank did not employ a Loan Review Officer. Neither do Plaintiff's allegations specify precisely how this statement is materially false and misleading.  To the extent that Plaintiff argues that the statement is false or misleading because it relates to the adequacy of loan loss reserves, the Court will address that argument below in its

42

specific discussion of statements pertaining to loan loss reserves.

### ii.     Statements related to loan loss reserves

The second group of statements Plaintiff alleges were "untrue and misleading" relate to statements made concerning Defendant Orrstown Bank's allocation of sufficient loan loss reserves.[11]   (Doc. No. 40 ¶ 166.)

Plaintiff challenges the following statement: "While certain borrowers have come under stress due to the economic conditions affecting our markets, we believe that this disciplined approach to lending results in peer-leading asset quality metrics even in a difficult environment. As of December 31, 2009, our nonperforming assets to total assets ratio was .44%.  Additionally, we have proactively moved to address any problem credits and ensure that we are adequately reserved for any potential losses."  (Id. ¶ 166(a)) (citing Doc. No. 55-7 at 12).

The representation that "we believe that this disciplined approach to lending results in peer-leading asset quality metrics even in a difficult environment" is a statement of opinion by the Bank as to the potential success resulting from its approach to lending even in a difficult environment.  Citing Omnicare, in its Supplemental Filing, Plaintiff argues that this statement is an opinion with embedded facts – specifically, the fact that the Bank's "disciplined approach to

---

[11] A loan loss reserve is defined in the banking trade as a

> Statement of condition, or balance sheet, account set up by a bank based on its expectation about future loan losses.  As losses occur, they are charged against this reserve.  That is, the loan account is credited and the reserve account is debited.  The reserve is established by a debit to an expense account called the loan loss provision, with a corresponding credit to the loan loss reserve.

Shapiro v. UJB Financial Corp., 964 F.2d 272, 281 (3d Cir. 1992) (citation omitted).

lending results in peer-leading asset quality metrics." (Doc. No. 91 at 7.) Plaintiff's argument

must fail, because as set forth above, for such representations to constitute something beyond

corporate puffery, they must be in some way determinate or verifiable. See Omnicare, Slip. Op.

at 7. The Bank's description of a "disciplined approach" and "peer-leading asset quality

metrics" are the type of vague statements of corporate optimism that qualify as immaterial

puffery. See In re Aetna, 617 F.3d at 284 ("General statements about the company's dedication

to 'disciplined' pricing and commitment to 'discipline and rigor' could not have meaningfully

altered the total mix of information available to the investing public. We therefore find the

statements immaterial as a matter of law."); In re Advanta, 180 F.3d at 537-38 (holding that

statement that "despite industry-wide pressure on credit card asset quality, Advanta continues to

produce better-than-average credit measures" was immaterial puffery). As to the second

sentence, Plaintiff does not assert that the stated .44% ratio is false. The final sentence of the

statement addresses Defendant's provision for loan losses, asserting that "we have proactively

moved to address any problem credits and ensure that we are adequately reserved for any

potential losses." Defendants argue that the statement regarding the adequacy of loan loss

reserves is a statement of Defendants' belief or opinion, and is forward-looking, potentially

receiving the protection afforded such statements under the safe harbor, bespeaks caution and

puffery doctrines.

It is clear that "it is not a violation of securities laws to simply fail to provide adequate

loan loss reserves." Shapiro, 964 F.2d at 283 (internal citations omitted). Moreover, the fact

that a company's loan loss reserves are subsequently increased does not mean that the reserves

were knowingly understated at some earlier time. See, e.g., id. at 281; In re Wachovia Equity

Sec. Litig., 753 F. Supp. 2d 326, 361 (S.D.N.Y. 2011) ("[T]he fact of a 'massive increase' to

loan loss reserves 'is not, in itself, an indicator that the previous levels were inadequate.'")

(citation omitted).  The setting of loan loss reserves and judgments to their adequacy are, as

defined above, a "[s]tatement of condition" based on an "expectation about future loan losses."

Shapiro, 964 F.2d at 281.  All techniques used to set such a reserve "require quantitative and

qualitative analyses of the past and present status of loans," and the economic judgments

involved "can be validated only at some future date."  Id. (internal citations omitted).  Therefore,

a company's statement regarding the adequacy of such a reserve can be viewed as a forward-

looking statement of analysis or belief.

 Under both Omnicare and established Third Circuit precedent, a company cannot offer an

opinion that characterizes loan loss reserves as adequate when it knows that the reserves are

inadequate because a reasonable investor could be influenced by a company hiding its financial

status by failing to provide adequate loss reserves.   Shapiro, 964 F.2d at 274-75, 281; see In re

Westinghouse, 90 F.3d at 709-10 ("[A] reasonable investor would be very interested in knowing

. . . [that] current reserves were known to be insufficient under current economic conditions"

(emphasis added)).  Here, Plaintiff has not alleged a factual basis supporting a reasonable

inference that at the time of the March 2010 offering, Defendants did not believe that they were

"adequately reserved for potential losses."

 However, statements about the adequacy of loan loss reserves are not per se forward

looking or always entitled to the protections afforded to an opinion or belief of management.  In

Underland v. Alter, No. 10-3621, 2011 WL 4017908 (E.D. Pa. Sept. 9, 2011), a district court in

this circuit applied the reasoning of Shapiro with respect to a claimed Securities Act violation

based on statements pertaining to the adequacy of loan loss reserves.  In that case, the Plaintiffs

alleged that the Defendants disclosed a methodology by which it claimed loan loss reserves were

calculated, but failed to conform to that methodology, and consequently understated its loan loss

reserves.  Id. at  *9.  The Defendants argued that statements pertaining to loan loss reserves are

inherently forward-looking and subjective and may receive protection as an opinion or prediction

under the safe harbor or bespeaks caution doctrines.  Id. at  *9-10.  However, the court found that

"[u]nlike a subjective evaluation that a loan reserve is adequate or not, nonconformance to a

stated methodology to arrive at a loan loss reserve amount is a measurable objective fact," and

therefore, the bespeaks caution doctrine or safe harbor did not apply to protect the statement.  Id.

Plaintiffs' allegation was based on an FDIC Material Loss report that included findings that

contradicted Defendants' claimed adherence to its loan loss methodology.  See id. at  *8-9.

Accordingly, in light of the findings in the report, the court denied the Defendants' motion to

dismiss the Securities Act claim premised on the loan loss reserve statements.  See also In re

Wilmington Trust Sec. Litig., 2014 WL 1151988 at  *13 (D. Del. March 20, 2014) (finding that

where Defendants calculated its reserves "using an objective and consistent standard," Plaintiffs

stated a Securities Act claim where they alleged facts showing that Defendants inconsistently

and arbitrarily applied the standard they claimed to use to calculate loan reserves).

Another case that is instructive as to what facts must be alleged to sufficiently state a

claim pertaining to the setting of loan loss reserves and adherence (or non-adherence) to a stated

methodology for doing so is Oklahoma Firefighters Pension and Retirement System v. Student

Loan Corp., 951 F. Supp. 2d 479 (S.D.N.Y. 2013).  In that case, the court held that the plaintiff

had not stated a claim on the basis of an allegation that the defendant had failed to set aside

sufficient loan loss reserves "in violation of GAAP and the [defendant's] own publicly-disclosed methodology." Id. at 495.  The court found that the complaint contained no allegations contradicting the reasonableness of the defendant's quarterly reserves at the time they were set, and rejected the plaintiffs' claim that reserves were improperly set merely because the defendant took an impairment charge at a later date, stating that there were no factual allegations to support an inference that later-disclosed credit losses were actually incurred during the earlier time periods. Id. at 495-96.  The court observed that the plaintiffs had not identified any "internal reports possessed by defendants, communications among Student Loan Corp. employees, or firsthand accounts from confidential witnesses from which one could reasonably conclude that defendants manipulated or did not actually perform the multi-factor migration analysis they said they did." Id. at 497.

Here, Plaintiff also argues that Defendants' statement that loan loss reserves were "adequate[] . . . for potential losses" was false or misleading when made as it alleges that Defendant Orrstown failed to follow its own methodology by which it claimed loan loss reserves were calculated.  In particular, Plaintiff alleges that the Bank conducted an internal review of its loan portfolio in November 2009, resulting in its increasing its allowance for loan loss reserves by 3.6 million for the 3 month period ending December 31, 2009, and in the process, failed to comply with its methodology for declaring loan loss reserves as defined in its 2009 Annual Report:

> [A] reserve established through a provision for loan losses charged to expense, that represents management's best estimate of probable incurred losses within the existing portfolio of loans.  The level of the allowance reflects management's evaluation of, among other factors, the status of specific impaired loans, trends in historical loss experience, delinquency trends, credit concentrations and economic conditions within our market

area. . . . Changes in economic conditions affecting borrowers, new
information regarding existing loans, identifications of additional
problem loans and other factors, both within and outside of our control,
may require us to increase our allowance for loan losses.

(Doc. No. 40 ¶ 105.)  Plaintiff alleges that by increasing its allowance for loan loss reserves by

only 3.6 million, the Defendants failed to follow the above methodology through their "failure to

accurately reflect the true level of impaired loans and the overall weakness and high risk in the

Bank's commercial portfolio at that time."  (Id.)  In support of this allegation, Plaintiff points to

the fact that (1) by mid-2009, Brian Selders had put the Bank on notice of widespread

weaknesses in a majority of the Hagerstown commercial loans originally brokered by Terry

Reiber, and (2) that the Loan Committee, which was comprised of many of the Bank's senior

officers and directors, was well aware of its frequent practice of advancing loans by exception to

less than credit-worthy borrowers.  (Id.)

As to the first factual allegation that by mid-2009, Brian Selders had "put management on

notice" that the Hagerstown commercial loans were "of poor quality and impaired," assuming

that Defendant Orrstown was aware that these loans were troubled assets, it does not necessarily

follow that the existence of these loans - out of Defendant Orrstown's entire loan portfolio,

absent any allegation as to what percentage of Defendant Orrstown's loan portfolio these loans

comprised - supports Plaintiff's allegation that Defendant Orrstown failed to comply with its

methodology for setting loan loss reserves by failing to accurately reflect the weakness of the

Bank's loan portfolio.

As to the second factual allegation supporting its argument regarding lack of adherence

to  loan loss methodology – that the Bank frequently made exceptions to its Loan Policy in

advancing loans to less than credit-worthy borrowers – Plaintiff relies on information provided

by confidential witnesses for factual support.  Specifically, Plaintiff points to information

provided by Confidential Witnesses #1 and #3, both of whom worked at the Bank during the

period leading up to the March 2010 offering.  Confidential Witness #1 was a Credit Analyst in

the Credit Department who later became a Loan Underwriting Officer and who is alleged to have

knowledge of the Bank's internal controls, credit review and underwriting processes that were in

effect before and during the class period.  (Doc. No. 40 ¶ 56.)  Confidential Witness #3 worked

as a Credit Analyst at Defendant Orrstown Bank from 2007 until 2009, when he was promoted to

Senior Credit Manager, supervising three credit analysts and attending Loan Committee

meetings until April 2010.  (Id. at ¶ 58.)  Confidential Witness #3 and his group of analysts were

charged with assessing a potential borrower's credit worthiness and making specific

recommendations to the Loan Committee as to whether loans should be approved.  (Id.)

Confidential Witness #3 is also alleged to have personal knowledge of the Bank's internal

controls, credit and underwriting practices during the class period.  (Id.)[12]

　　　Confidential sources may provide non-public information that a court may rely upon in

drawing inferences as to the adequacy of a plaintiff's claims, provided that the sources are

described in the complaint "with sufficient particularity to support the probability that a person

in the position occupied by the source would possess the information alleged."  CALPERS, 394

F.3d at 146 (citation omitted).  In conducting its analysis, a court must examine "the detail

---

　　　[12] In its opposition brief, Plaintiff concedes that Confidential Witnesses #4 and #5 had no
first-hand knowledge of Orrstown's loan approval and review practices as they were "not
employees of the Bank but rather commercial borrowers . . . that hail from the Hagerstown
market." (Doc. 66 at 61.)   Further, Plaintiff acknowledges that Confidential Witnesses #2 and
#6 are individuals who became employed by the Bank after the March 2010 offering, see id. at
59, so any information possessed by them pertaining to the Bank's loan review and approval
practices in the time period prior to the offering would be second-hand.

provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the coherence and plausibility of the allegations, and similar indicia." Avaya, 564 F.3d at 263 (citing CALPERS, 394 F.3d at 147). If confidential source allegations are lacking with respect to these criteria, a court "must discount them steeply." Id.

Here, the reliability of the these two confidential witnesses, and the relative weight that should be afforded information provided by them, is of great significance in analyzing the sufficiency of Plaintiff's claims, as the core of its allegations as to the misleading nature of various statements in the Offering Documents rest on its theory that the Loan Committee systematically disregarded internal policies and procedures in its underwriting decisions. Confidential Witnesses #1 and #3 are the primary sources of Plaintiff's information about the operation of the Loan Committee, as unlike the Plaintiffs in Underland, Plaintiff here has not relied on any documentation – internal or otherwise – in making its claims regarding the operation of the Loan Committee. See Rahman v. Kid Brands, Inc., 736 F.3d 237, 244 n.8 (3d Cir. 2013) (citing Avaya and noting that where plaintiffs lack documentary evidence such as internal memoranda, reliance on confidential witnesses assumes a heightened importance).

As to Confidential Witness #1, as pointed out by Defendants, he or she never participated in any Loan Committee meetings, and so has no first-hand knowledge of those meetings and the reasons why various credit decisions were made. Accordingly, Confidential Witness #1 is not a persuasive witness with regard to the issues of whether or how often the Loan Committee departed from its loan policy or the reasons why it may have done so. See, e.g., In re Adolor Corp. Sec. Litig., 616 F. Supp. 2d 551, 575 (E. D. Pa. 2009) (finding that information provided by a CW concerning certain "closed door meetings" did not satisfy the plaintiffs' pleading

burden because they did not allege the CW "was present for any of the meetings or that [the CW] has first- or second-hand knowledge of what was discussed"); <u>Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.</u>, No. 10-7021, 2013 WL 286700, at *9 (N.D. Ill. Mar. 27, 2013) (finding that allegations from a CW about the substance of a meeting that the CW did not attend "add[ed] little" to the court's analysis).

The complaint alleges only that Confidential Witness #3 attended Loan Committee meetings prior to the March 2010 offering, after he or she was promoted to senior credit manager at some unspecified time in 2009.  (Doc. No. 40 ¶ 58.)  It follows then that Confidential Witness #3 was not privy to the decision-making of the Loan Committee prior to that time, and accordingly, would have had no first-hand knowledge of the practices and processes followed by the committee.   Therefore, while the amended complaint relies on Confidential Witness #3's description of the Loan Committee's "approval process on the loan applications that were processed in 2005 through 2009" (<u>id.</u> at ¶¶ 76-77), the amended complaint as drafted indicates that Confidential Witness #3 does not possess first-hand knowledge of the Loan Committee's decision-making practices during the majority of the years that he or she purports to describe. Further, the only four loan relationships that the amended complaint specifically identifies are alleged to have been formed long before Confidential Witness #3 began attending loan committee meetings sometime in 2009.  (Doc. No. 40 ¶ 109 (alleging that Azadi relationship began in 2007), ¶ 118 (alleging that Shaool relationship began in 2005), ¶ 121 (alleging that Chambersburg Developers relationship began in 2006), ¶ 128 (alleging that Yorktown relationship began in 2002).)  Accordingly, the Court finds that the information offered by Confidential Witness #3 is of minimal reliability as to the workings of the Loan Committee

during the bulk of the period of time prior to the March 2010 offering.  To the extent

Confidential Witness #3 provides any reliable information, the Court finds that Plaintiff's

assertion that the Loan Committee's approvals of risky commercial loans were not merely

exceptions to the Loan Policy, but were in fact "violations" of the same, to be a mere difference

of opinion between Confidential Witness #3 (whose observations are of limited utility)[13] and the

Loan Committee, with the added benefit of hindsight.

Moreover, contrary to Plaintiff's contention that the Defendants failed to follow their

own loan loss reserve methodology by failing to accurately reflect in the Offering Documents the

weakness of the loan portfolio allegedly caused by the Loan Committee's decisions, as discussed

more fully above, the Offering Documents disclose that, in light of the November 2009 internal

review of its loan portfolio, the Bank's loan loss reserve was increased by approximately 44%

during 2009 (Doc. No. 55-4 at 31-36), and that its non-performing loans to outstanding loans

ratio had increased by approximately 860% in the same period of time. (Doc. No. 55-4 at 37.)  In

addition, the Offering Documents contained warnings that this negative trend could continue:

> "Our operations and the properties securing our loans are primarily in South
> Central Pennsylvania . . . and in Washington County, Maryland . . . . A further
> deterioration in the economic conditions in these market areas could materially
> adversely affect our operations and increase loan delinquencies . . . . " (Doc. No.
> 55-7 at 29-30.)
>
> "Our business strategy involves making loans secured by commercial real
> estate. . . . Accordingly, repayment of these loans is subject to adverse conditions
> in the real estate market or the local economy.  In addition, many economists

---

[13] The fact that Plaintiff relies on only one confidential witness with first-hand information on the workings of the Loan Committee is further reason to discount the information.  See Boca Raton Firefighters and Police Pension Fund v. Devry, Inc., No. 10 C 7031, 2012 WL 1030474 , at *7 (N.D. Ill. Mar. 27, 2012) ("we are reluctant to permit a securities class action to proceed based on statements from a single anonymous employee.")

believe that deterioration in income producing commercial real estate is likely
to worsen . . . ." (Id.)

In light of the limited utility of the information relied upon by Plaintiff to support its

central argument that the Loan Committee disregarded its Loan Policy in advancing loans to less

than credit-worthy borrowers, and considering the information disclosed in the Offering

Documents as to the deterioration of the Bank's loan portfolio and the consequences of that

deterioration for the Bank's loan loss reserve, the Court finds that Plaintiff has failed to point to

reliable facts supporting a reasonable inference that Defendants failed to conform to its disclosed

methodology for calculating loan loss reserves in the time period prior to the issuance of the

Offering Documents, and therefore, Plaintiff's Section 11 claim based on the statement regarding

the adequacy of loan loss reserves fails.

Next, Plaintiff challenges the statement that "[i]n recognition of sustained loan growth

and a continuation of its historically prudent approach, the Company added $3,600,000 to its

loan loss reserve in the fourth quarter." (Doc. No. 40 ¶ 166(b)) (citing Doc. No. 55-2 at 8).

Plaintiff does not allege that Defendants did not add $3.6 million to its loan loss reserve. As

discussed above, this figure marks an increase in the loan loss reserve. Although Plaintiff asserts

that Defendants had not taken a historically prudent approach to lending, Plaintiff alleges only

that "prior to the filing of the Offering Documents, Brian Selders 'put management on notice'

that the Hagerstown commercial loans were of 'poor quality and impaired.'" (Doc. No. 40 ¶

169(c).) As discussed above, assuming Defendant Orrstown's awareness that these loans were

troubled assets, it does not necessarily follow that the existence of these loans – out of

Defendants' entire loan portfolio, absent any allegation as to what percentage of Defendant

Orrstown's loan portfolio these loans comprised – renders the above statement materially false

or misleading.  Accordingly, the Court finds that Plaintiff has failed to sufficiently plead facts

supporting a reasonable inference that the statement is materially false or misleading.

 Plaintiff next challenges the statement that "[c]ommenting on the Bank's loan portfolio

Mr. Quinn stated, 'Our ratio of nonperforming loans to end of period loans of 1.18% and net

charge offs to average loans of 0.11% are well below peers and demonstrate our continued focus

on credit quality risk mitigation.'"  (Doc. No. 40 ¶ 166(c)) (citing Doc. No. 55-2 at 8).  The

factual portions of this statement are not alleged to be false.   In particular, Plaintiff does not

allege that the loan performance ratios being described were not in fact "well below [Orrstown's]

peers" at the time the statement was made.  Regarding the "soft" portion of the statement,

Plaintiff does not allege facts from which it could be reasonably inferred that Orrstown was not

"focus[ed] on credit quality risk mitigation" at the time the statement was made.   As Defendants

point out, the allegations in the amended complaint describing the November 2009 credit review

directly undercut any such inference.  (Doc. No. 40 ¶¶ 99-100.)

 Plaintiff next takes issue with the statement "[t]he quality of the Corporation's asset

structure continues to be strong.  A substantial amount of time is devoted by management to

overseeing the investment of funds in loans and securities and the formulation of policies

directed toward the profitability and minimization of risk associated with such investments."

(Doc. No. 40 ¶ 167(a)) (citing Doc. No. 55-4 at 31).   The second sentence of this statement is

divorced entirely from the factual allegations in the amended complaint, as the statement refers

to Orrstown's investment of funds in the securities of other companies, not to its loan portfolio.

As to the first sentence of the statement, the assertion that "[t]he quality of the Corporation's

asset structure continues to be strong," can most accurately be viewed as the sort of vague

statement constituting puffery, and is therefore immaterial.  See In re Advanta, 180 F.3d at 537

(finding statement that "our credit quality remained excellent" was puffery); In re Am. Bus.

Finan. Serv., Inc. Sec. Litig., No. 05-232, 2007 WL 819371 at *8 (E.D. Pa. Jan. 29, 2007)

(finding statement that financial services organization had "a strong credit culture which

consistently originates quality performance loans" was puffery).

Next, Plaintiff challenges the following: "The Corporation's loan loss history has been

much better than peer standards and analysis of the current credit risk position is favorable.  The

allowance for loan losses is ample given the current composition of the loan portfolio and

adequately covers the credit risk management sees under present economic conditions.

Management is prepared to make reserve adjustments that may become necessary as economic

conditions continue to change."   (Doc. No. 40 ¶ 167(b)) (citing Doc. No. 55-4 at 36).  First,

Plaintiff pleads no facts supporting a reasonable inference that the portion of the statement that

Defendant Orrstown Bank's "loan loss history has been much better than peer standards" was

false when made.  As to the rest of the statement, it principally describes Orrstown's belief or

opinion regarding the adequacy of its loan loss reserves at the time of the issuance of the

Offering Documents, and such a statement fails to state a claim under the Securities Act.  See

infra at 43-53.

### iii.    Statements regarding credit practices during Road Show PowerPoint Presentation

With regard to the Road Show PowerPoint Presentation, Plaintiff first challenges the

statement that "[c]onservative lending practices have resulted in strong asset quality metrics in a

difficult credit environment."  (Doc. No. 40 ¶ 168(a)) (citing Doc. No. 55-5 at 10). As discussed

above,  the words "conservative" and "strong" are the type of vague language constituting

puffery.  See In re Aetna, 617 F.3d at 284 (finding that a general statement about the company's

dedication to "disciplined" pricing and commitment to "discipline and rigor" was puffery);  In re

Advanta, 180 F.3d at 537 (holding that statement that "our credit quality remained excellent"

constituted puffery); In re Am. Bus. Finan., 2007 WL 819371 at *8 (finding that statement

describing a "strong credit culture" was puffery).  Further, the statement identified by Plaintiff

includes a parenthetical note (omitted in Plaintiff's pleading) that explains to investors in

objective terms how the loans were performing.  The note says that Orrstown's ratio of non-

performing assets to total assets was 0.44% at the end of 2009.  (Doc. No. 55-5 at 10.)

Plaintiff next challenges Orrstown's statement regarding "[g]lobal credit oversight by the

Bank's Credit Administration Committee, which is comprised of four independent directors."

(Doc. No. 40 ¶ 168(b) (citing Doc. No. 5505 at 25).)  Plaintiff alleges that Defendant Orrstown

did not provide "global credit oversight" because the credit review and loan approval process in

place before the March 2010 offering was "compromised by the influence of loan officers."  (Id.

¶ 169(f).)  The Court finds that Plaintiff has not alleged a factual basis supporting a reasonable

inference that this statement was false when made, for all the reasons discussed above in Section

III.C.1.b.ii regarding the alleged facts concerning decisions of the Loan Committee, and because

the allegations in the amended complaint describing the November 2009 internal review

undercut the inference that Orrstown did not provide global credit oversight prior to the March

2010 offering.  (Doc. No. 90 ¶¶ 99-100.)

Plaintiff further challenges Defendant Orrstown's reference to "[e]mphasis on credit

quality, return to shareholders, solid financial performance, and delivering peer-group leading

results."  (Doc. No. 40 ¶ 168(c).)  The Court finds that a reasonable investor would not take this

singular statement – in light of the specific disclaimers preceding this slide – as material.  Rather, it is presented in bullet form as one of four other "Investment Highlights," (Doc. No. 55-4 at 34), and uses puffery language such as "solid,"  "peer-group leading" and "emphasis on credit quality."  See, e.g., In re Advanta, 180 F.3d at 537-38 (finding that statements that "[o]ur emphasis on gold cards . . . sets us apart from other credit card issuers" and our "credit quality continues to be among the best in the industry" were immaterial puffery);   In re Am. Bus. Finan., 2007 WL 819371 at *8 (holding that the statement that a "strong credit culture" originated "quality performance loans" was puffery).

### iv.    Post-March 2010 Offering Statements related to credit procedures

Plaintiff next alleges that "[a]fter the March 2010 Offering closed, management continued to issue false statements about the Company's stringent credit procedures and misled investors about the reasons for the increase in provisions for loan losses . . . " (Doc. No. 40 ¶ 170.)  The Court concludes that these statements are inactionable, because for claims brought under the Securities Act, "only information conveyed to the purchaser at or prior to the time of sale can be considered."  Jacobs, Arnold S., 5 Disclosure and Remedies Under the Securities Laws, § 3:150 at 3-542 (2012).  Because the statements challenged in this Section were issued after the Securities Act Class made its final stock purchase, the Court finds these statements inactionable under the Securities Act.

### v.    Statements related to the effectiveness of management

Plaintiff also alleges that Defendants Orrstown and the Bank made a series of statements in the Offering Documents related to the quality of their management that were false and misleading.  Specifically, Plaintiff relies on information provided by Confidential Witnesses #1,

#2, and #3, and alleges that Defendant Orrstown had systemic management problems, which led to management failing to implement proper controls and processes.  (Doc. No. 40 ¶¶ 173-74.) Plaintiff contends that the management-related statements were misleading "because management had not fostered a disciplined credit culture and had undermined Orrstown's brand and capabilities."  (Id. ¶ 173.)  Defendant argues that Plaintiff's claims related to statements regarding management are inactionable because "the securities laws do not create liability for breaches of fiduciary duty or mismanagement."  (Doc. No. 60 at 47) (quoting In re Trump, 7 F.3d at 376).  The Court will address each statement and argument in turn.

First, Plaintiff alleges that Defendant Orrstown advertised its "[d]eep and experienced management team with strong community ties, operational ability and proven track record of acquisition integration."  (Doc. No. 40 ¶ 172(a)) (citing Doc. No. 55-5 at 10).   This statement consists of vague and general expressions of management's belief in its own capabilities. Accordingly, the Court finds that this statement is immaterial puffery: "deep and experienced," "strong," and "proven track record" are all examples of corporate puffery on which no reasonable investor would rely.  See In re Advanta, 180 F.3d at 537 (finding that statement touting company's "experienced management, technological expertise" was puffery); Majer v. Sonex Research, Inc., No. 05-606, 2006 WL 2038604, at *12 (E.D. Pa. July 19, 2006) (concluding that "[s]tatements about [the defendant's] 'wealth of management and industry turnaround experience,' and his 'career rich in successful management of both large established corporate organizations and firms focused on the research and development of innovative technologies' are classic puffing statements.").   Accordingly, the Court finds this statement immaterial as a matter of law.

58

Next, Plaintiff challenges Defendant Orrstown's statement that "[w]e view the current market environment as being full of opportunity for those institutions with a strong balance sheet and management." (Doc. No. 40 ¶ 172(b)) (citing Doc. 55-7 at 12). First, this statement is forward-looking, as it refers to the "current market environment" as "full of opportunity." Second, given the extensive listing of risk factors contained in the Prospectus Supplement, including a reminder that Defendant Orrstown Bank "face[s] substantial competition from other insured depository institutions such as banks, saving institutions and credit unions," which may "enjoy advantages" that Defendant does not (Doc. No. 55-7 at 31), the Court finds that a reasonable investor would find the above statement immaterial in light of the specific, tailored risks discussed preceding this statement. See In re Trump, 7 F.3d at 369. Moreover, the statement is also an expression of Orrstown's belief that the current "environment [is] full of opportunity for those institutions with a strong balance sheet and management." In its Supplemental Filing, Plaintiff argues that the statement is an opinion with the embedded factual representation that the Bank had a "strong balance sheet and management." (Doc. No. 91 at 7.) However, as noted above, for such a representation to constitute something beyond corporate puffery, it must be in some way determinate or verifiable. See Omnicare, Slip. Op. at 7 (in discussing the example of a CEO's assertion that a company manufactures TVs with the "highest resolution on the market," the Court stated that such a representation is "not mere puffery, but a determinate and verifiable statement"). Here, as noted above, the description of a balance sheet and management as "strong" is the type of vague statement constituting immaterial puffery. See, e.g., In re Advanta, 180 F.3d at 537-38 (holding that statement that "our credit quality remained excellent" was puffery); In re Am. Bus. Finan., 2007 WL 819371 at *8 (finding that statement

that a "strong credit culture" originated "quality performance loans" was puffery).  Accordingly, the Court finds the statement immaterial as a matter of law.

Plaintiff also challenges a statement made by Defendants Quinn, Everly, and Embly in their Road Show marketing presentation that management fostered a "disciplined credit culture . . . . and exercised significant oversight."  (Doc. No. ¶ 172(c).)  The Court finds this statement to be  corporate puffery upon which no reasonable investor would rely, and accordingly, it is immaterial as a matter of law.  See In re Aetna, 617 F.3d at 284 ("When read in context, no reasonable investor could infer that 'dedication to disciplined pricing,' a vague and subjective statement, meant Aetna had applied (or failed to apply) a static, across-the-board formula to determine the price of premiums charged for all products and services.  General statements about the company's dedication to 'disciplined' pricing and commitment to 'discipline and rigor' could not have meaningfully altered the total mix of information available to the investing public.").

Plaintiff further alleges that the Offering Documents emphasized the significant role of senior management: "[m]embers of senior management are involved heavily in customer interaction and business development and play an integral role in promoting Orrstown's brand and capabilities." (Doc. No. 40 ¶ 172(d).)  Plaintiff alleges that this statement was materially untrue and misleading "because management had not fostered a disciplined credit culture and had undermined Orrstown's brand and capabilities."  (Id. ¶ 173.)  Although Plaintiff asserts that "senior management did not implement internal controls and processes" in order to prevent "extending risky commercial loans throughout 2009 and 2010," Plaintiff has not pled facts supporting a reasonable inference that such vague, undefined terms as "involved heavily," and "play an integral role" were materially false or misleading when made.  Further, "involved

heavily" and "integral role" are the type of vague language constituting immaterial puffery. Accordingly, the Court finds this statement to be immaterial as a matter of law.

Therefore, for the reasons discussed above, the Court finds that Plaintiff's Section 11 claim against Orrstown and the Bank fails as a matter of law, and the Court will dismiss the claim.

### c.   Count II: Individual Defendants, Defendant Smith Elliott Kearns, and Defendants Sandler O'Neill and Janney Scott

Plaintiff alleges that the Individual Securities Defendants, Underwriter Defendants, and Auditor Defendant violated Section 11 of the Securities Act because "each failed to make a reasonable and diligent investigation and/or did not possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading," and thus they acted negligently in issuing the registration statement.  (Doc. No. 40 ¶ 206.)  Plaintiff alleges that it and the Securities Act Class purchased shares of Orrstown stock pursuant to the March 2010 offering, and were damaged when revelations about Orrstown's financial condition were revealed and the stock price correspondingly dropped.  (Id. ¶ 207.)  The Individual Securities Defendants, Defendant Smith Elliott Kearns (SEK), and Defendants Sandler O'Neill and Janney Scott all move to dismiss Plaintiff's claim for failure to state a claim.  (Doc. Nos. 53, 56, 58.)

### i.   Individual Securities Defendants and Underwriter Defendants

Plaintiff alleges that the Individual Securities Defendants and Underwriter Defendants, each of whom signed the Registration Statement, "acted negligently in issuing the Registration Statement which made materially false and misleading written statements to the investing public

and misrepresented or failed to disclose" the facts set out above, and violated Section 11 of the

Securities Act.  (Doc. No. 40 ¶¶ 200-10.)  Plaintiff's claims against the Individual Securities

Defendants and Underwriter Defendants are based on the same statements the Court analyzed in

Section III.C.1.b above, and which the Court ultimately found failed to state a Securities Act

claim.  Because the legal analysis does not change as applied to the Individual Securities

Defendants and Underwriter Defendants, there is no need for the Court to conduct additional

analysis.  Accordingly, the Court finds that Plaintiff's Section 11 claims against the Individual

Securities Defendants and Underwriter Defendants fail as a matter of law for those reasons set

forth above in Section III.C.1.b, and the Court will dismiss the claims.

### ii.        Auditor Defendant Smith Elliott Kearns

Plaintiff asserts that Auditor Defendant SEK's statements in the 2009 Annual Report

violate Section 11 in that they are false, misleading, and lack a reasonable basis.  (Doc. No. 40 ¶

176.)  Plaintiff argues that Defendant SEK failed to adhere to the PCAOB standards when

conducting its audit.  (Id. ¶ 181.)  Specifically, Plaintiff asserts that Defendant SEK "failed to

verify that Orrstown had used accurate source data, had made reasonable assumptions, and had

accounted for known or knowable past and present information when calculating its loan loss

reserves, and therefore, failed to ensure that Orrstown's financial statements, incorporated into

the Registration Statement, complied with GAAP."  (Id.)  Further, Plaintiff contends that

Defendant SEK failed to follow PCAOB Rule 3100,[14] AS No. 5, AU Section 342, and FASB

Statement No. 5 in conducting its audit.  (Id.)  Plaintiff also argues that Defendant SEK

---

[14] PCAOB 3100 requires an auditor "to comply with all applicable auditing and related
professional practice standards of the PCAOB."  Securities and Exchange Commission Release
No. 2003-010, 04/06/2004, at 1.

"disregarded red flags, failed to obtain sufficient evidence to support opinions and proceeded to issue a clean audit report and affirming that Orrstown had maintained, in all material respects, effective internal controls." (Id.)  Accordingly, Plaintiff argues that Defendant SEK's statement that "[i]n our opinion, the financial statements referred to above present fairly, in all material aspects, the financial position of Orrstown Financial Services, Inc. and its wholly-owned subsidiary as of December 31, 2009 and 2008," was "false, misleading, and lacked a reasonable basis." (Id. ¶ 177.)  Plaintiff further alleges that Defendant SEK's representations that its audit reports were presented "in conformity with generally accepted accounting principles ('GAAP')" and in compliance with PCAOB standards were "false, misleading, and lacked a reasonable basis." (Id. ¶¶ 176-77, 181.)

Defendant SEK argues that Plaintiff has failed to plead a violation of Section 11 against it as an auditor. (Doc. No. 59.)  Specifically, Defendant SEK asserts that Plaintiff fails to state a claim against it because Plaintiff merely alleges that SEK's opinion relating to the Bank's managerial decisions was incorrect, but such opinions are not actionable unless they are "objectively false and subjectively unreasonable at the time of issuance." (Doc. No. 57 at 16.)  Further, Defendant SEK asserts that Plaintiff's claims are inactionable as they are improperly based on hindsight. (Id.)

The Court has already determined in Section III.C.1.b. above that statements in the Offering Documents (and post-March 2010 statements) did not violate Section 11.  Accordingly, the Court finds that Defendant SEK has not violated Section 11 by "approving" any statement analyzed in Section III.C.1.b.  Thus, the Court's inquiry regarding Plaintiff's claim that Defendant SEK violated Section 11 will be limited to statements made by Defendant SEK.

As discussed earlier, the Supreme Court recently clarified the issue of when and how statements of opinion can constitute materially false or misleading statements for purposes of a Section 11 claim.  Under the Securities Act, a statement of opinion does not constitute an untrue statement of a material fact simply because the opinion ultimately proves to be incorrect. Omnicare, No. 13-435 (U.S. Mar. 24, 2015), Slip. Op. at 6.   As discussed more fully above, under the first clause of Section 11, an opinion can constitute an untrue statement of a material fact if (1) the opinion is not sincerely held, or, in other words, is subjectively disbelieved, or (2) the opinion contains an embedded statement of untrue material facts.  Id. at 9.

Here, Plaintiff has failed to point to a factual basis supporting its allegation that Defendant SEK did not believe its opinion that "the financial statements referred to above present fairly, in all material aspects, the financial position of Orrstown Financial Services, Inc. and its wholly-owned subsidiary as of December 31, 2009 and 2008."  (See Doc. No. 40 ¶ 181.) Nor does Plaintiff point to an untrue material fact embedded in that opinion statement. Accordingly, Defendant SEK's opinion as to the financial statements' fair presentation of Orrstown's financial position as of December 31, 2009 and 2008 is inactionable under the first clause of Section 11 as an untrue statement of  material fact.  Plaintiff similarly fails to point to a factual basis supporting a reasonable inference that Defendant SEK did not believe its representation that its audit reports were presented in conformity with GAAP, or that there was a untrue material fact embedded in that opinion statement.

Therefore, Plaintiff's theory of Section 11 liability against Defendant SEK can only proceed under the "omissions" clause of Section 11, whereby, as discussed more fully above, a statement of pure opinion can subject a defendant to liability if that statement of opinion "omits

material facts about the issuer's inquiry into or knowledge concerning a statement of opinion;

and if those facts conflict with what a reasonable investor would take from the statement itself."

Omnicare, Slip. Op. at 12.  Accordingly, in order to state a claim under Section 11's omissions

clause for a statement of opinion,

> "[t]he investor must identify particular (and material) facts going to the basis for
> the issuer's opinion – facts about the inquiry the issuer did or did not conduct or
> the knowledge it did or did not have – whose omission makes the opinion statement
> at issue misleading to a reasonable person reading the statement fairly and in
> context."

Id. at 18.

Plaintiff's Section 11 claim against Defendant SEK premised on an "omissions" theory

fails, as Plaintiff offers little more than the conclusory assertion that SEK's opinions expressed

in the Offering Documents "lacked a reasonable basis."  (Doc. No. 40 ¶¶ 176, 181.)  This is not

enough to meet the Omnicare standard.  See Omnicare, Slip. Op. at 17-19 ("The Funds'

recitation of the statutory language – that Omnicare 'omitted to state facts necessary to make the

statements made not misleading' – is not sufficient; neither is the Funds' conclusory allegation

that "Omnicare lacked 'reasonable grounds for the belief' it stated").  Plaintiff fails to identify

actual and material steps taken or not taken by Defendant SEK in its audit or knowledge it did or

did not have in the formation of its opinion, instead claiming that any reasonable audit would

have uncovered a material fact whose omission renders the opinion misleading to a reasonable

person reading the statement fairly and in context.

Further, the Court finds that even if Plaintiff could assert a Section 11 claim against

Defendant SEK's opinion based on what SEK "should have known," Plaintiff's allegations

nonetheless fail.  The "red flags" Plaintiff accuses Defendant SEK of missing when conducting

its audits stem from the Confidential Witnesses' assertions that the loan approval process was

seriously flawed, and that Mr. Reiber developed lending relationships in the Hagerstown market

that "became the Achilles Heel of the Bank." (See, e.g., id. ¶¶ 11, 13, 56-61, 74, 76, 80-87.)

However, Plaintiff fails to assert how, at the time Defendant SEK conducted its audits, it could

have been aware of these purported "red flags," in that the Confidential Witnesses are not

alleged to have divulged the "red flag" information prior to it appearing in Plaintiff's amended

complaint.[15]  Plaintiff's Section 11 claims against Defendant SEK are based on hindsight

provided by the allegations of the Confidential Witnesses.  Because omissions or statements that

create a misleading impression in hindsight "are not sufficient to constitute the basis of a

securities action under section 11 or section 12(2)," the Court finds that Plaintiff's Section 11

claim against Defendant SEK fails as a matter of law, and the Court will dismiss the claim.

Zucker v. Quasha, 891 F.Supp. 1010, 1017 (D.N.J. 1995) (citation omitted).

> **d.    Count III: Orrstown, the Bank, Individual Securities Act Defendants, Defendant Jeffrey Embly, and the Underwriter Defendants**

Plaintiff and the Securities Act class allege that Orrstown, the Bank, the Individual

Securities Defendants, Defendant Jeffrey Embly, and the Underwriter Defendants were sellers,

---

[15] For example, Plaintiff alleges that Defendants Orrstown and the Bank "violated GAAP when it failed to properly determine and report loan loss reserves and that GAAP violation should have been readily evident to Defendant Smith Elliott when conducting its audits." (Doc. No. 40 ¶ 11.)  Plaintiff's basis for this allegation stems from hindsight, in that Plaintiff contends that the aforementioned "financial and operational material weaknesses" were "revealed by the [Confidential Witnesses] and [the Bank's] belated disclosures [in 2012]. . . ." (Id.)  Thus, Plaintiff's assertion that the Bank's alleged "GAAP violations should have been readily evident to Defendant Smith Elliott when conducting its audits," improperly relies on the benefit of hindsight.  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002) (stating that under the Securities Act, "a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.").

offerors, and/or solicitors of purchasers of the shares offered pursuant to the Registration

Statement, which Plaintiff alleges contained "untrue statements of material facts, omitted to state

other facts necessary to make the statements not misleading, and concealed and failed to disclose

material facts."  (Doc. No. 40 ¶ 213.)  Plaintiff alleges that these Defendants "should have

known, in the exercise of reasonable care, of the misstatements and omissions contained in the

Registration Statement," and their conduct violated Section 12(a)(2) of the Securities Act.  (Id. ¶

221.)

The Court finds that Plaintiff fails to state a claim under Section 12(a)(2) of the Securities

Act against all Defendants named in this Count.  To state a claim for a Section 12(a)(2)

violation, a plaintiff must assert that it "purchased securities pursuant to a materially false or

misleading prospectus or oral communication."  Underland, 2011 WL 4017908, at *4 (quoting

14 U.S.C. § 77l(a)(2)).  Because the Court has already found in Section III.C.1.b. that all of the

statements challenged under the Securities Act fail to support a reasonable inference of their

materially false or misleading nature, it need not repeat its analysis here.  Accordingly, the Court

finds that Plaintiff fails to state a claim against Orrstown, the Bank, the Individual Securities

Defendants, Defendant Jeffrey Embly, and the Underwriter Defendants under Section 12(a)(2) of

the Securities Act.

### e.      Count IV: Section 15, Individual Securities Act Defendants

Plaintiff and the Securities Act class allege that the Individual Securities Act Defendants

are jointly and severally liable for Orrstown's primary violation of Section 11 by virtue of their

ability to directly or indirectly control Orrstown policy; specifically, its failure to issue a

materially true, complete, and non-misleading Registration Statement.  (Doc. No. 40 ¶ 225.)

Because such "control person liability . . . is premised upon a predicate violation of the . . . 1933 Act," and the Court has determined that Plaintiff's claims under the 1933 Act fail, the Court must dismiss Plaintiff's Section 15 claim.  See 15 U.S.C. §77o; CALPERS, 394 F.3d at 142.

### 2.     Exchange Act Claims

#### a.     Count V: Section 10(b) and Rule 10b-5, Orrstown Exchange Act Defendants

Plaintiff and the Exchange Act class allege that Defendants Orrstown, the Bank, and Defendants Everly, Embly, Zullinger, Shoemaker, Snoke and Coy: (1) deceived the investing public, including Plaintiff and other members of the Exchange Act class; (2) artificially inflated and maintained the market price of Orrstown common stock; and, (3) caused Plaintiff and other members of the Exchange Act class to purchase Orrstown stock at artificially inflated prices. (Doc. No. 40 ¶ 326.)  Plaintiff and the Class allege that they would not have purchased Orrstown stock at the prices they paid, and, as a direct and proximate result of the Orrstown Exchange Act Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases of Orrstown stock; and, this alleged conduct constitutes a violation of Section 10(b) and Rule 10b-5. (Id.)

The Orrstown Exchange Act Defendants argue the following in moving to dismiss: (1) Plaintiff has failed to plead particularized facts demonstrating materially false or misleading statements or material omissions; (2) Defendant Orrstown did not make false or misleading statements to its shareholders in May 2010; (3) Defendant Orrstown did not misrepresent or conceal its risk assets or loan loss reserves; (4) Defendant Orrstown's SEC filings in 2010 and 2011 did not contain false and misleading statements; (5) Defendant Orrstown's 2010, 2011, and 2012 SEC filings were not false or misleading; (6) Plaintiff fails to allege facts giving rise to a

strong inference of scienter; (7) Plaintiff ignores the more compelling inferences of non-fraudulent intent found in the corporate filings it selectively quotes; (8) Plaintiff fails to plead that the Exchange Act Defendants had the motive or opportunity to mislead investors; and (9) Plaintiff fails to plead specific facts sufficient to raise a strong inference that the Exchange Act Defendants acted with conscious misbehavior or recklessness.  (Doc. No. 60 at 56-79.)  The Court will address each of the Exchange Act Defendants' arguments in turn.[16]

### i.        Statements in the 2009 Annual Report

Plaintiff contends that in preparation for the March 2010 Offering, the Orrstown Exchange Act Defendants "sought to obscure the extent to which the loan portfolio was impaired so as to avoid dramatic increases in loan loss reserves," and therefore falsely portray their stock as a safe investment. (Doc. No. 40 ¶ 231.)  Plaintiff points to several statements in the Bank's 2009 Annual Report as violating Section 10(b) and Rule 10b-5, which the Court will address in turn.

"The Bank follows conservative lending practices and continues to carry a high quality loan portfolio with no unusual or undue concentrations of credit."  (Id. ¶ 232(a).)  In analyzing Plaintiff's Securities Act claims, the Court found that this statement contained elements of puffery and that Plaintiff had failed to allege a factual basis supporting a reasonable inference as to the material falsity or misleading nature of the statement. See Section III.C.1.b.i. Accordingly, the Court also finds this statement inactionable under Section 10(b) and Rule 10b-

---

[16] The Orrstown Exchange Act Defendants argue that Plaintiff lacks standing to pursue claims based on statements made after May 9, 2011, the date of Plaintiff's last purchase of Orrstown's stock.  In light of the Court's determination on the substantive issues raised by Defendants' motion to dismiss, the Court see no reason to address at this time the Orrstown Exchange Act Defendants' standing argument.

5.

"The quality of the Corporation's asset structure continues to be strong.  A substantial amount of time is devoted by management to overseeing the investment of funds in loans and securities and the formulation of policies directed toward the profitability and minimization of risks associated with such investments."  (Doc. No. 40 ¶ 232(b).) In analyzing Plaintiff's Securities Act claims, the Court found the part of this statement relevant to Plaintiff's Securities Act claim to be immaterial puffery.  See Section III.C.1.b.ii.  Accordingly, the Court finds this statement inactionable under Section 10(b) and Rule 10b-5 as well.

"The Corporation's loan loss history has been much better than peer standards and analysis of the current credit risk position is favorable.  The allowance for loan losses is ample given the current composition of the loan portfolio and adequately covers the credit risk management sees under present economic conditions."  (Doc. No. 40 ¶ 233(a).)  In analyzing Plaintiff's Securities Act claims, the Court found that this statement failed to state a claim as to the material falsity or misleading nature of Orrstown's opinion regarding the adequacy of loan loss reserves at the time of the issuance of the Offering Documents.  See Section III.C.1.b.ii. Accordingly, the Court similarly finds this statement inactionable under Section 10(b) and Rule 10b-5.

"Following the [Internal] review process, management increased the allowance by $3.1 million in order to better reflect the deterioration in local, regional and national economic conditions.  All economic allocations were increased during 2009 . . . . The unallocated portion of the reserve ensures that any additional unforeseen losses that are not otherwise identifiable will be able to be absorbed.  It is intended to provide for imprecise estimates in assessing

projected losses, uncertainties in economic conditions and allocating pool reserves.

Management deems the total of the allocated and unallocated portions of the allowance for loan

losses to be adequate to absorb losses at this time." (Doc. No. 40 ¶ 233(b).) Plaintiff argues that

this statement was materially untrue or misleading when made because Defendant Orrstown's

"structurally biased Internal Review" resulted in a material understatement of the Bank's loan

loss reserve, and therefore the Orrstown Exchange Act Defendants' assertion that they had

"adequately" provided for loss reserves was misleading. (Id. ¶ 237.) However, as discussed fully

above in the Court's analysis of Plaintiff's Securities Act claims, the Court finds that Plaintiff

has failed to state a claim as to the material falsity or misleading nature of Orrstown's assertion

as to the adequacy of loan loss reserves at the time of the issuance of the Offering Documents.

See Section III.C.1.b.ii.  Accordingly, the Court also finds this statement inactionable under

Section 10(b) and Rule 10b-5.

> ### ii.   Statements at the May 4, 2010 shareholder meeting and in the May 5, 2010 Form 8-K

Plaintiff next alleges that the Orrstown Exchange Act Defendants made false and

misleading statements at the May 4, 2010 shareholder meeting and in the May 5, 2010 Form 8-K

(Doc. No. 40 ¶ 239.)  Again, the Court will address each statement in turn.

At the May 4, 2010 shareholder meeting, Defendant Zullinger, Orrstown's Chairman of

the Board of Directors, stated: "[a]s a poor economy would indicate, we also had a higher level

of loan losses than we have in the past, yet despite this, we have added to our loan loss reserve

and still ended 2009 with an increase in income over 2008 and our first quarter of 2010 shows a

substantial increase in income over the same period in 2009." (Id. ¶ 239(a).)  Plaintiff argues

that this statement was materially false or misleading when made or omitted material facts

necessary to make the statements made not misleading because "economic conditions were not the bane of the Company's troubles." (Id. ¶ 243.)

The Court finds that this statement fails to meet the heightened pleading standard for Exchange Act claims dictated by the PSLRA. Plaintiff completely fails to allege the "who, what, when, where and how" of the Orrstown Exchange Act Defendants' alleged fraud in this statement. In re Advanta, 180 F.3d at 534. The only portion of the above statement Plaintiff claims to be untrue is Defendants' preface that the "poor economy" signaled the potential for financial problems. (See Doc. No. 40 ¶ 243.) Plaintiff fails to assert that this portion of the statement was "material," or that Defendants acted with the requisite scienter in stating it. Further, Plaintiff fails to allege a connection between the misrepresentation and the purchase of securities. The Court finds that Plaintiff fails in all respects to meet the pleading standard under the PSLRA regarding this statement, and accordingly, the statement is inactionable.

Defendant Zullinger next stated that: "[w]e have a strong and experienced management team that can capitalize on any opportunities we are presented with and also deal with the economic and regulatory environment we are facing." (Id. ¶ 239(b).) Plaintiff alleges that this statement contains a material misrepresentation because "the Company did not have a strong and experienced management team." (Id.) Setting aside the conclusory nature of Plaintiff's pleading, this statement is nearly identical to one Plaintiff challenged as false and misleading under the Securities Act ("Deep and experienced management team with strong community ties, operational ability and proven track record of acquisition integration," (id. ¶ 172(a)) (citing Doc. No. 55-5 at 10). The Court found that statement to be inactionable because "deep and experienced," "strong," and "proven track record" are all examples of corporate puffery on

which no reasonable investor would rely.  See Majer, 2006 WL 2038604, *12 ("Statements

about [Defendant's] 'wealth of management and industry turnaround experience,' and his 'career

rich in successful management of both large established corporate organizations and firms

focused on the research and development of innovative technologies' are classic puffing

statements.").  The Court likewise finds the Defendants' statement regarding its "strong and

experienced management team" is puffery, and therefore it is immaterial as a matter of law.

Accordingly, the Court finds the statement inactionable because it fails to meet the first prong of

the pleading standard for claims under the Exchange Act.

        Plaintiff next challenges statements made by Defendant Embly at the May 4, 2010

shareholder meeting.  First, Plaintiff challenges Defendant Embly's statements that Orrstown has

a "Disciplined Credit Culture" and takes a "Proactive & Thorough Approach to Credit."  The

Court has already determined that the representation of a "disciplined approach to lending" was

inactionable corporate puffery upon which no reasonable investor would rely.  See In re Aetna,

617 F.3d at 284 ("General statement about the company's dedication to 'disciplined' pricing and

commitment to 'discipline and rigor' could not have meaningfully altered the total mix of

information available to the investing public.  We therefore find the statements immaterial as a

matter of law."); see also Section III.C.1.b.ii.  Because the Court determined that the phrase

"disciplined approach to lending" did not constitute a material misrepresentation as to Plaintiff's

Securities Act claims, the Court also finds that the phrase "Disciplined Credit Culture" fails to

fulfill the first prong of the PSLRA pleading standard for Exchange Act claims.

        Similarly, the Court also finds the statement "Proactive & Thorough Approach to Credit"

to be inactionable puffery upon which no reasonable investor would rely.  See Majer, 2006 WL

2038604 at *12.  Similar to the phrase "disciplined," "proactive and thorough" is precisely the type of "vague and non-specific expression[] of corporate optimism on which reasonable investors would not have relied."  In re Aetna, 617 F.3d at 283.   Because the Court finds the statement "Proactive and Thorough Approach to Credit" does not constitute a material misrepresentation, it is inactionable under the Exchange Act.

Plaintiff further challenges Defendant Embly's representation that Orrstown's loan performance was far superior to that of its peers, in that only .44% of Orrstown's total assets were non-performing assets, which was 75% lower than its regional peers.  (Doc. No. 40 ¶ 241.) The Court finds that Plaintiff has failed to plead an actionable claim regarding this statement, as Plaintiff does not assert how this statement contains a material misrepresentation or omission by Defendants. Therefore, it fails to meet the particularity requirement dictated by the PSLRA.  See In re Advanta, 180 F.3d at 534 (plaintiff alleging securities fraud under the PSLRA must plead the "who, what, when, where and how" of the alleged fraud)..

Next, Plaintiff asserts that Defendant Quinn made misrepresentations to investors through two statements: "[w]e will continue our trend of strong financial performance mixed with conservative lending practices," and "[w]e will continue to invest in our business with responsible growth as a byproduct." (Doc. No. 40 ¶ 242(a)-(b).)  The Court finds that both of these statements are the type of general, non-specific statement of optimism or hope that courts have routinely rejected as immaterial puffery.  See In re Burlington, 114 F.3d at 1427 ("a general, non-specific statement of optimism or hope that a trend will continue" constitutes inactionable puffery).  Phrases such as "strong financial performance," "conservative lending practices," and "responsible growth as a byproduct [of future investment]" are vague to the point

74

of immateriality.  See id.; In re Aetna, 617 F.3d at 284 (finding that statement of commitment to "discipline and rigor" was puffery); In re Am. Bus. Finan., 2007 WL 819371 at *8 (finding that statement describing a "strong credit culture" was puffery).  Accordingly, the Court finds these statements inactionable.[17]

### iii.    Statements regarding risk assets and loan loss reserves

Plaintiff alleges that the Exchange Act Defendants "schemed" to materially understate loan loss reserves and to understate and conceal the magnitude of the company's risk assets by using their eight point internal risk rating system.  (Doc. No. 40 ¶ 244.)  Specifically, Plaintiff alleges that the Orrstown Exchange Act Defendants misled investors with Orrstown's quarterly report 1Q2010, which included a $21 million increase in risk assets and a $1.4 million increase in loan loss reserves from the prior quarter.  (Id. ¶ 244.)  Plaintiff further asserts that Defendant Quinn commented misleadingly on the quarterly performance by stating, "Our core fundamentals remain solid and we were pleased with our first quarter results given the challenging economic conditions."  (Id.)  Plaintiff contends that these statements "were false and misled the investing [public] because they concealed and understated the true magnitude of Orrstown's Risk Assets and loan losses which had nothing to do with 'challenging economic conditions,' but the systemic failure and manipulation of the Company's credit review and loan approval processes."  (Id. ¶ 245.)  Plaintiff further argues that because the Exchange Act

---

[17] Further, the Court notes that Plaintiff's claim ignores both Defendant Zullinger's cautionary statement that the contents of the May 2010 meeting were "what your board of directors believes," (see Doc. No. 60-8 at 8), and the Cautionary Statement Regarding Forward Looking Statements that Defendants disseminated to meeting attendees orally and in writing. (Id. at 7-8.)  Accordingly, the Court finds further support for its finding of immateriality in the context of cautionary statements Plaintiff omitted from its allegations.

Defendants could not "keep the additional $21 million of Risk Assets on Orrstown's books for long," Defendants "formulated and implemented a scheme to defraud investors about the health and financial conditions of Orrstown and to conceal and materially lower the Company's Risk Assets" by adopting the eight point internal risk rating system, which allowed Defendants to conceal and mislead investors regarding the magnitude of impaired loans.  (Id. ¶¶ 246-47.)

The Court finds that Plaintiff's claim based on the 1Q2010 report fails.  The 1Q2010 report clearly states that "[l]oans are designated as impaired when, in the judgment of management based on current information and events, it is probable that all amounts due according to the contractual terms of the loan agreement will not be collected."  (Doc. No. 60-16 at 25; see also Doc. No. 60 at 60.)  Thus, simply because the report disclosed a $21 million increase in risk assets but only a $1.4 million increase in loan loss reserves does not indicate that the loan loss reserves were inadequate or that Defendants had issued misleading statements, because a $21 million increase in risk assets does not automatically equate to $21 million in impaired loans. (See Doc. No. 60-16 at 25.) Rather, "[t]he amount of the allowance [for loan losses]," i.e., $1.4 million, "is based on management's evaluation of the collectability of the loan portfolio, including the nature of the loan portfolio, credit concentrations, trends in historical loss experience, specific impaired loans, and economic conditions."  (Id. at 35.)  Therefore, "[t]he allowance [for loan losses] is an amount that management believes will be adequate to absorb possible losses on existing loans that may become uncollectible." (Id. at 35.) The document also contained additional cautionary language indicating that it was based on "estimates and assumptions," that "results could differ materially," and that "the allowance for losses on loans" are "susceptible to significant change."  (Id.)  Reading all of these statements in context with

those challenged by Plaintiff, the Court finds Plaintiff has failed to allege that the 1Q2010 report

contained a material misrepresentation or omission by Defendants.  Defendants included

explanatory information that notified investors that the loan loss allowance is based on

management's judgment, and subject to change.  (See Doc. No. 60-16 at 35, 41.)  Accordingly,

the Court finds that Plaintiff fails to plead facts supporting a reasonable inference as to the

material falsity of Defendants' statements in the 1Q2010 report pertaining to risk assets and loan

loss reserves.

　　　　Further, although Plaintiff alleges that Defendants "schemed" to "conceal" information,

Plaintiff's allegation fails to meet the scienter requirement for claims under the Exchange Act.

Rather than pleading with specificity the Orrstown Exchange Act Defendants' state of mind,

Plaintiff conclusorily asserts that the eight point internal risk rating system was implemented to

mislead investors and conceal the truth.  (Id. ¶ 247.)  However, the Court finds that Plaintiff's

conclusory assertion that the eight point system was implemented for nefarious purposes to be

insufficient for pleading scienter under the PSLRA.  Pursuant to Section 78u-4(b)(2)'s

"exacting" standard for scienter, any private securities complaint alleging that a Defendant made

a false or misleading statement must "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind."  Tellabs, 551 U.S. at 313

(citation omitted).  To qualify as "strong," an inference of scienter must be "more than merely

plausible or reasonable – it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent."  Id.  Here, Plaintiff offers nothing more than the conclusory assertion

that the eight point internal risk rating system was intended to mislead the investing public.

However, Plaintiff has not pled facts creating a "strong inference" that is "more than merely

plausible or reasonable" that Defendants acted with the requisite state of mind. Id.; see also Doc. No. 40 ¶ 247.  Accordingly, the Court finds that Plaintiff's complaint fails to meet both the first and second prongs of the Exchange Act pleading standard with regard to statements contained in the 1Q2010 report, and therefore, those statements are inactionable.

**iv.**     **Statements from the second quarter 2010 through first quarter 2011**

Plaintiff next asserts that the Orrstown Exchange Act Defendants made a series of false and misleading statements from the second quarter 2010 through first quarter 2011.  (Doc. No. 40 ¶ 249.)  The Orrstown Exchange Act Defendants argue that Plaintiff "fails to plead cogent and compelling facts sufficient to infer that the statements were false."  (Doc. No. 60 at 62.) Because Plaintiff offers the same arguments in support of its assertion that the second quarter 2010 through first quarter 2011 statements were materially false and/or misleading when made or omitted to state material facts necessary to make the statements made not misleading, the Court will address the statements together.

The statements are as follows:

On July 22, 2010, the Company told investors that it had "significantly reduc[ed] nonperforming assets" and had a "solid core earnings position," (Doc. No. 40 ¶ 249);

on November 5, 2010, the Company told investors that the "Company continues to be diligent in its handling of nonperforming and other risk assets" and is working to "reduce the level of risk assets," (id. ¶ 250);

in November 2010 Defendant Quinn stated there are "compelling investment considerations" when investing in Orrstown, due to its "emphasis on credit quality, return to shareholders, solid financial performance, and delivering peer-group results," (id. ¶ 251);

in January 2011 Defendant Quinn stated that "we bolstered our services, added meaningfully to capital and were intensively focused on asset quality, which we believe remains quite solid" (id. ¶ 252);

78

in February and March 2011 Defendant Quinn "highlighted" Orrstown's "deep and experienced management team," "emphasis on credit quality," and "emphasis on growing mortgages," (id. ¶ 253), and the Orrstown Exchange Act Defendants stated that the Company had "excellent return rations," had "reduced" risk assets while "growing" both its assets and deposits, and the Bank continued to place an "emphasis on credit quality, return to shareholders, solid financial performance, and delivering peer-group leading results," (id. ¶ 253);

on February 10, 2011 Defendant Quinn stated "Over the past several years our Company has seen remarkable results and experienced significant growth.  We recently announced the highest earnings ever in the history of the organization and also reported that we surpassed the $1.5 billion asset mark for the year ending December 31, 2010," (id. ¶ 254);

Orrstown's Form 10-K for the year ended December 31, 2010, stated: "The quality of the Company's asset structure continues to be strong.  A substantial amount of time is devoted by management to overseeing the investment of funds in loans and securities and the formulation of policies directed toward the profitability and minimization of risks associated with such investments," (id. ¶ 255(a));

"[the] Company follows conservative lending practices and continues to carry a high quality loan portfolio with no unusual concentrations of credit," (id. ¶ 255(b));

"Credit risk is mitigated through conservative underwriting standards, on-going risk credit review, and monitoring asset quality measures," (id. ¶ 255©);

"The company continues to be diligent in its handling of nonperforming and other risk assets," (id. ¶ 255(d)); and

"The bank has a loan review policy and program which is designed to reduce and control risk to the lending function," (id. ¶ 255(e)).

Plaintiff argues that these statements were "materially false and/or misleading when made or omitted to state material facts necessary to make the statements made not misleading because throughout 2010 the Bank's Loan Committee continued to extend risky large commercial loans to certain borrowers . . . even though, according to CW #3 the loans did not satisfy the Loan Policy's credit requirements."  (Id. ¶ 256.)  Plaintiff asserts that the Orrstown Exchange Act Defendants' pattern of lending, particularly to the Chambersburg Developers, "did

not constitute 'conservative lending,' and represented an 'unusual concentration[ ] of credit' in one group of borrowers."  (Id.)

Further, Plaintiff contends that the statements were materially untrue or misleading when made or omitted to state material facts necessary to make the statements made not misleading "because they failed to disclose that the eight point internal risk rating system enabled the Company to gradually move troubled loans across this rating system to forestall classifying them as Risk Assets [in order] to make the declining credit quality of the Bank's commercial loan portfolio," even though "the loans did not satisfy the credit requirements of the Loan Policy." (Id. ¶ 257.)  Plaintiff alleges that Confidential Witnesses #1, #2, and #3 "confirmed' that the Bank restructured larger, troubled loan relationships "as part of its effort to obfuscate the true level of Risk Assets and needed provisions for loan loss reserves."  (Id.)  Plaintiff argues that the new internal rating system led to an artificial decline in risk assets and understatement of loan loss reserves to the public, and the Orrstown Exchange Act Defendants "knew that at the precise time they were touting the Company's financial health and credit practices . . . the Bank's primary regulators . . . were poised to formally launch [a] Joint Investigation into the Company's banking practices."  (Id. ¶ 259.)  Thus, Plaintiff concludes, "the foregoing false statements, misrepresentations and hollow assurances caused Orrstown to trade at artificially inflated prices."  (Id.)

First, the Court finds that many of the statements are inactionable as expressions of belief or opinion.  Defendant Quinn's statements in November 2010 that Orrstown "intensively focused on asset quality, which we believe remains quite solid," is the type of vague, optimistic assertion, couched in terms of belief, that courts have found inactionable.  See In re Aetna, 617 F.3d at 283.

80

The Court also finds Defendant Quinn's statements that Orrstown had a "deep and experienced management team," placed "emphasis on credit quality . . . [and] on growing mortgages," and that the Company had seen "remarkable results," are similarly vague and non-specific expressions of corporate optimism on which reasonable investors would not have relied.  See id. Additionally, the Court finds the Orrstown Exchange Act Defendants' statement that the Company had "excellent" return ratios, and that the Bank placed an "emphasis on credit quality, return to shareholders, solid financial performance, and delivering peer-group leading results," inactionable as vague, non-specific expression of corporate optimism.  See id.

In addition, the Court finds many of the challenged statements inactionable because when placed in context with accompanying cautionary language, the statements are rendered immaterial to a reasonable investor. Further, the July 22, 2010 statement that the Company had "significantly reduc[ed] nonperforming assets" and had a "solid core earning position" was accompanied by the disclosure in SEC filings that Orrstown was, as conceded by Plaintiff, "restructuring many of [its] larger troubled loan relationships."  (See Doc. No. 40 ¶ 257.) Additionally, in Orrstown's 3Q2010 10-Q, it disclosed that the Bank was working through the process of restructuring troubled loans, including a relationship with a borrower "with an outstanding loan balance of $1,558,000," as well as a relationship wherein the Bank continued to work with a borrower to secure a lease in order to meet its debt service requirements.  (Doc. No. 60-18 at 48-49.) Orrstown further disclosed that "[m]anagement deems the total of the allocated and unallocated portions of the allowance for loan losses to be adequate to absorb any losses at this time, thereby emphasizing that the loan loss reserves were the result of management's judgment at a particular point in time.  (Id. at 46.)  The Court finds such cautionary language

which expressly indicates that the loan loss reserves were the result of management's judgment at a particular point in time, and that large troubled loans were being restructured, to render the challenged statements immaterial in context.

Additionally, Plaintiff fails to assert how the November 5, 2010 statement that the "Company continues to be diligent in its handling of nonperforming and other risk assets," and Defendant Quinn's March 2011 statement that the Company had "reduced" risk assets while "growing" both its assets and deposits, were false and misleading in light of the numerous cautionary disclosures made by Defendants.  Rather, Plaintiff again attempts to assign a nefarious motive to Defendants' use of the internal rating system and argues that it constitutes proof that the statements challenged in this Section were false and misleading.  (See Doc. No. 40 ¶ 257.)  The Court finds that this argument fails to meet the PSLRA's particularity standard, because Plaintiff fails to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Avaya, 564 F.3d at 253.  Plaintiff's allegation that the internal rating system obfuscated the Company's true position, and that the Orrstown Exchange Act Defendants knew so at the time they issued the above-challenged statements, simply fails to "state with particularity all facts on which that belief is formed," see id., and instead relies on Plaintiff's assumptions about the Orrstown Exchange Act Defendants' state of mind.[18]  Accordingly, the Court finds the challenged statements in Orrstown's Form 10-K, as

_____

[18] Plaintiff's claim regarding the internal rating system's alleged obfuscation of the Company's true position is as follows: ". . . [Defendants] failed to disclose that the eight point internal risk rating system enabled the Company to gradually move troubled loans across this rating system to forestall classifying them as Risk Assets to mask the declining credit quality of the Bank's commercial loan portfolio, many of which were approved by the Orrstown Exchange Act Defendants despite the fact that the loans did not satisfy the credit requirements of the Loan Policy."  (Doc. No. 40 ¶ 257.)  Built into this statement is Plaintiff's assumption – unsupported

well as the challenged July 22, 2010, and November 5, 2010 statements, inactionable.

Finally, the Court finds the remaining challenged statement in this Section – Defendant Quinn's statement that "We recently announced the highest earnings ever in the history of the organization and also reported that we surpassed the $1.5 billion asset mark for the year ending December 31, 2010" – is inactionable because Plaintiff does not assert facts that challenge the veracity of this statement, or allege the ways in which this statement was materially false or misleading. Accordingly, the Court finds that Plaintiff has failed to meet the PSLRA pleading standard as to this statement, and therefore, the statement is inactionable.

### v.    Statements from the second quarter 2011

Plaintiff next challenges statements made by the Orrstown Exchange Act Defendants in the second quarter of 2011 as false and misleading. (Doc. No. 40 ¶ 260.) Specifically, Plaintiff claims that despite the fact that regulators "put the Company on notice that its management and banking practices raised material concerns," Defendants "falsely portrayed the Bank throughout 2010, 2011 and into 2012 as a conservative lender, diligent in assessing loan quality and allocating loan loss reserves, thereby duping investors to purchase Orrstown stock at artificially inflated prices." (Id. ¶¶ 260-61.) Specifically, Plaintiff challenges two statements in Orrstown's Form 8-K: (1) "Generally speaking, the Company follows conservative lending practices and continues to carry a high quality loan portfolio with no unusual or undue concentrations of

---

by factual allegations – that Defendants purposefully concealed the eight point internal risk rating system and the manner in which they accomplished this; that the risk rating system in fact obfuscated the Company's true position; and that Defendants' knew that it obfuscated the true position. The Court finds that such assumptions, without supporting facts pled with particularity, fail to meet the PSLRA particularity requirement. See Avaya, 546 F.3d at 253; In re Advanta, 180 F.3d at 534.

credit," and (2) that Orrstown maintained it had "conservative underwriting standards." (Id. ¶ 262.)

The Court analyzed an almost identical statement made in the Offering Documents above in the section discussing Plaintiff's Securities Act claims.  As discussed above, the Court finds the statement inactionable in this context as well, as the characterization of lending practices as "conservative" and the loan portfolio as "high quality" can most accurately be viewed as the sort of vague statement that constitutes immaterial puffery.  See In re Aetna, 617 F.3d at 284 ("General statements about the company's dedication to 'disciplined' pricing and commitment to 'discipline and rigor' could not have meaningfully altered the total mix of information available to the investing public.  We therefore find the statements immaterial as a matter of law."); In re Advanta, 180 F.3d at 538 (the statement that Advanta's "credit card asset quality statistics continue to be better than industry averages" held to be immaterial puffery).

Moreover, as above, to the extent the statement can be considered a statement of present fact as to the loan portfolio's lack of "unusual or undue concentrations of credit," the Court finds that Plaintiff has not alleged a factual basis supporting a reasonable inference as to the material falsity or misleading nature of the statement, in light of the many facts disclosed by the Bank in the Form 8-K pertaining to the contents of its loan portfolio.  Specifically, Orrstown attached a press release to the Form 8-K dated July 28, 2011, which disclosed that Orrstown had a net loss for the quarter ended June 30, 2011 of $10.6 million, with an income of only $3.9 million, garnering a total loss of $6.8 million compared to a net income of $7.3 million in 2010.  (Doc. No. 60-20 at 16.) Plaintiff also ignores the cautionary language in Form 10-Q 2Q2011, which provides detailed statements regarding loan losses and reserves.  (See, e.g., Doc. No. 60-21 at

18-19, 26-27.)   Accordingly, because Orrstown disclosed specific facts concerning the status of

its loan portfolio, and in addition, because the challenged language constitutes puffery, the Court

finds that Pliantiff has failed to allege facts supporting a reasonable inference as to the material

falsity or misleading nature of the statements under the PSLRA, and thus, they are inactionable.

### vi.      Statements from the third quarter 2011 through end of class period

Plaintiff alleges that the Orrstown Exchange Act Defendants made false and misleading

statements from the third quarter 2011 through the end of the class period that "slowly reveal[ed]

the truth."  (Doc. No. 40 ¶ 266.)  Specifically, Plaintiff alleges that after the Federal Reserve

Bank Board denied approval to Orrstown to issue a cash dividend for the third quarter of 2011,

Defendant Quinn issued a false and misleading statement by stating in the Form 8-K filed on

October 27, 2011 that the Company remained "safe and sound."  (Id. ¶¶ 267-68.)  Plaintiff

argues that the statement was materially untrue or misleading when made because the Bank was

not "safe and sound," as evidenced by the Federal Reserve Bank Board's preventing Orrstown

from declaring a dividend.  (Id. ¶ 269.)  Plaintiff further argues that it was not "safe and sound"

because "the Bank's internal controls had failed, the loan portfolio was not of high quality, and

the Exchange Act Defendants had deceptively implemented the eight point internal risk rating

system to conceal the true level of Risk Assets and needed loan loss reserves, and the Company

was under investigation by the Regulators for failing to, inter alia, maintain effective controls."

(Id.)

Again, the Court finds that Plaintiff has crucially omitted accompanying cautionary

language.  The letter in which Defendant Quinn used the phrase "safe and sound," also contained

the following statements: (1) "Our market has not been immune to the effects of the slowing

economy and decline in real estate values.  The second quarter marked the beginning of a

challenging time for Orrstown Bank and we continue to weather the ripple effects of some credit

quality issues, which resulted in the reporting of our first-ever quarterly earnings loss in the

second quarter of 2011"; (2) "[w]e are very disappointed to join the ranks of the many other

community banking organizations, both locally and across the nation, that have cut or suspended

their dividends but the Board of Directors had no other realistic choice in this matter.  There can

be no assurances as to whether, or in what amounts, cash dividends will be declared in the future

or, if declared, whether they will continue, be suspended, or discontinued."  (Doc. No. 60-22 at

5.) The Court finds that such detailed cautionary language easily renders the phrase "safe and

sound" immaterial to a reasonable investor.  See In re Trump, 7 F.3d at 369.  Accordingly, the

Court finds that Plaintiff has not pled facts supporting a reasonable inference as to the material

falsity of this statement, and therefore, the statement is inactionable.

Plaintiff also challenges a statement by Defendant Quinn in conjunction with Orrstown's

released Fourth Quarter Operating Results.  (Doc. No. 40 ¶ 271.)  As Plaintiff asserts,

Orrstown's Form 8-K for the Fourth Quarter 2011 "included a quarterly net income loss and one-

time non-cash goodwill impairment charge off of $19.4 million, as well as the continued

suspension of the payment of the dividend."  (Id.)  Defendant Quinn stated: "Our Credit

Administration department, processes, and procedures have been greatly enhanced since mid-

2011 and the Special Asset Group is actively engaged in the identification and work-out of

problem credits in the manner most favorable to the Company.  The re-engineering of our credit

processes and procedures have made us a stronger bank that is well-positioned for the future

when conditions rebound."  (Id.)  Plaintiff argues that this statement was materially untrue or

misleading when made or omitted to state material facts necessary to make the statement made

not misleading because "Defendant Quinn knew that the Company had a material weakness with

respect to its internal credit controls." (Id. ¶ 272.) Plaintiff contends that based on the "non-

public Joint Investigation," the Orrstown Exchange Act Defendants knew the Bank engaged in

"unsafe and unsound banking practices," such that the changes the Bank made in 2011 did not

render the Bank "stronger" or "well-positioned for the future." (Id.) Further, Plaintiff alleges

that the Orrstown Exchange Act Defendants knew that "the Bank's commercial loan portfolio

was not of high quality but rather consisted of a large number of troubled loans." (Id.)

Once again, the Court finds that Plaintiff has taken Defendant Quinn's statement out of

context, and consequently has not pled facts supporting a reasonable inference as to the material

falsity of the statement. Plaintiff omits both the first and last sentences of the press release, and

thus alters its meaning by removing it from its full context. The first sentence reads: "As

reported previously, we are taking vigorous steps to address the asset quality issues and return

the Company to consistent profitability." (Doc. No. 60-23 at 5.) The final sentence reads:

"Based upon the quarter's performance, regulatory guidance and to help insure contained capital

strength no dividend will be declared at this time." (Id.) Further, the January 26, 2012 Press

Release contained a discussion of Orrstown's loan loss provision, including its increase from

$8.9 million to $44.9 million by the year ended December 31, 2011. (Id. at 7.) Thus, the court

finds that when placed in context, Plaintiff fails to plead facts supporting a reasonable inference

as to the material falsity of this statement.[19] Accordingly, the Court finds the statement

_____

[19] The Court notes that Plaintiff also argues that a statement from Orrstown's Form 8-K
filed March 12, 2012, which restated the earnings for fiscal year ending December 31, 2011,
further establishes the misleading nature of Defendant Quinn's January 26, 2012 statement. (See

inactionable.

Plaintiff also argues that statements in Orrstown's 2011 Annual Report, 10-K, filed on March 15, 2012, rendered the Orrstown Exchange Act Defendants' financial reporting for 2011 and 2010 materially misleading.  (Doc. No. 40 ¶ 275.)  Specifically, Plaintiff points to Orrstown's admission that it "did not maintain effective internal control over the process to prepare and report information related to loan ratings and its impact on the allowance of loan losses" as evidence that Orrstown's 2011 and 2010 reports were misleading.  (Id. ¶ 175.) However, although the statement Plaintiff points to clearly contains Orrstown's admission to ineffective internal control in 2011, Plaintiff fails to allege that the Orrstown Exchange Act Defendants knew the internal controls were ineffective as the time of the 2011 and 2010 reports, and thus that they knowingly issued misleading statements therein.  (See id.)  Accordingly, the Court finds that these allegations are improperly based on hindsight, and therefore are inactionable.  See In re NAHC, Inc. Sec. Litig., 306 F.3d at 1330.

Next, Plaintiff argues that the following statement made in the 2011 Annual Report was materially untrue or misleading when made or omitted to state material facts necessary to make the statements made not misleading:

> [T]he Company has experienced a steady increase in risk assets from 2007-2011,
> which coincides with the downturn in the state and local economies, and softness
> in the real estate market.  The largest increase in risk elements was nonaccrual
> loans, which totaled $83,697,000 at December 31, 2011 compared to $13,896,000

---

Doc. No. 40 ¶ 274.)  However, the March 12, 2012 statement clearly states that its release "was prompted by events that arose subsequent to the original earnings release on January 26, 2012 that resulted in additional asset impairments."  (Id.)  Because a plaintiff cannot plead falsity on the basis of hindsight, the Court finds that Plaintiff's reliance on the March 12, 2012 statement, which clearly specifies that it was prompted by subsequent events, unavailing.  See In re NAHC, Inc., 306 F.3d at 1330.

at December 31, 2010, an increase of $69,801,000. All loan segments experienced increases in nonaccrual loans from year end December 31, 2010 to 2011, with commercial acquisition and development and non-owned occupied segments experiencing the greatest dollar and percentage increases, reflective of softness in the real estate market and corresponding decline in collateral values.

(Doc. No. 40 ¶ 276.) Plaintiff alleges this statement was misleading because it attempts to blame the increase in risk assets on the economy, rather than Orrstown's internal loan review and approval process. (Id. ¶ 177.) In support, Plaintiff includes a "Troubled Asset Ratio" chart that shows that Orrstown's troubled or impaired loans "spiked" when the Regulators conducted their Joint Investigation, rather than in line with general economic trends. (Id.)

The Court finds that Plaintiff has not pled facts supporting a reasonable inference as to the material falsity or misleading nature of this statement. The 2011 Annual Report provides specifics regarding the Bank's troubled lending relationships, and does not merely rely on the catch-all of "downturn in the state and local economies," which Plaintiff argues is misleading. (See Doc. No. 55-25 at 54-55 (detailing five troubled lending relationships and Orrstown's response thereto).) Additionally, the 2011 Annual Report contains standard risk elements relating to Orrstown's loan portfolio, particularly in its geographic market. (Id. at 51.) The Court finds that when placed in the context of the entire 2011 Annual Report, the Orrstown Exchange Act Defendants' statement relating to the local and state economy is immaterial, and therefore not misleading. Accordingly, the Court finds this statement inactionable.

Finally, Plaintiff alleges that Orrstown's statements via proxy materials mailed on or around March 30, 2012, indicated that the Orrstown Exchange Act Defendants' previous statements were false and misleading. (Doc. No. 40 ¶ 280.) Specifically, Plaintiff points to Defendant Quinn's admission that the Bank faced "significant challenges in 2011" requiring

Orrstown to "heed[] the advice and guidance of the governmental agencies that regulate" the

Bank, and that it had "begun the process of stress testing many aspects of the organization."

(Id.)

Again, the Court finds that these statements do not render previous statements actionable,

because Plaintiff attempts to plead fraud by hindsight.  See In re NAHC, Inc., 306 F.3d at 1330.

Rather than meeting the PSLRA's particularity standard, Plaintiff conclusorily asserts that "the

truth was known by the Exchange Act Defendants but concealed from the investing public

during the class period . . . ." (Id. ¶ 282.)  Pursuant to Section 78u-4(b)(2)'s "exacting" standard

for scienter, any private securities complaint alleging that a defendant made a false or misleading

statement must "state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind."  Tellabs, 551 U.S. at 313.  To qualify as a "strong

inference," an inference of scienter must be "more than merely plausible or reasonable – it must

be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Id.

Plaintiff repeatedly couches its allegations in terms of what the Orrstown Exchange Act

Defendants "knew," but these allegations do not meet the PSLRA pleading standard for scienter,

which requires alleged "facts to show that the defendants had the motive and opportunity to

commit fraud," or "facts that constitute strong circumstantial evidence of conscious misbehavior

or recklessness."  In re Radian Sec. Litig., 612 F.Supp.2d 594, 607 (E.D. Pa. 2009) (citing In re

Suprema, 438 F.3d at 276).  Instead, Plaintiff's allegations stem from its assertion that "as early

as December 2009, the Exchange Act Defendants knew from the information gather[sic] but

ignored by the structurally biased Internal Review that" many of their previous disclosures and

statements were false and misleading.  (Doc. No. 40 ¶ 282(b).)  Plaintiff also asserts that

Confidential Witnesses #1, #2, and #3 and the Regulators "confirmed" that the Orrstown

Exchange Act Defendants "knew that Orrstown was not and had not been 'conservatively'

extending loans using 'stringent underwriting standards' with proper internal oversight and the

balance sheet was not 'strong' because of the dramatically increasing levels of and related costs

for the Risk Assets and the needed increases of provisions for loan loss reserves." (Id. ¶ 283.)

Although Plaintiff provides specific allegations regarding <u>what</u> it believes the Exchange Act

Defendants actually knew, Plaintiff fails to plead specific facts raising a strong inference as to

<u>how</u> Defendants knew their prior statements were misleading, beyond the conclusory assertion

that "information [was gathered] but ignored by the structurally biased Internal Review," and

information was "confirmed" by Confidential Witnesses #1, #2, and #3 and the Regulators.[20] (Id.

¶¶ 282(b), 283.)  As the Court found above, built into this argument are Plaintiff's assumptions –

unsupported by factual allegations – that Defendants purposefully concealed the eight point

internal risk rating system; that the risk rating system in fact obfuscated the Company's true

position; and the Defendants knew that it obfuscated the true position.  See Section III.C.2.a.iii.-

iv.  The Court again finds such assumptions, without supporting facts pled with particularity, fail

to meet the PSLRA's heightened pleading standard.  See Avaya, 546 F.3d at 253; In re Advanta,

180 F.3d at 534.  Thus, the Court finds that Plaintiff's allegations regarding the March 2012

proxy material fail to meet the PSLRA pleading standards, see In re Suprema, 438 F.3d at 276,

and accordingly, finds this claim inactionable.

---

[20] Additionally, the Court notes that it has already found that the Orrstown Exchange Act
Defendants' statements regarding its "conservative" loan extension, "stringent underwriting
standards," and "strong" oversight were not materially false or misleading.  See Section
III.C.2.a.ii.-v.  Accordingly, Plaintiff's argument that the Orrstown Exchange Act Defendants
knew such statements were materially false or misleading must fail.

### vii.     Financial reporting

Plaintiff alleges that Orrstown's "unaudited 1Q2010 10Q, 2Q2010 10Q, 3Q2010 10Q, 4Q 2010, 1Q 2011, 2Q 2011, 3Q 2011, 4Q 2011, 1Q 2012 and audited 2009, 2010 and 2011 10Ks were false and misleading when made and failed to disclose material facts concerning Orrstown and the Bank's financial condition, underwriting standards, loan portfolio quality, and internal controls," because they contained "[m]any of the Orrstown Exchange Act Defendants' knowingly or recklessly false and misleading statements and omissions identified above . . . ." (Doc. No. 40 ¶ 284.) Because the Court has already found that subsequent statements, such as those related to the March 2012 proxy materials, did not meet the scienter requirement, Plaintiff's argument must fail under the pleading standards of the PSLRA.  See Amgen, 133 S.Ct. at 1192.  The Court therefore finds that Plaintiff's claim based on "false and misleading financial reporting" in Orrstown's quarterly financial reports inactionable.

### b.     Count VI: Section 10(b) and Rule 10b-5, Auditor Defendant

Plaintiff and the Exchange Act class allege that Auditor Defendant SEK made, prepared, disseminated, and/or approved statements contained in reports and other documents which were false and misleading with respect to material facts, that these materially false and misleading statements proximately caused Plaintiff and the Class to purchase Orrstown's common stock at artificially inflated prices throughout the class period, and thus proximately caused Plaintiff and the Class to suffer damages.  (Doc. No. 40 ¶ 339.)  Plaintiff and the Class allege that this conduct constituted a manipulative or deceptive device in violation of Section 10(b), and prohibited by Rule 10b-5. (Id. ¶ 340.)

The standard for stating a claim against an auditor-defendant under Section 10(b) or Rule

10b-5 is the same as that applied to the Orrstown Exchange Act Defendants.  A plaintiff must

plead that an auditor defendant: "(1) made a misstatement or omission of a material fact (2) with

scienter (3) in connection with the purchase or the sale of a security (4) upon which the Plaintiff

reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her

injury." In re Ikon Office Solns., Inc., 277 F.3d 658, 666 (3d Cir. 2002).   To establish fraud

under Section 10(b) against an auditor defendant, a plaintiff "must establish a more exacting

threshold of scienter – 'a mental state embracing intent to deceive, manipulate, or defraud.'" Id.

(quoting Ernst & Ernst, 425 U.S. at 193 n. 12).  "Simple computation errors or slight accounting

mistakes will not suffice to establish scienter."  Id.  Rather, "[t]he plaintiff must prove that . . .

the accounting judgments which were made were such that no reasonable accountant would have

made the same decisions if confronted with the same facts."  In re Ikon, 277 F.3d at 669 (internal

citations omitted).

Plaintiff alleges that Defendant SEK's audit opinions in the 2009, 2010, and 2011 Annual

Report were false and misleading because accepting Defendant SEK's assertion that it conducted

each audit in accordance with PCAOB standards, which requires "professional skepticism," and

that the auditor "review and test the process used by management to develop the estimate,"

develop an "independent expectation of the estimate . . . review subsequent events . . . [and]

"delve deep into the recent and historic credit data for each of the Bank's loan relationships and

integrate all relevant information coming from the Bank and Regulators to thoroughly test

management's estimates," "it is implausible that [Defendant SEK] did not have actual

knowledge that Orrstown and the Bank's financial statements contained material

understatements with respect to the classification of impaired loans and allocation of loan loss

reserves . . . ." (Doc. No. 40 ¶¶ 295-309.)  Regarding Defendant SEK's 2011 audit, Plaintiff also points to the fact that Defendant SEK's "own audit revealed a material weakness in the financial reporting controls related to the Company's process for preparing and reporting loan ratings and loan losses allocations which undercuts the veracity of the Company's financial statements." (Id. ¶ 308.)  Defendant SEK argues that Plaintiff's claims must fail because it has failed to assert either a material misstatement of fact or the requisite scienter. (Doc. No. 57 at 25.)

The Court finds that Plaintiff has failed to state a claim under Section 10(b) and Rule 10b-5 against Defendant SEK.  Specifically, the Court finds that Plaintiff fails to allege material misrepresentations in Defendant SEK's 2009, 2010, and 2011 audits, and further fails to plead the requisite scienter.  Plaintiff's allegations against Defendant SEK are no more than conclusory assertions that Defendant SEK violated accounting principles – not that Defendant SEK intentionally issued false and misleading statements.  (See Doc. No. 40 ¶ 331) (arguing that Defendant SEK "falsely represented that it had audited Orrstown and the Bank's financials in accordance with PCAOB, when in fact its audits had not complied with PCAOB" and "falsely certified Orrstown and the Bank's financial statements for the years 2009, 2010, and 2011 as having been in accordance with GAAP without any material weaknesses, when it knew or recklessly failed to know that these reports contained statements that were materially false and misleading.") Thus, the Court finds that Plaintiff has failed to plead with particularity "a material misrepresentation or omission by the defendant."  Amgen, 133 S.Ct. at 1192.

Further, the Court finds that Plaintiff's arguments that Defendant SEK failed to independently assess Orrstown's internal controls, violated GAAP, and did not exercise "professional skepticism" insufficient to state a claim under Section 10(b) or Rule 10b-5.

Although Plaintiff asserts that Defendant SEK intentionally or recklessly disregarded "glaring irregularities, [held] out to the public and the SEC that it had conducted the audits in accordance with PCAOB, and certif[ied] the Company's financial statements as prepared in accordance with GAAP without material weaknesses," (see Doc. No. 40 ¶ 334), the Third Circuit rejected similar arguments by a plaintiff asserting Section 10(b) and Rule 10b-5 liability against an auditor in In re Ikon Office Solutions, Inc. See 277 F.3d at 667-68. Specifically, the Third Circuit found allegations that the auditor "failed to investigate sufficiently evidence of fraud by [the defendant] or take into account other conspicuous risk factors or 'red flags'" and "impermissibly relied on [the defendant's] internal controls in preparing its audit calculations," in violation of GAA[P], were insufficient "to draw a reasonable inference that [the auditor] recklessly or knowingly issued a materially false and misleading audit opinion . . . ." Id. The Court finds that Plaintiff likewise fails to allege facts allowing a reasonable inference that Defendant SEK "recklessly or knowingly issued a materially false and misleading audit opinion," or that "the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." Id. at 667-69. Accordingly, the Court finds that Plaintiff has failed to state a claim under Section 10(b) or Rule 10b-5 against Defendant SEK, and will therefore dismiss the claim.

### c. Count VII: Section 20(a), Orrstown Exchange Act Defendants Quinn, Everly, and Embly

Plaintiff and the Exchange Act class allege that Defendants Quinn, Everly, and Embly acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, and that during the Class Period, they knew or were reckless in not knowing that Orrstown's financial statements contained untrue statements of material fact and/or omitted material facts required to

be stated therein to make them not misleading.  (Doc. No. 40 ¶ 343.)  Plaintiff and the Class

allege that as a direct and proximate result of Defendants Quinn, Everly, and Embly, Plaintiff

and the Class suffered damages by purchasing Orrstown stock at artificially inflated prices.

Liability under Section 20(a) requires an underlying violation of the Exchange Act.  <u>See</u>

<u>In re Suprema</u>, 438 F.3d at 285.  Because the Court has found Plaintiff fails to allege any

violations of the Exchange Act, it must find Plaintiff has failed to state a claim for control

liability under Section 20(a).  Accordingly, the Court will dismiss this claim.

## IV.     CONCLUSION

The Court finds that Plaintiff has failed to state a claim under either the Securities Act or

the Exchange Act in its amended complaint.  Accordingly, Plaintiff's claims against all

Defendants will be dismissed without prejudice.  Within thirty (30) days Plaintiff shall file a

motion to amend the amended complaint, accompanied by the proposed amendment in the form

dictated by Local Rule 15.1, or a notice of intention to stand on the amended complaint. An

order consistent with this memorandum follows.