**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles, Pa. Id. No. 17928
Kimberly Donaldson Smith, Pa. Id. No. 84116
Benjamin F. Johns, Pa. Id. No. 201373
Christina Donato Saler, Pa. Id. No. 92017
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Phone (610) 642-8500
Fax (610) 649-3633

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ORRSTOWN FINANCIAL SERVICES, INC., ORRSTOWN BANK, ANTHONY F. CEDDIA, JEFFREY W. COY, MARK K. KELLER, ANDREA PUGH, THOMAS R. QUINN, JR., GREGORY A. ROSENBERRY, KENNETH R. SHOEMAKER, GLENN W. SNOKE, JOHN S. WARD, BRADLEY S. EVERLY, JOEL R. ZULLINGER, JEFFREY W. EMBLY, SMITH ELLIOTT KEARNS & COMPANY, LLC, SANDLER O'NEILL & PARTNERS L.P., and JANNEY MONTGOMERY SCOTT LLC, <br><br> Defendants. <br> _____ | Civil Action No. 1:12-cv-00993 <br><br><br> **PLAINTIFF SEPTA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR LEAVE TO AMEND** <br><br> **ECF** |

# <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT ........................................................................1

II.    PROCEDURAL HISTORY ............................................................................2

III.   STATEMENT OF FACTS .............................................................................2

IV.  STATEMENT OF QUESTION INVOLVED...................................................9

V.    ARGUMENT..................................................................................................9

        A.    Defendants Will Not Be Prejudiced By the Amendment ...........9

        B.    Amendment Is Not Futile........................................................10

               *1.*    *Securities Act and Exchange Act Claims*........................10

               *2.*    *Materiality* ....................................................................11

               *3.*    *Falsity and Scienter* ......................................................13

VI.  CONCLUSION............................................................................................22

# TABLE OF AUTHORITIES

## CASES

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...............................................................21

*Basic v Levinson*,
   485 U.S. 224 (1988)..........................................................................................12

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011) ...................................................12, 20, 21

*Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ..............................................................................10

*Dobina v. Weatherford Int'l Ltd., et al.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012) ..............................................12, 18, 19, 20

*In re Genworth Fin. Inc. Sec. Litig.*,
   2015 U.S. Dist. LEXIS 57600 (E.D. Va. May 1, 2015) ........................12, 16, 17

*Indianapolis Life Ins. Co. v. Hentz*,
   2009 U.S. Dist. LEXIS 618 (M.D. Pa. Jan. 6, 2009).........................................10

*Redhead v. United States*,
   686 F.2d 178 (3d Cir. 1982) ................................................................................9

*Steffy v. Home Depot, Inc.*,
   2009 U.S. Dist. LEXIS 49631 (M.D. Pa. June 12, 2009)....................................9

*Thorpe v. Walter Inv. Mgmt., Corp.*,
   2015 U.S. Dist. LEXIS 84406 (S.D. Fla. June 30, 2015)...................................18

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)..........................................................................................12

*In re Vivendi Universal*,
   2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. Apr. 21, 2014) ...................................21

*Washtenaw Cnty. Emp. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93, 114-15 (D. Mass. 2014) ......................................................21

*Wenneker Distilleries v. Olifant USA, Inc.*,
    2011 U.S. Dist. LEXIS 131550 (M.D. Pa. Nov. 15, 2011) ..................................9

*Werner v. Werner*,
    267 F.3d 288 (3d Cir. 2001) ................................................................................10

## **OTHER AUTHORITIES**

Fed. R. Civ. P. 10b-5 .....................................................................................2, 10, 11

Fed. R. Civ. P. 12(b)(6) ........................................................................................10

Fed. R. Civ. P. 15(a) ...............................................................................................1

L.R. 15.1 ...................................................................................................................1

Pursuant to Fed. R. Civ. P. 15(a), L.R. 15.1, and the Court's June 22, 2015 Opinion and Order on Defendants' Motions to Dismiss (Dkt. Nos. 92-93, "Opinion"), Plaintiff submits this memorandum in support of its Motion for Leave to file its Second Amended Complaint ("SAC" or "¶_"), Ex. A to Plaintiff's Motion).[1]

## I.   **PRELIMINARY STATEMENT.**

With substantially revised and focused allegations, the SAC addresses the June 22, 2015 Opinion which primarily questioned: the materiality/falsity of the challenged misstatements; the temporal nexus between the alleged wrongdoing and Defendants' misstatements; and, relatedly, scienter.

The SAC and Plaintiff's claims are a targeted challenge of Defendants' false and misleading statements about Orrstown's utterly deficient, ineffective and failed internal controls. The SAC's claims are not based on any misstatement that the Opinion viewed as corporate puffery, vague, opinion, forward looking, or lacking in falsity. Internal controls are the most fundamental bulwarks of a bank; serious deficiencies in internal controls lead to bank failures. Accurate disclosures about a bank's internal controls are mandatory under federal securities laws.

In addition, the SAC alleges new information derived from the recent investigation into Orrstown and it internal controls by the Securities and Exchange

---

[1]      Capitalized terms have the same meanings set forth in the SAC.

Commission (the "SEC"), the Enforcement Actions by the Regulators, and former Orrstown employees ("CWs"). The SAC is not based on hindsight; it particularly pleads Orrstown's lack of effective internal controls from late 2009 through 2012, and does so using the Enforcement Actions and CWs. The SAC's allegations bolster prior allegations, and satisfy the applicable pleading standards and the elements of the securities claims. Thus, leave to file the SAC is not futile and should be granted.

## II.   <u>PROCEDURAL HISTORY</u>.

On May 22, 2012, Plaintiff filed its shareholder class action complaint asserting claims under Sections 11, 12(a) and 15 of the Securities Act of 1933 and under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5. The Amended Class Action Complaint was filed on March 4, 2013 (Dkt. No. 40), and Defendants moved to dismiss it on May 28, 2013. Following briefing and oral argument, on June 22, 2015, the Court issued its Opinion on Defendants' motions.

## III.   <u>STATEMENT OF FACTS</u>.[2]

In March 2010, Orrstown raised nearly $40 million from public investors in a secondary offering of 1.4 million shares of common stock sold for $27 per share. ¶¶ 1, 190.  By April 5, 2012, with the Company having made market-shattering

---

[2]    Due to page and word constraints, Plaintiff refers to the SAC for a full recitation of the pertinent facts and allegations, summarized herein.

disclosures about the utterly ineffective, materially weak and deficient internal controls, the stock price had declined 70% and closed at $8.20 per share (¶¶2-9, 11-14, 16).

All financial institutions are legally required to develop and implement an internal controls system.  The Office of the Comptroller of the Currency ("OCC") attributes weak internal controls to causing, among other things, inaccurate records, audits, and loan reviews, and having contributed to operational loss and failures of banks.  The OCC has stated that "effective internal controls form the foundation for a bank's system of risk management", and help to safeguard assets, prevent fraud and financial mismanagement, and ensure legal compliance as well as compliance with the bank's own policies.  Internal controls and the Bank's representations about its internal controls are material to investors (¶¶ 85-90).

The Enforcement Actions (Exhibits A and B to the SAC) were the culmination of the Regulators' on-site examination of Orrstown that began in late 2010, just months after the Offering, and became a formal investigation in May 2011 (¶ 92). The Joint Examination scrutinized every aspect of Orrstown's internal controls over operations, reliability of financial reporting, and compliance with applicable banking laws and regulations.  The Regulators identified approximately 11 areas of the Bank's internal controls (¶¶ 93-96), which controls were in

existence in 2010 and had been unchanged for years (¶95), and that required complete remediation and corrective action (¶¶6-9).

That federal and state regulators would undertake a formal joint examination of a community bank is highly unusual; that the examination would spawn a Consent Order issued by the Pennsylvania regulator is extraordinary; and, that both regulators would place the Bank under supervision for years after the Joint Examination commenced is virtually without precedent (¶ 15).  Orrstown was a very "sick" bank because it either had <u>no</u> internal controls in certain operations or highly deficient controls.  The Written Agreement and Consent Order yield the stark reality that <u>every</u> one of the Bank's internal controls required "improvement", "enhancement", "strengthening", "revisions", and "adherence to policies" governing every aspect of the Bank's operations (¶ 6). And, in respect to areas where internal controls simply did not exist, the Regulators demanded the Bank to "develop and submit" such controls.  (*See*, Consent Order, ¶ 7(a) with respect to absence of commercial real estate loan concentration plan; ¶ 6; and requirement of the Board of Directors to retain an independent consultant to "aid" in development of a suitable management structure that is adequately staffed by qualified and trained personnel."  Written Agreement, ¶3(a);  ¶ 6).

Perhaps most telling, the Regulators ordered the Bank to stop violating "laws or regulations" under which it operated.  The Consent Order at ¶ 14

commands the "Bank…to eliminate, correct and prevent unsafe and unsound banking practices, violations of law or regulations, and all contraventions of regulatory policies or guidelines cited in the Report of Examinations." (¶ 9). In sum, the Bank was a vessel that was rudderless and leaking.

Did those dire undisclosed conditions just emerge when the Regulators began their investigation in late 2010? Of course not. Even without more, the only reasonable inference that can be drawn from the Enforcement Actions is that the absence or failure of internal controls existed for years, and most certainly, mere months before the Regulators' attention was drawn. That reasonable and compelling inference alone would support, at this pleading stage, the granting of this Motion and the denial of the obligatory motion to dismiss.

The proposed SAC, however, does much more than rely on reasonable inferences. Each internal control deficiency or failure is corroborated as having existed throughout 2009 to 2012 by the Confidential Witnesses (¶¶ 62-73), including: the lack of competency of lending officers (¶¶ 107-128); senior management's ignoring credit analysts' recommendations to deny extensions of credit or restructurings of loans (¶ 102); the failure to maintain current loan documentation (including appraisals) (¶ 112); the modification of existing loans in order to avoid classification of such loans as criticized or in default (¶ 146); the failure to stress test or undertake any meaningful risk management measures with

5

respect to criticized loans (¶ 143); the failure to timely identify adequate loan loss reserve (¶242); the failure to follow regulatory guidance and regulations (¶150); and the failure to timely assess the financial impact of the bad loans and timely make exponential increases in loan loss reserves and write-offs (¶ 243).

Moreover, the Enforcement Actions were an indictment of wholly inadequate and structurally biased actions that Defendants had taken before and during the Class Period to create the false impression that internal controls were in place (¶¶ 130-137, regarding 2009 Internal Review and 2010 Eight Point Internal Risk Rating System).

The Enforcement Actions and the CWs' statements are further corroborated by the recent SEC formal investigation of Orrstown which focuses on the period of January 1, 2010 to the present (¶158). The SEC is investigating the issues alleged in the SAC, is interviewing key witnesses (including at least one CW), and is subpoenaing evidence concerning (¶159):

- accounting policies, procedures, and internal controls in effect at Orrstown reflecting or relating to Orrstown's loan approval, loan review, and/or credit administration policies and procedures;

- accounting treatment of any loan losses from 2005 forward;

- Orrstown's loan policy, allowance for loan losses, March 2010 offering, regulatory examinations and/or the quality of Orrstown's loan portfolio.

Also, the SAC alleges that correspondence between the Company and the SEC further corroborates Orrstown's pervasive and known internal control failures in 2010 and 2011 (¶¶ 155-160).

Notwithstanding that its internal controls were either non-existent or failed in all material respects, Defendants misled investors about Orrstown's internal controls in quarterly and annual SEC filings from March 2010 through March 2012.  For example, the quarterly reports and the SOX Certifications from March 2010 through 1st quarter 2011 uniformly stated that:

- "The Corporation's [CEO] and [CFO] have evaluated the effectiveness of the Corporation's disclosure controls and procedures …. [and] have concluded that… the Corporation's disclosure controls and procedures are effective in alerting them on a timely basis to material information relating to the Corporation …."

- "The Corporation regularly assesses the adequacy of its internal control over financial reporting and enhances its controls in response to internal control assessments and internal and external audit and regulatory recommendations. There have not been any significant changes in the Corporation's internal control over financial reporting …."

- **_SOX Certifications_**: "Based on my knowledge, the quarterly report does not contain any untrue statement of a material fact or omit to state a material fact ….The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures …. and internal control over financial reporting … and we have:
      (a) designed such disclosure controls and procedures… to ensure that material information relating to the registrant, … is made known to us…;
      (b) designed such internal control over financial reporting…to provide reasonable assurance regarding the reliability of financial reporting …"

In the second and third quarters of 2011, Defendants continued to certify the effectiveness of the internal controls, and noted no change but for the "engag[ement] [of] an independent third party loan review company to *participate in the review process*…" (2nd quarter 10-Q), and, then, notwithstanding its claim that the 3d quarter's statement was "[a]s noted in the previous quarter", stated that the Company "outsourced its loan review function to a third party …*to complete independent loan reviews and validate management's loan ratings*" (¶¶ 247-249). During this time, Defendant SEK audited Orrstown and supplied investors with an unqualified opinion that "Orrstown …maintained…effective internal control over financial reporting…" (¶¶ 263-273).

Only because they were impelled by the imminent disclosure of the Enforcement Actions, did Defendants publicly reveal and confirm the material weakness and failures of the Bank's internal controls (¶¶10, 12-13, 274):

- "the Company did not maintain effective internal control over the process to prepare and report information related to loan ratings and its impact on the allowance for loan losses."

- "This control deficiency results in a reasonable possibility that a material misstatement to the annual or interim Consolidated Financial Statements will not be prevented or detected."

- "Accordingly, management has determined that this condition constitutes a material weakness."

- "Because of this material weakness, we have concluded that the Company did not maintain effective internal control over financial reporting"

8

The Regulators' control and oversight did not end in 2012; the Bank still remains subject to a Memorandum of Understanding with the PA Department of Banking (¶ 15).

## IV.  STATEMENT OF QUESTION INVOLVED

Whether Plaintiff should be granted leave to file the Second Amended Complaint when doing so is neither futile nor would prejudice Defendants.

## V.  ARGUMENT

### A.  Defendants Will Not Be Prejudiced By the Amendment.

The question of prejudice focuses on "whether amendment 'would result in additional discovery, cost, and preparation to defend against new facts or new theories.'" *Steffy v. Home Depot, Inc.*, 2009 U.S. Dist. LEXIS 49631, *6 (M.D. Pa. June 12, 2009) (quoting *Cureton v. National Collegiate Athletic Ass'n,* 252 F.3d 267, 273 (3d Cir. 2001), 252 F.3d at 274 (affirming denial of post-judgment amendment because it would requiring parties to relitigate the case).[3]   No such hardship exists for Defendants and they are not "unfairly disadvantaged or deprived of the opportunity to present facts or evidence." *See Wenneker Distilleries v. Olifant USA, Inc.,* 2011 U.S. Dist. LEXIS 131550, *4 (M.D. Pa. Nov. 15, 2011) (granting amendment because no prejudice to defendant since at

---

[3]      *See also, Redhead v. United States*, 686 F.2d 178, 184 (3d Cir. 1982) (affirming denial of motion to amend when adding a claim would require the reopening of discovery and the plaintiffs sought to amend on the eve of trial).

the early stages of litigation and discovery had not started).  Here, discovery is

stayed and, if permitted by the Court, Defendants could move to dismiss the SAC

with the opportunity to present fully their legal challenge.

### B.   Amendment Is Not Futile.

This is the first time Plaintiff has requested leave to amend subsequent to a

Court ruling on motions to dismiss.[4] In evaluating the futility of an amended

pleading, the court applies the same standard of legal sufficiency as under Rule

12(b)(6).  *Indianapolis Life Ins. Co. v. Hentz*, 2009 U.S. Dist. LEXIS 618, *4

(M.D. Pa. Jan. 6, 2009) (citation omitted). Leave to amend in PSLRA cases may be

granted when plaintiffs, as Plaintiff has here, identify additional claims or facts that

cure any identified pleading deficiencies.  *See Cal. Pub. Emples'. Ret. Sys. v.*

*Chubb Corp.*, 394 F.3d 126, 165-66 (3d Cir. 2004); *Werner v. Werner*, 267 F.3d

288, 297 (3d Cir. 2001).  Plaintiff's Motion should, therefore, be granted.

### 1.   *Securities Act and Exchange Act Claims.*

The SAC alleges violations of Sections 11 and 10 and Rule 10b-5 through

the dissemination of SOX Certificates and SEC filings that misled investors

throughout the Class Period about the effectiveness of the Company's internal

controls.

---

[4]    Shareholder plaintiffs are often given two or three subsequent amendments
to try to cure any identified deficiencies. *See, e.g., Cal. Pub. Emples'. Ret. Sys.*, 394
F.3d at 163 (shareholder had previously filed two complaints both of which were
the subject of a dismissal motion and court order).

As set forth in the Court's Opinion (pages 21-23), Section 11 "imposes civil liability for the making of materially false statements in registration statements and prospectuses," and imposes "virtually absolute" liability that "does not require a plaintiff to allege that the defendants possess scienter…"   In addition, as the Opinion noted at 62, the legal analysis with respect to the Section 11 claims asserted against Orrstown and the Bank, does not change as applied to the Underwriter Defendants and the Individual Securities Defendants.

Section 10(b) and Rule 10b-5 make unlawful any untrue statement of a material fact or an omission of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Option at 23-24.  Unlike Section 11, 10(b) claims must meet a heightened pleading standard and plead scienter.  *Id.* at 24-25.  To plead scienter, a plaintiff must particularly plead "facts giving rise to a strong inference" that the defendant acted with "either reckless or conscious behavior."  *Id.* at 25.  The Court is to view "all of the facts alleged, taken collectively..."  *Id.* at 25-26 (*citing Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).

### 2.   *Materiality.*

The Court's Opinion addressed challenged statements that the Court deemed to be immaterial and inactionable because they constituted puffery, were vague, and protected forward-looking statements. *See* Opinion at 27-62.

In contrast, the SAC alleges securities claims based on Defendants' declaratory statements about the Company's internal controls. *See* Section III, *supra,* and ¶¶170-171, 233, 247-249. As noted, the development and implementation of a system of internal controls, which ensure effective banking operations, are legally required. Weak or non-existent internal controls, and/or failure to adhere to such controls cause inaccurate records, audits, loan reviews, disclosures and financial reporting.  Under the standards of materiality set forth in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) and *Basic v Levinson*, 485 U.S. 224, 232 (1988), there is a substantial likelihood that investors would consider the Bank's statements about its internal controls as material and to have altered the "total mix" of information available to them about the Bank. (¶¶85-90).  Courts routinely view statements and omissions concerning the effectiveness of a company's internal controls to be material and actionable under the federal securities laws.  *See, e.g., In re Genworth Fin. Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 57600, *21-22 (E.D. Va. May 1, 2015);   *Dobina v. Weatherford Int'l Ltd., et al.*, 909 F. Supp. 2d 228, 238-239 (S.D.N.Y. 2012); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 471 (S.D.N.Y. 2011).

### 3.    *Falsity and Scienter.*

In addition, particularly with respect to the Section 10 claims, the Opinion viewed the complaint as pleading falsity and fraud by hindsight, and as insufficiently pleading reckless or conscious behavior. *See* Opinion at 90-91.

The SAC includes particularized allegations, and allegations when viewed holistically from which inferences can be drawn in Plaintiff's favor, to find that the internal control failures that Defendants were forced to acknowledge in March 2012 existed throughout the Class Period.

The far-reaching and scathing findings in the Enforcement Actions, coupled with the CWs' statements based on their personal knowledge, the SEC inquiries and investigation of Orrstown, and Defendants' own statements, at minimum support the reasonable inference that the Bank lacked effective internal controls over underwriting, risk management and financial reporting at time of the Offering and through March 2012, and Defendants acted at least recklessly with respect to the internal controls and related disclosures (¶¶ 234-238, 251).[5]

---

[5]    Prior to certifying Orrstown's internal controls as effective and without material weakness, SEK was to conduct an audit in accordance with PCAOB's standards, which required SEK to (among other things) "review and test the process used by management", test the recent and historic credit data for each loan relationship, and integrate all relevant information coming from the Bank and Regulators (¶ 265). Unless SEK had conducted what amounted to no audit at all from the standpoint of internal controls, SEK was confronted with the same facts and conditions that were the subject of the Regulators' involvement in late 2010 and were deemed utterly deficient. Taken holistically, the SAC sufficiently alleges

The Regulators identified staggering failures of the Bank's internal controls and processes; far-reaching, material, deficiencies that had existed throughout the Class Period.  The Enforcement Actions charged Orrstown with deficient controls and procedures in all material aspects of its business, including Board oversight; management structure and competency; lending and credit administration, allowance for loan and lease losses; the declaration and payment of dividends; and compliance with laws and regulations.[6]

The following allegations from the SAC, when juxtaposed against the Enforcement Actions' indictments of the Bank's existing, systemic failures, and the statements of action needed to remediate (discussed *supra* and in the SAC), demonstrate that the SAC sufficiently alleges that statements during the Class Period about the Company's internal controls were material, false and misleading, and, for Section 10, made with scienter:

- Each Individual Defendant, who served on the Board and in management positions, was a target of the Enforcement Action. Defendant Everly signed all of the SOX Certificates. Defendants Everly and Embly were members of the Loan Committee at all

that, SEK "recklessly or knowingly issued a materially false and misleading audit opinion", or its judgments were such that "no reasonable accountant would have made the same decisions if confronted with the same facts."   *See* Opinion at 95, citing *In re Ikon Office Solutions Inc.,* 277 F.3d 658, 666 (3d Cir. 2002).

[6] Attached as Exhibit A is a chart summarizing the actions required to be taken by the Bank, its Board and the Company in accordance with the Written Agreement terminated on April 2, 2015. Attached as Exhibit B is an analysis of the additional and more specific corrective actions that the Pennsylvania Department of Banking demanded of the Bank in its March 22, 2012 Consent Order.

material times.  In September 2009, Defendant Embly was appointed as Chief Credit Officer to purportedly "enhance [the Bank's] processes and controls, as well as clearly delineate independence between sales and credit." (¶¶ 97-103, 115)

- CW#1 explained that often <u>new</u> loans were extended to "bail out" these borrowers from a bad situation during the period 2008 through 2011. (¶¶ 102, 146, 148)

- CW#3 confirmed that, as CW#1's supervisor in 2008 and 2011, the credit analysts' recommendations were often overruled based upon an "exception" (¶¶ 102, 116, 119, 148)

- CW#3 confirmed that Everly and Embly violated banking regulations in late 2010 or early 2011 by exceeding the Bank's legal lending limit of $19 million to the Chambersburg Developers (¶ 150)

- The Bank's junior credit analysts were inexperienced and the Bank refused to send them and the senior credit analysts, such as CW#3, to formalized training seminars. (¶ 111)

- From 2006 through 2012, the Bank's Loan Review Officer had no formal or practical training for this position, and after only three years, was appointed in December 2006 to the position of Loan Review Officer. (¶ 111)

- CW#3 stated that the credit analysts' work suffered from a huge volume of loan applications and either missing or outdated credit data, such as tax returns and appraisals, needed for their credit review. (¶ 112)

- CW#1 and CW#3 recall that more often than not during the Class Period they were working with either outdated appraisals or no appraisals. (¶112)

- Under Embly, in 2008 through 2011, CW#3 recalls commercial loans continued to be approved by the Loan Committee contrary to the Credit Analyst Group's "Do Not Recommend Approval" statements. (¶116)

- In the years 2008 through 2011, CW#3 recalls that the Loan Policy allowed for "exceptions" in approving credit to borrowers who did not satisfy the Loan Policy's standard credit requirements.  (¶¶ 117-118)

- According to CW#3, Defendant Embly appeared to have full discretion on identifying and justifying an exception.  (¶115-117)

- CW#1 and CW#3 recall the Loan Committee approving commercial loans in 2008 through 2010 from loan applicants who were well-known businessmen Bob Hickey and Tom Mongold (collectively the "Chambersburg Developers"), but whose loan applications did not satisfy the credit requirements of the Loan Policy.  (¶ 122)

- CW#3 specifically recalls the Loan Committee making invalid lending exceptions for the Chambersburg Developers because, in Embly's words, "Bob [Hickey] needs this." (¶ 122)

- There was no process or CRE Plan in place to reduce or detect undue credit concentrations (¶ 251)

Furthermore, a finding that the filing of the SAC is not futile is supported by the following internal control cases. In *In re Genworth Fin. Inc. Sec. Litig.*, a Section 10(b) case, the shareholders asserted (among other things) that Defendants had not implemented necessary internal controls, rendering SEC filings and SOX Certifications false and misleading. 2015 U.S. Dist. LEXIS 57600 at *21-22.   In *Genworth,* the court reasoned that plaintiff sufficiently stated claims because "[a]ccepting Plaintiffs' allegation that Defendants were using a 2.2-year claim duration when they knew they should have been using a 3-year average claim duration, then Defendants' internal controls could not have been effective."  *Id*.

16

The *Genworth* court also analyzed the **totality** of the alleged circumstances, as the Court should do here, to find that the plaintiff sufficiently pled scienter, even though "Plaintiffs' allegations standing alone may not be sufficient..." *Id*. at *58 (citation omitted).

As in *Genworth,* here, the failure to use appropriate credit data renders the statements about Orrstown's internal controls false and misleading.  Also, Orrstown's Chief Credit Officer, Enterprise Risk Management Committee and November 2009 Internal Review could not assess the Company's actual risk from impaired loans and to make adequate allocations to loan loss reserves because Orrstown had incomplete or outdated credit data on its borrowers and outdated, non-current and non-compliant appraisals for the collateral (¶ 112).  Had the Orrstown Defendants used current credit data and had effective risk management processes in place in 2009 and thereafter, they would have timely designated the Yorktown and Azadi loans, among others, as impaired, and either allocated loan losses or taken write-offs as of December 31, 2009, instead of waiting until they were forced to address such loans due to public scrutiny and a borrower's bankruptcy (¶¶ 147, 143-145).  Moreover, taken together, Plaintiff's allegations – including, (i)  the 2012 curative disclosure necessitated by the disclosure of the Joint Examination and Enforcement Actions; (ii) the fact that the Company had made no material change to its internal controls since at least 2009; (iii) Quinn's

17

November 2012 admissions about sweeping corrective action needed to "stabilize" the Company; (iv) Quinn and Everly's certifications of their control of the implementation of the Company's internal controls; (v) the systemic delay in reporting loans as impaired and in allocating additional loan loss provisions, which fostered the false appearance of a strong Bank balance sheet and served as a basis for the large performance bonuses; and, (vi)  the Defendants' "resignations"[7] (¶¶103, 154, 176, 233, 243, 246, 251-252, 285) -- support a strong inference that the Orrstown Exchange Act Defendants acted with reckless behavior concerning Orrstown's internal controls.

In *Dobina v. Weatherford Int'l Ltd., et al.*, the shareholders sufficiently alleged that, *inter alia*, up until the company ultimately disclosed internal controls failures, the defendants had made a series of misleading statements concerning the quality of the company's internal controls.  909 F. Supp. 2d 228, 238-239 (S.D.N.Y. 2012).  The *Weatherford* court compared the class period certifications with the ultimate disclosure of the "material weakness," and reasoned that the ***same internal control weaknesses must have existed*** in prior years, and did so, even though the curative

---

[7]     *See, Thorpe v. Walter Inv. Mgmt., Corp.*, 2015 U.S. Dist. LEXIS 84406, *58 (S.D. Fla. June 30, 2015) (citation omitted) ("[R]esignations can strengthen an inference of scienter when they occur around the same time as an investigation.").

disclosure about ineffective controls was limited by the company to only the then-current reporting period.  *Id*. at 245.

As Plaintiff urges the Court to do, taking the Enforcement Actions and end of Class Period disclosures, coupled with the CWs' corroborating statements, the same reasoning and reasonable inferences should apply and be drawn here. Orrstown did not change its internal controls throughout the Class Period. The same internal controls that Orrstown admitted were ineffective in March 2012 were equally ineffective in 2009 through 2011 (¶¶ 3-7, 176).

Moreover, in *Weatherford*, the court held that "[w]here a statement is made repeatedly regarding an issue of specific personal interest to the officers, the allegations will more readily give rise to the requisite strong inference of scienter." *Weatherford* at 245.  And, therefore, the *Weatherford* court found that the plaintiff had sufficiently pled scienter as to the company's CFO due to his numerous internal control certifications made during the three-year class period, that he had personal participation in designing and evaluating the relevant internal controls, he signed and filed substantially the same certifications every quarter and up to the time of the curative disclosure, and the deficiencies impacted the reporting of Weatherford's financial performance. *Id*. at 246-248.  The *Weatherford* court also found that scienter was sufficiently pled as to Weatherford, the company, because "the most straightforward way to raise [a strong inference of scienter] for a

corporate defendant will be to plead it for an individual defendant." *Id*. at 248 & n.91 (quotation omitted).

In *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d at 471, the plaintiffs alleged that the officer defendants falsely certified the company's internal controls as effective in years 2006 and 2007. *Id*. The court found that plaintiffs sufficiently pled that the SOX Certifications were false primarily because the SEC had put the company on notice that it was concerned the company's risk models were not updated to "predict[…] credit risk", and the company later knew **by October 2007** its entire model review department had "evaporated." *Id.* From these facts, the court drew a reasonable inference that the defendants either knowingly, or recklessly disregarded such flaws undermining the company's controls. *Id*. at 489-491. Similarly, here, by 2009 and through 2011, the Company's internal controls were either non-existent or deficient in content or adherence; in late 2010, the Regulators were on-site; by May 2011 the Regulators were steeped in the Joint Investigation criticizing the Company's operations; and by mid-2011 key banking functions were outsourced (*See supra* and ¶¶ 3, 92, 126, 176).

The *Bear Stearns* court's scienter analysis is particularly instructive as it supports a finding that Plaintiff's scienter allegations are not subject to a "fraud by hindsight" attack.   In *Bear Stearns*, the plaintiffs adequately alleged scienter by

relying upon, *inter alia*, the SEC's "OIG Report" that was issued **after** the class period ended and on statements made by confidential witnesses that were consistent with the OIG Report.  *Id*. at 503-504; *see, also, In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494-495 (S.D.N.Y. 2004) (rejecting defendants' fraud-by-hindsight claim because plaintiffs' allegations that "the company failed to take into account information that was available to it" at the time it issued its incorrect financial results sufficiently pleaded fraud); *In re Vivendi Universal*, 2004 U.S. Dist. LEXIS 7015, at *6 (S.D.N.Y. Apr. 21, 2014) (holding that, as "the Second Circuit has explicitly recognized [,] plaintiffs may rely on post-Class Period data to confirm what a defendant should have known during the Class Period"). *See also, Washtenaw Cnty. Emp. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114-15 (D. Mass. 2014) ("the government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter…").

Plaintiff appropriately relies on the Regulator's Enforcement Actions on the CWs' statements that corroborated the dire state of the Bank's internal controls prior to and throughout the Class Period, consistent with the Regulators' criticisms and actions.  It can be reasonably inferred that the Defendants were well aware that they and Orrstown did not design, manage and maintain effective internal controls, and were reckless in the conduct.  The SAC effectively draws the link between the

21

Enforcement Actions' findings and necessary corrective actions to the Bank's practices that existed in 2009 and throughout the Class Period to sufficiently plead falsity and scienter (¶¶6, 9, 154, 251-252).

## VI.   CONCLUSION

Plaintiff respectfully requests that the court grant its Motion.

Dated:  July 22, 2015                    Respectfully submitted,

                                         CHIMICLES & TIKELLIS LLP

                                          */s/ Kimberly Donaldson Smith*
                                         Nicholas E. Chimicles
                                         Kimberly Donaldson Smith
                                         Benjamin F. Johns
                                         Christina Donato Saler
                                         One Haverford Centre
                                         361 West Lancaster Avenue
                                         Haverford, PA 19041
                                         Telephone: (610) 642-8500
                                         Fax: (610) 649-3633
                                         nick@chimicles.com
                                         kimdonaldsonsmith@chimicles.com
                                         cdsaler@chimicles.com
                                         bfj@chimicles.com

                                         *Attorneys for Plaintiff*

## <u>L.R. 7.8 CERTIFICATE</u>

I, Christina Donato Saler, a specially admitted member of the bar of this Court, hereby certify that the word count function of my computer indicates that *Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Leave to Amen* does not exceed the 5,000 word limit.

Dated:  July 22, 2015         Respectfully submitted,

                           */s/ Christina Donato Saler*
                           Christina Donato Saler (PA 92017)
                           cdsaler@chimicles.com
                           Chimicles & Tikellis LLP
                           One Haverford Centre
                           361 West Lancaster Avenue
                           Haverford, PA 19041
                           Phone:  (610) 642-8500
                           Fax:  (610) 649-3633

# CERTIFICATE OF SERVICE

I, Christina Donato Saler, a specially admitted member of the bar of this Court, hereby certify that true and correct copies of *Plaintiff's Motion For Leave To Amend* has been electronically filed and served on all Defendants' counsel, via the Court's ECF system, this 22 day of July, 2015, as follows:

David J. Creagan
David E. Edwards
**White and Williams, LLP**
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
215-864-7032

*Counsel for the Orrstown Defendants*

Jonathan S. Ziss
Seth L. Laver
**Goldberg Segalla**
1700 Market Street, Suite 1418
Philadelphia, PA 19103
267-519-6800

*Counsel for Smith Elliott Kearns & Co.*

Thomas G. Wilkinson, Jr.
Jeffrey G. Weil
Jeffrey M. Monhait
**Cozen O'Connor**
1900 Market Street
Philadelphia, PA 19103
215-665-5582

Bradley R. Wilson
Adam D. Gold
**Wachtell Lipton Rosen & Katz**
51 West 52nd Street
New York, New York 10019
212-403-1000

*Counsel for Sandler O'Neill and Janney*

By:  _/s/ Christina Donato Saler_____
          Christina Donato Saler (PA 92017)