**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles, Pa. Id. No. 17928
Kimberly Donaldson Smith, Pa. Id. No. 84116
Christina Donato Saler, Pa. Id. No. 92017
Benjamin F. Johns, Pa. Id. No. 201373
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Phone (610) 642-8500
Fax (610) 649-3633

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, on behalf of itself and all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>ORRSTOWN FINANCIAL SERVICES, INC., ORRSTOWN BANK, ANTHONY F. CEDDIA, JEFFREY W. COY, MARK K. KELLER, ANDREA PUGH, THOMAS R. QUINN, JR., GREGORY A. ROSENBERRY, KENNETH R. SHOEMAKER, GLENN W. SNOKE, JOHN S. WARD, BRADLEY S. EVERLY, JOEL R. ZULLINGER, JEFFREY W. EMBLY, SMITH ELLIOTT KEARNS & COMPANY, LLC, SANDLER O'NEILL & PARTNERS L.P., and JANNEY MONTGOMERY SCOTT LLC,<br><br>    Defendants.<br>———————————————— | Civil Action No. 1:12-civ-00993<br><br><br>**SECOND AMENDED COMPLAINT**<br><br>**ECF**<br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF §§ 11, 12(a) and 15 OF THE SECURITIES ACT OF 1933 AND §§ 10(b) and 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934<br><br><br>DEMAND FOR JURY TRIAL |

H0046013.8

## **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ........................................................................2

II.    NATURE OF THE ACTION .......................................................................12

III.   JURISDICTION AND VENUE ..................................................................13

IV.    PARTIES ....................................................................................................15

     A.    Lead Plaintiff ..................................................................................15

     B.    Securities Act Defendants ..............................................................15

          1.   The Orrstown Securities Act Defendants ................................15

          2.   The Underwriter Defendants.....................................................21

          3.   The Auditor Defendant .............................................................24

     C.    Exchange Act Defendants ...............................................................26

V.     OTHER RELEVANT PERSONS ...............................................................28

VI.    RULE 23 CLASS ALLEGATIONS ...........................................................33

VII.   BACKGROUND AND FACTS ..................................................................36

     A.    The Critical Role of An Effective System of Internal Controls..........36

     B.    There Were Material Weaknesses In Orrstown's Internal
         Controls in 2009 through 2011.............................................................40

          (a)   *Corrective Action – Develop and Execute Board
             Oversight and Management Competency Plans*......................42

          (b)   *Corrective Action – Develop and Execute a New
             Process for Loan Underwriting* .................................................48

(c) *Corrective Action* – *Develop and Implement a New Process for Credit Administration, Determining Proper Allowance for Loan Loss Reserves, and a Plan for Identifying Concentrations of Credit*...............61

   i) *November 2009 Internal Review* ....................................62

   ii) *Eight Point Internal Risk Rating System ("IRRS")*........65

   iii) *Credit Concentration* ......................................................66

C. Four Lending Relationships that Illustrate Orrstown's Lack of Effective Internal Controls. ...............................................................68

D. The Material Weaknesses In Internal Controls Are Made Public ......72

E. SEC's Ongoing Scrutiny ...................................................................75

VIII. SECURITIES ACT SUBSTANTIVE ALLEGATIONS:  MATERIALLY FALSE & MISLEADING STATEMENTS CONTAINED IN THE OFFERING DOCUMENTS.........................................................................79

A. The Offering Documents' Materially False and Misleading Statements Regarding the Existence and Effectiveness of the Company's Internal Controls ...........................................................81

B. Auditor Defendant Smith Elliott's Statements in the 2009 10K Were False, Misleading and Lacked a Reasonable Basis ..................88

C. The Securities Act Class Is Damaged by the Offering Documents' False and Misleading Statements ......................................................97

IX. SECURITIES ACT CLAIMS FOR RELIEF............................................102

COUNT I - (For Violations of § 11 of the Securities Act Against Orrstown and the Bank)............................................................................102

COUNT II - (For Violations of § 11 of the Securities Act Against the Individual Securities Act Defendants, Underwriter Defendants and the Auditor Defendant) ..................................................................................103

COUNT III - (For Violations of §12(a)(2) of the Securities Act
Against Orrstown, the Bank, the Individual Securities Act Defendants,
Defendant Embly and the Underwriter Defendants) ............................................106

COUNT IV - (For Violations of § 15 of the Securities Act Against the
Individual Securities Act Defendants) ..................................................................109

X.     EXCHANGE ACT ALLEGATIONS: THE EXCHANGE ACT
       DEFENDANTS' FRAUDULENT CONDUCT AND COURSE OF
       BUSINESS ...............................................................................................111

       A.     The Orrstown Exchange Act Defendants' Fraudulent
              Material Statements and Omissions in the
              2009 Annual Report, Form 10-K  ...................................................112

       B.     The Exchange Act Defendants' Scheme to Materially
              Understate Loan Loss Reserves and to Understate and
              Conceal the Magnitude of the Company's Risk Assets from
              the Class With Their IRRS..............................................................118

       C.     The False and Misleading Statements and SOX Certifications
              in the Form 10-Qs filed throughout the Class Period .......................122

       D.     The False and Misleading Financial Reporting ................................133

       E.     Auditor Defendant Smith Elliott's Audit Opinions were
              Materially False and Misleading.......................................................138

              1.     Smith Elliott's Materially False and Misleading
                     2009 Audit Opinion in the 2009 Annual Report ...................139

              2.     Smith Elliott's Materially False and Misleading
                     2010 Audit Opinion in the 2010 Annual Report ...................143

              3.     Smith Elliott's Materially False and Misleading
                     2011 Audit Opinion in the 2011 Annual Report ...................145

XI.    ADDITIONAL EXCHANGE ACT ALLEGATIONS ................................149

A.     Loss Causation  ...................................................................149

B.     Scienter ...................................................................................150

C.     No Safe Harbor.......................................................................153

D.     Efficient Market .....................................................................154

XII.   EXCHANGE ACT CLAIMS FOR RELIEF................................................155

COUNT V - (For Violations of § 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against the
Orrstown Exchange Act Defendants) .....................................................155

COUNT VI - (For Violations of § 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against
the Auditor Defendant Smith Elliott).....................................................157

COUNT VII - (For Violation of § 20(a) of the Exchange Act
Against Orrstown Exchange Act Defendants Quinn, Everly and Embly) ............161

XIII.  PRAYER FOR RELIEF ...........................................................................162

XIV.  JURY TRIAL DEMANDED.....................................................................162

## SECOND AMENDED COMPLAINT

Lead Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Plaintiff"), individually and on behalf of all other persons similarly situated, makes the allegations contained in this federal securities class action complaint upon information and belief (except as to those allegations specifically pertaining to Plaintiff and Plaintiff's counsel, which are made with personal knowledge).   Plaintiff bases its information and belief upon the investigation conducted by Plaintiff's counsel, which included: a review of the U.S. Securities and Exchange Commission ("SEC") filings by Orrstown Financial Services, Inc. ("Orrstown" or the "Company"), as well as filings and reports relating to Enforcement Actions taken against the Company and Orrstown Bank by federal and state banking regulators, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company; a record review of the recorder of deeds in Maryland and Pennsylvania; a review of state and federal civil and bankruptcy court filings involving the Company and Orrstown Bank (the "Bank" or collectively "Orrstown" or the "Company"); and, interviews of individuals who possess relevant information regarding the Company, the Bank and Defendants (defined herein) including, but not limited to, Confidential Witnesses ("CWs"). Based upon the results of Plaintiff's investigation, it is anticipated that substantial

evidentiary support for the allegations set forth below will be further developed after a reasonable opportunity for discovery especially as to the evidence that is within the exclusive control of Defendants.

## I.    PRELIMINARY STATEMENT

1.    Just two years after raising $40 million from investors in a March 2010 public offering of Orrstown stock, Defendants were forced to publicly reveal Orrstown's systemic and long-standing internal control failures.

2.    On March 23, 2012, the Company filed with the SEC the Written Agreement and the Consent Order (collectively the "Enforcement Actions") it had entered into, respectively, with the Federal Reserve Bank of Philadelphia and the Pennsylvania Department of Banking (collectively "Regulators"). *See* Written Agreement, dated 3/22/2012, and Consent Order, filed 3/23/2012, attached hereto as Exhibits A-B.

3.    The Enforcement Actions were the culmination of the Regulators' on-site involvement with and examination of Orrstown since November-December 2010.   The Enforcement Actions were an indictment of Orrstown's historical, imprudent banking practices, and its management's lack of effective internal controls permeating, among other things, the Bank's underwriting processes, credit administration, management, and problem loan identification and monitoring.

4.     Unfortunately for investors who purchased Orrstown stock in the Company's 2010 offering and in the public market thereafter, the public revelation came too late.  Defendants had misled and concealed from the investors material information about the lack of effectiveness of the Bank's internal processes and controls that had existed at and prior to the time the investors purchased Orrstown stock. Such misstatements and omissions of material facts caused investors to purchase Orrstown stock at inflated prices and lose millions of dollars when the truth was revealed.

5.     The Regulators identified staggering failures of the Bank's internal controls and processes; far-reaching, material deficiencies that had existed throughout the Class Period.   Generally, the Enforcement Actions charged Orrstown with deficient controls and procedures in all material aspects of its business, including Board Oversight; Management Structure and Competency; Lending and Credit; Allowance for Loan and Lease Losses; Dividends and Payments; and Compliance with Laws and Regulations.

6.     As demonstrated by the following excerpts, the Written Agreement and the Consent Order pinpoint precisely the Bank's existing, systemic failures, and identify specific actions needed to address and remedy such failures:

a. "The actions that the [Board] will take to ….maintain effective control over, and supervision of, the Bank's major operations…" Exhibit A at ¶2(a)

b. "responsibility of the [Board] to monitor ***management's adherence to approved policies and procedures, and applicable laws and regulations and to monitor exceptions to approved policies*** and procedures" Exhibit A at ¶ 2(b) (emphasis added)

c. "develop[] [] a suitable management structure that is adequately staffed by qualified and trained personnel." Exhibit A at ¶3 (a).

d. "identif[y] [] the type and number of senior officers needed to manage and supervise ***properly*** the affairs of the Bank." Exhibit A at ¶ 3(b)(i)(emphasis added).

e. "[implement] procedures for the ***timely and accurate identification of problem loans***" Exhibit A at ¶ 5(b) (emphasis added).

f. "Loan underwriting and credit administration procedures that include and provide for, at a minimum, ***documented analysis of:*** (i) the borrower's repayment sources….; and (ii) the value of any collateral." Exhibit A at ¶ 6(a).

g. "ensure that appraisals conform to accepted appraisal standards." Exhibit A at ¶6(b).

h. "minimize and monitor underwriting and document exceptions." Exhibit A at ¶ 6(e).

i. "not, directly or indirectly, extend, renew, or restructure any credit to or for the benefit of any borrower, including any related interest of the borrower, whose loans or other extensions of credit are criticized in the [Joint Examination]." Exhibit A at ¶7.

j. "revise its ALLL [allowance for loan and lease losses] methodology consistent with relevant supervisory guidance." Exhibit A at ¶9.

k. "shall adopt policies and procedures to minimize and monitor loan documentation exceptions as well as to identify and correct outstanding exceptions noted in the Report of Examination."  Exhibit B at ¶ 6(a).

l. "shall develop and submit to the Bureau [of Commercial Institutions, a part of the Pennsylvania Department of Banking] for review… a written plan to identify, limit and manage the Bank's commercial real estate ("CRE") loan concentration of credit to an amount which is commensurate with the Bank's business strategy, management expertise, size and location ("CRE Concentration Plan")."  Exhibit B at ¶ 7(a).

m. "eliminate, correct and prevent unsafe and unsound banking practices, violations of law or regulations, and all contraventions of regulatory policies or guidelines cited in the Report of Examinations." Exhibit B at ¶ 14.

7.     Each of the foregoing is an indictment of the Bank's failed systems and internal controls.  That these internal controls failures existed in 2009 through 2012, is corroborated by the statements of  Confidential Witnesses (*see infra* Part VII.A-C) who provide examples of precisely these types of systemic failures that they personally observed throughout 2009 to 2012, including: the absence of sufficient and competent lending officers and supervisors (*see infra* Part VII.B(a)); the senior management's ignoring of credit analyst recommendations and violations of Bank Loan polices (*see infra* Part VII.B(b)); the failure to maintain current loan documentation (including appraisals) (*see infra* ¶112);  improper restructuring and extensions of credit to existing borrowers (*see infra* Parts VII.B(c), VII.C); the modification of existing loans in order to avoid classification of such loans as criticized or in default (*see infra* Parts VII.B(c), VII.C); the failure to stress test or undertake any meaningful risk management measures with respect to criticized loans; the failure to timely identify adequate loan loss reserve (*see infra* Parts  VII.B(c)(i), X.B); the failure to follow regulatory guidance and regulations (*see infra* ¶¶ 138-140, 150, 251); and the failure to timely assess the

financial impact of the bad loans and timely make exponential increases in loan loss reserves and write-offs (*see infra* Part X.B).

8.     The Regulators required Orrstown to completely revamp every aspect of its banking processes and operations to create, develop and enhance internal controls for its future operations.  In addition, the Regulators prohibited Orrstown from conducting certain of its business without prior approval, including payment of dividend, and the incurring or increasing debt, or redeeming any outstanding shares.

9.     Further, the Pennsylvania Department of Banking made the Bank affirm that it would act to eliminate all violations of law or regulations, and contraventions of regulatory policies or guidelines that were cited in the Report of Examinations:

> Corrective Action:   The Bank shall take all steps necessary, consistent with other provisions of this Order and sound banking practices, ***to eliminate, correct and prevent unsafe and unsound banking practices, violations of law or regulations, and all contraventions of regulatory policies or guidelines*** cited in the Report of Examinations.

Consent Order, ¶14 (emphasis added).  This is striking. Regulators do not lightly charge bank managers and banks with having such inadequate internal controls so as to characterize the bank as having "unsafe and unsound banking practices" and needing to "eliminate, and prevent . . . violations of law, and all regulations and

contraventions of regulatory policies or guidelines cited in the Report of Examinations." Indeed, since 2010, the Pennsylvania Department of Banking has only issued this type of enforcement action on two other Pennsylvania banks. Further, banks and bank managers do not lightly acknowledge such misconduct and promise "to eliminate, correct and prevent" such misconduct.

10.    In Orrstown's periodic reports and Defendant Quinn and Everly's certifications filed with the SEC during the Class Period pursuant to § 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), Defendants (falsely) certified the effectiveness of Orrstown's internal controls. Prior to the time of the March 2010 Offering and through May, 10, 2011 (the time the Company filed its Form 10-Q for the first quarter 2011), investors were told that Orrstown maintained effective internal control procedures, and had not made changes "in the Company's internal control over financial reporting or in the factors that have materially affected, or are reasonably likely to materially affect, such controls during the quarter." This was consistent with the certifications made by the Company, that its internal controls were effective, in the Company's 2010 Annual Report Form 10-K filed in March 2011, even as the Regulators were on-site and identifying the measures the Company needed to take to revamp its internal controls in order to address the material deficiencies that their existing (and previously certified as unchanged) internal controls had fostered.

11.     Some of the specific undisclosed deficiencies that existed during the Class Period, and their magnitude, were only publicly revealed by Defendants in March 2012, on the eve of the disclosure of the Joint Examination.  Using guarded wording, Defendants revealed that:

- "the Credit Administration department, processes and procedures have been greatly enhanced to address gaps noted."

- "the Company failed to implement a structured process with appropriate controls to ensure that updated loan ratings were incorporated timely into the calculation of the Allowance for Loan Losses."

- "As of the end of the period covered by this report, however, the Company has not fully remediated its material weakness in its internal control over financial reporting relating to loan ratings and its impact on the allowance for loan losses."

12.     Albeit over two years late, and only done on the eve of the public announcement of the Enforcement Actions, Orrstown finally publicly revealed, in its 2011 Annual Report on Form 10-K, its internal control failures:

> ***the Company did not maintain effective internal control over the process to prepare and report information related to loan ratings and its impact on the allowance for loan losses.*** This control deficiency results in a reasonable possibility that a material misstatement to the annual or interim Consolidated Financial Statements will not be prevented or detected.

Accordingly, management has determined that this condition constitutes a material weakness. ***Because of this material weakness, we have concluded that the Company did not maintain effective internal control over financial reporting***

13.     Orrstown's auditor, Defendant Smith Elliott & Kearns ("Smith Elliott"), also was forced to follow suit, and publicly reveal in its "Report of Independent Registered Public Accounting Firm" that Orrstown's internal controls suffered from material weaknesses:

> *... **The Company did not have a timely and effective process to prepare and report information related to loan ratings and the allowance of loan losses allocations*. . . . **In our opinion, because of the effects of the material weakness described above on the achievement of the objectives of the control criteria, Orrstown Financial Services, Inc. and its wholly-owned subsidiary has not maintained effective internal control over financial reporting…***

14.     As confirmed by the Confidential Witnesses and Regulators, the Company's financial and operational material weaknesses rendered the Company's financial reporting for each of the annual reporting periods of 2009, 2010 and 2011, and each of the quarterly reporting periods in 2010 and 2011 false and misleading.

15.     The Regulators' control and oversight did not end with the announcement of the Enforcement Actions.  It took nearly four (4) years from the date the Joint Examination commenced for the Federal Reserve's Written

Agreement to be terminated, and the Bank still remains subject to a Memorandum of Understanding with the PA Department of Banking.[1]

16.     Plaintiff and other shareholders incurred significant losses as a result of Defendants' federal securities law violations.  From the time of the March 2010 Offering, in which its common stock was sold for $27.00 per share, to the point at which the market fully digested the Bank's curative disclosures that its internal controls were ineffective, the Bank's stock price dropped by 70% to close at $8.20 per share on April 5, 2012.

17.     Plaintiff would not have incurred these losses but for Orrstown's false and misleading statements that certified the effectiveness of Orrstown's internal controls.  For the Orrstown executives, however, the concealment of, and delay in such revelations becoming public, permitted them in 2010 to double their prior-year bonuses, increase their salaries for 2011, and, for several, to hold onto their jobs until the Regulators' mandatory "management review" resulted in ousters and resignations.

---

[1]   The Federal Reserve's Written Agreement terminated on April 2, 2015. The Pennsylvania Department of Banking's Consent Order terminated on April 21, 2014 and was replaced with a Memorandum of Understanding ("MOU").   An MOU is a regulatory action that the Pennsylvania Department of Banking considers a lower level of regulatory action than the Consent Order.  *See*, Form 8-K Current Reports filed 4/22/2015, 4/2/2015.  The MOU is still in effect.

11

## II.    NATURE OF THE ACTION

18.    This is a federal securities class action brought pursuant to the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

19.    The "Securities Act Class" consists of all persons and/or entities who purchased Orrstown common stock pursuant to, or traceable to, Orrstown's February 8, 2010 Registration Statement and March 24, 2010 Prospectus Supplement (collectively these, and the documents incorporated therein by reference, the "Registration Statement" or "Offering Documents") issued in connection with Orrstown's secondary stock offering in March 2010 Offering. The Securities Act Class seeks remedies under Sections 11, 12(a) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, against Orrstown, certain of its officers and/or directors, the Bank, its auditor Smith Elliott Kearns & Company, LLC, and its underwriters Sandler O'Neill & Partners, L.P. and Janney Montgomery Scott LLC (collectively the "Securities Act Defendants") for the materially false and misleading statements contained in the Offering Documents.

20.    Pursuant to the Securities Act, the Securities Act Defendants are strictly liable for material misstatements in or the omission of material facts from the Offering Documents issued in connection with the March 2010 Offering, and the Securities Act claims and allegations are not based on any reckless or

intentionally fraudulent conduct by or on behalf of Defendants – *i.e.*, the Securities Act claims do not allege, arise from, or sound in, fraud.  Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims.

21.    The "Exchange Act Class" consists of all persons or entities who purchased Orrstown common stock on the open market between March 15, 2010 and April 5, 2012, inclusive (the "Class Period"),  seeking remedies under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Orrstown, the Bank and certain of its officers and/or directors, and auditor Smith Elliott Kearns & Company, LLC (collectively the "Exchange Act Defendants").

22.    The claims asserted herein arise from a series of materially false and misleading statements made by Defendants in the Offering Documents and throughout the Class Period pertaining to the effectiveness of the Company's internal controls over underwriting of loans, risk management, financial reporting and compliance with banking regulations.

## III.    JURISDICTION AND VENUE

23.    The Securities Act claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, [15 U.S.C. §§ 77k and 77o] and

rules promulgated thereunder by the United States Securities and Exchange Commission ("SEC").

24.     The Exchange Act claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, [15 U.S.C. § 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

26.     Defendants named herein have sufficient minimum contacts with this District, the Commonwealth, and the United States so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

27.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and Section 22 of the Securities Act [15 U.S.C. § 77v] or Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants Orrstown and Orrstown Bank maintain their principal place of business in this District and the acts and practices complained of herein, including the dissemination to the public of the false and misleading statements of material facts, occurred in this District.

28.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of

interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

## IV.   PARTIES

### A.   Lead Plaintiff

29.   Lead Plaintiff **SEPTA** is a regional transportation authority that operates various forms of public transit serving Bucks, Chester, Delaware, Montgomery, and Philadelphia counties in Pennsylvania.  SEPTA is headquartered at 1234 Market Street, Philadelphia, Pennsylvania.   As confirmed by SEPTA's investment manager and trading data and set forth in the attached certificate which was filed with Plaintiff's initial complaint (Dkt. #1), Plaintiff acquired Orrstown common stock pursuant to the Offering Documents for the March 2010 Offering from the Offering's underwriter, and also purchased Orrstown common stock on the open market during the Class Period.   SEPTA was harmed as a result of Defendants' wrongdoing as alleged in this complaint.

### B.   Securities Act Defendants

#### 1.   The Orrstown Securities Act Defendants

30.   Defendant **Orrstown** is the holding company for its wholly owned subsidiary Orrstown Bank.   Orrstown is incorporated in Pennsylvania, and its executive offices are located at 77 East Kings Street, Shippensburg, Pennsylvania. The Company was organized on November 17, 1987, for the purpose of acquiring

the Bank. On March 8, 1988, in a bank holding company reorganization transaction, the Company acquired 100% ownership of the Bank. In 2006, Orrstown acquired First National Bank of Newport to diversify the Bank's loan portfolio with residential mortgage loans. Orrstown's primary activity consists of owning and supervising the Bank. The Bank's five officers conduct the day-to-day management of the Company, and they are the Company's only employees. As a holding company, Orrstown's operating revenues and net income are derived primarily from the Bank through the payment of dividends. As of March 31, 2015, Orrstown had total assets of $1.18 billion, a loan portfolio totaling $727 million, total shareholders' equity of $131 million, and total deposits of approximately $945 million.

31.     Defendant **Orrstown Bank**, a state-chartered Pennsylvania bank, was founded in 1919 and provides community banking and bank related services in South Central Pennsylvania region. The Bank has twenty-two banking offices and two remote service facilities located in Cumberland, Franklin, Lancaster and Perry Counties as well as one banking office in the town of Hagerstown, Maryland. The Bank's Operations Center houses loan operations, EFT department, deposit operations, information technology, human resources and other support staff, and is located at North Pointe Business Center, 2605-2695 Philadelphia Avenue, Chambersburg, Pennsylvania. The Bank's commercial banking and trust business

involve accepting demand, time and savings deposits, and making loans.  The Bank makes commercial, residential, consumer and agribusiness loans within its geographic market.  Approximately 65% of the Bank's loan portfolio is concentrated in commercial loans.

32.     Defendant **Thomas R. Quinn, Jr.** ("Quinn") is, and during the Class Period was, the President and Chief Executive officer of the Company and the Bank.  Quinn joined the Bank in May 2009, and, at all times material to the issues raised in the complaint, he served on the ***Enterprise Risk Management Committee***, which was formed in 2009, and on the Bank's ***Loan Committee.*** Quinn signed each of the ***SOX Certifications*** in the periodic filings with the SEC during the Class Period.

33.     Defendant **Bradley S. Everly** ("Everly") was, during the Class Period, the Executive Vice President, Chief Executive Officer and Chief Financial Officer of the Bank.  He started with the Bank in 1997 and resigned on May 16, 2012.  At all times material to the issues raised in the complaint, Everly was an officer of the Bank and served on the Bank's ***Loan Committee***.  Everly signed each of the ***SOX Certifications*** in the periodic filings with the SEC during the Class Period.

34.     Defendant **Joel R. Zullinger** ("Zullinger") is, and during the Class Period, was the Chairman of the Boards of Directors of the Company and the

Bank.  He has been a Director since 1981, and, at all times material to the issues raised in the complaint, he served on the ***Enterprise Risk Management Committee***.

36.     Defendant **Jeffrey W. Coy** ("Coy") is, and during the Class Period was, the Vice Chairman of the Boards of Directors of the Company and the Bank. He has been a Director since 1984, and, at all times material to the issues raised in the complaint, he served on the ***Enterprise Risk Management Committee***.

36.     Defendant **Kenneth R. Shoemaker** ("Shoemaker") was, during the Class Period, President Emeritus of the Bank, a Director and the Secretary of the Company and Bank.  Shoemaker was a director from 1986 to 2012, and, at all times material to the issues raised in the complaint, he served on the ***Enterprise Risk Management Committee*** which was formed in 2009.  He also served as President and Chief Executive Officer of the Company and Bank from 1987 to his retirement in May 2009.  While Chief Executive Officer of the Bank, Shoemaker served on the Bank's ***Loan Committee***.

37.     Defendant **Anthony F. Ceddia** ("Ceddia") is, and during the Class Period was, a Director of the Company and Bank.  He has been a Director since 1996, and at the time of the March 2010 Offering was a member of the Board's ***Audit Committee***.

38.     Defendant **Mark K. Keller** ("Keller") is, and during the Class Period was, a Director of the Company and Bank.  He has been a Director since 2008.

39.     Defendant **Andrea Pugh** ("Pugh") is, and during the Class Period was, a Director of the Company and Bank.  She has been a Director since 1996, and at the time of the March 2010 Offering was a member of the Board's ***Audit Committee***.

40.     Defendant **Gregory A. Rosenberry** ("Rosenberry") is, and during the Class Period was, a Director of the Company and Bank.  He has been a Director since 1997.

41.     Defendant **Glenn W. Snoke** ("Snoke") is, and during the Class Period was, a Director of the Company and Bank.  He has been a Director since 1999.  At all times material to the issues raised in the complaint, Snoke was an officer of the Bank, served on the Bank's ***Loan Committee***, and prior to Defendant Everly's appointment to Chief Credit Officer, Snoke chaired the Loan Committee.

42.     Defendant **John S. Ward** ("Ward") was, during the Class Period, a Director of the Company and Bank.  He became a Director in 1999, and at the time of the March 2010 Offering was a member of the ***Audit Committee***.

43.     Defendant **Jeffrey W. Embly** ("Embly") was, during the Class Period, the Senior Executive Vice President and Chief Operating Officer of the Company. During parts of the Class Period, Embly served as Executive Vice

President of the Bank and Chief Credit Officer of the Bank.  Embly resigned on September 18, 2012.  At all times material to the issues raised in the complaint, Embly was an officer of the Bank and served on the Bank's ***Loan Committee***.

44.     Defendants Quinn, Zullinger, Shoemaker and Coy were members of the Board of Directors' ***Enterprise Risk Management Committee,*** created in 2009 to provide additional oversight over seven risk areas: credit, operations, transaction, liquidity, market/interest rate, legal/compliance, strategies and reputation.

45.     Defendants Zullinger, Ceddia, Coy, Keller, Pugh, Rosenberry and Ward, as directors, each filled at some point during the Class Period the monthly rotating director seat on the Bank's ***Loan Committee***.  Defendant Snoke was the permanent board member on the Loan Committee throughout the Class Period.

46.     Defendants Quinn, Everly, Zullinger, Shoemaker, Ceddia, Coy, Keller, Pugh, Rosenberry, Snoke and Ward are referred to herein as the "**Individual Securities Act Defendants**."

47.     The Individual Securities Act Defendants and Defendant Embly, as senior executive officers and/or directors of Orrstown and the Bank (the "**Individual Orrstown Defendants**"), were privy to confidential, non-public information concerning the Bank's internal operations, controls and financial condition.  They had access to material and adverse non-public information which,

as discussed in detail below, revealed the failures of the Bank's internal controls over underwriting of loans, risk management procedures and financial reporting. Because of their positions, the Individual Securities Act Defendants and Defendant Embly were required to critically review the Offering Documents to ensure accuracy and adequate disclosure.

48. Each of the Individual Securities Act Defendants signed the materially untrue and misleading Registration Statement. They were responsible to assure the accuracy and completeness of the statements made in the Registration Statement and Class Period SEC filings, and are therefore primarily liable for the false and misleading statements contained therein.

### 2. The Underwriter Defendants

49. Defendants **Sandler O'Neill & Partners, L.P.** ("Sandler O'Neill"), headquartered in New York City, and **Janney Montgomery Scott, LLP** ("Janney"), headquartered in Philadelphia, acted as underwriters of the March 2010 Offering and signed the Registration Statement. In the March 2010 Offering, Sandler O'Neill and Janney (collectively the "Underwriter Defendants") organized the distribution of at least 1,481,481 shares of Company common stock to investors and received $2,415,000 in underwriting commissions and expenses. The Company's agreement with the Underwriter Defendants provided that the Underwriters would be paid as much as $1.485 per share in connection with the

sale of these common shares.  The Underwriter Defendants, therefore, were paid approximately $2.2 million in fees on the shares sold, indirectly by purchasers of the Orrstown shares.

| | Per Share | Total Without Over-Allotment Exercise | Total With Full Over-Allotment Exercise |
|---|---|---|---|
| Public offering price | $ 27.00 | $39,999,987 | $45,999,981 |
| Underwriter discount | $ 1.485 | $ 2,199,999 | $ 2,529,998 |
| Proceeds to Orrstown (before expenses) | $25.515 | $37,799,988 | $43,469,983 |

50.   The $2.2 million in combined fees was paid in part to compensate the Underwriter Defendants for conducting a reasonable due diligence investigation into Orrstown in connection with the March 2010 Offering.  The Underwriter Defendants' due diligence investigation was a critical component of the March 2010 Offering intended to provide investors with important safeguards and protections.

51.   It was incumbent on the Underwriter Defendants to perform due diligence that investigated not only the Company's reported performance but also a qualitative analysis of the processes, procedures and assumptions underlying the reported performance with respect to  all aspects of the organization, including Orrstown's loan portfolios, books, records, accounting, financial reporting, and operation and internal controls.

52.    In preparing the Offering Documents, the Underwriter Defendants were to conduct due diligence of Orrstown and the Bank.   The Underwriter Defendants had the opportunity to review the work of the Internal Review, (*see infra* Part VII.B(c)(i)), and had access to management to make inquiries about the Bank's loan portfolio and loan practices.   The Underwriter Defendants had access to the Company's financial and SEC filings made within the period that the Offering Documents were being prepared and disseminated.   Indeed, the SEC filings were incorporated by reference into the Offering Documents.   Specifically, the Underwriter Defendants had access to the Form 10-K 2009 Annual Report, filed on March 15, 2010, which disclosed, *inter alia*, that the Internal Review resulted in management increasing over the prior year provisions for loan losses. Similarly, the Underwriter Defendants were aware of and had the opportunity to discuss with management the Form 8-K, filed on March 22, 2010, announcing Orrstown's unsecured nonpriority claim for over $8.5 million in the Yorktown Funding, Inc. ("Yorktown") bankruptcy.

53.    One of the primary purposes of underwriters to an offering is to work with management to set a realistic, marketable price for the offered shares.

54.    In addition to Sandler O'Neill and Janney serving as underwriters in the March 2010 Offering, they performed prior advisory and investment banking services to Orrstown for which they received compensation.   Janney is also the

only investment banking firm to have an analyst who has continually followed Orrstown since the March 2010 Offering up to the present.

### 3.    The Auditor Defendant

55.    Defendant **Smith Elliott Kearns & Company, LLC.** ("Smith Elliott" or "Auditor Defendant") is a regional independent registered public accounting firm providing professional services to individuals and businesses, including public companies, in the Shenandoah and Cumberland Valleys which include parts of Pennsylvania, Maryland, Virginia and West Virginia.   With three offices in Pennsylvania and one in Hagerstown, Maryland, Smith Elliott has 150 employees. Since 1963, Smith Elliott has been providing professional accounting services to independent community financial institutions and currently represents approximately 25 such community financial institutions.  Smith Elliott holds itself out as a firm providing the "highest quality" auditing services with a "Culture for Excellence" to foster the "highest professional and ethical standards."[2]

56.    Smith Elliott began auditing the consolidated balance sheets of Orrstown and the Bank and the related consolidated statements of income, changes in shareholders' equity, and cash flows at least in 2006.  As part of its audits, Smith Elliott also audited Orrstown's and the Bank's internal controls over financial

---

[2] Smith Elliott website, http://www.sek.com/about-sek-co/.

reporting.   On June 16, 2014, the Company dismissed Smith Elliott as the Company's independent registered public accounting firm.

57.   During the Class Period, Smith Elliott issued audit reports on Orrstown's financial statements for calendar years December 31, 2009, 2010 and 2011.   All received "unqualified" audit reports on the financial statements but, in 2011, Smith rendered an adverse opinion on the Company's internal financial controls.   The Registration Statement incorporated by reference the financial statements audited by Smith Elliott and Smith Elliott's unqualified audit reports for calendar years 2008 and 2009.   Smith Elliott signed the Registration Statement and certified that the financial statements contained therein and incorporated by reference were free of material misstatements and presented in conformity with generally accepted accounting principles ("GAAP").   The Registration Statement also, upon authority of Smith Elliott, designated Smith Elliott as an expert in auditing and accounting.

58.   Smith Elliott is a registered accounting and auditing firm with the Public Company Accounting Oversight Board ("PCAOB").   As required by the Sarbanes-Oxley Act of 2002, Smith Elliott as an auditor of U.S. public companies is subject to oversight by the PCAOB and the SEC.[3]   In conducting its audits in

---

[3]   *See*   PCAOB's   website   for   oversight   responsibilities:   http://pcaobus.org/About/Pages/default.aspx .

calendar years 2009, 2010 and 2011, Smith Elliott purportedly applied the standards of the PCAOB and the Internal Control – Integrated framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Plaintiff's claims asserted against Smith Elliott as alleged herein, focus on Smith Elliott's unqualified audit reports for calendar years 2009, 2010 and partially unqualified audit report for 2011.

59.     Orrstown, the Bank, the Individual Securities Act Defendants, Defendant Embly, the Underwriter Defendants, and Auditor Defendant Smith Elliott are sometimes collectively referred to herein as the "**Securities Act Defendants**" with respect to Plaintiff's Securities Act claims.

### C.      Exchange Act Defendants

60.     In addition to being Securities Act Defendants, Quinn, Everly, Embly, Zullinger, Shoemaker, Coy, Snoke, Orrstown, the Bank (collectively the "**Orrstown Exchange Act Defendants**") and auditor Smith Elliott are also collectively "**Exchange Act Defendants**."

61.     During the Class Period, Defendants Quinn, Everly and Embly, as senior executive officers and directors of Orrstown, were privy to confidential, non-public information concerning the Bank's internal operations, controls and financial condition.   Defendants Quinn, Zullinger, Shoemaker and Coy, as members of the Enterprise Risk Management Committee, developed risk

management protocols and were privy to confidential, non-public information concerning the bank's internal operations, controls and financial condition. Defendant Snoke was on the Bank's Loan Committee throughout the Class Period and was, therefore, intimately involved in the loan approval process. Similarly, the very nature of an audit demanded that Smith Elliott have access to confidential, non-public information concerning the Bank's internal operations, controls and financial condition. Each of the Exchange Act Defendants had access to material and adverse non-public information which, as discussed in detail below, revealed the failures of the Bank's internal controls and the Regulators' comprehensive review, strong criticism and compulsory call for corrective action. Because of their positions, Defendants Quinn, Everly, Embly, Zullinger, Shoemaker and Coy were able to and did control the content and timing of the various SEC filings, corporate press releases and other public statements pertaining to the Company at the time of the Offering and throughout the Class Period. Further, Defendants Quinn and Embly signed each of the SOX Certifications that were included in the Company's periodic filings with the SEC during the Class Period.

## V.    OTHER RELEVANT PERSONS[4]

62.    **Confidential Witness #1** ("CW#1") is a former Bank employee who worked from February 2008 to August 2011 at the Bank's Operations Center in Chambersburg, Pennsylvania.   CW#1 was a Credit Analyst in the Credit Department and later became a Loan Underwriting Officer.

63.    CW#1 has personal knowledge of the Bank's internal controls pertaining to the Bank's credit review and underwriting process that were in effect before and during the Class Period.   CW#1 has personal knowledge of the Bank's practice of restructuring loans to forestall classifying them as Risk Assets.[5]   CW#1 has personal knowledge of the credit review process for the loans initiated by loan officer, Terry Reiber, in the Hagerstown, Maryland market.   CW#1 has personal knowledge of certain borrowers' loan applications such as the Azadis and Shaool family, *discussed infra* Part VII.C, because CW#1 personally evaluated their creditworthiness from 2008 through 2011.   Lastly, CW#1 has personal knowledge

---

[4] As discussed *infra*, the SEC is currently conducting a formal investigation of Orrstown and has subpoenaed certain of the Confidential Witnesses, and at least one other potential Confidential Witness who had previously contacted Plaintiff's counsel.

[5] At all times relevant to the issues raised in the complaint, the Company defined "Risk Assets" as including nonperforming loans, nonaccrual loans, substandard loans, loans past due 90 days and still accruing, special mention loans and all other classified loans.   As alleged herein, Defendants used this purposefully narrow definition to avoid capturing the performing loans within the commercial portfolio that are inherently risky and show indicia of future impairment, *i.e.*, troubled loans.

about the loans that were extended to the Chambersburg Borrowers, *discussed infra* Part VII.C, between 2008 and 2011.

64.     **Confidential Witness #2** ("CW#2") is a former Bank employee who worked from April 2010 to May 2011 at the Bank's Operations Center in Chambersburg, Pennsylvania.  CW#2 was hired to fill a newly created position of Vice President, Credit Officer.  CW#2 supervised the Credit Department which encompassed the Credit Analyst Group, had credit approval and was a voting member of the Loan Committee which in April 2010 consisted of the Chief Executive Officer, Chief Credit Officer, Chief Commercial Officer, Chief Financial Officer, one permanent board member and one rotating board member. CW#2 reported directly to the Chief Credit Officer who at the time of CW#2's employment was Defendant Jeffrey W. Embly.

65.     CW#2 has personal knowledge of the Bank's internal controls, credit review and underwriting process, and loan approval procedures between April 2010 and May 2011.

66.     **Confidential Witness #3** ("CW#3") is a former Bank employee who worked from 2007 through February 2012 at the Bank's Operations Center in Chambersburg, Pennsylvania.  Prior to joining Orrstown Bank, CW#3 prepared tax returns for certified public accounting firms and then was a credit analyst with First National Bank of Newport, the community bank that Orrstown acquired in 2006.

Upon hiring CW#3 as a Credit Analyst in 2007, Defendant Embly told CW#3 that he was impressed with CW#3's critical evaluation of loan applicants' creditworthiness while at Newport Bank.  In 2009, CW#3 was promoted to Senior Credit Manager.  CW#3 supervised three credit analysts, and CW#3 attended Loan Committee meetings until CW#2 was hired.  CW#3 and his group of credit analysts were charged with critically assessing a potential borrower's credit worthiness and making specific recommendations to the Loan Committee as to whether the loans should be approved.  CW#3 was present during Loan Committee meetings and was required to present his group's recommendations and field any questions concerning the creditworthiness of the loan applicant.

67.    CW#3 has personal knowledge of the Bank's internal controls pertaining to credit review, underwriting process, and loan approval process during the Class Period.  Specifically, CW#3 has personal knowledge of the credit analysis performed on the Shaool Family loan applications, *discussed infra* Part VII.C.  CW#3 also has personal knowledge of the Regulators' investigation of Orrstown's underwriting processes and the loan portfolios, and some of the modifications to the Bank's risk management and troubled loan restructuring mandated by the Regulators, *discussed infra* Part VII.C.

68.     **Confidential Witness #4** ("CW#4") is an owner of rental and commercial properties and is a current borrower of the Bank.  CW#4's properties and rental office are located in Hagerstown, Maryland.

69.     CW#4's initial Orrstown Bank loan officer was Terry Reiber.  CW#4 has personal knowledge of the Bank's management of lending relationships in Hagerstown and the Bank's restructuring of Risk Assets.

70.     **Confidential Witness #5** ("CW#5") is the president of a company that was a borrower of the Bank.  CW#5's company is located in Hagerstown, Maryland, and its initial Orrstown Bank loan officer was Terry Reiber.

71.     CW#5 has personal knowledge of the Bank's management of lending relationships in Hagerstown, and of the Regulators' oversight of the Bank's current affairs.

72.     **Confidential Witness #6** ("CW#6") is a former Bank employee who worked from January 2, 2011 through April 2012 at the Bank's Operations Center in Chambersburg, Pennsylvania as the Consumer Compliance Officer.  Prior to joining Orrstown Bank, CW#6 worked with federal banking regulators and a firm that provided compliance consultation to banking institutions.

73.     CW#6 has personal knowledge concerning the Special Asset Group and the independent firm the Bank retained in 2011 to provide assistance with the loan review process.

74.     **Ash Azadi** and his father **Morris Azadi** are professional commercial pilots (collectively the "Azadis").   Through their various entities, they were involved in commercial real estate development projects in Hagerstown, Maryland. They were borrowers of Orrstown Bank, and Terry Reiber was their initial loan officer.   On February 3, 2012, in the United States District Court of Maryland, Orrstown Bank filed a Complaint for Confession of Judgment and Breach of Contract against each of the Azadis and their entities alleging that their loans were in default and the Bank was owed a total amount of $16,379,954.44.   The matter is docketed at *Orrstown Bank v. Ares Investment Group, et al.*, Civil No. 1:12-cv-00345 (D. Md.) ("Azadi Litigation").   The pleadings in the Azadi Litigation provide verified statements about the lending relationship that existed between Orrstown Bank and Ash Azadi, Morris Azadi and the Azadis' various business entities.[6]   Further, on August 3, 2012, Ash Azadi was interviewed by Plaintiff's counsel.

---

[6] On December 17, 2012, the Bank and ACM Thornell IV B Azadi LLC ("ACM"), an investor group, filed a joint motion for substitution to substitute ACM as the plaintiff and judgment creditor in the matter because on June 29, 2012, the Bank sold its interest in the Azadi loans to ACM.

## VI.   RULE 23 CLASS ALLEGATIONS

75.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Securities Act and Exchange Act Classes.

76.     The Securities Act Class consists of all those who purchased or otherwise acquired the common stock of Orrstown pursuant to, or traceable to, the Company's March 2010 Offering, who were damaged thereby.

77.     The Exchange Act Class consists of all those who purchased or otherwise acquired Orrstown common stock during the Class Period, and who were damaged thereby.

78.     Excluded from the Securities Act and Exchange Act Classes are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

79.     The members of the Securities Act and Exchange Act Classes are so numerous that joinder is impracticable.  Throughout the Class Period, Orrstown common stock shares were actively traded on the NASDAQ.  As of April 5, 2012 (the last day of the Class Period), the Company had approximately 8,064,206 shares of common stock issued and outstanding and approximately 3,100

shareholders of record. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Securities Act and Exchange Act Classes. Record owners and other members of the Securities Act and Exchange Act Classes may be identified from records maintained by Orrstown or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

80. Plaintiff's claims are typical of the claims of the members of the Securities Act and Exchange Act Classes as all members of each class are similarly affected by Defendants' conduct in violation of federal law that is complained of herein.

81. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

82. Common questions of law and fact exist as to all members of the Securities Act and Exchange Act Classes and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Classes are:

a.  whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.  whether the Registration Statement issued by Orrstown misrepresented or omitted material facts regarding the effectiveness of Orrstown's internal controls;

c.  whether the Exchange Act Defendants participated in and pursued the common course of wrongful conduct complained of herein;

d.  whether the Exchange Act Defendants had a duty to disclose certain material information;

e.  whether the Exchange Act Defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

f.  whether the Exchange Act Defendants' statements made during the Class Period misrepresented or omitted material facts about the effectiveness of Orrstown's internal controls;

g.  whether the market price of Orrstown's common stock during the Class Period was inflated due to the misrepresentations and omissions of material fact as well as failures to correct the false and misleading statements complained of herein; and,

h. the extent to which the members of the Securities Act and Exchange Act Classes have sustained damages and the proper measure of damages.

83.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the classes is impracticable.  Furthermore, as the damages suffered by some individual Securities Act and Exchange Act class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act and Exchange Act Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.   <u>BACKGROUND AND FACTS</u>

### A.    The Critical Role of an Effective System of Internal Controls.

84.    The development and implementation of a system of internal controls is legally required for all financial institutions.  Internal controls are vital for the operation of a bank.  The process of internal controls ensures effective banking operations through safeguarding assets, accurate financial reporting, and legal compliance.  A system of internal controls that is well-implemented will assist the bank in meeting goals and objectives, achieve long-term profit, decrease the risk of losses or damage to the bank's reputation, and ensure compliance with laws,

regulations, policies, plans and procedures.  All systems of internal controls are run by bank management.

85.    The Office of the Comptroller of the Currency ("OCC") attributes weak internal controls to causing, among other things, inaccurate records, audits, and loan reviews, having contributed to operational loss and failures of banks.  The OCC has also stated that "effective internal controls form the foundation for a bank's system of risk management," and helps to safeguard assets, prevent fraud and financial mismanagement, and ensure legal compliance as well as compliance with the bank's own policies.

86.    Unequivocally, internal controls and the Bank's representations about its internal controls are material to investors.

87.    Specifically, the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), which has developed an internal control framework that stresses the importance of internal controls on banking operations, defines "internal control" in Chapter 1 of its Framework as follows:

> Internal control is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of operations; (ii) Reliability of financial reporting; (iii) Compliance with applicable laws and regulations.

Orrstown is required to adhere to the criteria established by COSO in making its disclosures in SEC filings concerning the effectiveness of its internal controls.

88.    The COSO further defines these three categories of objectives which allow organizations to focus on the various aspects of internal control:

- Operations Objectives – These pertain to effectiveness and efficiency of the entity's operations, including operational and financial performance goals, and safeguarding assets against loss.

- Reporting Objectives – These pertain to internal and external financial and non-financial reporting and may encompass reliability, timeliness, transparency, or other terms as set forth by regulators, recognized standard setters, or the entity's policies.

- Compliance Objectives – These pertain to adherence to laws and regulations to which the entity is subject.

89.    For each internal control that is designed to address one or more of these objectives, the COSO Framework Executive Summary requires that the system of internal controls consists of five integrated components:

- Control Environment – the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization.

- Risk Assessment – a dynamic and interactive process for identifying and assessing risks to the achievement of objectives, *i.e.*, determining how risks will be managed.

- Control Activities – the actions established through policies and procedures that help ensure that management's directives to mitigate risks to the achievement of objectives are carried out.

- Information and Communication – the continual, iterative process of providing, sharing, and obtaining necessary information.

- Monitoring Activities – the use of ongoing evaluations, separate evaluations, or some combination of the two to ascertain whether each of the five components of internal control, including controls to effect the principles within each component, is present and functioning.

90.    COSO makes clear that "an internal control is most effective when controls are built into the entity's infrastructure and are a part of the essence of the enterprise."

91.    Orrstown, as confirmed by the Confidential Witnesses and Regulators, suffered from ineffective and utterly deficient internal controls and misled investors about the effectiveness of its internal controls throughout the Class Period.

**B.     There Were Material Weaknesses in Orrstown's
        Internal Controls in 2009 through 2011**

92.     The Enforcement Actions were the culmination of the Regulators' on-site involvement with and examination of Orrstown since late 2010:

>       a.   CW#2, who recalls that outside of the ordinary examinations done by the Regulators, the Federal Reserve was on-site at the Bank's Operations Center in or about November-December of 2010.
>
>       b.   After August of 2010, the following statement no longer appeared in Orrstown's Form 10-Qs issued during the Class Period:

>           ***Management is not aware of any current recommendations by regulatory authorities which, if implemented, would have a material effect on the Corporation's liquidity, capital resources or operations.***

Form 10-Q 1Q 2010, filed on 5/7/2010, at 24; *see also* Form 10-Q 2Q 2010, filed on 8/5/2010, at 26 (same).  Defendants did not note or provide any explanation for the omission of this material statement.

93.     The Joint Examination scrutinized every aspect of the Company's internal controls over operations, reliability of financial reporting, and compliance with applicable banking laws and regulatory guidelines.

94.     Specifically, the Regulators examined:

>       (i)     the board's supervision of the Bank's major operations,

(ii)   the adequacy of the Bank's management structure and the competency of senior officers;

(iii)   efficacy of the Bank's credit risk management practices;

(iv)   timeliness of the Bank's loan portfolio reports submitted to the board;

(v)   efficacy of the Bank's loan underwriting and credit administration procedures;

(vi)   conformance of appraisals with generally accepted appraisal standards;

(vii)   efficacy of the Bank's loan workout process;

(viii) reliability of the Bank's loan grading system; and

(ix)   the acceptability of the Bank's volume of criticized loans, concentrations of credit, and levels of Risk Assets.

*See* 8-K Current Report, filed on 3/23/2012; Exhibit A at 2-8.

95.   The Regulators identified approximately 11 areas of the Bank's internal controls that required complete remediation and corrective action, and the need to design, implement, enhance and improve the internal controls to the processes that had been in place and remained unchanged from at least December 2009.

96.   Each of the 11 areas was material to and constituted a significant part of Orrstown's internal controls, and Defendants' false and misleading statements are actionable as to each are of deficiency.   Plaintiff focuses on the following

categories of pervasive and long-standing deficiencies that rendered Orrstown's internal controls ineffective:

- *Board Oversight and Management Competency*

- *Loan Underwriting*

- *Credit Administration*

-  *Allocation of Loan Losses*

- *Concentrations of Credit*

### (a)   <u>Corrective Action</u> – Develop and Execute Board Oversight and Management Competency Plans

97.     Throughout the Class Period, the Bank had no effective board oversight and management of operations.  Therefore, the Regulators required the Bank to develop and execute effective plans for board oversight and management of operations.

98.     In developing these plans, the Federal Reserve required that by mid-June 2012, the Bank retain an independent consultant to "conduct a review of all management and staffing needs of the Bank and the qualifications and performance of all senior management (the 'Management Review'), and to prepare a written report of findings and recommendations (the 'Report')."   Ex. A, Written

Agreement at 2.   The Management Review was to consider several factors including but not limited to the following:

> An evaluation of each senior officer to determine whether the individual possesses the ability, experience, and other qualifications ***to competently perform*** present and anticipated duties, ***including their ability to: . . . restore and maintain the Bank to a safe and sound condition*** . . . .

*Id*. at 3-4 (emphasis added).   The Bank was to report its findings and recommendations within 30-days after the issuance of the independent consultant's Report.

99.   In its Consent Order, the Department of Banking also required the Bank to take affirmative steps to revamp management through a review conducted by an independent consultant "who is acceptable" to the Department of Banking. Form 8-K Department of Banking Consent Order, filed 3/23/2012, at 3-5   The independent consultant was to provide, *inter alia*,

> An evaluation of each existing director and senior officer to determine ***whether these individuals possess the ability***, experience, and other qualifications required to perform present and anticipated duties, including adherence to the Bank's established policies and practices, and ***restoration and maintenance of the bank in a safe and sound condition.*** . . .

*Id*. at 4 (emphasis added).

100.   Each of the Individual Defendants was subject to this review.  Each of these Individual Defendants served in board and/or senior management positions in 2009, prior to the March 2010 Offering, and at all other relevant times.  They had developed the internal controls over the underwriting of loans, risk management and financial reporting that were in place in 2009 through 2011 which were materially deficient and ineffective.

101.   Defendant Everly signed all of the SOX Certificates that were filed with the SEC during the Class Period.  Defendants Everly and Embly were members of the Loan Committee at all relevant times.  In fact, in September 2009, Defendant Embly was appointed as Chief Credit Officer to purportedly "enhance [the Bank's] processes and controls, as well as clearly delineate independence between sales and credit."  Form 424B5 Prospectus Supplement, filed 3/24/2010, at S-2.  Defendants Everly and Embly participated in the preparation of the Company's false and misleading SEC filings.

102.   Defendants Everly and Embly are implicated in the Company's ineffective and deficient internal controls that existed prior to and continued into 2012:

   a.  CW#1 confirmed that in 2008 and into early 2009, Everly and Embly permitted Terry Reiber, a former loan officer, to perform his own appraisals on some of the commercial loans he originated in

Hagerstown, Maryland, and these loans were often approved despite their failure to comply with the Loan Policy. These loans were part of the Bank's loan portfolio at the time of the 2010 Offering and during the Class Period.

b. CW#1 and CW#3 confirmed that in 2008 and into early 2009, Everly and Embly permitted commercial loans in Hagerstown, Maryland that were originated by Reiber to be approved even though no due diligence was done on them. These Reiber-approved loans were in the Bank's loan portfolio in March 2010 and during the Class Period.

c. CW#1 confirmed that beginning in 2008, CW#1 worked on the credit analyses for three of the Bank's largest borrowers – the Azadis, Schaool Family and two Chambersburg real estate developers Bob Hickey and Tom Mongold ("Chambersburg Developers"). CW#1 recalled that the cash flows often did not support the credit these borrowers requested, but that the loans were approved anyway by Everly and Embly who sat on the Loan Committee. These Everly/Embly approved credits were in the Bank's loan portfolio in March 2010 and during the Class Period.

d. CW#1 also explained that often new loans were extended to "bail out" these borrowers from a bad financial situation in 2008 through 2011.

e. CW#3 confirmed that in 2008 and 2011, the credit analysts' recommendations throughout this period to not extend credit were often overruled by the Loan Committee such that the loan applications were approved based upon an "exception" to the Loan Policy. These improperly approved credits were in the Bank's loan portfolio in March 2010 and/or during the Class Period.

f. CW#3 confirmed that Everly and Embly violated banking regulations in late 2010 or early 2011 by exceeding the Bank's legal lending limit of $19 million to the Chambersburg Developers (*discuss infra* Part VII.C). CW#3 recalled that Everly and Embly explored whether they needed to do "work arounds" to restructure the loans so that the loans could be reissued without either the Chambersburg Developers identified as guarantors of the loans or concealing the relationship between the Chambersburg Developers and to each of their related entities that had secured loans.

103. In the wake of the Enforcement Actions, several officer and senior level "resignations" occurred:

"On May 14, 2012, **Bradley S. Everly** resigned as Executive Vice President, Treasurer  and Chief Financial Officer of Orrstown Financial Services, Inc. and its wholly-owned subsidiary, Orrstown Bank (the "Bank"). The resignation was not due to any disagreement with the

Company or the Bank on any matter relating to the Company's or the Bank's accounting principles or practices."   Form 8-K Other Events, filed 5/14/2012 (emphasis added).

"On June 29, 2012, **Terry W. Miller** resigned as Senior Vice President and Director of the Special Assets Group of Orrstown Bank (the "Bank"), the Registrant's wholly-owned banking subsidiary."   Form 8-K Other Events, filed 7/16/2012 (emphasis added).

"On September 18, 2012, **Jeffrey W. Embly** resigned as Executive Vice President and Chief Operating Officer of Orrstown Financial Services, Inc. and Orrstown Bank, to pursue other business opportunities."   Form 8-K Other Events, filed 9/18/2012 (emphasis added).

104.   As Orrstown and the Bank were announcing Everly's and Embly's departures, they were also announcing additions to management which were intended to fulfill the Regulators' mandate that management "restore and maintain the Bank to a safe and sound condition."   The Company filed these announcements with the SEC:

"On August 14, the Company announced **Jeffrey M. Seibert** was appointed Executive Vice President and Chief Operating Officer of the Bank."   Form 8-K Other Events, filed 8/14/2012 (emphasis added).

"On August 29, 2012, **David P. Boyle** was appointed as Executive Vice President and Chief Financial Officer of the Orrstown and the Bank."   Form 8-K Other Events, filed 8/29/2012 (emphasis added).

"On September 15, 2012, the Company announced **David D. Keim** joined the Bank as Executive Vice President, Chief Risk Officer.   Mr. Keim will **oversee the**

*Enterprise Risk Management function of the Bank and in this role will be responsible for the leadership, innovation, governance, and management necessary to identify, evaluate, mitigate, and monitor the Bank's operational and strategic risk*." Form 8-K Other Events, filed 9/25/2012 (emphasis added).

105.   Of these new hires, Mr. Keim is the most telling given that he was tasked with developing and executing an *entirely new* risk management process. From this a reasonable inference can be made that the existing risk management processes that existed in 2009 and 2010 were inadequate and that the Enterprise Risk Management Committee, formed in 2009 and on which Defendants Quinn, Zullinger, Coy, Shoemaker sat, failed to implement effective adequate controls and oversight of the Bank's risk areas, such as credit, operations, liquidity and compliance with regulatory guidelines.

106.   The foregoing demonstrates (and, at minimum a reasonable inference can be made from the foregoing), that Everly and Embly engaged in reckless banking practices in 2009 through 2011 and were among those responsible for the Bank's internal control failures.

### (b)   <u>Corrective Action</u> – Develop and Execute a New Process for Loan Underwriting

107.   Throughout the Class Period, the Bank lacked effective internal controls with respect to loan underwriting.   The Enforcement Actions very

specifically outline the deficiencies that needed to be remediated through the implementation of new policies and procedures in Orrstown's loan underwriting.

108.   From at least 2007 through 2011, the Bank regularly disregarded and violated the loan policies in extending and restructuring credit to borrowers with existing commercial loans that, in CW#3's words, "didn't work" from the day they were made.

109.   As described in the Offering Documents, the Bank's "credit approval process is structured in a manner such that all major decisions regarding loans need to be *approved by a committee of senior management and board members*." Form 424B Prospectus Supplement, filed 3/24/10, at S-2 (emphasis added).   As reported in the Offering Documents, the loan review process had the following levels of involvement by executive officers and directors of Orrstown, including all of the Individual Defendants:

   a.  Oversight and management of the process by the Chief Credit Officer;

   b.  No individual lender had a maximum lending authority exceeding $350,000;

   c.  The Chief Commercial Officer had a maximum lending authority limit of $500,000;

   d.  The Chief Credit Officer had a maximum lending authority limit of $1 million with no single credit over $500,000;

  e. All other loans had to be reviewed and ratified by the Loan Committee consisting of the Chief Executive Officer, Chief Credit Officer, Chief Commercial Officer, Chief Financial Officer and rotating two directors;

  f. The Credit Administration Committee, consisting of four independent directors, provided ongoing credit oversight and annually reviewed all loan relationships with an aggregate committed exposure of greater than or equal to $750,000; and

  g. The Loan Review Officer, under the supervision of the Credit Administration Committee, rated all loan relationships with aggregate committed exposure of less than or equal to $1,000,000.

*Id.*

110. Depending upon the size of the loan, the "packets" would go to the Loan Committee for approval.  After loans were approved, the Loan Review Officer was to periodically monitor and perform stress tests on the loans.  The loan officers were to assist in securing updated financial data, *e.g.*, financial statements, on all lending relationships that would indicate the financial condition of each borrower and guarantor.

111. In 2008 through the end of March 2010, the Credit Department's Credit Analyst Group consisted of three credit analysts and a Senior Credit

Manager.  The Credit Analyst Group was charged with analyzing the credit quality of every loan that was generated by the Bank's loan officers, including the commercial loans for borrowers in the Hagerstown market.

    a. CW#3 explained that credit analysts would review a loan applicant's loan application, personal and business tax returns, appraisals, perform a collateral valuation, prepare cash flows and then submit the loan "packet" to the loan officer who would provide his analysis of the creditworthiness of the loan applicant.  The Credit Analyst Group was to make a recommendation whether to approve the loan application.

    b. Despite the fundamental and crucial role credit analysts play in determining the creditworthiness of a borrower, the Bank's junior credit analysts were inexperienced and the Bank, according to CW#1, refused to send them and the senior credit analysts, such as CW#3, to formalized training seminars.

    c. In addition, from 2006 through 2012, the Bank's Loan Review Officer had no formal or practical training for this position but rather was a 2003 college graduate with a marketing degree who went to work directly for the Bank as a credit analyst, and then after only three

years, was appointed in December 2006 to the position of Loan Review Officer.

112.   The Department of Banking specifically identified the Bank's deficiencies and failures in its loan underwriting process by requiring "[w]ithin 60 days of this Order, the Bank shall adopt policies and procedures to minimize and monitor loan documentation exceptions as well as identify and correct outstanding exceptions noted in the Report of Examination."  Ex. B, Consent Order at ¶ 6(a). This deficiency was identified as existing during the relevant time period of 2009 through 2011 by the Confidential Witnesses, who as credit analysts were often working with incomplete loan packets while handling a volume of loans excessive for a staff of three.

a.  According to CW#3, tax returns are the most important piece of data for credit analysts because they were used by credit analysts to construct the borrower's cash flow and derive a Debt Service Coverage Ratio.

b.  CW#3 stated that the credit analysts' work suffered from a huge volume of loan applications and either missing or outdated credit data, such as tax returns and appraisals, needed for their credit review. CW#1 and CW#3 recall that more often than not during the Class

Period they were working with either outdated appraisals or no appraisals.

c.  According to CW#1, the loan officer would review and, in some cases, modify the presentation of information in the "packets," especially as to the applicant's cash flow. These modifications often resulted in the applicant appearing to be more creditworthy.  CW#1 specifically recalls Hagerstown loan officer Terry Reiber either modifying "packets" prepared by the credit analysts or independently preparing the "packets."  These doctored packets resulted in the approval of unsustainable credits that were in the Bank's loan portfolio at the time of the March 2010 Offering and thereafter during the Class Period.

113.  The Bank's Loan Policy required the Loan Committee to stress test loans and carefully manage risks taken by the Bank when extending credit and conducting restructurings.   The Loan Policy specifically condemned taking excessive risks in approving loans.  According to CW#1 and CW#3, the Loan Committee routinely approved loans, restructurings and the extension of credit from late 2009 through 2011 that failed to satisfy the credit standards of the Loan Policy.  Although CW#1 and CW#2 were not in the Loan Committee meetings

during the voting in 2009 through 2011, they personally saw the loans that were approved during that period that did not satisfy the Loan Policy.

114.   Prior to the close of the March 2010 Offering, the Loan Committee consisted of the Chief Credit Officer, Chief Executive Officer, Chief Financial Officer, director Defendant Snoke and one rotating director.   Prior to and throughout the Class Period, Defendants Quinn, Everly, Embly and Snoke were consistently members of the Loan Committee.   The weekly Loan Committee meetings were attended by members of the Loan Committee, the loan officers and a representative of the Credit Analyst Group.

115.   In 2008, 2009 and up and until April 2010, CW#3 participated in the Loan Committee meetings to answer questions and comment on the Credit Analyst Group's recommendation as reflected in the "packets."   According to CW#3, Defendant Embly was the most influential member of the Loan Committee.   The allegations set forth in paragraphs 116 to 122 reflect actions and conditions that were personally observed by CW#3 prior to and during the entire Class Period.

116.   Under Embly in the years 2008 through 2011, CW#3 recalls commercial loans continued to be approved by the Loan Committee contrary to the Credit Analyst Group's "Do Not Recommend Approval" statements.   CW#3 confirmed that the Loan Committee, contrary to Loan Policy, took unwarranted or excessive risk in approving commercial loans generated by Terry Reiber in the

Hagerstown market and loans in which the applicant was part of the "Old Boys Club" of Chambersburg, *see infra* Part VII.C.  In these cases, the Loan Committee would approve the loans based upon an often frivolous "exception."  CW#3 was not present in the Loan Committee meetings during the actual voting, but CW#3 learned of the Loan Committee's decisions after the loans were approved.

117.  In the years 2008 through 2011, CW#3 recalls that the Loan Policy allowed for "exceptions" in approving credit to borrowers who did not satisfy the Loan Policy's standard credit requirements.  According to CW#3, Defendant Embly appeared to have full discretion on identifying and justifying an exception. CW#3 said that exceptions were only to be used as a justification for approving a loan if the borrower had an excellent credit history with the Bank, if the loan would be over-collateralized or if the borrower satisfied other recognized exceptions listed in the Loan Policy.  Importantly, the Loan Policy indicated that *more than one* of the listed exceptions should be met before a credit extension is approved.

118.  One of the Loan Policy's basic underwriting criteria for commercial loans is that the borrower's income must satisfy the debt service on a loan. According to CW#3, the Loan Policy required that the loan applicant or prospective borrower's generated cash flow exceed *at a minimum* 1.20 times the annual debt service.  CW#3 confirmed that in 2008 through 2011, loans were

regularly approved even though the applicant failed to satisfy the 1.20 Debt Service Ratio.  CW#3 specifically recalls the Debt Service Ratio being as low as 1.1 and 1.0 on loan applications, yet, the Loan Committee would approve the loan based upon an "exception."   From CW#3's credit analyst perspective, the exceptions rarely – if ever – justified approval of the loans.   And, equally concerning to CW#3, the exception of a Debt Service Ratio of 1.1 and 1.0 became the norm.   By lowering the Debt Service Ratio, the Loan Committee was approving very risky loans in the Hagerstown and Chambersburg markets that CW#3 confirmed "didn't work" from a cash flow standpoint throughout 2007 and into 2011.

119.   The Hagerstown commercial loans generated by loan officer Terry Reiber in 2007 through 2009 often had below Loan Policy level Debt Service Ratios.   Yet, the loans would be approved without any justification for the Loan Committee allowing this exception other than Reiber's vacuous response of, "It is what it is."  In one telling Loan Committee meeting that occurred in 2007 or 2008, CW#3 recalls, the Loan Committee was reviewing a loan application submitted by Reiber on behalf of existing Hagerstown commercial borrower Dustin Shaool, *see infra* Part VII.C.  Despite the Credit Analyst Group's recommendation to "not approve loan," Defendant Embly lobbied for the loan stating, "Dustin's loans won't go bad – his dad won't let them." Although CW#3 was not present when this

loan was voted upon, it was approved.  Thus, a reasonable inference can be made that the Loan Committee was swayed by Embly that the unenforceable expectation about Dustin's dad was a valid basis for an exception to the criteria set forth in the Bank's Loan Policy.

120.   Aside from inadequate Debt Service Ratios, the Hagerstown commercial loans that were made in 2007 through mid-2009 were often outside of the Loan Policy's credit requirements because the loan to value ratios ("LTV") were unacceptably high for the loan collateral.  Yet, again according to CW#3, Reiber's "It is what it is" statements were enough for the Loan Committee to approve the loans notwithstanding the LTV.  This occurred even at times when the Loan Committee did not have current appraisals for the collateral that was reviewed by the Bank's Staff Appraiser, according to CW#3.

121.   CW#1 and CW#3 confirmed that Reiber cultivated the relationships, influenced the credit review and approval process on the loan applications that were processed in 2007 through 2009, *see infra* Part VII.C, and the Bank extended large commercial loans to risky borrowers, who in many cases, simply did not have the wherewithal to satisfy the debt service on the loans.  CW#3 confirmed this fact and stated that by mid-2009 Brian Selders, who was hired in replace Reiber, had made known within the Bank that the vast majority of Hagerstown commercial loans Reiber "had left him" were of very poor quality.

122. CW#1 and CW#3 recall the Loan Committee approved loans in 2008 through 2010 from loan applicants who were well-known businessmen Bob Hickey and Tom Mongold (collectively the "Chambersburg Developers"), but whose loan applications did not satisfy the credit requirements of the Loan Policy. CW#3 specifically recalls the Loan Committee making invalid lending exceptions for the Chambersburg Developers. *See infra* Part VII.C. From CW#3's observations, the Loan Committee over-extended the Bank and violated the Loan Policy just because, in Embly's words, "Bob [Hickey] needs this."

123. In September of 2009, Defendant Embly was appointed as Chief Credit Officer to purportedly "enhance [the Bank's] processes and controls, as well as clearly delineate independence between sales and credit." Form 424B5 Prospectus Supplement, filed 3/24/2010, at S-2. Because of his influence over the loan review process both before and after becoming the Chief Credit Officer, according to CW#6, Orrstown employees believed that Embly was the primary person responsible for the Bank's extension of loans that were not creditworthy and later became Risk Assets.

124. Another aspect of the Bank's loan process is the role of the Bank's Credit Administration Committee in the "administration and supervision over the lending process." Form 10-K 2009 Annual Report, filed 3/15/2010, at 5. The Credit Administration Committee consists of board members who are charged with

safeguarding the Company from taking excessive credit risks, ensuring loans are adequately and effectively stress tested to trigger accurate classifications of loans as Risk Assets, and designating adequate provisions for loan losses. Throughout the Class Period, the Credit Administration Committee failed to fulfill its duties as evidenced by the Bank's excessively risky commercial loan portfolio, delayed classification of Risk Assets and understatement of loan loss reserves, *see infra* Part VII.C, X.B.

125.   As confirmed by CW#1, CW#2 and CW#3, the aggressive, non-conservative lending undertaken by Reiber and the Bank with respect to the borrowers discussed herein, as well as the dozens of other loans concentrated in the Hagerstown market totaling tens of millions of dollars as of March 2010, left Orrstown in a compromised operational and financial state by the time of the March 2010 Offering. The Regulators' involvement and scrutiny within months of the March 2010 Offering caused the Bank to classify over $113.7 million of these loans as Risk Assets. *See* Form 10Q 1Q2012, filed 5/9/2012, at 44. In July 2012, Defendant Quinn admitted that there were still 20 troubled loans in Hagerstown. He then brokered two significant sales including most of the Hagerstown troubled loans which collectively had a carrying balance of approximately $74.2 million.[7]

---

[7] Marcus Rauhut, "Orrstown Bank Sells 65 commercial loans to improve balance sheet," *Public Opinion*, July 30, 2012. *See also* Form 8-K Press Release,

126.   The Regulators presumably started to put the brakes on Orrstown's reckless underwriting practices during the course of the Joint Examination because in July 2011, the Bank disclosed without explanation that it had outsourced its loan review process to an independent firm.  Form 8-K 2Q2011 Operation Results, filed on 7/28/2011.   Specifically, the Bank retained a credit review consulting firm which , among other things, was to assist the Bank with "identify[ing] gaps in the underwriting process."  Form 10-K 2011 Annual Report, filed 3/15/2012, at 125. According to CW#6, the credit review consulting firm provided at least one lengthy training session for the Bank's commercial lenders in which Defendant Embly participated.   CW#3 recalled that as the result of the independent consultant's involvement, by the end of 2011, there was a "new process flow" for credit and "everyone was given new binders."

127.   The unsafe and unsound underwriting practices described by CW#1, CW#2, CW#3 and CW#6 are precisely the practices that prevailed and characterized the Bank's lending realities during 2009, 2010 and the better part of

---

2Q2012 Operating Results, filed on 7/27/2012 (announcing sale of 65 commercial real estate loans with a carrying balance of $28.6 million); Form 8-K Press Release, filed 12/20/2012 (announcing sale of 172 distressed commercial loans will balance of $45.6 million); Andy Peters, "Pennsylvania Bankers Give Crash Course in Biting the Bullet," *American Banker*, December 24, 2012 (interview of Defendant Quinn and the Bank's new Chief Financial Officer David Boyle).  The first of these two sales, included the sale of the Azadi loans (*see infra* Part VII.C) to investor group ACM.

2011. Thus, Orrstown's admission of its lack of effective internal controls in calendar year ending December 31, 2011 coupled with the Regulators' mandate for compulsory corrective action after the Regulators' scrutiny of the Bank's loan portfolio beginning in 2010, mere months after the March 2010 Offering, supports a reasonable inference that in 2009 and 2010, the internal controls over underwriting, risk management and financial reporting were also materially ineffective.

### (c) Corrective Action – Develop and Implement a New Process for Credit Administration, Determining Proper Allowance for Loan Loss Reserves, and a Plan for Identifying Concentrations of Credit

128. Throughout the Class Period, the Bank lacked effective internal controls with respect to its allowance for loan loss reserves, identifying concentrations of credit, and its credit administration.

129. The Enforcement Actions very specifically delineate the types of new policies and procedures Orrstown needed in order to develop sound banking practices with respect to credit administration and devising the methodology for determining the proper allowance for loan loss reserves. The need for a complete overhaul of the internal controls addressing credit administration and loan loss reserves was warranted given that from 2009 through early 2011, the Bank failed to effectively stress test and risk rate loans and then adequately provide for loan

losses.   Also during this time period, the Bank had *no process* in place for managing concentrations of credit.   A reasonable inference from this corrective action is that prior to the Regulators' Joint Examination the Bank's credit administration process and methodology for loan loss reserves were both incomplete and inadequate. Even more pointedly, the Enforcement Actions implicitly *rejected* the Bank's *2009 internal review* and *eight point internal risk rating system*, introduced in 2010, as effective methodologies to assess risk and allocate loan losses.

### i)   November 2009 Internal Review

130.   In November 2009, after Orrstown created the position of Chief Credit Officer, the Bank initiated an internal review ("Internal Review").   The Bank described it as "an expanded review of the Bank's commercial loan portfolio, in a proactive attempt to identify potential weaknesses and deterioration in the portfolio." Form 10-K 2009 Annual Report, filed 3/15/2010, at 33.  The Internal Review was first announced in the Offering Documents and then in the 2009 Annual Report which were filed within weeks of each other.

131.   The Internal Review mirrored the Bank's Loan Review Officer's responsibilities of calculating the allocation of loan loss reserves for the loans rated as impaired, as well as monitoring and evaluating loan customers by "utilizing

risk-rating criteria established in the Loan Policy in order to spot deteriorating trends and detect conditions which might indicate potential problem loans." Form 10-K 2009 Annual Report, filed 3/15/2010, at 5; Form 10-K 2010 Annual Report, filed 3/11/2011, at 5.

132.   The Internal Review was concocted to create the impression that Defendants were carefully scrutinizing and assessing the Bank's loan portfolio.   In fact, the Internal Review was an utter failure as confirmed by CW#1, CW#3 and the Enforcement Actions. It was never structured to nor capable of exposing the weaknesses and deterioration in the Bank's portfolio or the Bank's imprudent and high risk lending.   At bottom, the Internal Review, rather than exemplify internal controls, demonstrated that the Bank lacked effective internal controls or the ability to assess, using well recognized metrics, the quality of its loan portfolio.

133.   The Internal Review was done by those who were at least, in part, responsible for the Bank's internal controls and the poor quality of the loan portfolio.   In a fox-guarding-the-chicken house moment, the Internal Review team included one or more of the loan officers who brokered the very lending relationships under review.    The Internal Review team consisted of three employees and two contract employees.   CW#2 stated that none of the review team members were "credit minded" which, of course, was one of the fundamental problems at Orrstown – a lack of focus on sound credit requirements needed to

prevent the extension of risky loans and then identify when a loan had become or threatened to become a Risk Asset. This structural bias enabled the Bank to limit the exposure of Risk Assets through the Internal Review because the team was neither capable nor motivated to delve into the adverse credit data for each commercial loan and make determinations that would directly implicate themselves or their supervisors as pushing through risky loans.

134. The Internal Review resulted in the Company increasing the allowance for loan loss reserves by a mere $3.6 million for the three-month period ending December 31, 2009, which was reported in the Company's 2009 Annual Report filed one week prior to the March 2010 Offering. In making such an allowance, however, the Company failed to disclose that its internal controls were wholly inadequate to accurately reflect the true level of impaired loans and the overall weakness and high risk in the Bank's commercial portfolio because, among the things discussed herein, by mid-2009, (i) Brian Selders had put the Bank on notice of wide-spread weaknesses in a majority of the Hagerstown commercial loans; (ii) CW#1 and CW#3 confirmed that the Bank did not secure from borrowers "new information regarding existing loans" or possess current, reliable appraisals; (iii) no allowance was timely made for the Yorktown loan despite the fact the Bank's management should have known in 2009 that the loan was a Risk Asset, months before Yorktown filed for bankruptcy; and (iv) no allowance made

for the Azadis' loan in 2009 when again the Bank should have known they were experiencing financial difficulties and their cash flow was drying up.

### ii)   *Eight Point Internal Risk Rating System ("IRRS")*

135.   In early 2010, the Bank adopted an **IRRS**, which gave the Bank the discretion to use several different rating levels until it would ultimately have to move a troubled loan into the nonperforming category.  Consequently, the Bank no longer identified as "impaired" its "performing substandard loans."  This change in policy was not mentioned until Orrstown's 2010 Form 10-K filed in March 2011. The practical effect of the IRRS was that as management applied it over different reporting periods, there were significant decreases in Risk Assets and the loan loss reserves only slightly increased, *see infra* Part X.B.   Therefore, the IRRS essentially serves as a device to delay proper recognition of Risk Assets in direct contravention to the impression its adoption was intended to create.

136. Months after the start of the Joint Examination, the Bank was prompted by the Regulators' scrutiny of the Bank's internal controls to outsource some or all of its credit administration and problem loan identification and monitoring.  Form 8-K 2Q2011 Operation Results, filed on 7/28/2011; *see also* Form 10-K 2011 Annual Report, filed 3/15/2012, at 125.   In disclosing the retention of this independent consulting firm to the investing public, the Bank

positioned this move as a responsible effort to ensure good risk management: "Management's decision to supplement its internal review was consistent with its desire to review every loan within these portfolios in excess of $500,000 and to obtain at least 75% coverage of the portfolio as measured in dollars."  Form 10-Q 2Q2011, filed on 8/9/2011, at 56-57.  The Company, at that time, did not disclose the existence of the Joint Examination, the true state of the deteriorating commercial loan portfolio, or the inability of the Bank's internal controls to adequately assess loan risks.

137.   The Regulators were on-site months after the implementation of the IRRS.  A reasonable inference can be made that the Regulators found the IRRS to be a flawed risk management tool which prompted, at least in part, Orrstown's retention of the independent consulting firm and the abandonment of the IRRS.

### iii)   Credit Concentration

138.   At the time the Regulators issued the Enforcement Actions, they noted that the Bank had no plan or process in place "to identify, limit and manage the Bank's commercial real estate ("CRE") loan concentration of credit to an amount which is commensurate with the Bank's business strategy, management expertise, size and location ("CRE Concentration Plan")" and required Orrstown to "develop and implement" such a plan within 90-days from the effective date of the Consent

Order.  Ex. B, Consent Order at ¶ 7(a); *see also* Ex. A, Written Agreement at ¶ 5(a).  Orrstown's submitted plan was to be in accordance with the Federal Reserve's Interagency Guidance on Concentrations in Commercial Real Estate Lending ("Interagency Guidance").

139.   The Federal Reserve issued the Interagency Guidance on December 6, 2006 and developed it "to reinforce sound risk management practices for institutions with high and increasing concentrations of commercial real estate loans on their balance sheets."[8]  The Interagency Guidance applied to Orrstown, and Orrstown's internal controls with respect to CRE loan concentrations should have comported with the Interagency Guidance.

140.   Despite the Bank's heavily weighted commercial loan portfolio, Orrstown failed to create or implement a CRE Concentration Plan at any time prior to or during the Class Period.  The investing public was never informed at any relevant time that the Bank lacked a CRE Concentration Plan.  The Bank's failure to adopt and adhere to a CRE Concentration Plan constitutes failures of internal controls over credit management.

---

[8] Board of Governors of the Federal Reserve System, Supervisory Policy and Guidance Tips, "Real Estate," http://www.federalreserve.gov/bankinforeg/topics/real_estate.htm.

C.      **Four Lending Relationships that Illustrate Orrstown's Lack of Effective Internal Controls.**

141.   The Bank's lending practices with respect to four borrowers – ***Yorktown,*** the ***Azadis***, ***Shaool Family*** and ***Chambersburg Developers*** – illustrate that from 2009 through 2011, Orrstown lacked the requisite internal controls over underwriting, risk management, credit administration and financial reporting.

142.   ***Yorktown*** provided interim construction financing to residential developers.  It began borrowing from the Bank in 2002, and by 2010 its total outstanding loan balance was $8.3 million.

143.   CW#1 and CW#3 analyzed Yorktown's loans in 2008-2009 and concluded that the loans failed to satisfy the Loan Policy, but their assessments were disregarded by the Chief Credit Officer, Loan Committee and Credit Administration Committee, which included Defendants Quinn, Embly, Everly, Snoke and Shoemaker.  Moreover, the structurally deficient Internal Review (*see supra* Part VII.B(c)) conducted in late 2009 did not identify Yorktown as a Risk Asset despite the fact that: (i) Yorktown's cash flow was unable to satisfy the debt service on the loans; (ii) Yorktown was heading for bankruptcy; and (iii) the Bank should have increased the risk rating on this loan and taken a loan loss provision on Yorktown as of December 31, 2009.

144.   In February 2010, Yorktown filed for bankruptcy.  Orrstown waited until March 22, 2010 to disclose the bankruptcy and that, since the Bank had an "unsecured nonpriority claim," the Bank reclassified the loan as nonperforming as of March 31, 2010.  Form 8-K Current Report, filed 3/22/2010.  One year later, the Bank disclosed that it was writing off Yorktown's entire $8.3 million loan balance.  Form 8-K Material Impairments, filed 7/14/2011.

145.   The Yorktown loan exemplifies the absence of internal controls at the Bank with respect to loan underwriting and the prudent periodic monitoring and assessment of loan quality.

146.   The *Azadis* developed commercial and residential properties in Hagerstown, Maryland.  Orrstown began extending credit to the Azadis in 2007 and within three years, the Bank had extended $10 million.   In January and June 2010, the Azadis informed Defendant Embly that they were having financial difficulty.  *See* Azadi Litigation, at 37-38.  CW#1 and CW#3 analyzed the Azadis' credit for loans made in 2007 through 2010 and they recalled that the "cash flow didn't work" and that the Bank was not monitoring the Azadis' construction draws on their line of credit.  Despite the findings of the credit analysts, CW#1 and CW#3, and the Azadis' admissions of financial difficulties throughout 2010, Orrstown went ahead and extended another $5.9 million in January 2011 through a series of restructures or modifications and personal guarantees.  *Id*.  This cash

infusion could not keep the Azadis afloat, and in July of 2011 they asked for additional funding. *Id*. at 39. Defendant Embly was unable to push the loans through for the Azadis. *Id*. at 39-40. On August 26, 2011, the Bank issued default notices to the Azadis in the amount of $16.3 million. *Id*. at 40.

147. From the Azadis' lending history, a reasonable inference can be drawn that Orrstown had failed to conduct meaningful stress testing of the their loans because if it had, Orrstown would have determined that: (i) as early as 2009, the Azadis' cash flow was unable to satisfy the immediate and long term debt service on the loans; (ii) the Bank should not have extended further credit to the borrowers; and (iii) the Bank should have increased the risk rating on the Azadi loans and made provisions for loan loss associated with the loans prior to 2012. Tellingly, Defendant Quinn identified the Azadis' loans "troubled" and included them in the July 22, 2012 sale, *see supra* n.7.

148. The ***Shaool Family*** and their entities borrowed millions from the Bank from 2005 through 2011 for residential development projects in Hagerstown, Maryland. Like the Azadis, the Shaool Family ultimately had their loans modified or restructured in 2011. CW#1 and CW#3 personally worked on the Shaool Family's credit analyses between 2008 and 2011, and concluded that their loan applications did not satisfy the Loan Policy. These findings were ignored and the Bank extended over $24 million to the Shaool Family between 2005 and 2011.

149.   From the Shaool Family lending history, a reasonable inference can be drawn that Orrstown had failed to apply the Loan Policy to credit decisions because if it had, Orrstown would not have extended additional credit to these borrowers in 2008 and 2011.

150.   The ***Chambersburg Developers***, Bob Hickey and Tom Mongold are real estate agents and developers in the Chambersburg area.   Hickey was Defendant Embly's next-door neighbor and, according to CW#1 and CW#3, the two had a close friendship.   Hickey also sat on the Bank's Chambersburg-Greencastle Advisory Council.   *See* Schedule 14A Additional Definitive Proxy Materials, filed 3/30/2012, at 10.   According to CW#1, CW#2, and CW#3, the Chambersburg Developers and their entities were given preferential treatment by the Loan Committee, especially by Defendant Embly, such that their loans were approved throughout 2008 to 2010, despite adverse credit information and the failure to meet the standards set out in the Company's Loan Policy.   By late 2010, the Bank's Loan Committee approved over $21 million in loans to the Chambersburg Developers.   At this time, Orrstown reported that its loan lending limit was $19,000,000.   Form 10-K 2010 Annual Report, filed 3/11/11, at 42. According to CW#3, Defendants Everly and Embly realized sometime in late 2010 or early 2011, that they may have gone over the Bank's legal lending limit with respect to the Chambersburg Developers and they began restructuring the loans.

151.   From the Chambersburg loan history, a reasonable inference can be drawn that (i) Orrstown failed to apply the Loan Policy and overrode credit analysts' recommendations when extending credit to these borrowers in the period 2008-2010 and (ii) Orrstown did not have in place a CRE Plan that would have alerted Orrstown well in advance of 2010 that it was approaching its legal lending limits with these borrowers.

**D.     The Material Weaknesses In Internal Controls Are Made Public.**

152.   On March 15, 2012, the Company filed its 2011 Annual Report admitting that the Company had a "material weakness" in its internal controls. Form 10-K 2011 Annual Report, filed 3/15/2012, at 74-75.   Further, the Bank informed investors that in the third quarter of 2011, it formed the Special Assets Group ("SAG").   *Id*. at 125.   SAG, the Bank's loan workout department, was staffed with "12 employees actively engaged in the identification and work out of problem credits in the most favorable manner to the Company."   *Id*.   Despite the "enhancements" in the "underwriting, credit administration and problem loan identification and monitoring" by SAG and the credit review consulting firm, the Company ***for the first time admitted*** that throughout 2011 it had "***failed to implement a structured process with appropriate controls to ensure that updated loan ratings were incorporated timely into the calculation of the Allowance for Loan Losses*.**"   *Id*. (emphasis added).   The Company further admitted that as of

March 2012, it had failed to "*fully remediate its material weakness in its internal control over financial reporting relating to loan ratings and its impact on the allowance for loan losses*." *Id.* (emphasis added).  The Company also pledged to "improve its internal controls over financial reporting" by continuing to implement remedial actions.  *Id.*  Then, one week later after these dramatic disclosures, the investing public was told about the Regulators' Joint Examination and resulting Enforcement Actions against the Bank.

153.   On March 23, 2012, Orrstown disclosed the Consent Order and Written Agreement.   Form 8-K Current Report, filed on 3/23/12.   These Enforcement Actions mirror each other.  As summarized by the Company:

> Pursuant to the Agreement, the Company and the Bank agreed to, among other things, (i) adopt and implement a plan, acceptable to the Reserve Bank, to *strengthen oversight of management and operations*; (ii) adopt and implement a plan, acceptable to the Reserve Bank, to *reduce the Bank's interest in criticized or classified assets*; (iii) adopt a plan, acceptable to the Reserve Bank, to *strengthen the Bank's credit risk management practices*; (iii) adopt and implement a program, acceptable to the Reserve Bank, for the *maintenance of an adequate allowance for loan and lease losses*; (iv) adopt and implement a written plan, acceptable to the Reserve Bank, to *maintain sufficient capital on a consolidated basis for the Company and on a stand-alone basis for the Bank*; and (v) *revise the Bank's loan underwriting and credit administration policies*. The Bank and the Company also agreed not to declare or pay any dividend without prior approval from the Reserve Bank, and the Company agreed not to incur or increase

debt or to redeem any outstanding shares without prior Reserve Bank approval.

The Agreement will continue until terminated by the Reserve Bank. . . .

Additionally, on March 22, 2010 [sic], the Board of Directors of the Bank entered into a Consent Order (the "Order") with the Commonwealth of Pennsylvania, Department of Banking, Bureau of Commercial Institutions (the "Department of Banking").  Pursuant to the Order, the Bank has agreed to, among other things, subject to review and approval by the Department of Banking, (i) adopt and implement a plan to **strengthen oversight of management and operations**; (ii) adopt and implement a plan to **reduce the Bank's interest in criticized or classified assets**; (iii) adopt and implement a program for the **maintenance of an adequate allowance for loan and lease losses**; (iv) and adopt and implement a **capital plan which include specific benchmark capital ratios to be met at each quarter end**; and (v) adopt a plan to strengthen the Bank's **credit risk management practices**.  The Bank also agreed not to declare or pay any dividend without prior approval of the Department of Banking.

The Order will continue until terminated by the Department of Banking . . .

Additional regulatory restrictions require prior approval before appointing or changing the responsibilities of directors and senior executive officers, entering into any employment agreement or other agreement or plan providing for the payment of a "golden parachute payment" or the making of any golden parachute payment.  Also, the Bank's FDIC assessment will increase.

Thomas R. Quinn, Jr., President and Chief Executive Officer, stated "our Board of Directors and management **have already taken, and are continuing to take,** all steps necessary to ensure we have strong and fully compliant

plans, policies and programs that address the items contained in these agreements. ***We understand that the environment and the economy are mandating enhancements to prior industry norms. These agreements are not related to any new findings by our regulators and we believe we have already initiated actions and made substantial progress with many of their provisions.***

Form 8-K Current Report, filed on 3/23/12 (emphasis added).

154. Orrstown's summary of the Enforcement Actions and Quinn's comment confirm that the then present "environment and the economy" ***had no bearing*** on the Bank's internal control failures that the Regulators identified. Thus, even though Orrstown admitted that there were material weaknesses in internal controls in 2011 and that persisted until June 2012, these systemic problems were not, as Quinn admitted, ***"new"*** but existed long before the Joint Examination began. This is also evidenced by the Company's admissions in a November 2012 letter that Regulators had required the Bank to ***"discontinue a number of practices, . . ."*** for the ***"[s]tabilization of our risk management process, including the re-engineering of process involved in loan origination, credit administration and loan work out."*** Quinn Letter to SEC, dated 11/5/2012 (emphasis added).

### E.   SEC's Ongoing Scrutiny

155. Beginning in March of 2011, the SEC began scrutinizing Orrstown's disclosures concerning its underwriting of loans, risk rating of loans, and methodology for allocating loan losses. Specifically, the SEC made a series of

comments on the 2010 Form 10-K; and in 2012, the SEC made a series of comments on the 2011 Form 10-K, and the Form 10-Q for the Period Ended June 30, 2012.  Orrstown responded to each of these comments and in so doing made several notable admissions concerning its internal control failures in 2010 and 2011.

156.   Orrstown admitted that it failed to obtain current credit data to accurately stress test loans during 2010 and 2011:

a.   The four lending relationships referenced in 2010 Form 10-K had outstanding balances that may have exceeded the appraised values of the collateral, and the Bank ***did not have current appraisals*** for each of these loans.  Quinn Letter to SEC, dated 5/19/2011 (responding to questions on 2010 Form 10-K).

b.   Two lending relationships that the Bank was marketing for sale had received purchase proposals with prices far below the Bank's asking prices.  Quinn wrote to the SEC: "Based on this proposal, it was determined that there was significant decline in the observable market values of these loans, which existed in December 31, 2011, resulting in an additional combined charge of $6 million."  Quinn Letter to SEC, dated 9/14/2012 (responding to questions on 2011 Form 10-K).

The statement indicates that had the Bank secured current appraisals, it would have been timely aware of the changed market value.

c. Similarly, in response to questions about two other borrowers that were unable to repay their loans, Quinn's response indicated that Orrstown would have known this sooner if it had periodically stress tested the loan: because the "collateral [was] not sufficient to pay off the loans" and the "inability to pay-off loans represented a ***culmination of conditions that existed prior to*** [] December 31, 2011." Quinn Letter to SEC, dated 9/14/2012 (responding to questions on 2011 Form 10-K) (emphasis added).

157. Orrstown admitted that it had material weaknesses in internal controls over financial reporting relating to risk management and allocations of loan losses in 2011 and 2012:

a. "Disclosure Committee noted that the material weaknesses in internal controls over financial reporting remained at March 31, 2012 and June 30, 2012." Quinn Letter to SEC, dated 11/5/2012 (concerning questions on 2011 10-K and 1Q -2Q 2012 10-Qs).

b. Quinn responded to the SEC that beginning in 2012, Orrstown "[c]ontracted a third party service provider specializing in corporate governance matters (Treliant Risk Advisors) to review existing

policies and procedures pertaining to credit administration, finance and other banking areas to determine *if additional gaps in internal controls were noted*." Quinn Letter to SEC, dated 11/5/2012 (concerning questions on 2011 10-K and 1Q -2Q 2012 10-Qs) (emphasis added).

    c. Quinn responded to the SEC that in the first quarter of 2012, the Regulators told the Bank that its current "risk profile would suggest higher capital ratios be maintained." Quinn Letter to SEC, dated 11/5/2012 (concerning questions on 2011 10-K and 1Q -2Q 2012 10-Qs).

158. The SEC has recently launched a formal investigation into Orrstown's financial reporting and controls from January 1, 2010 to the present, which of course encompasses the March 2010 Offering and all of the Class Period.

159. The SEC's investigation tracks the issues in this complaint, and it is subpoenaing documentary evidence pertaining to, *inter alia*, the following:

> All documents and communications concerning accounting policies, procedures, and internal controls in effect at Orrstown reflecting or relating to Orrstown's loan approval, loan review, and/or credit administration policies and procedures;

> All documents relating to any communications between any auditors and Orrstown's senior management, Board of Directors, Audit Committee, Loan Committee and/or

Enterprise Risk Management Committee regarding the accounting treatment of any loan losses from 2005 forward;

All communications sent or forwarded from your Orrstown email account to any personal email account(s) to which you have access (jointly or solely), regarding or relating to Orrstown's loan policy, allowance for loan losses, Orrstown's March 2010 offering, regulatory examinations and/or the quality of Orrstown's loan portfolio.

SEC Subpoena, dated 6/3/2015.

160.   To date, the SEC has "interviewed" former Orrstown employees, including at least one CW.  Orrstown's counsel is representing some of these witnesses.

## VIII.  SECURITIES ACT SUBSTANTIVE ALLEGATIONS: MATERIALLY FALSE & MISLEADING STATEMENTS CONTAINED IN THE OFFERING DOCUMENTS

161.   The Securities Act claims contained in this portion of the Complaint specifically exclude any allegations of knowledge or scienter, and any allegation that could be construed as alleging fraud or intentional or reckless misconduct. The Securities Act claims are rooted exclusively in theories of strict liability and negligence.

162.   Plaintiff's Securities Act allegations stem from materially false and misleading statements contained in Orrstown's Offering Documents concerning

the existence and effectiveness of the Company's internal controls over the underwriting of loans, risk management and financial reporting.

163.   Where any materially untrue and misleading statement is deemed to be a statement of opinion not verifiable by objective facts, each Securities Act Defendant is alleged to have known at the time that the subjective statement(s) was made that it was untrue or to have lacked a reasonable basis for the statement(s).

164.   On April 29, 2009, Orrstown was listed on the NASDAQ and shortly thereafter Defendant Quinn replaced retiring Defendant Shoemaker to serve as the Company and Bank's President, Chief Executive Officer and Director.

165.   The March 2010 Offering represented Orrstown's first offering since the Company was listed on the NASDAQ exchange.

166.   Throughout March 2010, Orrstown's common stock was trading in the low to mid-$30s.   After the 2009 Annual Report was filed on March 15, 2010, and the Yorktown bankruptcy was announced on March 23, 2010, the stock price dropped as summarized by the following chart:

| Date | Average Daily Stock Price ($) | Closing Stock Price |
|------|------|------|
| 3/15/2010 | 35.10 | 35.68 |
| 3/16/2010 | 32.76 | 32.94 |
| 3/17/2010 | 32.43 | 36.69 |
| 3/18/2010 | 32.15 | 32.17 |
| 3/19/2010 | 31.62 | 31.84 |
| 3/22/2010 | 31.82 | 34.50 |
| 3/23/2010 | 30.00 | 30.50 |

Source: Yahoo Finance.

167.    Subsequent to the concurrent announcements about the additional provisions for loan losses and the Yorktown situation (*supra* Part VII.C), the Underwriter Defendants and Orrstown Securities Act Defendants priced Orrstown common stock at $27 for the March 2010 Offering that commenced on March 24, 2010.  The sale of Orrstown stock at that price, however, did not accurately reflect the value of Orrstown stock which was materially inflated by false and misleading statements about the quality of the Bank's internal controls over underwriting of loans, risk management and financial reporting.  *See infra* Part VIII.B.

168.    On March 29, 2010, Orrstown announced that it had completed its Offering of 1,481,481 shares of common stock, sold to the public at a price of $27.00 per share to raise net proceeds (after underwriting commissions and expenses) of $37.5 million.

**A.    The Offering Documents' Materially False and Misleading Statements Regarding the Existence and Effectiveness of the Company's Internal Controls**

169.    The Offering Documents for the March 2010 Offering made a series of statements about the quality of the Bank's internal controls over its underwriting of loans, risk management and financial reporting.

170.   The 2009 Annual Report on Form 10-K, which was filed nine days before the March 2010 Offering and incorporated by reference in the Offering Documents, made the following false and misleading statement:

> **<u>Management's Report on Internal Control</u>** – "Under the supervision and with the participation of the Corporation's management, including its Chief Executive Officer and Chief Financial Officer, the Corporation has evaluated the effectiveness of its internal control over financial reporting as of December 31, 2009, using the Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon this evaluation, management has concluded that, at December 31, 2009, ***the Corporation's internal control over financial reporting is effective based on the criteria established in Internal Control-Integrated Framework***.

Form 10-K 2009 Annual Report, filed 3/15/2010, at 45 (emphasis added).

171.   Also, appended to the 2009 Annual Report Form 10-K, were the SOX Certifications made by Defendants Quinn and Everly.   As the CEO and CFO, respectively, Quinn and Everly certified that:

> 1. I have ***reviewed*** this annual report on Form 10-K of Orrstown Financial Services, Inc.
>
> 2. Based on my knowledge, the annual report ***does not contain any untrue statement of a material fact or omit to state a material fact*** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report.

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, *fairly present, in all material respects, the financial condition*, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report.

4. The registrant's other certifying officer and I are *responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act rules 13a – 15(f) and 15d – 15(f)) for the registrant and we have:

(a) *designed* such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to *ensure* that material information relating to the registrant, including its consolidated subsidiaries, is *made known to us by others* within those entities, particularly during the period in which this annual report is being prepared;

(b) *designed* such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide *reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements* for external purposes in accordance with generally accepted accounting principles;

(c) *evaluated* the effectiveness of the registrant's disclosure controls and procedures and *presented, in this annual report, our conclusions about the effectiveness* of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

(d) *disclosed*, in this annual report, any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal

quarter that has **_materially affected, or is reasonably likely to materially affect,_** the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

    (a) **_all significant deficiencies and material weaknesses_** in the design or operation of the internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) **_any fraud, whether or not material_**, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Form 10-K 2009 Annual Report, filed 3/15/2010, Section 320 – CEO/CFO Certification (emphasis added).

172. Beginning in 2002, officers of public companies were required under Rules 302 of the Sarbanes-Oxley Act to provide assurances relating to the Company's internal controls over the effectiveness of operations, reliability of financial reporting and compliance with applicable laws and regulations. Management's assessment of internal control is a critical metric for investors because it provides assurance that the Company is in compliance with financial

reporting regulations and its operations are effectively managed and regularly stress test to reduce exposures to risk.

173.    In making this SOX Certification, the Orrstown Securities Act Defendants were first required to assess the effectiveness of the Company's internal control structure and financial reporting procedures and, if necessary, publicly report all material weaknesses in the Company's internal controls.  This assessment was to be done using the criteria established in the Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

174.    Given the COSO standards that Defendants Quinn and Embly were bound to follow when evaluating the Company's internal controls, the SOX Certification and "Management's Report on Internal Control" in the 2009 Annual Report (for the period ending December 31, 2009) were false and misleading in that they omitted material information about the effectiveness of Orrstown's internal controls over underwriting, risk management and financial reporting because at the time the Certifications were made:

> a.  Orrstown did not have an effective underwriting procedure in place in that the Loan Policy was regularly violated resulting in the extension and/or restructuring of credit to borrowers who did not satisfy the cash flow or collateral requirements of the Loan Policy.  Moreover, the

Bank's credit analysts' recommendations against extending credit were often ignored and credit was extended to borrowers who were incapable of meeting their new loan obligations and often were already having difficulties meeting their current loans obligations, in direct contravention of prudent and well-recognized banking standards. Also credit analysts were required to complete their analyses and make loan recommendations even when they had incomplete credit data such as current income tax returns and appraisals.

b.  Orrstown did not have an effective risk management procedure as the Company failed to secure the necessary data, such as current tax returns, income statements and appraisals, to periodically stress test loans to timely identify impairments.

c.  Orrstown did not follow its methodology for making adequate provisions for loan losses because it used its IRRS that was designed to delay timely recuperation of Risk Assets and failed to secure necessary data to allow accurate risk rating of loans.

d.  Orrstown's practices were also in violation of banking regulations and guidelines as determined by the Federal Reserve and Reported in the Consent Order.  Exhibit B at ¶ 14.

175. The Orrstown Securities Act Defendants did not properly assess the Company's internal controls over financial reporting and, therefore, they violated the "Internal Control-Integrated Framework" issued by the COSO and various other requirements found in the SEC regulations and the Sarbanes-Oxley Act.

176. Further, after the Class Period and pending the issuance of the Regulators' Enforcement Actions, Orrstown was forced to admit that as of December 31, 2011, the disclosure controls and procedures were not effective and that a material weakness existed pertaining to its internal controls over financial reporting as it related to loan ratings and their impact on the allowance for loan losses. *See* Quinn Letter to SEC, dated 11/5/2012. Orrstown's internal controls that were deficient and ineffective in 2011 mirrored the internal controls that were in place for the reporting periods ending December 31, 2009 and March 31, 2010. Indeed, as reported by CW#3, the Regulators' Joint Examination was to have officially begun in March 2011, but the Regulators were already on-site and had begun their investigation of the Bank's internal controls in 2010. There was no measurable difference in the internal controls that were categorically criticized by the Regulators and the controls in place in early 2010. Therefore, a reasonable inference can be made that during the entire Class Period, the same material internal control weaknesses existed and that, specifically, the November 2009 Internal Review was ineffective. This inference is further substantiated by the

Regulators prompting Orrstown in mid-2011 to engage independent consultants to assume a significant role in the Bank's underwriting and credit review processes and the Corrective Actions that the Regulators required Orrstown to take pursuant to the Enforcement Actions.   The Corrective Actions revealed that Orrstown needed to design new processes and enhance and improve internal controls for every aspect of its operations, secure the Regulators' approval of the processes and then implement these processes to stabilize its operations.

## B. Auditor Defendant Smith Elliott's Statements in the 2009 10K Were False, Misleading and Lacked a Reasonable Basis

177.   Auditor Defendant Smith Elliott "consented" to the designation as an accounting "expert" in the Offering Documents.  *See* S-3 Registration Statement, Exhibit 23.1.  The Offering Documents incorporate by reference the Company's Annual Report on Form 10-K for the year ended December 31, 2009 that Smith Elliot audited.  *See* Form 424B5 Prospectus, filed 3/24/2012, at 25-26.  It is Smith Elliott's statements in the 2009 Annual Report that are false, misleading and lack a reasonable basis.

178.   In its Report of Independent Registered Accounting Firm dated March 15, 2010, Smith Elliott stated, in part, as follows:

> The management of Orrstown Financial Services, Inc. and its wholly-owned subsidiary (the "Corporation") is responsible for these financial statements, for maintaining effective internal control over financial

reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control. *Our responsibility is to express an opinion on these financial statements and an opinion on the Corporation's internal control over financial reporting based on our audits.*

*We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects.* Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. *Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk.* Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ["GAAP"]. . . .

*In our opinion, the financial statements referred to above present fairly, in all material respects, the*

> *financial position of Orrstown Financial Services, Inc.*
> *and its wholly-owned subsidiary as of December 31,*
> *2009 and 2008*, and the results of their operations and
> their cash flows for each of the years in the three-year
> period ended December 31, 2009 in conformity with
> accounting principles generally accepted in the United
> States of America. Also, *in our opinion, Orrstown*
> *Financial Services, Inc. and its wholly-owned*
> *subsidiary maintained, in all material respects, effective*
> *internal control over financial reporting as of*
> *December 31, 2009*, based on criteria established in
> Internal Control – Integrated Framework issued by the
> Committee of Sponsoring Organizations of the Treadway
> Commission (COSO).

Form 10-K 2009 Annual Report, filed 3/15/2010, at 46 (emphasis added).

179.  The Sarbanes-Oxley Act of 2002 authorized the PCAOB to establish auditing and related professional standards to be used by registered pubic accounting firms.  Rule 3100 issued by PCAOB (*see* PCAOB Release No. 2003-009) generally requires all registered public accounting firms to adhere to PCAOB's standards in connection with the preparation and issuance of any audit report on the financial statements of an issuer.  Further, on July 27, 2007, PCAOB adopted and continues to refine Auditing Standard No. 5 ("AS No. 5") which,

> establishes requirements and provides direction that
> applies when an auditor is engaged to perform an audit of
> management's assessment of the effectiveness of internal
> control over financial reporting ("audit of internal
> control") that is integrated with an audit of the financial
> statements.  Risk assessment underlies the entire audit
> process described in AS No. 5, including the
> determination of significant accounts and disclosures and

> relevant assertions, the selection of controls to test, and
> the determination of the extent of audit evidence
> necessary for a given control.

PCAOB Release No. 2012-006, 12/10/2012, at 1.

180. In conducting its audit, Smith Elliott would have evaluated the
reasonableness of the Company's provisions for loan loss reserves and ultimately
whether the Company's financial statements incorporating the loan loss reserves
were prepared in accordance with GAAP. To do so, Smith Elliott, in accordance
with AS No. 5, was to apply PCAOB standard AU Section 342, Auditing
Accounting Estimates.   This standard provides in relevant part the following
guidance:

> In evaluating reasonableness, the auditor should obtain
> an understanding of how management developed the
> estimate. Based on that understanding, the auditor should
> use one or a combination of the following approaches:
>
> a.  Review and test the process used by management to
> develop the estimate.
> b.  Develop an independent expectation of the estimate to
> corroborate    the    reasonableness    of    management's
> estimate.
> c.  Review subsequent events or transactions occurring
> prior to the date of the auditor's report.

Additionally,

> Review  and  test  management's  process. . . .  The
> following  are  procedures  the  auditor  may  consider
> performing when using this approach:

a.    Identify whether there are controls over the preparation of accounting estimates and supporting data that may be useful in the evaluation.

b.    Identify the sources of data and factors that management used in forming the assumptions, and consider whether such data and factors are relevant, reliable, and sufficient for the purpose based on information gathered in other audit tests.

c.   Consider whether there are additional key factors or alternative assumptions about the factors.

d.   Evaluate whether the assumptions are consistent with each other, the supporting data, relevant historical data, and industry data.

e.   Analyze historical data used in developing the assumptions to assess whether the data is comparable and consistent with data of the period under audit, and consider whether such data is sufficiently reliable for the purpose.

f.   Consider whether changes in the business or industry may cause other factors to become significant to the assumptions.

g.   Review available documentation of the assumptions used in developing the accounting estimates and inquire about any other plans, goals, and objectives of the entity, as well as consider their relationship to the assumptions.

h. Consider using the work of a specialist regarding certain assumptions (section 336, Using the Work of a Specialist).

i.  Test the calculations used by management to translate the assumptions and key factors into the accounting estimate.

AU Section 342.10-11.

181.  Smith Elliott was also obligated to follow Financial Accounting Standards Board ("FASB") Statement No. 5, which is the primary guidance on the accounting and reporting loss contingencies, including credit losses.  FASB's

Summary of Statement No. 5 explains that under this standard, if a credit loss exists, "the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote."   Statement No. 5 uses the terms probable, reasonably possible, and remote to identify three areas within that range:

> **Probable** – the future event or events are likely to occur;
> **Reasonably possible** – the chance of the future event or events occurring is more than remote but less than likely; and
> **Remote** – the chance of the future event or events occurring is slight.

The allowance for loan loss should be appropriate under GAAP, without any material misstatements, so as to cover probable credit losses related to specifically identified loans as well as probable credit losses inherent in the remainder of the Bank's loan portfolio.  Whether a credit loss is probable, reasonably possible or remote takes into consideration all available credit data on a borrower.  Thus, in calculating loan loss reserves for purposes of GAAP, all material factors, *i.e.*, past and present credit information must be considered.

182.   Smith Elliot failed to follow Rule 3100 issued by PCAOB, AS No. 5, AU Section 342, and FASB Statement No. 5 in connection with its audit.  Smith Elliott failed to verify that Orrstown had used accurate source data, had made reasonable assumptions, and had accounted for known or knowable past and present information when calculating its loan loss reserves, and therefore, failed to

ensure that Orrstown's financial statements, incorporated into the Registration Statement, complied with GAAP.  Ultimately, Smith Elliott disregarded red flags, failed to obtain sufficient evidence to support opinions and proceeded to issue a clean audit report and affirming that Orrstown had maintained, in all material respects, effective internal controls.  Also, Smith Elliot's statement that, "In our opinion, the financial statements referred to above present fairly, in all material aspects, the financial position of Orrstown Financial Services, Inc. and its wholly-owned subsidiary as of December 31, 2009 and 2008," was false, misleading and lacked a reasonable basis.

183.   Smith Elliott ignored and failed to account for: (a) the inadequate provisions for loan losses in calendar year 2009 by management which should have been, but was not, revealed by the Internal Review; (b) the number of loans made by the Bank and Loan Committee that were based on exceptions; (c) that loans failed to satisfy the Loan Policy's 1.20 Debt Service Ratio; (d) the absence of necessary current loan documentation from loan files; (e) the heavy concentration of commercial loans, particularly development loans, made to affiliated borrowers in certain geographic areas; (g) adverse credit data about borrowers; and (h) undue influence and control over loan decisions by management.

184.   The Company also conducted an Internal Review (*discussed supra* Part VII.B(c)(i)) at a time when Smith Elliott was auditing Orrstown and the

Bank's financial statements for the year ending December 31, 2009.  At that time, the Bank's Internal Review had purportedly made findings as to the credit quality of 60% of the Bank's commercial loan portfolio.  In response to the Internal Review's findings and any recommendations made by the Credit Administration Committee, the Bank increased its provisions for loan loss reserves by only $3.6 million in 4th Quarter 2009.  The Internal Review and the Credit Administration Committee's recommendations on those findings that were reflected in the financial statements prepared by the Company, at least as of that time, put Smith Elliott on notice of internal problems at the Bank, and that management had improperly forestalled the allocation of additional provisions for loan loss reserves which would have had the concomitant effect of driving down the Company's net income.

185.   Smith Elliot's material auditing failures are consistent with those of other auditing firms registered with the PCAOB.  The PCAOB issued a report that provided "information about the nature and frequency of deficiencies in firms' audits of internal control over financial reporting detected during the PCAOB's 2010 inspections."  PCAOB Release No. 2012-006, 12/10/2012, at i.  The PCAOB found in its inspections significant incidences of deficiencies in firms' audits of internal controls and financial statements ("integrated audits") for public company issuers' for the year ending 2009 which, the PCAOB concluded, indicates that

auditing firms are not following the methodologies and standards required of them. *Id*. at ii.

186.   The PCAOB found the "most pervasive" deficiencies in integrated audits related to firms' failures to:

a.   Identify and sufficiently test controls that are intended to address the risks of material misstatements;

b.   Sufficiently test the design and operating effectiveness of management review controls that are used to monitor the results of operations. . . . ;

c.   Sufficiently test the system-generated data and reports that support important controls;

d.   Sufficiently perform procedures regarding the use of the work of others;

e.   Sufficiently evaluate identified control deficiencies and consider their effect on both the financial statement audit and on the audit of internal control.

*Id*. at ii-iii.   The PCAOB also found that in providing integrated audit opinions, two or more of the above deficiencies were found in 70% of these audits such that firms failed to obtain sufficient audit evidence to support the opinions on the effectiveness of internal controls.   *Id*. at iii.

187.    Under the circumstances of this Action, and based on the facts disclosed above, it is apparent that Smith Elliott's integrated audits of the 2009, 2010 and 2011 financial statements were materially deficient in the same manner as the serious deficiencies identified in ¶ 186 *supra*.

## C.    The Securities Act Class Is Damaged by the Offering Documents' False and Misleading Statements

188.    A series of post-Offering disclosures concerning the Bank's escalating provisions for loan losses and increases in Risk Assets, *see supra* Part VIII.A, revealed Orrstown's true financial condition and the material weaknesses in Orrstown's internal controls over underwriting, risk management and financial reporting at the time of the March 2010 Offering.   These matters were material and, therefore, the Offering Documents contained untrue statements and omitted material facts in violation of the Securities Act.

189.    After the market closed on Thursday, July 14, 2011, Orrstown announced:

> The Company has preliminarily estimated that it will record an additional provision for loan losses at June 30, 2011 in the amount of approximately $21,000,000 as a result of the Bank's review of its outstanding loans (including approximately $ 5,621,029 added to the loan loss reserve for the Yorktown loan discussed above). This anticipated additional reserve increase reflects the Bank's recognition of continuing softness in economic conditions and comes as a result of internal risk rating

> downgrades to existing credits, plus additional specific reserve set-asides attributable to various commercial loan relationships.

Form 8-K Material Impairments, filed 7/14/2011; *see also supra* ¶¶ 142-145.   In the same SEC filing, the Company gave positive reassurances to investors, in an attempt to downplay the Yorktown loss stating:

> The Bank intends to aggressively pursue a recovery of the amounts owed to it in the Bankruptcy Court proceedings as well as through other avenues of recovery that may be available to it including, without limitation, the guarantees provided by the Yorktown principals and other potential claims against third parties.

Form 8-K Material Impairments, filed 7/14/2011.  In response to such revelations, Orrstown's stock price dropped by 23% to close on Monday, July 18, 2011 at $20.06.

190.   On Thursday, July 28, 2011, the Company filed its Form 8-K providing Second Quarter 2011 operating results.  The results revealed that for the first time in the Company's history it was reporting a quarterly loss. The Company also admitted that the Bank's underwriting and review departments had been expanded to include additional personnel, and most notably, that the Company had to *"outsource[] certain credit review responsibilities in order to mitigate the Company's risk of loss, and to reduce its level of nonaccrual and classified loan."*  This news was more fully reported with the filing of Orrstown's Form 10-

Q on August 9, 2011.  On August 9, 2011, Orrstown's stock closed at $17.87 share price, a 34% loss since its Offering Price of $27 per share.

191.   The Company, however, perpetuated the façade of a "safe and sound" bank with sufficient capital level by declaring a quarterly cash dividend of $0.23.

192.    After the market closed on October 26, 2011, the Company reported that the Federal Reserve refused to approve the Company's payment of a cash quarterly dividend.  The Federal Reserve took this step to prevent the Company from engaging in an "unsafe and unsound banking practice" which would further deplete the Company's capital base.   In addition, the 8-K reported that the Company had $9.4 million of charge-offs in that quarter alone and that there were **"decreases in asset quality ratios, including elevated levels of nonaccrual loans, restructured loans and delinquencies."**   Form 8-K 3Q2011 Operating Results, filed 10/26/2011, at 2 (emphasis added).  On October 27, 2011, the Company filed an 8-K with a letter from Defendant Quinn to Orrstown's shareholders in which he told shareholders that despite the second quarter loss, federal regulator's intervention, and no dividend declaration, **"Orrstown Bank is safe and sound."** Form 8-K Letter, filed 10/27/2011 (emphasis added).  The market reacted swiftly to these two filings, and the share price dropped by approximately 30% to close at $9.20 a share.  This news, though shocking, only partially revealed the true state of affairs at the Bank.  On January 26, 2012, the Company issued a press release with

Fourth Quarter 2011 operating results, which included a quarterly net income loss and one-time non-cash goodwill impairment charge off of $19.4 million, as well as the continued suspension of the payment of a dividend.  Form 8-K Press Release on 4Q2011 Operational Results, filed 1/26/2012.   Defendant Quinn, however, tempered the news, stating that the Company had effective internal controls to address the "asset quality issues" such that the market reaction was sharp, but not devastating.  *Id.*  It was not until March 30, 2012, that the Company revealed that 2011 had been a "challenge" and that the Company was "not able to continue historical performances" due to material weaknesses in its internal controls, which as a result of the Regulators' Enforcement Actions reported on March 23, 2012, the Company was making much needed "structural changes."   Schedule 14A Additional Definitive Proxy Materials, filed 3/30/2012, at 1.  By April 5, 2012, this news was digested by investors and the stock sunk to $8.20.

193.   Plaintiff and the members of the Class have suffered significant losses and damages.  Plaintiff and the Class acquired Orrstown securities issued in the March 2010 Offering pursuant to and/or traceable to the Offering Documents that contained untrue statements of material facts and material omissions concerning the effectiveness of Orrstown's internal controls, and sustained damages as a result of those acquisitions measured by the amount paid for the security (which was priced at $27 in the Offering) less the value of Orrstown stock at the time the suit

was brought, the price of the security if sold in the market before suit, *or* the price at which the security is disposed of after suit (if greater than the value when suit was brought).  Now, three years after Regulators issued their Enforcement Actions, Orrstown's stock has yet to reach its Offering of $27 and since July 2013 the stock has only hovered around $15 per share.



## IX.   SECURITIES ACT CLAIMS FOR RELIEF

### <u>COUNT I</u>
**(For Violations of § 11 of the Securities Act
Against Orrstown and the Bank)**

194.   This Securities Act claim expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

195.   Plaintiff brings this Claim on behalf of itself and all members of the Securities Act Class against Orrstown and the Bank.

196.   As result of each of the statements and omissions alleged above in the Section entitled "Securities Act Allegations: Materially Untrue & Misleading Statements and/or Omissions Contained in the Offering Documents," the Registration Statement was materially untrue and/or misleading and omitted to state other facts necessary to make the statements made not misleading.

197.   Orrstown and the Bank are strictly liable for the material misstatements and omissions in the Registration Statement issued by them.

198.   Less than three years elapsed from the time the securities upon which this Claim is bought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Claim is based to the time of the filing of this action.

199.   Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

200.   By reason of the conduct herein alleged, Orrstown and the Bank violated Section 11 of the Securities Act.

**COUNT II**
**(For Violations of § 11 of the Securities Act Against
the Individual Securities Act Defendants, Underwriter Defendants and the
Auditor Defendant)**

201.   This Securities Act claim expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

202.   This claim is brought by Plaintiff on behalf of itself and other members of the Securities Act Class against the Individual Securities Act Defendants, the Underwriter Defendants and the Auditor Defendant.

203.   Each of the Individual Securities Act Defendants signed the Registration Statement.

204.   The Underwriter Defendants each served as an underwriter with respect to Orrstown's securities and each permitted their names to be included on the cover of the Registration Statement as the Underwriters.

205.   The Auditor Defendant served as auditor and/or account with respect to the management prepared financial statements that were incorporated in the Registration Statement and was named as such with its consent as having certified or prepared portions of the Registration Statement.

206.   The Individual Securities Act Defendants, the Underwriter Defendants and the Auditor Defendant owed to the purchasers of the stock, including Plaintiff and the members of the Securities Act Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

207.   The Individual Securities Act Defendants, the Underwriter Defendants and the Auditor Defendant each failed to make a reasonable and diligent investigation and/or did not possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.  The Individual Securities Act Defendants, the Underwriter Defendants and the Auditor Defendant named in this Count acted negligently in issuing the Registration Statement which made materially false and misleading written statements to the investing public and misrepresented or failed to disclose, *inter alia*, the facts set forth above.

208.   Plaintiff and the Securities Act Class purchased shares of Orrstown pursuant to the March 2010 Offering and were damaged when revelations about Orrstown's risky loan portfolio, inadequate underwriting standards and material understatement of loan loss reserves were revealed and resulted in the stock price dropping as alleged herein.

209.   This action is brought within three years from the time that the securities upon which this claim is brought were sold to the public, and within one year from the when Plaintiff discovered or reasonably could have discovered the facts upon which this claim is based.

210.   Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

211.   By reason of the conduct herein alleged, the Individual Securities Act Defendants, the Underwriter Defendants and the Auditor Defendant violated Section 11 of the Securities Act.

## COUNT III

**(For Violations of §12(a)(2) of the Securities Act Against Orrstown,
the Bank, the Individual Securities Act Defendants, Defendant Embly
and the Underwriter Defendants)**

212.  This Securities Act claim expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

213.  This claim is brought by Plaintiff on behalf of itself and all other members of the Securities Act Class against Orrstown, the Bank, the Individual Securities Act Defendants and the Underwriter Defendants.  These Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Registration Statement.

214.  The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  Orrstown, the Bank, the Individual Securities Act Defendants, Defendant Embly and the Underwriter Defendants' actions of solicitation include participating in the preparation, review and dissemination of the materially untrue and misleading Registration Statement.

215.  Orrstown, the Bank, the Individual Securities Act Defendants, Defendant Embly and the Underwriter Defendants owed to the purchasers of

Orrstown's common stock, including Plaintiff and other members of the Securities Act Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

216.   Orrstown, the Bank, the Individual Securities Act Defendants, Defendant Embly and the Underwriter Defendants should have known, in the exercise of reasonable care, of the material misstatements and material facts omitted from the Registration Statement.

217.   Plaintiff and other members of the Securities Act Class purchased or otherwise acquired Orrstown's securities pursuant to and/or traceable to the defective Registration Statement.   Plaintiff and members of the Securities Act Class did not know, or in the exercise of reasonable diligence could not have known, of the material misstatements and material facts omitted from the Registration Statement.

218.   Plaintiff, individually and representatively, hereby offers to tender to the Defendants that stock which Plaintiff and other Securities Act Class members continue to own, on behalf of all members of the Securities Act Class who continue to own such stock, in return for the consideration paid for the stock

together with interest thereon.  Securities Act Class members who have sold their Orrstown stock are entitled to rescissory damages.

219.   By reason of the conduct alleged herein, Orrstown, the Bank, the Individual Securities Act Defendants, Defendant Embly and the Underwriter Defendants violated, and/or controlled, a person who violated § 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Securities Act Class who hold Orrstown securities purchased in the March 2010 Offering have the right to rescind and recover the consideration paid for their Orrstown securities, and hereby elect to rescind and tender their Orrstown securities to Defendants sued herein.  Plaintiff and Securities Act Class members who have sold their Orrstown securities are entitled to rescissory damages.

220.   This action is brought within three years from the time that the securities upon which this claim is brought were sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this claim is based.

221.   Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the material misstatements and material facts omitted from the Registration Statement.

222.   By reason of the conduct herein alleged, Orrstown, the Bank, the Individual Securities Act Defendants and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

## COUNT IV
### (For Violations of § 15 of the Securities Act Against the Individual Securities Act Defendants)

223.   This Securities Act claim expressly excludes and disclaims any allegations that could be construed as alleging fraud or intentional or reckless misconduct.

224.   This claim is brought by Plaintiff on behalf of itself and all other members of the Securities Act Class against the Individual Securities Act Defendants, each of whom was a controlling person of Orrstown and/or the Bank by virtue of their position as directors and/or senior officers of the Company and Bank.

225.   The Company and Bank are liable under Section 11 of the Securities Act as set forth above in Count I.

226.   The Individual Securities Act Defendants by virtue of their position as directors and/or senior offices of the Company and Bank had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in the unlawful acts and conduct alleged in Count I.

227.   The Individual Securities Act Defendants were culpable participants in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and having otherwise participated in the process that allowed the March 2010 Offering to be successfully completed.  These Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company as well as the contents of the Registration Statement at the time of the March 2010 Offering.  These Defendants should have been provided with unlimited access to copies of the Registration Statement and, therefore, had the ability to either prevent issuance of the Registration Statement or cause it to be corrected.

228.   For their failures to issue a materially true, complete and non-misleading Registration Statement, the Individual Securities Act Defendants are liable under Section 15 of the Securities Act for the Company's primary violation of Section 11 of the Securities Act.

229.   Plaintiff and the Securities Act Class were damaged when they purchased shares of Orrstown in the March 2010 Offering and harmed when Orrstown's shares dropped as a result of the truth about the status of Orrstown's inadequate internal controls and underwriting standards, impaired loan portfolio, understatement of loan loss reserves and charge-offs, and overall deteriorating financial condition.

**X.     EXCHANGE ACT ALLEGATIONS: THE EXCHANGE ACT DEFENDANTS' FRAUDULENT CONDUCT AND COURSE OF BUSINESS**

230.   The Orrstown Exchange Act Defendants and Auditor Defendant are liable for: (1) making false material statements; or (2) failing to disclose adverse material facts know by them about Orrstown.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Orrstown common stock on the open market was a success, as it: (1) deceived the investing public regarding the quality of Orrstown's internal controls over underwriting of loans, risk management and financial reporting; (2) artificially inflated the prices of Orrstown common stock; and (3) caused the Exchange Act Class to purchase Orrstown at inflated prices.

231.   Throughout the Class Period, the Orrstown Exchange Act Defendants maintained and perpetuated the artifice of a Company operated based on effective internal controls.  And, the Auditor Defendant also maintained and perpetuated the deceit by issuing unqualified or "clean" auditor reports included in the Company's 2009, 2010 and 2011 Annual Reports when the Auditor Defendant knew for those years that there was a material weakness in the Company's internal controls over financial reporting and that, as a result, the Company's financial statements failed to conform to GAAP due, primarily, in part, to the material understatements of loan loss reserves.

**A.     The Orrstown Exchange Act Defendants' Fraudulent Material Statements and Omissions in the 2009 Annual Report, Form 10-K**

232.   As early as September 2009, the Orrstown Exchange Act Defendants were confronting failures in the credit review and loan approval process.   The Bank created the position of Chief Credit Officer to purportedly "enhance [credit] processes and controls, as well as clearly delineate independence between sales and credit."   Then in November 2009, the Bank initiated its Internal Review of 60% of the Bank's commercial loan portfolio.   Through this Internal Review, *see supra* Part VII.B(c)(i), the Orrstown Exchange Act Defendants were presented with adverse credit data revealing the Bank's need to reclassify loans as impaired and allocate additional loan loss reserves.   The Orrstown Exchange Act Defendants, however, were preparing for the March 2010 Offering and sought to obscure the extent to which the loan portfolio was impaired so as to avoid dramatic increases in loan loss reserves.   To do otherwise would have revealed to the investing public that the Company's internal controls were failing and the stock was neither a safe nor sound investment.

233.   On March 15, 2010, the Company filed its 2009 Annual Report.   The Orrstown Exchange Act Defendants made false and misleading statements in certifying the effectiveness of the Company's internal controls over underwriting loans, risk management and financial reporting:

>**Management's Report on Internal Control** – Under
>the supervision and with the participation of the
>Company's management, including its Chief Executive
>Officer and Chief Financial Officer, the Company has
>evaluated the effectiveness of its internal control over
>financial reporting as of December 31, 2010, using the
>Internal Control – Integrated Framework issued by the
>Committee of Sponsoring Organizations of the Treadway
>Commission. Based upon this evaluation, management
>has concluded that, at December 31, 2010, the
>Company's internal control over financial reporting is
>effective based on the criteria established in Internal
>Control-Integrated Framework.

Form 10-K 2010 Annual Report, filed 3/11/2011, at 65 (emphasis added).  Also,

appended to the 2009 Annual Report Form 10-K, were the false and misleading

SOX Certifications made by Defendants Quinn and Everly.  As the CEO and CFO,

respectively, Quinn and Everly certified that:

>1. I have *reviewed* this annual report on Form 10-K of
>Orrstown Financial Services, Inc.
>
>2. Based on my knowledge, the annual report ***does not
>contain any untrue statement of a material fact or omit
>to state a material fact*** necessary to make the statements
>made, in light of the circumstances under which such
>statements were made, not misleading with respect to the
>period covered by this annual report.
>
>3. Based on my knowledge, the financial statements, and
>other financial information included in this annual report,
>***fairly present, in all material respects, the financial
>condition***, results of operations and cash flows of the
>registrant as of, and for, the periods presented in this
>annual report.

4. The registrant's other certifying officer and I are *responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act rules 13a – 15(f) and 15d – 15(f)) for the registrant and we have:

(a) *designed* such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to *ensure* that material information relating to the registrant, including its consolidated subsidiaries, is *made known to us by others* within those entities, particularly during the period in which this annual report is being prepared;

(b) *designed* such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide *reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements* for external purposes in accordance with generally accepted accounting principles;

(c) *evaluated* the effectiveness of the registrant's disclosure controls and procedures and *presented, in this annual report, our conclusions about the effectiveness* of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

(d) *disclosed*, in this annual report, any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has *materially affected, or is reasonably likely to materially affect,* the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's

auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a) ***all significant deficiencies and material weaknesses*** in the design or operation of the internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) ***any fraud, whether or not material***, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Form 10-K 2009 Annual Report, filed 3/15/2010, Section 320 – CEO/CFO Certification (emphasis added).

234. These statements as to the quality and effectiveness of Orrstown's lending practices were materially untrue or misleading when made or omitted material facts necessary to make the statements made not misleading because Orrstown's credit review and loan approval process was wholly inadequate and failed to comply with Orrstown's Loan Policy. As confirmed by CW#1, CW#2 and CW#3, in 2009 the credit review for every loan that went through the Bank was carried out by only three analysts, who like CW#1, had been given no formal training and often hindered by an overwhelming work load and a lack of necessary credit data. Further, as confirmed by CW#1 and CW#2, in 2009 the loan officers who had brokered the loans unduly influenced the loan approval process such that borrowers were often portrayed as being more creditworthy than they actually

were.  This lack of independence between the sales and credit functions adversely affected the quality of loans extended.

235.  The statements in the Form 10-K were also false and misleading because, as CW#1, CW#2 and CW#3 confirmed, in 2009 large commercial loans were extended, such as in Hagerstown and to the Chambersburg Developers (*see supra* Part VII.C), which did not receive the type of loan approval scrutiny necessary to adequately evaluate the credit risks to the Bank.  CW#1, CW#2 and CW#3 stated that the multi-million dollar loans extended to the Azadis (*see supra* Part VII.C) in 2011, even after the Azadis told Defendant Embly and Orrstown that they were having problems, are just one example of the Bank's Loan Committee extending credit to borrowers who did not satisfy the credit requirements of the Bank's Loan Policy.

236.  As members of the Loan Committee, Exchange Act Defendants Quinn, Everly, Embly and Snoke were actively involved with the deficient loan approval process and the troubled loans, as discussed above, as were Exchange Act Defendants Zullinger, Shoemaker and Coy who were members of the Enterprise Risk Management Committee.   CW#3 explained that management periodically generated a chart that tracked troubled loans against the recommendations originally made by the Credit Analyst Group to the Loan Committee.  Accordingly, the Orrstown Exchange Defendants knew throughout the Class

116

Period that the Bank's internal controls were failing because the charts were revealing that the Loan Committee was disregarding the Credit Analyst Group's recommendations and instead making arbitrary exceptions to the Loan Policy for poor quality commercial loans.

237.   These statements in the 2009 Form 10-K were also materially untrue or misleading when made or omitted a material fact necessary to make the statements made not misleading because at the time that the Orrstown Exchange Act Defendants made these statements or caused them to be made Orrstown had completed the structurally biased Internal Review (*see supra* Part VII.B(c)(i)). Moreover, the Internal Review operated under a very narrow view of "Risk Assets" and imprudently failed to account for substandard loans particularly in the context of the undisclosed failures of Orrstown's loan approval process.  The result was that the loan loss reserves of $4,267,000 as of December 31, 2009, was materially understated, failing to account for commercial loans that were troubled and needed reclassification based upon past and present credit information.  By way of example, the Orrstown Exchange Act Defendants knew or recklessly disregarded information gathered but ignored by the Internal Review team and recent communications from large commercial borrowers the Azadis and Yorktown that there was ***at least*** an additional $19 million in Risk Assets that should have been identified and loan loss provisions allocated.  The Orrstown

Exchange Act Defendants, however, did not want to sabotage the March 2010 Offering by accounting for the $19 million in additional Risk Assets.  To assist in this delayed disclosure of Risk Assets, the Bank adopted  the IRRS which forestalled the proper classification of troubled loans and allocation of provisions for loan losses (*see infra* Part X.B).   Form 10-K 2010 Annual Report, filed 3/11/2011, at 47-48 (discussing IRRS system).

238.   These statements in the 2009 Form 10-K were also materially untrue or misleading when made or omitted a material fact necessary to make the statements made not misleading because at the time Orrstown's practices were also in violation of banking regulations and guidelines as determined by the Federal Reserve and Reported in the Consent Order.  Exhibit B at ¶ 14.

**B.     The Exchange Act Defendants' Scheme to Materially Understate Loan Loss Reserves and to Understate and Conceal the Magnitude of the Company's Risk Assets from the Class With Their IRRS.**

239.   Just five weeks after the March 2010 Offering closed, on May 7, 2010 Orrstown filed its quarterly report 1Q2010 which included a $21 million increase in Risk Assets but only a $1.4 million increase in loan loss reserves from the prior quarter ending December 31, 2009.  Form 8-K Press Release on 1Q2010 Operating Results, filed 4/22/2010.

240.   Recognizing that the $21 million increase in Risk Assets was only the tip of the iceberg, the Orrstown Exchange Act Defendants moved quickly to formulate and implement a scheme to defraud investors about the health and financial condition of Orrstown and to conceal and materially understate Company's Risk Assets.  The Bank adopted a new **IRRS**, which gave the Bank the discretion to use several different rating levels until it would ultimately have to move a troubled loan into the nonperforming category.  Consequently, the Bank no longer identified as "impaired" its "performing substandard loans."  This change in policy, which was not mentioned until Orrstown's 2010 Form 10-K filed in March 2011.  Defendants did not disclose the impact of the IRRS which was to facilitate Defendants' concealment of the magnitude of impaired loans, in particular the Hagerstown-based and Azadi loans.

241.   The Company's quarterly Form 10-Q filings for Second, Third and Fourth Quarters 2010, illustrate the significant decreases in Risk Assets and yet the slight increases in loan loss reserves *after* First Quarter 2010 when the Orrstown Exchange Act Defendants implemented the IRRS:

|  | 1Q2010 | 2Q 2010 | 3Q2010 | 4Q2010 |
|---|---|---|---|---|
| **Total Risk Assets** | $ 32,822,000 | $ 23,015,000 | $ 20,481,000 | $ 18,437,000 |
| **Reserve for Loan Losses** | 12,020,000 | 14,582,000 | 15,386,000 | 16,020,000 |

242.   Throughout the Class Period, the Company's financial reporting was therefore materially false and/or misleading when made or omitted to state material facts necessary to make the statements made not misleading.   They failed to disclose that the IRRS enabled the Company to gradually move troubled loans across this rating system to forestall classifying them as Risk Assets and, thus, to mask the declining credit quality of the Bank's commercial loan portfolio. Moreover, the IRRS delayed scrutiny of the loan approvals granted by the Orrstown Exchange Act Defendants despite the fact that the loans did not satisfy the credit requirements of the Loan Policy.   Further, these statements are false and misleading because at the precise time that the Orrstown Exchange Act Defendants were making these statements in late 2010 and throughout 2011, the Bank – as confirmed by CW#1, CW#2, and CW#3 – was restructuring many of its larger troubled loan relationships as part of its effort to obfuscate the true level of Risk Assets and needed provisions for loan loss reserves.   As illustrated by the Bank's lending relationship with the Azadis, in January 2011 the Bank restructured and secured guarantees on $5.8 million of loans to them (*see supra* Part VII.C). Further, at around the same time in 2011, CW#4 also confirmed that the Bank's management suggested that CW#4 restructure its 2007 and 2008 loans after CW#4 informed the Bank that CW#4 was financially struggling.   In late 2010, CW#4 entered into a series of "Change in Terms Agreements" on $1.6 million of prior

loans all of which had been originally brokered by Terry Reiber in 2007, 2008 and 2009.

243.   The increase in Risk Assets was at its high-water mark in the 1Q2010 but declined in subsequent 2010 quarters when the Company applied the IRRS. This artificial decline in Risk Assets and understatement of loan loss reserves provided investors with misleading financial data that created a false reassurance that the Company was competently managing the credit risks of its portfolio.   In the 2010 Annual Report, filed in March of 2011, the Orrstown Exchange Act Defendants gave no indication that the levels of Risk Assets were due to the failure of the Company's internal controls and loan review process.

244.   In truth, however, the Orrstown Exchange Act Defendants knew in late 2010 that the Regulators were poised to "formally" launch their Joint Examination into the Company's banking practices and internal controls.

245.   After all of the false and misleading statements as to the existence and effectiveness of the Bank's internal controls were stripped away and the truth was revealed, Orrstown's stock had been artificially inflated by as much as 70% throughout the Class Period, thereby damaging Plaintiff and the Exchange Act Class.

### C.     The False and Misleading Statements and SOX Certifications in the Form 10-Qs filed throughout the Class Period

246.   Throughout the Class Period, the Company expressly assured investors in each Form 10-Q filed with the SEC that Defendants Quinn and Embly, as the Company's CEO and CFO respectively, had "carried out an evaluation . . .of the effectiveness of [Orrstown's] disclosure controls and procedures" and "[b]ased upon that evaluation . . . concluded [that Orrstown's] disclosure controls and procedures [were] effective as of the end of the period covered by this report."[9]

247.   In addition, for the first, second and third quarters of 2010 and the first quarter of 2011, the Company made the following statements with respect to the effectiveness of the Company's internal controls and that there had been no changes to the Company's internal controls throughout this period:

**Item 4. Controls and Procedures**

**(a) Evaluation of disclosure controls and procedures:**

The Corporation's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of the Corporation's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) under the Securities Exchange Act

---

[9] Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures.  SEC Rule 13a-15, 17 C.F.R. § 240.13a-15; SEC Rule 15d-15(e), 17 C.F.R. § 240.15d-15(e).

of 1934, as amended) as of [March 31, 2010, June 30, 2010 and September 30, 2010]. Based on such evaluation, such officers have concluded that, as of [March 31, 2010, June 30, 2010 and September 30, 2010], the Corporation's disclosure controls and procedures are effective in alerting them on a timely basis to material information relating to the Corporation (including its consolidated subsidiary) required to be included in the Corporation's periodic filings under the Exchange Act.

**(b) Changes in internal controls:**

The Corporation regularly assesses the adequacy of its internal control over financial reporting and enhances its controls in response to internal control assessments and internal and external audit and regulatory recommendations. There have not been any significant changes in the Corporation's internal control over financial reporting or in other factors that have materially affected, or are reasonably likely to materially affect, such controls during the quarter ended [March 31, 2010, June 30, 2010 and September 30, 2010].

*See* Orrstown's Form 10-Qs for the quarterly periods ended March 31, 2010, June 30, 2010 and September 30, 2010, filed on 05/07/2010, 08/05/2010 and 11/05/2010 respectively; Orrstown's Form 10-Q for the quarterly period ended March 31, 2011.

248.   After the Company retained an independent consulting firm to assist with its internal controls, the Company slightly modified its controls and procedures report in its quarterly 10-Qs for the Second and Third Quarters of 2011. In the Second Quarter 2011 Form 10-Q, the Company stated:

**Item 4. Controls and Procedures**

**(a) Evaluation of disclosure controls and procedures:**

The Company's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) under the Securities Exchange Act of 1934, as amended) as of June 30, 2011. Based on such evaluation, such officers have concluded that, as of June 30, 2011, the Company's disclosure controls and procedures are effective in alerting them on a timely basis to material information relating to the Company (including its consolidated subsidiary) required to be included in the Company's periodic filings under the Exchange Act.

**(b) Changes in internal controls:**

The Company regularly assesses the adequacy of its internal control over financial reporting and enhances its controls in response to internal control assessments and internal and external audit and regulatory recommendations. During the second quarter of 2011, the Company supplemented its internal loan review function in rating credits within the commercial portfolios by engaging an independent third party loan review company to participate in the review process. Management's decision to supplement its internal loan review was consistent with its desire to review every loan within these portfolios in excess of $500,000 and to obtain at least 75% coverage of the portfolio as measured in dollars. This level of review was necessitated based upon management's conclusion that a current review of credits was required in light of the continuing softness in overall economic conditions and deterioration of underlying collateral based upon recent appraisals of the collateral securing the loans. All relationships reviewed by either internal or contracted resources were reviewed with the Company's Credit Administration Committee, who reaffirmed the rating after a review of the loans cash flows, detailed collateral analysis and the development of action plans.

With the exception of the engagement by the Company of the independent loan review firm noted

above, there have not been any other significant changes in the Company's internal control over financial reporting or in other factors that have materially affected, or are reasonably likely to materially affect, such controls during the quarter ended June 30, 2011. Effective July 1, 2011, the Company outsourced its loan review function to a third party loan review firm to complete independent loan reviews and validate management's loan ratings.

*See* Orrstown's Form 10-Q for the quarterly period ended June 30, 2011, filed on

8/9/2011.  Then, in the Third Quarter 2011 Form 10-Q, the Company stated:

**Item 4. Controls and Procedures**

**(a) Evaluation of disclosure controls and procedures:**

The Company's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) under the Securities Exchange Act of 1934, as amended) as of September 30, 2011. Based on such evaluation, such officers have concluded that, as of September 30, 2011, the Company's disclosure controls and procedures are effective in alerting them on a timely basis to material information relating to the Company (including its consolidated subsidiary) required to be included in the Company's periodic filings under the Exchange Act.

**(b) Changes in internal controls:**

The Company regularly assesses the adequacy of its internal control over financial reporting and enhances its controls in response to internal control assessments and internal and external audit and regulatory recommendations. As noted in the previous quarter, effective July 1, 2011, the Company outsourced its loan review function to a third party loan review firm to complete independent loan reviews and validate management's loan ratings. This level of review was

necessitated based upon management's conclusion that a current review of credits was required in light of the continuing softness in overall economic conditions and deterioration of underlying collateral based upon recent appraisals of the collateral securing the loans. All relationships reviewed by the outside loan review firm were reviewed with the Company's Credit Administration Committee, who reaffirmed the rating after a review of the loans cash flows, detailed collateral analysis and the development of action plans.

With the exception of the engagement by the Company of the independent loan review firm noted above, there have not been any other significant changes in the Company's internal control over financial reporting or in other factors that have materially affected, or are reasonably likely to materially affect, such controls during the quarter ended September 30, 2011.

*See* Orrstown's Form 10-Q for the quarterly period ended September 30, 2011, filed on 11/9/2011.

249. The Company's Form 10-K for the fiscal year ended December 31, 2010, filed on 03/11/2011, recited substantially similar statements as those quarterly filings made in 2010:

### ITEM 9A—CONTROLS AND PROCEDURES

The Company's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-14(c) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2010. Based on such evaluation, such officers have concluded that the Company's disclosure controls and procedures are effective as of December 31, 2010 in recording, processing, summarizing and reporting information

required to be disclosed, within the time periods specified in the SEC's rules and forms. Management's Report on internal control over financial reporting for December 31, 2010 is included in Item 8 of this 10-K report and is incorporated by reference into this Item 9A. The audit report of the registered public accounting firm on internal control over financial reporting is included in Item 8 of this 10-K report and is incorporated by reference into this Item 9A. There have not been any changes in the Company's internal control over financial reporting during the quarter ended December 31, 2010 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

250.   Separately, Quinn and Everly signed sworn SOX Certifications appended to each quarterly report on Form 10-Q representing that:

1. I have reviewed this quarterly report on Form 10-Q of Orrstown Financial Services, Inc.

2. Based on my knowledge, the quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report.

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act rules 13a – 15(f) and 15d – 15(f)) for the registrant and we have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d) disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a) all significant deficiencies and material weaknesses in the design or operation of the internal control over financial reporting which are reasonably

likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

1Q2010 Form 10-Q, filed (emphasis added).

251.   Each of foregoing statements and SOX Certifications was materially false or misleading when made or omitted to state material facts necessary to make the statements made not misleading because:

a.   Throughout 2010, there was no effective underwriting process as the then-existing Loan Policy was honored in the breach and the Loan Committee regularly disregarded the credit analysts' recommendations to extend credit which necessitated the outsourcing of these functions in mid-2011 to an independent consultant;

b.   The IRRS delayed the timely discovery of impaired loans and did not serve as a legitimate means by which to manage the Bank's credit risk and therefore the provisions for loan losses were understated from 2010 until the latter part of the Class Period; and

c.   There was no process or CRE Plan in place to reduce or detect undue credit concentrations;

    d.  The suggestion beginning with the Second Quarter 2011 Form 10-Q, filed August 9, 2011, that an "independent third party loan review company" had been retained because of "continuing softness in overall economic conditions and deterioration of underlying collateral based upon recent appraisals" was materially false and misleading. Defendants were seeking to use the economic conditions to mask (i) the fact that the Bank's internal controls had failed and allowed the loans to be originated in the first place; (ii) the Bank's systemic internal control failures had allowed Risk Assets not to be properly and timely classified; and (iii) the Regulators' presence at the Bank conducting a Joint Examination and their involvement in the retention of the third party loan review specialist.

    e.  Orrstown's practices were also in violation of banking regulations and guidelines as determined by the Federal Reserve and Reported in the Consent Order.  Exhibit B at ¶ 14.

252.  In sum, the truth, which was known by the Exchange Act Defendants but concealed from the investing public during the Class Period, was as follows:

    a.  as early as September 2009 when the Bank created the position of Chief Credit Officer, the Exchange Act Defendants knew the Bank's underwriting standards and loan approval procedures violated the

Loan Policy and the Bank had extended loans in 2008 through 2010 that were inherently risky with a high degree of default;

b.  as early as December 2009, the Exchange Act Defendants knew from the information gathered but ignored by the structurally biased Internal Review that,

  i.  the Loan Committee routinely approved loans that did not meet the credit requirements of the Loan Policy;

  ii.  the loan officers often usurped the credit analyst's role such that there was a lack of independence in the underwriting and loan sales functions;

  iii.  there was a glut of risky commercial loans, concentrated especially in the Hagerstown, Maryland market, that either needed to be reclassified as Risk Assets or were on the verge of becoming Risk Assets; and

  iv.  the Bank needed to significantly increase its loan loss reserves to adequately address the impaired loans;

c.  as early as December 2009, the Bank knew that its Enterprise Risk Management Committee had not put in place effective internal controls that would ensure timely and accurate identification of impaired loans and accurate allocations of loan loss reserves;

d. as early as January 2010, the Orrstown Exchange Act Defendants were aware that the Company would need to record unprecedented increases in Risk Assets and increases in loan loss reserves which indicated material failures in the Bank's underwriting processes and internal controls and jeopardized the strength of the Company's balance sheet;

e. the Orrstown Exchange Act Defendants knew as early as March 2010 that the Bank's IRRS would enable management to forestall classifying loans as Risk Assets and making the needed loan loss reserve provisions;

f. the Orrstown Exchange Act Defendants were aware as early late 2010 that the Department of Banking and Federal Reserve had concerns that the Bank and Company were engaging in unsound and unsafe practices yet failed to materially alter the Bank's lending practices and financial reporting or to make adequate disclosures about the matters that triggered the interest and concern of the Regulators;

g. the Orrstown Exchange Act Defendants were aware as early as March 31, 2011 that the Department of Banking and the Federal Reserve had formally launched their Joint Investigation into the Company's

banking practices which included scrutiny of management's competency;

h. the Orrstown Exchange Act Defendants knew as early as March 31, 2011 that its internal controls over underwriting, risk management and financial reporting were ineffective because they retained an independent consulting firm to take over these functions and devise new processes; and

i. the Orrstown Exchange Act Defendants knew that their attributing increase loan scrutiny and loan portfolio deterioration to economic conditions was false and misleading because they failed to acknowledge that these problems were largely due to a systemic failure in internal controls.

## D.    The False and Misleading Financial Reporting

253.    The Orrstown Exchange Act Defendants' knowingly or recklessly made false and misleading statements and omissions identified above in the Company's quarterly financial reports (Form 10Q) and annual reports (Form 10-K) that were filed with the SEC and made publicly available to the investing public. Specifically, the Company's unaudited 1Q2010 10Q, 2Q2010 10Q, 3Q2010 10Q, 4Q 2010, 1Q 2011, 2Q 2011, 3Q 2011, 4Q2011, 1Q2012 and audited 2009, 2010

and 2011 Form 10-Ks were false and misleading when made and failed to disclose material facts concerning Orrstown and the Bank's financial condition, underwriting standards, loan portfolio quality, and internal controls.

254. With respect to the Orrstown Exchange Act Defendants' financial reporting, Defendants Quinn and Everly signed every Class Period Form10-Q quarterly financial report. In signing these filings, Quinn and Everly certified each time that

> Based on my knowledge, the quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report.

*See, e.g.*, Form 10Q 1Q2010, filed 5/7/2010, at Quinn Certification and Everly Certification. Further, as the certifying officers, Quinn and Everly also certified:

> Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

*Id.*

255. Quinn and Everly along with the other individual Orrstown Exchange Act Defendants Zullinger, Shoemaker, Snoke and Coy, signed every Class Period

Form 10-K Annual Report.  Quinn as Chief Executive Officer and Everly as Chief

Financial Officer, certified:

> the annual report does not contain any untrue statement
> of a material fact or omit to state a material fact
> necessary to make the statements made, in light of the
> circumstances under which such statements were made,
> not misleading with respect to the period covered by this
> annual report.

Quinn and Everly also certified:

> Based on my knowledge, the financial statements, and
> other financial information included in this annual report,
> fairly present, in all material respects, the financial
> condition, results of operations and cash flows of the
> registrant as of, and for, the periods presented in this
> annual report.

*See, e.g.*, Form 10-K 2010 Annual Report, filed 3/11/2010, at Quinn and Everly

Certifications.

256.   In signing the Form 10-Qs and Form 10-Ks, the Orrstown Exchange

Act Defendants verified that the management-prepared financial statements were

prepared in accordance with GAAP without material weaknesses and that the

Company was maintaining effective internal controls.

257.   Following the Internal Review, in early 2010 management was in the

position that it could not ignore the new credit data gathered by the Internal

Review for the Bank's larger commercial lending relationships and the

communications from large borrowers the Azadis and Yorktown of financial

difficulties. The Orrstown Exchange Act Defendants did not want to sabotage the planned March 2010 Offering by issuing financial statements that revealed a weakened loan portfolio with sharply escalating Risk Assets and provisions for loan loss reserves.  The Orrstown Exchange Act Defendants, therefore, reached a compromise position in that they reclassified *some* of the impaired loans and made ***some*** of the requisite allocations for loan loss reserves in 4Q2009 but forestalled accounting for the other impaired loans until ***after*** the March 2010 Offering closed. Then, after the March 2010 Offering closed, the Exchange Act Defendants employed the IRRS to further forestall classifying loans as Risk Assets and making loan loss reserve allocations that would have negatively impacted the Company's net income. *See supra* Part X.B.

258.   Indeed, "Bank policy related to the allowance for loan losses is considered to be a ***critical accounting policy*** because the allowance for loan losses represents a ***particularly sensitive accounting estimate***. The amount of the allowance is based on management's evaluation of the collectability of the loan portfolio. . . ."  From 10-Q 1Q2010, filed 5/7/2010, at 19 (emphasis added).  Thus, the Orrstown Exchange Act Defendants who were aggressively circumventing sound lending policies through abusive application of their exception discretion to approve risky loans and ignoring adverse credit data on their commercial borrowers, *see supra* Part VII.B(a), VII.C, X.B, through their use of the IRRS

system were also those responsible for determining this highly critical and sensitive accounting estimate for loan losses.

259.   This scheme caught up with the Orrstown Exchange Act Defendants when the Regulators' comprehensive investigation forced the Orrstown Exchange Act Defendants to admit in the 2011 Annual Report that the Company's internal controls, which incorporated the IRRS used in 2010 and 2011, were fundamentally flawed.  The Company stated:

> ***As of December 31, 2011, the Company did not maintain effective internal control over the process to prepare and report information related to loan ratings and its impact on the allowance for loan losses.*** This control deficiency results in a reasonable possibility that a material misstatement to the annual or interim Consolidated Financial Statements will not be prevented or detected. Accordingly, management has determined that this condition constitutes a material weakness. ***Because of this material weakness, we have concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2011 based on the criteria in the Internal Control – Integrated Framework.***

Form 10-K 2011 Annual Report, filed 3/15/2012, at 74.

260.   This admission reveals that the Bank's loan loss reserves were materially understated and the loan loss reserves were materially inadequate during the ***entire*** Class Period, the Bank had failed to use the proper accounting

methodology to calculate loan loss reserves, causing the Company's financial statements to be materially misstated and non-compliant with GAAP.

261.   As a result of the Orrstown Exchange Act Defendants' false statements, Orrstown's common stock traded at artificially inflated levels during the Class Period.   However, when the truth about Orrstown's practices was revealed to investors, the Company's share price dramatically declined thereby damaging the Class.

### E.     Auditor Defendant Smith Elliott's Audit Opinions were Materially False and Misleading

262.   Under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, an auditor may be primarily liable for securities fraud when it provides an audit report containing an unqualified or "clean" audit opinion certifying financial statements that were false and misleading at the time the audit report was issued.   If the auditor fails to take reasonable steps to correct or withdraw a previously issued "clean" audit report after the auditor subsequently learns or is reckless in not learning that its previously issued audit reports erroneously certified financial statements that were, in fact, materially false and misleading, the auditor may also be primarily liable for securities fraud.

263.   During the Class Period, Smith Elliott issued unqualified or "clean" audit reports for the years ending December 31, 2009 and 2010 that incorrectly

certified Orrstown and the Bank's Class Period financial statements as being free of material misstatements and opined that the Company's internal controls were effective and without any material weaknesses.  For the year ending December 31, 2011, Smith Elliott also incorrectly issued a clean audit report of the Company's financial statements but did issue an adverse opinion as to the Company's internal financial controls.  This adverse opinion, of course, contradicts the clean report on the 2011 financial statements that are a product of the Company's internal financial controls.

### 1.    Smith Elliott's Materially False and Misleading 2009 Audit Opinion in the 2009 Annual Report

264.   Smith Elliott's audit for 2009 was included in the Company's Annual Report Form 10-K filing.  In the 2009 10-K, Smith Elliott expressed the following unqualified opinion:

> [T]he financial statements referred to above present fairly, in all material respects, the financial position of Orrstown Financial Services, Inc. and its wholly-owned subsidiary as of December 31, 2009 and 2008, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, Orrstown Financial Services, Inc. and its wholly-owned subsidiary maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control – Integrated Framework

issued by the Committee of Sponsoring Organizations of
the Treadway Commission (COSO).

Form 10-K 2009 Annual Report, filed 3/15/2010, at 47.

265.   Smith Elliott affirmatively stated that it had conducted its audit in
accordance with PCAOB's standards.   *See id.*   Smith Elliott, therefore, applied
PCAOB standard AU Section 342 in evaluating the reasonableness of the
Company's loan loss reserves which required that Smith Elliott "review and test
the process used by management to develop the estimate," develop its own
"independent expectation of the estimate" to cross-check management's estimate,
and "review subsequent events" that would have impacted the credit relationships
for which loan loss reserves were being allocated.   AU Section 342, Auditing
Accounting Estimates; *see supra* ¶ 180.   Further, AU Section 342, as well as FASB
Statement No. 5 (*see supra* ¶ 181) and AS No. 5 (*see supra* ¶ 179), required Smith
Elliott to delve deep into the recent and historic credit data for each of the Bank's
loan relationships and integrate all relevant information coming from the Bank and
Regulators to thoroughly test management's estimates.

266.   An auditor has a responsibility to plan and perform an audit in such a
manner as to determine whether the financial statements are free from material
misstatement, whether caused by error or fraud.   AU Section 316  ("AU 316"),
*Consideration of Fraud in Financial Statement Audit.*   AU 316 provides specific
standards and guidelines auditors must follow in order to fulfill their responsibility

in accordance with PCAOB.  An audit should be planned and performed with an attitude of "professional skepticism":

> Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU 316.13, *The Importance of Exercising Professional Skepticism*.

267.  By performing its audits in accordance with PCAOB auditing standards referenced above , which Smith Elliott affirmatively stated it had done in the 2009 audit report, it is implausible that Smith Elliott did not have actual knowledge that Orrstown and the Bank's financial statements contained material understatements with respect to the classification of impaired loans and allocation of loan loss reserves especially in light of the updated credit data gathered by the Internal Review of which Smith Elliott would have been apprised.  In addition to the Internal Review, Smith Elliott would have been privy to the Credit Analyst

Group's recommendations on loan applications, and the Loan Committee's approval of loans that conflicted with the Credit Analyst Group's recommendations, did not satisfy the credit requirements of the Loan Policy, such as the Debt Service Ratio, but rather were approved based upon an inadequate "exception."

268.  Smith Elliott's unqualified audit report for the year 2009 was materially false and misleading because Smith Elliott failed to apply the standards of the PCAOB.  Under the PCAOB standards, a reasonable auditor would have exercised professional skepticism and discovered that the financial statements contained material understatements of Risk Assets and that there was a material weakness in the Company's internal controls over the financial reporting of Risk Assets and loan loss reserve allocations such that the financial statements were not prepared in accordance with GAAP.  Smith Elliott's loyalty to its client and financial interest in continuing to serve as Orrstown and the Bank's auditor (of which it still is today) eclipsed Smith Elliott's professional responsibility under the PCAOB and caused Smith Elliott to issue the materially false and misleading audit report for 2009.

### 2.     Smith Elliott's Materially False and Misleading 2010 Audit Opinion in the 2010 Annual Report

269.   Smith Elliott's audit for 2010 was included in the Company's Annual Report Form 10-K filing.  In the 2010 10-K, Smith Elliott expressed the following unqualified opinion:

> [T]he financial statements referred to above present fairly, in all material respects, the financial position of Orrstown Financial Services, Inc. and its wholly-owned subsidiary as of December 31, 2010 and 2009, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2010 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, Orrstown Financial Services, Inc. and its wholly-owned subsidiary maintained, in all material respects, effective internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

Form 10-K 2010 Annual Report, filed 3/11/2011, at 67.

270.   Smith Elliott affirmatively stated that it had conducted its audit in accordance with PCAOB's standards.  *See id.*  Smith Elliott, therefore, applied PCAOB standard AU Section 342 in evaluating the reasonableness of the Company's loan loss reserves which required that Smith Elliott "review and test the process used by management to develop the estimate," develop its own "independent expectation of the estimate" to cross-check management's estimate,

and "review subsequent events" that would have impacted the credit relationships for which loan loss reserves were being allocated.   AU Section 342, Auditing Accounting Estimates; *see supra* ¶ 180.  Further, AU Section 342, as well as FASB Statement No. 5 (*see supra* ¶ 181) and AS No. 5 (*see supra* ¶ 179), required Smith Elliott to delve deep into the recent and historic credit data for each of the Bank's loan relationships and integrate all relevant information coming from the Bank and Regulators to thoroughly test managements estimates.

271.  An auditor has a responsibility to plan and perform an audit in such a manner as to determine whether the financial statements are free from material misstatement, whether caused by error or fraud.  AU Section 316  ("AU 316"), *Consideration of Fraud in Financial Statement Audit*.  AU 316 provides specific standards and guidelines auditors must follow in order fulfill their responsibility in accordance with PCAOB.  AU 316.13 requires that the audit be planned and performed with an attitude of "professional skepticism."

272.  By performing its 2010 audit in accordance with PCAOB auditing standards referenced above , which Smith Elliott affirmatively stated it had done in the 2010 audit report, it is implausible that Smith Elliott did not have actual knowledge that Orrstown and the Bank's financial statements contained material understatements of Risk Assets with respect to the classification of impaired loans and allocation of loan loss reserves especially in light of the updated credit data

gathered by the Internal Review, the Bank's IRRS implemented in 2010 which purposefully delayed the Bank's classification of impaired loans, and the Regulators' investigation all of which Smith Elliott would have been apprised.

273.  Smith Elliott's unqualified audit report for 2010 was materially false and misleading because Smith Elliott failed to apply the standards of the PCAOB. Under the PCAOB standards, a reasonable auditor would have exercised professional skepticism and discovered that the financial statements contained material understatements of Risk Assets and that there was a material weakness in the Company's internal controls over the financial reporting of Risk Assets and loan loss reserve allocations such that the financial statements were not prepared in accordance with GAAP.  Smith Elliott's loyalty to its client and financial interest in continuing to serve as Orrstown and the Bank's auditor eclipsed Smith Elliott's professional responsibility under the PCAOB and caused Smith Elliott to issue the materially false and misleading audit report for 2010.

### 3.     Smith Elliott's Materially False and Misleading 2011 Audit Opinion in the 2011 Annual Report

274.  Smith Elliott's audit for 2011 was included in the Company's Annual Report Form 10-K filing.  In the 2011 10-K, Smith Elliott expressed the following unqualified opinion:

> [T]he financial statements referred to above present
> fairly, in all material respects, the financial position of
> Orrstown Financial Services, Inc. and its wholly-owned
> subsidiary as of December 31, 2011 and 2010, and the
> results of their operations and their cash flows for each of
> the years in the three-year period ended December 31,
> 2011 in conformity with accounting principles generally
> accepted in the United States of America.

Form 10-K 2011 Annual Report, filed 3/15/2011, at 77.   But then, Smith Elliot

expressed the following adverse opinion as to the Company's internal controls:

> A material weakness is a control deficiency, or
> combination of deficiencies, in internal control over
> financial reporting, such that there is a reasonable
> possibility that a material misstatement of the Company's
> annual or interim financial statements will not be
> prevented or detected on a timely basis.  The following
> material weakness has been identified and included in
> management's assessment.  ***The Company did not have a
> timely and effective process to prepare and report
> information related to loan ratings and the allowance of
> loan losses allocations*** . . . .  ***In our opinion, because of
> the effects of the material weakness described above on
> the achievement of the objectives of the control criteria,
> Orrstown Financial Services, Inc. and its wholly-owned
> subsidiary has not maintained effective internal control
> over financial reporting as of December 31, 2011*** . . . .

*Id*. at 75-76 (emphasis added); *see also id*. at 77 (same).

275.   Smith Elliott affirmatively stated that it had conducted its audit in

accordance with PCAOB's standards.   *See id.*   Smith Elliott, therefore, applied

PCAOB standard AU Section 342 in evaluating the reasonableness of the

Company's loan loss reserves which required that Smith Elliott "review and test

the process used by management to develop the estimate," develop its own "independent expectation of the estimate" to cross-check management's estimate, and "review subsequent events" that would have impacted the credit relationships for which loan loss reserves were being allocated.  AU Section 342, Auditing Accounting Estimates; *see supra* ¶ 180.  Further, AU Section 342, as well as FASB Statement No. 5 (*see supra* ¶ 181) and AS No. 5 (*see supra* ¶ 179), required Smith Elliott to delve deep into the recent and historic credit data for each of the Bank's loan relationships and integrate all relevant information coming from the Bank and Regulators to thoroughly test managements estimates.

276.   An auditor has a responsibility to plan and perform an audit in such a manner as to determine whether the financial statements are free from material misstatement, whether caused by error or fraud.  AU Section 316  ("AU 316"), *Consideration of Fraud in Financial Statement Audit*.  AU 316 provides specific standards and guidelines auditors must follow in order fulfill their responsibility in accordance with PCAOB.  AU 316.13, *supra* ¶ 266, requires that the audit be planned and performed with an attitude of "professional skepticism."

277.  By performing its 2011 audit in accordance with PCAOB auditing standards referenced above , which Smith Elliott affirmatively stated it had done in the 2011 audit report, it is implausible that Smith Elliott did not have actual knowledge that Orrstown and the Bank's financial statements contained

understatements of Risk Assets with respect to the classification of impaired loans and allocation of loan loss reserves especially in light of the updated credit data gathered by the Internal Review, the Bank's IRRS implemented in 2010 which purposefully delayed the Bank's classification of impaired loans, the work done by the Special Asset Group, and the Regulators' investigation all of which Smith Elliott would have been apprised.  Moreover, Smith Elliott's own audit revealed a material weakness in the financial reporting controls related to the Company's process for preparing and reporting loan ratings and loan losses allocations which undercuts the veracity of the Company's financial statements.[10]

278.   Smith Elliott's unqualified audit report on the 2011 financial statements was materially false and misleading because Smith Elliott failed to apply the standards of the PCAOB.  Under the PCAOB standards, a reasonable auditor would have exercised professional skepticism and discovered that the financial statements had not been prepared in accordance with GAAP as they contained material understatements of Risk Assets and loan loss reserves due, at a minimum, to the material weakness in the Company's internal controls over the financial reporting of Risk Assets and loan loss reserve allocations that Smith

---

[10] The Company's Form 10-Q for 3Q2012 which reported a $19.8 million valuation allowance further evidences Smith Elliott's failure to test management's estimates and apply the rigorous professional skepticism required by the PCAOB in auditing Orrstown's 2011 financial statements.

Elliott discovered in its audit.  Smith Elliott's loyalty to its client and financial interest in continuing to serve as Orrstown and the Bank's auditor eclipsed Smith Elliott's professional responsibility under the PCAOB and caused Smith Elliott to issue the materially false and misleading audit report for 2011.

## XI.    ADDITIONAL EXCHANGE ACT ALLEGATIONS

279.   The preceding allegations are herein incorporated by reference and are in addition to the following allegations concerning Loss Causation, Scienter, Safe Harbor and Efficient Market, which are not mutually exclusive.

### A.    Loss Causation

280.   During the Class Period, as detailed therein, the Exchange Act Defendants made false and misleading statements and engaged in a course of conduct to deceive that artificially inflated the prices of Orrstown common stock, and operated as a fraud or deceit on the Exchange Act Class by misrepresenting, throughout the Class Period, the quality of the Company's lending practices, loan portfolio and financial condition.  Later, when the Exchange Act Defendants' prior misrepresentations and fraudulent conduct related to the quality of the Company's lending practices, loan portfolio and financial condition were revealed to the

market, the price of Orrstown's common stock fell precipitously as a result of such revelations.

281.   As a result of their purchases of Orrstown common stock during the Class Period, Plaintiff and the members of the Exchange Act Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## B.   Scienter

282.   During the Class Period, the Exchange Act Defendants had both the motive and opportunity to commit fraud.

283.   They had actual knowledge of the misleading nature of the statements they made, or acted with reckless disregard for the true information known to them at the time, as alleged *supra*.  In so doing, the Exchange Act Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of Orrstown common stock during the Class Period.

284.   Further, the Exchange Act Defendants benefitted from perpetuating the fraud of selling a "safe and sound" financial institution.  The Company paid Smith Elliott fees for its professional auditing services which Smith Elliott risked losing if it challenged management about its accounting irregularities.  The Orrstown Exchange Act Defendants also financially benefited by obfuscating the deteriorating financial condition of the Company.  As illustrated by the compensation chart below, the Orrstown Exchange Act Defendants were able to

receive handsome income and benefits in 2009 and 2010 when they were issuing

the materially false and misleading financial statements alleged herein:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(1) | Option Awards ($)(1) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)(2) | All Other Compensation ($)(3) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Thomas R. Quinn, Jr. | 2011 | 414,027 | 0 | - | 0 | - | 135,051 | 16,347 | 565,425 |
| *President & Chief* | 2010 | 399,051 | 196,160 | - | 34,860 | - | 194,122 | 89,775 | 913,968 |
| *Executive Officer* | 2009 | 302,885 | 75,160 | - | 0 | - | 14,490 | 27,299 | 419,834 |
| | | | | | | | | | |
| Bradley S. Everly | 2011 | 206,013 | 0 | - | 0 | - | 49,272 | 7,126 | 262,411 |
| *Executive Vice* | 2010 | 180,204 | 70,267 | - | 27,888 | - | 49,266 | 33,262 | 360,887 |
| *President & Chief Financial Officer* | 2009 | 158,346 | 33,660 | - | 11,336 | - | 32,055 | 29,158 | 264,555 |
| | | | | | | | | | |
| Jeffrey W. Embly | 2011 | 209,906 | 0 | - | 0 | - | 11,824 | 6,718 | 228,448 |
| *Senior Executive Vice* | 2010 | 202,969 | 83,726 | - | 27,888 | - | 11,824 | 36,942 | 363,349 |
| *President & Chief Operating Officer* | 2009 | 188,077 | 40,226 | - | 13,224 | - | 11,824 | 34,157 | 287,508 |

**Source: Form DEF 14A, filed 3/30/2012, at 25 (footnotes omitted).**

285.   Since the Orrstown Exchange Act Defendants were able to dupe

investors throughout 2011 and inflate and misstate the Company's financial

condition, they, throughout 2011, continued to collect their annual salary.   But

once the fraud was publicly exposed, and the Regulators had imposed their

supervision, Defendants' Quinn, Everly and Embly were no longer able to take

their end of year massive bonuses, resulting in a drastic decrease in compensation

for the year 2011.   *See* Form DEF 14A, filed 3/30/12, at 25.

286.   Following the Regulators' intervention and the requirement that the Bank "adopt and implement a plan, acceptable to the [Regulators], to strengthen oversight of management and operations[,]" *supra* Part VII.B, and engage an independent consultant to evaluate the competency and effectiveness of management with a report to be submitted to the Regulators within 120 days of the execution of the Enforcement Actions taken on March 23, 2012, Defendants Embly and Everly "resigned" as employees and executives of Orrstown.  This, as well as the information from CWs, alleged *supra,* evidences such Defendants' knowledge of and role in the wrongdoing throughout the Class Period.

287.   The Orrstown Exchange Act Defendants Zullinger, Shoemaker, Snoke and Coy, as directors of the Company who also sat on at various times the Loan Committee, Enterprise Risk Management Committee and possibly the Credit Administration Committee, also benefitted from misleading and deceiving the investing public about the true financial condition of Orrstown, through receipt of the following compensation.

**2011 DIRECTOR COMPENSATION TABLE**

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($)(1) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)(2),(3) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Jeffrey W. Coy | 65,500 | 7,982 | - | - | 11,850 | - | 85,332 |
| Kenneth R. Shoemaker | 33,100 | 7,982 | - | - | 11,510 | | 52,592(4) |
| Glenn W. Snoke | 48,900 | 7,982 | - | - | 13,260 | - | 70,142 |

| Joel R. Zullinger | 78,700 | 7,982 | - | - | 22,602 | - | 109,284 |

**Source: Form DEF 14A, filed 3/30/2012, at 14 (footnotes omitted).**

### C.     No Safe Harbor

288.   Orrstown's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

289.   The Exchange Act Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Orrstown who knew that the FLS was false. None of the historic or present-tense statements made by the Exchange Act Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections by the Exchange Act Defendant expressly related to, or stated to be dependent, on those historic or present tense statements when made.

### D.     Efficient Market

290.   At all relevant times, the market for Orrstown stock was an efficient market for the following reasons, among others:

a.  Orrstown securities met the requirements for listing, were listed, and actively traded on the NASDAQ, a high efficient market;

b.  Orrstown counts Boenning & Scattergood, Inc., Stifel, Nicolaus & Company, Inc., and Defendant Janney as market makers for Orrstown securities on the NASDAQ;

c.  As a regulated issuer, Orrstown filed periodic public reports with the SEC and the NASDAQ;

d.  Upon the filing of periodic public reports with the SEC of unexpected corporate events or news, Orrstown's stock price tends to react as alleged herein;

e.  Orrstown securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

f.  Orrstown regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

291.   As a result, the market for Orrstown securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Orrstown's stock price.   Under these circumstances, all purchasers of Orrstown securities during the Class Period suffered similar injury after the true facts were revealed.

292.   Orrstown's own filings indicate its recognition that once Orrstown's common stock began trading on the NASDAQ in April 2009, there was an efficient market for Orrstown securities which did not exist prior when Orrstown traded on the OTC Bulletin Board.   Form 10-K 2009 Annual Report, filed on 3/15/2010, at 19.

## XII.   EXCHANGE ACT CLAIMS FOR RELIEF

### COUNT V
### (For Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Orrstown Exchange Act Defendants)

293.   Plaintiff brings this claim on behalf of itself and the members of the Exchange Act Class against the Orrstown Exchange Act Defendants – Orrstown, the Bank, Quinn, Everly, Embly, Zullinger, Shoemaker, Snoke and Coy.

294.   During the Class Period, Orrstown Exchange Act Defendants disseminated or approved the false statements specified herein, which they knew to be or recklessly disregarded as to whether they were misleading, in that they

contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

295.   During the Class Period, the Orrstown Exchange Act Defendants collectively and individually, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and the other members of the Exchange Act Class; (b) artificially inflate and maintain the market price of Orrstown common stock; and (c) cause Plaintiff and other members of the Class to purchase Orrstown stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Orrstown Exchange Act Defendants each participated in the actions set forth herein.

296.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Orrstown common stock. Plaintiff and the Class would not have purchased Orrstown common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

297.   As a direct and proximate result of the Orrstown Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Exchange

Act Class suffered damages in connection with their purchases of Orrstown

common stock during the Class Period.

## COUNT VI

**(For Violations of § 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against
the Auditor Defendant Smith Elliott)**

298.   Plaintiff brings this claim on behalf of itself and the members of the

Exchange Act Class against the Auditor Defendant Smith Elliott.

299.   As "independent auditors" of the Company, Smith Elliott had a duty

to examine Orrstown and the Bank's financial statements in accordance with the

PCAOB to determine, among other things, whether the management prepared

financials were presented in accordance with GAAP.   Further, in connection

therewith, Smith Elliott had a duty to disclose to management any defects in the

system of internal controls.

300.   At all relevant times, Smith Elliott made, prepared, disseminated

and/or approved statements contained in reports and other documents the Company

filed with the SEC which were, at the time in light of the circumstances under

which they were made, false and misleading with respect to material facts.   Smith

Elliott falsely represented that it had audited Orrstown and the Bank's financials in

accordance with PCAOB, when in fact its audits had not complied with PCAOB.

Smith Elliott falsely certified Orrstown and the Bank's financial statements for

years 2009, 2010 and 2011 as having been in accordance with GAAP without any material weaknesses, when it knew or recklessly failed to know that these reports contained statements that were materially false and misleading.

301.  As Orrstown was a public company, Smith Elliott knew and understood that its reports concerning the Company's financial statements would be distributed to the investing public, and that the investors would rely and had a right to rely on such reports.  Smith Elliott knew and understood that its audit opinions would be included and constituted material parts of the Company's annual reports on Form 10-K filed with the SEC and with the Company's Registration Statement filed with the SEC in connection with the March 2010 Offering.

302.  In auditing the Company's financial statements, Smith Elliott disregarded, in violation of PCAOB, glaring irregularities in the Company's books and records and system of internal controls.  Smith Elliott falsely represented to investors that it had audited the Company's financials in accordance with PCAOB and that the Company's financial statements were presented in accordance with GAAP without material weaknesses when it issued unqualified audit opinions in connection with the Company's financial statements during the Class Period.

303.  Smith Elliott's actions in disregarding these glaring irregularities, holding out to the public and the SEC that it had conducted the audits in

accordance with PCAOB, and certifying the Company's financial statements as prepared in accordance with GAAP without material weaknesses, were intentional or, at a minimum, reckless.

304.  By virtue of its position as independent auditor of Orrstown and the Bank, Smith Elliott had access to key employees of the Company and continual access to and knowledge of the Company's confidential corporate, financial, operating, and business information at all relevant times.  Smith Elliott knew or recklessly disregarded the Company's true financial and operating condition, and intentionally or recklessly failed to take steps which, as the independent auditor, it could and should have taken to fully and fairly disclose the true facts to the public.

305.  Throughout the Class Period, Smith Elliott knew or was reckless in not knowing that the Company's internal controls for classifying impaired loans and allocation loan loss reviews was faulty.  Nevertheless, Smith Elliott continued to certify financial statements whose accuracy was dependent, in material part, on these accounting practices.

306.  In sum, Smith Elliott either knew or recklessly disregarded the facts which indicated that Orrstown and the Bank's financial statements were materially false and misleading, and issued unqualified opinions on 2009, 2010 and 2011 financial statements when such financial statements materially understated the Company's Risk Assets, loan loss reserves and net income.

307.   Smith Elliott's scienter is further evidenced by the magnitude by which the Company's Risk Assets and loan loss reserves were misstated during the Class Period.   Absent intention or reckless conduct, Smith Elliott would have detected these misstatements during the course of its audits and either taken corrective action or declined to issue unqualified audit opinions.

308.   These materially false and misleading statements proximately caused Plaintiff and the Class to purchase Orrstown's common stock at artificially inflated prices throughout the Class Period and thereby proximately caused Plaintiff and the Class to suffer damages.

309.   The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## <u>COUNT VII</u>
### (For Violation of § 20(a) of the Exchange Act
### Against Orrstown Exchange Act Defendants Quinn, Everly and Embly)

310.   Plaintiff brings this claim on behalf of itself and the members of the Exchange Act Class against the Orrstown Exchange Act Defendants Quinn, Everly and Embly.

311.   The Defendants Quinn, Everly and Embly acted as controlling persons of Orrstown within the meaning of Section 20(a) of the Exchange Act. By virtue of their power to control public statements about Orrstown, Defendants Quinn, Everly and Embly had the power and authority to control Orrstown and its employees.

312.   During the Class Period, Defendants Quinn, Everly and Embly knew or were reckless in not knowing that he Company's financial statements contained untrue statements of material fact and/or omitted material facts required to be stated therein to make them not misleading.

313.   At the time that Plaintiff and members of the Class purchased Orrstown's common stock, they did not know of any of the false and/or misleading statements and omissions, and relied upon the representations made by the Company and Defendants Quinn, Everly and Embly.

314.   As a direct and proximate result of the wrongful conduct of Defendants Quinn, Everly and Embly, Plaintiff and the Class suffered damages by purchasing Orrstown stock at artificially inflated prices.

315. By virtue of their positions as control persons, Defendants Quinn, Everly and Embly are liable pursuant to Section 20(a) of the Exchange Act.

316. By reason of such conduct, Quinn, Everly and Embly are liable pursuant to Section 20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying class of investors to pursue claims under the Securities Act and Exchange Act;

C.    Awarding Plaintiff and members of the Classes damages and interest;

D.    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

E.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  July 22, 2015                Respectfully submitted,

                                     **CHIMICLES & TIKELLIS LLP**

                                     */s/ Nicholas E. Chimicles*_____
                                     Nicholas E. Chimicles
                                     Kimberly Donaldson Smith
                                     Christina Donato Saler
                                     Benjamin F. Johns
                                     One Haverford Centre
                                     361 West Lancaster Avenue
                                     Haverford, PA 19041
                                     Telephone: (610) 642-8500
                                     Fax: (610) 649-3633
                                     nick@chimicles.com
                                     kimdonaldsonsmith@chimicles.com
                                     cdsaler@chimicles.com
                                     bfj@chimicles.com

## CERTIFICATE OF SERVICE

I, Christina Donato Saler, a specially admitted member of the bar of this Court, hereby certify that true and correct copies of *Plaintiff's Second Amended Complaint* have been electronically filed and served on all Defendants' counsel, via the Court's ECF system, this 22nd day of July, 2015, as follows:

David J. Creagan
David E. Edwards
**White and Williams, LLP**
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
215-864-7032

*Counsel for the Orrstown Defendants*

Jonathan S. Ziss
Seth L. Laver
**Goldberg Segalla**
1700 Market Street, Suite 1418
Philadelphia, PA 19103
267-519-6800

*Counsel for Smith Elliott Kearns & Co.*

Thomas G. Wilkinson, Jr.
Jeffrey G. Weil
Jeffrey M. Monhait
**Cozen O'Connor**
1900 Market Street
Philadelphia, PA 19103
215-665-5582

Bradley R. Wilson
Adam D. Gold
**Wachtell Lipton Rosen & Katz**
51 West 52nd Street
New York, New York 10019
212-403-1000

*Counsel for Sandler O'Neill and Janney*

By:   _/s/ Christina Donato Saler_
     Christina Donato Saler (PA 92017)
     cdsaler@chimicles.com
     Chimicles & Tikellis LLP
     One Haverford Centre
     361 West Lancaster Avenue
     Haverford, PA 19041
     Phone:  (610) 642-8500
     Fax:  (610) 649-3633

H0046013.8

## CERTIFICATION

I, James B. Jordan, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Southeastern Pennsylvania Transportation Authority ("SEPTA"). I have authorized counsel to prepare a complaint against Orrstown Financial Services, Inc. ("Orrstown") alleging violations of the federal securities laws. I have reviewed the complaint and I authorize its filing.

2.      I understand that SEPTA is a named plaintiff and a proposed class representative in this action against Orrstown.

3.      SEPTA did not purchase securities of Orrstown at the direction of counsel or in order to participate in any private action under the federal securities laws;

4.      SEPTA is willing to serve as a lead plaintiff in this matter and as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

5.      SEPTA's transactions in the securities of Orrstown are reflected in Exhibit A, attached hereto;

6.      During the three years prior to this certification, SEPTA has sought to serve as a representative party on behalf of a class in the following securities class actions: *In re Wells Fargo Mortgage-Backed Certificates Litigation*, 09-cv-1376-SI (N.D. Cal.); *In re Level 3 Communs., Inc. Secs. Litig.*, 09-cv-00200-PAB-CBSConsolidated (D. Colo.); *Southeastern Pennsylvania Transportation Authority v. The Bank of New York Mellon Corporation*, 2:11-cv:01628 (E.D. Pa.), *transfer, In re Bank of NY Mellon Corp. Foreign Exchange Transaction Litigation*, MDL No. 2335; and *Gaer v. Educ. Mgmt. Corp.*, 2:10-cv-01061 (W.D. Pa.); *In re Wachovia Preferred Securities & Bond/Notes Litigation*, 09-cv-6351 (S.D.N.Y.) (closed); *Miller v. Wachovia*, 5:09-cv-00998 (N.D. Cal.) (closed).

7.     During the three years prior to this certification, SEPTA has served as a representative party on behalf of a class in the following securities class actions: *In re Wells Fargo Mortgage-Backed Certificates Litigation*, 09-cv-1376-SI (N.D. Cal.); *Southeastern Pennsylvania Transportation Authority v. The Bank of New York Mellon Corporation*, 2:11-cv:01628 (E.D. Pa.), *transfer, In re Bank of NY Mellon Corp. Foreign Exchange Transaction Litigation*, MDL No. 2335; and *Gaer v. Educ. Mgmt. Corp.*, 2:10-cv-01061 (W.D. Pa.); *In re Wachovia Preferred Securities & Bond/Notes Litigation*, 09-cv-6351 (S.D.N.Y.) (closed); *Miller v. Wachovia*, 5:09-cv-00998 (N.D. Cal.) (closed).

8.     Beyond its pro rata share of any recovery, SEPTA will not accept payment for serving as a representative party on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 24 day of May, 2012.

James B. Jordan
General Counsel, SEPTA

# Exhibit A

SEPTA's Purchases of Orrstown Financial Services Common Stock

| ACTIVITY | Purchased / Sold | UNITS | ORIGINAL COST ($) |
|---|---|---|---|
| 3/24/2010 | Purchased | 4,160 | 112,320.00 |
| 3/24/2010 | Purchased | 357 | 9,540.47 |
| 3/31/2010 | Purchased | 1,240 | 31,781.20 |
| 4/8/2010 | Purchased | 401 | 10,335.22 |
| 4/12/2010 | Purchased | 2,606 | 65,972.45 |
| 4/14/2010 | Purchased | 150 | 3,833.43 |
| 5/10/2010 | Purchased | 53 | 1,252.18 |
| 5/20/2010 | Purchased | 432 | 10,408.74 |
| 5/21/2010 | Purchased | 799 | 19,732.91 |
| 5/25/2010 | Purchased | 481 | 11,746.36 |
| 5/28/2010 | Purchased | 241 | 5,764.32 |
| 7/6/2010 | Purchased | 832 | 18,241.52 |
| 7/13/2010 | Purchased | 1,140 | 25,740.86 |
| 8/10/2010 | Purchased | 530 | 12,576.74 |
| 3/11/2011 | Purchased | 527 | 13,522.56 |
| 4/12/2011 | Purchased | 500 | 13,143.00 |
| 5/9/2011 | Purchased | 125 | 3,141.41 |

# EXHIBIT A

EX-10.1 2 ex10-1.htm EXHIBIT 10.1 - AGREEMENT

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

| | |
|---|---|
| Written Agreement by and among<br><br>ORRSTOWN FINANCIAL SERVICES, INC.<br>Shippensburg, Pennsylvania<br><br>ORRSTOWN BANK<br>Shippensburg, Pennsylvania<br><br>and<br><br>FEDERAL RESERVE BANK<br> OF PHILADELPHIA<br>Philadelphia, Pennsylvania | Docket No.  12-021-WA/RB-HC<br>             12-021-WA/RB-SMB |

WHEREAS, in recognition of their common goal to maintain the financial soundness of

Orrstown Financial Services, Inc, Shippensburg, Pennsylvania ("Orrstown"),  a registered bank

holding company, and its subsidiary bank, Orrstown Bank, Shippensburg, Pennsylvania (the

"Bank"), a state-chartered bank that is a member of the Federal Reserve System, Orrstown, the

Bank, and the Federal Reserve Bank of Philadelphia (the "Reserve Bank") have mutually agreed

to enter into this Written Agreement (the "Agreement"); and

WHEREAS, on _March 22_, 2012, Orrstown's and the Bank's boards of

directors, at duly constituted meetings, adopted resolutions authorizing and directing

_Thomas Quinn_ to consent to this Agreement on behalf of Orrstown and the Bank,

and consenting to compliance with each and every applicable provision of this Agreement by

Orrstown, the Bank, and their institution-affiliated parties, as defined in sections 3(u) and 8(b)(3)

of the Federal Deposit Insurance Act, as amended (the "FDI Act") (12 U.S.C. §§ 1813(u) and 1818(b)(3)).

NOW, THEREFORE, Orrstown, the Bank, and the Reserve Bank agree as follows:

**Source of Strength**

1.　　The board of directors of Orrstown shall take appropriate steps to fully utilize Orrstown's financial and managerial resources, pursuant to section 38A of the FDI Act (12 U.S.C. § 1831o-1) and section 225.4(a) of Regulation Y of the Board of Governors of the Federal Reserve System (the "Board of Governors") (12 C.F.R. § 225.4(a)), to serve as a source of strength to the Bank, including, but not limited to, taking steps to ensure that the Bank complies with this Agreement and any other supervisory action taken by the Bank's federal or state regulators.

**Board Oversight**

2.　　Within 60 days of this Agreement, the board of directors of the Bank shall submit to the Reserve Bank a written plan to strengthen board oversight of the management and operations of the Bank. The plan shall, at a minimum, address, consider, and include:

(a)　　The actions that the board of directors will take to improve the Bank's condition and maintain effective control over, and supervision of, the Bank's major operations and activities, including but not limited to, credit risk management, lending and credit administration, asset quality, liquidity, audit, capital, and earnings;

(b)　　the responsibility of the board of directors to monitor management's adherence to approved policies and procedures, and applicable laws and regulations and to monitor exceptions to approved policies and procedures;

2

(c)     steps to improve the information and reports that will be regularly reviewed by the board of directors and its committees in their oversight of the operations and management of the Bank, including information on the Bank's credit risk management, lending and credit administration, adversely classified assets, interest only loans, allowance for loan and lease losses ("ALLL"), capital, liquidity, audit, and earnings; and

(d)     the maintenance of adequate and complete minutes of all board and committee meetings.

**Management Review**

3.      (a)     Within 30 days of this Agreement, the board of directors of the Bank shall retain an independent consultant acceptable to the Reserve Bank to conduct a review of all management and staffing needs of the Bank and the qualifications and performance of all senior Bank management (the "Management Review"), and to prepare a written report of findings and recommendations (the "Report"). The primary purpose of the Management Review shall be to aid in the development of a suitable management structure that is adequately staffed by qualified and trained personnel.

(b)     Within 10 days of the Reserve Bank's approval of the Bank's independent consultant selection, the Bank shall submit an engagement letter to the Reserve Bank for approval. The engagement letter shall require the independent consultant to submit the Report within 90 days of regulatory approval of the engagement letter and to provide a copy of the Report to the Reserve Bank at the same time that it is provided to the Bank's board of directors. The Review shall, at a minimum, address, consider, and include:

(i)     the identification of the type and number of senior officers needed to manage and supervise properly the affairs of the Bank

3

(ii)    an evaluation of each senior officer to determine whether the individual possesses the ability, experience, and other qualifications to competently perform present and anticipated duties, including their ability to: adhere to applicable laws and regulations and the Bank's established policies and procedures; restore and maintain the Bank to a safe and sound condition; and comply with the requirements of this Agreement;

(iii)   an evaluation of reporting lines within the management structure;

(iv)    a management succession plan for key senior officers; and

(v)     the identification of present and future management and staffing needs for each area of the Bank, particularly in the areas of credit risk management, lending and credit administration, loan review, and problem asset resolution.

4.      Within 30 days of receipt of the Report, the Bank's board of directors shall submit a written management plan to the Reserve Bank that fully addresses the findings and recommendations in the Report and describes the specific actions that the board of directors proposes to take in order to strengthen the Bank's management, including, but not limited to plans to hire or appoint additional or replacement personnel

**Credit Risk Management**

5.      Within 90 days of this Agreement, the Bank shall submit to the Reserve Bank an acceptable written plan to strengthen credit risk management practices. The plan shall, at a minimum, address, consider, and include:

(a)     Procedures to identify, limit and manage concentrations of credit that are consistent with the Interagency Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices, dated December 12, 2006 (SR 07-1);

(b)     procedures for the timely and accurate identification of problem loans;

4

(c)     enhancements to the internal loan grading system to ensure timely and accurate risk ratings;

(d)     enhanced stress testing of loan and portfolio segments; and

(e)     improvements to the Bank's management information systems to ensure that the board of directors and senior management obtain timely and accurate information regarding the condition of the Bank's loan portfolio.

**Lending and Credit Administration**

6.     Within 60 days of this Agreement, the Bank shall submit to the Reserve Bank an acceptable written lending and credit administration program that shall, at a minimum, address, consider, and include:

(a)     Loan underwriting and credit administration procedures that include and provide for, at a minimum, documented analysis of: (i) the borrower's repayment sources, global cash flow, and overall debt service ability; and (ii) the value of any collateral;

(b)     procedures to ensure that appraisals conform to accepted appraisal standards, as defined in the Uniform Standards of Professional Appraisal Practice, and comply with the requirements of Subpart G of Regulation Y of the Board of Governors (12 C.F.R. Part 225, Subpart G) made applicable to state member banks by section 208.50 of Regulation H of the Board of Governors (12 C.F.R. § 208.50), and the Interagency Appraisal and Evaluation Guidelines, dated October 27, 1994 (SR 94-55);

(c)     standards for interest-only loans;

(d)     the appropriate use of interest reserves;

(e)     policies and procedures to minimize and monitor underwriting and document exceptions;

5

(f)    enhancements to the loan workout process to ensure that workout plans for problem loans are consistent with the Interagency Guidance on Prudent Commercial Real Estate Loan Workouts, dated October 30, 2009 (SR 09-7);

(g)    standards for renewing, extending or modifying existing loans;

(h)    standards for the timely movement of loans to non-accrual status;

(i)    compensation standards for loan origination officers that include an assessment of loan performance; and

(j)    the appropriate accounting treatment of costs incurred in connection with the maintenance and sale of collateral.

**Asset Improvement**

7.    The Bank shall not, directly or indirectly, extend, renew, or restructure any credit to or for the benefit of any borrower, including any related interest of the borrower, whose loans or other extensions of credit are criticized in the report of the joint examination conducted by the Reserve Bank and the Pennsylvania Department of Banking that commenced on May 16, 2011 (the "Report of Examination") or in any subsequent report of examination, without the prior approval of a majority of the full board of directors or a designated committee thereof. The board of directors or its committee shall document in writing the reasons for the extension of credit, renewal, or restructuring, specifically certifying that: (i) the Bank's risk management policies and practices for loan workout activity are acceptable; (ii) the extension of credit is necessary to improve and protect the Bank's interest in the ultimate collection of the credit already granted and maximize its potential for collection; (iii) the extension of credit reflects prudent underwriting based on reasonable repayment terms and is adequately secured; and all necessary loan documentation has been properly and accurately prepared and filed; (iv) the Bank

6

has performed a comprehensive credit analysis indicating that the borrower has the willingness and ability to repay the debt as supported by an adequate workout plan, as necessary; and (v) the board of directors or its designated committee reasonably believes that the extension of credit will not impair the Bank's interest in obtaining repayment of the already outstanding credit and that the extension of credit or renewal will be repaid according to its terms. The written certification shall be made a part of the minutes of the meetings of the board of directors or its committee, as appropriate, and a copy of the signed certification, together with the credit analysis and related information that was used in the determination, shall be retained by the Bank in the borrower's credit file for subsequent supervisory review.

8.      (a)      Within 60 days of this Agreement, the Bank shall submit to the Reserve Bank an acceptable written plan designed to improve the Bank's position through repayment, amortization, liquidation, additional collateral, or other means on each loan, relationship, or other asset in excess of $750,000, including other real estate owned ("OREO"), that (i) is past due as to principal or interest more than 90 days as of the date of this Agreement; (ii) is on the Bank's problem loan list; or (iii) was adversely classified in the Report of Examination.

     (b)      Within 30 days of the date that any additional loan, relationship, or other asset in excess of $750,000, including OREO, becomes past due as to principal or interest for more than 90 days, is on the Bank's problem loan list, or is adversely classified in any subsequent report of examination of the Bank, the Bank shall submit to the Reserve Bank an acceptable written plan to improve the Bank's position on such loan or asset.

     (c)      Within 45 days after the end of each calendar quarter thereafter, the Bank shall submit a written progress report to the Reserve Bank to update each asset improvement plan, which shall include, at a minimum, the carrying value of the loan or other asset and

7

changes in the nature and value of supporting collateral, along with a copy of the Bank's current

problem loan list, a list of all loan renewals and extensions without full collection of interest in

the last quarter, and past due/non-accrual report.

**Allowance for Loan and Lease Losses**

    9.    (a)    The Bank shall, within 30 days from the receipt of any federal or state

report of examination, charge off all assets classified "loss" unless otherwise approved in writing

by the Reserve Bank.

        (b)    Within 60 days of this Agreement, the Bank shall review and revise its

ALLL methodology consistent with relevant supervisory guidance, including the Interagency

Policy Statements on the Allowance for Loan and Lease Losses, dated July 2, 2001 (SR 01-17

(Sup)) and December 13, 2006 (SR 06-17), and the findings and recommendations regarding the

ALLL set forth in the Report of Examination, and submit a description of the revised

methodology to the Reserve Bank. The revised ALLL methodology shall be designed to

maintain an adequate ALLL and shall address, consider, and include, at a minimum, the

reliability of the Bank's loan grading system, the volume of criticized loans, concentrations of

credit, the current level of past due and nonperforming loans, past loan loss experience,

evaluation of probable losses in the Bank's loan portfolio, including adversely classified loans,

and the impact of market conditions on loan and collateral valuations and collectibility.

        (c)    Within 60 days of this Agreement, the Bank shall submit to the Reserve

Bank an acceptable written program for the maintenance of an adequate ALLL. The program

shall include policies and procedures to ensure adherence to the revised ALLL methodology and

provide for periodic reviews and updates to the ALLL methodology, as appropriate. The

program shall also provide for a review of the ALLL by the board of directors on at least a

8

quarterly calendar basis. Any deficiency found in the ALLL shall be remedied in the quarter it is discovered, prior to the filing of the Consolidated Reports of Condition and Income, by additional provisions. The board of directors shall maintain written documentation of its review, including the factors considered and conclusions reached by the Bank in determining the adequacy of the ALLL. During the term of this Agreement, the Bank shall submit to the Reserve Bank, within 30 days after the end of each calendar quarter, a written report regarding the board of directors' quarterly review of the ALLL and a description of any changes to the methodology used in determining the amount of ALLL for that quarter.

**Capital Plan**

10.     Within 90 days of this Agreement, Orrstown shall submit to the Reserve Bank an acceptable written plan to maintain sufficient capital at Orrstown on a consolidated basis, and Orrstown and the Bank shall submit an acceptable joint written plan to maintain sufficient capital at the Bank as a separate legal entity on a stand-alone basis. The plans shall, at a minimum, address, consider, and include:

(a)     Orrstown's current and future capital requirements, including compliance with the Capital Adequacy Guidelines for Bank Holding Companies: Risk-Based Measure and Tier 1 Leverage Measure, Appendices A and D of Regulation Y of the Board of Governors (12 C.F.R. Part 225, App. A and D);

(b)     the Bank's current and future capital requirements, including compliance with the Capital Adequacy Guidelines for State Member Banks: Risk-Based Measure and Tier 1 Leverage Measure, Appendices A and B of Regulation H of the Board of Governors (12 C.F.R. Part 208, App. A and B);

9

(c)       the adequacy of the Bank's capital, taking into account the volume of classified assets, concentrations of credit, the adequacy of the ALLL, current and projected asset growth, projected retained earnings, and anticipated and contingency funding needs;

(d)       the source and timing of additional funds to fulfill Orrstown's and the Bank's future capital requirements; and

(e)       the requirements of section 225.4(a) of Regulation Y of the Board of Governors that Orrstown serve as a source of strength to the Bank.

11.       Orrstown and the Bank shall notify the Reserve Bank, in writing, no more than 30 days after the end of any calendar quarter in which any of Orrstown's consolidated capital ratios or the Bank's capital ratios (total risk-based, Tier 1 risk-based, or leverage) fall below the approved capital plan's minimum ratios. No more than 60 days after the end of any such calendar quarter, Orrstown and the Bank shall submit an acceptable written plan that details the steps Orrstown or the Bank, as appropriate, will take to increase Orrstown's or the Bank's capital ratios to or above the approved capital plan's minimums.

**Internal Audit**

12.       Within 60 days of this Agreement, the Bank shall submit to the Reserve Bank an acceptable enhanced written internal audit program that shall, at a minimum, provide for:

(a)       Improved oversight of all aspects of the audit program by the board of directors' audit committee;

(b)       timely resolution of audit findings and follow-up reviews to ensure completion of corrective measures; and

(c)       comprehensive tracking and reporting of the status and resolution of audit and examination findings to the audit committee.

10

**Strategic Plan and Budget**

13.    (a)    Within 90 days of this Agreement, the Bank shall submit to the Reserve Bank a strategic plan to improve the Bank's earnings and a budget for 2012.  The written plan and budget shall include, but not be limited to:

(i)    Identification of the major areas where, and means by which, the board of directors will seek to improve the Bank's operating performance;

(ii)    a realistic and comprehensive budget for the remainder of calenda year 2012, including income statement and balance sheet projections; and

(iii)    a description of the operating assumptions that form the basis for, and adequately support, major projected income, expense, and balance sheet components.

(b)    A strategic plan and budget for each calendar year subsequent to 2012 shall be submitted to the Reserve Bank at least 30 days prior to the beginning of that calendar year.

**Liquidity and Funds Management**

14.    Within 60 days of this Agreement, the Bank shall submit to the Reserve Bank an acceptable revised written contingency funding plan that, at a minimum, identifies available sources of liquidity and includes adverse scenario planning.

**Interest Rate Risk Management**

15.    Within 60 days of this Agreement, the Bank shall submit to the Reserve Bank an acceptable written plan to improve interest rate risk management practices that are appropriate for the size and complexity of the Bank.  The plan shall, at a minimum, include procedures and controls to ensure that the inputs and assumptions used to model and control

11

the vulnerability of the Bank's net interest income due to changes in interest rates are accurate and reflect the Bank's current balance sheet structure and market conditions.

**Dividends and Payments**

16.    (a)    Orrstown and the Bank shall not declare or pay any dividends without the prior written approval of the Reserve Bank and the Director of the Division of Banking Supervision and Regulation of the Board of Governors.

(b)    Orrstown shall not take any other form of payment representing a reduction in capital from the Bank without the prior written approval of the Reserve Bank.

(c)    All requests for prior approval shall be received at least 30 days prior to the proposed dividend declaration date.  All requests shall contain, at a minimum, current and projected information, as appropriate, on the parent's capital, earnings, and cash flow; the Bank's capital, asset quality, earnings and ALLL needs; and identification of the sources of funds for the proposed payment or distribution.  For requests to declare or pay dividends, Orrstown and the Bank, as appropriate, must also demonstrate that the requested declaration or payment of dividends is consistent with the Board of Governors' Policy Statement on the Payment of Cash Dividends by State Member Banks and Bank Holding Companies, dated November 14, 1985 (Federal Reserve Regulatory Service, 4-877 at page 4-323).

**Debt and Stock Redemption**

17.    (a)    Orrstown shall not, directly or indirectly, incur, increase, or guarantee any debt without the prior written approval of the Reserve Bank.  All requests for prior written approval shall contain, but not be limited to, a statement regarding the purpose of the debt, the terms of the debt, and the planned source(s) for debt repayment, and an analysis of the cash flow resources available to meet such debt repayment.

(b)      Orrstown shall not, directly or indirectly, purchase or redeem any shares of its stock without the prior written approval of the Reserve Bank.

**Compliance with Laws and Regulations**

18.      (a)      In appointing any new director or senior executive officer, or changing the responsibilities of any senior executive officer so that the officer would assume a different senior executive officer position, the Bank shall comply with the notice provisions of section 32 of the FDI Act (12 U.S.C. § 1831i) and Subpart H of Regulation Y of the Board of Governors (12 C.F.R. §§ 225.71 *et seq.*).

(b)      The Bank shall comply with the restrictions on indemnification and severance payments of section 18(k) of the FDI Act (12 U.S.C. § 1828(k)) and Part 359 of the Federal Deposit Insurance Corporation's regulations (12 C.F.R. Part 359).

**Compliance with the Agreement**

19.      Within 30 days after the end of each calendar quarter following the date of this Agreement, the boards of directors of Orrstown and the Bank shall jointly submit to the Reserve Bank written progress reports detailing the form and manner of all actions taken to secure compliance with this Agreement and the results thereof.

**Approval and Implementation of Plans, Programs, and Engagement Letter**

20.      (a)      The Bank, and as applicable, Orrstown, shall submit written plans, programs, and engagement letter that are acceptable to the Reserve Bank within the applicable time periods set forth in paragraphs 3(b), 5, 6, 8(a), 9(c), 10, 12, 14, and 15 of this Agreement.

(b)      Within 30 days of approval by the Reserve Bank, the Bank, and as applicable Orrstown, shall adopt the approved plans, programs, and engagement letter.  Upon

13

adoption, the Bank, and as applicable Orrstown, shall promptly implement the approved plans and programs and thereafter fully comply with them.

(c)     During the term of this Agreement, the approved plans, programs, and engagement letter shall not be amended or rescinded without the prior written approval of the Reserve Bank.

**Communications**

21.     All communications regarding this Agreement shall be sent to:

(a)     Mr. Christopher C. Henderson
Assistant Vice President
Federal Reserve Bank of Philadelphia
Ten Independence Mall
Philadelphia, Pennsylvania 19106

(b)     Mr. Thomas R. Quinn, Jr.
President and Chief Executive Officer
Orrstown Financial Services, Inc. and Orrstown Bank
77 East King Street
Shippensburg, Pennsylvania 17244

**Miscellaneous**

22.     Notwithstanding any provision of this Agreement, the Reserve Bank may, in its sole discretion, grant written extensions of time to Orrstown and the Bank to comply with any provision of this Agreement.

23.     The provisions of this Agreement shall be binding upon Orrstown and the Bank and their institution-affiliated parties, in their capacities as such, and their successors and assigns.

24.     Each provision of this Agreement shall remain effective and enforceable until stayed, modified, terminated, or suspended in writing by the Reserve Bank.

25.     The provisions of this Agreement shall not bar, estop, or otherwise prevent the Board of Governors, the Reserve Bank, or any other federal or state agency from taking any

14

other action affecting Orrstown and the Bank or any of their current or former institution-affiliated parties and their successors and assigns.

26.    Pursuant to section 50 of the FDI Act (12 U.S.C. § 1831aa), this Agreement is enforceable by the Board of Governors under section 8 of the FDI Act (12 U.S.C. § 1818).

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the 2 2 day of _Mersh_, 2012.

ORRSTOWN FINANCIAL
SERVICES, INC.

By: _Thomas R. Z___.

FEDERAL RESERVE BANK OF
PHILADELPHIA

By: _Christopher C._
Christopher C. Henderson
Assistant Vice President

ORRSTOWN BANK

By: _Thomas R. Z___.

15

# EXHIBIT B

EX-10.2 3 ex10-2.htm EXHIBIT 10.2 - CONSENT ORDER

## COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF BANKING

| | |
|---|---|
| Commonwealth of Pennsylvania, Department of Banking, Bureau of Commercial Institutions | : : : |
| v. | : Docket No.: 12 _____ (ENF-ORD) |
| Orrstown Bank | : : |

### CONSENT ORDER

**WHEREAS,** Orrstown Bank, Shippensburg, Pennsylvania (the "Bank"), is a Pennsylvania state-chartered bank and subject to regulation by the Commonwealth of Pennsylvania Department of Banking (the "Department") and the Federal Reserve Bank of Philadelphia (the "Federal Reserve");

**WHEREAS,** the Bureau of Commercial Institutions (the "Bureau") is primarily responsible within the Department for the regulation and supervision of the Bank;

**WHEREAS,** the Bank was the subject of a Joint Report of Examination by the Bureau and the Federal Reserve as of March 31, 2011 (the "Report of Examination");

**WHEREAS,** the Report of Examination gave the Bureau the reason to believe that the Bank had engaged in unsafe or unsound banking practices or violations of law or policy; and,

**WHEREAS,** the Bank, without admitting or denying wrongdoing as more fully set forth in the Stipulation of Consent and Entry of Order executed by the Bank, agrees to the issuance of this Consent Order (the "Order") by the Bureau.

**IT IS HEREBY ORDERED,** pursuant to Section 501.A of the Department of Banking Code, 71 P.S. § 733-501.A, that the Bank, its directors, officers, employees, agents, and other

proposed replacement personnel, and must be received at least 30 days prior to the individual(s) assuming the "senior executive officer" position(s).

2.    Board and Management.

(a)    Within 30 days from the effective date of this Order, the Bank shall retain an independent consultant who is acceptable to the Bureau and who will develop a written analysis and assessment of the Bank's management needs ("Management Report") for the purpose of providing aid in the development of a suitable management structure that is adequately staffed by qualified and trained personnel.

(b)    Prior to retaining the independent consultant, the Bank shall provide the Bureau with a copy of the proposed engagement letter or contract with the third party for non-objection or comment before it is executed.   The contract or engagement letter shall include, at a minimum:

(i)    a description of the work to be performed under the contract or engagement letter, the fees for each significant element of the engagement, and the aggregate fee;

(ii)    the responsibilities of the firm or individual;

(iii)    identification of the professional standards covering the work to be performed;

(iv)    identification of the specific procedures to be used when carrying out the work to be performed;

(v)    the qualifications of the employee(s) who are to perform the work;

(vi)    the time frame for completion of the work;

(vii)    any restrictions on the use of the reported findings;

- 3 -

    (viii)   a provision for unrestricted examiner access to work papers; and

    (ix)   a certification that the firm or individual is not affiliated in any manner with the Bank.

(c)    The Management Report shall be developed within 120 days from the effective date of this Order and shall include, at a minimum:

    (i)   identification of both the type and number of officer positions needed to properly manage and supervise the affairs of the Bank;

    (ii)   identification and establishment of such Bank committees as are needed to provide guidance and oversight to active management;

    (iii)   an evaluation of each existing director and senior officer to determine whether these individuals possess the ability, experience, and other qualifications required to perform present and anticipated duties, including adherence to the Bank's established policies and practices, and restoration and maintenance of the Bank in a safe and sound condition;

    (iii)   evaluation of all Bank officers' compensation, including salaries, director fees, and other benefits;

    (v)   a current organization chart that identifies all existing and proposed staff and officer positions, delineates related lines of authority and accountability, and establishes a written plan for addressing any identified needs;

    (vi)   a management succession plan; and,

- 4 -

"institution-affiliated parties," as that term is defined in Section 3(u) of the FDIA, 12 U.S.C. § 1813(u), and its successors and assigns, shall take the following affirmative action:

1.   Board Participation.

(a)   The Board shall strengthen Board oversight of the management and operations of the Bank, with full responsibility for the approval of sound policies and objectives and for the supervision of all of the Bank's activities, consistent with the role and expertise commonly expected for directors of banks of comparable size.

(b)   This participation shall include meetings to be held no less frequently than monthly at which, at a minimum, the following areas shall be reviewed and approved: reports of income and expenses; new, overdue, renewal, insider, charged off, and recovered loans; investment activity; liquidity levels and funds management; adoption or modification of operating policies; individual committee reports; audit reports; internal control reviews including management's responses; reconciliation of general ledger accounts; oversight and supervision over third-party service providers; oversight of the Bank's compliance program; oversight of the Bank's BSA program, including management's responses to recommendations from all external or internal audits or reviews, which shall be included as part of the Progress Reports required by the Order; and compliance with this Order. Board minutes shall document these reviews and approvals, including the names of any dissenting directors.

(c)   The Bank shall notify the Bureau in writing of any additions, resignations, or terminations of any members of its Board or any of its "senior executive officers" (as that term is defined in 12 C.F.R. 225.71) within 10 days of the event. Any notification required by this subparagraph shall include a description of the background(s) and experience of any

- 2 -

      (vii)    a plan to recruit and hire any additional or replacement personnel with the requisite ability, experience, and other qualifications to fill those officer or staff member positions identified in the Management Report.

(d)     Within 60 days from receipt of the Management Report, the Bank shall formulate a written plan ("Management Plan") that incorporates the findings of the Management Report, a plan of action in response to each recommendation contained in the Management Report, and a time frame for completing each action.  At a minimum, the Management Plan shall:

      (i)    contain a recitation of the recommendations included in the Management Report, a plan of action to respond to each recommendation, and a time frame for completing each action;

      (ii)    include provisions to implement necessary training and development for all employees;

      (iii)    establish procedures to periodically review and update the Management Plan, as well as periodically review and assess the performance of each officer and staff member; and

      (iv)    contain a current management succession plan.

(e)     The Management Plan shall be submitted to the Bureau for non-objection or comment. Within 30 days from receipt of non-objection or any comments from the Bureau, and after incorporation of all comments, the Board shall approve the Management Plan, which approval shall be recorded in the minutes of the Board meeting.  Thereafter, the Bank shall implement and fully comply with the Management Plan.

- 5 -

3.  <u>Classified Asset Reduction.</u>

(a)  Within 60 days from the effective date of this Order, the Bank shall formulate and submit for review as described in subparagraph (c), a written plan ("Classified Asset Plan") to reduce the Bank's risk position in each loan relationship or other real estate owned property in excess of $750,000 which is classified "Substandard" or "Doubtful" in the Report of Examination. For purposes of this provision, "reduce" means to collect, charge off, or improve the quality of an asset so as to warrant its removal from adverse classification.

(b)  The Classified Asset Plan shall include, at a minimum, the following:

(i)  an action plan to review, analyze and document the current financial condition of each classified borrower with loans classified "Substandard," "Doubtful" or "Loss," including source of repayment, repayment ability, and alternative repayment sources, as well as the value and accessibility of any pledged or assigned collateral, and any possible actions to improve the Bank's collateral position;

(ii)  a schedule showing, on a quarterly basis, the expected consolidated balance of all adversely classified assets, and the ratio of the consolidated balance to the Bank's projected Tier 1 Capital plus the allowance for loan and lease losses ("ALLL");

(iii)  specific action plans intended to reduce the Bank's risk exposure in each classified asset;

(iv)  delineation of areas of responsibility for loan officers; and

(v)    provision for the submission of monthly written progress reports to the Board for review and notation in minutes of the Board meetings.

(c)    The Classified Asset Plan shall be submitted to the Bureau for non-objection or comment. Within 30 days from receipt of non-objection or any comments from the Bureau, and after incorporation of all comments, the Board shall adopt the Classified Asset Plan, which adoption shall be recorded in the minutes of the Board meeting. Thereafter, the Bank shall implement and fully comply with the Classified Asset Plan.

(d)    The Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower who is already obligated in any manner to the Bank on any extensions of credit (including any portion thereof) that have been charged off the books of the Bank or classified "Loss" in the current or any future report of examination, so long as such credit remains uncollected, unless it receives the prior written consent of the Bureau.

(e)    The Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower whose loan or other credit has been classified "Substandard" or "Doubtful" or is listed for "Special Mention" in the current or any future report of examination, and is uncollected, unless the Board documents , in writing, the reasons why the extension is in the best interest of the Bank. Prior to extending additional credit pursuant to this subparagraph, whether in the form of a renewal, extension, or further advance of funds, such additional credit shall be approved by the Board, or a designated committee thereof, which shall determine that:

- 7 -

(i)    the failure of the Bank to extend such credit would be detrimental to the best interests of the Bank, with a written explanation of why the failure to extend such credit would be detrimental;

(ii)   the extension of such credit would improve the Bank's position, with a written explanatory statement of how and why the Bank's position would improve; and,

(iii)  an appropriate workout plan has been developed and will be implemented in conjunction with the additional credit to be extended.

(f)    The Board's or designated committee's determinations and approval shall be recorded in the meeting minutes of the Board or designated committee, and copies shall be submitted to the Bureau at such times as the Bank submits the Progress Reports required by this Order or sooner upon the written request of the Bureau.

4.    Allowance for Loan and Lease Losses.

(a)    The Bank shall eliminate from its books, by charge-off or collection, all assets or portions of assets classified "Loss" by the Bureau in the current Report of Examination that have not been previously collected or charged off. Elimination or reduction of such assets with the proceeds of other Bank extensions of credit shall not be considered "collection" for purposes of this paragraph. Thereafter, within 30 days after the receipt of any report of examination or target examination report from the Bureau, the Bank shall eliminate from its books, by charge-off or collection, all assets or portions of assets classified "Loss" in any report of examination or target examination report issued while this Order remains in effect, to the extent that such loans have not previously been collected or charged off.

- 8 -

(b)     Within 60 days from the effective date of this Order, the Bank shall develop or enhance and submit to the Bureau for review, as described in subparagraph (d), a comprehensive policy and methodology for determining the ALLL ("ALLL Policy") that incorporates the comments set forth in the Report of Examination. The ALLL Policy shall provide for a review of the ALLL at least once each calendar quarter. Said review should be completed within 30 days following the end of each calendar quarter, so the results of the review conducted by the Board may be properly reported in the quarterly Consolidated Reports of Condition and Income ("Call Report"). Such reviews shall, at a minimum, be made in accordance with:

(i)     Financial Accounting Standards Board ("FASB") Statements Numbers 5 and 114, as codified by FASB under its Accounting Standards Codification effective after September 15, 2009 (established by FASB Statement Number 168)("FASB 5 and 114");

(ii)     the Federal Financial Institutions Examination Council's ("FFIEC") Instructions for the Consolidated Reports of Condition and Income;

(iii)     the *Interagency Statement of Policy on the Allowance for Loan and Lease Losses* (SR 01-17 (SUP), issued July 2, 2001 and SR 06-17, issued December 13, 2006);

(iv)     other applicable regulatory guidance that addresses the appropriateness of the Bank's ALLL; and

(v)     any analysis of the Bank's ALLL provided by the Bureau.

- 9 -

(c)     Such reviews shall include, at a minimum:

     (i)      the Bank's loan loss experience;

     (ii)     an estimate of the potential loss exposure in the portfolio; and

     (iii)    trends of delinquent and non-accrual loans and prevailing and prospective economic conditions.

(d)     The minutes of the Board meetings at which such reviews are undertaken shall include complete details of the reviews and the resulting recommended adjustment in the ALLL. The Board shall document in the minutes the basis for any determination not to require provisions for loan losses in accordance with subparagraphs (a) and (b).

(e)     The ALLL Policy shall be submitted to the Bureau for non-objection or comment. Within 30 days from receipt of non-objection or any comments from the Bureau, and after incorporation of all comments, the Board shall adopt the ALLL Policy, which adoption shall be recorded in the minutes of the Board meeting.  Thereafter, the Bank shall implement and fully comply with the ALLL Policy.

(f)     A deficiency in the ALLL shall be remedied in the calendar quarter in which it is discovered by a change to current operating earnings prior to any Tier 1 Capital determinations required by this Order; and prior to the Bank's submission of its Call Report. The Bank shall thereafter maintain an appropriate ALLL.

(g)     The analysis supporting the determination of the adequacy of the ALLL shall be submitted to the Bureau within 30 days after the end of each calendar quarter.

- 10 -

5.    Lending and Credit Administration. Within 90 days of the effective date of this Order, the Bank shall submit to the Bureau an acceptable written plan to strengthen credit risk management practices. The plan shall, at a minimum, address, consider, and include:

(a)    Procedures to identify, limit and manage concentrations of credit that are consistent with the *Interagency Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Policies*, (SR-07-1, issued December 12, 2006);

(b)    Procedures for the timely and accurate identification of problem loans;

(c)    Enhancements to the internal loan grading system to ensure timely and accurate risk ratings;

(d)    Enhanced stress testing of loan and portfolio segments; and,

(e)    Improvements to the Bank's management information systems to ensure that the board of directors and senior management obtain timely and accurate information regarding the condition of the Bank's loan portfolio.

6.    Correction of Loan Documentation Exceptions.

(a)    Within 60 days from the effective date of this Order, the Bank shall adopt policies and procedures to minimize and monitor loan documentation exceptions as well as to identify and correct outstanding exceptions noted in the Report of Examination.

(b)    Progress reports detailing each outstanding exception and the Bank's plan for corrective action shall be submitted to the Board for review during each regularly scheduled meeting. The review shall be noted in the minutes of the meeting of the Board.

7.    Concentration of Credit–Commercial Real Estate.

(a)    Within 90 days from the effective date of this Order, the Bank shall develop and submit to the Bureau for review, as described in subparagraph (c), a written plan to

- 11 -

identify, limit and manage the Bank's commercial real estate ("CRE") loan concentration of credit to an amount which is commensurate with the Bank's business strategy, management expertise, size, and location ("CRE Concentration Plan").

     (b)     The CRE Concentration Plan shall include, at a minimum:

         (i)     provisions requiring compliance with the *Interagency Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices* (SR 07-1, issued December 12, 2006);

         (i)     provisions for controlling and monitoring of CRE, including plans to address the rationale for CRE levels as they relate to growth and capital targets, and segmentation and testing of the CRE portfolio to detect and limit concentrations with similar risk characteristics; and,

        (iii)     provisions for the submission of monthly written progress reports to the Board for review and notation in minutes of the Board meetings.

     (c)     The CRE Concentration Plan shall be submitted to the Bureau for non-objection or comment. Within 30 days from receipt of non-objection or any comments from the Bureau, and after incorporation of all comments, the Board shall adopt the CRE Concentration Plan, which adoption shall be recorded in the minutes of the Board meeting. Thereafter, the Bank shall implement and fully comply with the CRE Concentration Plan.

- 12 -

8.   Capital.

(a)   Within 90 days from the effective date of this Order, the Board shall develop a written capital plan ("Capital Plan"), subject to review and approval of the Bureau as described in subparagraph (c).   At a minimum, the Capital Plan shall include specific benchmark Leverage Ratios, Tier 1 Risk-Based Capital Ratios, and Total Risk-Based Capital Ratios to be met at each calendar quarter end until the required capital levels are achieved.   The Bank shall comply with the *Capital Adequacy Guidelines for State Member Banks: Risk Based Measures and Tier 1 Leverage Measure*, Appendices A and B of Regulation H of the Board of Governors (12 C.F.R. Part 208, App. A and B).

(b)   In the event any required capital ratio falls below the minimum required by the approved Capital Plan, the Bank shall within 60 days after the end of any calendar quarter notify the Bureau and submit an acceptable plan that details the steps the Bank will take to increase the Bank's capital ratios to or above the approved capital plan's minimums.

(c)   The Capital Plan shall be submitted to the Bureau or non-objection or comment.  Within 30 days from receipt of non-objection or any comments from the Bureau, and after incorporation of all comments, the Board shall adopt the Capital Plan, which adoption shall be recorded in the minutes of the Board meeting.  Thereafter, the Bank shall implement and fully comply with the Capital Plan.

(d)   The Board shall review the Bank's adherence to the Capital Plan, at a minimum, on a monthly basis.  Copies of the reviews and updates shall be submitted to the Bureau as part of the Progress Reports required by this Order, and any material changes to the Capital Plan shall be submitted to the Bureau no later than 10 days after completion.

- 13 -

9.   Profit and Budget Plan.

     (a)     Within 90 days from the effective date of this Order, and within the first 30 days of each calendar year thereafter, the Bank shall develop and submit to the Bureau for review to the Bureau as described in subparagraph (c), a written profit and budget plan ("Profit Plan") consisting of goals and strategies, consistent with sound banking practices, and taking into account the Bank's other written plans, policies, or other actions as required by this Order.

     (b)     The Profit Plan shall include, at a minimum:

         (i)     a description of the operating assumptions that form the basis for, and adequately support, material projected revenue and expense components;

         (ii)     specific goals to maintain appropriate provisions to the ALLL;

         (iii)     realistic and comprehensive budgets for all categories of income and expense;

         (iv)     an executive compensation plan, addressing any and all salaries, bonuses and other benefits of every kind or nature whatsoever, both current and deferred, whether paid directly or indirectly, which plan incorporates qualitative as well as profitability performance standards for the Bank's senior executive officers;

         (v)     a budget review process to monitor the revenue and expenses of the Bank whereby actual performance is compared against budgetary projections not less than quarterly; and

- 14 -

(vi)    recording the results of the budget review and any actions taken by the Bank as a result of the budget review in the Board minutes; and,

(vii)    individual(s) responsible for implementing each of the goals and strategies of the Profit Plan.

(c)    The Profit Plan shall be submitted to the Bureau for non-objection or comment. Within 30 days from receipt of non-objection or any comments from the Bureau, and after incorporation of all comments, the Board shall adopt the Profit Plan, which adoption shall be recorded in the minutes of the Board meeting. Thereafter, the Bank shall implement and fully comply with the Profit Plan.

(d)    Within 30 days following the end of each calendar quarter following completion of the Profit Plan required by this paragraph, the Board shall evaluate the Bank's actual performance in relation to the Profit Plan, record the results of the evaluation, and note any actions taken by the Bank in the minutes of the Board's meeting at which such evaluation is undertaken.

10.    <u>Strategic Plan</u>.

(a)    Within 90 days of this Order, the Bank shall formulate a revised comprehensive written business/strategic plan ("Strategic Plan"), based on the Bank's financial information as of December 31, 2011, covering an operating period of at least three years. The Strategic Plan shall contain an assessment of the Bank's current financial condition and market area along with a description of the operating assumptions that form the basis for major projected income and expense components of the assessment.

- 15 -

(b)    The Strategic Plan shall include short-term goals and operating plans to comply with the terms of this Order and correct all regulatory criticisms in the Report of Examination, intermediate goals and project plans, and long-range goals and project plans. Additionally, the Strategic Plan shall, at a minimum, include:

(i)    strategies for pricing policies and asset/liability management;

(ii)    anticipated average maturity and average yield on loans and securities, average maturity and average cost of deposits, the level of earning assets as a percentage of total assets, and the ratio of net interest income to average earning assets;

(iii)    dollar volume of total loans, total investment securities, and total deposits;

(iv)    plans for sustaining adequate liquidity, including back-up lines of credit to meet any unanticipated deposit withdrawals;

(v)    financial goals including pro forma statements for asset growth, capital adequacy and earnings; and,

(vi)    formulation of a mission statement and the development of a strategy to carry out that mission.

(c)    The Board shall submit the Strategic Plan to the Bureau for review and comment. Within 30 days from receipt of any comment from the Bureau, and after due consideration of any recommended changes, the Board shall approve the Strategic Plan, which approval shall be recorded in the minutes of the Board meeting in which it is approved.

(d)    The Bank shall implement and fully comply with the Strategic Plan after completion of the requirements of subparagraph (c) of this paragraph.

- 16 -

(e)  Within 30 days from the end of each calendar quarter following the effective date of this Order, the Board shall evaluate the Bank's performance in relation to the Strategic Plan and record the results of the evaluation, and any actions taken by the Bank in the minutes of the Board meeting during which such evaluation is undertaken.  In the event the Board determines that the Strategic Plan should be revised in any manner, the Strategic Plan shall be revised and submitted to the Bureau for review and comment within 30 days after such revisions have been approved by the Board.

(f)  Within 30 days of receipt of any comments from the Bureau, and after consideration of all such comments, the Bank shall approve the revised Strategic Plan, which approval shall be recorded in the minutes of the Board meeting in which it is approved.

(g)  The Board shall implement and fully comply with the revised Strategic Plan after completion of the requirements of subparagraph (f) of this paragraph.

11.  <u>Liquidity and Funds Management.</u>

(a)  Within 60 days from the effective date of this Order, the Bank shall revise its liquidity and funds management policy to strengthen the Bank's funds management procedures and maintain adequate provisions to meet the Bank's liquidity needs ("Liquidity and Funds Management Policy").

(b)  The Liquidity and Funds Management Policy shall be submitted to the Bureau for non-objection or comment.  Within 30 days from receipt of non-objection or any comments from the Bureau, and after incorporation of all comments, the Board shall adopt the Liquidity and Funds Management Policy, which adoption shall be recorded in the minutes of the Board meeting.  Thereafter, the Bank shall implement and fully comply with the Liquidity and Funds Management Policy.

- 17 -

(c)     The Bank shall review annually its Liquidity and Funds Management Policy for adequacy and, based upon such review, shall make necessary revisions to the policy.

12.   Interest Rate Risk.

(a)     Within 60 days from the effective date of this Order, the Bank shall develop and submit for review, as described in subparagraph (c), an interest rate risk policy and procedures ("IRR Policy") that shall include, at a minimum:

        (i)     measures designed to control the nature and amount of interest rate risk the Bank takes, including those that specify risk limits and define lines of responsibility and authority for managing risk;

        (ii)    a system for identifying and measuring interest rate risk;

        (iii)   a system for monitoring and reporting risk exposures; and

        (iv)    a system of internal controls, review, and audit to ensure the integrity of the overall risk management process.

(b)     The IRR Policy shall address the exceptions noted in the current Report of Examination, comply with the FFIEC's *Advisory on Interest Rate Risk Management* (SR 10-1, issued January 11, 2010), the FFIEC's *Supervisory Policy Statement on Investment Securities and End-User Derivative Activities*, and the *Joint Agency Policy Statement on Interest Rate Risk* (SR 96-13, issued May 23, 1996).

(c)     The IRR Policy shall be submitted to the Bureau for non-objection or comment. Within 30 days from receipt of non-objection or any comments from the Bureau, and after incorporation of all comments, the Board shall adopt the IRR Policy, which adoption shall be recorded in the minutes of the Board meeting. Thereafter, the Bank shall implement and fully comply with the IRR Policy.

- 18 -

13.    Dividends.  The Bank shall not declare or pay any cash dividends without the prior written approval of the Bureau.  Requests for approval shall be received at least 30 days prior to the proposed date for the declaration of dividends and shall contain, but not be limited to, information on consolidated earnings for the most recent annual period and the last quarter.

14.    Corrective Action.  The Bank shall take all steps necessary, consistent with other provisions of this Order and sound banking practices, to eliminate, correct and prevent unsafe or unsound banking practices, violations of law or regulation, and all contraventions of regulatory policies or guidelines cited in the Report of Examination.

15.    Fidelity Bond.

(a)    Immediately upon renewal of the Bank's current bond required by 7 P.S. § 1410 (the "Bond"), the Bank shall provide a full and complete copy to the Bureau. The Bank shall provide a copy of the required Bond to the Bureau each time the Bond is renewed while this Order is in effect.

(b)    The Bank shall immediately notify the Bureau of any notifications or information from the Bank's Bond insurance carrier, its agents and/or representatives that the Bond is not going to be renewed or will be terminated.

16.    Oversight Committee.  The Board shall establish a subcommittee of the Board ("Oversight Committee") charged with the responsibility of ensuring that the Bank complies with all of the provisions of this Order.  The Oversight Committee shall submit a written report monthly to the full Board and a copy of the report and any discussion related to the report or the Order shall be included in the minutes of the Board meeting.  Nothing contained herein shall diminish the responsibility of the entire Board to ensure compliance with the provisions of this Order.

- 19 -

17.   Progress Reports.   Within 30 days from the end of each calendar quarter following the effective date of this Order, the Bank shall furnish to the Bureau written Progress Reports detailing the form, manner, and results of any actions taken to secure compliance with this Order. All Progress Reports and other written responses to this Order shall be reviewed by the Board, and made a part of the Board minutes.

18.   Section 403 Reports to the Bureau.   All reports required to be submitted to the Bureau under this Order are special reports being required under Section 403 of the Department of Banking Code, 71 P.S. § 733-403, and shall be submitted to the Bureau in accordance with Section 403.B of the Department of Banking Code, 71 P.S. § 733-403.B.

19.   Confidentiality.   This Order and all reports and communications relating to this Order shall be confidential and shall not be released or divulged to any person or entity not officially connected to the Bank as a director, officer, attorney or employee without the express written permission of the Bureau. Notwithstanding the foregoing, the Bank may disclose the existence and contents of this Order under the provisions of 71 P.S. § 733-404.A, relating to disclosures required by federal and state securities laws.

20.   Other Actions.

(a)   If at any time the Department shall deem it appropriate in fulfilling the responsibilities placed upon the Department under applicable law to undertake any further action affecting the Bank, nothing in this Order shall in any way inhibit, estop, bar or otherwise prevent the Department from doing so.

(b)   Nothing herein shall preclude any proceedings brought by the Department to enforce the terms of this Order, and that nothing herein constitutes, nor shall the Bank contend that it constitutes, a waiver of any right, power or authority of any other representatives of the

- 20 -

United States, departments or agencies thereof, Department of Justice, or any other representatives of the Commonwealth of Pennsylvania or any other departments or agencies thereof, including any prosecutorial agency, to bring other actions deemed appropriate.

21.   Communications.  All communications regarding this Order shall be sent to:

> Robert C. Lopez, Director
> Bureau of Commercial Institutions
> Commonwealth of Pennsylvania
> Department of Banking
> 17 North Second St., Suite 1300
> Harrisburg, Pennsylvania  17101

22.   Binding Nature.  The provisions of this Order including the recital paragraphs shall be binding upon the Bank and all of their institution-affiliated parties, in their capacities as such, and their successors and assigns.

23.   Effective Date.  The effective date of this Order shall be the date upon which this Order has been executed by the Bureau.  Each provision of this Order shall remain effective and enforceable, jointly and severally, until stayed, modified, terminated or suspended by the Bureau.

24.   Titles.  The titles used to identify the paragraphs of this document are for the convenience of reference only and do not control the interpretation of this document.

**SO ORDERED**

_____
Date

_____
Robert C. Lopez, Director
Bureau of Commercial Institutions
Commonwealth of Pennsylvania
Department of Banking
17 North Second Street, Suite 1300
Harrisburg, PA 17101

- 21 -