**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:12-cv-00993** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **ORRSTOWN FINANCIAL SERVICES,** | : | |
| **INC., et al.,** | : | |
| **Defendants** | : | |

**TABLE OF CONTENTS**

I.    FACTUAL AND PROCEDURAL BACKGROUND

    A.    First and Second Amended Complaints

    B.    SEPTA's Motion for Leave to File Third Amended Complaint

    C.    Interlocutory Appeal

    D.    Oral Argument and Failed Mediation

II.   LEGAL STANDARD

III.  DISCUSSION

    A.    Factual Allegations

        1.    Securities Act Allegations – March 2010 Offering

        2.    Securities Act Allegations – Defendant SEK

        3.    Securities Act Allegations – Underwriter Defendants

        4.    Remaining Securities Act Allegations

        5.    Exchange Act Allegations

    B.    Legal Standards Applicable to SEPTA's Claims

        1.    Securities Act

        2.    Exchange Act

**3.**     **Principles Governing Materiality Under the Acts**

       **a.**     **Statements of Opinion or Belief**

       **b.**     **Forward-Looking Statements**

       **c.**     **Puffery**

**C.**     **Analysis**

     **1.**     **Securities Act Claims (Counts 1 through 4)**

       **a.**     **Applicable Pleading Standard**

       **b.**     **Section 11 (Counts 1 and 2)**

          **i.**     **Orrstown, the Bank, the Individual Securities Act Defendants, and the Underwriter Defendants**

          **ii.**     **Defendant SEK**

       **c.**     **Section 12(a)(2) – Orrstown, the Bank, the Individual Securities Act Defendants, Defendant Embly, and the Underwriter Defendants (Count 3)**

       **d.**     **Section 15 – Individual Securities Act Defendants (Count 4)**

     **2.**     **Exchange Act Claims (Counts 5 through 7)**

       **a.**     **Section 10(b) and SEC Rule 10b-5 – Orrstown Exchange Act Defendants (Count 5)**

       **b.**     **Section 20(a) – Individual Defendants Quinn, Everly, and Embly (Count 7)**

       **c.**     **Section 10(b) and SEC Rule 10b-5 – Defendant SEK (Count 6)**

**IV.**     **CONCLUSION**

## MEMORANDUM

Before the Court are three motions to dismiss Plaintiff Southeastern Pennsylvania

Transportation Authority ("SEPTA")'s Third Amended Complaint ("TAC") (Doc. No. 199) filed

by: (1) Defendants Orrstown Financial Services, Inc. ("Orrstown"), Orrstown Bank ("Bank"),[1]

Anthony Ceddia, Jeffrey W. Coy, Jeffrey W. Embly, Bradley S. Everly, Mark K. Keller, Andrea

Pugh, Thomas R. Quinn, Jr., Gregory Rosenberry, Kenneth R. Shoemaker, Glenn W. Snoke,

John S. Ward, and Joel R. Zullinger ("Individual Defendants," and with Orrstown and the Bank,

"Orrstown Defendants") (Doc. No. 213); (2) Defendant Smith Elliott Kearns & Company LLC

("SEK") (Doc. No. 215); and (3) Defendants Janney Montgomery Scott, LLC and Sandler

O'Neill & Partners, L.P. (the "Underwriter Defendants").   (Doc. No. 217).   The parties have

fully briefed the motions (Doc. Nos. 214, 216, 218, 228, 234, 245), and the Court heard oral

argument on the motions on July 13, 2022.

For the reasons that follow, the Court will grant in part and deny in part the Orrstown

Defendants' motion, grant in part and deny in part the Underwriter Defendants' motion, and

deny SEK's motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

This is a purported class action alleging securities violations in connection with

Orrstown's March 2010 public offering ("Offering") of approximately 1.4 million shares of

---

[1] Orrstown is the Bank's parent company.   (Doc. No. 199 at 9.)

[2] As the pending motions to dismiss test SEPTA's fourth iteration of its complaint in this matter, the Court assumes the parties' familiarity with the underlying facts and procedural history of this case and recites the facts and procedural background only to the extent necessary to decide the pending motions.   What follows is a brief statement of the factual background underlying SEPTA's claims, taken from SEPTA's TAC, which significantly expands upon the allegations in SEPTA's prior pleadings.   (Doc. No. 199.)

common stock, which raised almost $40 million dollars.   (Doc. No. 199 ¶¶ 1, 26-27.)

Following a series of revelations regarding Orrstown's financial condition, Orrstown reported

significant losses for the fourth quarter of 2011 and, on March 15, 2012, filed its 2011 Annual

Report, which disclosed that it had a "material weakness" in its internal controls and "did not

maintain effective internal control over the process to prepare and report information related to

loan ratings and its impact on the allowance for loan losses" as of December 31, 2011.   (Id. ¶ 2.)

On March 23, 2012, Orrstown and its Board of Directors revealed that they had entered into an

agreement with the Philadelphia Federal Reserve Bank ("Written Agreement") and a consent

order with the Pennsylvania Department of Banking ("Consent Order," and with the Written

Agreement, "Enforcement Actions"), requiring them to revise their underwriting and credit

administration policies and strengthen their credit risk management practices.   (Id. ¶¶ 6-7.)

### A.     First and Second Amended Complaints

On May 12, 2012, SEPTA filed this purported class action pursuant to Federal Rule of

Civil Procedure 23(a) and (b)(3) against the Orrstown Defendants.   (Doc. No. 1.)   On March 4,

2013, SEPTA filed a First Amended Complaint (the "FAC"), adding as defendants Orrstown's

auditor (SEK) and the underwriters involved in the Offering (the Underwriter Defendants), and

alleging that all Defendants issued materially untrue and/or misleading statements and omissions

in violation of both the Securities Act of 1933 and the Exchange Act of 1934.   (Doc. No. 40.)

SEPTA asserted claims on behalf of two classes: (1) the "Securities Act Class," i.e., persons

and/or entities who purchased Orrstown common stock pursuant to, or traceable to, Orrstown's

February 8, 2010 Registration Statement and March 23, 2010 Prospectus Supplement ("Offering

Documents")[3] issued in connection with its secondary stock offering in March 2010 and were

---

[3] The March 2010 Offering was sold to investors using the Offering Documents, which

damaged thereby; and (2) the "Exchange Act Class," i.e., persons and/or entities who purchased

Orrstown common stock on the open market between March 15, 2010 and April 5, 2012 (the

"class period") and were damaged thereby.   (Doc. No. 40 ¶¶ 17-18.)   SEPTA acquired

Orrstown stock pursuant to the Offering Documents for the March 2010 Offering and also

purchased Orrstown common stock on the open market during the class period.   (Id. ¶ 25.)

Following extensive briefing, the Court dismissed SEPTA's claims for failure to state a

claim upon which relief could be granted.   (Doc. No. 92.)   As to SEPTA's Securities Act

claims, the Court found that, in its FAC, SEPTA failed to plausibly allege that the Defendants

made materially false and/or misleading statements (or omissions) in the Offering Documents.

(Id.)   The Court found that the statements challenged by SEPTA were not actionable, for one or

more reasons: (1) because they were mere puffery; (2) because they constituted forward-looking

statements entitled to the protection of the Private Securities Litigation Reform Act ("PSLRA")'s

safe harbor or the "bespeaks caution" doctrine; (3) because they were opinion statements entitled

to protection under the standards articulated in Omnicare, Inc. v. Laborers Dist. Council Constr.

Indus. Pension Fund, 575 U.S. 175 (2015); or (4) because SEPTA failed to allege a factual basis

supporting a reasonable inference that they were false when made.   (Id. at 37-68.)   Regarding

SEPTA's Exchange Act claims, the Court similarly found that all statements challenged by

SEPTA were not actionable under the PSLRA's heightened pleading standard because they

constituted puffery or because SEPTA failed to allege a factual basis supporting a plausible

---

incorporated by reference Orrstown's 2009 Annual Report, Form 10-K, filed 3/15/10, and other
SEC filings, including 4Q 2009 Operating Results, Form 8-K, filed 1/28/10, and a "Road Show
PowerPoint" Presentation, Form 8-K, filed 3/16/10.   The Court has considered these materials in
deciding the pending motions.   See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410,
1426 (3d Cir. 1997) (noting that a court may consider documents "integral to or explicitly relied
upon in the complaint" in deciding a motion to dismiss).

inference that they were false when made.   (Id. at 69-95.)   The Court also found, as to certain statements, that SEPTA's allegations failed to meet the Exchange Act's scienter requirement, as the statements consisted of nothing more than conclusory assertions regarding Defendants' state of mind.   (Id. at 77, 82, 90-95.)

Subsequently, SEPTA, with the Court's permission, filed a Second Amended Complaint ("SAC") against the same Defendants.   (Doc. No. 101.)   The SAC asserted Securities and Exchange Act claims against the same Defendants, but this time focused on alleged materially false and/or misleading statements made by Defendants in the Offering Documents and through the class period pertaining to the "effectiveness of the [Orrstown Defendants'] internal controls over underwriting of loans, risk management, financial reporting and compliance with banking regulations."   (Id. ¶ 22.)

All Defendants moved to dismiss the SAC, and while their motions were pending, on September 27, 2016, the Orrstown Defendants filed a "Notice of Subsequent Event in Further Support of their Motion to Dismiss the Second Amended Complaint."   (Doc. No. 122.)   That filing pertained to the Securities and Exchange Commission ("SEC") investigation of Orrstown referenced in the SAC and informed the Court that the SEC had concluded its investigation and issued an "Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings and Imposing Remedial Sanctions and Cease-and-Desist Orders" ("SEC Order").   Orrstown attached the SEC Order, noting that it memorialized a settlement between the SEC and Orrstown, between the SEC and Orrstown's current Chief Executive Officer (Defendant Quinn) and current Chief Accounting Officer, and between the SEC and Orrstown's former Chief Financial Officer

(Defendant Everly) and former Chief Credit Officer (Defendant Embly).   (Id. at 2.)

On December 7, 2016, the Court granted the motions to dismiss as to SEK and the Underwriter Defendants and granted in part and denied in part the Orrstown Defendants' motion to dismiss.  (Doc. Nos. 126-27.)   The Court dismissed the SAC's Securities Act claims (counts one through four) after concluding that SEPTA's allegations did not support a reasonable inference that the representations and certifications in Orrstown's 2009 Annual Report on Form 10-K as to the effectiveness of its "internal controls over financial reporting" were materially false and misleading when made.  (Doc. No. 126 at 23-33.)[4]   The Court dismissed the Exchange Act claims as to SEK and the Individual Defendants, excepting Quinn, Everly, and Embly, but denied the motion to dismiss as to Orrstown and the Bank.   (Id. at 34-53.)

In deciding the motions to dismiss the SAC, the Court took judicial notice of the SEC Order and its findings, which supported SEPTA's allegations of misstatement or omission beginning in the second quarter of 2010 through the end of 2011 because the SEC Order found that, during that time period, Orrstown "did not maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit financial statements in accordance with [generally accepted accounting principles]."  (Doc. No. 122, Exh. 1, SEC Order ¶ 50.)   Specifically, the SEC Order summarized its findings as follows:

> In 2010, as Orrstown's primary lending markets were experiencing a significant decline in real estate values, Orrstown incorrectly accounted for its commercial loans by not disclosing as much as approximately $69.5 million in loans as "impaired" in accordance with U.S. generally accepted accounting principles ("GAAP"). . . .  Orrstown did not comply with GAAP's impaired loan disclosure requirements due to certain Respondents' negligence and Orrstown's lack of sufficient internal accounting controls.   This failure resulted in material misstatements in Orrstown's impaired loan disclosures in its quarterly filings for

---

[4] In so doing, the Court assumed without deciding that the representations and certifications were "hard" information not subject to the requirements of Omnicare, as opposed to statements of opinion or belief.   (Id. at 23.)

the period ended June 30, 2010 through September 30, 2011, and its annual filings for the years ended December 31, 2010 and 2011.

Additionally, Orrstown (i) did not calculate loan losses in accordance with GAAP in connection with the filing of its Form 10-Q for the period ended June 30, 2011, (ii) incorrectly implemented a newly issued GAAP accounting pronouncement in connection with the filing of its Form 10-Q for the period ended June 30, 2011 in a manner that was not consistent with the new standard, and (iii) incorrectly applied GAAP when calculating fair value for certain collateral in connection with its impairment analyses for its Form 10-Q for the periods ended June 30, 2010 and September 30, 2010.

(Id. ¶¶ 2-5.)

In view of this additional information, the Court concluded that the SAC's allegations, coupled with the SEC Order, supported the following reasonable inferences:

Orrstown failed to maintain an adequate system of internal accounting controls through the relevant time period – second quarter 2010 through 2011 – and that such failure resulted in inaccuracies in financial reporting during that time, including "(1) incorrect loan risk ratings; (2) incorrect disclosures of impaired loans; (3) incorrect calculations and disclosures of loan losses; (4) incorrect application of newly issued accounting pronouncements; and (5) the lack of action to remedy accounting problems after being alerted to them."

(Doc. No. 126 at 49.)   Accordingly, the Court concluded that SEPTA had sufficiently alleged that the challenged statements regarding the effectiveness of Orrstown's financial reporting for the second quarter of 2010 through 2011 were false and misleading at the time they were made; in addition, the Court found the same statements potentially material, stating that it "cannot conclude at this stage of the proceedings that Orrstown's alleged misstatements regarding the effectiveness of its internal control over financial reporting in its 2010 and 2011 Annual Reports on Form 10-K and its quarterly reports on Form 10-Q (beginning with the second quarter of 2010 through the end of 2011) are 'so obviously unimportant to an investor' as to be immaterial as a matter of law."   (Id. at 46.)

The Court further concluded, as to Individual Defendants Quinn, Everly, and Embly,

Orrstown, and the Bank, that SEPTA had alleged facts supporting a strong inference that they issued or approved the challenged representations in Orrstown's financial reporting with the requisite scienter to state a claim under the Exchange Act.   (Id. at 49-50.)   The Court noted that "[t]he inference that the representations and certifications were made with reckless disregard of their truth is 'at least as compelling as any opposing inference of nonfraudulent intent.'"   (Id. at 50) (internal quotation marks omitted).   Therefore, after the Court decided the parties' motions to dismiss, the claims remaining in this case were Exchange Act claims under Section 10(b) and rule 10b-5 against Orrstown, the Bank, and Quinn, Everly, and Embly, as well as a Section 20(a) claim for control person liability against Quinn, Everly, and Embly.   (Id. at 49-51.)

## B.   SEPTA's Motion for Leave to File Third Amended Complaint

The parties subsequently initiated discovery on the remaining Exchange Act claims. After a period of document discovery—which involved substantial delays and Court intervention to address claims of privilege by Orrstown and banking regulators[5]—SEPTA sought leave to file its operative pleading, the TAC (Doc. No. 182), reasserting Securities and Exchange Act claims previously dismissed against several Individual Defendants, SEK, and the Underwriter Defendants based upon information gathered during discovery in 2018.   The TAC consists of 319 pages of factual allegations (up from the SAC's 168 pages) and includes a significantly greater amount of factual detail gleaned from the documents produced during discovery in this case.[6]

---

[5] The details of the privilege claims are related in the Court's Memorandum addressing SEPTA's renewed motion to compel (Doc. No. 239), issued contemporaneously with this Memorandum.

[6] Exhibits to the TAC include the following: the Written Agreement entered into between the Orrstown Defendants and the Federal Reserve Bank of Philadelphia (Exhibit A), the Consent Order issued by the Pennsylvania Department of Banking (Exhibit B), and the SEC Order

The Court granted SEPTA's motion for leave to file the TAC in a February 14, 2020 Order.   (Doc. Nos. 197-98.)   The Court rejected Defendants' argument that the Securities and Exchange Acts' respective statutes of repose barred SEPTA's reassertion of claims, rendering its effort to amend the operative complaint futile.   However, "because the Court's December 7, 2016 Order [dismissing in part the SAC] adjudicated 'fewer than all the claims or rights and liabilities of fewer than all the parties [and] does not end the action as to any of the claims or parties,' and because through the TAC SEPTA sought to reassert the same claims against the same parties originally brought by way of the FAC, filed within the applicable statute of repose and limitations period, no statute of repose or limitation is calculated by reference to the potential filing of the TAC."   (Doc. No. 197 at 54) (quoting Fed. R. Civ. P. 54(b)).

In granting SEPTA's motion to file the TAC, the Court noted that, in opposing SEPTA's motion under Federal Rule of Civil Procedure 15(a), the various Defendants strictly limited their discussion of futility to the issues of statutes of repose and limitation, and did not argue that the filing of the TAC was futile for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6); therefore, the Court limited its analysis accordingly. (Doc. No. 197 at 49 n.36.)   In connection with the issuance of its Memorandum and Order permitting SEPTA to file the TAC, the Court directed the parties to file a proposed briefing schedule for any anticipated motions to dismiss the TAC.   (Doc. No. 198.)

On February 24, 2020, Defendants filed motions to certify the Court's February 14, 2020 Order for interlocutory appeal.   (Doc. Nos. 201-02.)   In accordance with the Court's order adopting their proposed briefing schedule (Doc. No. 203), Defendants filed motions to dismiss the TAC.   (Doc. Nos. 213, 215, 217.)   After various COVID-19 related requests for extensions

---

(Exhibit C).   (Doc. No. 199 at 320-76.)

of time, briefing on the motions to dismiss the TAC was completed on August 26, 2020.   (Doc. Nos. 214, 216, 218, 228, 234-35, 245.)   The Court granted Defendants' motions to certify (Doc. Nos. 229-30), the Third Circuit Court of Appeals granted their petitions for permission to appeal the February 14, 2020 Order pursuant to 28 U.S.C. § 1292(b), and the Defendants filed a notice of appeal (Doc. Nos. 236, 253).

### C.   Interlocutory Appeal

On interlocutory appeal, the Third Circuit ordered the parties to brief the following issue: "under Federal Rule of Civil Procedure 15(c) and the Rules Enabling Act, can a plaintiff relate new claims back to timely claims to avoid a statute of repose"?   See Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc., No. 20-2829 (3d Cir. Jan. 15, 2021), ECF No. 37.   On September 2, 2021, the Third Circuit issued its Opinion and Judgment affirming this Court's Order permitting the filing of the TAC.   (Doc. No. 264.)   The Third Circuit was "persuaded that Rule 15(c) allows amendment of a pleading after the expiration of a repose period here—subject to the Rule's ordinary constraints—because the Rule's 'relation-back' doctrine leaves the legislatively mandated deadline intact and does not disturb any of the defendants' vested rights to repose in this case."   See Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc., 12 F.4th 337, 341 (3d Cir. 2021).   Because the Third Circuit's September 2, 2021 Opinion has implications for the Court's consideration of the pending motions to dismiss, the Court turns to a summary of the Third Circuit's conclusions therein.

First, the Third Circuit noted the applicability of Rule 15(c) to SEPTA's claims asserted in the TAC because the TAC "both restates claims with greater particularity and amplifies the factual circumstances surrounding the relevant conduct by adding significantly more factual detail to SEPTA's existing claims."   See id. at 345.   The court then identified the relevant

question as "whether Rule 15(c) permits amendment outside an otherwise-applicable repose period," noting that "[i]t is well established that Rule 15(c) permits amended pleadings to relate back past statutes of limitations such that an amendment filed outside the limitations period is deemed timely," but also noting that the parties' appeal challenged whether the statutes of repose applicable to SEPTA's Securities and Exchange Act claims barred SEPTA's effort to amend its pleading.   See id.   Accordingly, the court noted that "[o]ne major difference between statutes of repose and statutes of limitations is that the former are not subject to equitable tolling" because of the "'unqualified nature' of statutes of repose." See id. at 346 (quoting Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc., 137 S. Ct. 2042, 2051 (2017)).

The Third Circuit disagreed with Defendants' initial contention that relation back under Rule 15(c) is incompatible with the nature of statutes of repose.   The court noted that SEPTA's filing of the FAC asserting Securities and Exchange Act claims against all Defendants occurred before the applicable repose periods expired.   See id. at 347.   The court then addressed Defendants' contention that the relevant statutes of repose barred the claims asserted in the TAC because the "previously dismissed claims were extinguished by the expiration of the repose period, even though the action continued."   See id.   The court noted that, even if the relevant statutes of repose barred "claims" instead of an "action," the conclusion would be the same, because the "claims" would have to have ended in order for them to be barred, and, as this Court concluded, because the Court "had not decided all claims as to all parties at the time of the repose period's expiration," none of the claims brought by SEPTA in this action ended.   See id.

The Third Circuit also concluded that Rule 15(c)'s relation back doctrine is consistent with the purpose of statutes of repose.   The Circuit "agree[d] that a repose statute's purpose is to give defendants protection after a certain amount of time," but found that "it does not defeat that

12

purpose for a plaintiff to bring an action within the time allotted—even if the plaintiff later amends the precise form of its pleadings." See id. at 349.   The court deemed unfounded Defendants' concern of the use of relation back to circumvent statutes of repose to permit "limitless" filing of new claims, concluding that Rule 15(a) protects against that possibility by permitting courts to deny amendment under Rule 15(a).   See id.   In this regard, the court noted that Rule 15(a) and Rule 15(c) are independent, such that even if a court concluded that a claim, if filed, would relate back, it could still deny amendment under Rule 15(a) if it found that other equitable considerations counseled against permitting amendment.   See id.   The court stated that although SEPTA, through the TAC, sought "to expand its complaint with additional facts," it was "not bringing any new legal claims or adding new parties that were not included in the First Amended Complaint."   See id. at 350.   Accordingly, the Third Circuit clarified that its holding "does not address whether an entirely new claim—one that the plaintiffs did not bring before—may relate back to skirt statutes of repose."   See id.   In a footnote, the Third Circuit noted that although "Defendants assert that some—though not all—of SEPTA's new facts included distinct, new breaches of the Securities and Exchange Acts not included in previous complaints," it would "leave the dispute, which falls under (c), for [the district court] to decide in the first instance."   See id. at n.10.

The Third Circuit also addressed Defendants' argument that the Rules Enabling Act precludes the use of relation back to defeat statutes of repose, finding the argument unavailing because, "under Rule 54(b), SEPTA's action had not ended when the repose deadline passed because the District Court's previous dismissal did not decide all claims as to all parties"— therefore, "none of the Defendants had vested rights to repose as against SEPTA when the repose period expired, and the Rules Enabling Act's protections for substantive rights do not apply

here." See id. at 351.   The court acknowledged that several district courts had "declined to permit relation back past statutes of repose" but noted that those decisions, which involved entirely new claims or parties added subsequent to the repose period's expiration, "rel[ied] on the premise that relation back would violate the defendants' substantive rights . . . ." See id. at 352. Finally, because relation back may make the TAC timely, the Third Circuit found no error in this Court's decision to grant leave to amend pursuant to Rule 15(a).   See id.   The court declined to reach the question as to "whether each of SEPTA's proposed amendments relates back to its timely filed pleadings under [15](c)."   See id. at n.12.

### D.      Oral Argument and Failed Mediation

On October 27, 2021, the Court issued an Order scheduling oral argument on the pending motions to dismiss the TAC for December 9, 2021.   (Doc. No. 266.)   The parties thereafter filed a joint motion to continue the hearing on the Defendants' motions to dismiss (Doc. No. 267), in order to permit the parties to engage in private mediation.   The Court granted the motion (Doc. No. 268), requiring the parties to file a joint status report by January 28, 2022 regarding the outcome of their settlement efforts.   On January 21, 2022, the parties filed a joint status report (Doc. No. 269) indicating that their mediation was unsuccessful, and asking the Court to reschedule oral argument on the pending motions to dismiss.   The Court thereafter issued an Order rescheduling oral argument for July 13, 2022.   (Doc. No. 273.)   The Court heard argument on the pending motions on that date, and accordingly, they are ripe for resolution.

## II.    LEGAL STANDARD

A motion filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint's factual allegations.   See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).   A

complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."   See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)).   A court considering a Rule 12(b)(6) motion to dismiss must determine whether the complaint contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."   See Iqbal, 556 U.S. at 678.   The court must accept all well-pleaded factual allegations in the complaint as true and must view the factual allegations in the light most favorable to the plaintiff.   See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).

Consistent with the Supreme Court's rulings in Twombly and Iqbal, the Third Circuit has identified three steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."   See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 675, 679).   Facial plausibility exists when the plaintiff pleads factual content "that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."   See Iqbal, 556 U.S. at 678.   A court's determination on a Rule 12(b)(6) review "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."   See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig., 804 F.3d 633, 638 (3d Cir. 2015) (quoting Maio v. Aetna, Inc., 221 F.3d 472, 482 (3d Cir. 2000)).   The analysis is context-specific task requiring a court "to draw on its judicial experience and common sense."   See Iqbal, 556 U.S. at 663-64.

In ruling on a 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus. Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## III.   DISCUSSION

### A.   Factual Allegations

As noted above, the TAC contains significantly more factual detail than the SAC. Below the Court summarizes the new factual allegations pertaining to SEPTA's Securities and Exchange Act claims.

### 1.   Securities Act Allegations – March 2010 Offering

As alleged in the TAC, SEPTA's Securities Act claims "stem from materially false and misleading statements contained in Orrstown's Offering Documents concerning the existence and effectiveness of [its] internal controls over the underwriting of loans, risk management and financial reporting."  (Doc. No. 199 ¶ 382.)   SEPTA asserts that Orrstown was listed on the NASDAQ on April 29, 2009, shortly thereafter which Defendant Quinn became the Bank's President, Chief Executive Officer, and Director.  (Id. ¶ 384.)   The planned March 2010 Offering was Orrstown's first since listing on the NASDAQ exchange.  (Id. ¶ 385.)   In the TAC, SEPTA alleges that in March 2010, Orrstown stock was trading in the low to mid-$30s, and that, after its 2009 Annual Report was filed (on March 15, 2010) and the Yorktown bankruptcy, see infra, was disclosed (on March 23, 2010), the stock price dropped steadily to a closing price of $30.50 on March 23, 2010.  (Id. ¶ 386.)   According to the TAC, after the disclosure of the Yorktown bankruptcy, as well as the additional provisions for loan losses

reflected in the 2009 Annual Report, the Underwriter Defendants and Orrstown Securities Act Defendants[7] priced Orrstown common stock at $27 for the March 24, 2010 Offering.   (Id. ¶ 387.)   SEPTA asserts that "[t]he sale of Orrstown stock at that price [] did not accurately reflect the value of Orrstown stock[,] which was materially inflated by false and misleading statements about the quality of the Bank's internal controls over financial reporting, including the Bank's ALLL,[8] the quality of the Bank's commercial loan portfolio, and the Bank's internal review processes, to name a few."   (Id.)   SEPTA references Orrstown's March 29, 2010 announcement that it completed its Offering of 1,481,481 shares of common stock, sold at a price of $27 per share, to raise proceeds of $37.5 million.   (Id. ¶ 388.)

The Court will not attempt to set forth the entirety of the SEPTA's new allegations in paragraphs 100 through 139 of the TAC regarding Orrstown's ALLL calculation process during the time period addressed by SEPTA's claims.   (Doc. No. 199 ¶¶ 100-39.)   However, the Court notes that these paragraphs offer extensive details in support of the following allegations:

> Orrstown's loan review process failed to take into account material adverse information about both its borrowers and the broader financial crisis impacting real estate markets beginning by 2008.   Indeed, as described herein, even when large borrowers expressly informed Orrstown they were short on money, were struggling with cash flow, and sought loan modifications, Orrstown granted modifications and extensions without recognizing their loans as impaired or TDRs, and without increasing the ALLL reserve to properly recognize the higher risk of loss on the loan.

---

[7]  The "Orrstown Securities Act Defendants" are Orrstown, the Bank, and eleven of the Individual Defendants (all but Defendant Embly).

[8]  ALLL is an "Allowance of Loan and Lease Losses," which SEPTA defines as "a reserve to account for the probability that loans will not be fully repaid," consisting of an "account on a bank's balance sheet that is netted against gross loans"—"[e]ach quarter the ALLL reserve rises by the amount of the 'loan loss provision,' which is the amount of new reserve added to ALLL, and is reduced by any charge offs of loans for which a reserve had previously been created." (Doc. No. 199 ¶ 100.)

(<u>Id.</u> ¶ 506.)

The TAC details the statements contained in the Offering Documents about the quality of Orrstown's internal controls over financial reporting and commercial loan portfolio, as well as its internal review processes, alleged to be false and misleading.   (<u>Id.</u> ¶ 389.)   SEPTA asserts that the Offering Documents stated that Orrstown had an "enviable" loan portfolio and effective internal controls over financial reporting, while "in reality Orrstown's financial statements were materially false and misleading because the Bank's ALLL and disclosures of impaired loans and TDRs[9] simply failed to reflect the fact[] that many of Orrstown's commercial borrowers were experiencing dire financial circumstances and had requested loan modifications, the value of their collateral had plummeted, and the Bank failed to properly account for impaired loans, calculate ALLL, and accurately risk rate loan[s]."   (<u>Id.</u> ¶ 390) (footnote added).

The TAC also challenges Orrstown's statement in the Offering Documents that "we have proactively moved to address any problem credits and ensure that we are adequately reserved for any potential losses," maintaining that Orrstown had not created adequate reserves for troubled loans.   (<u>Id.</u>)   SEPTA asserts that "the Bank's ALLL failed to comply with GAAP and its own loan policy, and excluded loans for which reserves were required, resulting in a materially understated ALLL and failure to identify impaired loans and TDRs."   (<u>Id.</u> ¶ 391.)

SEPTA also alleges in the TAC that the Offering Documents contained misleading statements about a review of Orrstown's loan portfolio, pointing to the following statement in the Prospectus: "[i]n November 2009 we undertook an expanded review of our loan portfolio which covered $526 million in outstanding and committed balances."   (<u>Id.</u> ¶ 392.)   SEPTA asserts that Orrstown's 10-K described the November 2009 loan review ("November Loan Review") in the

---

[9]  "TDR" is a "Troubled Debt Restructuring."   (Doc. No. 199 at 8.)

following misleading terms:

> In November of 2009, management undertook an expanded review of the Bank's commercial loan portfolio, in a proactive attempt to identify potential weaknesses and deterioration in the portfolio.   This review was in addition to the normal loan review process conducted by our loan review officer and the Bank's Credit Administration Committee.   A review team, consisting of 3 employees and 2 contract employees, reviewed all commercial loan relationships with an aggregate committed exposure greater than or equal to $750,000.   The review team focused on the global cash flow of the borrower, global debt service coverage ratios of the borrower, LTV ratios when collateral values decreased by 10% and 20%, borrower's liquidity and guarantor's overall cash flow and liquidity.   The review covered a total of approximately $526,000,000 in outstanding loans and loan commitments.   Following the review process, management increased the allowance by $3.1 million in order to better reflect the deterioration in local, regional and national economic conditions.   All economic allocations were increased during 2009.

(Id. ¶ 392.)

SEPTA avers that the November Loan Review was not an "expanded" review but was instead "little more than the standard, deficient review the Bank regularly performed pursuant to its Loan Policy, which required the Bank to review all loans over $750,000 at least yearly, and all loans rated 4 or less at least quarterly."   (Id. ¶ 393.)   In this regard, SEPTA alleges that (1) Defendant Embly, in an email to the Bank's Credit Administration Committee, described the review as a "summary" one and (2) the only documentation substantiating the review produced by the Orrstown Defendants is a "two page summary memorandum which does not provide important details on the review, such as who conducted it, how, what they reviewed, or the review criteria."   (Id.)

Further, SEPTA alleges that the Offering Documents stated that the November Loan Review "examined 'LTV ratios when collateral values decreased by 10% and 20%,'" but "in reality only 75% of the loans were reviewed for LTV when shocked at 10% and 20%."   (Id. ¶ 394.)   SEPTA asserts that the "vast majority of the collateral valuations used" in connection

19

with the review were "stale" because "the Bank used the collateral value as of the <u>loan closing</u> <u>date</u>," but "most of those loans were several years old," and so "[t]he Offering Documents were therefore materially misleading because, while they stated that the Bank had examined 'LTV ratios when collateral values decreased by 10% and 20%,' the Offering Documents failed to disclose that this testing was performed on stale valuations, rendering the Bank's review of LTVs meaningless with respect to current valuation."   (<u>Id.</u>)

It is SEPTA's position that the November Loan Review was a "fly-by" that "failed to uncover all of the numerous deficiencies, including "that loans were supported by outdated appraisals and the Bank's key borrowers were in dire financial condition and had requested and received loan modifications."   (<u>Id.</u> ¶ 395.)   With regard to specifics, SEPTA asserts that the loan review "would have examined the Shaool, Azadi, Hickey, Mongold, and Yorktown loans discussed herein, yet failed to result in an identification of those loans as impaired, the creation of required reserves on them, or accurately rating them as Substandard or less."   (<u>Id.</u>)

SEPTA additionally discusses the November Loan Review's recommendation to drop the rating for $3.7 million in loans to Marvin Windows to Substandard, which "would have required calculating an ALLL reserve under the Bank's Loan Policy, but the Bank failed to do so in its 2009 10-K, while at the same time touting" the November Loan Review.   (<u>Id.</u> ¶ 396.)   SEPTA alleges that "[i]nternal memoranda show that the Bank projected an $800,000 reserve was necessary as of December 31, 2009," but "the final ALLL schedule used for the 2009 10-K, which was audited by SEK and should have shown every Substandard loan, did not include any calculation or specific reserve for Marvin Windows."   (<u>Id.</u>)   Accordingly, SEPTA asserts that Orrstown excluded the Marvin Windows balance from its ALLL even though the November Loan Review recommended that it be rated Substandard.   (<u>Id.</u>)   SEPTA alleges that, after the

20

March 2010 Offering, Orrstown added a $1.5 million reserve for this loan in its first quarter 2010 financial statements.   (Id.)[10]

The TAC challenges the statement included in the Offering Documents to the effect that, "at December 31, 2009, we had 50 loan relationships, aggregating $307.5 million that were performing according to their original terms with outstanding balances that exceeded $3.0 million."   (Id. ¶ 397.)   The TAC asserts that "[t]his was patently untrue" based on the following:

> [N]either the Bank nor SEK actually reviewed the loans to determine whether they were performing according to their original terms.   In reality, at least over $40 million of those loans had been modified or extended prior to December 31, 2009, and another more than $15 million had been modified prior to March 23, 2010, the date of the final Prospectus.   Upon information and belief, this sentence, with blanks for the dollar amounts, was drafted and recommended to be added to the Prospectus by Sandler O'Neill.   When Orrstown filled in the blanks, it merely used the total number of outstanding loans over $3 million, without actually confirming that all of those were "performing according to their original terms."   In truth, many were not performing according to their original terms because they had been modified or extended, including, as discussed above, loans to the Azadis, Shaools, Mongold, Dwight Martin, Dahbura, Mourtil, and many others.

(Id.)

SEPTA's allegations also touch upon the statements in Orrstown's 2009 10-K to the effect that its "loan loss history has been much better than peer standards and analysis of the current credit risk position is favorable" and that "[t]he allowance for loan losses is ample given the current composition of the loan portfolio and adequately covers the credit risk management sees under present economic conditions."   (Id. ¶ 398.)   SEPTA challenges these statements as materially false and misleading because, "[r]ather than recognize impaired loans, the Bank simply ignored them or extended and/or modified loans," and because the Bank's allowance for

---

[10]  The TAC also contains allegations regarding the Bank's November Loan Review in paragraphs 183 through 189.

loan losses "was materially understated because it was based on stale appraisals, violations of GAAP with respect to calculating ALLL," and its "failure to accurately risk rate loans."   (Id.) The Court will not set forth the entirety of the TAC's extensive new allegations, contained in paragraphs 194 through 368, pertaining to Orrstown's lending relationships and its alleged lack of effective internal controls regarding those relationships.   (Doc. No. 199 ¶¶ 194-368.)   The Court nevertheless notes that these allegations largely pertain to four of the Bank's largest borrowers (Yorktown, the Azadis, the Shaool Family, and the Chambersburg Developers) about which SEPTA asserts as follows:

> These borrower stories are merely illustrative of the Bank's pervasive failures over internal controls, including failures to identify impaired loans, calculate adequate reserves, and accurately risk rate loans.   As will be shown at summary judgment and/or trial, there are numerous borrower relationships like these, where the Bank engaged in a "pretend and extend" course of conduct, extending matured loans and extending more credit in order to forestall inevitable losses.

(Id. ¶ 194.)

SEPTA asserts that many large loans to Orrstown borrowers continued to decline after December 31, 2009, but in advance of the March 2010 Offering.   (Id. ¶ 399.)   SEPTA, for example, maintains that the same month as the Offering "the Shaool's [sic] obtained loan modifications of over $18M in loans, which constituted TDRs and should have resulted in the Bank writing down the loans and creating new reserves" and providing "updated, corrective information in its Prospectus to inform investors that the [B]ank was aware [of] deterioration of its commercial loan portfolio subsequent to December 31, 2009."   (Id.)

SEPTA characterizes the above alleged failures as examples of the Bank's material weakness in its internal controls over financial reporting, despite which Orrstown and SEK "told investors that the bank had no such weaknesses and that its financial reporting was accurate." (Id. ¶ 400.)   Along those lines, SEPTA challenges Orrstown's statement in its 2009 Annual

22

Report on Form 10-K pertaining to "Management's Report on Internal Control," which represented that Orrstown had "evaluated the effectiveness of its internal control over financial reporting as of December 31, 2009," and determined that it was "effective."   (Id. ¶ 401.)   In addition, SEPTA challenges certifications made by Defendants Quinn and Everly as CEO and CFO, respectively, in Orrstown's 2009 Form 10-K pursuant to § 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications").   (Id. ¶ 402.)   The SOX Certifications indicated that Orrstown's internal control over financial reporting was designed "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles" and that Quinn and Everly had disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting." (Id. ¶ 402.)   According to SEPTA, the Orrstown officers had failed to follow the required standards when evaluating Orrstown's internal controls, such that Orrstown's statement regarding the effectiveness of its internal control over financial reporting and accompanying SOX Certifications was false and misleading in the following ways:

> [T]hey omitted material information about the effectiveness of Orrstown's internal controls over financial reporting because at the time the Certifications were made because, as described above, Orrstown failed to comply with GAAP and its own Loan Policy, including by failing to obtain updated appraisals, failing to accurately identify and disclose impaired loans, failing to accurately risk rate loans and ignoring negative information regarding borrower's ability to pay, failing to identify TDRs, failing to calculate reserves on all loans in the portfolio, failing to accurately state the Bank's investment in impaired loans, and using improper discount factors.

(Id. ¶ 405.)   SEPTA points to Orrstown's later admission that, as of December 31, 2011, the "disclosure controls and procedures were not effective and that a material weakness existed

pertaining to its internal control over financial reporting as it related to loan ratings and their

impact on the allowance for loan losses" and asserts that the deficient and ineffective internal

controls existing in 2011 "mirrored the internal controls that were in place for the reporting

periods ending December 31, 2009 and March 31, 2010."   (Id. ¶ 407.)

### 2.     Securities Act Allegations – Defendant SEK

Regarding SEK, SEPTA alleges in the TAC that statements made by SEK in the 2009

Annual Report were false, misleading, and lacked a reasonable basis.   (Id. ¶ 409.)   Specifically,

SEPTA challenges as false SEK's opinions that (1) "the financial statements referred to above

present fairly, in all material respects, the financial position of Orrstown Financial Services, Inc.

and its wholly-owned subsidiary as of December 31, 2009 and 2008" and that (2) "Orrstown

Financial Services, Inc. and its wholly-owned subsidiary maintained, in all material respects,

effective internal control over financial reporting as of December 31, 2009 based on criteria

established in Internal Control – Integrated Framework issued by the Committee of Sponsoring

Organizations of the Treadway Commission (COSO)."   (Id.)

Despite SEK's statement that it "conducted [its] audits in accordance with the standards"

of the Public Company Accounting Oversight Board ("PCAOB") and its responsibility to do so

in connection with the preparation and issuance of any audit report on the financial statements of

an issuer, SEPTA alleges that SEK failed to adhere to PCAOB standards when conducting its

audit for Orrstown's 2009 Annual Report.   (Id. ¶¶ 409, 410-14.)   SEPTA avers that "[i]n

conducting its audit SEK was required to evaluate the reasonableness of the Company's

provisions for loan loss reserves, and ultimately whether the Company's financial statements

incorporating the loan loss reserves were prepared in accordance with GAAP," which, in

accordance with Auditing Standard No. 5 ("AS No. 5"),[11] required SEK to apply and follow

PCAOB Standard AU 342, Auditing Accounting Estimates ("AU 342").[12]   (Id. ¶ 411.)

SEPTA asserts that SEK also failed to follow Financial Accounting Standards ("FAS")

Nos. 114 and 5, "which are the primary guidance on the accounting and reporting impaired loans

and loss contingencies, including credit losses."   (Id. ¶ 412.)   SEPTA describes the obligations

imposed by this guidance as follow:

> Under [FAS 114], an individual loan is impaired when, based on current
> information and events, it is probable that the bank will be unable to collect all
> amounts due according to the contractual terms of the loan agreement.   As used in
> FAS 114 "all amounts due according to the contractual terms means that both the
> contractual interest payments and the contractual principal payments of a loan will
> be collected as scheduled in the loan agreement."   As discussed herein Orrstown's
> material failures with respect to internal controls over financial reporting derived
> in significant part from its failure to recognize loans as impaired, and to calculate
> appropriate reserves for such loans.   FAS 114 requires a bank to evaluate each loan
> individually to determine a reasonable estimate of the amount that can be realized
> or recovered.   If the value of an impaired loan is less than its recorded balance the
> bank must recognize the impairment that was not previously provided for through
> a provision to its allowance.   Relevant here, the value of a collateral-dependent
> loan should be determined by the fair market value of the collateral securing the
> loan.   Thus, for loans secured by collateral, identifying impaired loans and
> calculating ALLL requires accurate and up-to-date appraisals of the collateral.
> Orrstown's own credit policy recognized the importance of accurate and up-to-date
> appraisals and required appraisals to be updated at least every two years and more
> frequently in a declining market.   As discussed below however, Orrstown
> regularly failed to update its collateral appraisals, which resulted in failure to
> recognize tens-of-millions of dollars in impaired loans, and failure to calculate
> appropriate ALLL on those loans.   Moreover, Orrstown frequently extended
> mature loans in circumstances when the borrowers were experiencing financial

---

[11] AS No. 5 "establishes requirements and provides direction that applies when an auditor is
engaged to perform an audit of management's assessment of the effectiveness of internal control
over financial reporting ('audit of internal control') that is integrated with an audit of the
financial statements.   Risk assessment underlies the entire audit process described in AS No. 5,
including the determination of significant accounts and disclosures and relevant assertions, the
selection of controls to test, and the determination of the extent of audit evidence necessary for a
given control."   (Id. ¶ 410) (quoting PCAOB Release No. 2010-006, 12/10/2012, at 1).

[12] AU 342 provides guidance as to how an auditor should test management's estimates and
review and test management's process.   (Id. ¶ 411) (citing AU Section 342.10-11).

difficulty and/or the real estate collateral securing the loan had declined in value, but failed to calculate required reserves on such loans.   In addition, just prior to the Offering Orrstown unjustifiably removed several large loan balances from its ALLL, thereby creating a materially misleading picture of the trajectory of its ALLL in its 2009 10-K.

Second, in calculating ALLL, all loans for which a reserve is not calculated under FAS 114 should be placed in pools in which estimated credit losses should be calculated in accordance with [FAS 5].   The reserves on pools of loans are intended to account for the fact that even loans that are not currently impaired can sometimes go bad.   In accordance with FAS 5, when measuring estimated credit losses these loans are grouped into homogenous pools (groups of loans with similar risk characteristics), and evaluated collectively considering both quantitative (e.g., historical losses) and qualitative (e.g., environmental adjustment) measures, in order to determine appropriate reserve levels.   When estimating credit losses on a group of loans with similar risk characteristics, a bank should consider its historical loss experience on the group "adjusted for changes in trends, conditions, and other relevant factors that affect repayment of the loans as of the evaluation date." Interagency Policy Statement on the Allowance for Loan and Lease Losses.   As discussed further below, Orrstown's ALLL calculated under FAS 5 was understated by virtue of the fact that it utilized historic loss factors that relied on lengthy look back periods that bore no relationship to current financial conditions in 2008, 2009, and beyond.   For example, as discussed below, in 2009 Orrstown used a five year look back period for its historic loss factor when calculating ALLL for pooled loans, but historic losses in 2004, 2005, 2006, and 2007 were uninformative at best when applied during the financial crisis beginning in 2008.

(Id. ¶ 103) (cleaned up).   Further elaborating upon the implications of FAS 5, SEPTA states as

follows in its TAC:

[The Financial Accounting Standards Board ("FASB")]'s Summary of [FAS] 5 explains that under this standard, if a credit loss exists, "the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote."   [FAS] 5 uses the terms probable, reasonably possible, and remote to identify three areas within that range:

**Probable** – the future event or events are likely to occur;
**Reasonably possible** – the chance of the future event or events occurring is more than remote but less than likely; and
**Remote** – the chance of the future event or events occurring is slight.

The allowance for loan loss should be appropriate under GAAP, without any material misstatements, so as to cover probable credit losses related to specifically identified loans as well as probable credit losses inherent in the remainder of the

> Bank's loan portfolio.   Whether a credit loss is probable, reasonably possible or
> remote takes into consideration all available credit data on a borrower.   Thus, in
> calculating loan loss reserves for purposes of GAAP, all material factors, i.e., past
> and present credit information must be considered.

(Id. ¶ 412) (citing FAS 5).

SEPTA alleges that "[a]s early as 2008 SEK failed to follow Rule 3100 issued by

PCAOB,[13] AS No. 5, AU Section 342, and FASB Statement No. 5 in connection with its audit,"

because "SEK failed to verify that Orrstown had used accurate source data, had made reasonable

assumptions, and had accounted for known or knowable past and present information when

calculating its loan loss reserves, and therefore failed to ensure that Orrstown's statements,

incorporated into the Registration Statement, complied with GAAP."   (Id. ¶ 413) (footnote

added).   SEPTA asserts that SEK failed to follow FAS 114 in connection with its audit of the

Bank and thereby "failed to verify that the Bank's disclosures of impaired loans accurately

reported the Bank's investment in impaired loans."   (Id. ¶ 414.)

SEPTA further alleges that "SEK discovered numerous failures to comply with GAAP,

and FAS 114 and FAS 5, during the course of its audits, and that the Bank lacked adequate

controls over financial reporting," asserting that SEK had knowledge of the following:

> (a) Orrstown evaluated only Substandard loans for impairment, which failed to
> comply with GAAP, and because Orrstown failed to accurately risk rate loans its
> identification of Substandard loans was vastly under inclusive; (b) Orrstown failed
> to disclose as impaired loans for which it had actually calculated an impairment
> amount; (c) Orrstown regularly failed to obtain updated appraisals in its analysis of
> impairment and calculation of ALLL, which, in addition to rendering the Bank's
> disclosures of ALLL and impaired loans false and misleading, violated the Bank's
> own Loan Policy; (d) rather than obtain updated appraisals, Orrstown applied
> discount factors to old appraisals that were totally improper under GAAP;
> (e) Orrstown failed to calculate a reserve on loans other than those rated
> Substandard (except to the extent that the Bank's exposure to a particular industry

---

[13] PCAOB 3100 requires an auditor "to adhere to PCAOB standards in connection with the
preparation and issuance of any audit report on the financial statements of an issuer."   (Id.
¶ 410) (citing PCAOB Release No. 2003-09).

exceeded 25% of the Bank's total equity), which was contrary to generally accepted industry practice and also improperly assumed that the Bank only incurs losses through its Substandard and lower rated loans, which was not accurate; (f) Orrstown used improper historical loss factors in its FAS 5 calculation; [and] (g) Orrstown improperly risk rated loans and failed to calculate reserves or identify them as impaired, including because as accountant to several of the Bank's largest borrowers, SEK knew that they were experiencing financial difficulty, and that real estate collateral values had plummeted, and also knew that the Bank had failed to rate the relationships as Substandard.   Moreover, in connection with its audit SEK failed to examine several of the Bank's largest lending relationships, including Yorktown and several of SEK's own clients.

(Id. ¶ 416.)

Based on all the above allegations, SEPTA asserts that SEK made misleading statements lacking a reasonable basis, to wit: (1) "financial statements referred to above present fairly, in all material aspects, the financial position of Orrstown Financial Services, Inc. and its wholly-owned subsidiary as of December 31, 2009 and 2008"; and (2) "Orrstown Financial Services, Inc. and its wholly-owned subsidiary maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009 based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)."   (Id. ¶ 415.)[14]

---

[14] In connection with SEPTA's Securities Act allegations against SEK, SEPTA also makes assertions regarding SEK's alleged auditing failures and those of other auditing firms registered with the PCAOB.   In this regard, SEPTA alleges as follows:

The PCAOB issued a report that provided "information about the nature and frequency of deficiencies in firms' audits of internal control over financial reporting detected during the PCAOB's 2010 inspections."   The PCAOB found in its inspections significant incidences of deficiencies in firms' audits of internal controls and financial statements for public company issuers' for the year ending 2009 which, the PCAOB concluded, indicates that auditing firms are not following the methodologies and standards required of them.

The PCAOB found the "most pervasive" deficiencies in integrated audits related to firms' failures to: a. [i]dentify and sufficiently test controls that are intended to address the risks of material misstatements; b. [s]ufficiently test the design and

### 3.    Securities Act Allegations – Underwriter Defendants

Regarding the Underwriter Defendants' role, SEPTA alleges that they were very experienced in stock offerings of banking institutions and that Defendant O'Neill was "actively involved" in drafting parts of Orrstown's 2009 10-K, to be filed with the SEC shortly before the Offering date.   (Id. ¶¶ 420-21.)   SEPTA asserts that "O'Neill commented on and drafted sections of the 10-K and Prospectus Supplement dealing with the loan portfolio, including the November Loan Review" and also "suggested inclusion of the materially false and misleading statement concerning the Bank's 50 largest loan relationships 'performing according to their original terms.'"   (Id. ¶ 421.)   SEPTA avers that O'Neill was aware, prior to the pricing of the Offering, "that Yorktown had filed for bankruptcy, that Orrstown's exposure to Yorktown was nearly $8.6 million, and that Orrstown's assertion that it was a secured creditor was in serious question because of documentation and recording foul-ups by Orrstown and/or its counsel."   (Id.

---

operating effectiveness of management review controls that are used to monitor the results of operations; c. [s]ufficiently test the system-generated data and reports that support important controls; d. [s]ufficiently perform procedures regarding the use of the work of others; [and] e. [s]ufficiently evaluate identified control deficiencies and consider their effect on both the financial statement audit and on the audit of internal control.   The PCAOB also found that in providing integrated audit opinions, two or more of the above deficiencies were found in 70% of these audits such that firms failed to obtain sufficient audit evidence to support the opinions on the effectiveness of internal controls.

[I]n a 2010 report the PCAOB specifically found that SEK failed to "obtain sufficient competent evidential matter" and failed to "perform sufficient procedures to test the allowance for loan losses" for a public company, and reached a similar conclusion in a 2013 report, finding "deficiencies of such significance that it appeared that the Firm, at the time it issued its audit report, had not obtained sufficient appropriate audit evidence to support its opinion on the issuer's financial statements . . . and fail[ed] to perform sufficient procedures to test the allowance for loan losses."   [SEPTA] believes one or both of these reports likely refer to SEK's audit of Orrstown.

(Id. ¶¶ 417-19) (cleaned up).

¶ 423.)

According to the TAC, "[d]espite this knowledge, the Underwriter Defendants failed to conduct any additional due diligence with respect to Orrstown's exposure to Yorktown or, more broadly, whether the Yorktown debacle signaled more widespread internal control problems." (Id. ¶ 424.)   SEPTA asserts that the Underwriter Defendants failed to conduct appropriate due diligence with regard to the Yorktown loan by failing to determine:

a.  Whether the Yorktown loan had been the subject of the November Loan Review, and the outcome of that review with respect to the Yorktown loan;

b.  Whether the Yorktown loan had been the subject of any consideration for an ALLL allocation prior to its filing for bankruptcy protection, and if not, why not;

c.  When was the last time the Yorktown loan had been the subject of an in-depth internal or external loan review, and the results of such review(s);

d.  Whether the Yorktown loan, given its size, had been among the loans reviewed by SEK in its 2008 or 2009 audits, and if not, why not (in fact, inexplicably, SEK did not sample the Yorktown loan because it was a complex loan, being composed of and dependent on the creditworthiness of the many borrowers of Yorktown); [and]

e.  Whether the absence of virtually any recognition by Orrstown of any impairment or troubled condition of the Yorktown loan denoted a material weakness of ICFP.

(Id. ¶ 424.)   By allegedly failing to pursue an inquiry with regard to the above areas, the Underwriter Defendants, according to SEPTA, engaged in a "material underwriting failure" because "even a modicum of inquiry . . . would have at minimum learned that due to internal loan review weaknesses and incompetency the Yorktown loan, despite its magnitude, was virtually ignored by Orrstown and its external auditor, SEK."   (Id. ¶ 425.)   SEPTA goes on to allege:

[The Underwriter Defendants] treated the Yorktown bankruptcy to be an 11th hour annoyance that they did not want to interfere with the predetermined schedule for

taking the March 2010 Offering to market.   The Underwriter Defendants dealt with this by simply encouraging Orrstown to file a Form 8-K with the SEC, making no special effort to investigate how the demise of such a significant loan could elude senior management if internal controls over financial reporting were functioning in the same universe of acceptable levels.   Indeed, even the March 19, 2010 bankruptcy court determination that Orrstown was an unsecured creditor of Yorktown instead of a secured creditor as it had professed to the Underwriters did not prompt obvious and necessary investigation by or cause the Underwriters to interrupt or delay the March 2010 Offering for fear that their commissions would be in jeopardy if the Offering did not get marketed on the original timetable.

(Id. ¶ 425.)   SEPTA accordingly asserts that the Underwriter Defendants, as pertains to Orrstown's operations in connection with their role in the preparation of the Offering Documents, failed to appropriately address the following areas: (1) the process for reviewing loans; (2) the adequacy of internal controls over financial reporting; and (3) the relationship between Orrstown's auditor, SEK and some of its principal borrowers.   (Id. ¶ 426.)

### 4.    Remaining Securities Act Allegations

Also in support of its Securities Act claims, SEPTA alleges that Orrstown's March 2010 Offering was "necessary in order to raise capital to withstand losses that Bank management (and the Regulators) knew would materialize if the financial crisis and real estate market did not bail out the Bank's reckless lending and concealment of loan portfolio deterioration."   (Id. ¶ 427.) SEPTA relatedly describes an October 30, 2009 meeting among Defendants Quinn, Embly, and Shoemaker and officials of the Philadelphia Federal Reserve Board, at which the participants discussed "capital and risk management."   (Id. ¶ 428.)   SEPTA asserts that this meeting coincided with retreats held by Orrstown in September and October 2009 for its executive management and directors, "where the need to raise capital was addressed."   (Id. ¶ 429.) According to the TAC, "by December 9[,] the Bank's senior management and directors had decided to proceed with a public offering to raise $40 million in capital."   (Id.)   SEPTA alleges that the Offering Documents did not detail the reasons for which Orrstown sought to raise $40

million in equity—instead, "the Offering Documents and 'road show' presentation preceding the March 2010 Offering portrayed Orrstown as a financial institution that uniquely had weathered the financial crisis, performed better than its peers, and saw lending opportunities created by the financial crisis that other institutions could not exploit."  (Id. ¶ 430.)   Contrary to this portrayal, SEPTA argues that "the new capital would be used to provide the additional equity that the bank executives knew was going to be necessary to fund the expected material credit losses in the forthcoming quarter which were likely to reduce current capital below regulatory ratios."  (Id.)

### 5.   Exchange Act Allegations

In connection with its Exchange Act claims, SEPTA alleges that all of the pre-Offering conduct described above was undertaken with fraudulent intent.   SEPTA challenges post-Offering statements as well.   The Court summarizes only those allegations of the TAC that were not included in the SAC.

Regarding Orrstown's 2009 Annual Report on Form 10-K, SEPTA alleges that the Orrstown, the Bank, and Individual Defendants Quinn, Everly, Embly, Zullinger, Shoemaker, Coy, and Snoke (collectively, "Orrstown Exchange Act Defendants") knew or were reckless as to their knowledge that the SOX Certifications and representations regarding the effectiveness of Orrstown's internal control over financial reporting were false when made.  (Id. ¶ 470.)   These Defendants "nevertheless perpetrated this falsehood in order to obtain additional capital through the Offering in order to fund the massive charge-offs that would result from the deteriorated loan portfolio."  (Id.)   SEPTA alleges that the Orrstown Exchange Act Defendants "deliberately manipulated the Bank's ALLL in the 2009 10-K by removing certain substandard loans without justification in order to conceal deterioration in the Bank's portfolio."  (Id.)   SEPTA further alleges that "the 2009 10-K reassured investors that the Bank's 50 largest loan relationships were

'performing according to their original terms,['] which was completely false, as the Orrstown Exchange Act Defendants knew."   (Id.)

More specifically as to Quinn, Everly, and Embly, SEPTA alleges that they were aware of Orrstown's material weakness in internal controls and its "growing portfolio of impaired loans."   (Id. ¶ 471.)   SEPTA asserts that Quinn, who joined the Bank in May 2009, was the individual responsible for the administration of Orrstown's Loan Policy, as well as the SOX Certifications.   (Id. ¶ 472.)   By the end of 2009, SEPTA alleges that Quinn "knew, or was reckless in not knowing," the following:

> [T]he procedures specified in the Bank's Loan Policy for calculating ALLL (including, as examples, that reserves were not calculated on the entire loan portfolio, the Bank utilized improper discount factors to modify stale appraisals rather than obtain updated appraisals, and the Bank's FAS 5 calculations were based on unreasonable historic loss factors) were deficient, and further that Orrstown regularly failed to comply with its Loan Policy by failing to obtain updated appraisals, rendering the Bank's identification of impaired loans and ALLL calculations in particular materially false and misleading.

(Id.)

As to Everly, SEPTA alleges that he was "responsible for ensuring that Orrstown's financial reporting was materially accurate, complete and prepared in accordance with GAAP." (Id. ¶ 473.)   SEPTA asserts that by the end of 2009, "Everly knew, or was reckless in not knowing, that the procedures specified in the Bank's Loan Policy for calculating ALLL failed to comply with GAAP, and further that Orrstown regularly failed to comply with its Loan Policy by failing to obtain updated appraisals, rendering the Bank's identification of impaired loans and ALLL calculations in particular materially false and misleading."   (Id.)

Regarding Embly, SEPTA identifies him as the individual responsible for "credit underwriting, loan work out and loan administration, including supervision of the loan review process and ensuring that material adverse information concerning borrowers was timely

incorporated into the loan ratings."   (Id. ¶ 474.)   SEPTA asserts that Embly, though aware of problems relating to the Bank's largest borrowers, "failed to ensure that the loans were identified as impaired, that reserves were calculated on them, or that modifications and extensions to them were identified as TDRs."   (Id.)   Embly instead "directed a scheme to 'pretend and extend' in order to forestall recognition of Orrstown's deteriorating credit quality."   (Id.)

As members of Orrstown's Loan Committee, Quinn, Everly and Embly had ultimate responsibility to "ensur[e] that each loan was supported by updated information, and Embly in particular was ultimately responsible for regulatory compliance regarding appraisals."   (Id. ¶ 475.)   SEPTA alleges that the three knew that many of Orrstown's loans were unsupported by updated appraisals and "knew or should have known that the Bank's use of stale appraisals in connection with the measurement of impairment loss, and its use of a universal discount rate, did not comply with GAAP and Orrstown's own Loan Policy."   (Id.)   As members of committees that reviewed borrower loan-modification requests, Quinn, Everly, and Embly "each knew, or were reckless in not knowing, that many of the bank's largest borrowers were suffering from poor cash flow, that their collateral values had seriously declined as a result of the financial crisis, and that modifications to their loan[s] should have been identified as TDRs, and reserves and/or impairments should have been calculated."   (Id. ¶ 476.)

Concerning Orrstown's November Loan Review, SEPTA alleges that although Orrstown portrayed it as an assurance of the soundness of its loan portfolio, "[i]n reality, [it] was a "sham" because "the Bank has almost no documentation of it, and the documentation produced to date shows that it was at best perfunctory."   (Id. ¶¶ 485-86.)   Among the alleged deficiencies of this review are the following: (1) the November Loan Review "looked at collateral values at the time the relevant loans were written, which in almost all cases meant the collateral values were stale";

(2) "despite the fact that the November Loan Review resulted in a recommended downgrade to the $3.7 million Marvin Windows/Robert Slagle loans, the Bank's ALLL schedule used for the [2]009 10-K did not include any specific reserve for these loans"; (3) "many of the loans reviewed had matured and been extended or modified, and these should have been identified as TDRs," including the "entire Shaool family of loans," which were identified as "substandard," but no ALLL reserve provision was made for the loans.   (Id. ¶¶ 486-88.)   SEPTA alleges that the Exchange Act Defendants[15] "knew, or were reckless in not knowing, that the November Loan Review was a charade perpetrated on the investing public to conceal losses inherent in the Bank's portfolio just long enough to consummate the public Offering."   (Id. ¶ 490.)

SEPTA additionally alleges that the statement contained in the 2009 10-K and Prospectus—i.e., "at December 31, 2009, we had 50 loan relationships, aggregating $307.5 million that were performing according to their original terms with outstanding balances that exceeded $3.0 million"—was "patently untrue," and that neither Orrstown nor SEK even reviewed the loans described to determine whether they were performing according to their original terms.   (Id. ¶ 491.)   SEPTA asserts that "over $40 million of those loans had been modified or extended prior to December 31, 2009, and another more than $15 million had been modified prior to March 23, 2010, the date of the final Prospectus."   (Id.)   According to SEPTA, O'Neill recommended that "this sentence, with blanks for the dollar amounts, be added to the Prospectus and that "[w]hen Orrstown filled in the blanks, it merely used the total number of outstanding loans over $3 million, without actually confirming that they were performing

---

[15] The "Exchange Act Defendants" consist of the Orrstown Exchange Act Defendants and SEK. (Doc. No. 199 ¶ 29.)   It is not entirely clear to the Court whether SEPTA intended to refer to the Orrstown Exchange Act Defendants (without SEK) rather than the Exchange Act Defendants (with SEK), as the relevant allegations do not appear to speak to SEK.   Nevertheless, the Court will adopt SEPTA's naming conventions and use "Exchange Act Defendants" where it has.

according to their original terms." (Id.)  SEPTA avers that the Exchange Act Defendants "were reckless in not knowing that a substantial percentage were not performing according to their original terms because they already had been modified or extended." (Id.)

As previously touched upon, in addition to the alleged misstatements catalogued above, SEPTA alleges that the Exchange Act Defendants "deliberately manipulated" the Bank's ALLL in the 2009 10-K. (Id. ¶ 492.)  According to SEPTA, the Exchange Act Defendants, and Embly in particular, manipulated the Bank's ALLL calculation in connection with the 2009 10-K. (Id.)  They did so "by removing at least two large borrowers from the ALLL calculation, Antonio Mourtil and J&S, without any valid justification, and by failing to include a known, required reserve for Marvin Windows/Robert Slagle, in order to hide the declining quality of the Bank's loan portfolio." (Id.)  SEPTA elaborates on this point with the following:

> [W]hen calculating ALLL the Bank analyzed any loans rated Substandard (i.e., "6") and determined whether there was a collateral deficiency.  If there was a collateral deficiency, the Bank created a specific FAS 114 reserve for that loan.  Any FAS 114 reserve for a loan meant that it was impaired, and the loan loss provision for that reporting period would be increased and added to the ALLL.

(Id. ¶ 493.)  In this connection, upon information that a large borrower, Windy Heights, "was having problems and its $5.65 million loan would become non-performing in the first quarter," requiring an additional $2 million FAS 114 reserve, Orrstown allegedly addressed the situation by removing from its ALLL reserves two other large reserves for loans to Antonio Mourtil and J&S Enterprises so as to add a reserve to the ALLL for Windy Heights without changing the total ALLL in the 2009 10-K. (Id. ¶ 496.)  Additionally, in the 2009 10-K, the Bank allegedly "failed to include any specific reserve on the $3.7 million Marvin Windows/Slagle loans that the November Loan Review had identified as Substandard," even though "Embly knew and discussed in internal memos that the Marvin Windows/Slagle loans required at least an $800,000

reserve."   (Id.)   SEPTA therefore alleges that the ALLL in the 2009 10-K was materially

misleading due to its "failure to include reserves which Embly and the other Exchange Act

Defendants knew were required."   (Id.)

The TAC includes detailed allegations regarding Orrstown's treatment of the Mourtil,

J&S, and Marvin Windows loans in connection with the Windy Heights loan and Orrstown's

2009 10-K, as follows:

498.   Antonio Mourtil was a real estate developer who sometimes worked on development projects with Tom Mongold.   Among other projects, the Bank lent Mourtil over $3 million for a "Cleveland Avenue Commons" project to build 14 townhomes near one of the Bank's branch locations in Hagerstown.   Although originally intended to be sold, after the financial crisis hit Mourtil was unable to sell the units and had to rent them instead.

499.   The loan became due in July 2009.   Because Mourtil was unable to sell the homes, which according to the Bank's internal documents were "affected by the bad market," Mourtil requested a two year extension at the same interest rate.   The bank knew that rents from the properties were not sufficient to support the debt. An internal Loan Presentation from August 2009 noted that "without a new appraisal, we do not know how deeply we are positioned today."   The appraisal on the property was over here [sic] years old at that time and the bank knew "it is likely that the properties have decreased in value."

500.   An internal Loan Presentation from November 2009 reflected that an updated appraisal, dated August 21, 2009, showed collateral a value of just $2.2 million on a more than $3 million loan.   Moreover, the presentation reported that Mourtil "says all of their projects are under water and . . . they are having difficulty keeping the units fully occupied and with the inconsistency in rental income, they are pulling cash from their personal accounts to service the debt."   Internally Orrstown stated "we either want re-payment to begin or we want a large balance reduction to continue interest only."

501.   Obviously this loan was Substandard, impaired, and required a specific ALLL reserve.   That is precisely what Chad Rydbom conveyed to Embly.

502.   On January 12, 2010, Chad Rydbom conveyed to defendant Embly an ALLL schedule that showed Mourtil's loan with a 12/31/09 balance of $2.96M, for which a reserve of $1.33M was taken under FAS 114.   The Mourtil reserve amount was by a factor of 2.5 the largest FAS 114 reserve amount on the 1/12/10 schedule.

503.   The 1/12/10 schedule did not yet list the Windy Heights loan, but as noted

above the Bank knew by January 6, 2010 that Windy Heights would also need to be rated Substandard and a reserve calculated.

504.    In order to provide the required reserve for Windy Heights without materially increasing the ALLL, the Bank simply excluded Mourtil, J&S, and Marvin Windows from the ALLL calculation.   Embly oversaw creation of a new reserve schedule that removed the Mourtil and J&S loans entirely, thereby eliminating nearly $2 million in FAS 114 allocated reserve amounts.   That removal made it possible to add the Windy Heights loan and reserve amount without substantially increasing the entire ALLL by $2.0M, which would have resulted in an 18% increase in ALLL and a 15% decrease in net income.

505.    The removal of the Mourtil and J&S loans from the substandard list and the consequent decrease of the FAS 114 reserve was a calculated and manipulative action taken at the behest of Embly, and it thereby resulted in an understatement of the loan loss provision by $2M and the overstatement of net income.   The Bank's 2009 reported net income was $13.37M; if the $2M reserve for Mourtil and J&S had not been removed, net income would have been $2M less, or 15% lower than reported.   Further, if Marvin Windows had been added as required by virtue of the fact that it had been rated Substandard, the ALLL would have been higher by at least $800,000, and more likely $1.5 million.   That manipulation was material to the reported 2009 financial results.   In total, if the required reserves for Mourtil ($1.33M), J&S ($484,000), and Marvin Windows ($1.57M) had been included in the ALLL reported in the 2009 10-K, Orrstown's reported ALLL would have been 31% higher, and Orrstown's net income would have been 25% lower.

506.    There was no change in the risk profile of the Mourtil loan that would explain its evaporation from the substandard loan list or the removal of the largest FAS 114 reserve that had been attributed to it.   Indeed, its loan-to-value metrics were among the worst of the Bank's largest loans.   The removal of the Mourtil loan subsequent to the 1/12/10 schedule of substandard loans was especially improper in light of the following:

a.   The Mourtil loan came due on July 16, 2009, at which time the entire principal amount was due and owing.   The principal amount was not paid on or after July 16, 2009, in accordance with the demand note, and thus the loan was in default.   It was for this reason the Mourtil loan was listed on the "matured" loans report beginning shortly at or about July 2009.

b.   The matured loans report was a source of considerable concern to the Bank's senior management.   On November 18, 2009, an e-mail was sent to a group of lending officers along with the current matured loans list stating that "The matured loans listing is growing, again."   Defendant Embly later that day, using the same e-mail string, sent to loan officer Steve Szady an e-mail:

"I need you to do everything in your power to get DELM and Anton [Mourtil] off of the matured list by 11/30."

c.  As to Mourtil, despite a 11/24/09 loan presentation to the CAC seeking approval of a restricting of Mourtil's loan, there was no resolution reached because the borrower and his co-investors co-guarantors in Cleveland Avenue Commons, LLC were unwilling to adopt any of the options presented to them by the Bank, including making a significant ($1 million) principal payment.

d.  The Bank ultimately capitulated in late-December, agreeing to extend the interest-only payments for 36 months (retroactively to 7/16/09), with the borrower making a 3% payment ($100,000) on the principal balance, bringing the outstanding principal to $2,960,000.

507.    Subsequent to the Mourtil loan being in default, the Bank obtained an appraisal that valued the collateral as of August 2009 at 47% of the value ascribed to it in 2006 when the loan was initially made.   By any measure, the Mourtil loan was a TDR at 12/31/09, but was not so identified except on the 1/12/09 substandard loans schedule (which schedule was later doctored to remove the loan).

508.    Neither the borrower (Antonio Mourtil) nor his co-investors/co-guarantors provided any credible information about their financial condition as confirmed by the fact that the Bank did not even have information about the financial institutions where these borrowers/guarantors deposited their cash.

509.    Likewise, there was no legitimate basis to remove the J&S loan from the ALLL calculation.   Even SEK disagreed with the Bank when it discovered that the Bank had changed the rating for J&S and removed it from the ALLL calculation.

510.    J&S Enterprises was the real estate holding company for a commercial seller of trailers and truck equipment.   The Bank loaned $2 million to J&S in August 2006, and the loan had been rated substandard since at least 2007 due to inter alia, "weak cash flow" and insufficient collateral.

511.    As of December 31, 2008, J&S had an outstanding loan balance of nearly $1.9 million, and the Bank calculated a collateral deficit (i.e., FAS 114 reserve) of $606,416.   Moreover, much of the collateral consisted of real estate, and the latest appraisals were from 2006, meaning the true deficit as of December 31, 2008 was much greater given the collapse of real estate markets that occurred after 2006. Notably, the Bank's ALLL schedule reported that J&S had $1,440,559 in inventory but the discounted value of the inventory was less than other outstanding liens on the inventory, meaning it was essentially worthless as security for the Bank. During its audit of the 2008 financials SEK reviewed the J&S loan and agreed with

the Substandard rating and the calculation of an FAS 114 reserve of $606,000.

512.    J&S remained Substandard throughout 2009, but when calculating ALLL for the 2009 10-K Orrstown removed J&S from the ALLL calculation despite the fact that internal documents show it was still rated Substandard as of December 31, 2009.

513.    During its audit of the 2009 financials, SEK reviewed the J&S loan and disagreed with the Bank's upgrading of the J&S loan and removal of it from the ALLL calculation.   In its "Loan Loss Reserve Calculation Memo" to the Bank, SEK noted:

> J & S Enterprises was classified as substandard in 9/30/09 calculation, but is not included in the calculation as of 12/31/09. This had been graded as substandard previously due to high inventory, but new information was received that shows inventory has decreased and sales have increased, so the relationship was upgraded to watch in the 4th quarter by management.   From discussion with Jeff Embly, this relationship has been classified as substandard for the past 18-24 months due to inventory and some turmoil within the entity, but cash flow has continued to be adequate and loan has remained current, so this was looked at more than the collateral as a factor in the classification upgrade as management does not feel there are any issues with this relationship that will cause concerns.   While we agreed that cash flows are adequate for this relationship, collateral is still deficient and due to insufficient collateral, the relationship does not meet the definition of "watch" classification according to the Bank's loan review policy. Management used different discount factors in their evaluation at D.01.1a, which doesn't make the collateral deficit look as bad, but if you use the discounts used in the allowance calculation and a 12/31/09 account balance of $1,835,399, collateral is deficient by $483, 577, which would be added to the calculation if it was classified as substandard.   We will include this in our evaluation at D.01.3.

In other words, SEK believed the loan should have remained rated Substandard, should not have been moved to "Watch" (i.e., at 4), and the 2009 ALLL calculation should have included at least an FAS 114 reserve of $483, 577 due to the deficient collateral.   Given that an FAS 114 reserve was required, the loan should also have been identified as impaired.   Moreover, the Bank's stated reason for increasing the rating to Watch – i.e., "[t]his had been graded as substandard previously due to high inventory, but new information was received that shows inventory has decreased and sales have increased, so the relationship as upgraded to watch in the 4th quarter by management" – was transparently false.   SEK's Loan Review and Evaluation Form showed J&S's inventory as of December 31, 2008 was $1,250,000, which

was a mere $190,000 less than the value of the inventory a full year earlier.   That was hardly a significant change that merited upgrading the loan from Substandard given the nearly $500,000 collateral deficit and weak cash flows of the borrower.

514.   Because SEK concluded that the J&S loan should have remained at Substandard, SEKs audit workpapers added an additional FAS 114 reserve to the Bank's ALLL calculation for J&S in the amount of $483,577.   SEK did not increase the total ALLL amount of $11.067 million calculated by the Bank, but rather moved the necessary $483,577 reserve from the "unallocated" portion of the reserve to the "allocated" portion of the ALLL reserve, thereby reducing the unallocated portion in the Bank's calculation from $1.262M to $630k.

515.   In its 2009 10-K, however, the Bank simply ignored the opinion of its auditor.   Rather than include the necessary FAS 114 reserve for J&S, Orrstown disregarded SEK's opinion and presented the ALLL in the 10-K as the Bank had initially calculated it, without any specific reserve for J&S.   Specifically, the 2009 10-K showed a total reserve of $11.067 million with $1.262 million being "unallocated," meaning no specific reserve was included from J&S.   In addition, because the Bank failed to calculate a required reserve of at least $800,000 for Marvin Windows, the entire unallocated portion of the reserve reported in the 10-K was more than consumed by just two loan relations, which the bank knew were Substandard but excluded them from its ALLL calculation for the purpose of making the Bank's portfolio appear safer than it really was.

516.   Moreover, since an FAS 114 reserve had been calculated, the J&S loans also should have been identified as impaired, which would have increased the bank's disclosure of impaired loans by nearly 13%.

517.   The Exchange Act Defendants deliberately (1) excluded Mourtil, (2) excluded Marvin Windows, and (3) removed J&S from the ALLL calculation in order to present a misleading picture of the trajectory of Bank's loan portfolio to investors.

518.   Moreover, SEK unquestionably knew that Orrstown had improperly rated the J&S loan, failed to calculate an FAS 114 reserve, and failed to identify it as impaired.   Upon information and belief the Bank also disclosed its treatment of the Marvin Windows loan to SEK.   In light of this and the many other failures of internal controls of which SEK had knowledge discussed herein SEK could not truthfully issue a clean audit opinion, yet did so in order to aid Orrstown in its fraud on the investing public.

(Doc. No. 199 ¶¶ 498-518) (cleaned up).

The TAC contains the following new allegations regarding Orrstown's treatment of

impaired loans during the post-Offering period:

521.    As stated in the SEC [C]onsent Order, which was proposed by Orrstown to the SEC, in its 10-Q for the second quarter of 2010, Orrstown disclosed approximately $21.7 million in impaired loans, but failed to disclose an additional $46.6 million in undisclosed impaired loans.   Moreover, what was particularly egregious was that of the $46.6 million in undisclosed impaired loans, Orrstown had actually calculated an FAS 114 impairment for $5.6 million of them but simply omitted them from its disclosures.   In other words, there is no question Orrstown actually knew these loans were impaired – since it calculated impairments on them – but it deliberately or recklessly omitted them from its disclosures in order to conceal the losses inherent in its portfolio.   These loans alone would have increased the disclosure of impaired loans by 125%.   If all loans identified by the SEC as impaired had been disclosed, the total would have increased by 215%.

522.    Likewise in its 10-Q for the second quarter of 2010 Orrstown disclosed approximately $22.6 million in impaired loans, but failed to disclose an additional $69.5 million in impaired loans.   Of those undisclosed loans, Orrstown had actually determined that $18.5 million were impaired but deliberately or recklessly excluded them from its disclosures in order to present a misleading picture of the Bank's portfolio.   If Orrstown had included all the loans it actually identified as impaired, the total disclosed impaired loans would have increased by 182%.   If all loans identified as impaired in the SEC Order had been included, the total would have increased 308%.

523.    In its 2010 Form 10-K, filed March 11, 2011, Orrstown again understated impaired loans.   As found by the SEC, Orrstown disclosed $14.1 million in impaired loans, but failed to disclose an additional $51 million in impaired loans that should have been disclosed. This misstatement was also repeated in footnotes to financial statements in Orrstown's 10-Qs for the second and third quarters of 2011, as well as the 10-K for 2011.

524.    As found by the SEC, in its 10-Q for the first quarter of 2011 filed May 10, 2011, Orrstown disclosed $14.1 million in impaired loans but failed to disclose an additional $51 million in impaired loans.

525.    Moreover, throughout 2010, Orrstown's ALLL calculations once again utilized stale appraisals, which did not comply with the Bank's Loan Policy, and did not comply with GAAP because Orrstown incorporated inappropriate inputs into its collateral valuation methods, which resulted in a failure to accurately calculate ALLL and identify impaired loans.   There is no question this was deliberate or at least reckless, since the Bank's loan policy required updated appraisals and given the Bank's knowledge that real estate values had plummeted due to the financial crisis.

526.    In evaluating Substandard loans for impairment and calculating reserves on them for the first quarter of 2010, approximately 53% of the loans evaluated had real estate appraisals more than two years old and 20% had appraisal over five years

old.   Once again, these outdated appraisals were completely unreliable.   If Orrstown had utilized updated appraisals as required it would have had to calculate a materially higher ALLL.

527.   Similarly, in the second quarter of 2010, approximately 40% of the loans evaluated for impairment were supported by real estate appraisals more than two years old, and 14% were supported by appraisals over five years old.

528.   In the third quarter of 2010 approximately 29% of the loans evaluated for impairment were supported by real estate appraisals more than two years old, and 10% were supported by appraisals over five years old.

529.   As a result of all of the above, Orrstown's disclosures of impaired loans and its ALLL were materially false and misleading.   The Exchange Act [D]efendants acted deliberately, or at least recklessly, given that these false and misleading statements were a direct result of the Bank's failure to comply with its own loan policies, GAAP, and a deliberate course of conduct with respect to "pretending and extending" loans in order to avoid taking required reserves and/or losses, which would have materially impacted the Bank's financial reports, including net income and capital.

530.   The Orrstown Exchange Act [D]efendants also knew or were reckless in not knowing that Orrstown had understated its investments in impaired loans in its SEC filings, but did nothing to correct those disclosures in order to present a misleadingly rosy financial picture.   In fact, in October 2010 [Douglas] Barton[16] specifically informed Everly and Embly that failing to disclose loans with impairment losses as impaired was inconsistent with accounting guidance, but no one took corrective action.

. . . .

533.   As set forth above, by the 2008-2010 time period many of the [B]ank's largest borrowers had sought modifications of their loans due to cash flow problems and as a result of the real estate crash, the [B]ank knew that the outdated appraisals on their collateral no longer represented the true value of the assets.   Shaool, Azadi, and Mongold, to name just a few examples, had all sought modifications due to lack of cash flow, and their cash flow problems were discussed at meetings of Orrstown's Loan Committee, Executive Committee, and/or Board of Directors. As attendees at these meetings, Quinn, Everly and Embly knew or should have known that the loans were impaired or, at a minimum, that these loans needed to be evaluated for impairment.   Quinn, Everly, and Embly received copies of the internal loan presentation materials that set forth the borrowers' financial difficulties, but Quinn, Everly, and Embly did not raise any concerns about whether the loans should have been disclosed as impaired, or identified for impairment

---

[16] Douglas Barton was Orrstown's Chief Accounting Officer.   (Doc. No. 122 at 10.)

analysis.

. . . .

535.     Moreover, in its 10-Q for the second quarter of 2011 Orrstown disclosed that approximately $34 million in restructured loans qualified as TDRs.   In performing an impairment analysis of those loans, rather than use the expected future cash flows and each loan's effective interest rate as required by GAAP, Orrstown used each loan's contractual cash flows discounted by a "market rate" to arrive at the net realizable value.   Barton informed Quinn, Everly, and Embly that this approach was "not technically within the accounting rules," but none of them took any action to conform the model to GAAP.

(Id. ¶¶ 521-30, 533, 535) (footnote added).

The remaining new Exchange Act allegations in the TAC largely pertain to Defendant SEK and its audit opinions.   With regard to SEK's audit opinion in Orrstown's 2009 Annual Report, SEPTA alleges that "SEK knew from its audits that Orrstown and the Bank had violated GAAP and the Bank's own Loan Policy in calculating ALLL and identifying impaired loans, and that the financial statements contained material understatements with respect to the classification of impaired loans and allocation of loan loss reserves."   (Id. ¶ 558.)   SEPTA asserts SEK's knowledge that Orrstown "had improperly risk rated loans and failed to calculate reserves on loans which should have been included in the impairment analysis and ALLL calculation."   (Id.)   The TAC contains similar allegations as to SEK's audit opinion in Orrstown's 2010 Annual Report.   (Id. ¶¶ 561-65.)

The TAC also includes a number of new allegations regarding SEK's knowledge of loan rating deficiencies by the second quarter of 2011.   The allegations include that, by the second quarter of 2011, the following information was "known or recklessly disregarded by the Individual Defendants and SEK":

a.   The SEG[17] First Quarter Report regarding the downgrading of a significant

---

[17]   "SEG" is Solomon Edwards Group, a consulting firm to which Orrstown began outsourcing

number of loans that had been improperly rated by OTB's[18] internal staff, with respect to which SEG had concluded: ". . . internal capabilities for loan ratings were not adequate. . ."

b.  OTB had failed to identify and classify loans as TDRs and the federal bank examiners had insisted on TDR classifications that increased TDRs from $1M to $34M between the first and second quarters 2011.

c.  SEG's Second Quarter Report dated 7/15/11 recommended additional downgrading of a significant number of loans that had been improperly rated by OTB's internal staff.

d.  SEG's "gap" report dated 7/25/11, revealed over 50 gaps or deficiencies in OTB's business process.

(Id. ¶ 566) (footnote added).   While "[t]he confluence of these factors mandated an immediate 8-K disclosure by Defendants of a material weakness in internal controls," SEPTA alleges that "Defendants along with SEK effectively conspired to 'manage' the reality of internal control failures by calling the situation a 'significant deficiency, a condition that did not mandate an immediate disclosure.'"   (Id. ¶ 567.)   SEPTA's allegations continue as follows:

568.   A material weakness would not only have required an immediate 8-K disclosure, it would likely have triggered a restatement of financial results for prior reporting periods.

569.   SEK's audit partner acknowledged that, in his opinion, the factors set forth in paragraph 566 above constituted a material weakness in internal controls for financial reporting.   Moreover, SEK understood that OTB could not treat the regulators as part of the Bank's internal controls; OTB needed its own internal controls to risk rate loans and assess and calculate the reserves necessary to account for possible loan losses.

570.   The loans that were reclassified as TDRs in the 2Q 2011 would have been so classified prior to the guidance issued by the Financial Accounting Standards Board in ASU 2011-02 in April 2011.   The FASB guidance did not apply to loan restructuring and modifications that predated 2011 (indeed, OTB's 2Q 2011 TDRs related to restructurings and loan modifications dating back to 2009-2010).   ASU 2011-02 was effective June 15, 2011 and was to be applied prospectively, and

---

its loan review function in 2011.   (Doc. No. 199 ¶ 107.)

[18]   The reference to "OTB" is to the Bank.

specifically stated that retrospective application would be made "to restructurings occurring on or after the beginning of the annual period of adoption."   Sec. BC 16.

571.    Moreover, TDRs had been specially noted by the examiners as early as the 2009 Report on Examination and during the Federal Reserve's "targeted" examination (i.e., special, not regularly scheduled) performed as of September 30, 2010.   Despite this admonition about the need to identify and properly classify loans as TDRs, OTB's management did not undertake to even assess its loan restructurings and modifications for TDR status until Third Quarter 2011, after the examiners compelled reclassification of loans as TDRs.   Indeed, Michael A. Moore, who became OTB's SVP/Chief Credit Officer in August 2011, stated that when he took that position there were no TDR processes at the Bank.

572.    Defendants recognized that TDRs constituted a negative commentary on the Bank's financial portrayal, with one bank official remarking to a bank examiner that shareholders did not look favorably on TDRs.

573.    SEK's audit failures with respect to TDRs were multi-fold:

a.    SEK failed to adopt its audit procedures to assess OTB's internal controls with respect to identifying and properly classifying loans as TDRs, and providing ALLL reserves for such loans.

b.    SEK failed to include in its loan reviews for fiscal year 2009, 2010 and 2011, loans that had been restructured and modified, thus consciously or recklessly avoiding the review of loans that were likely TDR candidates.

c.    SEK did not receive or request in its audit procedures a list of loans that had been the subject of loan modifications or restructuring.

d.    SEK did not review loan files to develop its own list of loans that had been modified or restructured.

e.    In light of a.-d., SEK could not conduct any sampling or testing of (i) OTB's internal controls with respect to identifying and classifying TDRs; or (ii) how the then current economic environment was impacting the Bank's business operations, including loan review functions, risk-rating loan competency, ALLL reserve and provision calculations and adequacy, and financial reporting integrity.

f.    SEK's motivation in not doing a.-d. was driven by its knowledge that some of its largest accounting service clients were OTB borrowers with the highest loan balances.   SEK further knew, based on the performance of accounting services for these borrowers, including preparation of tax returns and financial compilations, that these large borrowers' loans had been the subject of systemic loan modifications and restructurings beginning in 2007 and 2008.

g.      It should be noted that SEK's lack of testing the internal processes with regard to TDRs and the lack of TDR classification from Orrstown can only be willful and not an oversight of a technical accounting policy.   In 2009 and 2010 the analysis of TDRs, together with the analysis of non-performing loans and the loan loss reserves, was one of the topics most heavily scrutinized and reviewed by investors, security analysts and regulators.   For example, the word TDR appeared 36 times in JP Morgan's 2010 10-K.

(Id. ¶¶ 568-73) (cleaned up).   SEPTA asserts that the SEC found that Orrstown's 2011 10-K failed to disclose approximately $51 million in impaired loans, which was an understatement of approximately 346%.   (Id. ¶ 577.)   With regard to SEK's scienter, SEPTA alleges that "SEK risked losing lucrative contracts with many of the Bank's largest borrowers, as well as Orrstown, if it disclosed the true financial conditions of those borrowers, which would have required [Orrstown] to identify the loans as impaired, calculate ALLL reserves, and identify modifications to their loans as TDRs."   (Id. ¶ 591.)

The TAC also contains new allegations regarding Orrstown's revelations regarding its escalating provisions for loan losses and increases in Risk Assets in a Form 8-K Material Impairments, filed July 14, 2011, which indicated that Orrstown was adding an additional $21 million to its loan loss reserve as a result of its review of its outstanding loans (including approximately $5.6 million for the Yorktown loan).   (Id. ¶ 580.)   In that document, Orrstown "gave positive reassurances to investors in an attempt to downplay the Yorktown loss" and stated as follows:

> The Bank intends to aggressively pursue a recovery of the amounts owed to it in the Bankruptcy Court proceedings as well as through other avenues of recovery that may be available to it including, without limitation, the guarantees provided by the Yorktown principals and other potential claims against third parties.

(Id.)   SEPTA asserts that, in the wake of those revelations, "Orrstown's stock price dropped by 23% to close on Monday, July 18, 2011 at $20.01."   (Id.)   Orrstown subsequently filed its Form 8-K regarding second quarter 2011 operating results on July 28, 2011, which revealed that

Orrstown was reporting a quarterly loss for the first time in its history.   (Id. ¶ 581.)   As a part of

that filing, Orrstown revealed that it was outsourcing certain credit responsibilities to mitigate its

risk of losses, a disclosure which was expanded upon in the filing of Orrstown's Form 10-Q on

August 9, 2011.   (Id.)   SEPTA asserts that Orrstown's stock closed at $17.87 per share on that

date, which was a 34% loss since the Offering price of $27 a share.   (Id.)   SEPTA alleges that

Orrstown attempted to portray the image of a "safe and sound" bank by declaring a quarterly

cash dividend of $0.23 only to report, on October 26, 2011, that the Federal Reserve refused to

approve its payment of a cash quarterly dividend.   (Id. ¶¶ 582-83.)   As a result of this

disclosure, coupled with an October 27, 2011 letter from Quinn to Orrstown shareholders

indicating that "Orrstown Bank is safe and sound," Orrstown's share price dropped again by

approximately 30% to close at $9.20 per share.   (Id. ¶ 583.)   On March 30, 2012, because of

material weaknesses in its internal controls and as a result of the Enforcement Actions, Orrstown

reported that it was making "structural changes."   (Id.)   Finally, SEPTA asserts that after the

market closed on April 26, 2012, Orrstown issue a press release regarding its earning results for

the first quarter of 2012, in which it disclosed a net loss of $8.2 million and a loan loss provision

totaling $19.2 million for that quarter, leading to an additional drop in stock price to $7.94 on

April 27, 2012, a decrease of 5.7%.   (Id. ¶ 584.)

### B.    Legal Standards Applicable to SEPTA's Claims

The first four counts of the TAC assert Securities Act claims.   (Doc. No. 199 ¶¶ 431-66.)

Count 1 asserts that the Orrstown and the Bank violated Section 11 of the Act in connection with

the alleged material misstatements and omissions contained in the Registration Statement

pertaining to the March 2010 Offering.   (Id. ¶¶ 431-37.)   In Count 2, SEPTA alleges claims

against: (1) eleven of the Individual Defendants ("Individual Securities Act Defendants," i.e., all

but Embly), each of whom signed the Registration Statement; (2) SEK, which audited the financial statements included in the Registration Statement; and (3) the Underwriter Defendants, who are named as underwriters on the Registration Statement.   (Id. ¶¶ 444-48.)   SEPTA asserts that these Defendants "acted negligently in issuing the Registration Statement[,] which made materially false and misleading written statements to the investing public and misrepresented or failed to disclose" the facts described, supra, and thereby violated Section 11 of the Securities Act.   Count 3 is based on allegations that all Defendants excepting SEK violated Section 12(a)(2) of the Act by soliciting purchasers of the shares offered pursuant to the Registration Statement, including by "participating in the preparation, review and dissemination of the materially untrue and misleading Registration Statement."   (Id. ¶¶ 449-59.)   The final Securities Act claim, Count 4, alleges that the Individual Securities Act Defendants are subject to "control person" liability per Section 15 of the Securities Act by virtue of their positions as directors and/or senior officers of Orrstown and the Bank.   (Id. ¶¶ 460-66.)

The last three counts of the TAC assert Exchange Act claims.   In Count 5, SEPTA alleges that the Orrstown Exchange Act Defendants violated Section 10(b) and Rule 10b-5 of the Exchange Act though the following conduct: (1) deceiving the investing public, including SEPTA and other members of the Exchange Act Class; (2) artificially inflating and maintaining the market price of Orrstown stock; and (3) causing SEPTA and other members of the Exchange Act Class to purchase Orrstown stock at artificially inflated prices.   (Id. ¶¶ 601-03.)   SEPTA and the purported Exchange Act class assert that they would not have purchased Orrstown stock at the prices they paid and that the Orrstown Exchange Act Defendants' wrongful conduct directly and proximately caused SEPTA and the purported class to sustain damages, all in violation of Section 10(b) and Rule 10b-5.   (Id. ¶¶ 604-05.)   In Count 6, SEPTA and the

purported Exchange Act class allege that SEK made, prepared, disseminated, and/or approved materially false and misleading statements—contained in reports and other documents—that proximately caused SEPTA and the purported class to purchase Orrstown's common stock at artificially inflated prices throughout the class period, resulting in damages to SEPTA and the purported class, in violation of Section 10(b) and Rule 10b-5.   (Id. ¶¶ 608-17.)   Count 7 asserts that Defendants Quinn, Everly, and Embly acted as controlling persons within the meaning of Section 20(a) of the Exchange Act and are therefore liable for the alleged underlying violations of Section 10(b) and Rule 10b-5.   (Id. ¶¶ 619-24.)   The Court reviews the legal standards applicable to these claims below.

### 1.      Securities Act

The Securities Act creates federal duties related to the registration and disclosure of public offerings.   See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 269 (3d Cir. 2006).   Sections 11 and 12(a)(2) of the Act "impose civil liability for the making of materially false statements in registration statements and prospectuses," see In re Adams Golf Inc. Sec. Litig., 381 F.3d 267, 273 (3d Cir. 2004); see 15 U.S.C. §§ 77k, 77l(a)(2), and Section 15 allows a plaintiff to bring a claim for "control liability" against a person who controls a person liable for an underlying violation of the Securities Act, see In re Suprema, 438 F.3d at 284-85.

Section 11 of the Securities Act concerns material misstatements or omissions in registration statements.   See 15 U.S.C. § 77k(a).   A Section 11 claim may be brought against the issuer of securities, its directors or partners, underwriters, and accountants who prepared or certified the registration statement.   See id.   Under Section 11, a plaintiff must allege that a registration statement "(1) contained an untrue statement of material fact, (2) omitted to state a material fact required to be stated therein, or (3) omitted to state a material fact necessary to

make the statements therein not misleading."   See In re Suprema, 438 F.3d at 269 (internal

quotation marks omitted).   Section 11 does not require a plaintiff to allege that the defendants

possessed any scienter.   See Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).

Rather, if a plaintiff purchases a security issued pursuant to a registration statement, he or she

need only show a material misrepresentation or omission to establish a prima facie case.

Section 12(a)(2) provides civil liability for anyone who offers or sells a security "by

means of a prospectus or oral communication, which includes an untrue statement of a material

fact or omits to state a material fact necessary in order to make the statements . . . not

misleading," see 15 U.S.C. § 77l(a)(2), and, like Section 11, is a "virtually absolute" liability

provision that does not require a plaintiff to allege that the defendants possessed scienter.   All

that must be alleged is that the plaintiff made the purchase pursuant to a materially false or

misleading prospectus or oral communication.   See In re Adams Golf, 381 F.3d at 274 n.7.

Section 11 and 12(a)(2) claims are generally not subject to the heightened pleading

standards set forth in the PSLRA and Federal Rule of Civil Procedure 9(b) because fraud "is not

a necessary element to establish a prima facie claim" under either section.   See In re Suprema,

438 F.3d at 269 (citing Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 161-63 (3d Cir.

2004) [hereinafter "CALPERS"]).   "But claims under those provisions can be, and often are,

predicated on allegations of fraud."   See id. at 270.   Thus, "where the plaintiff grounds these

Securities Act claims in allegations of fraud—and the claims thus 'sound in fraud'—the

heightened pleading requirements of Rule 9(b) apply."   See id.   However, if the allegations are

pleaded separately and the plaintiffs expressly premise their Securities Act claims on negligence

rather than fraud, Rule 9(b) is inapplicable.   See id. at 272-73.

2.      **Exchange Act**

Section 10(b) of the Exchange Act prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities.   See 15 U.S.C. § 78j(b).   To implement the statute, the SEC promulgated Rule 10b-5.   See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195-96 (1976).   Rule 10b-5, in relevant part, makes it unlawful for an individual "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."   See 17 C.F.R. § 240.10b-5(b).   The private right of action under Section 10(b) and Rule 10b-5 reaches beyond statements and omissions made in a registration statement or prospectus—or in connection with an initial distribution of securities—and creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market.   See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997).

To state a claim for securities fraud under Section 10 and Rule 10b-5, a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." See Amgen, Inc. v. Conn. Retirement Plans & Trust Fund, 133 S. Ct. 1184, 1192 (2013) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37 (2011)).   Claims brought pursuant to Section 10(b) and Rule 10b-5 must meet a heightened pleading standard pursuant to the PSLRA and Federal Rule of Civil Procedure 9(b).   See 15 U.S.C. § 78u-4(b)(1), (b)(2); Fed. R. Civ. P. 9(b).   The PSLRA "imposes another layer of factual particularity to allegations of securities fraud," see In re Rockefeller Ctr. Prop., Inc. Sec. Litig., 311 F. 3d 198, 217 (3d Cir. 2002), and

requires that claims brought under the Exchange Act:

> [S]pecify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

See 15 U.S.C. 78u-4(b)(1).   If this requirement is not met, "the court shall . . . dismiss the complaint."   See id. at (b)(3)(A).   "[U]nless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations – inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." See In re Rockefeller, 311 F.3d at 224.

Rule 9(b), for its part, requires a plaintiff pleading fraud-based claims to state with "particularity" the "circumstances constituting fraud or mistake."   See CALPERS, 394 F.3d at 144.   Courts rigorously apply the particularity requirement in securities fraud cases.   See In re Burlington, 114 F.3d at 1417.   Under Rule 9(b), a plaintiff asserting a securities fraud claim must allege "the who, what, when, where and how: the first paragraph of any newspaper story." See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)), abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007).

In addition to pleading with particularity a material misrepresentation or omission by the defendant, an Exchange Act plaintiff must also adequately plead scienter.   Scienter is a "mental state embracing intent to deceive, manipulate, or defraud."   See Ernst & Ernst, 425 U.S. at 218 n.12.   Under the PSLRA's second pleading requirement for Exchange Act claims, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."   See 15 U.S.C. § 78u-4(b)(2).   The facts must give rise to a strong

inference of "either reckless or conscious behavior."   See In re Advanta, 180 F.3d at 534-35.

The Supreme Court interpreted the meaning of scienter's "strong inference" requirement in Tellabs, where it held that courts must weigh "plausible nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff."   See 551 U.S. at 324.   A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."   See id. at 314; see also id. at 324 (stating that "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the smoking gun genre, or even the most plausible of competing inferences" (internal quotation marks omitted)). The pertinent question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."   See id. at 323; see also id. at 326 (stating that "the court's job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically").

An Exchange Act plaintiff must also plead a connection between the misrepresentation or omission and the purchase or sale of a security, see Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), as well as reliance, see Amgen, 133 S. Ct. at 1192.   In Basic, Inc. v. Levinson, 485 U.S. 224 (1988)—a proposed class action securities fraud case—the Supreme Court held that plaintiffs can invoke a rebuttable presumption of reliance based on what is known as the "fraud on the market" theory.   See id. at 241.   Under that theory, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."   See id. at 246.   The theory permits a court to assume an investor relies on public misstatements whenever he "buys or sells stock at the price set by the market." See id. at 247.   Finally, an Exchange Act plaintiff must allege economic loss and loss causation, i.e., a causal connection between the material misrepresentation and the loss.   See 15 U.S.C. §

54

78u-4(b)(4).

Section 20(a) of the Exchange Act imposes joint and several liability on any individual who exercises control over a "controlled person" who violates Section 10(b).   See 15 U.S.C. § 78t(a).   A plaintiff pursuing a Section 20(a) claim must therefore plead not only that "one person controlled another person, but also that the controlled person is liable under [Section 10(b)]." See City of Roseville Emp. Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404, 412 (D. Del. 2009) (alteration in original) (internal quotation marks omitted) (quoting In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004)).   Section 20(a) applies to corporations as well as individuals.   See Institutional Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 252 (3d Cir. 2009).

### 3.    Principles Governing Materiality Under the Acts

Although claims brought under the Securities Act are generally subject to a lesser pleading standard than those brought under the Exchange Act, the standard for pleading "a material misrepresentation or omission" is the same under both Acts.   See In re Trump Casino Sec. Litig., 7 F.3d 357, 369 (3d Cir. 1992) (first citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976) [hereinafter "TSC"]); and then citing Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 629 (3d Cir. 1989)).   Not all misrepresentations or omissions in connection with public offerings are actionable.   Rather, a plaintiff's right to recover under either act is limited by the doctrine of materiality and the doctrine's exceptions for statements of opinion, forward-looking statements, and puffery.

The Supreme Court in TSC defined materiality within the proxy solicitation context of Section 14(a) of the Exchange Act.   Subsequently the Court made the TSC standard applicable to actions brought under Section 10 and Rule 10b-5 of the Exchange Act, see Basic, 485 U.S. at 232, and the Third Circuit made the standard applicable as well to claims under Sections 11 and

12(a)(2) of the Securities Act, see Craftmatic, 890 F.2d at 641 n.18.   As explained by the

Supreme Court in TSC, a misrepresentation or omitted fact is material "if there is a substantial

likelihood that a reasonable shareholder would consider it important" in making an investment

decision.   See TSC, 426 U.S. at 449.   "[T]here must be a substantial likelihood that the

disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available."   Id.

Materiality must be determined as of the date of the alleged misstatement or omission, not with

the benefit of hindsight.   See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002).

    Materiality is a mixed question of law and fact, "and the delicate assessments of the

inference a reasonable shareholder would draw from a given set of facts are peculiarly for the

trier of fact."   See Shapiro v. UJB Financial Corp., 964 F.2d 272, 280 n.11 (3d Cir. 1992) (citing

TSC, 426 U.S. at 450); see also Weiner v. Quaker Oats Co., 129 F.3d 310, 317 (3d Cir. 1997)

(stating that "the emphasis on a fact-specific determination of materiality militates against a

dismissal on the pleadings").   "Only if the alleged misrepresentations or omissions are so

obviously unimportant to an investor that reasonable minds cannot differ on the question of

materiality is it appropriate for the district court to rule that the allegations are inactionable as a

matter of law."   Shapiro, 964 F.2d at 280 n.11.   As the Third Circuit noted in Craftmatic, the

task of determining materiality can be especially difficult when the statement at issue concerns

"soft" information.   See Craftmatic, 890 F.2d at 642.   "The term soft information refers to

statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or

forward looking statements, such as projections, estimates and forecasts."   Id.

### a.    Statements of Opinion or Belief

    In Omnicare, the Supreme Court held that a statement of opinion does not constitute an

untrue statement of material fact under the Securities Act simply because the opinion ultimately proves to be incorrect.   See Omnicare, 575 U.S. at 186.   Opinion statements are not, however, immune from liability under the Securities Act and may be considered material misstatements or omissions in several circumstances.

The Court in Omnicare analyzed the status of opinion statements under the two clauses of Section 11's disclosure provision, which provides for liability where a registration statement either (1) contained an untrue statement of a material fact or (2) omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.   See 15 U.S.C. § 77k(a).   The Court held that under the first clause of Section 11, an opinion can constitute an untrue statement of a material fact if the opinion is not sincerely held, or, in other words, is subjectively disbelieved, or the opinion contains an embedded statement of untrue material facts.   See Omnicare, 575 U.S. at 184-86.

The Court further held that under the second, "omissions" clause of Section 11, a statement of pure opinion can subject an issuer to liability if a registration statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." See id. at 189.   The Court explained that an opinion statement is not necessarily misleading "when an issuer knows, but fails to disclose, some fact cutting the other way," as a reasonable investor "does not expect that every fact known to an issuer supports its opinion statement." See id. at 189-90.   The Court stated that "whether an omission makes an expression of opinion misleading always depends on context," noting that an investor reads each statement within a registration statement "whether of fact or opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information."   See id. at 190.   Accordingly, in

order to state a claim under Section 11's omissions clause for a statement of opinion:

> The investor must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

See id. at 194.

The Court in Omnicare also discussed the difference between a statement of fact and an opinion statement.   A fact is "a thing done or existing," and an "opinion is a belief[,] a view[.]"   See id. at 183 (first alteration in original) (internal quotation marks omitted).   "Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."   Id.   The Court nonetheless recognized that some opinion statements beginning with the words "I believe," or similar language, can contain embedded statements of fact.   See id. at 185.   The Court used the example of a CEO stating, "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access," as a statement that can be "read to affirm not only the speaker's state of mind," but also the underlying verifiable fact "that the company uses a patented technology."   See id.   Based on its discussion of opinion statements in Omnicare, the Supreme Court appears to contemplate three types of statements potentially giving rise to Section 11 liability: (1) statements of fact, (2) statements of pure opinion, and (3) statements of opinion containing embedded statements of fact.

### b.   Forward-Looking Statements

Statements such as projections, estimates, and forecasts that are deemed "forward-looking" may be immaterial as a matter of law.   The PSLRA contains a safe-harbor provision that applies to forward-looking statements under the Securities and Exchange Acts.   See 15 U.S.C. § 78u-5(c)(1); In re Aetna Sec. Litig., 617 F.3d 273, 277 (3d Cir. 2010).   The statutory

definition of forward-looking statements, includes, <u>inter alia</u>, "projections of future performance,

plans and objectives for future operations, and assumptions underlying statements about future

financial, economic or operational performance."   See In re Aetna, 617 F.3d at 279.   The safe

harbor applies to statements that fall within the statutory definition of forward-looking provided

that they are: "(1) identified as such, and accompanied by meaningful cautionary statements; or

(2) immaterial; or (3) made without actual knowledge that the statement was false or

misleading."   See id. at 278-79.

Forward-looking statements not specifically identified as such and therefore protected by

the PSLRA's safe harbor provision may nevertheless be protected under the "bespeaks caution"

doctrine, adopted by the Third Circuit in In re Trump, 7 F.3d 357.   Under the "bespeaks

caution" doctrine, "cautionary language, if sufficient, renders the alleged omissions or

misrepresentations immaterial as a matter of law."   See id. at 371.   Application of the doctrine

requires a court to examine "a misrepresentation or omission in the complete context in which

the author conveys it."   See id.; see also EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865,

872 (3d Cir. 2000)   For the doctrine to be applicable, the cautionary language must relate

directly to the statement on which investors claim to have relied.   The Third Circuit explained

this point in In re Trump, viz.:

> [A] vague or blanket (boilerplate) disclaimer which merely warns the reader that
> the investment has risks will ordinarily be inadequate to prevent misinformation.
> To suffice, the cautionary statements must be substantive and tailored to the specific
> future projections, estimates, or opinions in the prospectus which the plaintiffs
> challenge.

7 F.3d at 371-72; see In re Westinghouse Sec. Litig., 90 F.3d 696, 710 (3d Cir. 1996) (reversing

dismissal of a suit based on alleged misstatements in a prospectus, holding, "notwithstanding the

cautionary language" in the prospectus, alleged misrepresentations about the adequacy of loan

loss reserves likely "would have assumed actual significance to a reasonable investor contemplating the purchase of securities").

The "bespeaks caution" doctrine applies only to forward-looking statements.   See EP Medsystems, 235 F.3d at 874 (stating that "[b]y its terms, the 'bespeaks caution' doctrine, is directed only to forward-looking statements").   As the PSLRA safe-harbor and bespeaks-caution doctrines apply only to forward-looking statements, they cannot protect (at least in their entirety) representations that are mixed present/future statements.   See Avaya, 564 F.3d at 255.   "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."   Id. (quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 705 (7th Cir. 2008) (concluding that the statement that sales were "still going strong" was not entitled to protection of the safe harbor with respect to the statement's representation regarding current sales)) (citing In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 213 (1st Cir. 2005) (stating that "the mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement")).

### c.      Puffery

In addition to the protections offered to statements of opinion or belief and forward-looking statements, a defendant may not be liable for any alleged misrepresentation if it consists of nothing more than corporate puffery—that is, vague and non-specific expressions of corporate optimism on which reasonable investors would not have relied.   The Third Circuit discussed the puffery doctrine at length in In re Advanta, 180 F.3d 525.   The shareholders in that case claimed that Advanta, a credit card company, publicly touted its strong financial health and "risk-adjusted pricing strategy," which targeted customers with good credit.   See id. at 537.   In its annual

report, Advanta stated, "[w]hile we added substantially to our account based, our credit quality remained excellent," and, "[o]ur emphasis on gold card—and targeting of better quality customers—helps us maintain an enviable credit quality profile."   See id.   Advanta issued other statements, including that its "credit quality continues to be among the best in the industry," that its strengths included "an experienced management team, technological expertise," that it "continued to produce better-than-industry credit measures," and that it "achieved excellent growth and returns throughout our core businesses."   See id. at 537-38.

The plaintiffs in In re Advanta alleged that, during the time period when Advanta was issuing the positive portrayals, it implemented policies relaxing its underwriting and monitoring procedures, while "superior credit risk customers were switching to other credit card companies at rates that would have a materially negative impact on the Company's reported earnings."   See id. at 538.   More specifically, the plaintiffs alleged that Advanta had begun offering "teaser" rates to new customers with poor credit.   See id. at 537.   Advanta's positive portrayals were not borne out when the new customers defaulted, causing a $20 million quarterly loss.   See id. at 528.   The plaintiffs argued that the juxtaposition of these alleged facts against the positive portrayals demonstrated that the statements were materially misleading at the time that they were made.   The Third Circuit disagreed, holding that Advanta's positive portrayals were vague and, "even if arguably misleading," did not "give rise to a federal securities claim" because they were not material.   See id. at 538.

The Third Circuit again addressed the puffery doctrine in In re Aetna, 617 F.3d 272, a class action brought against an insurance company alleging a fraudulent scheme by which the defendant misled investors about Aetna's pricing of insurance policies and then sold shares of Aetna's stock before the scheme was revealed to the public.   See id. at 274.   The plaintiffs had

claimed that Aetna falsely characterized its pricing of medical insurance premiums as "disciplined" during a time when Aetna allegedly relaxed its underwriting criteria in an effort to underprice competitors and gain market share.  See id.  Among the statements that were challenged as misleading were the following: "we continue to adhere to a disciplined pricing policy"; "[w]e have a very strong amount of 'pricing discipline'"; "[we] continue to maintain discipline and rigor in everything we do at Aetna"; and Aetna's policy is "to exhibit commitment to disciplined pricing."  See id. at 275-76.  The Third Circuit applied Advanta and found that the references to Aetna's pricing policy were immaterial as they were "too vague to ascertain anything on which a reasonable investor might rely."  See id. at 284.

> C.     **Analysis**

> > 1.     **Securities Act Claims (Counts 1 through 4)**

> > > a.     **Applicable Pleading Standard**

At the outset, the Court must determine (as it did when assessing the claims contained in the FAC and SAC) whether SEPTA's Securities Act claims "sound in fraud" or negligence to determine the proper pleading standard applicable to the claims.   That determination will dictate whether SEPTA must meet the particularity requirements under Federal Rule of Civil Procedure 9(b) and the PSLRA for its Securities Act claims.   The Third Circuit held in In re Suprema that "where . . . individual defendants are accused in separate claims of the same complaint as having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims."   See In re Suprema, 438 F.3d at 273.   In In re Suprema the plaintiff carefully separated its allegations of negligence from its allegations of fraud against the same defendants by "pleading its Section 11 and Section 12(a)(2) claims in negligence before—and wholly apart from—pleading its fraud-

based Section 10(b) claims."   See id.

Like SEPTA's SAC, the TAC separates the substantive allegations supporting the Securities Act claims from those supporting the Exchange Act claims, pleading the Section 11 and Section 12(a)(2) claims before the Section 10(b) claims.   The TAC prefaces the Securities Act allegations with the following: "[SEPTA] incorporates by reference all paragraphs above except to the extent such paragraphs allege scienter or intent to defraud," and, "[t]he Securities Act claims in this portion of the [TAC] specifically exclude any allegations of knowledge or scienter, and any allegation that could be construed as alleging fraud or intentional or reckless misconduct," as such claims are "rooted exclusively in theories of strict liability and negligence." (Doc. No. 199 ¶ 381.)[19]

However, the TAC also states, in a contrary fashion, that if any statement "is deemed to be a statement of opinion not verifiable by objective facts, each Securities Act Defendant[20] is alleged to have known at the time that the subjective statement(s) was made that it was untrue or to have lacked a reasonable basis for the statement(s)."   (Id. ¶ 383.)[21]

In view of the above statements in the TAC, the Underwriter Defendants argue that:

> [SEPTA] cannot have it both ways.   If [SEPTA] wants to amend its complaint to allege that the Securities Act [D]efendants made knowingly false statements—and take on the more stringent pleading burden that would then apply under Fed. R.

---

[19] In addition, the TAC reiterates this position in paragraph 28, wherein it asserts that "the Securities Act claims and allegations are not based on any reckless or intentionally fraudulent conduct by or on behalf of Defendants – i.e., the Securities Act claims do not allege, arise from, or sound in, fraud.   Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims."   (Id. ¶ 28.)

[20] The "Securities Act Defendants" consist of all Defendants but Defendant Embly.

[21] At paragraphs 467 through 518, the TAC essentially realleges the factual basis pertaining to its Offering-related Securities Act claims in support of its Offering-related Exchange Act claims, while adding the additional assertion that the alleged material misstatements and omissions in the Offering Documents were issued fraudulently.   (Id. ¶¶ 467-518.)

> Civ. P. 9(b)—it should request leave to do so.   Until then, [SEPTA] should be held to its express disavowal of any allegation of fraud in paragraphs 28 and 381 of the TAC.

(Doc. No. 218 at 32.)   The Orrstown Defendants similarly maintain that "SEPTA cannot have it both ways" but also argue that, "for its Securities Act claims, as well as its Exchange Act claims, the TAC must satisfy FRCP 9(b)'s heightened standards for pleading fraud with particularity." (Doc. No. 214 at 18 n.7.)   In response, SEPTA maintains that it "is entitled to assert both negligent and knowing false certifications in the alternative, notwithstanding the Underwriters' argument to the contrary," citing Federal Rule of Civil Procedure 8(d)(2) regarding alternative pleadings and In re Cinar Corp. Secs. Litig., 186 F. Supp. 2d 279, 308 (E.D.N.Y. 2002).   (Doc. No. 228 at 141.)   SEPTA may be permitted to allege negligent false certifications in connection with its Securities Act claims, while at the same time alleging knowing false certifications in connection with its Exchange Act claims related to the Offering Documents, but the same does not necessarily hold true with regard to alternatively pleading both negligent and knowing Securities Act claims, and In re Cinar does not hold to the contrary.   See In re Cinar, 186 F. Supp. 2d at 308 (stating that "[a] Section 11 claim does not sound in fraud simply because it is based on acts that also support a claim for securities fraud under Section 10(b)").

Based on the TAC's explicit disclaimer of any Securities Act claim based on fraud, and the separation of its allegations pertaining to its Securities Act claims from its allegations pertaining to its Exchange Act claims (a separation also pursued by SEPTA in the FAC and SAC)—and notwithstanding its contrary position articulated in paragraph 383, which attempts to preserve SEPTA's ability to argue, in connection with its Securities Act claims, that the defendants had knowledge of the falsity of any Securities Act statement deemed to be an opinion subject to the requirements of Omnicare—the Court finds, as it did in connection with the FAC

64

and SAC, that SEPTA should be held to its disavowal of any allegation of fraud in connection

with its Securities Act claims in paragraphs 28 and 381 of the TAC.   Because SEPTA has

pleaded its Securities Act claims in a manner sufficient "to avoid triggering Rule 9(b)," its claims

sound in negligence, not fraud.   See In re Suprema, 438 F.3d at 273 (concluding that even where

"a core theory of fraud permeate[s]" an action, a plaintiff asserting Section 11 and Section 10(b)

claims in the same pleading can avoid the Rule 9(b) standard for its Section 11 claims by

"expressly disavow[ing]" fraud allegations and "expressly [pleading] negligence").

### b.        Section 11 (Counts 1 and 2)

The Court will address SEPTA's Section 11 claims in two parts.   The Court will first

address SEPTA's claims against Orrstown, the Bank, the Individual Securities Act Defendants,

and the Underwriter Defendants, all of which are based on the same representations contained in

the Offering Documents.   The Court will then turn to SEPTA's claim against Defendant SEK,

which is based on SEK's audit opinion issued in connection with Orrstown's 2009 Annual

Report on Form 10-K, incorporated by reference in the Offering Documents.   Embly is not

implicated in Counts 1 and 2.

### i.        Orrstown, the Bank, the Individual Securities Act Defendants, and the Underwriter Defendants

In the TAC, SEPTA alleges that Orrstown, the Bank, the Individual Securities Act

Defendants, and the Underwriter Defendants issued materially false and misleading statements

(or omissions) in the Offering Documents with specific regard to "the quality of the Bank's

internal controls over financial reporting, the quality of the Bank's commercial loan portfolio,

and the Bank's internal review processes."   (Doc. No. 199 ¶ 389.)   The TAC identifies certain

statements or groups of statements in the Offering Documents, totaling seven in all (by the

Court's count) that SEPTA maintains were false and/or misleading and provide a basis for

Securities Act liability.   Defendants move to dismiss the claims predicated on these statements, arguing generally that the statements are not actionable because: (1) the Offering Documents contained extensive and specific cautionary language and discussion of risk factors and/or the statements are otherwise immaterial as a matter of law; and/or (2) the TAC does not support a plausible inference that any of the challenged statements were materially false and misleading when made.   The challenged statements are as follows:

1. The statement that the Bank "has had an enviable record regarding its control of loan losses" (Doc. No. 199 ¶¶ 390, 485);

2. The statement that "we have proactively moved to address any problem credits and ensure that we are adequately reserved for any potential losses" (id. ¶ 390);

3. Statements regarding the November Loan Review, as follows:

    In November of 2009, management undertook an expanded review of the Bank's commercial loan portfolio, in a proactive attempt to identify potential weaknesses and deterioration in the portfolio.   This review was in addition to the normal loan review process conducted by our loan review officer and the Bank's Credit Administration Committee.   A review team, which consisted of 3 employees and 2 contract employees, reviewed all commercial loan relationships with an aggregate committed exposure greater than or equal to $750,000.   The review team focused on the global cash flow of the borrower, global debt service coverage ratios of the borrower, LTV ratios when collateral values decreased by 10% and 20%, borrower's liquidity and guarantor's overall cash flow and liquidity.   The review covered a total of approximately $526,000,000 in outstanding loans and loan commitments. Following the review process, management increased the allowance by $3.1 million in order to better reflect the deterioration in local, regional and national economic conditions. All economic allocations were increased during 2009 (id. ¶ 392);

4. The statement that "at December 31, 2009, we had 50 loan relationships, aggregating $307.5 million that were performing according to their original terms with outstanding balances that exceeded $3.0 million" (id. ¶ 397);

5. The statement that "[t]he Corporation's loan loss history has been much better than peer standards and analysis of the current credit risk position is favorable. The allowance for loan losses is ample given the current composition of the loan portfolio and adequately covers the credit risk management sees under

present economic conditions" (id. ¶ 398);

6.  The statement in Orrstown's 2009 10-K related to Management's Report on Internal Control to the effect that Orrstown "had evaluated the effectiveness of [its] internal control over financial reporting" and determined that it was "effective" (id. ¶ 401); and

7.  The SOX Certifications, in which Defendants Quinn and Everly represented that Orrstown's internal control over financial reporting was designed "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements . . . in accordance with [GAAP] (id. ¶ 402).

As to certain of these statements, Defendants argue in their briefing, see supra, that any statements not challenged in SEPTA's FAC (the only complaint filed within the repose period applicable to Securities Act claims) are untimely, including statements 6 and 7—which Defendants maintain were challenged for the first time in the SAC—as well as statements 1, 3, and 4—which Defendants maintain SEPTA challenged for the first time in the TAC.   (Doc. No. 218 at 27-28.)   However, with regard to statements 6 and 7, subsequent to the parties' briefing on the motions to dismiss, and as noted in the Third Circuit's Opinion, on appeal Defendants conceded that the SAC did not offend the relevant statutes of repose.   See (Doc. No. 265-1 at 9 n.3).   Based on that concession, the Court assumes the timeliness of claims based on statements 6 and 7, pertaining to management's representations and SOX Certifications regarding effective internal controls.

SEPTA maintains that all of the above claims challenging each respective statement were asserted in the FAC and "factually developed" by way of the SAC and TAC.   (Doc. No. 228 at 134.)   Regarding the "enviable" record statement, SEPTA contends that "the FAC asserted claims for misrepresentations and omissions arising from the Orrstown's statements that '[t]he Corporation's loan loss history has been much better than peer standards,' (FAC ¶ 167), and that Orrstown misrepresented its 'loan portfolio [which] consisted of undisclosed risky, impaired

67

loans, in particular, commercial loans concentrated in the Hagerstown, Maryland market.' (FAC ¶ 2.b.)."   (Id. at 135-36.)   As to the statements concerning the 2009 November Loan Review, SEPTA maintains that Defendants' assertion that these claims are "new" is "far from true" because "[t]he FAC dedicated an entire section to the November [Loan] [R]eview."   (Id. at 136.) SEPTA argues that the "50 loan relationships" statement is timely asserted in the TAC, arguing that, "[f]rom the very beginning . . . , SEPTA's claims have been based on Orrstown's misleading statements and omissions concerning the quality of its portfolio and its practice of restructuring loans to conceal the inherent risk in the portfolio."   (Id.)   SEPTA argues that "the FAC specifically alleged that the Bank 'had aggressively restructured loans and even gave the borrowers new loans, essentially throwing good money after bad, to keep the borrowers from formally defaulting,'" and that the "allegation that the '50 loans . . . performing according to their original terms' in fact included many of these restructured loans is the same underlying claim – that Orrstown concealed restructured loans – pleaded with a level of specificity that was not possible until SEPTA received discovery showing which loans were included in the 50." (Id. at 137.)

In sum, SEPTA argues that none of the above claims is new, just pleaded with greater specificity.   SEPTA quotes Fogel v. Wal-Mart de Mexico SAB de CV, No. 13-cv-02282, 2017 WL 751155, at *9 (S.D.N.Y. Feb. 27, 2017), for its statement that "broader challenges" in an original complaint "encompass [the] later, more specific challenges" in a subsequent complaint. (Id. at 137-38.)   Accordingly, SEPTA maintains that the Securities Act's statute of repose does not render untimely any of the challenged claims asserted in the TAC.

The Court finds it unnecessary to resolve the issue of the timeliness of claims based on challenged statements 1, 3, and 4 above because, even assuming Securities Act claims based on

those statements are timely, and as discussed <u>infra</u>, the allegations in the TAC do not state a claim upon which relief can be granted as to any of the statements.   The Court addresses each challenged statement in turn.

<u>Statement 1</u>

The TAC first challenges the statement in the Offering Documents that Orrstown "has had an enviable record regarding its control of loan losses . . . ."   (Doc. No. 199 ¶¶ 390, 485.) The Orrstown Defendants argue that this statement is inactionable as a matter of law because, when read in context, this statement (1) refers to Orrstown's historic performance, (2) contains express cautionary language regarding future risks, and (3) amounts to inactionable puffery. (Doc. No. 214 at 25-26 and n.10.)   The Underwriter Defendants similarly maintain that this statement is immaterial puffery, noting that the reference to an "enviable record" is "virtually identical" to a statement challenged unsuccessfully by the <u>Advanta</u> plaintiffs and similar to the statements in the Offering Documents that the Court previously found immaterial as a matter of law when deciding the motions to dismiss the FAC.   (Doc. No. 218 at 36.)

The Court agrees with Defendants that this particular statement regarding Orrstown's "enviable record regarding its control of loan losses" is too vague to be capable of verification. It is therefore best characterized as inactionable puffery, or a positive portrayal so vague as to be immaterial to a reasonable investor.   <u>See</u> <u>In re Advanta</u>, 180 F.3d at 537-38 (finding statement that Advanta "maintain[ed] an enviable credit quality portfolio" immaterial as a matter of law).

<u>Statement 2</u>

The TAC next challenges the statement in the Offering Documents that "we have proactively moved to address any problem credits and ensure that we are adequately reserved for any potential losses."   (Doc. No. 199 ¶ 390.)   The Underwriter Defendants note that the Court

previously rejected SEPTA's efforts (in the FAC) to assert a Securities Act claim based on this

statement pursuant to binding precedent holding "that 'it is not a violation of securities law to

simply fail to provide adequate loan loss reserves.'"   (Id. at 40) (quoting Doc. No. 92 at 44).

As noted by the Underwriter Defendants, the Court recognized (consistent with applicable

precedent) that the calculation of loan loss reserves is a subjective judgment appropriately

viewed as a statement of opinion subject to the pleading requirements of Omnicare.   (Id. at 40-

41.)   The Court assessed this statement under Omnicare and concluded that SEPTA had "not

alleged a factual basis supporting a reasonable inference that at the time of the March 2010

offering, Defendants did not believe that they were 'adequately reserved for potential losses.'"

(Doc. No. 92 at 45.)   The Underwriter Defendants maintain that the same holds true with regard

to this statement in the TAC as well, in light of the TAC's express disclaimer of any "allegation

of fraud, scienter, or recklessness" in connection with its Securities Act claims.   (Doc. No. 218

at 41) (quoting Doc. No. 199 ¶¶ 28, 381).   The Underwriter Defendants further maintain that the

TAC does not identify any factual representations "embedded" in the opinion statement that are

alleged to be materially false and misleading in accordance with Omnicare's second prong.

In addition, "[t]o the extent that [SEPTA] seeks to challenge Orrstown's stated opinion

under Omnicare's third prong," the Underwriter Defendants maintain, as the Supreme Court

stated in Omnicare, that reasonable investors do not expect that every fact available to the issuer

of an opinion necessarily supports that opinion, because opinions may result from a weighing of

competing facts.   (Id. at 41-42.)   In this regard, the Underwriter Defendants highlight the

following allegations in paragraph 126 of the TAC:

> The Bank's ALLL calculation reported in the 2009 10-K improperly excluded at
> least three significant loans that had been identified as Substandard, and for which
> ALLL reserves totaling around $2.8 million had been calculated, but were removed
> without legitimate basis from the Bank's ALLL calculation at the eleventh hour.

Specifically, despite internally identifying over $8.7 million in loans to Antonio Mourtil, J&S Enterprises, and Marvin Windows as "Substandard," and including them in drafts of the ALLL calculation as of December 31, 2009, the Bank excluded those loans from its ALLL reported in the 2009 10-K.   As set forth below, these loans had not improved in quality to justify their removal.   To the contrary, they were all rated Substandard and the Bank had considered them Substandard at year end.   In fact, SEK specifically disputed the Bank's removal of J&S from the ALLL calculation, but the Bank ignored SEK's opinion.   The [November Loan Review], which was touted in the 2009 10-K to reassure investors about the quality of the Bank's loan portfolio as discussed more fully below, resulted in a recommendation to rate the Marvin Window loan Substandard, which means a reserve was required, but the final ALLL in the 10K simply ignored it.   None of the loans were fully secured by collateral.   The Bank had calculated a collateral deficit of $1.33 million for Mourtil, a collateral deficit of around $600,000 for J&S, and a deficit of $800,000 for Marvin Window.   If those three loans had been included in the ALLL reported in the 2009 10-K as they should have been, the Bank's reported ALLL would have increased roughly by 131%, and its reported net income would have dropped by roughly 25%.   Those loans also should have been identified as impaired, which would have increased the bank's disclosure of impaired loans by nearly 127%.   By failing to include these loans in the ALLL calculation and disclose necessary reserves on them, and also by failing to disclose them as impaired, the 2009 10-K financial statements were materially misstated, all of which derived from the Bank's materially deficient internal controls over financial reporting.

(Doc. No. 199 ¶ 126.)   The Underwriter Defendants argue that "[t]hese preliminary calculations were allegedly prepared by a loan review officer in anticipation of senior management's 'review and approval of the overall reasonableness of the calculation and the factors used.'"   (Doc. No. 218 at 42) (quoting Doc. No. 199 ¶ 114).   They argue that, "[b]oiled down, [SEPTA] alleges that Orrstown's senior management disagreed with a subordinate's preliminary judgment and made adjustments to his reserve calculation before finalizing it and disclosing the results," which does not amount to an actionable omission under Omnicare.   (Id.)   The Underwriter Defendants analogize this situation to the following hypothetical contained in the Omnicare opinion:

Suppose, for example, that in stating an opinion about legal compliance, the issuer did not disclose that a single junior attorney expressed doubts about a practice's legality, when six of his more senior colleagues gave a stamp of approval.   That omission would not make the statement of opinion misleading, even if the minority position ultimately proved correct[.]

71

(Id.) (quoting Omnicare, 575 U.S. at 190).   The Underwriter Defendants maintain that no

reasonable investor would have been misled by the omission of this information, especially given

the disclaimers included in the Offering Documents describing the uncertainty surrounding a

loan loss calculation.   (Id. at 42-43.)

   In response, SEPTA maintains that it has stated a claim under Omnicare based on this

statement because "in its 2009 10-K Orrstown failed to provide loan loss reserves that it

internally determined to be necessary (J&S, Mourtil, and Marvin Windows), and SEK concluded

that Orrstown lacked updated borrower and collateral information that would have been

necessary to be 'proactive' or 'adequately reserve[d]' for losses."   (Doc. No. 228 at 146.)

Accordingly, SEPTA argues that "Orrstown's statements that it was 'proactively' addressing

problem credits and 'adequately reserved' contain embedded false facts and/or omit material

information necessary to make them not misleading" and were not mere "disagreements" with a

subordinate.   (Id.)   Instead, SEPTA maintains, "Orrstown ignored SEK, the November 2009

Loan Review team, and its own Loan Policy."   (Id.)

   The Court need not necessarily determine whether the TAC has stated an omissions-

based opinion claim under Omnicare with regard to statement 2 because, as the Court stated in

its Memorandum dismissing the FAC, such a statement about the adequacy of loan loss reserves

is not always entitled to the protections afforded to an opinion or belief of management.   Rather,

a statement regarding the adequacy of loan loss reserves can in some circumstances constitute a

measurable objective fact where a defendant discloses a methodology for calculating loan loss

reserves and then fails to adhere to that methodology.   The Court quotes its previous discussion

in this regard below:

   In Underland v. Alter, No. 10-cv-03621, 2011 WL 4017908 (E.D. Pa. Sept. 9,

2011), a district court in this circuit applied the reasoning of <u>Shapiro</u> with respect to a claimed Securities Act violation based on statements pertaining to the adequacy of loan loss reserves.  In that case, the plaintiffs alleged that the defendants disclosed a methodology, and consequently understated its loan loss reserves.  <u>Id.</u> at *9.  The defendants argued that statements pertaining to loan loss reserves are inherently forward-looking and subjective and may receive protection as an opinion or prediction under the safe harbor or bespeaks caution doctrines.  <u>Id.</u> at *9-10.  However, the court found that "[u]nlike a subjective evaluation that a loan reserve is adequate or not, nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact," and therefore, the bespeaks caution doctrine or safe harbor did not apply to protect the statement.  <u>Id.</u>  The plaintiffs' allegation was based on an FDIC Material Loss report that included findings that contradicted the defendants' claimed adherence to its loan loss methodology.  <u>See id.</u> at *8-9.  Accordingly, in light of the findings in the report, the court denied the defendants' motion to dismiss the Securities Act claim premised on the loan loss reserve statements.  <u>See also</u> <u>In re Wilmington Trust Sec. Litig.</u>, [29 F. Supp.3d 432 (D. Del. 2014)] (finding that where defendants calculated its reserves "using an objective and consistent standard," plaintiffs stated a Securities Act claim where they alleged facts showing that defendants inconsistently and arbitrarily applied the standard they claimed to use to calculate loan reserves).

Another case that is instructive as to what facts must be alleged to sufficiently state a claim pertaining to the setting of loan loss reserves and adherence (or non adherence) to a stated methodology for doing so is <u>Oklahoma Firefighters Pension and Ret. System v. Student Loan Corp.</u>, 951 F. Supp. 2d 479 (S.D.N.Y. 2013).  In that case, the court held that the plaintiff had not stated a claim on the basis of an allegation that the defendant had failed to set aside sufficient loan loss reserves "in violation of GAAP and the [defendant's] own publicly-disclosed methodology." <u>Id.</u> at 495.  The court found that the complaint contained no allegations contradicting the reasonableness of the defendant's quarterly reserves at the time they were set, and rejected the plaintiffs' claim that reserves were improperly set merely because the defendant took an impairment charge at a later date, stating that there were no factual allegations to support an inference that later-disclosed credit losses were actually incurred during the earlier time periods.  <u>Id.</u> at 495-96.  The court observed that the plaintiffs had not identified any "internal reports possessed by defendants, communications among Student Loan Corp. employees, or firsthand accounts from confidential witnesses from which one could reasonably conclude that defendants manipulated or did not actually perform the multi-factor migration analysis they said they did."  <u>Id.</u> at 497.

(Doc. No. 92 at 45-48.)   The Court then discussed SEPTA's argument in this regard:

Here, [SEPTA] also argues that Defendants' statement that loan loss reserves were "adequate[] . . . for potential losses" was false or misleading when made as it alleges that Defendant Orrstown failed to follow its own methodology by which it claimed loan loss reserves were calculated.   In particular, [SEPTA] alleges that the Bank

conducted an internal review of its loan portfolio in November 2009, resulting in its increasing its allowance for loan loss reserves by 3.6 million for the 3 month period ending December 31, 2009, and in the process, failed to comply with its methodology for declaring loan loss reserves as defined in its 2009 Annual Report:

> [A] reserve established through a provision for loan losses charged to expense, that represents management's best estimate of probable incurred losses within the existing portfolio of loans.   The level of the allowance reflects management's evaluation of, among other factors, the status of specific impaired loans, trends in historical loss experience, delinquency trends, credit concentrations and economic conditions within our market area. . . .   Changes in economic conditions affecting borrowers, new information regarding existing loans, identifications of additional problem loans and other factors, both within and outside of our control, may require us to increase our allowance for loan losses.

(Doc. No. 40 ¶ 105.)   [SEPTA] alleges that by increasing its allowance for loan loss reserves by only 3.6 million, [] Defendants failed to follow the above methodology through their "failure to accurately reflect the true level of impaired loans and the overall weakness and high risk in the Bank's commercial loan portfolio at that time."   (Id.)

(Doc. No. 92 at 45-48.)

Ultimately, the Court concluded that the facts related by SEPTA in the FAC in support of its claim regarding Orrstown's nonadherence to its stated methodology for calculating loan loss reserves—facts provided primarily by confidential witness testimony as opposed to documentary evidence—did not support a plausible inference that Defendants failed to comply with the methodology for calculating loan loss reserves because those confidential witnesses had little to no first-hand knowledge of the relevant facts during the time period at issue.   (Id. at 52.)   The Court also observed that disclosures in the Offering Documents regarding the increase in Orrstown's loan loss reserve as a result of the November Loan Review and an increase in its ratio of non-performing loans to outstanding loans also failed to support SEPTA's claim that Orrstown failed to follow its loan loss reserve methodology.   (Id.)   Finally, noting the Offering Documents' warning that further deterioration in Orrstown's loan portfolio could occur, the

Court found that SEPTA had failed to point to reliable facts supporting a reasonable inference that Defendants did not conform to the disclosed methodology for calculating loan loss reserves in the time period prior to Offering Documents' issuance.   (Id. at 52-53.)

However, the extensive, newly alleged facts in the TAC (Doc. No. 199 ¶¶ 100-39, 183-89, 194-368) provide significant additional factual support for SEPTA's claim related to statement 2, which was previously based solely on the limitedly useful testimony of a confidential witness coupled with the benefit of hindsight.   (Id.)   Paragraphs 100 through 126 of the TAC contain lengthy and detailed allegations regarding Orrstown's ALLL calculation process and its repeated failure to recognize impaired loans in connection with that calculation in the time period prior the 2010 Offering.   The TAC summarizes these allegations in the following way:

> Orrstown's loan review process failed to take into account material adverse information about both its borrowers and the broader financial crisis impacting real estate markets beginning by 2008.   Indeed, as described herein, even when large borrowers expressly informed Orrstown they were short on money, were struggling with cash flow, and sought loan modifications, Orrstown granted modifications and extensions without recognizing their loans as impaired or TDRs, and without increasing the ALLL reserve to properly recognize the higher risk of loss on the loan.

(Doc. No. 199 ¶ 106.)   The TAC alleges that Orrstown's quarterly ALLL calculation was performed by Chad Rydbom, Orrstown's Loan Review Officer, and sent to Defendants Embly and Everly for their review and approval of the calculation and factors used in connection with it before presentation to the Credit Administration Committee for approval.   (Id. ¶ 114.)

The TAC further alleges that Orrstown's "internal controls suffered from numerous material weaknesses, resulting in materially under-reserved ALLL and repeated failure to recognize impaired loans, both of which are required to be disclosed in SEC filings."   (Id.) Paragraphs 115 through 120 of the TAC allege six specific failures relating to Orrstown's

calculation of its loan loss reserve.    First, the TAC alleges that Orrstown limited its evaluation

of loans for potential reserve purposes to only those loans rated Substandard and, further,

calculated reserves only on Substandard loans found to be impaired, thereby "artificially

limit[ing] its evaluation."    (Id. ¶ 115.)   Next, the TAC alleges that "from at least 2008 through

2010, Orrstown routinely failed to identify as impaired in its SEC filings all of the Substandard

loans for which it had calculated collateral deficits under FAS 114, in contravention of its own

Loan Policy and GAAP."    The TAC elaborates on this allegation:

> As discussed above, a specific reserve should have been calculated on all individual
> loans that are determined to be "impaired" under FAS 114.   Orrstown's Loan
> Policy provided that "All commercial substandard rated credits are evaluated for
> impairment based on the 'Fair Value of Collateral' method. . . .   If any analysis
> results in a deficit the credit is considered impaired and the deficit will be added to
> the FAS 114 allocation."   In other words, if the collateral was worth less than the
> loan balance, the loan should have been considered impaired and a specific reserve
> created.   Orrstown however regularly failed to identify loans as impaired in its
> SEC filings even when it found collateral deficiencies under FAS 114.   In 2008
> and 2010 Orrstown calculated collateral deficits on loans but simply failed to
> identify those loans as impaired in its SEC filings, resulting in material
> understatements in its impaired loan disclosures.

(Id. ¶ 116.)

Third, the TAC alleges that "in conducting its analysis of the collateral for Substandard,

collateral-based loans, Orrstown failed to obtain updated appraisals," and "[s]ince the existence

and amount of impairment under FAS 114 depends on the value of the collateral pledged,

obtaining updated appraisals is critical to determining impairment and assuring adequate

reserves."    (Id. ¶ 117.)   The TAC quotes Orrstown's Loan Policy statement that "[i]n a stable

real estate environment, an appraisal may remain valid for no more than two years.   In a rapidly

escalating or deteriorating market, a value may be valid for only a few months."    (Id.)   SEPTA

alleges that Orrstown often used appraisals older than two years, which SEPTA asserts were

"virtually worthless and resulted in a failure to accurately identify impaired loans and calculate

ALLL."   (Id.)

Fourth, the TAC alleges that instead of obtaining updated appraisals, "Orrstown applied discount factors to old appraisals, which was improper under GAAP."   (Id. ¶ 118.)   The TAC alleges specifically that "Orrstown applied a 22% discount (and later added an additional 15% discount) to old appraisals based on a 2004 study that, as found by the SEC, had 'no bearing on the current real estate market as of 2010.'"   (Id.)

The TAC alleges a fifth failure regarding Orrstown's procedure for calculating loan loss reserves as follows:

> Orrstown failed to calculate a reserve on loans other than those rated Substandard (except to the extent that the Bank's exposure to a particular industry exceeded 25% of the Bank's total equity).   As noted above, for all loans not subject to FAS 114, the Bank should have calculated reserves under FAS 5 based on pools of loans with similar characteristics using historical loss factors.   But Orrstown only calculated an FAS 5 reserve for Substandard loans for which a FAS 114 reserve was not calculated, instead of the entire loan portfolio by segment.   This practice was contrary to generally accepted industry practice and also improperly assumed that the Bank only incurs losses through its Substandard and lower rated loans, which was not accurate.

(Id. ¶ 119.)

Sixth, the TAC alleges that "for the pooled loans for which it did calculate an FAS 5 reserve (i.e., Substandard that were not impaired under FAS 114 and loans to the extent that the Bank's exposure to a particular industry exceeded 25% of the Bank's total equity), Orrstown used improper historical loss factors, which resulted in understated reserves."   (Id. ¶ 120.) SEPTA maintains that all of these failures amounted to "material failures of internal controls," which resulted in "materially misstated financial statements."   (Id. ¶ 121.)   As noted above, the TAC also identifies specific examples of the deficiencies described above from 2008 through 2009, highlighting Orrstown's treatment of three specific significant loans—Antonio Mourtil, J&S Enterprises, and Marvin Windows—that were identified as Substandard and for which

ALLL reserves in the amount of $2.8 million had been calculated, but which were removed from the Bank's ALLL calculation reported in its 2009 10-K.   (Id. ¶ 126.)

In light of the additional factual allegations contained in the TAC regarding Orrstown's calculation of its loan loss reserves in the time period leading up to the 2010 Offering (summarized above but detailed extensively in the TAC), and viewing all well-pleaded factual allegations in the light most favorable to SEPTA, the Court concludes that the TAC's allegations support a plausible inference that Orrstown "failed to conform to its disclosed methodology for calculating loan loss reserves in the time period prior to the issuance of the Offering Documents" (Doc. No. 92 at 52).   SEPTA has thus cured the deficiency identified in the FAC with regard to this statement.   Accordingly, the Court finds that SEPTA has stated a Section 11 claim based on Orrstown's statement regarding the adequacy of its loan loss reserves (statement 2).   See Lord Abbett Affiliated Fund, Inc. v. Navient Corp., 363 F. Supp. 3d 476, 496-97 (D. Del. 2019) (holding that "dollar amounts disclosed for the loan loss provisions were false or misleading, because [the] [d]efendants' systemic use of forbearance meant the loan loss provisions were 'artificially understated,'" and denying motion to dismiss part of Securities Act claim based on statements regarding loan loss reserves); In re Wilmington Trust Sec. Litig., 29 F. Supp. 3d 432, 452-53 (D. Del. 2014) (denying motion to dismiss Securities Act claim where defendants claimed adequate loan loss reserves—calculated according to a consistent standard, based in part on credit risk and loan classification—and plaintiffs alleged that defendant "was inconsistently and arbitrarily applying the standards it claimed to use to calculate its loan reserve").

Statement 3

The TAC next challenges statement 3, i.e., statements made in the Offering Documents regarding Orrstown's November Loan Review.   (Doc. No. 199 ¶¶ 392-96.)   The Court quotes

the TAC's allegations regarding the challenged statements in full below:

392.    The Offering Documents also made false and misleading statements about the November Loan Review.  The Prospectus told potential investors that "[i]n November 2009, we undertook an expanded review of our loan portfolio which covered $526 million in outstanding and committed balances."  The 2009 10-K, which was incorporated by reference in the Offering Documents, likewise referred to this "expanded review," stating:

> In November of 2009, management undertook an expanded review of the Bank's commercial loan portfolio, in a proactive attempt to identify potential weaknesses and deterioration in the portfolio. This review was in addition to the normal loan review process conducted by our loan review officer and the Bank's Credit Administration Committee.  A review team, which consisted of 3 employees and 2 contract employees, reviewed all commercial loan relationships with an aggregate committed exposure greater than or equal to $750,000.  The review team focused on the global cash flow of the borrower, global debt service coverage ratios of the borrower, LTV ratios when collateral values decreased by 10% and 20%, borrower's liquidity and guarantor's overall cash flow and liquidity.   The review covered a total of approximately $526,000,000 in outstanding loans and loan commitments. Following the review process, management increased the allowance by $3.1 million in order to better reflect the deterioration in local, regional and national economic conditions.   All economic allocations were increased during 2009.

Thus, the Offering Documents assured investors that, despite the financial crisis, the Bank had recently conducted an expansive review of its loan portfolio and its reserves were more than adequate.

393.    In reality, as discussed above, the November 2009 "expanded" loan review was little more than the standard, deficient review the Bank regularly performed pursuant to its Loan Policy, which required the Bank to review all loans over $750,000 at least yearly, and all loans rated 4 or less at least quarterly.   In fact, the evidence suggests the November Loan Review touted in the Offering Documents was less rigorous that the Bank's standard review process.  In an email to the Credit Administration Committee, Embly described the review merely as a "summary" review, and despite agreeing to produce documents related to the November Loan Review in this litigation, Orrstown has been able to produce almost no documentation substantiating the November 2009 review process.  The only documentation of the review supporting the statement in the Offering Documents is a two page summary memorandum which does not provide important details on the review, such as who conducted it, how, what they reviewed, or the review criteria.   That summary memorandum does show however that 16.5% of the loans

reviewed were downgraded, a fact which is nowhere disclosed in the Offering Documents.

394.    Although the Offering Documents stated that the November 2009 review examined "LTV ratios when collateral values decreased by 10% and 20%," in reality only 75% of the loans were reviewed for LTV when shocked at 10% and 20%.    Further, this statement in the Offering Documents was materially misleading since the vast majority of the collateral valuations used were stale.   As reflected in the summary memorandum, the Bank used the collateral value as of the loan closing date the loan for this LTV testing.  But most of those loans were several years old.   The Offering Documents were therefore materially misleading because, while they stated that the Bank had examined "LTV ratios when collateral values decreased by 10% and 20%," the Offering Documents failed to disclose that this testing was performed on stale valuations, rendering the Bank's review of LTVs meaningless with respect to current valuation.

395.    Far from a "proactive attempt to identify potential weaknesses," the November 2009 loan review was at best a fly-by, without any substantiating documentation, that failed to uncover all of the numerous deficiencies discussed above, including that loans were supported by outdated appraisals and the Bank's key borrowers were in dire financial condition and had requested and received loan modifications.   The November 2009 loan review would have examined the Shaool, Azadi, Hockey, Mongold, and Yorktown loans discussed herein, yet failed to result in an identification of those loans as impaired, the creation of required reserves on them, or accurately rating them as Substandard or less.   Moreover, the loan review would have identified at least $41 million in loans that had been restructured, extended, or modified as of December 31, 2009 (and at least $55 million as of March 15, 2010), but failed to result in identification of these as substandard or creation of required reserves.

396.    Further, as noted above, the Loan Review resulted in a recommendation to drop the rating for $3.7 million in loans to Marvin Windows to Substandard, which would have required calculating an ALLL reserve under the Bank's Loan Policy, but the Bank failed to do so in its 2009 10-K, while at the same time touting its November Loan Review.   Internal memoranda show that the Bank projected an $800,000 reserve was necessary as of December 31, 2009.   However, the final ALLL schedule used for the 2009 10-K, which was audited by SEK and should have shown every Substandard loan, did not include any calculation or specific reserve for Marvin Windows.   Thus, the Bank excluded from its ALLL the substantial Marvin Windows balance even though the November Loan Review recommended that it should be rated Substandard.   After the March 2010 Offering took place the Bank added a $1.5 million reserve for Marvin Windows in its first quarter 2010 financial statements.

(Id.)

The Orrstown Defendants emphasize that the TAC alleges not that Orrstown falsely reported that it conducted the November Loan Review but rather that Orrstown's description of the review as proactive and expanded was misleading.   They argue that all of the adjectives used to describe the November Loan Review were vague statements of opinion amounting to puffery, and moreover, that as a result of the review, Orrstown disclosed that it increased its allowance for loan losses by $3.1 million to reflect deteriorating economic conditions.   The Orrstown Defendants therefore conclude that "Orrstown's statements regarding the November [L]oan [R]eview would not have misled a reasonable investor."   (Doc. No. 214 at 33-34.)

The Underwriter Defendants expand on the same line of argument, maintaining first that the Court should disregard as entirely conclusory (and therefore not entitled to the assumption of truth) the TAC's assertion that Orrstown's November Loan Review was not actually "expanded" but was instead "little more than the standard, deficient review the Bank regularly performed pursuant to its Loan Policy."   (Doc. No. 218 at 37.)   According to the Underwriter Defendants, SEPTA has simply failed to plead non-conclusory facts regarding the details of the November Loan Review and how it compared to Orrstown's normal process to review loans despite that "its theory of falsity hinges on the comparison."   (Id. at 38.)   The Underwriter Defendants therefore maintain that SEPTA has failed to plausibly allege that statement 3 was materially false or misleading in this respect.   (Id.)

The Underwriter Defendants, moreover, describe as inactionable puffery Orrstown's characterization of the November Loan Review as a "proactive attempt" to identify deterioration in its loan portfolio.   (Id.)   In this regard, the Underwriter Defendants point out that this statement itself identifies the November Loan Review as an "attempt" to identify weaknesses and deterioration in the loan portfolio and note that Orrstown "provided no guarantee that the

review had identified the full extent of any problems with the loan portfolio" while also warning investors that it could not provide any assurance that its allowance for loan losses would prove sufficient for actual losses.   (Id. at 39.)

Finally, the Underwriter Defendants take issue with the TAC's characterization as materially misleading Orrstown's statement in the Offering Documents that the November Loan Review assessed "LTV ratios when collateral values decreased by 10% and 20%" because the TAC asserts that Orrstown "failed to disclose that this testing was performed on stale valuations."   (Id. at 39) (quoting Doc. No. 199 ¶ 394).   The Underwriter Defendants argue that it would not have been reasonable for an investor to infer that Orrstown possessed updated appraisals for every loan assessed where it "disclosed in its 2009 Annual Report that 'appraisals are updated as deemed appropriate under the circumstances' (Ex. A at 4), and made clear that it held a significant number of impaired loans for which the 'appraisal of the real estate property is older than two years' (id. at 78)."   (Doc. No. 218 at 39-40) (quoting Doc. No. 219-1 at 4, 78).

In response, SEPTA maintains that Orrstown's statements regarding the November Loan Review should not be considered inactionable puffery, stating that "[b]y touting the November 2009 Loan Review at issue in the Offering Documents, Orrstown had a duty to speak truthfully about it," but instead "misrepresented the review and concealed highly material facts."   (Doc. No. 228 at 145.)   Accordingly, SEPTA argues that "[t]he court cannot hold that these statements were immaterial puffery as a matter of law."   (Id.)

Upon careful review of the allegations of the TAC, viewed in the light most favorable to SEPTA, and the authorities cited by the parties, the Court concludes that the challenged statements regarding the November Loan Review are either conclusory, constitute inactionable puffery, or are otherwise not supported by facts giving rise to a plausible inference that they were

materially false or misleading when made.   First, the Court agrees with Defendants that SEPTA

has failed to plausibly allege that Orrstown's statement about "an expanded review of our loan

portfolio" in November 2009 was materially false or misleading in the absence of facts regarding

the details of the November Loan Review and how it compared to Orrstown's normal loan

review process.   Second, regarding the statement that the November Loan Review was a

"proactive attempt" to identify deterioration in Orrstown's loan portfolio, the Court is persuaded

that the statement is inactionable puffery.   See City of Roseville Emps.' Ret. Sys. v. Sterling

Fin. Corp., 47 F. Supp. 3d 1205, 1220 (E.D. Wash. 2014), aff'd, 691 F. App'x 393 (9th Cir.

2017) (finding the defendants' statement that its "credit administration team was proactively

managing portfolio risk" mere puffery); see also Veal v. Lending Club Corp., 423 F. Supp. 3d

785, 804 (N.D. Cal. 2019) (finding "too generalized to be actionable" the statement that

"maintaining a transparent, proactive and delivered approach to credit [is] a driver of long-term

value").   Third, to the extent SEPTA alleges that Orrstown's statement that the November Loan

Review assessed "LTV ratios when collateral values decreased by 10% and 20%" was materially

false and misleading because Orrstown "failed to disclose that this testing was performed on

stale valuations" (Doc. No. 199 ¶ 394), the Court is persuaded that a reasonable investor would

not have inferred from that statement that such testing was performed utilizing current appraisals

in the absence of such a representation in the 10-K and in light of its disclosure that "appraisals

are updated as deemed appropriate under the circumstances."   (Doc. No. 214-1 at 5.)   SEPTA

has therefore failed to plausibly allege that the statement was materially false or misleading in

that regard.[22]   In short, the Court concludes that the TAC fails to plausibly allege a Section 11

---

[22]  With regard to the TAC's allegation that the statement that the November Loan Review
assessed "LTV ratios when collateral values decreased by 10% and 20%" was materially false
and misleading because "only 75% of the loans were reviewed for LTV when shocked at 10%

claim based on the identified statements regarding the November Loan Review.

Statement 4

The TAC next challenges the following statement in Orrstown's prospectus supplement: "at December 31, 2009, we had 50 loan relationships, aggregating $307.5 million that were performing according to their original terms with outstanding balances that exceeded $3.0 million."   (Doc. No. 199 ¶ 397.)   The TAC maintains that "[t]his was patently untrue, and neither the Bank nor SEK actually reviewed the loans to determine whether they were performing according to their original terms," as "over $40 million of those loans had been modified or extended prior to December 31, 2009, and another more than $15 million had been modified prior to March 23, 2010, the date of the final Prospectus."   (Id.)

The Underwriter Defendants argue that "no 'reasonable investor' who read the March 2010 offering materials 'as a whole and in context' would have been misled into thinking that none of Orrstown's large commercial loans were experiencing problems at that time" because "Orrstown disclosed—in the very same report that contained the challenged statement—that 'a commercial credit aggregating approximately $5.0 million that was current and performing at December 31, 2009 was having problems and would become nonperforming during the first quarter of 2010.'"   (Doc. No. 218 at 44-45) (first quoting In re Cell Pathways, Inc., No. 99-cv-00725, 2000 WL 805221, at *9 n.7 (E.D. Pa. June 20, 2000); and then quoting Doc. No. 219-1 at 37).   The Underwriter Defendants further argue that Orrstown had "also disclosed that a 'construction financing' provider that owed it $8.5 million had filed for bankruptcy in February 2010 and the entire loan would accordingly be designated nonperforming."   (Id. at 45.)   In light

---

and 20%" (Doc. No. 199 ¶ 394), the Court agrees with Defendants that the TAC fails to plead facts in support of this allegation of falsity.

of these disclosures, the Underwriter Defendants maintain that SEPTA has failed to plausibly allege that the "50 loan relationships" statement was materially false or misleading.   (Id.)

For their part, the Orrstown Defendants argue that "the TAC does not allege which 50 loan relationships were among the 50 mentioned by Orrstown, nor why those 50 were material to investors, nor how many of those 50 loan relationships were allegedly not performing according to their 'original terms.'"   (Doc. No. 214 at 37.)   Even "[l]eaving aside SEPTA's questionable conclusion that a loan that has been 'modified or extended' is not 'performing according to its original terms,'" the Orrstown Defendants contend that "the vagueness and conclusory nature of SEPTA's allegation that the statement was false because 'many' loans were not so performing demonstrates why the statement was immaterial to investors."   (Id.)   The Orrstown Defendants note that the "50 loan relationships" statement was followed by cautionary language stating that "the deterioration of one or more of these loans could result in a significant increase in our nonperforming loans and our provisions for loan losses."   (Id.) (quoting Doc. No. 214-3 at 15). In short, the Orrstown Defendants maintain that "whatever one is supposed to make of the statements about the '50 loan relationships,' the statement is qualified by the cautionary language," and informed investors that these loans could become nonperforming and require an increase in Orrstown's ALLL.   (Id.)

SEPTA responds by stating that the TAC answers the questions raised by the Orrstown Defendants.   SEPTA maintains that, according to the TAC, the 50 loan relationships "were all of the Bank's loans 'over $3 million,' which totaled $307.5 million," and that "this was material because those were the Bank's largest loans (i.e., loans over $3 million) and they comprised approximately half of Orrstown's total loan portfolio."   (Doc. No. 228 at 65-66.)   In addition, SEPTA points to its allegation that "at least over $40 million of those loans had been modified or

extended prior to December 31, 2009, and another more than $15 million had been modified

prior to March 23, 2010, the date of the final Prospectus."   (Id. at 66.)   Accordingly, SEPTA

maintains that the "50 loan relationships" statement misleadingly communicated that none of

Orrstown's largest loan relationships had problems.   (Id. at 148.)

       With regard to the cautionary language related to this statement, SEPTA maintains that

"none of that cautionary language discloses or addresses the objective fact that many of the loans

were not 'performing according to their original terms' because they had already been modified."

(Id.)   SEPTA further maintains that the cautionary language (indicating that several loans were

having problems or would become non-performing in the near future) does not make the "50

loan relationships statement" truthful.   (Id. at 148.)

       Having thoroughly reviewed the TAC's allegations, viewed in the light most favorable to

SEPTA, and the authorities cited by the parties, the Court concludes that the TAC fails to

plausibly allege the material falsity of the "50 loan relationships" statement.   The Court

concludes as such given the lack of specificity of the statement coupled with the Offering

Documents' disclosure that multiple large loans were having problems.   The Court disagrees

with SEPTA's position that this statement is materially false because it refers to all of the Bank's

loans over $3 million, some of which were not performing according to their original terms.

The statement in the prospectus supplement does not make the representation that it is describing

all of the Bank's loans over $3 million.   See (Doc. No. 214-3 at 15) (stating "at December 31,

2009, we had 50 loan relationships, aggregating $307.5 million that were performing according

to their original terms with outstanding balances that exceeded $3.0 million").   In light of the

Offering Documents' disclosure that multiple large loans were having problems, and reading the

Offering Documents as a whole, a reasonable investor would not have inferred from the

statement that none of Orrstown's loans exceeding $3 million were experiencing difficulties at the time of the Offering.   See In re Cell Pathways, 2000 WL 805221, at *9 n.7 (stating that, for purposes of the securities laws, the issue is "whether the statements taken as a whole and in context would have misled a reasonable investor").

Statement 5

The TAC next challenges the 2009 10-K's allegedly misleading two-part statement that (1) "[t]he Corporation's loan loss history has been much better than peer standards and analysis of the current credit risk position is favorable" and (2) "[t]he allowance for loan losses is ample given the current composition of the loan portfolio and adequately covers the credit risk management sees under present economic conditions."   (Doc. No. 199 ¶ 398.)   This statement was challenged in the FAC.   In deciding the motions to dismiss the FAC, the Court held that SEPTA had failed to state a claim upon which relief could be granted as to the first sentence of this statement due to the lack of facts supporting a plausible inference that the statement was false or misleading.   (Doc. No. 92 at 55.)   Regarding the second sentence, the Court concluded: "it principally describes Orrstown's belief or opinion regarding the adequacy of its loan loss reserves at the time of the issuance of the Offering Documents, and such a statement fails to state a claim under the Securities Act," referencing the Court's previous discussion regarding Orrstown's statement about the adequacy of its loan loss reserves—specifically, the fact that the FAC had not plausibly alleged an opinion claim with regard to the statement and had not plausibly alleged a misleading statement of objective fact regarding whether Orrstown followed its methodology for calculating loan loss reserves.   (Id.)

In the absence of additional allegations in the TAC regarding Orrstown's loan loss history as compared to "peer standards," the Court again concludes that SEPTA has failed to

plead facts supporting a plausible inference that the first sentence of the statement was false or misleading.   As to the second sentence of this statement ("[t]he allowance for loan losses is ample given the current composition of the loan portfolio"), however, the Court reaches a different conclusion.   For the same reasons articulated in connection with the Court's discussion of Orrstown's statement that it was "adequately reserved for any potential losses," see supra, and in light of the additional factual allegations in the TAC regarding Orrstown's calculation of its loan loss reserves in the time period leading up to the 2010 Offering (Doc. No. 199 ¶¶ 100-39), the Court concludes that SEPTA has now plausibly alleged that Orrstown failed to adhere to its methodology for calculating loan loss reserves.   SEPTA has therefore stated a Section 11 claim based on Orrstown's statement that "[t]he allowance for loan losses is ample given the current composition of the loan portfolio. . . ."   See Lord Abbett, 363 F. Supp. 3d at 496-97; In re Wilmington Trust, 29 F. Supp. 3d at 452-53.

Statements 6 and 7

Finally, the TAC challenges as materially false or misleading the statement in Orrstown's 2009 10-K related to Management's Report on Internal Control to the effect that Orrstown "had evaluated the effectiveness of [its] internal control over financial reporting" and determined that it was "effective."   (Doc. No. 199 ¶ 401.)   Along with that statement, the TAC challenges the SOX Certifications to the effect that "Orrstown's internal control over financial reporting was designed 'to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements . . . in accordance with [GAAP].'"   (Id. ¶ 402.)   SEPTA alleges that these two statements were false and misleading because "they omitted material information about the effectiveness of Orrstown's internal controls over financial reporting because at the time the Certifications were made" due to the following:

> Orrstown failed to comply with GAAP and its own Loan Policy, including by failing to obtain updated appraisals, failing to accurately identify and disclose impaired loans, failing to accurately risk rate loans and ignoring negative information regarding borrowers' ability to pay, failing to identify TDRs, failing to calculate reserves on all loans in the portfolio, failing to accurately state the Bank's investment in impaired loans, and using improper discount factors.

(Id. ¶ 405.)   The TAC references Orrstown's later admission that, as of December 31, 2011, its "disclosure controls and procedures were not effective and that a material weaknesses existed pertaining to its internal controls over financial reporting as it related to loan ratings and their impact of the allowance for loan losses."   (Id. ¶ 407.)   SEPTA alleges in the TAC that the "internal controls that were deficient and ineffective in 2011 mirrored the internal controls that were in place for the reporting period ending December 31, 2009 and March 31, 2010."   (Id.) In connection with the Court's prior decision regarding the motions to dismiss the SAC, the Court found that SEPTA failed to plead an actionable Securities Act claim based on the SOX Certifications and representations about the effectiveness of Orrstown's internal controls over financial reporting because it had not plausibly alleged that the statements/certifications were false when made.   (Doc. No. 126 at 23.)

The Underwriter Defendants argue that the SOX-mandated disclosures regarding Orrstown's internal controls over financial reporting are statements of opinion and therefore not actionable under Omnicare.   They maintain that post-Omnicare federal courts have uniformly held that SOX-mandated statements like the ones at issue here constitute statements of opinion. (Doc. No. 218 at 28-31.)   As such, the Underwriter Defendants contend that SEPTA's disclaimer of any allegations of fraud, scienter, or recklessness in connection with its Securities Act claims amounts to a concession that any such opinions were honestly held, and so SEPTA's "only recourse . . . is to an omissions theory under Omnicare's third prong."   (Id. at 32.)   To that point, the Underwriter Defendants maintain that the TAC "does not allege that anyone—not

the Federal Reserve; not the Pennsylvania Department of Banking; not the SEC; not SEK; and
not any bank employee—told the certifying officers, Quinn and Everly, prior to the March 2010
offering that Orrstown's internal controls over financial reporting were defective or even
suggested that they might be."   (Doc. No. 218 at 33.)   In the Underwriter Defendants'
estimation, the TAC "alleges in conclusory fashion that '[a]t least by the end of 2009, Quinn
[and] Everly . . . were aware of the material weaknesses in internal controls' (TAC ¶ 471), but no
facts are pleaded to plausibly suggest this was so."   (Id.)

The Underwriter Defendants additionally argue that the allegations provided by
confidential witnesses "do not fill this gap," as only two of the witnesses worked at Orrstown
prior to the March 2010 offering.   Moreover, the Underwriter Defendants note the Court's prior
conclusion that SEPTA's allegations do not attribute to those two confidential witnesses "'any
personal knowledge with regard to the design and evaluation of internal controls over financial
reporting' and instead pertain to 'issues of loan underwriting and risk management practices.'"
(Id. at 34) (quoting Doc. No. 126 at 26).   Accordingly, the Underwriter Defendants maintain
that "the pleaded facts do not suggest that either CW was 'privy' to any information suggesting
that either Quinn or Everly was told about potential deficiencies in Orrstown's internal controls
over financial reporting prior to the March 2010 offering."   (Id.)

In response to this argument, SEPTA asserts that "this Court already held that SEPTA
adequately pleaded such claims in the SAC based on 'Orrstown's alleged misstatements
regarding the effectiveness of its internal controls over financial reporting in its 2010 and 2011
Annual Reports on Form 10-K, and its quarterly reports on Form 10-Q,' including 'the relevant
SOX [C]ertifications.'"   (Doc. No. 228 at 68-69.)   This assertion is misguided.   The Court's
prior conclusion was made in connection with SEPTA's Exchange Act claims beginning in the

second quarter of 2010 (along with the Court's concomitant finding of a plausible inference of scienter in connection with those claims).   The Court's conclusion in this regard was based largely on the fuller factual basis provided by the SEC Order, which addressed the time period beginning in the second quarter of 2010 through the end of 2011.   As the SEC Order did not provide facts relating to any period of time before the second quarter of 2010, the Court concluded that the SAC failed "to allege facts supporting a reasonable inference that the representations and certifications [in the 2009 10-K] were materially false and/or misleading at the time they were made" and instead amounted to a "claim of fraud by hindsight."   (Doc. No. 126 at 23.)   For these reasons, the Court concluded that the SAC did not adequately plead a Securities Act claim based on these statements in the 2009 10-K.   In so doing, the Court assumed without deciding that SOX Certifications constituted "hard" information as opposed to "soft" information subject to the requirements of Omnicare.   (Id.)

The Court now decides the question it left open in its Memorandum addressing the motions to dismiss the SAC—whether the representations regarding internal controls over financial reporting and the accompanying SOX Certifications contained in Orrstown's 2009 Annual Report are "hard" information or statements of opinion or belief subject to the requirements of Omnicare.   Based on the weight of authority cited to the Court post-dating its previous Memorandum, and noting that SEPTA has not cited any cases to the contrary, the Court concludes that such representations and certifications are statements of opinion under Omnicare. See In re AmTrust Financial Services, Inc. Sec. Litig., No. 17-cv-01545, 2019 WL 4257110, at *24-25 (S.D.N.Y. Sept. 9, 2019) (rejecting plaintiffs' argument that "statements in AmTrust's Forms 10-K and SOX certifications regarding the company's controls are statements of fact" and instead concluding that the statements were "statements of opinion" for purposes of Securities

Act claim); see also Lewis v. YRC Worldwide Inc., No. 19-cv-00001, 2020 WL 1493915, at *

16 (N.D.N.Y. Mar. 27, 2020) (following In re AmTrust and concluding that "[d]efendants' SOX

certifications are statements of opinion" in connection with Exchange Act claim); Doshi v.

General Cable Corp., 386 F. Supp. 3d 815, 835 (E.D. Ky. 2019) (holding, in connection with

Exchange Act claim, that defendants' statement that "internal control over financial reporting

was effective" was "soft" information because it consisted of defendants' perception of its

internal controls and, further, that the associated "SOX certifications . . . also constitute soft

information"); Fogel v. Vega, 759 F. App'x 18, 24 (2d Cir. 2018) (holding, in connection with

Exchange Act claim, that "statements concerning Wal-Ex's internal controls" must "meet the

standard for actionable opinion statements under Omnicare").

        As such, the Court agrees with Defendants that, because SEPTA in the TAC "disclaims

any allegation of fraud, scienter, or recklessness" relating to its Securities Act claims (Doc. No.

199 ¶ 28) and affirmatively alleges that its "Securities Act claims are rooted exclusively in

theories of strict liability and negligence" (id. ¶ 381), it has conceded that the opinions expressed

in the challenged statements were "honestly held" for purposes of Omnicare, see supra at §

III.C.1.a.   Accordingly, the TAC fails to state a Section 11 claim under Omnicare's first prong

with regard to the representation and certifications regarding internal controls over financial

reporting.

        The second Omnicare prong, to reiterate, applies in the limited circumstances where a

statement of opinion "contain[s] embedded statements of fact" that are false.   See Omnicare,

575 U.S. at 186.   SEPTA argues that Orrstown's "false and misleading financial statements are

embedded facts" in connection with the SOX Certifications, which "expressly states that 'the

financial statements, and other financial information . . . fairly present, in all material respects,

the financial condition . . . of the registrant."   (Doc. No. 228 at 74.)   As Defendants note,

however, the SOX Certifications cannot consist of embedded facts when their plain language

characterizes them as opinion, to wit: "[b]ased on my knowledge, the financial statements, and

other financial information included in this annual report, fairly present, in all material respects,

the financial condition, results of operations and cash flows of the registrant as of, and for, the

periods presented in this annual report."   (Doc. No. 199 ¶ 402) (emphasis added).   This

conclusion is supported by the district court's decision in In re AmTrust regarding virtually

identical language in a SOX certification.   In that case, the court noted the "important

qualification that the certifying officer's statements are true based on his or her knowledge" in

finding the challenged certification "a statement of opinion."   See In re AmTrust, 2019 WL

4257110, at *24.   The court explained that "plaintiffs must allege more than that the financial

statements themselves were inaccurate"—they "must allege sufficiently that defendants knew

that the financial statements were inaccurate."   See id.[23]

Thus, as argued by the Underwriter Defendants, SEPTA's only recourse with regard to its

Section 11 Securities Act claim based upon these representations and SOX Certifications is to an

omissions theory under Omnicare.   The requirements of the omissions theory are as follows:

> The investor must identify particular (and material) facts going to the basis for the
> issuer's opinion – facts about the inquiry the issuer did or did not conduct or the
> knowledge it did or did not have – whose omission makes the opinion statement at
> issue misleading to a reasonable person reading the statement fairly and in context.

See Omnicare, 575 U.S. at 194.   As the Third Circuit has recognized, "[a]lleging an actionable

claim under this theory 'is no small task.'"   See Jaroslawicz v. M&T Bank Corp., 962 F.3d 701,

---

[23]   SEPTA's reliance on In re Petrobras Sec. Litig., No. 14-cv-09662, 2016 WL 1533553, in
support of its proposition that financial statements are facts embedded within audit opinions is
unavailing, as that decision did not address a management SOX certification.   See id. at *3-4.

717 (3d Cir. 2020) (quoting Omnicare, 575 U.S. at 194).

With regard to the "inquiry" conducted by the issuer, and as previously recognized by this Court, a plaintiff cannot state a claim under the omissions prong by alleging that the opinion "lacked a reasonable basis" or that any "reasonable [inquiry] would have uncovered a material fact whose omission renders the opinion misleading."   (Doc. No. 92 at 65); see Omnicare, 575 U.S. at 196 (holding that "the Funds' conclusory allegation that Omnicare lacked 'reasonable grounds for the belief' it stated respecting legal compliance" was "not sufficient"); Jaroslawicz, 962 F.3d at 717 (finding insufficient to state a claim under Omnicare allegations that defendants "acted negligently in reviewing M&T's compliance program" before offering opinion that it was legally sound).   The Court agrees with the Underwriter Defendants that the TAC asserts just such allegations when it states that the Orrstown Securities Act Defendants "did not properly assess [Orrstown's] internal controls over financial reporting" (Doc. No. 199 ¶ 406), and that they therefore did not discover and thereafter disclose that Orrstown "failed to comply with GAAP and its own Loan Policy" (id. ¶ 405).

Further, to the extent SEPTA claims that the representations and SOX Certifications omitted "known contradictory evidence," such a claim fails as well because the TAC does not contain particular facts suggesting that the certifying officers knew, prior to the issuance of the Offering Documents, of any evidence that contradicted the opinions expressed in the SOX Certifications.   See Omnicare, 575 U.S. at 189 n.6.   Rather, as noted by the Underwriter Defendants, the TAC alleges Quinn's and Everly's knowledge of evidence contradicting their representations regarding the effectiveness of Orrstown's internal controls, but it does so in a conclusory manner, stating that "[a]t least by the end of 2009, Quinn [and] Everly . . . were aware of the material weaknesses in internal controls."   (Doc. No. 199 ¶ 471.)

The confidential witness allegations contained in the TAC do not further SEPTA's claims in this regard.   As the Court previously concluded when addressing the motions to dismiss the SAC, only two confidential witnesses worked at Orrstown prior to the 2010 Offering. Moreover, any of SEPTA's allegations regarding those witnesses "do not attribute to [them] any personal knowledge with regard to the design and evaluation of internal controls over financial reporting."   (Doc. No. 126 at 26.)   For all these reasons, the Court concludes that the TAC fails to plausibly allege a Section 11 claim based on the SOX-mandated disclosures in the Offering Documents.

To sum up, the Court's analysis of the seven statements upon which SEPTA bases its Securities Act claims results in the conclusion that as to two of the statements—statement 2, and the second sentence of statement 5—the allegations of the TAC support a plausible inference that Orrstown failed to adhere to its methodology for calculating loan loss reserves in the time period prior to the issuance of the Offering Documents, thereby rendering those statements materially false and/or misleading.   See Lord Abbett, 363 F. Supp. 3d at 496-97; In re Wilmington Trust, 29 F. Supp. 3d at 452-53.   Accordingly, the Court will deny the Orrstown Defendants' motion to dismiss counts 1 and 2 of the TAC with regard to these two statements and deny the Underwriter Defendants' motion to dismiss count 2 of the TAC as to these two statements.   The Court turns to an assessment of the TAC's Section 11 claim asserted against SEK.

### ii.        Defendant SEK

SEPTA's Section 11 claim against Defendant SEK stems from the "clean" audit opinion SEK issued in connection with Orrstown's 2009 Annual Report, which was incorporated in Orrstown's 2010 Registration Statement.   (Doc. No. 199 ¶ 409.)   SEPTA challenges SEK's opinion that the Orrstown financial statements upon which it relied in its audit "present[ed]

95

fairly, in all material respects, the financial position of Orrstown [and the Bank] as of December

31, 2009 and 2008."   (Id.)   SEPTA also challenges SEK's opinion that Orrstown "maintained,

in all material respects, effective internal control over financial reporting as of December 31,

2009."   (Id.)   As set forth more fully above, the TAC alleges that SEK failed to follow PCAOB

Rule 3100, AS No. 5, AU Section 342, and FAS 5 in connection with its audit of Orrstown.   (Id.

¶¶ 410-13.)   According to SEPTA's allegations, these accounting failures resulted in SEK's

failure "to verify that Orrstown had used accurate source data, had made reasonable assumptions,

[] had accounted for known or knowable past and present information when calculating its loan

loss reserves," and failed "to ensure that Orrstown's financial statements, incorporated into the

Registration Statement, complied with GAAP."   (Id. ¶ 413.)

In connection with the SAC, the Court assessed the above representations of SEK as a

statement of opinion under Omnicare and concluded that the SAC provided neither a factual

basis supporting a reasonable inference that SEK did not honestly hold the opinion offered nor

support for an untrue material fact embedded in SEK's opinion.   (Doc. No. 126 at 30.)   Thus,

the Court concluded that SEPTA's claim against SEK could proceed only under an "omissions"

theory.   (Id.)   The Court ultimately held that SEPTA had failed to state such a claim, stating:

> Just as in the [FAC], [SEPTA] fails to identify actual and material steps taken or
> not taken by Defendant SEK in its audit, or knowledge that it did or did not have in
> the formation of its opinion.   Instead, [SEPTA]'s SAC alleges that if SEK had
> performed its audit of Orrstown in accordance with applicable auditing standards,
> any reasonable auditor would have "discovered that the financial statements
> contained material understatements of Risk Assets and that there was a material
> weakness in the Company's internal controls over the financial reporting of Risk
> Assets and loan loss reserve allocations such that the financial statements were not
> prepared in accordance with GAAP."   This allegation, which is identical to that
> contained in the [FAC] is still not sufficient to state a Section 11 claim under
> Omnicare.   See Omnicare, 135 S. Ct. at 1333 ("recitation of the statutory language
> – that [defendant] 'omitted to state facts necessary to make the statement made not
> misleading' is not sufficient; neither is the [plaintiff's] conclusory allegation that
> [defendant] lacked 'reasonable grounds for the belief'");   In re Fairway Grp.

> Holdings Corp. Sec. Litig., No. 14-cv-00950, 2015 WL 4931357, at *19 (S.D.N.Y. Aug. 19, 2015) ("allegations that defendants 'should have' been aware of facts contradicting their opinions" are insufficient to "state a securities fraud claim"), report and recommendation adopted, No. 14-cv-00950 LAK AJP, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).
>
> Even if [SEPTA] could assert a Section 11 claim against [] SEK based on what SEK "should have known," [it]s allegations still fail.   As the Court discussed in its earlier Opinion, the "red flags" [SEPTA] accuses SEK of missing when conducting its audit stem from Confidential Witness assertions that the loan approval process was seriously flawed.   However, as before in its amended complaint, [SEPTA] in its SAC fails to assert how [] SEK could have been aware of these purported "red flags," in that the Confidential Witnesses are not alleged to have divulged the "red flag" information to [] SEK.   See In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 579-81 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015) (confidential witness allegations about "widespread" undisclosed deficiencies generally known to defendants were insufficiently specific enough to establish falsity, as "it is the facts known to, and the intent of, the maker of the statements which is ultimately relevant when the [c]ourt considers the falsity of statements of belief or opinion").
>
> [SEPTA]'s Section 11 claim against [] SEK based on its opinion issued in connection with Orrstown's 2009 Annual Report is based on hindsight provided by the allegations of the Confidential Witnesses, and the substance of the March 2012 Enforcement Actions.   As before, because omissions and statements that create a misleading impression in hindsight "are not sufficient to constitute the basis of a securities act claim under section 11," the Court finds that [SEPTA]'s SAC has failed to state a Section 11 claim against Defendant SEK, and the Court will dismiss the claim.   Zucker v. Quasha, 891 F. Supp. 1010, 1017 (D.N.J. 1995) (quoting In re Bank of Boston Sec. Litig., 762 F. Supp. 1525, 1538 (D. Mass. 1991)).

(Doc. No. 126 at 31-33) (cleaned up).

SEPTA's TAC attempts to remedy the SAC's failure to set forth steps "taken or not taken

by [] SEK in its audit, or knowledge that it did or did not have in the formation of its opinion."

(Id. at 31.)   Specifically, the TAC alleges as follows in paragraph 416:

> SEK discovered numerous failures to comply with GAAP, and FAS 114 and FAS 5, during the course of its audits, and that the Bank lacked adequate controls over financial reporting.   Among other things, SEK knew that: (a) Orrstown evaluated only Substandard loans for impairment, which failed to comply with GAAP, and because Orrstown failed to accurately risk rate loans its identification of Substandard loans was vastly under inclusive; (b) Orrstown failed to disclose as impaired loans for which it had actually calculated an impairment amount; (c) Orrstown regularly failed to obtain updated appraisals in its analysis of

impairment and calculation of ALLL, which, in addition to rendering the Bank's disclosure of ALLL and impaired loans false and misleading, violated the Bank's own Loan Policy; (d) rather than obtain updated appraisals, Orrstown applied discount factors to old appraisals that were totally improper under GAAP; (e) Orrstown failed to calculate a reserve on loans other than those rated Substandard (except to the extent that the Bank's exposure to a particular industry exceeded 25% of the Bank's total equity), which was contrary to generally accepted industry practice and also improperly assumed that the Bank only incurs losses through its Substandard and lower rated loans, which was not accurate; (f) Orrstown used improper historical loss factors in its FAS 5 calculation; [and] (g) Orrstown improperly risk rated loans and failed to calculate reserves or identify them as impaired, including because as accountant to several of the Bank's largest borrowers, SEK knew that they were experiencing financial difficulty, and that real estate collateral values had plummeted, and also knew that the Bank had failed to rate the relationships as Substandard.   Moreover, in connection with its audit SEK failed to examine several of the Bank's largest lending relationships, including Yorktown and several of SEK's own clients.

(Doc. No. 199 ¶ 416.)

In moving to dismiss the Securities Act claim asserted against it in the TAC, SEK first reiterates that its "representations" challenged by SEPTA consist of opinions within the meaning of Omnicare.   (Doc. No. 216 at 37.)   Along those lines, SEK maintains that under Omnicare's first prong, the TAC does not allege that SEK did not honestly hold the opinions set forth in its audit reports, in light of its disclaimer—"any allegation that could be construed as alleging fraud or intentional or reckless misconduct"—in connection with its Securities Act allegations.   (Id. at 38) (quoting Doc. No. 199 ¶¶ 381, 438).

SEK also maintains that the TAC fails to state an omissions claim under Omnicare. SEK notes that an opinion is "not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts."   (Id. at 38-39) (quoting Omnicare, 575 U.S. at 189-90).   Drawing from Omnicare, SEK reiterates that liability results only when "a registration statement omits material facts about the issuer's 'knowledge concerning' a statement

of opinion." (Id. at 39.)   SEK characterizes SEPTA's allegations in the following way: "the Bank's lending methodology and its procedure for calculating ALLL 'lacked a reasonable basis' and therefore should have led SEK to a different opinion regarding the Bank's financial statements and system of internal controls." (Id.)   SEK maintains that such allegations are insufficient to state a claim under Omnicare's omissions prong. (Id.)

Regarding Orrstown's methodology for calculating loan loss reserves, SEK argues that the methodology is "highly technical and involves several layers of subjectivity by management that are all too easy to second-guess in hindsight," and that "[a]n auditor's opinion on the adequacy of management's loss reserves and other managerial, discretionary decisions is actionable only if the opinion was knowingly false." (Id.)

Further, with respect to Orrstown's system of internal controls and alleged failures in that connection, SEK maintains that "[e]ven if these internal control deficiencies did exist at the Bank, SEPTA's allegations that SEK omitted them from its audit reports are insufficient to state a claim under § 11 against an auditor under § 11's omissions clause." (Id. at 41.)   In support of this contention, SEK cites Monroe v. Hughes, 31 F.3d 772, 774 (9th Cir. 1994), and In re Watchguard Sec. Litig., No. 05-cv-00678, 2006 WL 2038656 (W.D. Wash. Apr. 21, 2006). Both decisions, however, are of limited relevance.   In Monroe, a pre-SOX decision, the Ninth Circuit held that an accountant did not violate the Securities Act by failing to note control deficiencies in an audit report, even if the control deficiencies amounted to material weaknesses. In re Watchguard did not involve Securities Act claims against an auditor.   SEK nonetheless contends that the information that SEPTA alleges should have been "patently obvious" to SEK was disclosed only after SEK issued its clean audit opinions for the years ending 2008 and 2009. (Id.)   At bottom, SEK alleges that SEPTA's Securities Act claim against it is "based on

hindsight" and should be dismissed.   (Id. at 42-43.)

Responding to SEK's contentions, SEPTA first summarizes the TAC's allegations against SEK, allegedly based on SEK's workpapers, that it maintains demonstrate SEK's knowledge of accounting deficiencies that should have precluded the issuance of a clean audit opinion for Orrstown in 2008 and 2009.   (Doc. No. 228 at 86-93.)   The Court quotes the allegations as summarized by SEPTA below:[24]

1)   SEK knew as a result of its audits from 2008 through 2010 (or was reckless in not knowing (for Exchange Act claims), and/or negligently failed to disclose (for Securities Act claims)), that the Bank failed to comply with GAAP by evaluating for impairment only loans that were rate[d] "Substandard," and further discovered that the Bank had improperly rated loans and failed to create reserves, (¶ 317), including the following:

   a)   During its 2009 audit:

      i)   SEK discovered that the Bank did not include any reserves for Mourtil, J&S, and Marvin Windows, and with respect to J&S in particular criticized the Bank stating that failure to include a reserve did not comply with the Bank's Loan Policy (¶¶ 338, 513);

      ii)   SEK concluded that the Dahbura loan should have been rated Substandard, knew that it had been extended three times and that Dahbura was not generating sufficient cash flow to service the debt, and also noted that "Management also needs to obtain more current financial information for continued analysis," but SEK knew the Bank did not rate the loan Substandard, did not calculate any required reserve, and did not identify the loan extensions as TDRs (¶¶ 303, 339);

      iii)   SEK reviewed the Ahrens loans and knew that the Bank had not created any reserve for them even though the most important appraisal was five-years old, the borrower filed for bankruptcy and had been running a Ponzi scheme, and the properties were scheduled for a Sheriff's sale (¶ 344);

      iv)   SEK reviewed the Asper American Legion Post loans and knew that the Bank had not created any reserve for them despite the fact that the appraisal was over four years old, the Post had been closed

---

[24] These allegations contain some references to SEK's 2010 audit, as well.

for much of 2009 due to gaming violations, the borrower had not provided financial information as required under the loan and had informed the Bank that it could not make payments, (¶ 345).

2) SEK also knew as a result of its audits from 2008 through 2010 (or was reckless in not knowing (for Exchange Act claims), and/or negligently failed to disclose (for Securities Act claims)), that the Bank had failed to include in its disclosure of impaired loans in its financial statements millions of dollars in impaired loans that the Bank had actually identified as impaired, which violated GAAP and the Bank's Loan Policy, (¶ 318), including that:

   a) In the 2008 10-K Orrstown understated impaired loans by 416% (¶ 327);

   b) In the 2009 10-K Orrstown understated impaired loans by over 400% (¶ 337); and

   c) In the 2010 10-K Orrstown understated impaired loans by over 360% (¶ 356, see also ¶ 380.A-H (summarizing SEC's finding that Orrstown's financial statement understated impaired loans)).

3) SEK knew (or was reckless in not knowing (for Exchange Act claims), and/or negligently failed to disclose (for Securities Act claims)), that the Bank routinely failed to obtain updated appraisals and borrower financial information in violation of GAAP and its own Loan Policy, resulting in understatement of ALLL and impaired loans, (¶ 319), including:

   a) In connection with SEK's 2008 audit:

      i) 62% of loans evaluated for impairment, representing 81% of the dollar value evaluated, were supported by appraisals more than two-years old, and 15% were more than five-years old, (¶ 326), and SEK also informed the Bank that its ALLL was below "regulatory examiner's expectations" and the Bank's peer group (¶ 329); and

      ii) SEK noted in a letter to Bank management at the conclusion of the 2008 audit that several of the Bank's largest relationships "did not have current financial information (2007 on later) on file," and that "three files . . . had appraisal worksheets in the loan files, but there were no appraisal reports in the files to support the amounts on the worksheets," (¶ 328).

   b) In connection with SEK's 2009 audit:

      i) 56% of loans evaluated for impairment, representing 54% of the dollar value evaluated, were supported by appraisals more than

two-years old, and 14% were more than five years old, (¶ 336); and

ii) At the conclusion of the 2009 audit, SEK once again notified the Bank that "some of the Bank's large credits did not have current financial information (2008 or later) on file," and "management should also enhance procedures to ensure there is continual monitoring of financial information," (¶ 341);

iii) SEK also stated in a "Control Deficiency Comment," that "With deteriorating real estate values in recent years, some older appraisal values may no longer be valid and without updated financial information, management has no way of determining the current financial condition of business customers," and when SEK discussed this problem with Embly it did nothing to challenge the Bank's blatantly improper practice that "updated appraisal values are generally not obtained unless there is a problem developing with the loan, management feels the property value has deteriorated, or the customer wants to obtain a new credit." (¶ 342); and

iv) The PCAOB issued a report citing SEK for "a deficiency [in its audits] of such significance that it appeared the Firm did not obtain sufficient competent evidential matter to support its opinion . . . [and the] deficiency was the failure to perform sufficient procedures to test the allowance for loan losses," which upon information and belief referred to SEK's audit of Orrstown, (¶ 335).

c) In connection with SEK's 2010 audit:

i) In the first quarter of 2010 approximately 53% of loans evaluated for impairment were supported by real estate appraisals more than two-years old and 20% were supported by appraisals over five-years old, (¶ 352);

ii) In the second quarter of 2010, approximately 40% of the loans evaluated for impairment were supported by real estate appraisals more than two-years old and 14% were supported by appraisals over five-years old, (¶ 353);

iii) In the third quarter of 2010, approximately 29% of the loans evaluated for impairment were supported by real estate appraisals more than two-years old and 10% were supported by appraisals over five-years old, (¶ 354).

4)   SEK knew (or was reckless in not knowing (for Exchange Act claims), and/or negligently failed to disclose (for Securities Act claims)), that rather than obtain updated appraisals, the Bank applied discount factors that were totally improper under GAAP (as also found by the SEC), (¶ 320);

5)   SEK knew (or was reckless in not knowing (for Exchange Act claims), and/or negligently failed to disclose (for Securities Act claims)), that the Bank failed to calculate reserves under FAS 5 for loans other than those rate[d] Substandard, which was contrary to generally accepted practice and improperly assumed the Bank only incurs losses through Substandard and lower rated loans, (¶ 321);

6)   SEK knew (or was reckless in not knowing (for Exchange Act claims), and/or negligently failed to disclose (for Securities Act claims)), that Orrstown was using improper historical loss factors in calculating reserves for pooled loans, (¶ 322);

7)   SEK deliberately excluded many of the Bank's riskiest borrowers from its audits, including Yorktown in its 2008 and 2009 audits, which was inexplicable since that was the largest credit and, despite SEK's baseless statement that it posed "little risk," declared bankruptcy a year later, (¶¶ 332-34, 348);

   a)   Moreover, in its 2010 audit SEK took an absurdly optimistic approach to the Yorktown loan and knew that the Bank had not identified it as impaired, despite its unsecured status, (¶ 358);

8)   In 2009 SEK discovered that the Bank had provided incorrect reports to SEK, which resulted in SEK failing to review several large loan relationships that otherwise would have been reviewed, (¶ 349),

9)   SEK had inside information concerning the true financial condition of many of the Bank's worst and largest borrowers because SEK served as their accountant at the same time it served as the Bank's auditor (and never disclosed any potential conflict to the Bank's Audit Committee), but SEK omitted from its audit loan testing program virtually any loan to a borrower for which SEK was performing accounting services, thereby turning a blind eye upwards of $50 million in loans to the Bank's largest borrowers in 2008 and 2009, (¶¶ 311-315, 323);

   a)   Moreover, in July 2010, SEK intervened to persuade the bank to loan more money to the Azadis, who soon after defaulted. (¶¶ 236-41); and

   b)   Despite knowing that many of the Bank's largest loans had been restructured (including the Azadi's loans), SEK reviewed but did not correct Orrstown's material misstatement in the Offering Documents

103

that its largest "50 loan relationships . . . were performing according to their original terms," which was blatantly false and represented yet another failure to ICFR of which SEK was aware. (¶¶ 397, 491).

10) Finally, by 2011, SEK had additional knowledge of the Bank's material weaknesses in ICFR as a result of the investigation by the Regulators, culminating in the March 2012 Consent Orders, which are described more fully in the TAC, (see ¶¶ 9-17, 140-193).

(Id. at 86-93.)   SEPTA maintains that these allegations "are not 'fraud by hindsight'" but rather "based on the actual totally deficient audits that SEK performed, SEK's knowing involvement in Orrstown's misrepresentations, and SEK's own false and misleading clean audit opinions."   (Id. at 93.)

SEPTA argues that SEK's clean audit opinions and certifications regarding no material weakness in internal controls over financial reporting should not necessarily be assessed under Omnicare, as an auditor's professional opinion is "qualitatively different" from the kind of opinion addressed by Omnicare, citing Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc., 243 F. Supp. 3d 1109, 1116 (E.D. Cal. 2017), in support of this proposition. (Doc. No. 228 at 110.)   SEPTA also argues, however, that even if SEK's opinion is assessed like any other opinion under Omnicare, the TAC adequately alleges SEK's liability under all three prongs of Omnicare.   (Id. at 111.)   As to the first prong of Omnicare, SEPTA relies on its alternative pleading that if any "statement is deemed to be a statement of opinion not verifiable by objective facts, each Securities Act Defendant is alleged to have known at the time that the subjective statement[] was made to have known that [it] . . . was untrue or . . . lacked a reasonable basis. . . ."   (Id.) (quoting Doc. No. 199 ¶ 383).   As to the second prong of Omnicare (whether an opinion contains embedded statements of facts that were untrue), SEPTA first argues that the SEK's audit opinion regarding the fact that Orrstown's financial statements "present fairly, in all material respects, the financial position of Orrstown" contains the

embedded factual statement of the financial statements themselves.   (Id. at 112.)   SEPTA also

asserts that embedded within SEK's audit opinion are the following facts:

> SEK "conducted our audits in accordance with the standards of the Public Company
> Accounting Oversight Board," [] SEK "obtain[ed] reasonable assurance about
> whether the financial statements are free of material misstatement and whether
> effective internal control over financial reporting was maintained in all material
> respects," and [] SEK did not find material weakness in ICFR, none of which was
> true.

(Id.)   In support of its assertion that these statements can constitute embedded facts, SEPTA

cites Yang v. Tibet Pharm., Inc., Nos. 14-cv-03538, 14-03620, 2015 WL 730036, (D.N.J. Feb.

20, 2015), and Miller Inv. Tr. v. Morgan Stanley & Co., LLC, 308 F. Supp. 3d 411, 430 (D.

Mass. 2018).

SEPTA maintains that the TAC also adequately alleges omissions liability under

Omnicare's third prong because, "[d]ue to omitted information here, a reasonable person reading

SEK's audit opinions would mistakenly conclude that SEK did not actually discover violations

of GA[A]P and the Loan Policy, that the documents reviewed by SEK did not reflect that

Orrstown materially understated its impaired loans, and that SEK did not have conflicts of

interest, just as examples."   (Doc. No. 228 at 113.)   SEPTA argues that the extensive

allegations of the TAC have remedied the defect in its omissions-based Securities Act claim

against SEK, arguing that the TAC has "identif[ied] particular (and material) facts going to the

basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the

knowledge it did or did not have—whose omission makes the opinion statement at issue

misleading."   (Id.) (quoting In re Valeant Pham. Int'l, Inc. Sec. Litig., No. 15-cv-07658, 2017

WL 1658822, *14 (D.N.J. Apr. 28, 2017)).   In support of its conclusion, SEPTA cites In re

Valeant; In re Am. Realty Capital Props., 2019 WL 2082508 (S.D.N.Y. May 10, 2019); In re

Petrobras Sec. Litig., No. 14-cv-09662, 2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016); and In re

<u>Lehman Bros. Sec. and ERISA Litig.</u>, 131 F. Supp. 3d 241, 259 (S.D.N.Y. 2015).

As an initial matter, the Court need not address SEPTA's argument that an auditor's opinion is "qualitatively different" from the kind of opinion discussed in <u>Omnicare</u> and should therefore be assessed under a different standard.   The Court need not do so because, after careful review of SEPTA's allegations, viewed in the light most favorable to SEPTA, it concludes that the TAC plausibly alleges a Securities Act claim under <u>Omnicare</u>'s omissions prong against SEK.   As discussed, <u>supra</u>, because SEPTA in the TAC "disclaims any allegation of fraud, scienter, or recklessness" relating to its Securities Act claims (Doc. No. 199 ¶ 28) and, further, affirmatively alleges that its "Securities Act claims are rooted exclusively in theories of strict liability and negligence" (<u>id.</u> ¶ 381), it has conceded that SEK's opinions were "honestly held" for purposes of <u>Omnicare</u>.   Further, in light of the Court's conclusion as to the TAC's plausible allegation of an omissions claim under <u>Omnicare</u>'s third prong, discussed below, the Court finds it unnecessary to determine whether the TAC also states a claim under <u>Omnicare</u>'s second prong with regard to embedded statements of fact, as argued by SEPTA.

To reiterate, a statement of pure opinion can form the basis for a Section 11 omission claim if a registration statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself."   <u>See</u> <u>Omnicare</u>, 575 U.S. at 189.   A statement of opinion is not necessarily misleading "when an issuer knows, but fails to disclose, some fact cutting the other way," as a reasonable investor "does not expect that <u>every</u> fact known to an issuer supports its opinion statement."   <u>See</u> <u>id.</u> at 189-90.   Therefore, "whether an omission makes an expression of opinion misleading always depends on context."   <u>See</u> <u>id.</u> at 190.

Based on the context provided in the TAC, the Court concludes that SEPTA has plausibly

alleged a material omission by SEK under Omnicare's standards.   The extensive allegations

pertaining to the facts of SEK's interaction with Orrstown and information available to it in

connection with its role as auditor of Orrstown's financial statements, summarized above,

persuade the Court that the TAC has addressed the pleading failures of the SAC in connection

with SEPTA's Securities Act claim against SEK.   Specifically, SEPTA has now alleged facts

giving rise to a plausible inference that SEK's opinion—that Orrstown's financial statements,

relied on by SEK in its audit, "present fairly, in all material respects, the financial position of

Orrstown [and the Bank] as of December 31, 2009 and 2008"—and its representation that

Orrstown "maintained, in all material respects, effective internal control over financial reporting

as of December 31, 2009," omitted material information regarding its audits of Orrstown prior to

that date.   Such omitted material includes Orrstown's failure to disclose impaired loans in

violation of GAAP, failure to calculate ALLL in accordance with its Loan Policy, and failure to

obtain appropriately updated borrower information and appraisals, all as set forth more fully,

supra, which may have rendered its opinion materially false or misleading.   As such, the Court

will deny SEK's motion to dismiss count 2 of the TAC.   See In re Valeant, 2017 WL 1658822,

at *14 (concluding that plaintiff stated a Section 11 omissions claim against an auditor based on

audit opinion); In re Petrobras, 2016 WL 1533553, at *4 (same); In re Lehman Bros., 131 F.

Supp. 3d at 259 (permitting Section 11 claims against an auditor and stating that "[t]he logic of

Omnicare indicates that an auditor, like any other speaker, may omit matter from its opinions on

a company's financial statements and its compliance with GAAS that would render those

opinions materially misleading to an informed reader").   The Court turns to the remaining

Securities Act claims alleged in the TAC.

### c. Section 12(a)(2) – Orrstown, the Bank, the Individual Securities Act Defendants, Defendant Embly, and the Underwriter Defendants (Count 3)

SEPTA and the Securities Act class allege that the conduct of Orrstown, the Bank, the Individual Securities Act Defendants, Defendant Embly, and the Underwriter Defendants in soliciting purchasers of the shares of the Registration Statement violated Section 12(a)(2) of the Securities Act.   (Doc. No. 199 ¶¶ 449-59.)   To state a Section 12(a)(2) claim, a plaintiff must assert that it "purchased securities pursuant to a materially false or misleading 'prospectus or oral communication.'"   See Underland, 2011 WL 4017908, at *4 (quoting 15 U.S.C. § 77l (a)(2)). Because the Court has concluded, supra, that the TAC contains facts supporting a plausible inference that Orrstown's statement that it was "adequately reserved for any potential losses," which appears in the prospectus supplement, was materially false and misleading, it will deny the Orrstown Defendants' and Underwriter Defendants' motions to dismiss count 3 of the TAC.

### d. Section 15 – Individual Securities Act Defendants (Count 4)

SEPTA alleges that the Individual Securities Act Defendants are jointly and severally liable for Orrstown's primary violation of Section 11, alleged in count 1 of the TAC.   (Doc. No. 199 ¶ 463.)   SEPTA maintains that "by virtue of their position as directors and/or senior officers of [Orrstown]," these Defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in the unlawful acts and conduct alleged in [c]ount [1]."   (Id.)   SEPTA additionally asserts their liability "based on their having signed the Registration Statement and having otherwise participated in the process that allowed the March 2010 Offering to be successfully completed."   (Id. ¶ 464.)   SEPTA posits that they "controlled the Company as well as the contents of the Registration Statement and, therefore, had the ability to either prevent issuance of the Registration Statement or cause it to be corrected."   (Id.)

However, such control person liability is "premised upon a predicate violation of the . . . 1933 Act," and because the Court has determined that the TAC has pleaded facts plausibly alleging a Section 11 violation in count 1 against Orrstown and the Bank, the Court will also deny the Individual Securities Act Defendants' motion to dismiss count 4 of the TAC.   See 15 U.S.C. § 77o; CALPERS, 394 F.3d at 142.   The Court turns to SEPTA's Exchange Act claims.

## 2. Exchange Act Claims (Counts 5 through 7)[25]

### a. Section 10(b) and SEC Rule 10b-5 – Orrstown Exchange Act Defendants (Count 5)

Count 5 of the TAC alleges that the Orrstown Exchange Act Defendants (i.e., Orrstown, the Bank, Quinn, Everly, Embly, Zullinger, Shoemaker, Snoke, and Coy) knowingly or recklessly issued or approved materially false and/or misleading statements in furtherance of a scheme which was intended to and did:

> (a) [D]eceive the investing public, including SEPTA and other members of the putative Exchange Act class, (b) artificially inflate and maintain the market price of Orrstown common stock, and (c) cause SEPTA and the other members of the putative Exchange Act class to purchase Orrstown stock at artificially inflated prices.

(Doc. No. 199 ¶¶ 601-03.)

In its TAC, SEPTA challenges Orrstown's statements made in its 2009, 2010, and 2011 Annual Reports on Form 10-K, as well as statements in quarterly financial reports (Form 10-Q) beginning with the first quarter of 2010 and continuing through the first quarter of 2012, verifying that the "management-prepared financial statements were prepared in accordance with GAAP without material weaknesses and that [Orrstown] was maintaining effective internal

---

[25] The Court notes that Defendants' motions to dismiss challenge only whether SEPTA's TAC adequately pleads prongs (1) and (2) of a Section 10b-5 claim—a material misrepresentation or omission and scienter—and do not challenge the pleading of the remaining prongs.   The Court limits its analysis accordingly.

controls." (Id. ¶ 547.)   SEPTA also challenges the SOX Certifications made by Quinn and

Everly as CEO and CFO, respectively, in those same filings to the effect that Orrstown's internal

control over financial reporting was designed "to provide reasonable assurance regarding the

reliability of financial reporting and the preparation of financial statements . . . in accordance

with [GAAP]." (Id. ¶ 541.)   SEPTA alleges that the above statements issued throughout the

Class Period were materially false and/or misleading when made because in March 2012,

Orrstown disclosed in its 2011 Annual Report on Form 10-K that, as of December 31, 2011,

there existed a "material weakness" in its internal controls over financial reporting as related to

"loan ratings and its impact on the allowance for loan losses." (Id. ¶ 550.)   SEPTA maintains

that Orrstown had therefore failed to "maintain effective internal control over financial reporting

as of December 31, 2011." (Id.)   These statements were challenged in the SAC.[26]

As noted above, in its Memorandum addressing the motions to dismiss the SAC, the

Court took judicial notice of the SEC Order and the following findings contained in it relating to

Orrstown's financial reporting beginning in the second quarter of 2010 and through 2011:

> In 2010, as Orrstown's primary lending markets were experiencing a significant
> decline in real estate values, Orrstown incorrectly accounted for its commercial
> loans by not disclosing as much as approximately $69.5 million in loans as
> "impaired" in accordance with [GAAP]. . . .   Orrstown did not comply with
> GAAP's impaired loan disclosure requirements due to certain Respondents'
> negligence and Orrstown's lack of sufficient internal accounting controls.   This
> failure resulted in material misstatements in Orrstown's impaired loan disclosures
> in its quarterly filings for the period ended June 30, 2010 through September 30,
> 2011, and its annual filings for the years ended December 31, 2010 and 2011.
>
> Additionally, Orrstown (i) did not calculate loan losses in accordance with GAAP
> in connection with the filing of its Form 10-Q for the period ended June 30, 2011,
> (ii) incorrectly implemented a newly issued GAAP accounting pronouncement in
> connection with the filing of its Form 10-Q for the period ended June 30, 2011 in a

---

[26] As the Court noted, supra, subsequent to the parties' briefing on the motions to dismiss,
Defendants conceded on appeal that these claims did not offend the relevant statute of repose;
accordingly, the Court assumes their timeliness for purposes of its discussion.

manner that was not consistent with the new standard, and (iii) incorrectly applied GAAP when calculating fair value for certain collateral in connection with its impairment analyses for its Form 10-Q for the periods ended June 30, 2010 and September 30, 2010.

(Doc. No. 122, Exh. 1, SEC Order ¶¶ 2-5.)   In view of this additional information, the Court

concluded that the SAC's allegations, coupled with the SEC Order, supported an inference that:

> Orrstown failed to maintain an adequate system of internal accounting controls through the relevant time period—second quarter 2010 through 2011—and that such failure resulted in inaccuracies in financial reporting during that time, including "(1) incorrect loan risk ratings; (2) incorrect disclosures of impaired loans; (3) incorrect calculations and disclosures of loan losses; (4) incorrect application of newly issued accounting pronouncements; and (5) the lack of action to remedy accounting problems after being alerted to them."

(Doc. No. 126 at 49.)   These allegations, as the Court discussed, supported a reasonable

inference that the challenged statements regarding the effectiveness of Orrstown's financial

reporting for the second quarter of 2010 through 2011 were false and misleading at the time they

were made.   (Id. at 46.)   Further, the Court found that it was unable to "conclude at this stage of

the proceedings that Orrstown's alleged misstatements regarding the effectiveness of its internal

control over financial reporting in its 2010 and 2011 Annual Reports on Form 10-K and its

quarterly reports on Form 10-Q (beginning with the second quarter of 2010 through the end of

2011) are 'so obviously unimportant to an investor' as to be immaterial as a matter of law."

(Id.)[27]

---

[27]  The Court did not explicitly discuss the standard applicable to an Exchange Act claim based on Orrstown's representations and certifications in the 2009 Annual Report—i.e., whether Omnicare applied to such a claim.   Notably, since the issuance of the Court's opinion addressing the motions to dismiss the SAC, the Third Circuit has on three occasions declined to determine whether Omnicare applies to claims asserted under the Exchange Act.   See In re Amarin Corp. PLC Sec. Litig., No. 21-2071, 2022 WL 2128560, at *3 (3d Cir. June 14, 2022) (declining to "decide[] whether the framework in Omnicare is applicable to claims under § 10(b) of the Exchange Act"); Jaroslawicz, 962 F.3d at 717 n.16 (stating "[w]e have not considered whether Omnicare applies to claims brought under the Exchange Act"); In re Amarin Corp. PLC Sec. Litig., 689 F. App'x 124, 132 n.12 (3d Cir. 2017) (declining to "decide whether Omnicare is

Moreover, as to Orrstown, the Bank, and Individual Defendants Quinn, Everly, and

Embly, the Court concluded that SEPTA had alleged specific facts supporting a strong inference

that they issued or approved the challenged representations in Orrstown's financial reporting

with the requisite scienter sufficient to state a claim under the Exchange Act.   (Id. at 49-50.)

The Court noted that "[t]he inference that the representations were made with reckless disregard

of their truth is 'at least as compelling as any opposing inference of nonfraudulent intent.'"   (Id.)

(quoting Tellabs, 557 U.S. at 314.   As the Court stated in its Memorandum:

> [T]he SEC Order supports an inference that, given the information they knew or
> should have known as members of Orrstown's Loan Committee, Executive
> Committee, and/or Board of Directors, Defendants Quinn, Everly, and Embly knew
> or should have known in 2010 that certain significant lending relationships became
> impaired or should have been evaluated for impairment, yet they did not raise any
> concerns as to whether the loans should have been disclosed as impaired in
> accordance with relevant accounting standards.   Moreover, the SEC Order
> supports an inference that, as [CFO] and [CCO], [] Everly and Embly "were directly
> notified that Orrstown's Loan Review Officer did not appropriately record as
> impaired in Orrstown's books and records loans that had been assigned impairment
> losses," and that such a failure was inconsistent with accounting guidance, resulting
> in numerous misstatements by Orrstown in SEC filings from the second quarter of
> 2010 through the end of 2011, yet neither of them took action upon receipt of this
> information.   Further, the SEC Order supports an inference that Defendants Quinn,
> Everly, and Embly knew or should have known in 2011 that loan losses were not
> calculated in accordance with generally accepted accounting principles, yet they
> failed to take action to remedy that fact.   Finally, the SEC Order supports an
> inference that [] Quinn, Everly, and Embly knew or should have known, in the
> second and third quarters of 2010, that [Orrstown's] "use of stale appraisals in
> connection with the measurement of impairment loss, and its use of a universal
> discount rate, did not comply with GAAP and Orrstown's own loan policy."

(Id. at 48-49) (cleaned up).

SEPTA maintains that the TAC—in addition to more fully supporting the Exchange Act

---

applicable to § 10(b) claims").   Yet the Second Circuit, in a nonprecedential opinion, has
applied Omnicare's standard for actionable opinion statements to an Exchange Act claim based
on statements regarding internal controls.   See Fogel v. Vega, 759 F. App'x 18, 24 (2d Cir.
2018).

claims sustained by the Court in connection with the SAC—has pleaded facts "giving rise to the same strong inference of scienter beginning at least as early as the Offering Documents (including the 2009 10-K filed March 15, 2010)" with regard to the SOX-related representations. (Doc. No. 228 at 79.)

Before assessing the TAC's Exchange Act claims based on statements in the Offering Documents, the Court addresses the re-asserted Exchange Act claims, previously sustained by the Court, related to SOX-related representations made beginning in the second quarter of 2010 through 2011.   To restate, the Court previously found that the SAC adequately pleaded Exchange Act claims based on those representations.   The Court concluded that the allegations of the SAC (coupled with the factual support provided by the SEC Order) supported a plausible inference that the statements regarding the effectiveness of Orrstown's internal controls over financial reporting for second quarter 2010 through 2011 were false and/or misleading when made, and were potentially material.   The Court sees no reason to revisit its previous conclusion in this regard in the light of the additional factual allegations contained in the TAC.[28]   The Court similarly sees no reason to revisit another of its previous conclusions, i.e., that, "as to Exchange Act Defendants Quinn, Everly, and Embly, and the Orrstown Defendants, [SEPTA] has alleged facts supporting a strong inference that those defendants issued or approved the challenged representations in Orrstown's financial reporting with the requisite scienter to state a claim under

---

[28]  The parties have not explicitly briefed the issue of Omnicare's potential application to SEPTA's Exchange Act claims, and the Court is reluctant to resolve this issue of first impression without briefing from the parties as to its applicability.   However, in light of the allegations in the TAC supporting the knowledge of Quinn, Everly, and Embly regarding potential deficiencies in internal controls over financial reporting by at least the second quarter of 2010, described supra, the Court concludes, in any event, that even assuming its applicability, the TAC's allegations satisfy Omnicare's first prong—that is, they support a plausible inference that these defendants knew that the statements were false and/or misleading when made.

the Exchange Act."   (Doc. No. 126 at 50.)   Pursuant to the allegations of the TAC, the

inference that the representations and certifications were made with reckless disregard of their

truth during that time period is "at least as compelling as any opposing inference of

nonfraudulent intent."   See Tellabs, 551 U.S. at 314.[29]

  However, as to Exchange Act Defendants Zullinger, Shoemaker, Snoke, and Coy, the

Court agrees with the Orrstown Defendants that the additional factual allegations contained in

the TAC do not add to the scienter picture previously painted by the SAC.   The TAC is bereft of

any specific allegations as to the knowledge of these Defendants with regard to SOX-related

representations from the second quarter of 2010 through 2011.   SEPTA points to these

Defendants' membership on one or both of Orrstown's Enterprise Risk Management Committee

and Loan Committee and notes their signatures on the 10-Ks issued throughout the relevant

period.   (Doc. No. 228 at 84.)   Asserting that "the evidence of scienter against [these]

Defendants may not be of the 'smoking gun' genre," SEPTA contends that there is at least

sufficient 'circumstantial evidence of either reckless or conscious behavior' to give rise to a

strong inference of scienter at this stage."   (Id.)   Given the lack of specific allegations regarding

---

[29] As before, the Court concludes that its finding of a sufficient allegation of scienter as to
Defendants Quinn (as CEO) and Everly (as CFO) suffices to support a finding of scienter on the
part of Orrstown and the Bank as well.   That is so because "[w]hen the defendant is a corporate
entity," the "pleaded facts must create a strong inference that someone whose intent could be
imputed to the corporation acted with the requisite scienter," and "[i]n most cases, the most
straightforward way to raise such an inference for a corporate defendant will be to plead it for an
individual defendant."   See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.,
531 F.3d 190, 195 (2d Cir. 2008).   The Third Circuit has not definitively opined as to the
pleading of scienter on behalf of a corporate entity, but a district court in this circuit has followed
the Second Circuit's lead in Dynex and found corporate scienter sufficiently alleged where the
pleaded facts "create[d] a strong inference that someone whose intent could be imputed to the
corporation acted with the requisite scienter."   See Chao Sun v. Han, No. 15-cv-00703, 2015
WL 9304542, at *12 (D.N.J. Dec. 21, 2015) (quoting Dynex, 531 F.3d at 195).   This Court
adopted such an approach in connection with its opinion regarding the SAC (Doc. No. 126 at 50
n.13) and sees no reason to alter it here.

knowledge on the part of these Defendants, the Court discerns no basis for revisiting its previous conclusion that, "absent any allegation as to how they would have known the challenged representations were false and/or misleading at the time they were made, the Court finds that [SEPTA] has failed to allege facts supporting a strong inference of scienter as to those defendants."   (Doc. No. 126 at 50); see Appvion v. Buth, 475 F. Supp. 3d 910, 933-34 (E.D. Wisc. 2020) (rejecting fraud claims against members of an ESOP Committee for lack of "specific allegations suggesting that they knew the valuations were artificially inflated as alleged and, despite that fact, intended to release the prices to the Employee Participants for fraudulent purposes," stating, "[t]he fact that [they] were members of the ESOP Committee does not relieve [plaintiff] of his obligation to sufficiently plead scienter").   The Court turns to the TAC's assertion of Exchange Act claims based on statements in the Offering Documents.

The Court will first address the TAC's challenge to the statements in Orrstown's 2009 10-K addressing the November Loan Review, as well as the Offering Documents' statement that "at December 31, 2009, we had 50 loan relationships, aggregating $307.5 million that were performing according to their original terms with outstanding balances that exceeded $3.0 million."   (Doc. No. 199 ¶¶ 485-91.)   In light of the Court's conclusion, supra (in connection with SEPTA's Securities Act claims), that the statements regarding the November Loan Review are either conclusory, constitute inactionable puffery, or are otherwise not supported by facts giving rise to a plausible inference that there were false and/or misleading when made, the Court also concludes that the TAC fails to state an Exchange Act claim based on these statements. Similarly, as to the "50 loan relationships" statement, the Court previously concluded, supra (in connection with SEPTA's Securities Act claims), that the TAC failed to plausibly allege the material falsity of the statement, in light of the lack of specificity of the statement coupled with

the Offering Documents' disclosure that multiple large loans were having problems.   That

conclusion compels the Court to similarly conclude that the TAC fails to state an Exchange Act

claim based on the "50 loan relationships" statement in Orrstown's 2009 10-K.[30]

The TAC's remaining Exchange Act claims pertain to Orrstown's representations and

accompanying SOX Certifications regarding internal controls over financial reporting issued in

connection with the Offering Documents (i.e., prior to the second quarter of 2010), as well as

Orrstown's alleged "deliberate manipulation" of its ALLL in the 2009 10-K.   First, as noted

above, with regard to the representations and SOX Certifications, the Court previously concluded

that because the SAC failed to adequately plead facts supporting a reasonable inference that the

SOX-related representations contained in Orrstown's 2009 Annual Report were materially false

and/or misleading when made (for purposes of a Securities Act claim), the SAC similarly failed

to state an Exchange Act claim based on the same.   (Doc. No. 126 at 39 n.12.)   Once again, the

Court concluded, supra, that the TAC fails to state a Securities Act claim based on such

representations.   It did so upon concluding that the representations amounted to an opinion

subject to the pleading requirements of Omnicare, and because the TAC disclaims "any

allegation of fraud, scienter, or recklessness" in connection with that claim, the Court concluded

that SEPTA had conceded that such opinions were "honestly held" for purposes of Omnicare's

first prong, and the Court further concluded that the TAC failed to plead a claim under the

Securities Act based on an embedded statement of fact or omission under Omnicare's standards,

see supra at 91-94.

In moving to dismiss the TAC's Exchange Act claim based on the certifications and

---

[30] As noted above in connection with its Securities Act discussion, given the Court's conclusion
that the TAC fails to state an Exchange Act claim based on these two statements, the Court
concludes that it is unnecessary to resolve the issue of the timeliness of these claims.

representations in the 2009 10-K regarding internal controls over financial reporting, the

Orrstown Defendants argue that SEPTA has not pleaded "facts showing that the signers knew of

any inaccuracy with respect to the disclosures about the effectiveness of Orrstown's internal

controls."   (Doc. No. 214 at 41.)   They maintain that "it is impermissible hindsight to infer that

because Orrstown disclosed in its 2011 10-K that it had a material weakness in internal controls

at December 31, 2011, its internal controls at 12/31/2009 and 12/31/2010 must have also had a

material weakness that required disclosure, or that the Orrstown Defendants were aware of any

such weakness before 2011," especially given the 2009 10-K's cautionary language regarding

this issue, as follows:

> While we have reported no "material weaknesses" in the Form 10-K for the fiscal
> year ended December 31, 2009, we cannot guarantee that we will not have any
> "material weaknesses" reported in our management's report on internal control or
> by our independent registered public accounting firm in the future.

(Id.) (quoting Doc. No. 214-1 at 19).   The Orrstown Defendants also point to the fact that

neither the SEC, nor the Federal Reserve, nor the Pennsylvania Department of Banking required

Orrstown to restate its financials, which it maintains is an important fact cutting against any

finding of scienter related to the representations and certifications in the 2009 10-K.   (Doc. No.

234 at 13 n.6.)   Ultimately, the Orrstown Defendants maintain that the TAC alleges

"substandard management or suboptimal business processes" which "are not securities law

violations."   (Id. at 14) (citing Kates v. Kandarian, No. 19-01266, 2020 WL 4287374, at *11 (D.

Del. July 27, 2020) (stating that "internal management problems are not actionable under the

securities fraud laws unless they involve scienter")).

In response, SEPTA supports its allegations of scienter by pointing to the assertion in

paragraph 342 of the TAC, where it describes how SEK communicated with Orrstown in

connection with its 2009 audit by way of a "Control Deficiency Comment and Management

117

Point Development Worksheet," wherein it noted:

> During our review of loan files, we noted some older appraisals in the loan files and some stale financial information. . . .   Appraisals have not been updated and more recent financial information has not been obtained from customers. . . .   With deteriorating real estate values in recent years, some older appraisal values may no longer be valid and without updated financial information, management has no way of determining the current financial condition of business customers.

(Doc. No. 228 at 80-81) (quoting Doc. No. 199 ¶ 342).   SEPTA maintains that SEK discussed this issue with CCO Embly, who informed SEK that "updated appraisal values are generally not obtained unless there is a problem developing with the loan, management feels the property value has deteriorated, or the customer wants to obtain a new credit."   (Id.)   SEPTA argues that this notification and conversation indicates Embly's intent to deceive Orrstown investors as to the financial condition of the Bank in connection with the 2009 10-K.   (Id. at 81.)   SEPTA also points to the fact that Quinn, Everly, and Embly were members of the Loan Committee who were ultimately responsible for ensuring that each loan was supported by adequate information. (Id. at 81-82.)   SEPTA argues that, as committee members, Quinn, Everly, and Embly received access to information regarding borrowers' financial difficulties, as a consequence of which "each [of them] knew, or was reckless in not knowing, that many of the Bank's largest borrowers were suffering poor cash flow, that their collateral values had seriously declined as a result of the financial crisis, that modifications to their loans should have been identified as TDRs, and that reserves and/or impairments should have been calculated."   (Id. at 82-83.)   Accordingly, SEPTA maintains that the TAC supports the Court's conclusion that "the same inference of scienter the Court already found with respect to Orrstown, Quinn, Everly, and Embly beginning second quarter 2010" applies to the representations and SOX Certifications in the Offering Documents.   (Id. at 83.)   Further, SEPTA argues that its allegations also support "a strong inference of scienter" with respect to Defendants Zullinger, Shoemaker, Snoke, and Coy.   (Id.)

As previously mentioned, the parties do not address the issue of Omnicare's potential application to an Exchange Act claim based on the SOX-related representations in the Offering Documents and the Court's determination as to whether the TAC has adequately pleaded their material falsity.   The Court nevertheless finds it unnecessary to resolve this issue because, upon careful review of the allegations of the TAC, the Court's Memorandum addressing the motions to dismiss the SAC, and the SEC Order—and assessing all of SEPTA's allegations "holistically," see Tellabs, 551 U.S. at 326—the Court concludes that the TAC fails to allege specific facts supporting a strong inference that Quinn, Everly, and/or Embly issued or approved the challenged representations and SOX Certifications in Orrstown's financial reporting (prior to second quarter 2010) with the requisite scienter to state an Exchange Act claim.   As the Court discussed in connection with the TAC's Securities Act claim based on the same statements, SEPTA does not allege that anyone told Quinn or Everly that Orrstown's internal controls over financial reporting were ineffective—or even suggested that they might be—prior to the March 2010 Offering.   With regard to SEPTA's argument that the Court should conclude, based on the allegations of the TAC, that the "strong inference of scienter" previously found by the Court in connection with the SAC's allegations concerning the time period beginning in the second quarter of 2010 should extend to the representations and certifications in the Offering Documents as well, the Court is unpersuaded, for reasons discussed below, that the allegations of the TAC meet this standard.

As an initial matter, the Court notes that its previous conclusion with regard to scienter in connection with SOX-related representations beginning in second quarter 2010 rested on the factual basis provided by the SEC Order, which described specific information that Quinn and Everly received after providing the certifications in the Offering Documents, including that:

> [A]s [CFO] and [CCO], [] Everly and Embly 'were directly notified that Orrstown's Loan Review Officer did not appropriate record as impaired in Orrstown's books and records loans that had been assigned impairment losses,' and that such a failure was inconsistent with accounting guidance, resulting in numerous misstatements by Orrstown in SEC filings from the second quarter of 2010 through the end of 2011, yet neither of them took action upon receipt of this information.
>
> . . . .
>
> On or around September 2, 2011, [Orrstown's accountant] informed Quinn, Everly, and Embly that [Orrstown's methodology for calculating loan losses] was 'not technically within the accounting rules' but none of them took any action to alter [the loan loss methodology] to conform to GAAP.

(Doc. No. 122, SEC Order ¶¶ 34, 43).   Accordingly, in order for the TAC to adequately allege scienter with regard to the challenged representations in the Offering Documents, the TAC must point to specific facts suggesting that Quinn and Everly (as the individuals responsible for the challenged statements) had knowledge—or were at least reckless as to their knowledge—of material weaknesses in Orrstown's internal controls prior to their certifications in the 2009 10-K. See Woolgar v. Kingstone Cos., 477 F. Supp. 3d 193, 230 (S.D.N.Y. 2020) (finding Exchange Act claim relating to internal controls insufficiently pleaded where complaint did not "contain factual allegations supporting the inference that the defendants knew about any material weakness in the [c]ompany's internal controls prior to" their provision of SOX certifications).

Yet the TAC merely asserts, in a conclusory manner, that at the end of 2009, Quinn, Everly, and Embly knew—or were reckless as to their knowledge—that there was a "material weakness" in Orrstown's internal controls, alleging that "[a]t least by the end of 2009, Quinn, Everly, and Embly in particular were aware of the material weaknesses in internal controls[.]" (Doc. No. 199 ¶ 471.)   Further, the allegations provided by the two confidential witnesses who worked at Orrstown prior to the 2010 Offering do not add specificity to this conclusory allegation.   (Doc. No. 126 at 26) (concluding that SEPTA's allegations do not attribute to those

two confidential witnesses "any personal knowledge with regard to the design and evaluation of internal controls over financial reporting" and instead pertain to "issues of loan underwriting and risk management practices").

As noted above, SEPTA's attempt to point to specific facts supporting its scienter allegations as to these representations and certifications focuses on Embly's response to SEK's "Control Deficiency Comment" regarding older appraisal values (made in connection with its 2009 audit), which it maintains "shows intent from Embly to deceive Orrstown investors." (Doc. No. 228 at 81.)   SEPTA also points to the TAC's allegation that Embly deliberately manipulated Orrstown's ALLL in the 2009 10-K by way of Orrstown's removal of required reserves for the Mourtil and J&S loans—as well as its failure to create a reserve for Marvin Windows—because it sought to cover another required reserve without increasing Orrstown's ALLL.   (Id. at 82) (citing Doc. No. 199 ¶¶ 492-518).   However, as pointed out in the parties' briefing, unlike Quinn and Everly, Embly did not sign the Management's Report on Internal Control in the 2009 10-K.   Nor did he provide an accompanying SOX certification.   Further, Embly was not responsible for designing and supervising Orrstown's internal controls over financial reporting.   See 17 C.F.R. § 240.15d-15(f) (stating that an entity's principal executive [CEO] and principal financial officers [CFO] are responsible for designing or supervising internal controls over financial reporting).   Accordingly, the TAC's allegations pertaining to Defendant Embly's knowledge and interaction with SEK in connection with its 2009 audit of Orrstown and calculation of ALLL do not necessarily assist in supporting a strong inference of scienter with regard to Quinn and Everly as certifying officers in relation to the 2009 10-K's representations and certifications regarding effective internal controls.   See, e.g., Lewis, 2020 WL 1493915, at *19 (finding failure to plead scienter where amended complaint did not allege

that signers of SOX certifications knew of the alleged fraud during the relevant time period).

Beyond the TAC's assertion of these specific facts regarding Defendant Embly in relation to the 2009 10-K's Management Report on Internal Control and accompanying SOX certifications, SEPTA relies on the fact that Quinn, Everly, and Embly were members of the Loan Committee—which "reviewed borrowers' requests for loan modifications and, in the course of those meetings, received information regarding the borrowers' financial difficulties" (Doc. No. 228 at 82)—as support for its position that the TAC adequately alleges a strong inference of scienter with regard to the SOX-related statements concerning internal controls. Without more, however, this allegation falls short of supporting a strong inference of knowledge or recklessness on the part of Quinn or Everly with regard to a material weakness of internal controls in reference to the 2009 10-K that is at least as compelling as a competing inference of nonfraudulent intent (i.e., negligence or a belief that any potential deficiency in internal controls did not rise to the level of a "material weakness").   The Court's conclusion in this regard is supported by the fact that Orrstown has not had to revise its disclosure of financial results for that period as a result of any material weakness.   See Johnson v. Costco Wholesale Corp., 18-cv-01611, 2019 WL 6327580, at *20 (W.D. Wash. Nov. 26, 2019) (finding no strong inference of scienter where defendants "did not have to revise public disclosures of financial results as a result of a material weakness in internal controls, suggesting that any material weakness did not rise to the level of 'patently obvious'" to defendants).   For all of the above reasons, and viewing the TAC's allegations "holistically," as the Court is required to do when assessing scienter, see Tellabs, 551 U.S. at 326, the Court concludes that SEPTA has failed to allege a strong inference of scienter in connection with Orrstown's Management's Report on Internal Control and the accompanying SOX Certifications prior to the second quarter of 2010—i.e., in the Offering

Documents.   Therefore, SEPTA has failed to state an Exchange Act claim based on these statements.[31]

The TAC's final Exchange Act claim related to Orrstown's 2009 10-K arises from its assertion that Defendant Embly deliberately manipulated Orrstown's ALLL calculation in the 2009 10-K.[32]   The TAC alleges, in relevant part:

> [I]n addition to the material misstatements above, the Exchange Act defendants, and in particular Defendant Embly, also perpetrated a deliberate manipulation of the Bank's ALLL calculation for purposes of the 2009 10-K by removing at least two large borrowers from the ALLL calculation, Antonio Mourtil and J&S, without any valid justification, and by failing to include a known, required reserve for Marvin Windows/Robert Slagle, in order to hide the declining quality of the Bank's loan portfolio and impending losses.

(Doc. No. 199 ¶ 492.)   The TAC's allegations regarding Embly's alleged manipulation of the ALLL in the 2009 10-K are set forth fully, supra at § III.A.5.

In moving to dismiss this claim, the Orrstown Defendants first argue that Orrstown's ALLL as stated in the 2009 10-K is a statement of opinion about the likelihood of future losses, which is subject to the PSLRA's statutory safe harbor in light of the cautionary language contained in Orrstown's 2009 10-K, including the following:

> We may be required to make further increases in our provisions for loan losses and to charge off additional loans in the future, which would materially adversely affect us.

\*     \*     \*

---

[31]   Given the Court's conclusion that the TAC fails to plausibly allege a strong inference of scienter as to Quinn and Everly, the individuals who issued the challenged statements, the Court also concludes that the TAC fails to plausibly allege scienter as to the other Orrstown Exchange Act Defendants.

[32]   The Court notes that an Exchange Act claim based on Orrstown's alleged manipulation of its ALLL in its 2009 10-K did not appear in the SAC.   However, the FAC asserted an Exchange Act claim based on allegedly fraudulent statements in the 2009 10-K, including statements pertaining to the adequacy of the ALLL.   See (Doc. Nos. 40 at 123-29, 92 at 70).   Accordingly, the Court concludes that this claim is timely for purposes of the applicable statute of repose.

> There is no precise method for predicting loan losses.   We can give no assurance
> that our allowance for loan losses is or will be sufficient to absorb actual loan losses.
> We maintain an allowance for loan losses . . . that represents management's best
> estimate of probable incurred losses within the existing portfolio of loans.

*       *       *

> [B]ank regulatory agencies periodically review our allowance for loan losses and
> may require us to increase the provision for loan losses or to recognize further loan
> charge-offs, based on judgments that differ from those of management.

(Doc. No. 214 at 31) (quoting Doc. No. 214-1 at 13).   The Orrstown Defendants also discount

the TAC's allegations with respect to the ALLL by noting that Orrstown was never required to

restate its financials (including the challenged ALLL).   (Id. at 32.)

The Orrstown Defendants additionally argue that the TAC fails to plead scienter with

regard to any Exchange Act claim based on the ALLL because, with regard to the TAC's

"allegations of a grandiose 'deliberate scheme orchestrated by Embly' to understate ALLL

because he did not include a reserve for certain loans," the "more plausible inference is that

Embly, using his judgment, mistakenly or not, concluded that no reserve was required for those

loans."   (Id.)   The Orrstown Defendants maintain that the facts alleged in the TAC support that

inference, arguing as follows:

> For example, while SEPTA concludes that Orrstown should not have upgraded the
> J&S Enterprise loan's rating to watch, that decision is clearly subjective and there
> is no question Orrstown had a reasonable basis to do so.   As SEPTA openly
> acknowledges, "cash flow [for the loan] has continued to be adequate and the loan
> has remained current." (TAC ¶ 513.)   And while the TAC alleges that SEK
> disagreed with the Bank's decision, the TAC also acknowledges that SEK
> recognized that "[Orrstown] used different factors" in its evaluation of the loan.
> (TAC ¶ 513.)   Moreover, while the TAC asserts that Orrstown's purported basis
> for upgrading the loan (that the borrower's inventory was down and sales were up)
> was "transparently false," the TAC also acknowledges that the borrowers'
> inventory had decreased by over 13%.   As the TAC recognizes, Orrstown and
> Embly had multiple reasons to rate the J&S loan "watch" in 2009, and the fact that
> SEPTA (11 years later and with the benefit of hindsight) disagrees with Orrstown's
> decision is not, and cannot be, securities fraud.

124

(Doc. No. 214 at 38-39.)   The Orrstown Defendants also maintain that the TAC's allegations regarding Orrstown's treatment of the Mourtil loan provide no support for an Exchange Act claim based on the ALLL.   They argue that, while the TAC alleges that Orrstown had no justification for its failure to include the loan in its ALLL, "the TAC also acknowledges that Orrstown required a principal payment of $100,000 in exchange for extending the Mourtil loan," and thus, "the inference that Embly, using his judgment, determined the loan did not need to be included in the ALLL is far more plausible than the 'deliberate fraudulent scheme' alleged by SEPTA."   (Id. at 39 n.15.)

In response, as it did in connection with its Exchange Act claim based on Orrstown's 2009 10K Management Report on Internal Control and accompanying SOX Certifications, SEPTA points to Embly's response to SEK's "Control Deficiency Comment" regarding older appraisal values, which it maintains "shows intent from Embly to deceive Orrstown investors." (Doc. No. 228 at 81.)   SEPTA references its allegations regarding Embly's actions with regard to the 2009 10-K's ALLL, specifically citing his removal of reserves previously determined to be required for loans to Mourtil and J&S and his failure to create a required reserve for Marvin Windows so that Orrstown could provide a $2 million required reserve for Windy Heights, all without increasing its reported ALLL.   (Id. at 82.)   SEPTA points to the allegations of the TAC in paragraphs 506 to 515, according to which Embly expressed his concern regarding the matured loans list in November 2009 and subsequently acted to omit the impaired loans described above, thereby preventing an increase in reported ALLL.   (Id.)   Further, SEPTA points to the TAC's description of "how Orrstown failed to rate as Substandard numerous loans of its riskiest borrowers even after becoming aware that they would be unable to pay their debts as a result of the real estate crash (including the Azadis, the Shaools, Tom Mongold, Mourtil, and

J&S, as examples)."   (Id.) (citing Doc. No. 199 ¶¶ 214-26, 243-60, 274-84, 304).   SEPTA notes

that Quinn, Everly, and Embly, as a members of committees overseeing borrower loan-

modification requests, see supra, "each knew, or was reckless in not knowing, that many of the

Bank's largest borrowers were suffering poor cash flow, that their collateral values had seriously

declined as a result of the financial crisis, that modifications to their loan should have been

identified as TDRs, and that reserves and/or impairments should have been calculated."   (Id. at

82-83.)

The Court first addresses the Orrstown Defendants' argument that the ALLL is a

statement of opinion potentially subject to the PSLRA's statutory safe harbor.   The Court

reiterates its conclusion that the TAC plausibly alleges a material misrepresentation or omission

with regard to two statements in the Offering Documents which pertain to the amount or

adequacy of Orrstown's loan loss reserves (or ALLL) based on the TAC's allegations that

Orrstown failed to comply with its disclosed methodology for calculating ALLL.   It is for that

reason that the Court found it unnecessary to consider whether the TAC also stated an omissions-

based opinion claim under Omnicare based on statements regarding the ALLL in Orrstown's

2009 10-K.   For the same reasons—and in light of the TAC's plausible allegation that Orrstown

failed to comply with its disclosed methodology for calculating ALLL—the Court finds it

appropriate to consider Orrstown's ALLL in a similar manner for purposes of SEPTA's

Exchange Act claim based on the ALLL.   As a result, the Court concludes that the TAC

contains facts plausibly alleging that Orrstown's ALLL calculation in the 2009 10-K constituted

a material misrepresentation or omission.   Accordingly, to determine whether the TAC has

stated an Exchange Act claim pertaining to the 2009 ALLL, the Court assesses the allegations of

the TAC with regard to scienter and the 2009 ALLL.

Upon a thorough and holistic review of the allegations of the TAC, the Court concludes, at least as to Embly, that the TAC alleges specific facts supporting a strong inference—at least as compelling as any competing inference of nonfraudulent intent—that he issued or approved the 2009 10-K's ALLL with at least reckless disregard of its accuracy sufficient to state a claim under the Exchange Act.   To summarize, the TAC asserts that upon notice that a large borrower (Windy Heights) would become nonperforming in the first quarter of 2010 and require a significant ($2 million) reserve, Embly acted to remove two large reserves (J&S and Mourtil) that totaled the approximate amount of the Windy Heights reserve, all to avoid increasing the total amount of the ALLL to be presented in the Offering Documents. The TAC alleges that SEK explicitly disagreed with Embly's removal of the J&S loan from the reserve.   The TAC also alleges that the November Loan Review resulted in a recommendation that the Marvin Windows loan be considered Substandard, which would have required calculating an ALLL reserve on the loan under the Bank's Loan Policy.   However, according to the TAC, while the Bank projected that a potential $800,000 reserve would be required for the loan as of December 31, 2009, the final ALLL schedule utilized in connection with the Offering Documents did not include any reserve for Marvin Windows.   The TAC further alleges that, after the Offering took place, the Bank added a $1.5 million reserve for Marvin Windows in its first quarter 2010 financial results.

These facts, asserted in detail in the TAC at paragraphs 492 through 518, provide a description of Embly's treatment of the Mourtil, J&S, and Marvin Windows loans in connection with the 2009 ALLL which supports a strong inference that he manipulated the treatment of these loans so as to lower the ALLL to be presented in the Offering Documents, or was at least reckless with regard to the accuracy of the ALLL as stated in the 2009 10-K.   See, e.g., In re Signet Jewelers Ltd. Sec. Litig., No. 16-cv-06728, 2018 WL 6167889, at *13-16 (S.D.N.Y. Nov.

26, 2018) (sustaining Exchange Act claim based on quantitative inadequacy of loan loss reserve amount where defendant knew its reserve amount was misleading).

The Court has assessed the facts that the Orrstown Defendants deem supportive of a competing inference of nonfraudulent intent with regard to the 2009 ALLL calculation, specifically, the allegation that Embly removed a reserve for J&S from the ALLL due to a decrease in borrower inventory and removed a reserve for the Mourtil loan from the ALLL due to a principal payment on the loan.   However, the Court concludes that such facts do not suffice to support a competing inference of nonfraudulent intent—i.e., that, in the exercise of Defendant Embly's judgment, the loans did not need to be included in the ALLL—that is at least as plausible as an inference that the ALLL calculation was presented with reckless disregard of its truth.   Therefore, the Court cannot conclude at this time that the TAC fails to support an inference of scienter with regard to the 2009 ALLL calculation, at least with regard to Embly, as well as Orrstown and the Bank.[33]

In accordance with all of the above, the Court will grant the Orrstown Defendants' motion to dismiss count 5 of the TAC as to Defendants Zullinger, Shoemaker, Snoke, and Coy, but, as before, will deny the motion to dismiss count 5 as to Orrstown, the Bank, and Individual Defendants Quinn, Everly, and Embly.[34]

> **b.     Section 20(a) – Individual Defendants Quinn, Everly and Embly (Count 7)**

---

[33] As noted, supra at n.28, based on the Court's finding of a strong inference of scienter on the part of Embly as Chief Credit Officer of the Bank with regard to the 2009 ALLL, the Court concludes that his intent can be fairly imputed to Orrstown and the Bank.   See Dynex, 531 F.3d at 195.

[34] As stated in the Court's prior Opinion, the Orrstown Exchange Act Defendants' challenge to SEPTA's standing as it relates to purchases of stock made after May 9, 2011, will be addressed by the Court in connection with a class certification motion.

128

Count 7 alleges that Defendants Quinn, Everly, and Embly acted as controlling persons within the meaning of Section 20(a) of the Exchange Act.   (Id. ¶ 619.)   To sufficiently allege a Section 20(a) claim, SEPTA must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws.   See In re Suprema, 438 F.3d at 285.   The Court has already concluded that the TAC adequately alleges a primary violation of Section 10(b) by these Defendants, Orrstown, and the Bank.   As to control liability, the TAC alleges that, by virtue of their power to control public statements about Orrstown as its CEO, CFO, and COO, respectively, Defendants Quinn, Everly, and Embly had the power and authority to control Orrstown and its employees.   (Id. ¶ 619.)   These allegations sufficiently plead "actual control" under the PSLRA.   Therefore, the Court will deny the Orrstown Defendants' motion to dismiss count 7 of the TAC.

### c.    Section 10(b) and SEC Rule 10b-5 – Defendant SEK (Count 6)

In Count 6 of the TAC, SEPTA reiterates its claim from the SAC that Defendant SEK violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 because it "knew or recklessly disregarded the facts which indicated that Orrstown and the Bank's financial statements were materially false and misleading, and issued unqualified opinions on 2009, 2010, and 2011 financial statements when such financial statements materially understated the Company's Risk Assets, Loan Loss Reserves and net income."   (Doc. No. 199 ¶ 614.)   As noted above, the Court previously concluded that SEPTA's FAC and SAC both failed to state a Section 10(b) claim against SEK.   As to the SAC, the Court noted that it contained virtually no new factual allegations as to SEK and found, as it did in addressing the motions to dismiss the FAC, that SEPTA had "failed to allege facts allowing an inference that Defendant SEK 'recklessly or knowingly issued a materially false and misleading audit opinion,' or that 'the accounting

judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.'"   (Doc. No. 126 at 52-53.)

As an initial matter, the Court notes that it has already concluded, supra, that the TAC has plausibly alleged a Securities Act claim—or a materially false and/or misleading statement or omission—against SEK based on its unqualified 2009 audit opinion of Orrstown under the Omnicare standard.   While the Third Circuit has not addressed whether Omnicare applies to Exchange Act claims, and although the parties have not explicitly briefed that issue, both SEK and SEPTA assume in their briefing the potential applicability of Omnicare's demanding standard to SEPTA's Exchange Act claims against SEK based on its audit opinions.   See (Doc. Nos. 216 at 34, 228 at 111).   The Court will do the same.   Accordingly, given the Court's conclusion that the TAC pleads a materially false and/or misleading statement or omission by SEK with regard to its 2009 unqualified audit opinion for purposes of SEPTA's Securities Act claim, see supra at § III.C.1.b.ii, the Court similarly concludes that the TAC pleads a "materially false and/or misleading statement or omission" for purposes of an Exchange Act claim with regard to SEK's 2009 unqualified audit opinion.   Thus, as to that claim, the Court need only determine whether the TAC adequately pleads scienter.   However, as noted above, the TAC also challenges SEK's 2010 and 2011 unqualified audit opinions, and therefore, prior to addressing the issue of scienter, the Court first assesses whether the TAC's allegations pertaining to SEK's 2010 and 2011 audit opinions plausibly allege a materially false and/or misleading statement or omission.

With regard to SEK's 2010 audit opinion, the TAC asserts: (1) that "SEK knew from its audits that Orrstown and the Bank had violated GAAP and the bank's own Loan Policy in calculating ALLL and identifying impaired loans"; (2) that the "financial statements contained

material understatements with respect to the classification of impaired loans and allocation of

loan loss reserves"; (3) that "SEK also knew that the bank had improperly risk rated loans"; and

(4) that SEK "failed to calculate reserves on loans which should have been included in the

impairment analysis and ALLL calculation."   (Doc. No. 199 ¶ 564.)   The TAC also asserts that

SEK's unqualified audit report for 2010 was false and/or misleading because SEK "failed to

apply the standards of the PCAOB."   (Id. ¶ 565.)   The Court revisits SEPTA's summary of such

allegations, which are as follows:

> SEK also knew as a result of its audits from 2008 through 2010 (or was reckless in
> not knowing (for Exchange Act claims), and/or negligently failed to disclose (for
> Securities Act claims)), that the Bank had failed to include in its disclosure of
> impaired loans in its financial statements millions of dollars in impaired loans that
> the Bank had <u>actually identified as impaired</u>, which violated GAAP and the Bank's
> Loan Policy, (¶ 318), including that:
>
> . . . .
>
> In the 2010 10-K Orrstown understated impaired loans by over 360% (¶ 356), <u>see
> also</u> ¶ 380.A-H (summarizing SEC's finding that Orrstown's financial statement
> understated impaired loans))
>
> . . . .
>
> SEK knew (or was reckless in not knowing (for Exchange Act claims), and/or
> negligently failed to disclose (for Securities Act claims)), that the Bank routinely
> failed to obtain updated appraisals and borrower financial information in violation
> of GAAP and its own Loan Policy, resulting in understatement of ALLL and
> impaired loans, (¶ 319), including:
>
> . . . .
>
> In connection with SEK's 2010 audit:
>
> In the first quarter of 2010 approximately 53% of loans evaluated for impairment
> were supported by real estate appraisals more than two-years old and 20% were
> supported by appraisals over five-years old, (¶ 352);
>
> In the second quarter of 2010, approximately 40% of the loans evaluated for
> impairment were supported by real estate appraisals more than two-years old and
> 14% were supported by appraisals over five-years old, (¶ 353);

In the third quarter of 2010, approximately 29% of the loans evaluated for impairment were supported by real estate appraisals more than two-years old and 10% were supported by appraisals over five-years old, (¶ 354).

SEK knew (or was reckless in not knowing (for Exchange Act claims), and/or negligently failed to disclose (for Securities Act claims)), that rather than obtain updated appraisals, the Bank applied discount factors that were totally improper under GAAP (as also found by the SEC), (¶ 320);

SEK knew (or was reckless in not knowing (for Exchange Act claims), and/or negligently failed to disclose (for Securities Act claims)), that the Bank failed to calculate reserves under FAS 5 for loans other than those rate[d] Substandard, which was contrary to generally accepted practice and improperly assumed the Bank only incurs losses through Substandard and lower rated loans, (¶ 321);

SEK knew (or was reckless in not knowing (for Exchange Act claims), and/or negligently failed to disclose (for Securities Act claims)), that Orrstown was using improper historical loss factors in calculating reserves for pooled loans, (¶ 322);

SEK deliberately excluded many of the Bank's riskiest borrowers from its audits, including Yorktown in its 2008 and 2009 audits, which was inexplicable since that was the largest credit and, despite SEK's baseless statement it posed "little risk," declared bankruptcy a year later, (¶¶ 332-34, 348);

Moreover, in its 2010 audit SEK took an absurdly optimistic approach to the Yorktown loan and knew that the Bank had not identified it as impaired, despite its unsecured status, (¶ 358);

In 2009 SEK discovered that the Bank had provided incorrect reports to SEK, which resulted in SEK failing to review several large loan relationships that otherwise would have been reviewed (¶ 349);

SEK had inside information concerning the true financial condition of many of the Bank's worst and largest borrowers because SEK served as their accountant at the same time it served as the Bank's auditor (and never disclosed any potential conflict to the Bank's Audit Committee), but SEK omitted from its audit loan testing program virtually any loan to a borrower for which SEK was performing accounting services, thereby turning a blind eye upwards of $50 million in loans to the Bank's largest borrowers in 2008 and 2009 (¶¶ 311-315, 323);

Moreover, in July 2010, SEK intervened to persuade the bank to loan more money to the Azadis, who soon after defaulted, (¶¶ 236-41).

(Doc. No. 229 at 86-92.)

The TAC's allegations regarding SEK's knowledge (or recklessness) by the second quarter of 2011 regarding loan rating deficiencies as related to Orrstown's 2011 10-K are detailed at paragraphs 566 to 573 of the TAC and are set forth fully, supra at § III.A.5. However, the Court highlights the alleged auditing failures of SEK as detailed in paragraph 573, as follows:

573.    SEK's audit failures with respect to TDRs were multi-fold:

a.    SEK failed to adapt its audit procedures to assess OTB's internal controls with respect to identifying and properly classifying loans as TDRs, and providing ALLL reserves for such loans.

b.    SEK failed to include in its loan review for fiscal year 2009, 2010 and 2011, loans that had been restructured and modified, thus consciously or recklessly avoiding the review of loans that were likely TDR candidates.

c.    SEK did not receive or request in its audit procedures a list of loans that had been the subject of loan modifications or restructuring.

d.    SEK did not review loan files to develop its own list of loans that had been modified or restructured.

e.    In light of a.-d., SEK could not conduct any sampling or testing of (i) OTB's internal controls with respect to identifying and classifying TDRs; or (ii) how the then current economic environment was impacting the Bank's business operations, including loan review functions, risk-rating loan competency, ALLL reserve and provision calculations and adequacy, and financial reporting integrity.

f.    SEK's motivation in not doing a.-d. was driven by its knowledge that some of its largest accounting service clients were OTB borrowers with the highest loan balances.   SEK further knew, based on the performance of accounting services for these borrow[er]s, including preparation of tax returns and financial compilations, that these large borrowers' loans had been the subject of systemic loan modifications and restructurings beginning in 2007 and 2008.

g.    It should be noted that SEK's lack of testing the internal processes with regard to TDRs and the lack of TDR classification from Orrstown can only be willful and not an oversight of a technical accounting policy.   In 2009 and 2010 the analysis of TDRs, together with the analysis of non-performing loans and the loan loss reserves, was one of the topics most heavily scrutinized [and] reviewed by investors, security analysts and regulators.

(Doc. No. 199 ¶ 573.)

In its 2011 audit opinion, SEK stated that Orrstown's "financial statements referred to above present fairly, in all material respects, the financial position of Orrstown [and the Bank] as of December 31, 2011 and 2010," but then expressed an adverse opinion regarding Orrstown's internal controls, as follows:

> The Company did not have a timely and effective process to prepare and report information related to loan ratings and the allowance of loan losses allocations. . . . In our opinion, because of the effects of the material weakness described above on the achievement of the objectives of the control criteria, Orrstown [and the Bank] ha[ve] not maintained effective internal control over financial reporting as of December 31, 2011.

(Id. ¶ 574.)   The SEC allegedly found that Orrstown's 2011 10-K failed to disclose approximately $51 million in impaired loans, which was an understatement of approximately 346%.   (Id. ¶ 577.)   SEPTA alleges that the audit "revealed a material weakness in the financial reporting controls related to the Company's process for preparing and reporting loan ratings and loan losses allocations, [] undercut[ting] the veracity of the Company's financial statements." (Id.)   It is alleged that SEK "risked losing [fees for its services] if it challenged management about its accounting irregularities" and also "risked losing lucrative contracts with many of the Bank's largest borrowers, as well as Orrstown, if it disclosed the true financial conditions of those borrowers, which would have required [Orrstown] to identify the loans as impaired, calculate ALLL reserves, and identify modifications to their loans as TDRs."   (Id. ¶ 591.)

Assuming the truth of SEPTA's allegations pertaining to SEK's 2010 and 2011 unqualified audit opinions, the Court concludes that SEPTA has plausibly alleged a "materially false and/or misleading statement or omission" for purposes of its Exchange Act claim based on those opinions.   Specifically, the TAC contains facts from which the Court can plausibly infer that SEK's opinion (that Orrstown's financial statements "present fairly, in all material respects,

the financial position of Orrstown [and the Bank] as of December 31, 2010 and 2009") and

related representation (that Orrstown "maintained, in all material respects, effective control over

financial reporting as of December 31, 2010") omitted material information regarding its audits

of Orrstown prior to that date, including that: (1) Orrstown failed to disclose as impaired certain

loans that it had actually identified as impaired in violation of GAAP; (2) Orrstown failed to

obtain updated appraisals and borrower financial information in violation of GAAP; (3) due to its

failure to obtain updated appraisals, Orrstown applied discount factors that were improper under

GAAP; and (4) Orrstown failed to calculate ALLL in accordance with its Loan Policy and

GAAP, which may have rendered its opinion materially false or misleading.   Regarding SEK's

2011 audit opinion, which admitted to a material weakness in Orrstown's internal controls

related to loan ratings and the allowance for loan losses, but yet represented that Orrstown's

financial statements "present fairly, in all material respects, the financial position of Orrstown

Financial Services, Inc. and its wholly-owned subsidiary as of December 31, 2011 and 2010,"

the facts detailed above give rise to a plausible inference that SEK's opinion omitted material

information regarding its audit of Orrstown, where the TAC alleges that SEK failed to include in

its loan review certain loans that had been subject to modification or restructuring, and given the

SEC's finding that Orrstown's 2011 10-K "failed to disclose approximately $51 million in

impaired loans, an understatement of 346%."   (Id. ¶ 577.)   The Court thus turns to the issue of

scienter.

Mindful of the significantly greater factual allegations of the TAC with regard to SEK's

conduct (as compared to the SAC), the Court reviews the legal standard applicable to pleading

auditor scienter in connection with a Section 10(b) claim.   The Third Circuit in In re Suprema

set forth the standard for pleading auditor scienter, stating that a plaintiff may assert that "an

auditor either lacked a genuine belief that its representations were supported by adequate information," or that the auditor "engaged in auditing practices so shoddy that they amounted at best to a 'pretended audit.'"   See In re Suprema, 438 F.3d at 279.   This requires a showing "that [SEK]'s judgment at the moment exercised was sufficiently egregious such that a reasonable accountant reviewing the facts and figures should have concluded that [the company's] financial statements were misstated and that as a result the public was likely to be misled."   See id. (quoting In re Ikon, 277 F.3d at 673).

        In this regard, "courts have recognized that allegations of GAAS[35] violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss."   See id. at 279-80.   To do so, however, a plaintiff must allege "how the defendant knowingly or recklessly violated those standards."   See id. at 280 (citing In re Westinghouse, 90 F.3d at 712).   This requires "a mental state embracing intent to deceive, manipulate, or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care" that in turn "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."   See In re Ikon, 277 F.3d at 667 (citation and internal quotation marks omitted).   And again, in "many cases the most plausible means to prevail on a section 10(b) claim against an auditor without that ever-elusive 'smoking gun' document or admission will be to show how specific and not insignificant accounting violations collectively raise an inference of scienter."   See id. at 677 n.26.

        In moving to dismiss the Exchange Act claims asserted against it, SEK maintains that, "[e]ven assuming internal control deficiencies existed at the Bank throughout the class period,

---

[35] GAAS refers to generally accepted auditing standards.

this allegation alone does not establish that SEK subjectively believed that there was a material

weakness in internal control when it rendered a clean audit opinion as to the Bank's internal

controls." (Doc. No. 216 at 19.) SEK argues that "an audit of internal controls is not designed

or intended to detect fraud" but rather to "determine whether controls are in place to provide

'reasonable assurance' – not guarantee – that the financial statements are properly stated." (Id.

at 20.) SEK cites Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.

(Special Situations I), 33 F. Supp. 3d 401 (S.D.N.Y. 2014), in support of its argument that an

auditor's failure to identify problems with a company's internal controls does not amount to

reckless conduct for Section 10(b) liability. (Id. at 21.) SEK describes that case as one in

which "[t]he plaintiffs alleged that the auditor knowingly failed to comply with PCAOB and

GAAP standards, and that had the auditor performed any audit at all, it would have discovered

rampant fraud of the audited company." (Id.) SEK notes that the court dismissed the claim

against the auditor because it did not meet the heightened auditor scienter standard of "no audit

at all." (Id. at 21-22.) SEK analogizes the TAC's allegations to Special Situations, arguing that

the TAC fails to plead scienter and that, "[a]t worst, SEPTA has pled that SEK's 'failure' to

identify weaknesses in internal control and render a corresponding adverse opinion was shoddy.

But mere auditor malpractice or shoddy work product does not satisfy the heightened scienter

requirement of an audit that is so deficient as to amount to 'no audit at all.'" (Id. at 22-23.)

SEK also argues that the SEPTA's allegations regarding SEK's disagreement with

Orrstown's decision not to calculate a reserve for certain loans, or identify certain Substandard-

rated loans as impaired, similarly does not support a finding of scienter. (Id. at 23.) SEK

maintains that loan loss reserves are "statements of opinion with regard to predicted future

losses," as opposed to statements of fact. It is SEK's position that "an auditor may select a

sample of loans for review, make an independent judgment as to how it should be rated, and challenge the bank to support its ratings," but that such a challenge does not mean that a bank's rating is necessarily wrong, and "a difference of opinion as to a particular loan rating [does not] necessarily result in a <u>material</u> impact on the overall ALLL rating or constitute <u>material</u> weakness in internal control."   (<u>Id.</u> at 24-25.)   Accordingly, SEK maintains that "SEPTA's allegations that SEK disagreed in certain instances with the rating of loans under the Bank's IRR system, and that certain loans were not included in the ALLL calculation, does not support the conclusion that SEK subjectively believed there were material weaknesses in the Bank's internal control or that its financial statements did not fairly represent the condition of the company." (<u>Id.</u> at 25.)   In SEK's estimation, such allegations fail to rise to the level of accounting work "so deficient that the audit amounted to no audit at all" sufficient to support a plausible inference of scienter.   (<u>Id.</u>)

SEK also addresses the TAC's allegations that SEK knew of material weaknesses in Orrstown internal controls and deficiencies in its financial statements due to the fact that it provided non-attest accounting services to some of Orrstown's borrowers, including the Shaools and the Azadis.   (<u>Id.</u> at 26.)   SEK asserts that it is not unusual for the customers of a regional bank like Orrstown to use the accounting services of a regional accounting firm like SEK.   In this regard, SEK argues: "[n]oticeably absent from the TAC . . . is any allegation that the individual SEK accountants who performed non-attest services for these borrowers had any involvement whatsoever in the audit of the Bank"—"SEPTA has not alleged, and cannot allege, that SEK's individual auditors had special knowledge or access to financial information of the Bank's borrowers beyond that available from the Bank in the course of their audit."   (<u>Id.</u> at 26-27.)   SEK argues that SEPTA is attempting to aggregate knowledge from different SEK

departments and accountants in order to "impute collective scienter to SEK as a whole . . . ."

(Id. at 28.)   According to SEK, the Third Circuit has not adopted a theory of "collective" or

"corporate" scienter in securities fraud cases, citing Rahman v. Kid Brands, Inc., 736 F.3d 237,

245 (3d Cir. 2013), and Teamsters Local 456 Pen. Fund v. Universal Health Servs., 396 F. Supp.

3d 413, 476 (E.D. Pa. 2019).   (Id.)   SEK argues, moreover, that "even assuming the auditors

were involved in the non-attest services . . . , SEPTA's allegations still fail to establish the

requisite nefarious state of mind to support scienter" because the TAC does not establish "who

performed the accounting services, what financial information was actually obtained from the

borrowers in performing non-attest accounting services, why this information would be different

from information already available to SEK through its audit of the Bank, or how this information

was utilized by SEK's individual auditors."   (Id. at 29-30.)

       In response, SEPTA notes the Court's previous dismissal of Exchange Act claims against

SEK based on its finding that the allegations against SEK consisted of conclusory allegations

that, if SEK had applied the appropriate accounting standards, it must have known that

Orrstown's financial statements contained material misstatements regarding impaired loans and

loan loss reserves and, moreover, that SEPTA's allegations that SEK intentionally or recklessly

disregarded glaring irregularities in connection with its audits were insufficient to establish

scienter.   (Doc. No. 228 at 94-95.)   SEPTA maintains that its allegations, as amplified by the

TAC, are neither conclusory nor based "merely on allegations that SEK ignored red flags."   (Id.

at 95.)   Rather, SEPTA argues that the TAC contains detailed allegations establishing the

following:

> [T]hat SEK knew (or was reckless in not knowing) during the course of its audits
> that Orrstown failed to comply with GAAP and its Loan Policy, improperly rated
> loans and failed to create required reserves, failed to disclose impaired loans that
> the Bank had actually determined were impaired, routinely failed to obtain updated

appraisals in violation of the Bank's policies resulting in understatement of ALLL and impaired loans, and that SEK's audits deliberately turned a blind eye to many of the Bank's riskiest loans, including those of several of SEK's accounting clients.

(Id.)   SEPTA argues that its allegations are based on information in SEK's own workpapers, including the "serious ICFR deficiencies" SEK found during its 2008 and 2009 audits, specifically, that:

> [T]he Bank "did not have current financial information" for many of its largest borrowers that files were missing appraisal reports and in 2009 SEK told the Bank that "[w]ith deteriorating real estate values in recent years, some older appraisal values [on which the Bank was relying] may no longer be valid and without updated financial information, management has no way of determining the current financial condition of business customers[.]"

(Doc. No. 228 at 96) (second and third alterations in original) (cleaned up).   SEPTA analogizes the allegations against SEK to other cases in which courts have found a strong inference of scienter against an auditor, including In re Wilmington Trust, In re Suprema, and In re Am. Bus. Fin. Servs., Inc. Noteholders Litig., No. 08-cv-00784, 2008 WL 3405580 (E.D. Pa. Aug. 11, 2008).   (Id. at 96-97.)

Upon careful consideration of the allegations of the TAC and the relevant authorities, and assessing all of the TAC's allegations "holistically," as the Court is required to do when assessing scienter, see Tellabs, 551 U.S. at 326, the Court is persuaded that they support a strong inference that SEK issued its 2009, 2010, and 2011 clean audit opinions with the requisite scienter to state a claim under the Exchange Act—i.e., facts constituting strong circumstantial evidence that SEK knew (or was at least reckless in not knowing) during the course of its audits that Orrstown failed to comply with GAAP and its Loan Policy, improperly rated loans and failed to create required reserves, failed to disclose impaired loans that the Bank had determined were impaired, and routinely failed to obtain updated appraisals contrary to the Bank's Loan Policy, resulting in understatement of ALLL and impaired loans.   While SEK argues that the

facts pleaded in the TAC support only an inference of auditor malpractice or shoddy work product, the TAC's allegations satisfy the demanding standard for auditor scienter by detailing alleged accounting violations coupled with allegations that SEK ignored significant "red flags," all of which collectively raise a strong inference of scienter.   See In re Suprema, 438 F.3d at 279-80.

In so concluding, the Court notes that the TAC contains detailed allegations at paragraphs 317 through 360 regarding SEK's knowledge of alleged accounting failures of Orrstown in connection with its audits.   Several key facts supporting the Court's scienter conclusion are set forth below.   With regard to its 2009 audit:

- "SEK specifically criticized the Bank for upgrading the J&S rating from Substandard to Watch, as doing so did not meet the bank's own Loan Policy, but the Bank ignored SEK's advice.   As a result, the ALLL in the 2009 10-K did not include a required FAS 114 reserve for J&S.   Failure to include that reserve, which was nearly 5% of the total ALLL, resulted in a materially skewed ALLL.   Thus, at minimum SEK knew that the final ALLL reported in the 2009 10-K was misleading because it excluded the required reserve on J&S. Moreover, since SEK had calculated an FAS 114 reserve on the J&S loans, SEK knew that J&S should have been identified as impaired" (Doc. No. 199 ¶ 338);

- "[I]n its 2009 audit SEK recommended that the Dahbura loan should have been rated Substandard and also noted that 'Management also needs to obtain more current financial information for continued analysis,' but the Bank did not rate the loan Substandard, did not calculate any required reserve, and did not identify the loan extensions as TDRs.   J&S and Dahbura represented 7.5% of the loans SEK reviewed in its 2009 audit, yet despite finding that the loans were incorrectly rated, which had a material impact on ALLL, SEK issued a clean audit opinion and no disagreement between Orrstown and SEK was disclosed in the 2009 10-K" (id. ¶ 339);

- SEK audited the loans of the Burt J. Asper American Legion Post, which the Bank classified as Substandard "but not impaired based on the value of the property, which supposedly exceeded the loan balance.   Once again, however, the appraisal was over four years old, from September 2005, and was therefore worthless in determining the post-real estate crash value of the property.   In its comments to the loan review, SEK noted that the Post had been 'closed for 156 days during 2009 of which 80 days were for gaming violations.'   Further, 'the Legion has stated that they may not be able to sustain the current payments due

141

to decreased revenue,' and that any purchaser of the building would not be able to continue the special use of the building under zoning regulations. Moreover, the Post had 'not provided annual or regular monthly financial information as required in the commitment letter.' SEK admitted that '[t]he bank is uncertain of the property's value and has not had a recent appraisal. . . . The Bank needs to obtain current financial information and properly evaluate the collateral to determine if the loan is impaired.' This loan was obviously impaired, but once again the Bank failed to identify it as impaired and failed to calculate any specific reserve amount, issues which were obvious to SEK in the course of its audit" (id. ¶ 345);

- "In its March 2010 Management Letter to the Audit Committee of the Board of Directors, just like the prior year's letter, SEK again noted that 'some of the Bank's large credits did not have current financial information (2008 or later) on file.' They went on to suggest 'management should also enhance procedures to ensure there is continual monitoring of financial information received and consistent follow-up with customers (particularly large relationships) to ensure up-to-date financial information is regularly requested, received, and properly filed in the center customer financial files" (id. ¶ 341);

- "[I]n its 'Control Deficiency Comment and Management Point Development Worksheet,' SEK specifically noted that 'During our review of loan files, we noted some older appraisals in the loan files and some stale financial information. . . . Appraisals have not been updated and more recent financial information has not been obtained from customers. . . . With deteriorating real estate values in recent years, some older appraisal values may no longer be valid and without updated financial information, management has no way of determining the current financial condition of business customers' . . .SEK discussed this issue with Embly, who informed SEK that 'updated appraisal values are generally not obtained unless there is a problem developing with the loan, management feels the property value has deteriorated, or the customer want to obtain a new credit.' This statement made by the Chief Credit Officer of a bank at the height of the real estate financial crisis is ludicrous and shows intent from Embly to deceive the bank investors on the real financial condition of the bank. Furthermore SEK knew that the bank was not doing this, and that it was contrary to the Bank's own Loan Policy and defied basic credit assessment standards as well as sound banking practice. The fact that SEK accepted such a blatant statement is an indication of SEK's disregard for basic professional standards" (id. ¶ 342);

- "SEK's failure once again to review the Yorktown loans in 2009 was also inexplicable. SEK's Loan Loss Reserve Calculation memo states that SEK selected for review 'all commercial lines of credit approved over $5 million (regardless of balance)' but SEK skipped over Yorktown, which was approved for $9.5 million and represented the second biggest line of credit at the bank. Within months Yorktown declared bankruptcy" (id. ¶ 348);

- "SEK knew that the Bank had provided incorrect reports, which resulted in SEK failing to select certain larger loan relationships for review.   SEK's Loan Loss Reserve Calculation memo stated 'The reports . . . that management originally gave us to pick our samples from had incorrect data, which was not discovered until our review was almost complete, so some larger loans that could have been selected were not on our original report and were not selected for review. . . .' This was yet another internal control failure, which had a direct impact on SEK's audit, yet SEK issued a clean audit opinion despite it[s] awareness of the numerous material weaknesses in internal controls over financial accounting described herein" (id. ¶ 349);

With regard to its 2010 audit:

- "By the fourth quarter of 2010, the Regulators had already demanded significant changes to the Bank's accounting practices and operations.   For example, the Bank began calculating ALLL on all loans in the bank's portfolio, broken down by segment" (id. ¶ 357);

- "SEK's Loan Loss Reserve Calculation Memo for the year-end 2010 audit also evidences an absurdly optimistic outlook for the Yorktown loan, which in roughly six months would be completely written off.   SEK commented:

  > If the loans are rewritten as anticipated, the Banks should come out of this relationship with no loss other than accrued interest, which has been on nonaccrual anyway.   If the new loans would fall through for some reason Jeff [Embly] is anticipating the Bank could potentially lose up to $3 million in a worst case scenario. At December 31, 2010, the Bank recorded an estimated allowance for Yorktown of $2.9 million based on an estimated calculation of discounting the value of the non-performing loans by 40% and then estimating another $1.5 million to be conservative given the imprecision of the estimate for a total of $2.9 million.   While the estimate is based on a calculated value of the loss that is an imprecise estimate and not solid appraisal values, the likelihood of the new refinancing happening is very probably with any potential loss being considered remote.   In the unlikely event that the refinancing does not happen, management has allocated an estimate of the loss, which is about 35% of the balance and is considered adequate at 12/31/10 based on the circumstances.

Once again, however, SEK knew that the Bank had failed to identify Yorktown as an impaired loan in its impaired loan list, that it had no current appraisals, and failed to search for or review the underlying UCC-1 filings for the Yorktown loan during its auditing engagements, which would have revealed the Bank's unsecured status and the Bank's internal estimate that based on the amount of unsecured debt it

would likely lose more than $5 million of loan principal, plus accrued interest.   (As noted the Bank ultimately took a charge of $8.3 million for the Yorktown loan.) (id. ¶ 358).

The allegations of the TAC are in line with cases in this Circuit where courts have found a strong inference of auditor scienter sufficient to withstand a motion to dismiss based on a pattern of significant alleged accounting violations and failure to investigate "red flags."   The Court finds particularly persuasive in this regard the fact that SEK repeatedly identified specific "red flags" in connection with its audits and communicated those "red flags" to Orrstown, but failed to further investigate the "red flags" while issuing clean audit opinions.   See In re Suprema, 438 F.3d at 281 (concluding, despite the protests of the auditor, that "[in] the face of the numerous and not insignificant alleged accounting violations, we cannot rule out, as a matter of law, a strong and reasonable inference of [auditor] scienter"); In re Wilmington Trust, 29 F. Supp. 3d at 449-50 (concluding that scienter was sufficiently alleged where auditor "did not request updated appraisals" in connection with auditor's duty "to evaluate the loan reserves' reasonableness and review the process used by management to develop the reserves"); In re Am. Bus. Fin. Servs., Inc. Noteholders Litig., 2008 WL 3405580, at *1-9 (denying motion to dismiss and concluding that plaintiff sufficiently alleged auditor scienter given allegations of "the presence of significant red flags that defendant either knowingly or recklessly disregarded in producing its unqualified audit opinions"); see also Chao Sun, 2015 WL 9304542, at *16-18 (denying auditor motion to dismiss and finding scienter based on plaintiff's identification of (1) suspect accounts, (2) "red flags" that the auditor failed to investigate prior to issuing its clean audit opinion, (3) specific GAAS and GAAP violations, and (4) additional circumstantial evidence that auditor not performing due diligence in connection with its audits); Starr Invs. Cayman II, Inc. v. China MediaExpress Holdings, Inc., No. 11-cv-00233, 2014 WL 4180331, at

*4 (D. Del. Aug. 21, 2014) (sustaining Exchange Act claim against auditor where plaintiff alleged GAAS violations and significant "red flags" that were ignored by auditor).   Special Situations, relied on by SEK, is distinguishable from the facts here in that the complaint in that case did not allege "awareness of facts that would inspire any reasonable auditor to investigate." See 35 F. Supp. 3d at 431.   The Court thus concludes that SEPTA has sufficiently alleged an Exchange Act claim against SEK and will deny SEK's motion to dismiss count 6 of the TAC.[36]

## IV.   CONCLUSION

For all of the reasons discussed above, the Court will grant in part and deny in part the motions to dismiss.   Specifically, the Court will:

1.  Grant in part and deny in part the Orrstown Defendants' motion to dismiss the TAC's Securities Act claims—specifically, the Court will dismiss all but the claims based on the two statements relating to the adequacy of loan loss reserves, as to which their motion will be denied;

2.  Grant in part and deny in part the Orrstown Defendants' motion to dismiss the TAC's Exchange Act claims, as follows:

    a.  The Court will dismiss all claims asserted against Defendants Zullinger, Shoemaker, Snoke, and Coy;

---

[36] In concluding that the TAC sufficiently alleges SEK's scienter, the Court notes SEK's argument that the TAC impermissibly seeks to aggregate the knowledge of SEK's auditors who performed Orrstown's audits and SEK accountants who provided accounting services to Orrstown's banking customers for purposes of pleading scienter based on SEK's alleged conflict of interest as outside auditor to Orrstown and accountant to several of its significant banking customers.   However, the TAC's allegations support a strong inference of scienter based on accounting violations and significant "red flags" that were identified by SEK but ultimately not investigated by it in connection with its clean audit opinions.   Accordingly, the Court's scienter finding does not depend on any assertions regarding information obtained by accountants to Orrstown's banking customers.   The multiple and significant alleged failures by SEK identified above alone suffice to support a strong inference of scienter sufficient to withstand a motion to dismiss the TAC's Exchange Act claims against SEK.   Moreover, given that SEK's clean audit opinions were presumably approved by a senior auditor with knowledge of their public disclosure in compliance with Orrstown's financial reporting requirements, the Court concludes that the facts pleaded "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."   See Chao Sun, 2015 WL 9304542, at *12.

      b.      The Court will dismiss the claims asserted against Orrstown, the Bank, and Defendants Quinn, Everly, and Embly to the extent the claims are based on: (a) Orrstown's statement regarding the effectiveness of its internal control over financial reporting and accompanying SOX certification in Orrstown's 2009 10-K; (b) the November Loan Review statements; and (c) the "50 loan relationships" statement;

      c.      The Court will deny the motion as to the claims based on: (a) the ALLL reported in Orrstown's 2009 10-K; and (b) Orrstown's statements regarding the effectiveness of its internal control over financial reporting and accompanying SOX certifications in Orrstown's financial reporting beginning in the second quarter of 2010 through 2011 (Form 10-Q and Form 10-K);

3.      Grant in part and deny in part the Underwriter Defendants' motion to dismiss the TAC's Securities Act claims—specifically, the Court will dismiss all but the claims based on the two statements relating to the adequacy of loan loss reserves, as to which the motion will be denied; and

4.      Deny Defendant SEK's motion.

An Order consistent with this Memorandum follows.