**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:12-cv-00993** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **ORRSTOWN FINANCIAL SERVICES,** | : | |
| **INC., et al.,** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Before the Court is Plaintiff Southeastern Pennsylvania Transportation Authority

("SEPTA")'s Renewed Motion to Compel Production of Documents being withheld by the

Orrstown Defendants[1] and third parties on the basis that such documents contain "confidential

supervisory information" ("CSI") protected by the bank examination privilege provided by

regulations of the Board of Governors of the Federal Reserve System ("FRB") and the

Pennsylvania Department of Banking and Securities ("PADOB") (collectively, the

"Regulators").   (Doc. No. 239.)   For the reasons that follow, the Court will grant SEPTA's

motion.

**I.      FACTUAL AND PROCEDURAL BACKGROUND[2]**

This is a purported class action alleging securities violations in connection with

---

[1] "Orrstown Defendants" as used herein refers to Defendant Orrstown Financial Services, Inc. ("Orrstown"), Defendant Orrstown Bank, and the twelve individual defendants associated with Orrstown.

[2] What follows is a statement of the factual and procedural background relevant to the instant motion, taken primarily from the Court's February 12, 2019 Memorandum and Order denying SEPTA's initial motion to compel (Doc. Nos. 176, 177), and its February 14, 2020 Memorandum and Order granting SEPTA's motion for leave to file a Third Amended Complaint (Doc. Nos. 197, 198).   For a more extensive description of the alleged historical facts underlying SEPTA's claims, see the Court's Memorandum and Order issued June 22, 2015, addressing several motions to dismiss SEPTA's First Amended Complaint.   (Doc. No. 92.)

Orrstown's early 2010 public offering (the "Offering") of approximately 1.4 million shares of Orrstown common stock, which raised almost $40 million dollars.   (Doc. No. 197 at 1.) Following a series of revelations regarding Orrstown's financial condition, Orrstown reported significant losses for the fourth quarter of 2011, and on March 15, 2012, filed its 2011 Annual Report, which disclosed that it had a "material weakness" in its internal controls and had "failed to implement a structured process with appropriate controls to ensure that updated loan ratings were incorporated timely into the calculation of the Allowance for Loan Losses."   (Id. at 1-2.) Orrstown further admitted that, as of March 2012, it had failed to "fully remediate its material weakness in its internal control over financial reporting relating to loan ratings and its impact on the allowance for loan losses."   (Id. at 2.)   On March 23, 2012, Orrstown and its Board of Directors revealed that they had entered into an agreement with the Federal Reserve Bank of Philadelphia (the "Written Agreement"), and a consent order with the Commonwealth of Pennsylvania, Department of Banking (the "Consent Order"), (collectively, the "Enforcement Actions"), requiring them, inter alia, to revise their underwriting and credit administration policies and strengthen their credit risk management practices.   (Id.)

On May 12, 2012, SEPTA, on behalf of two classes, filed this purported class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) against Orrstown Financial Services, Inc., Orrstown Bank, and several additional individual Defendants associated with Orrstown.   (Doc. No. 1.)   On March 4, 2013, Plaintiff filed a First Amended Complaint (the "FAC"), adding as Defendants Orrstown's auditor, Smith Elliott Kearns & Company, LLC ("SEK"), and Janney Montgomery Scott LLC and Sandler O'Neill & Partners L.P. (the "Underwriter Defendants"), the underwriters involved in the Offering, and alleging that Defendants issued materially untrue and/or misleading statements and omissions in violation of

the Securities Act of 1933 ("Securities Act") and the Exchange Act of 1934 ("Exchange Act").

(Doc. No. 40.)

After the Court's dismissal of SEPTA's Securities and Exchange Act claims against all

Defendants as asserted in the FAC for failure to state a claim upon which relief could be granted

(Doc. No. 92), SEPTA, with the Court's permission, filed a Second Amended Complaint

("SAC") against the same Defendants, which focused exclusively on alleged materially false

and/or misleading statements made by Defendants in the offering documents and throughout the

class period pertaining to the "effectiveness of the [Orrstown Defendants'] internal controls over

underwriting of loans, risk management, financial reporting and compliance with banking

regulations" (Doc. No. 101 ¶ 22).

All Defendants filed motions to dismiss the Second Amended Complaint, and while those

motions were pending, on September 27, 2016, Orrstown filed a "Notice of Subsequent Event in

Further Support of their Motion to Dismiss the Second Amended Complaint."   (Doc. No. 122.)

That filing pertained to the Securities and Exchange Commission ("SEC") investigation of

Orrstown referenced in Plaintiff's SAC and informed the Court that the SEC had concluded its

investigation and issued an "Order Instituting Administrative and Cease-and-Desist Proceedings

Pursuant to Section 8A of the Securities Act of 1933, Sections 4C and 21C of the Securities

Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings

and Imposing Remedial Sanctions and Cease-and-Desist Orders" (the "SEC Order").

Orrstown's Notice attached the SEC Order as an exhibit and noted that the Order memorialized a

settlement between the SEC and Orrstown, between the SEC and Orrstown's current Chief

Executive Officer (Thomas R. Quinn) and current Chief Accounting Officer, and between the

SEC and Orrstown's former Chief Financial Officer (Bradley S. Everly) and former Chief Credit

3

Officer (Jeffrey W. Embly).   (Id. at 2.)

On December 7, 2016, the Court granted SEK and the Underwriter Defendants' motions

to dismiss and granted in part and denied in part the Orrstown Defendants' motion to dismiss.

(Doc. Nos. 126, 127.)   Specifically, as to the Securities Act claims asserted in the SAC (counts

one through four), the Court granted the motions to dismiss all such claims upon the Court's

finding that the SAC failed to allege facts supporting a reasonable inference that the

representations and certifications in Orrstown's 2009 Annual Report on Form 10-K as to the

effectiveness of its "internal controls over financial reporting" were materially false and

misleading when made.   (Doc. No. 126 at 23-33.)   As to the Exchange Act claims asserted in

the SAC, the Court granted the motions as to the claims asserted against SEK (count six) and all

individual Defendants, with the exception of claims asserted against individual Defendants

Quinn, Everly, and Embly.   (Id. at 34-53.)   The Court denied the motions as to the SAC's

Exchange Act claims against the Orrstown entity Defendants.   (Id.)   Accordingly, after the

issuance of the Court's December 7, 2016 Order, the remaining Exchange Act claims involved

alleged misstatements about the effectiveness of Orrstown's internal controls over financial

reporting in its 2010 and 2011 Annual Reports on Form 10-K and its quarterly reports on Form

10-Q (beginning with the second quarter of 2010 through the end of 2011).   (Id.)[3]

---

[3] The Court's Order regarding the motions to dismiss the SAC provided as follows with regard
to the dismissal of the claims against Defendant SEK and the Underwriter Defendants: "[t]he
[m]otion to [d]ismiss filed by Defendant SEK . . . is GRANTED in its entirety" and "[t]he
[m]otion to [d]ismiss filed by the Underwriter Defendants . . . is GRANTED in its entirety."
(Doc. No. 127 at 2.)   With regard to the motion to dismiss filed by the Orrstown Defendants and
Individual Defendants Ceddia, Coy, Embly, Every, Keller, Pugh, Quinn, Rosenberrry,
Shoemaker, Snoke, Ward, and Zullinger, the Order provided that their motion to dismiss was
granted in part and denied in part as follows:   "(a) [t]he motion is GRANTED as to Plaintiff's
Securities Act claims (Counts 1-4) against all Defendants, and as to Count 5 against Individual
Defendants Zullinger, Shoemaker, Snoke and Coy; (b) [t]he motion is DENIED as to Count 5

In connection with its decision on the motions to dismiss, the Court took judicial notice of the SEC Order and its findings, which the Court considered supportive of the SAC's allegations of misstatement or omission, beginning in the second quarter of 2010 through the end of 2011, because the SEC Order found that, during that time period, Orrstown "did not maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit financial statements in accordance with [generally accepted accounting principles]."   (Doc. No. 122, Exh. 1, SEC Order ¶ 50.) Specifically, the SEC Order summarized its findings as follows:

> In 2010, as Orrstown's primary lending markets were experiencing a significant decline in real estate values, Orrstown incorrectly accounted for its commercial loans by not disclosing as much as approximately $69.5 million in loans as "impaired" in accordance with U.S. generally accepted accounting principles ("GAAP"). . . .   Orrstown did not comply with GAAP's impaired loan disclosure requirements due to certain Respondents' negligence and Orrstown's lack of sufficient internal accounting controls.   This failure resulted in material misstatements in Orrstown's impaired loan disclosures in its quarterly filings for the period ended June 30, 2010 through September 30, 2011, and its annual filings for the years ended December 31, 2010 and 2011.
>
> Additionally, Orrstown (i) did not calculate loan losses in accordance with GAAP in connection with the filing of its Form 10-Q for the period ended June 30, 2011, (ii) incorrectly implemented a newly issued GAAP accounting pronouncement in connection with the filing of its Form 10-Q for the period ended June 30, 2011 in a manner that was not consistent with the new standard, and (iii) incorrectly applied GAAP when calculating fair value for certain collateral in connection with its impairment analyses for its Form 10-Q for the periods ended June 30, 2010 and September 30, 2010.

(Id., SEC Order ¶¶ 2-5.)

Accordingly, the Court concluded that the allegations of the SAC, coupled with the SEC Order, supported an inference that:

---

against the Orrstown Defendants and Individual Defendants Quinn, Everly and Embly, and as to Count 7 against Individual Defendants Quinn, Everly and Embly."   (Id.)

> Orrstown failed to maintain an adequate system of internal accounting controls through the relevant time period – second quarter 2010 through 2011 – and that such failure resulted in inaccuracies in financial reporting during that time, including "(1) incorrect loan risk ratings; (2) incorrect disclosures of impaired loans; (3) incorrect calculations and disclosures of loan losses; (4) incorrect application of newly issued accounting pronouncements; and (5) the lack of action to remedy accounting problems after being alerted to them."

(Doc. No. 126 at 49.)

Subsequently, in January of 2017, after the issuance of Case Management Order, the remaining parties initiated discovery on the remaining Exchange Act claims.[4]   Shortly after the initiation of discovery, the Orrstown Defendants communicated to SEPTA their stated intent to withhold documents from production because they potentially contained confidential supervisory information, or CSI,[5] which is protected from disclosure without the express written consent of

---

[4]  The initial Case Management Order set a close of fact discovery date of November 3, 2017. (Doc. No. 33 at 1.)

[5]  "Confidential supervisory information" is defined in 12 C.F.R. § 261.2(c)(1) as follows:

> (i)     Exempt information consisting of reports of examination, inspection and visitation, confidential operating and condition reports, and any information derived from, related to, or contained in such report;
>
> (ii)    Information gathered by the Board in the course of any investigation, suspicious activity report, cease-and-desist orders, civil money penalty enforcement orders, suspension, removal or prohibition orders, or other orders or actions . . . [and]
>
> (iii)   Any documents prepared by, on behalf of, or for the use of the Board, a Federal Reserve Bank, a federal or state financial institutions supervisory agency, or a
>      bank or bank holding company or other supervised financial institution.

12 C.F.R. § 261.2(c)(1).   "Confidential supervisory information" does not include "documents prepared by a supervised financial institution for its own business purposes and that are in its possession."   See § 261.2(c)(2).

the FRB.[6]  SEPTA sent a formal waiver request ("February 14, 2017 Request") to the FRB

pursuant to 12 C.F.R. § 261.22, seeking access to the withheld documents.[7]   (Doc. No. 159-5.)

In its February 14, 2017 Request, SEPTA provided a brief description of this litigation and

SEPTA's claims that the Orrstown Defendants made false and misleading statements to the

public regarding a number of issues, including internal control failures over financial reporting,

impaired loans, loan review processes, certain borrowers, impaired commercial loans, failed

---

[6] FRB policy provides that confidential supervisory information is "confidential and privileged." See 12 C.F.R. § 261.22(a).   Accordingly, such information is not normally disclosed to the public, but the FRB considers requests for disclosure of such information and will authorize such disclosure if the requester is able to demonstrate "a substantial need for such information that outweighs the need to maintain confidentiality."   See id.; see also 12 C.F.R. §§ 261.20(g), 261.22(e), 261.23(b).

[7] Such a waiver request, known as a Touhy request, is governed by 12 C.F.R. § 261.22(b), which provides, as to requests from litigants, that anyone

> seeking access to confidential supervisory information or seeking to obtain the testimony of present or former Board of Reserve Bank employees on matters involving confidential supervisory information of the Board, whether by deposition or otherwise, for use in litigation before a court, board, commission, or agency, shall file a written request with the General Counsel of the Board.   The request shall describe:

> (i)     The particular information, kinds of information, and where possible, the particular documents to which access is sought;
> (ii)    The judicial or administrative action for which the confidential supervisory information is sought;
> (iii)   The relationship of the confidential supervisory information to the issues or matters raised by the judicial or administrative action;
> (iv)    The requesting party's need for the information;
> (v)     The reason why the requesting party cannot obtain the information sought from any other sources; and
> (vi)    A commitment to obtain a protective order acceptable to the Board from the judicial or administrative tribunal hearing the action preserving the confidentiality of any information that is provided.

12 C.F.R. § 261.22(b)(1).

impairment analyses, GAAP violations, and Sarbanes-Oxley ("SOX") certifications.   (Id. at 4-5.)   In connection with its February 14, 2017 Request, SEPTA also submitted to the FRB the SAC with the Enforcement Actions attached; this Court's Case Management Order issued January 30, 2017; a Protective Order governing the exchange of information in this case; and its First Request for Production of Documents directed to the Orrstown Defendants ("Request for Production"). (Id. at 3.)

That Request for Production, dated February 2, 2017, specifically sought the following categories of information, covering the period from January 1, 2009, to the date of the Request for Production:

1. All documents that you produced to the SEC in connection with the investigation and proceedings that culminated in the SEC Order.

2. All documents produced by any person to you or the SEC in connection with the investigation and proceedings that culminated in the SEC Order.

3. All transcripts or recordings of any depositions or interviews of witnesses taken during the investigation and proceedings that culminated in the SEC Order, including all documents identified, used or marked as exhibits during those depositions or interviews.

4. All documents that the SEC delivered to you during the investigation and proceedings that culminated in the SEC Order.

5. All documents that were sent to the SEC or delivered by you to the SEC subsequent to the issuance of the SEC Order with respect to the SEC Order.

6. All communications and documents that relate to or reflect any communications that you had internally or with any other person concerning the SEC investigation and proceedings that culminated in the SEC Order.

7. The joint reports of examination and all documents concerning the joint reports of examination.

8. All documents that you produced to the Federal Reserve in connection

with the Joint Examination.

9. All documents produced by any person to you or the Federal Reserve in connection with the Joint Examination.

10. All documents that the Federal Reserve delivered to you in connection with the Joint Examination.

11. All documents concerning the Written Agreement.

12. All documents that were sent to the Federal Reserve or delivered by you to the Federal Reserve subsequent to the issuance of the Written Agreement with respect to the Written Agreement.

13. The Stipulation of Consent and Entry of Order, and any Documents concerning the Stipulation of Consent and Entry of Order.

14. All documents that you produced to the Department of Banking in connection with the Joint Examination.

15. All documents produced by any person to you or the Department of Banking in connection with the Joint Examination.

16. All documents that the Department of Banking delivered to you in connection with the Joint Examination.

17. All documents concerning the Consent Order.

18. All documents that were sent to the Department of Banking or delivered by you to the Department of Banking subsequent to the issuance of the Consent Order with respect to the Consent Order.

19. All transcripts or recordings of any depositions or interviews of witnesses taken in connection with the Joint Examination which culminated in the Enforcement Action, including all Documents identified, used or marked as exhibits during those depositions or interviews.

20. All communications and documents that relate to or reflect any communications that you had internally or with any other person concerning the:
    (a)     Joint Reports of Examination;
    (b)     Stipulation of Consent and Entry of Order;
    (c)     Joint Examination;
    (d)     Enforcement Acts;
    (e)     Written Agreement; and

(f)      Consent Order.

(Doc. No. 159-4 at 12-15.)

SEPTA's February 14, 2017 Request to the FRB also described its view of the relevance

of confidential supervisory information to this litigation (id. at 6-8), as well as its view of the

need for the information and the unavailability of such information from other sources (id. at

8-9).   Lastly, the February 14, 2017 Request represented that the release of any such

confidential supervisory information to SEPTA would be governed by the Protective Order

previously issued by the Court in this case.   (Id. at 9.)

On March 1, 2017, the FRB responded to a February 2, 2017 letter and follow-up

February 13, 2017 email from the Orrstown Defendants requesting permission to produce to

SEPTA all documents Orrstown previously produced to the SEC.   (Doc. No. 159-6.)   In that

letter, the FRB requested that the Orrstown Defendants produce to the FRB a log reflecting the

information designated as CSI by Orrstown and produced to the SEC in connection with its

investigation.   (Id.)[8]   In addition, the letter clarified that "nothing in the Board's Rules prevents

the Orrstown Defendants from providing relevant, responsive portions of the SEC production

that are clearly not CSI" to SEPTA.   (Id. at 3.)   According to a status report filed with the Court

on February 9, 2018, SEPTA contacted the FRB in December of 2017 to inquire about the status

of the FRB's review of documents designated as CSI by the Orrstown Defendants.   (Doc. No.

143.)   In that status report, SEPTA informed the Court that a representative of the FRB, Ms.

Yvonne F. Mizusawa, Senior Counsel of the Litigation, Enforcement and System Matters at the

Federal Reserve, advised SEPTA that the Regulators had not yet completed their review of the

---

[8] According to SEPTA, the documents produced to the SEC constitute the bulk of documents at
issue because only 157 documents on the CSI log were not produced to the SEC.   (Doc. No.

documents designated CSI by Orrstown.   (Id. at 6.)   SEPTA reported that as a result of its discussion with Ms. Mizusawa, she thereafter instructed the Orrstown Defendants to provide a copy of the CSI log to SEPTA.   (Id.)

In its February 9, 2018 status report filed with the Court, SEPTA further reported that after receiving the CSI log in December 2017, it discovered that a number of the documents on the log contained only "partial" CSI and that others were publicly disseminated documents. (Id.) Accordingly, the Orrstown Defendants subsequently produced to SEPTA redacted versions of partial-CSI documents and removed additional documents from the log.   (Doc. No. 144 at 3.)

In March 2018, counsel for the parties and the Regulators participated in a conference call to discuss the Regulators' review of documents the Orrstown had designated as containing full or partial CSI.   (Doc. No. 153 at 2.)   As a result of the discussion that occurred, the Regulators requested re-production of the potential CSI documents in two groups – the first containing the full CSI documents, and the second containing the redacted, partial-CSI documents.   (Id.) Accordingly, on March 27, 2018, the Orrstown Defendants produced the 3,398 full CSI documents, comprising 17,419 pages, to the Regulators.   (Id. at 3.)   On April 3, 2018, the Orrstown Defendants produced the partial-CSI, redacted documents, which consisted of 649 documents comprising 48,984 pages, to the Regulators.   (Id.)

Thereafter, the parties filed a Joint Status Report with the Court on May 2, 2018, reporting that the parties had participated in an April 2018 conference call with the Regulators to discuss the status of the Regulators' review of the CSI documents.   (Doc. No. 153 at 3-4.)   In that status report, all parties agreed that the withheld documents could be released to SEPTA only under the following conditions: (1) should the Regulators consent to the production of them

159-9.)

to SEPTA, or (2) "in the event that the Regulators withhold consent, the Court determines either that the privilege does not apply, or the Court determines that good cause exists to override the privilege."   (Id. at 2.)   Subsequent to the filing of the May 2, 2018 Joint Status Report, the Court held a status call with the parties, on May 10, 2018, and scheduled another status call for August 17, 2018, with a Joint Status Report to be filed on August 15, 2018, in advance of the call.   (Doc. No. 155.)

In the meantime, on June 18, 2018, Katherine H. Wheatley, Associate General Counsel to the FRB, sent a detailed letter to SEPTA's counsel (the "Wheatley letter"), formally responding to SEPTA's February 14, 2017 Request seeking the FRB's waiver of any applicable bank examination privilege and approval of the Orrstown Defendants' production of CSI to SEPTA. (Doc. No. 159-1.)[9]   The Wheatley letter stated the FRB's position that SEPTA's February 14, 2017 Request "does not comply with the requirements of the Board's regulations regarding requests for access to confidential supervisory information," and therefore, the FRB was "unable to process [SEPTA's] request in its current form."   (Id. at 3.)

SEPTA thereafter filed a motion to compel with this Court seeking an order compelling

---

[9]   The Wheatley letter referenced its notification that, in addition to the documents sought from the Orrstown Defendants, SEPTA sought, via subpoena, CSI in the possession of six third parties between April 2017 and May 2018.   (Id. at 6-7.)   The Wheatley letter noted that despite receiving a copy of an April 17, 2017 FRB letter issued to one such third party indicating that litigants such as SEPTA "may request access to confidential supervisory information by filing a written request with the Board's general counsel under the procedures set forth in 12 C.F.R. § 261.22(b)," SEPTA did not submit a request to the FRB for access to CSI in the possession of third parties until May 1, 2018.   (Id. at 7.)   The Wheatley letter noted that SEPTA's May 1, 2018 letter to the FRB regarding CSI in the possession of third parties did not independently seek to provide information regarding "the particular kinds of information or particular documents sought from the third parties, the relationship of this information to the issues in this litigation, SEPTA's need for the information, or the reason information was unavailable from any other source, as required by the Board's rules."   (Id. at 7-8.)   Instead, SEPTA's May 1, 2018 letter incorporated by reference its February 14, 2017 letter to the FRB.   (Id. at 8.)

production of all documents under review by the Regulators.   (Doc. No. 157.)[10]   Ultimately,

after extensive briefing, the Court denied SEPTA's motion by Memorandum and Order dated

February 12, 2019 (Doc. Nos. 176, 177) for failure to exhaust administrative remedies in

connection with its <u>Touhy</u> request.[11]   In its Memorandum and Order, the Court instructed

SEPTA to continue to engage with the FRB to attain final action on its <u>Touhy</u> request, stating

that "[t]he Court expects that the good faith efforts of SEPTA to engage with the FRB as

outlined in the Wheatley letter will be met with the FRB's timely and good faith review of the

relevant documents and prompt final action – whether it be assertion or waiver of the bank

examination privilege – on SEPTA's [r]equests."   (Doc. No. 176 at 31.)

Thereafter, SEPTA filed a Motion for Leave to File Third Amended Complaint (Doc. No.

182), seeking leave to file a Third Amended Complaint ("TAC") reasserting Securities and

Exchange Acts claims previously dismissed by the Court's December 7, 2016 Order against

several individual Defendants associated with Orrstown, as well as Orrstown's auditor, SEK, and

the Underwriter Defendants, based upon information gleaned during the discovery process in

2018.   After extensive briefing, the Court granted SEPTA's motion for leave to file the TAC by

Memorandum and Order dated February 14, 2020.   (Doc. Nos. 197, 198.)   In its Memorandum,

the Court rejected Defendants' argument that the Securities and Exchange Acts' respective

statutes of repose barred SEPTA's reassertion of claims and therefore rendered its effort to

amend the operative complaint futile, noting that no party had cited to it any controlling authority

---

[10] The Court subsequently granted the FRB's unopposed motion to intervene in this litigation for
the purpose of addressing SEPTA's motion to compel.   (Doc. Nos. 166-70.)

[11] For a detailed discussion of the basis for the Court's denial of SEPTA's motion, see the
Court's Memorandum issued February 12, 2019.   (Doc. No. 176.)

on point.   However, the Court was persuaded that "because the Court's December 7, 2016 Order adjudicated 'fewer than all the claims or rights and liabilities of fewer than all the parties [and] does not end the action as to any of the claims or parties,' and because through the TAC SEPTA sought to reassert the same claims against the same parties originally brought by way of the FAC, filed within the applicable statute of repose and limitations period, no statute of repose or limitation is calculated by reference to the potential filing of the TAC."   (Doc. No. 197 at 54) (quoting Federal Rule of Civil Procedure 54(b)).

On February 24, 2020, the Orrstown Defendants and the Underwriter Defendants (along with Defendant SEK) filed motions to certify the Court's February 14, 2020 Order for interlocutory appeal.   (Doc. Nos. 201, 202.)[12]   After briefing, the Court granted the motions to certify the Court's February 14, 2020 Order for interlocutory appeal.   (Doc. Nos. 229, 230.) The Third Circuit Court of Appeals subsequently granted the Defendants' petitions for permission to appeal the Court's February 14, 2020 Order pursuant to 28 U.S.C. § 1292(b) by Order dated August 13, 2020 (Doc. No. 236), and the Defendants accordingly filed a notice of appeal (Doc. No. 253).   On September 2, 2021, the Third Circuit issued its Opinion and Judgment affirming this Court's Order permitting the filing of the TAC.   (Doc. No. 264.)   The Third Circuit's Mandate followed on September 28, 2021.   (Doc. No. 265.)

Meanwhile, on May 1, 2020, Joshua P. Chadwick, Senior Special Counsel to the FRB, sent a letter to SEPTA's counsel (the "Chadwick letter") formally responding to SEPTA's February 14, 2017 Request seeking waiver of the bank examination privilege and concluding that

---

[12]   At about the same time Defendants filed the motions seeking certification of interlocutory appeal, all Defendants filed motions to dismiss the TAC with supporting briefs.   (Doc. Nos. 213- 218.)   These motions to dismiss have been fully briefed and will be addressed by the Court in a separate Memorandum and Order.

"disclosure of the Board CSI to SEPTA under the facts and circumstances of this case is inconsistent with the with [sic] supervisory and regulatory responsibilities and policies of the Board."   (Doc. No. 241-1 at 16.)   More specifically, the Chadwick letter determined that: (1) the information sought by SEPTA (with limited exceptions) is CSI; (2) SEPTA did not demonstrate a substantial need for CSI that outweighs the need to maintain confidentiality because SEPTA "failed to demonstrate the necessary relationship of the [FRB] CSI to the issues or matters raised in this action and its need for the information" and "information needed to prove its claims is available to SEPTA from other sources, including Orrstown's own internal business records and business records of SEK and other defendants"; and (3) disclosure of the FRB CSI to SEPTA in connection with this case is "not consistent with the regulatory responsibilities and policies of the [FRB]."   (Id. at 5-14.)

On August 24, 2020, SEPTA filed the instant Renewed Motion to Compel (Doc. No. 239), with a brief in support (Doc. No. 240), and Declaration (Doc. No. 241), seeking the Court's assistance in obtaining the production of all documents withheld by the Orrstown Defendants and third parties on the grounds that they allegedly contain privileged CSI.[13]   On September 8, 2020, the Orrstown Defendants filed a brief in opposition to SEPTA's renewed motion to compel.   (Doc. No. 252.)   On September 21, 2020, the FRB and the PADOB[14] filed briefs in opposition to SEPTA's motion.   (Doc. Nos. 257, 258.)   On September 22, 2020, SEPTA filed a

---

[13] The universe of documents sought to be produced by way of this motion are reflected on Exhibit 12 to the Declaration of Timothy N. Mathews in Support of Plaintiff's Renewed Motion to Compel Production of Documents (the "Mathews Declaration").   (Doc. No. 241-12.)

[14] The PADOB filed an unopposed motion to intervene in this action for the limited purpose of opposing SEPTA's renewed motion to compel (Doc. No. 248), and the Court subsequently granted the motion (Doc. No. 250).

reply brief to the Orrstown Defendants' brief in opposition.   (Doc. No. 259.)   Thereafter, on

October 5, 2020, SEPTA filed a brief replying to the briefs of the FRB and the PADOB.   (Doc.

No. 262.)   By Order dated March 23, 2021 (Doc. No. 263), the Court directed that the

documents listed on Exhibit 11 to the Mathews Declaration, filed in support of SEPTA's

motion—consisting of fifty (50) "exemplar" documents reviewed by the FRB in connection with

its consideration of SEPTA's <u>Touhy</u> request and ultimate rejection of that request and assertion

of the bank examination privilege by way of the Chadwick letter—be submitted to the Court for

<u>in camera</u> review in connection with its resolution of the instant motion.   The documents were

subsequently delivered to the Court for its review.   Accordingly, SEPTA's renewed motion to

compel is ripe for disposition.

## II.   LEGAL STANDARD

### A.   Motion to Compel

Federal Rule of Civil Procedure 37 provides that "[o]n notice to other parties and affected

persons, a party may move for an order compelling disclosure of discovery."   <u>See</u> Fed. R. Civ.

P. 37(a)(1).   The scope of discovery is defined by Federal Rule of Civil Procedure 26, which

provides as follows:

> Unless otherwise limited by court order, the scope of discovery is as follows:
> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant
> to any party's claim or defense and proportional to the needs of the case,
> considering the importance of the issues at stake in the action, the amount in
> controversy, the parties' relative access to relevant information, the parties'
> resources, the importance of the discovery in resolving the issues, and whether the
> burden or expense of the proposed discovery outweighs its likely benefit.
> Information within this scope of discovery need not be admissible in evidence to
> be discoverable.

Fed. R. Civ. P. 26(b)(1).   Discovery sought pursuant to Rule 26 may include Requests for

Production under Federal Rule of Civil Procedure 34, which requires a party to produce documents requested that are "items in the responding party's possession, custody, or control." See Fed. R. Civ. P. 34(a)(1).   "Rulings regarding the proper scope of discovery, and the extent to which discovery may be compelled, are matters consigned to the [C]ourt's discretion and judgment.   Thus, it has long been held that decisions regarding Rule 37 motions are 'committed to the sound discretion of the district court.''   Pilchesky v. Deputy U.S. Marshal Barone, No. 14-cv-381, 2016 WL 7118147, at *2 (M.D. Pa. Dec. 7, 2016) (quoting DiGregorio v. First Rediscount Corp., 506 F.2d 781, 788 (3d Cir. 1974)).

**B.      The Bank Examination Privilege**

Courts in the Third Circuit have recognized the bank examination privilege as a version of the government's deliberative process privilege and official information privilege.   See Redland Soccer Club, Inc. v. Dep't of Army of U.S., 55 F.3d 827, 853 n.18 (3d Cir. 1995) (citing Schreiber v. Soc'y for Sav. Bancorp, Inc., 11 F.3d 217, 220-22 (D.C. Cir. 1993)); In re Sunrise Sec. Litig., 109 B.R. 658, 664-65 (E.D. Pa. 1990) (finding that as "the policies supporting the 'bank examination privilege' are similar to other, more general governmental privileges . . . I will treat [the] claim of privilege as an assertion of an 'official information privilege'").   The deliberative process privilege allows a governmental agency to withhold from disclosure information containing "confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice."   See In re Grand Jury, 821 F.2d 946, 959 (3d Cir. 1987) (citing NLRB v. Sears Roebuck & Co., 421 U.S. 132, 150-54 (1975)).   The regulatory agency bears the burden of demonstrating that the documents sought are privileged.   See Redland, 55 F.3d at 854. If the regulatory agency fails to meet this burden, the privilege does not apply and the challenged documents must be produced.   See Schreiber, 11 F.3d at 220.

17

The bank examination privilege is a qualified privilege, protecting from disclosure agency opinions and recommendations.   See id.   The purpose of the privilege is to preserve and promote candor in communications between banks and their regulators, in an effort to promote effective supervision of banking institutions.   See Redland, 55 F.3d at 854. The privilege does not apply to factual information.   See Bancorp. v. F.D.I.C., No. 99-cv-3799, 1999 WL 1332312, at *4 (D.N.J. Nov. 10, 1999) (citing Redland, 55 F.3d at 853).   The privilege protects:

> only agency opinions and recommendations from disclosure; purely factual material falls outside the privilege and, if relevant, must be produced.   The agency asserting the privilege has the burden of establishing its applicability to the documents at issue.   If the agency fails to establish the privilege with respect to the subpoenaed material, then the documents must be produced.

Schreiber, 11 F.3d at 220 (citations omitted).   If the relevant documents contain a combination of opinion and factual material, an agency should redact the documents and produce the factual material.   See In re Midlantic Corp. S'holder Litig., No. 92-99, 1994 WL 750664, at *2 (D.D.C. Oct. 24, 1994)   If the opinion and factual material are inextricably intertwined, a court must determine whether to override the privilege for good cause.   See Schreiber, 111 F.3d at 220.

In making this good cause determination, courts "must balance the 'competing interests' of the party seeking the documents (which may vary from case to case) and those of the Government (which will tend to be a constant, reflecting long-term institutional concerns)."   See id. (quoting In re Subpoena Served Upon the Comptroller of the Currency, 967 F.2d 630, 634 (D.C. Cir. 1992)).   That balancing generally requires an assessment of five different factors:

> (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

See id. at 220-21 (citations and quotations omitted).

18

### III.   DISCUSSION

#### A.   Arguments of the Parties

##### 1.   SEPTA

At the outset of its primary brief in support of its renewed motion to compel, SEPTA sets forth its interactions with the FRB subsequent to the Court's February 12, 2019 Memorandum and Order denying SEPTA's initial motion to compel and directing SEPTA to continue to engage with the FRB to attain final action on its <u>Touhy</u> request.   SEPTA maintains that it first sought to narrow the universe of documents subject to its <u>Touhy</u> request by serving Orrstown with an interrogatory asking Orrstown "to identify withheld documents that reference specific borrower relationships or specific topics (e.g., the allowance for loan and lease losses, or 'ALLL') relevant to SEPTA's claim."  (Doc. No. 240 at 14.)   SEPTA asserts that, after conferring with Orrstown, "the Orrstown Defendants agreed to run a list of search terms against the documents that included 22 relevant borrowers' names, along with 13 topic terms, such as 'ALLL,' 'Loan Loss,' and others."   (<u>Id.</u>)   However, SEPTA maintains that the FRB subsequently refused to permit Orrstown to disclose the results of the search to SEPTA, because it maintained that "merely identifying which documents on the CSI log contained one or more of the 35 search terms might reveal CSI," and that the "FRB's refusal to allow SEPTA access to any information about the results of the search process meant the FRB had foreclosed SEPTA's ability to refine the searches and further narrow its <u>Touhy</u> request."   (<u>Id.</u> at 14-15.)

SEPTA asserts that it thereafter "supplemented its original <u>Touhy</u> request to seek only the documents that contained one or more of the search terms, which, even though SEPTA could not list them, the FRB could identify from the log provided to it by Orrstown," and provided "additional explanation concerning the relationship of the relevant search terms and documents

to the issues in the case, and also why such information is not available from another source."

(Id. at 15.)   SEPTA reports that the FRB responded to this supplementation by disclosing that

the search terms had "halved the number of documents at issue and reduced by about 80% the

number of pages, from 4,100 documents/66,824 pages to 2,301 documents/14,330 pages," but

also asked SEPTA "to further limit its search terms and requests."   (Id.)

SEPTA reports that the FRB then proposed a different process to further narrow the

universe of documents to be reviewed, requesting that the "parties agree to specify 50 'exemplar'

documents that the FRB would review containing the 'various types of CSI SEPTA is seeking,

including both direct communications between Orrstown and its regulators … and internal

Orrstown documents … cover[ing] the full time period of SEPTA's CSI request.'"   (Id. at 16.)

SEPTA asserts that "[i]n order to provide some means for SEPTA to choose exemplar

documents, the FRB relented from its earlier position and allowed SEPTA to review partial CSI

log information for documents that contained one or more search terms."   (Id. at 16-17.)

SEPTA asserts that "[t]he parties thereafter agreed on a list of 50 exemplar documents, which

consisted of a variety of documents covering the relevant time period."   (Id. at 16.)   SEPTA

reports that on October 23, 2019, Orrstown provided a DVD containing the chosen exemplars to

the FRB.   (Id. at 17.)[15]

In May 2020 the FRB completed its review of the 50 exemplars.   (Id.)   SEPTA reports

that the FRB found that "5 out of 50 (i.e., 10%) of the exemplars did not contain any CSI,"

although it "noted that two of those documents . . . might contain CSI of the PADOB."   (Id.)

SEPTA maintains that, "[a]s to the other 45 exemplar documents, the FRB found that they

---

[15] As noted above, the exemplar documents are listed on Exhibit 11 to the Mathews Declaration.
 (Doc. No. 241-11.)

contain CSI and refused to allow production of even one," making "no effort to redact the

privileged information but, rather, refused to allow production of the entirety of the documents."

 (Id. at 18.)   In addition, SEPTA asserts that "based solely on its review of the 50 exemplars (of

which 10 percent did not contain CSI), the FRB made a final determination that all of the other

roughly 2,000 documents at issue are CSI" and refused to permit production of any document.

(Id.)   SEPTA notes that the FRB's letter of determination ultimately found that "SEPTA's need

for the documents did not outweigh the Board's desire to maintain confidentiality," thus

concluding its analysis of SEPTA's Touhy request.   (Id.)

    In support of its renewed motion to compel, SEPTA relies heavily on In re Wilmington

Trust Securities Litigation, No. 10-990-SLR-SLF, 2016 WL 9753979 (D. Del. Aug. 16, 2016),

which it maintains "dealt with substantially similar allegations concerning misstatements about a

bank's internal controls and financial conditions" and accordingly, should guide this Court's

decision.   (Id. at 21.)   SEPTA maintains that the bank examination privilege asserted by the

FRB "has a very narrow scope," not applying to documents that are primarily factual, such as

bank examination reports.   (Id.)   SEPTA asserts that, with regard to this "strictly limited"

privilege, "[t]he burden is on the party asserting the privilege to present more than a bare

conclusion that the documents are privileged," and that the "FRB's assertion that all but 5 of the

2031 documents on the log are privileged, without reviewing them and even after finding 10% of

the 50 exemplars to be not privileged, is exactly the sort of conclusory finding" that this Court

should not credit.   (Id. at 22.)   SEPTA maintains that "[i]f this Court were to review the same

exemplar documents under the rigorous legal standards applicable here, it could not reach the

same conclusion as the FRB, as it is well-established that the privilege does not protect material

that is primarily factual or historical in nature – even for documents that do contain advisory

21

opinions."   (Id. at 23.)

SEPTA asserts that the FRB's May 1, 2020 final determination letter lists four categories

of allegedly privileged documents:

> (1) bank examination reports; (2) formal and informal communications
> between Orrstown and [regulators] . . . relating to bank examination and
> supervisory matters; (3) documents created by or on behalf of Orrstown in
> response to examiners' requests or examination findings or supervisory
> directives; and (4) internal Orrstown documents or emails discussing,
> describing, or relating to bank examinations, examination findings, or other
> supervisory matters.

(Id. at 23-24) (quoting Doc. No. 241-1 at 5).   SEPTA maintains that each of these categories of

documents was similarly at issue in the Wilmington Trust case, and "for each one, the [c]ourt

ordered documents to be produced after determining that the documents were primarily factual

and that good cause existed to override the privilege for any protected information that also

appeared in the documents." (Id. at 24.)

As to the first category of documents, bank examination reports and related documents,

SEPTA maintains that "[d]ocuments describing an agency's examination of a bank's financial

condition and risk management, and setting forth concrete measures to transform the Bank's

operations, are factual and not privileged."   (Id. at 25.)   SEPTA urges this Court to follow the

lead of the district court in Wilmington Trust and find that the bank examination reports are

primarily factual and further, that "good cause exist[s] to override any claim of privilege over

any non-factual information" due to the relevance of the privileged content to issues of scienter

and Orrstown's defenses.   (Id. at 26.)

As to the second category of allegedly privileged documents—"formal and informal

correspondence and emails between Orrstown and [FRB] examination staff relating to

examination and supervisory matters"—SEPTA argues that "Defendants' log far exceeds this,

appearing to include <u>all</u> communications between regulators and the Bank regardless of whether they concern an examination or supervisory matter, as well as documents that merely <u>reference</u> such communications, on the basis that these communications are inherently privileged."   (<u>Id.</u> at 27.)   SEPTA urges the Court to find that such categories of documents are not privileged, as they "necessarily contain factual information."   (<u>Id.</u>)   In addition, SEPTA argues that, even if such communications were to contain privileged information, "good cause exists to override any claim of privilege given the importance of the communications to the claims in a Securities action against a bank," citing <u>Wilmington Trust</u>.   (<u>Id.</u> at 27-28.)

With regard to the third category of documents, consisting of documents either forwarded to the regulators or prepared by Defendants or third parties "'in response' to the examination," SEPTA maintains that these types of documents are "primarily factual in nature," and "do not become agency 'opinions, recommendations or advice' through the mere act of forwarding them to a regulator or merely because the document was generated as a result of the investigation." (<u>Id.</u> at 28.)   SEPTA argues that "<u>Wilmington Trust</u> is in accord with numerous courts uniformly holding that factual documents created by or on behalf of a regulated entity in response to examiners' requests are not privileged," and further, that the privilege does not protect any communications subsequent to an agency decision "because the purpose is to protect the quality of agency decisions, not the subject Bank."   (<u>Id.</u> at 29.)

SEPTA describes the final category of allegedly privileged documents as "internal Orrstown communications that allegedly reflect the Bank's own internal analyses of its financial condition and/or its internal preparations for bank examinations," and maintains that the <u>Wilmington Trust</u> court held that "these documents are primarily factual and not privileged." (<u>Id.</u>)   In addition, SEPTA argues that "[e]ven if these documents do contain privileged

information, <u>Wilmington Trust</u> makes clear that redaction is unnecessary under the good cause exception in the case of a securities action against a bank." (<u>Id.</u>)

SEPTA generally argues that, to the extent the bank examination privilege applies to a certain number of documents, the Court should override the privilege and order production pursuant to the good cause exception in order to facilitate the "paramount interest" of doing justice between litigants. (<u>Id.</u> at 30) (internal quotation marks and citations omitted). SEPTA maintains that the standard of "good cause" to be applied here in connection with its motion to compel is "wholly separate and unrelated to the FRB's findings concerning SEPTA's 'substantial need' for the documents under the FRB's own <u>Touhy</u> regulations." (<u>Id.</u>)

SEPTA argues that each of the five factors considered by courts in applying the "good cause" exception to the bank examination privilege weighs in favor of court-ordered disclosure here. (<u>Id.</u>) First, SEPTA maintains that the documents at issue are "highly likely to contain relevant information," again analogizing this case to the situation faced by the <u>Wilmington Trust</u> court, where SEPTA maintains that the court "specifically examined each of the FRB's 4 categories of allegedly privileged documents in a case alleging substantially similar claims, and for each one, found that the good cause standard applied to any privileged material remaining." (<u>Id.</u> at 31.) SEPTA maintains that in that case, the court held that the potentially privileged content in bank examination reports was "highly relevant" to the claims at issue because such content was "'indicative of Defendants' knowledge of the bank's problems, the alleged misrepresentations and breach of fiduciary duty, and scienter,' relevant to defendants' defenses to the action, and relevant to plaintiffs' claims against defendants' auditors and whether or not they sufficiently took into account known warnings or criticisms." (<u>Id.</u>) (citation omitted).

As to the other four factors, SEPTA first argues that the "availability of other evidence"

factor favors disclosure, challenging the FRB's contention that "Defendants' own documents can provide the sort of evidence SEPTA seeks from the CSI documents," and maintaining that "numerous courts have held that evidence available from other sources cannot substitute for the types of reports, communications, and documents being withheld here, weighing in favor of disclosure."   (Id.)   With regard to the "seriousness of the litigation" factor, SEPTA again analogizes this case to Wilmington Trust, maintaining that, like that case, "[t]his case alleges knowing violations of the federal securities laws and the loss of tens of millions of dollars of investors' money."   (Id.)   SEPTA also maintains that the "role of the Government" factor—specifically, the SEC's investigation and the subsequent SEC Order—weigh in favor of disclosure, as does the "potential chilling effect" factor, maintaining that the disclosure of the relevant documents will have no "chilling effect" on communications between regulators and banks, because "Orrstown has stated that it intends to rely on examiner reports and findings in support of its defenses," and therefore, there can be no chilling effect "when the bank itself seeks to rely on examiner reports and findings."   (Id. at 35.)   Finally, SEPTA maintains that "protective orders such as the one present in this case provide more than adequate safeguards for any such information."   (Id. at 36.)   For all of these reasons, SEPTA maintains that it has established good cause to override the FRB's assertion of the bank examination privilege and order the disclosure of the withheld documents.

### 2.     The Orrstown Defendants

In response to SEPTA's motion and initial brief, the Orrstown Defendants note that, absent "written permission from the FRB pursuant to a proper written request, a bank like Orrstown may not release CSI to a private litigant"; accordingly, the brief of the Orrstown Defendants acknowledges their inability to provide the documents sought by SEPTA absent the

25

Regulators' permission and focuses on what they refer to as "several inaccuracies in SEPTA's Renewed Motion."   (Doc. No. 252 at 2.)   The Orrstown Defendants first challenge SEPTA's argument that they "over-designated" various documents as potentially containing CSI, maintaining that "in light of the breadth of the definition of CSI, Orrstown's designations were consistent with applicable law and regulations (and overwhelmingly confirmed by the Regulators in the exemplar process)."   (Id. at 8.)   The Orrstown Defendants note SEPTA's focus on the FRB's conclusion that five of the exemplar documents examined by it did not contain CSI, but argue that SEPTA's focus "overlooks the obvious fact that the FRB also determined that 45 (i.e., 90%) of the exemplar documents are CSI," which they maintain demonstrates that they "did not categorically over-designate documents as CSI."   (Id.)   The Orrstown Defendants further note that SEPTA "appears to take issue now with the exemplar process undertaken by the FRB, though it did not object before," and argue that SEPTA has not "sufficiently explained why the Reports of Examination, the communications between the Regulators and the Bank, or the Bank's proposals to address matters raised by the Regulators are indispensable to prove its claims against defendants."   (Id. at 9-10.)

In addition, the Orrstown Defendants maintain that, despite SEPTA's efforts to analogize this case to Wilmington Trust, "Wilmington Trust involved very different facts and very different issues and is therefore of little precedential value here."   (Id.)   The Orrstown Defendants assert that Wilmington Trust's decision that CSI be produced to plaintiffs "was largely based on the fact that Wilmington Trust ('WTC') and/or many of its senior executives faced (and were convicted of) criminal charges," noting that "the court found that the 'pendency of criminal proceedings enhance[d] the importance of information from the examination reports because witnesses involved in the criminal proceedings [were] likely to assert their Fifth

Amendment privilege against testifying, and the examination reports'" would offer an alternative eyewitness perspective otherwise unavailable.   (Id. at 10-11) (quoting Wilmington Trust, 2016 WL 9753979, at *9).   As the Orrstown Defendants note, there has not been a criminal investigation or charges involving Orrstown or its executives.   (Id. at 11.)   The Orrstown Defendants also maintain that of "significance to the court in Wilmington Trust was the 'widespread impact of [WTC's] collapse,'" and note that here, "not only did Orrstown not collapse, it emerged from the financial crisis as a financially stable bank," further distinguishing this case from Wilmington Trust.   (Id. at 12.)

Finally, the Orrstown Defendants challenge SEPTA's contention that any claim of bank examination privilege over the CSI documents should be nullified by the Orrstown Defendants' stated intention to use bank examination reports in support of their defenses to SEPTA's claims. (Id. at 13.)   The Orrstown Defendants note that while in their initial disclosures they identified "regulatory reviews" as potential documents they may use to support their defenses to SEPTA's claims, they have always maintained that they may not disclose such CSI-containing documents without the permission of the Regulators, and that they have no intention of seeking such permission from the Regulators to utilize CSI-containing documents in defense of SEPTA's claims "unless SEPTA is permitted to use CSI."   (Id. at 14.)

### 3.    The FRB

As an initial matter, the FRB defends its determination, made by way of the Chadwick letter, that FRB CSI sought by SEPTA in this case falls within the parameters of the bank examination privilege.   The FRB notes that, after review of the representative exemplars, the FRB determined that the FRB CSI sought by SEPTA falls into four categories, each of which it maintains fall under the privilege:

27

> (1) bank examination reports; (2) formal and informal correspondence and emails between Orrstown and FRB Philadelphia examination staff relating to bank examination and supervisory matters; (3) documents created by or on behalf of Orrstown in response to examiners' requests or examination findings or supervisory directives; and (4) internal Orrstown documents or emails discussing, describing, or relating to bank examinations, examination findings or other supervisory matters.

(Doc. No. 257 at 16.)   The FRB takes issue with SEPTA's argument that only relatively small portions of particular documents are reflective of agency opinions and recommendations, instead maintaining that "the [FRB] CSI reflects examiner opinion throughout," stating that the FRB CSI demonstrates:

> the regulators' selection of specific areas of Orrstown's operations to review and regulators' analyses on those subjects, the regulators' requests for information on specific subjects and banking relationships of interest to them; Orrstown's responses to the regulators' questions; documents created by Orrstown specifically to respond to examiners' inquiries; and Orrstown's internal emails and documents describing in detail specific areas of concern to the examiners and the Bank's preparations to respond.

(Id. at 16-17.)   The FRB maintains that FRB CSI "reveals precisely the type of 'iterative process of comment . . . and response' that the bank examination privilege protects."   (Id. at 17) (quoting In re Subpoena, 967 F.2d at 633).

In addition, the FRB takes issue with SEPTA's suggestion that it could separate purely factual portions of FRB CSI as "incorrect as an initial matter because 'Orrstown has already produced, with the Regulators' consent, documents that were only partial CSI.'" (Id. at 18) (quoting Doc. No. 252 at 9 n.6).   Moreover, the FRB articulates its position that "as a number of courts have found, factual information is inextricably intertwined with opinion in documents such as the [FRB] CSI here, and purely factual information cannot meaningfully be segregated in these circumstances."   (Id.)   In support of its position, the FRB cites the conclusion of the court in Shirk v. Fifth Third Bancorp, No. 05-cv-049, 2008 WL 2661955 (S.D. Ohio July 2, 2008).

28

The FRB maintains that the <u>Shirk</u> court, "when confronted with a similar demand for a wide array of confidential bank examination information including 'examination reports and communications leading up to the Written Agreement, and plans, reports, and recommendations that [the bank] was required to prepare pursuant to the Written Agreement,'" found, upon <u>in camera</u> inspection, that "the entirety of the 1,528 pages were 'not purely factual in nature. Indeed, factual and deliberative information is largely inextricably intertwined in the documents. And the mixture of facts and deliberative indications is not amenable to being segregated.'" (<u>Id.</u> at 18-19) (quoting <u>Shirk</u>, 2008 WL 2661955, at *1, 3).   The FRB maintains that similarly here "any factual elements cannot meaningfully be separated from opinion in the [FRB] CSI," and moreover, would "almost certainly be available from Orrstown's internal business records in its possession, which are not CSI."   (<u>Id.</u> at 19.)

The FRB also challenges SEPTA's argument that the FRB cannot demonstrate that its CSI falls within the bank examination privilege because the FRB reviewed a limited number of representative exemplars chosen by the parties, rather than the entirety of 2,031 documents and 14,330 pages.   (<u>Id.</u> at 20-21.)   The FRB maintains that the "exemplar procedure was necessitated by [SEPTA's] refusal to narrow and clarify the scope of its exceedingly broad CSI request, despite the [FRB's] reasonable requests that it do so."   (<u>Id.</u> at 21.)   The FRB maintains that it left the method of choosing exemplars up to the parties, but set some parameters for the choice of exemplars, requesting that they be "representative 'of the various types of CSI SEPTA is seeking'; include 'both direct communications between Orrstown and its regulators such as examination reports, supervisory letters and emails, and internal Orrstown documents describing or reflecting supervisory communications'; 'cover the full time period of SEPTA's CSI request'; and 'contain a mixture of hits on borrower-specific as well as non-borrower specific search

29

terms.'"   (Id.) (quoting Doc. No. 241-8 at 3-4 (Mathews Declaration)).   The FRB emphasizes

that the exemplar process was designed to enable the FRB to complete its review of the potential

CSI documents "and was not simply a precursor to review of the entire population of

documents."   (Id.)   The FRB states that "[a]t no time, until filing of its Renewed Motion, did

[SEPTA] object to the use of exemplars, nor has [SEPTA] pointed to any authority precluding

such review," noting that the [FRB's] rules do not "preclude review of representative samples of

CSI."   (Id. at 23.)   The FRB further maintains that "similar procedures have been ordered by

courts in cases involving large amounts of bank examination information."   (Id.)

The FRB next addresses SEPTA's argument that it has demonstrated good cause

sufficient to override the bank examination privilege asserted by the FRB over the documents

sought by SEPTA.   With regard to the first factor in the good cause analysis, the relevance of

the evidence sought to be protected from disclosure, the FRB argues that SEPTA has not

demonstrated that the FRB CSI is relevant to its claims in this litigation.   (Id. at 25.)   The FRB

maintains that SEPTA proffers only one argument on the relevance factor—the argument "that

the [FRB] CSI 'reference[s] one or more specific borrower relationships and/or terms directly

related to the failures of ICFR at issue here," including the terms of "loan loss," "impaired," and

"TDR."   (Id. at 26) (quoting Doc. No. 240 at 27).   However, the FRB notes that, "in denying

SEPTA's administrative request, 'whether or not Orrstown violated federal securities laws by

making materially false or misleading statements regarding its alleged failure properly to risk

rate loans or to recognize and calculate its loan loss provisions,' or by other material

misstatements, 'does not depend on examiners' findings and observations, and communications

with Orrstown, on these issues.'"   (Id.) (quoting Doc. No. 241-1 at 8).

The FRB further notes that, in the Chadwick letter denying SEPTA's administrative

30

request, it provided "specific examples using allegations from the TAC to show that proof of

[SEPTA's] allegations was in no way dependent on the [FRB] CSI." (Id.) Specifically, the

FRB states that SEPTA's claim of a material understatement of its ALLL was subject to proof by

a comparison of Orrstown's internal loan records with applicable GAAP provisions and the

Bank's own loan policy, and further, that specific allegations in the TAC rely on disparities

between Orrstown's internal business records and those of its auditor, SEK, and other

defendants, rather than FRB examination findings. (Id. at 27.) In addition, the FRB challenges

SEPTA's assertion that the SEC Order relied on certain borrower relationships as examples of

failures of Orrstown's internal controls over financial reporting and that such reliance formed the

basis of SEPTA's efforts to seek CSI with regard to those and other borrower relationships,

instead insisting that "the [FRB] found that 'the SEC Order does not rely on Federal Reserve

examination reports or examiner analysis for its findings or even mention them at all, and instead

relies on Orrstown's own internal business records and the requirements of GAAP and the

federal securities laws.'" (Id.) (quoting Doc. No. 241-1 at 9.) The FRB notes that the

Chadwick letter informed SEPTA that it had previously obtained from Orrstown the internal

business records that formed the basis of the SEC's findings. (Id. at 28.) For all of the above

reasons, the FRB maintains that the challenged CSI documents lack relevance to SEPTA's

claims, strongly weighing against disclosure. (Id.)

     The FRB supplements its argument as to the lack of relevance of the CSI sought by

SEPTA, maintaining that "in addition to determining that [FRB] CSI is irrelevant, the [FRB]

made a separate public policy determination that disclosure of CSI, on the facts of this case, is

inconsistent with the [FRB]'s 'supervisory and regulatory responsibilities and policies.'" (Id. at

29) (quoting 12 C.F.R. § 261.22(c)(ii)). The FRB position is based on its finding that "SEPTA

'seeks to use the fact that FRB Philadelphia entered into the March 22, 2012 Written Agreement with Orrstown, the specific provisions of the Written Agreement, and the examination communications and findings preceding and following the Written Agreement, as additional proof of violations of federal securities laws,'" which it maintains "also would 'discourage banks from entering into such agreements, which are designed to strengthen individual banks and the financial system generally.'"   (Id. at 29-30) (quoting Doc. No. 241-1 at 15, 16).   Therefore, in addition to what it asserts is the lack of relevance of FRB CSI to SEPTA's claims, the FRB argues that this Court "should take into account this important public policy consideration and decline to overrule the privilege."   (Id.)

The FRB next argues that the second factor—availability of evidence from another source—also "strongly counsels against, if not precludes, overriding the privilege."   (Id.)   The FRB maintains that "[b]y [SEPTA's] own admissions in its Court filings, it has obtained copious documents needed to prove its claims from Orrstown, SEK, other defendants, and third parties," and further, that "[SEPTA] makes no discernable argument that evidence it needs to prove its claims is unavailable from other sources."   (Id. at 30-31.)   The FRB asserts that SEPTA's argument in this regard is based on its contention that courts in other cases have held that evidence available from other sources is not an appropriate substitute for bank examination reports and communications regarding the same.   (Id. at 31.)   However, the FRB maintains that "whether courts in other cases have found that there was 'no substitute' for bank examination information on those facts does not show that [SEPTA] lacks access to other information here." (Id.)   The FRB echoes its statement in the Chadwick letter that the FRB "found[] 'SEPTA has access in discovery to, and has in fact obtained, voluminous discovery consisting of internal business records of Orrstown that do not reflect supervisory communications, as well as

non-privileged information from SEK and other defendants.'"   (Id.) (quoting Doc. No. 241-1 at

11).   The FRB notes that SEPTA has represented that it has received in production from

Orrstown, SEK and other third parties, over 112,000 documents, which constitute over 1.1

million pages.   (Id. at 32.)

In addition, the FRB notes that, in making its determination reflected in the Chadwick

letter, it relied upon this Court's February 14, 2020 Memorandum and Order granting SEPTA's

motion for leave to file a TAC and its finding therein "that documents produced to SEPTA in

November 2018 by Orrstown and SEK supported previously dismissed securities claims in the

TAC."   (Id.)   The FRB asserts that:

> Importantly, the [FRB] determined that the timeline laid out by SEPTA in
> connection with its motion for leave to file the TAC established that SEPTA had
> not even begun receiving documents from Orrstown, SEK, and other defendants
> when it originally sought access to CSI in February 2017, and that SEPTA sought
> access to highly confidential [FRB] CSI in order to "streamline the discovery
> process" and "to conserve the parties' resources," and not because information
> was unavailable from "any other source."

(Id. at 32-33) (quotation omitted).   The FRB reiterates its conclusion, communicated to SEPTA

via the Chadwick letter, that "supervisory determinations, such as those in the [FRB] CSI, 'are

based on the same kinds of internal bank documents' that Orrstown and other defendants have

produced to SEPTA, and SEPTA has not explained 'why supervisory communications in

particular, as opposed to the source communications on which they are based,' are relevant."

(Id. at 33) (quoting Doc. No. 241-1 at 13-14).   Accordingly, the FRB argues that because

"copious information is available to [SEPTA] from other sources," the second factor weighs

strongly in favor of not overriding the FRB's assertion of the bank examination privilege.   (Id.

at 34.)

The FRB argues that the third factor—seriousness of the litigation—similarly weighs

against overriding the FRB's assertion of the bank examination privilege, maintaining that "a securities class action, for which money damages are the remedy, does not rise to the level of seriousness that would require production of bank examination materials."   (Id.)   In support of its position, the FRB cites several cases so holding.   (Id. at 34-35.)

Further, the FRB maintains that the fourth factor—the role of the government—also fails to support any decision to override the FRB's assertion of the bank examination privilege here, noting that SEPTA "does not allege that the [FRB] is a party, or has any interest in the outcome of this case," but instead alleges that "'the SEC investigation and subsequent Cease and Desist Order' weighs in favor of disclosure."   (Id. at 35) (quoting Doc. No. 240 at 31).   The FRB maintains that the fourth factor relates more to whether the information sought to be disclosed "would 'shed light on alleged government malfeasance' and is not met in private securities litigation."   (Id. at 35-36) (quoting In re Providian Fin. Corp., 222 F.R.D. 22, 29 (D.D.C. 2004)).

The FRB also maintains that the fifth factor in the good cause assessment—the potential chilling effect of disclosure on the work of government employees—also weighs against overriding the bank examination privilege asserted by the FRB.   (Id. at 36.)   The FRB maintains that "[a] regulator who believes that his comments may be used, perhaps out of context, against a bank in a future private lawsuit may be less candid in his assessments than one who believes that his comments will be used strictly to improve the safe and sound operations of the bank."   (Id.)   The FRB maintains that a protective order "is unlikely to diminish this chilling effect," because "bank officials and regulators may be more circumscribed in their comments if they believe that their communications will be used against the bank in future, third-party litigation, diminishing the free flow of information."   (Id.)

In sum, the FRB maintains that all five factors examined by courts in determining

34

whether to override an assertion of the bank examination privilege, as well as additional public policy considerations, weigh against any finding by this Court of good cause to override the FRB's assertion of the bank examination privilege over the universe of documents sought by SEPTA.

### 4.    Pennsylvania Department of Banking and Securities

The PADOB also opposes SEPTA's motion to compel and notes that the records sought to be produced have resulted from a "joint examination of Orrstown conducted by the [PADOB] and the [FRB]," pursuant to applicable state statutes and federal regulations.   (Doc. No. 258 at 18.)   The PADOB raises the additional question as to whether the Department of Banking and Securities Code ("DoBS Code")'s statutory confidentiality provisions, 71 P.S. §§ 733-302, 733-404, "provide a separate justification to prevent the disclosure of documents sought by [SEPTA] in the Renewed Motion to Compel."   (Id.)   The PADOB notes that it is bound by statute, particularly Sections 302 and 404 of the DoBS Code, regarding "when and how the [PADOB's] reports of examination and records may be divulged or disclosed."   (Id. at 10.) The PADOB notes that the provisions of Section 302 prevent it from "divulg[ing] to anyone any information contained in or ascertained from any examination or investigation made by the [D]epartment, or any letter, report, or statement sent to the [D]epartment, or any other paper or document in the custody of the [D]epartment," except "where 'the production of such information is required by subpoena or other legal process of a court of competent jurisdiction.'" (Id. at 13-14) (quoting 71 P.S. § 733-302(A)(2)).[16]

---

[16]  The PADOB admits that an order from this Court compelling such disclosure would constitute such legal process.   (Id. at 17) (quoting 71 P.S. § 733-302(A)).   In the event that this Court would issue such an order, the PADOB requests that the production of any such documents be subject to the Stipulation and Protective Order Governing the Production and Exchange of

With regard to the first category of documents contained in the exemplars reviewed by the FRB, bank examination reports, the PADOB maintains that production of joint bank examination reports would be inappropriate because such reports are the "joint property" of the PADOB and FRB and "confidential under Section 404 of the DoBS Code"; in addition, the PADOB notes that Section 302 of the DoBS Code prohibits it "from divulging to anyone any information contained in or ascertained from any examination."   (Id. at 15) (citing 71 P.S. § 733-302(A)(2)).   The PADOB maintains that the production of any documents in the second category is also prohibited by Section 302, which it maintains "protects 'any letter, report, or statement sent to the [D]epartment, or any other paper or document in the custody of the [D]epartment' from disclosure."   (Id.) (quoting 71 P.S. § 733-302(A)(2)).

With regard to the third and fourth category of documents—those created by or on behalf of Orrstown in response to examiners' requests or examination findings or supervisory directives and internal Orrstown documents relating to bank examinations, examination findings, or other supervisory matters—the PADOB admits that such documents "would only be protected by Section 302 of the DoBS Code if these documents were sent to the [PADOB]"; however, the PADOB maintains that these categories may be protected from disclosure pursuant to the bank examination privilege.   (Id.)

Of the four categories of documents submitted to the [FRB] by way of exemplars, the PADOB first addresses SEPTA's argument that "reports of examination and related documents are predominantly factual," and therefore, "the bank examination privilege does not protect them from disclosure."   (Id.)   The PADOB acknowledges that courts examining bank examination reports have found them to consist at least partly of factual material and that if a bank

Confidential Information, issued by the Court on February 6, 2017.   (Id.)

examination report contains factual material, a court "must evaluate whether that factual material can be practically segregated and, if this is not possible, the court must balance the interest of a bank and its regulators to determine if the bank examination privilege should be overridden for good cause."   (Id. at 21.)   The PADOB acknowledges that the bank examination reports at issue contain "factual information regarding Orrstown's financial strength and status," but argues that "the Court should not order their disclosure" because the "reports detail the examiners' opinions with respect to Orrstown's internal control deficiencies and[] disclosing the entirety of the exam report would undercut the candor needed between Orrstown and its regulators to undertake necessary corrective action to remedy those deficiencies."   (Id. at 21-22.)

With regard to the second category of documents contained in the exemplars—formal and informal communications between Orrstown and its regulators regarding ongoing bank examination and supervisory matters—the PADOB emphasizes that these communications are related to the joint examination of Orrtown and the "regulators' supervisory findings and recommendations resulting therefore," and that, "[g]iven the nature of these communications and the purpose of the bank examination privilege (i.e., to promote open and candid discussion of supervisory concerns), the disclosure of these documents would reveal 'agency opinions and recommendations' and Orrstown's responses, which are protected by the bank examination privilege."   (Id. at 22-23.)   Therefore, the PADOB maintains that these documents should not be subject to production "because such disclosure threatens the 'iterative process of comment by the regulators and response by the bank.'"   (Id. at 23) (quoting FHFA v. JPMorgan Chase & Co., 978 F. Supp. 2d 267, 273 (S.D.N.Y. 2013) (internal quotation marks omitted)).

The PADOB similarly argues that the third and fourth category of documents at issue also remain "subject to the bank examination privilege," maintaining that Orrstown's responses

to bank examiners' findings "both internally and externally" would "necessarily reveal the regulators' opinions and recommendations stemming from the examination," again compromising the candid nature of the communications between the Regulators and a bank, which the bank examination privilege serves to protect. (Id. at 23-24.)

The PADOB next echoes the FRB in arguing that SEPTA has failed to demonstrate good cause to override the bank examination privilege. Like the FRB, the PADOB challenges SEPTA's contention that the documents sought to be produced are relevant because they may reveal the various defendants' state of mind regarding issues such as a failure to maintain adequate internal controls over financial reporting ("ICFR"), a failure to properly risk rate loans, and to a failure to adequately calculate ALLL, as those issues relate to the potential violation of federal securities laws. (Id. at 26.) The PADOB notes that while the TAC's Exchange Act claims require a showing of scienter "through either knowing or reckless conduct," it argues that the mental state of "recklessness" "does not necessarily require the disclosure of the CSI sought to be produced," and maintains that "the most salient evidence [of scienter] available to SEPTA is the testimony of the Orrstown officers and directors." (Id. at 26-27.) The PADOB, like the FRB, distinguishes the instant situation from that in Wilmington Trust, relied on by SEPTA in support of its motion, asserting that "there is no threat of an invocation of the right against self-incrimination because there are no current or pending criminal charges stemming from these allegations." (Id. at 27-28.)

The PADOB also challenges SEPTA's argument that the CSI-containing documents have no substitutes, noting that SEPTA has compiled the allegations contained in the TAC through a number of other sources, including "(1) documents already produced by Orrstown to SEPTA – including loan files of certain borrowers, (2) testimony of confidential witnesses, (3) the Written

38

Agreement and Consent Order entered into in 2012, (4) the SEC's Cease and Desist Order in

2016, (5) Orrstown's Loan Policy and GAAP, and (6) Orrstown's annual (10-K) and quarterly

(10-Q) public SEC filings."   (Id. at 28.)   The PADOB maintains that the availability of

evidence from other sources similarly weighs against a finding of good cause to override the

privilege.   (Id. at 29.)

The PADOB further maintains that the seriousness of the litigation factor weighs against

disclosure here, noting that the privilege may be "overridden to: (1) promote the paramount

interest of the Government in having justice done between litigants; (2) shed light on alleged

government malfeasance; or (3) when the public's interest in effective government would be

furthered by disclosure."   (Id.) (citing In re Subpoena, 967 F.2d at 634 (internal citation

omitted)).   The PADOB maintains that "[b]y providing SEPTA with access to a greater amount

of non-CSI documents, the Board and the Department have striven to have justice done between

the parties while honoring the underlying rationales of the bank examination privilege."   (Id. at

30.)   With regard to the role of the Government factor, the PADOB echoes the FRB's argument

that when litigation is "between private parties, '[t]he policy in favor of overriding the privilege

in order to 'shed light on alleged government malfeasance' therefore is not at play."   (Id. at 31)

(quoting In re Providian, 222 F.R.D. at 29) (internal quotation marks omitted)).

Finally, the PADOB reiterates the FRB's position that disclosure of CSI-containing

documents here would have a chilling effect on government employees, maintaining that such

disclosure "would likely lead to timidity by government employees, especially during targeted

examinations and investigations – where both the regulator and the institution are aware that the

examination is not 'routine,'" and that as a result of the possibility of the exposure of

examination-related materials in future litigation, "prudential supervision would suffer."   (Id. at

32.)   The PADOB counters SEPTA's argument that, in the event Orrstown intends to rely on the

examination reports to support its defenses, no chilling effect will occur due to disclosure of

CSI-containing documents.   The PADOB notes that "the test is not whether the bank subject to

current litigation will experience a chilling effect, but whether government employees in the

future will experience this chilling effect when attempting to candidly communicate with banks

regarding supervisory opinions or recommendations," and maintains that because "disclosure of

CSI in this instance would present a chilling effect for government employees in future

examinations and investigations, this factor weighs in favor of upholding the bank examination

privilege."   (Id. at 32-33.)   For all of the above reasons, the PADOB urges the Court to deny

SEPTA's renewed motion to compel.

> **B.**     **Analysis**

>> **1.**     **Applicability of the Bank Examination Privilege**

As noted above, the bank examination privilege is a qualified privilege, protecting from

disclosure agency opinions and recommendations.   See Schreiber, 11 F.3d at 220.   The purpose

of the privilege is to preserve and promote candor in communications between banks and their

regulators, in an effort to promote effective supervision of banking institutions.   See Redland, 55

F.3d at 854. The privilege does not apply to factual information.   See Bancorp, 1999 WL

1332312, at *4 (citing Redland, 55 F.3d at 853).   The privilege protects:

> only agency opinions and recommendations from disclosure; purely factual
> material falls outside the privilege and, if relevant, must be produced.   The
> agency asserting the privilege has the burden of establishing its applicability to
> the documents at issue.   If the agency fails to establish the privilege with respect
> to the subpoenaed material, then the documents must be produced.

Schreiber, 11 F.3d at 220 (citations omitted).   If the relevant documents contain a combination

of opinion and factual material, an agency should redact the documents and produce the factual

material.   See Midlantic, 1994 WL 750664, at *2.   If the opinion and factual material are

inextricably intertwined, a court must determine whether to override the privilege for good

cause.   See Schreiber, 111 F.3d at 220.

The Court has conducted an in camera review of the fifty exemplar documents reviewed

by the Regulators in connection with the assertion of the bank examination privilege over the

universe of documents sought by SEPTA by way of its Touhy request.   As described above, the

FRB's May 1, 2020 final determination letter asserting the bank examination privilege lists four

(4) categories of allegedly privileged documents:

> (1) bank examination reports; (2) formal and informal communications
> between Orrstown and [regulators] . . . relating to bank examination and
> supervisory matters; (3) documents created by or on behalf of Orrstown in
> response to examiners' requests or examination findings or supervisory
> directives; and (4) internal Orrstown documents or emails discussing,
> describing, or relating to bank examinations, examination findings, or other
> supervisory matters.

(Doc. No. 241-1 at 5.)   As noted by SEPTA in connection with the briefing of this motion, the

Regulators determined that five of the fifty exemplar documents did not contain any CSI.[17]

With regard to the first category of withheld documents—bank examination

reports—courts have consistently held that they are partially or entirely factual.   In reversing the

district court's denial of the enforcement of a subpoena served on the FRB, the United States

Court of Appeals for the D.C. Circuit noted in Schreiber that the district court failed to make

findings regarding the factual versus evaluative nature of the documents, and stated that:

---

[17] Those documents are exemplars: (1) thirteen (13) and its attachment, which were determined
to contain attorney-client privileged information and so were not produced for that reason; (2)
nineteen (19) and its two attachments—nineteen and the second attachment were withheld based
on attorney-client privilege, and the first attachment was produced; (3) forty (40) and its
attachment were determined to not contain CSI and so were produced; (4) forty-eight (48) and its
attachment were determined to not contain CSI and so were produced; and (5) forty-nine (49)

> [w]hile we recognize that the district court must determine anew in each case whether some portion of the bank examination reports (and responses thereto) are factual in nature and thus outside the privilege, we note that every court that has examined the nature of bank examination reports thus far has found them to be at least partly factual.

See Schreiber, 11 F.3d at 221 (citations omitted); Wilmington Trust, 2016 WL 9753979, at *6

(concluding that bank examination reports contained both factual and privileged information);

Principe v. Crossland Savings, 149 F.R.D. 444, 449-50 (E.D.N.Y. 1993) (noting that the

"overwhelming majority of courts that have considered the disclosure of reports of bank

examiners have ruled in favor of their production"); Seafirst Corp. v. Jenkins, 644 F. Supp. 1160,

1163 (W.D. Wash. 1986) (concluding that bank examination reports at issue "serve to present

and interpret facts, not to offer recommendations of policy"); In re Franklin Nat'l Bank Sec.

Litig., 478 F. Supp. 577, 585 (E.D.N.Y. 1979) (concluding that examiner's comments in bank

examination reports "are not opinions, but are factual statements by a first hand observer of the

bank").   In finding bank examination reports to be at least partly factual, courts "have rejected

the notion that the examiners' process of selecting facts to be included in the reports is integral to

the deliberative process, instead concluding that the reports are 'primarily reportorial and

expository, not deliberative.'"   See Wilmington Trust, 2016 WL 9753979, at *6 (quoting

Franklin, 478 F. Supp. at 585).

Having reviewed the bank examination reports included in the exemplar documents

reviewed by the Regulators in connection with the assertion of the bank examination privilege

here (exemplar documents 5 and 8), the Court concludes that they contain a significant amount

of factual information.   The PADOB acknowledges that the bank examination reports contain

"factual information regarding Orrstown's financial strength and status," but argues that "the

---

and its three attachments were determined to not contain CSI and so were produced.

Court should not order their disclosure" because the "reports detail the examiner's opinions with respect to Orrstown's internal control deficiencies." (Doc. No. 258 at 21.) The FRB argues that any factual information contained in the reports "cannot meaningfully be separated from opinion." (Doc. No. 259 at 19.) As noted above, under such circumstances, the Court must determine whether to override any privilege for good cause. See Schreiber, 111 F.3d at 220. For the reasons discussed in section III.B.2., infra, the Court concludes that good cause exists to override any privilege applicable to the bank examination reports. See Principe, 149 F.R.D. at 448 (finding that "even if portions of bank examination reports are privileged, the privilege is overridden by the public interest in disclosure").

The second category of documents over which the FRB/PADOB asserts privilege consists of formal and informal communications between the FRB/PADOB and Orrstown relating to bank examination or supervisory matters. With regard to this category of documents, courts have generally concluded that the factual content of such communications is not privileged and must be produced to the extent the factual content is not inextricably intertwined with privileged material. See id. at 450 (concluding that only factual portions of correspondence were requested and so the bank examination privilege did not apply); Midlantic, 1994 WL 750664, at *4 (concluding that factual part of correspondence must be produced). As noted above, to the extent factual contents are inextricably intertwined with privileged portions of the documents, the Court must determine whether to override the privilege for good cause. Having reviewed the exemplar documents containing communications related to bank examination matters (exemplar documents 2, 5, 7-8, 10-11, 18, 21-23, 25, 27-38, 41-42, 47) the Court concludes that they are at least partly factual. Moreover, the Court finds that, for the reasons discussed in section III.B.2., infra, good cause exists to override any privilege applicable

43

to non-factual portions of communications between the FRB/PADOB and Orrstown.

The third category of documents over which the FRB/PADOB asserts privilege consists of documents created by or on behalf of Orrstown in response to examiners' requests or examination findings or supervisory directives.[18]   As noted above, to the extent such documents contain factual information, such information is not subject to the bank examination privilege unless it is inextricably intertwined with privileged material.   Having reviewed the exemplar documents consisting of documents created by or on behalf of Orrstown in response to examiners' requests of examination findings or supervisory directives (exemplar documents 1, 3, 4, 6, 9-12, 14-15, 17-18, 20, 26, 31, 36, 39, 43-45), the Court concludes that they are comprised, at least in part, of factual information.   In addition, the Court finds that, to the extent the documents contain privileged material, and for the reasons set forth in section III.B.2, infra, good cause exists to override any privilege applicable to documents created by or on behalf of Orrstown in response to examiner requests or findings.

With regard to the fourth category of documents over which the FRB/PADOB asserts privilege—internal Orrstown documents or emails discussing, describing, or relating to bank examinations, examination findings, or other supervisory matters[19]—courts have concluded that such documents are primarily factual and therefore not subject to the bank examination privilege.   See Wilmington Trust, 2016 WL 9753979 at *7 (finding that "[w]ith respect to internal Bank

---

[18] To the extent such documents were created by Orrstown (which is the majority of documents in this category), the Court notes that this category of documents overlaps with the fourth category of documents over which the FRB/PADOB asserts privilege—internal Orrstown documents or emails discussing, describing, or relating to bank examinations, examination findings, or other supervisory matters.

[19] The Court notes that, to the extent internal Orrstown emails forward correspondence from or to the Regulators, this category overlaps with the second category of exemplar documents

documents and communications regarding the regulator examinations, opinions, and recommendations . . . , the court concludes that these communications are primarily factual"); In re Vescio, 208 B.R. 122, 128 (Bankr. D. Vt. 1997) (finding that internal documents discussing actions taken and to be taken by the bank, including the bank's customs, practices and guidelines for lending and loan workouts, were factual and not subject to the bank examination privilege). However, to the extent that the internal communications or documents reveal regulators' opinions and recommendations, they are subject to the privilege.   See Wilmington Trust, 2016 WL 9753979, at *7; Midlantic, 1994 WL 750664, at *4.   "[I]nternal communications falling outside this narrow scope should not be deemed privileged, as the privilege belongs to the regulators, not the Bank, and therefore only protects communications relating to agency opinions and recommendations."   Wilmington Trust, 2016 WL 9753979 at *7.   Having reviewed the exemplar documents consisting of internal Orrstown documents or emails discussing, describing, or relating to bank examinations, findings, or other supervisory matters (exemplar documents 3-4, 6, 9-12, 14-18, 20-26, 34, 36-39, 41-46, 50), the Court concludes that these documents consist, at least in part, of factual information, including actions taken by the bank.   To the extent that the documents contain privileged material, the Court finds that, for the reasons discussed in section III.B.2, infra, good cause exists to override any privilege that may be applicable to internal Orrstown documents or emails discussing, describing, or relating to bank examinations, findings, or other supervisory matters.

---

identified by the FRB/PADOB.

### 2.      Whether There Exists Good Cause to Override the Bank Examination Privilege

Upon careful review of the arguments of the parties and the intervenors, the relevant authorities, the TAC, and the fifty (50) exemplar documents produced for in camera review by the Court, the Court is persuaded that, to the extent the bank examination privilege applies to any of the exemplar documents, they are subject to production under the good cause exception to the privilege.   In determining whether good cause exists to order production of privileged material, the Court assesses and ultimately "balance[s] the 'competing interests' of the party seeking the documents (which may vary from case to case) and those of the Government (which will tend to be a constant, reflecting long-term institutional concerns)."   See Schreiber, 11 F.3d at 220 (quoting In re Subpoena, 967 F.2d at 634).   "[T]he court must balance the importance of the privilege against the need for the information and its availability from other sources." Wilmington Trust, 2016 WL 9753979 at *7 (citing Redland, 55 F.3d at 853).   Typically, courts assess five factors when applying the good cause exception: "(1) the relevance of the evidence sought; (2) the availability of other evidence; (3) the seriousness of the litigation; (4) the role of the government, and (5) the potential chilling effect on future disclosures to regulators."   See id. (first citing In re Bankers Trust Co., 61 F.3d 465, 472 (6th Cir. 1995); then citing Schreiber, 11 F.3d at 220; and then citing In re Subpoena, 967 F.2d at 634).   The Court addresses each factor in turn.

### a.      Relevance

As noted by SEPTA, the relevance prong of the Court's good cause analysis is assessed pursuant to the ordinary standards of civil discovery, under which the standard of relevance is

broadly construed.   See Redland, 55 F.3d at 856 (cautioning that "[i]n considering the United

States' assertion of privilege, the district court should keep in mind the fact that Federal Rule of

Civil Procedure 26 authorizes broad discovery into 'any matter, not privileged, which is relevant

to the subject matter involved in the pending action, but the deliberative process privilege, like

other executive privileges, should be narrowly construed'") (internal quotation marks and

citation omitted); Wilmington Trust, 2016 WL 9753979, at *7 (noting that "privileged portions

of bank examination reports are subject to the good cause exception if they are relevant to the

claims at issue in the litigation").

In general, as noted by SEPTA, the documents at issue are a subset of documents

collected by the SEC during its investigation of the conduct of Orrstown that forms the basis of

SEPTA's claims against the Defendants, which preceded the SEC's investigation that resulted in

the SEC Order.   As discussed, supra, the allegedly privileged universe of documents sought by

SEPTA was further narrowed by the application of particular search terms related to Orrstown's

internal controls over financial reporting, including specific borrower relationships and thirteen

(13) topic terms, including "ALLL" and "Loan Loss," which are at issue in this case.

With regard to the bank examination reports, the Court easily concludes that information

contained in those reports is relevant to SEPTA's claims, specifically, the issues of the Orrstown

Defendants' knowledge of Orrstown's problems regarding its internal controls over financial

reporting, alleged misrepresentations, and scienter, during the period of time prior to Orrstown's

March 15, 2012 disclosure (by way of its 2011 Annual Report on Form 10-K) of a "material

weakness" in its internal controls over financial reporting and its failure "to implement a

structured process with appropriate controls to ensure that updated loan ratings were

incorporated timely into the calculation of the Allowance for Loan Losses."   (Doc. No. 197 at

1-2.)   Other courts addressing the relevance prong of the good cause assessment have concluded

likewise in similar situations.   In Wilmington Trust, the court found that any privileged

information in the bank examination reports was "highly relevant" to the Exchange Act claims

alleged because it was "indicative of Defendants' knowledge of the Bank's problems, the alleged

misrepresentations and breach of fiduciary duty, and scienter," and relevant to defenses to the

claims.   See Wilmington Trust, 2016 WL 9753979 at *7; In re Subpoena Duces Tecum Served

Upon the Office of the Comptroller of the Currency, 151 F.R.D. 1, 2 (D.D.C. 1992) (concluding

that the bank examination reports were "highly relevant" to plaintiff's claims that the bank made

false and misleading statements); Principe, 149 F.R.D. at 449 (finding bank examination reports

relevant to proof of defendants' knowledge, misrepresentations, and scienter); Walsh v.

Chittenden Corp., 799 F. Supp. 405, 408 (D. Vt. 1992) (finding it "undisputed" that the requested

reports are relevant to securities fraud claims, particularly the element of scienter); Forstmann

Leff Assoc., Inc. v. Am. Brands, Inc., No. 88-cv-4485, 1991 WL 168002, at *3 (S.D.N.Y. Aug.

16, 1991) (finding requested reports relevant to justifiable reliance element of securities fraud

claims); Seafirst, 644 F. Supp at 1162 (finding bank examination reports relevant to allegations

of "imprudent" loans issued by bank to "high-risk" borrowers).[20]

Further, the Court concludes that the other three categories of documents at

issue—formal and informal communications between Orrstown and regulators relating to bank

examination matters, documents created by or on behalf of Orrstown in response to examiner

---

[20]  The bank examination reports are also potentially relevant to SEPTA's claims against SEK for
violation of the Securities and Exchange Acts, asserted by way of the TAC, because the reports
may reveal whether SEK appropriately considered warnings or recommendations of the
regulators in performing audits during the relevant period.   See Wilmington Trust, 2016 WL
9753979, at *7; Franklin, 478 F. Supp. at 586-87 (determining that bank examination reports
were relevant to auditor defense of negligence claims asserted against it); Seafirst, 644 F. Supp.

requests or findings, and internal Orrstown documents or emails discussing or relating to
examination findings—are also relevant to a determination as to whether the Orrstown
Defendants misrepresented or failed to disclose material facts in its public disclosures regarding
its loan portfolios and banking practices.   See Wilmington Trust, 2016 WL 9753979, at *8.
The documents reflecting Orrstown's internal responses to the examiners' findings also may
relate to the issue of loss causation to the extent they reveal whether the Orrstown Defendants
concealed the truth about their loan portfolio for a period of time before the March 2012
disclosure and Enforcement Actions.   See id. (finding internal responses to examination findings
to be relevant to loss causation where documents would reveal whether the defendants concealed
the truth about its loan portfolio and banking practices for an extended period of time before a
Memorandum of Understanding was imposed on the bank, resulting in modification of its
banking practices).

     The Court also notes that the timing of the examination reports and related documents
(occurring prior to Orrstown's disclosure of a material weakness in its internal controls over
financial reporting) particularly supports a finding of relevance.   See Wilmington Trust, 2016
WL 9753979, at *8 (holding that the pre-disclosure timing of the FRB investigation weighs in
favor of a finding of relevancy).   By contrast, in Shirk, relied on by the FRB in opposition to
SEPTA's motion, the court found that the regulatory documents sought by the plaintiff were of
limited relevance because they "were all initiated and prepared after [defendant] had already
disclosed its accounting problems, which give rise to this lawsuit."   See Shirk, 2008 WL
2661955, at *2; see also Raffia v. Wachovia Corp., No. 8:02-cv-1443, 2003 WL 21517778, at
*3-5 (M.D. Fl. May 15, 2003) (upholding privilege where the events causing the injury occurred

---

at 1162 (finding bank examination reports relevant to claims against auditor).

prior to the preparation of the documents reflecting the assessment of activities occurring after the closing of the merger and did not reveal what the defendants knew before or at the time of the merger).

Ultimately, upon in camera review of the exemplar documents, the Court is persuaded that the documents are relevant to the claims at issue in this case, in accordance with the majority of courts that have addressed the good cause analysis in factually similar cases and found the relevance prong satisfied.   See, e.g., Wilmington Trust, 2016 WL 9753979, at *7-8 (concluding that examination reports, communications, and related documents are "highly relevant" to securities fraud claims because they are "indicative of [d]efendants' knowledge of the Bank's problems, the alleged misrepresentations and breach of fiduciary duty, and scienter," and relevant to defendants' defenses to the action); Schreiber, 11 F.3d at 222 (finding bank examination CSI relevant to officers' scienter); In re Subpoena Duces Tecum, 151 F.R.D. at 2 (concluding that bank examination reports were "highly relevant" to plaintiffs' claims that the bank made false and misleading statements); Principe, 149 F.R.D. at 449 (finding supervisory reports relevant to "alleged misrepresentations" and "proving defendants' scienter"); Walsh, 799 F. Supp. at 408 (finding it "undisputed" that the requested reports are relevant to securities fraud claims, particularly with respect to the element of scienter); Forstmann, 1991 WL 168002, at *3 (finding bank examination reports relevant to justifiable reliance element of securities fraud claims); Seafirst, 644 F. Supp. at 1162 (finding bank examination reports relevant to allegations of "imprudent" loans issued by bank to "high-risk" borrowers).[21]

---

[21]  The PADOB argues that the bank examination-related reports are "not highly relevant" to the issue of scienter because "[p]erhaps the most salient evidence available to SEPTA is the testimony of the Orrstown officers and directors, and, unlike in Wilmington Trust, there is no threat of an invocation of the right against self-incrimination because there are no current or

The Court notes that the examiners' findings are also relevant to the extent the Orrstown Defendants intend to rely on them in their defense to the claims asserted against them.   While the Orrstown Defendants disclaim any intention to utilize CSI documents in their defense unless SEPTA is permitted to use such documents (Doc. No. 252 at 14), the Court notes that another set of defendants in this action, the Underwriter Defendants, appear to concede the potential relevance of such examination documents in their brief in support of their pending motion to dismiss the Securities Act claims asserted in the TAC, further supporting the Court's relevance determination here.   (Doc. No. 218 at 26) (stating that "plaintiff does not allege that anyone—not the Federal Reserve; not the Pennsylvania Department of Banking; not the SEC; not SEK; and not any bank employee—told the certifying officers . . . prior to the March 2010 offering that Orrstown's internal controls over financial reporting were defective, or even suggested that they might be").   For all of these reasons, the Court concludes that the relevance prong of the good cause analysis is met here.[22]

### b.      Availability of Other Evidence

---

pending criminal charges stemming from these allegations."   (Doc. No. 258 at 27-28.) However, the Court notes that, in <u>Wilmington Trust</u>, the court initially concluded that the relevant authorities emphasized accurate judicial factfinding and the lack of adequate substitutes for bank examination reports in concluding that good cause existed to override the privilege with regard to such documents, before noting that the pending criminal proceedings against various officers "enhance[d] the importance of information from examination reports" in that particular case.   <u>See Wilmington Trust</u>, 2016 WL 9753979, at *9.   The Court notes that the fact that testimonial evidence of the officers and directors may be available to SEPTA on the issue of scienter does not lessen the relevance of a contemporaneous record of the officers and directors' state of mind and knowledge at the time various alleged misstatements were made.

[22] The Court notes that the FRB suggests that "inconsistency with the Board's supervisory responsibilities and policies" is an additional "relevance" factor that should be considered by the Court; however, the Court concludes that any such concern is appropriately addressed within the context of the fifth prong of the good cause analysis—the potential chilling effect on communications with regulators.

With regard to the "availability of other evidence" factor of the good cause analysis, as noted above, the Regulators maintain that the examination-related materials requested by SEPTA are available to SEPTA from other sources, specifically, internal Orrstown documents that may contain similar information.   The Court is unpersuaded by the Regulators' argument, for two reasons.   First, as SEPTA notes, the Regulators' argument "makes little sense here" because the majority of the exemplar documents are the internal documents of Orrstown which the Regulators have refused to permit them to produce to SEPTA.   (Doc. No. 262 at 27.)   As in Wilmington Trust, "the alternative sources of information cited by the regulators are not viable, as the regulators have claimed privilege over many of the Bank's own internal records and other documents."   See Wilmington Trust, 2016 WL 9753979, at *9.[23]

Further, the bank examination-related materials have no effective substitutes in cases where a plaintiff's claims require a finding of scienter, because those materials reflect the knowledge and state of mind of the defendants at the time of the examination reports.   The majority of the cases addressing this issue under the good cause standard have concluded that bank examination-related materials have no substitutes.   See In re Subpoena Duces Tecum, 151 F.R.D. at 2 (finding that the defendants' "own records, even if complete and maintained in usable form . . . cannot substitute for the [bank examination reports], whose contents form an essential part of plaintiffs' cause of action"); Franklin, 478 F. Supp. at 586 (finding that the

---

[23] The Regulators also argue that the fact that SEPTA has received voluminous discovery from other sources means that the "availability of other evidence" factor counsels against a finding of good cause here.   (Doc. No. 257 at 31-32.)   However, as noted by SEPTA, the number of documents produced to and received by SEPTA does not speak to the issue of whether the CSI documents are duplicative of other documents available to SEPTA.   See Funnekotter v. Agric. Dev. Bank of Zimb., No. 13-cv-1917, 2014 WL 4630020, at *8 (S.D.N.Y. Sept. 11, 2014) (acknowledging that "[d]iscovery is evaluated by quality, not quantity").

examination reports provided "a unique and objective contemporaneous chronicle of the financial decline of Franklin National Bank; no satisfactory substitute exists"); Principe, 149 F.R.D. at 449 (ordering production of bank examination reports in part because no adequate substitute existed); see also Schreiber, 11 F.3d at 222 (stating that examination-related documents have no substitutes because "in their communications with the bank examiners, the officers may have evidenced or gained an awareness of [the bank's] true financial state at the same time that they were presenting the public with a rosier picture").

The Court notes that Shirk, cited by the FRB in opposition to SEPTA's motion, is distinguishable in this regard because in that case, the examination reports were created after the wrongdoing at the bank had been disclosed, and so the court concluded that the bank's "own internal business records of the facts . . . are likely to show when [the bank] became aware of these issues, and how it remediated [them]."   See Shirk, 2008 WL 2661955, at *9-10.   Here, the Orrstown Defendants' disclosure of a material weakness in its internal controls over financial reporting occurred on March 15, 2012, subsequent to the creation of the bank examination-related exemplar documents, which cover the period of time prior to that date. Accordingly, the Court finds that, under such circumstances, the examination-related documents provide evidence of the Orrstown Defendants' knowledge and awareness that is unavailable from another source.[24]

### c.    Seriousness of the Litigation

The Court finds unavailing the Regulators' position that the seriousness factor of the good cause assessment cannot be met in cases between private parties where money damages are

---

[24] In re Bank One Securities Litigation, 209 F.R.D. 418 (N.D. Ill. 2002), cited by the FRB in opposition to SEPTA's motion, is distinguishable from the instant case on the basis that scienter

the remedy.   Courts have concluded that securities fraud allegations raise significant questions regarding the fairness of financial markets and are therefore "serious" for purposes of the good cause analysis.   See, e.g., Wilmington Trust, 2016 WL 9753979, at *9 (stating that allegations "indicating that senior bank management engaged in massive fraud to artificially inflate the price of the institution's publicly traded securities, raise fundamental issues regarding public confidence in the fairness of financial markets"); In re Subpoena Duces Tecum, 151 F.R.D. at 2 (finding "such [securities fraud] allegations are undoubtedly serious, and raise fundamental issues regarding public confidence in the fairness of the financial markets"); Franklin, 478 F. Supp. at 586 (finding seriousness element satisfied in securities class action where senior management engaged in massive fraud).   The Court notes that, even in Bank One—a case cited by the FRB in connection with its argument against a finding of good cause here—the court concluded that "there is no question" that securities fraud claims are of a serious nature sufficient to fulfill this factor in light of the public's need to make educated investing decisions.   See 209 F.R.D. at 428.   Accordingly, the Court finds that this action is "serious" within the meaning of the third prong of the good cause assessment and so this factor weighs in favor of the application of the good cause exception to any privileged material.

### d.    Role of the Government in the Litigation

The Court is similarly unpersuaded by the Regulators' contention that, because a governmental entity is not a party to this litigation, this factor weighs against a finding of good cause to override the bank examination privilege.   The Court notes that, as discussed above, in addition to the Enforcement Actions entered into between Orrstown and the Federal Reserve Bank of Philadelphia and Orrstown and the PADOB, the SEC entered into a Cease-and-Desist

---

was not an element of the claims at issue in that case.   See id. at 420-21.

Order with Orrstown in September of 2016 in connection with the failures of internal control over financial reporting that are at issue in this case.   The SEC investigation concluded that Orrstown had made "material misstatements in [its] impaired loan disclosures in its quarterly filings for the period ended June 30, 2010 through September 30, 2011, and its annual filings for the years ended December 31, 2010 and 2011."   (Doc. No. 122, Exh. 1, SEC Order ¶4.)   In denying in part the Orrstown Defendants' motion to dismiss the SAC, the Court, having taken judicial notice of the SEC Order, found it supportive of the Court's conclusion that the SAC adequately alleged Exchange Act claims against Orrstown and several of its officers during the relevant time period.   (Doc. No. 126 at 49.)   As noted above, the documents at issue in SEPTA's <u>Touhy</u> request are a subset of the documents Orrstown produced to the SEC in connection with its investigation.   SEPTA notes that the SEC did not seek discovery for the period of time prior to January 1, 2010, and so maintains that it "never uncovered the full scope of wrongdoing."   (Doc. No. 262 at 31.)   In addition, none of the regulatory actions achieved any monetary recovery for investors who purchased Orrstown stock at inflated prices during the relevant time period.

As recognized by the United States Supreme Court, "meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission."   <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 313 (2007).   Under the circumstances present in the instant case, where this private litigation is based upon claims that are related to the public interest and supplement government enforcement of the securities laws, the Court concludes that the governmental interest factor is met here and weighs in favor of a finding of good cause.   <u>See, e.g.</u>, <u>Wultz v. Bank of China LTD.</u>, 61 F. Supp.

3d 272, 290 (S.D.N.Y. 2013) (concluding that the governmental interest factor of the good cause analysis was satisfied in a suit between private litigants where the underlying statutes upon which the claims were based are "infused with the public interest") (citation omitted); cf In re Providian, 222 F.R.D. at 29 (finding governmental interest factor not met in private litigation where there was no indication that "the government has sought to use its own civil or enforcement powers under the securities law to pursue the claims made by the plaintiffs").

### e.    Chilling Impact

This factor assesses whether disclosure will have a "chilling" impact on communications between banks and regulators.   Specifically, this factor assesses "the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable."   See Schreiber, 11 F.3d at 220 (quoting Franklin, 478 F. Supp. at 583).   SEPTA argues that this factor weighs in favor of disclosure because "bank officials are legally obligated to cooperate with bank examiners."   (Doc. No. 240 at 36) (quoting Forstmann, 1991 WL 168002, at *4 (internal quotation marks omitted)).   Moreover, SEPTA maintains that, to the extent Orrstown intends to rely on the examination reports and findings in support of its defenses to SEPTA's claims, there can be no chilling effect.   (Id. at 35.)   However, the PADOB points out that "the test is not whether the bank subject to current litigation will experience a chilling effect, but whether government employees in the future will experience this chilling effect when attempting to candidly communicate with banks regarding supervisory opinions or recommendations."   (Doc. No. 258 at 32).   The PADOB argues that this concern is especially applicable to targeted examinations and investigations where regulators and banks "are aware that the examination is not 'routine,'" and that "[i]f government employees are in greater fear that their candid supervisory recommendations and opinions could be used against bank in future

litigation, then effective prudential supervision would suffer."   (<u>Id.</u>)

The Court recognizes the potential for a chilling effect for future government employees and bank investigations; however, "courts have recognized that government employees must always be cognizant that their communications may at some point be made public because the privilege is qualified."   <u>See</u> <u>Wilmington Trust</u>, 2016 WL 9753979, at *11 (citing <u>In re Vescio</u>, 208 B.R. at 131).   Moreover, as SEPTA notes, courts have consistently held that protective orders can function as a sufficient safeguard to protect any privileged information disclosed. <u>See</u> <u>Schreiber</u>, 11 F.3d at 222 (stating that the concern regarding the chilling effect that producing the requested information might have on the bank examination process can "largely be alleviated if the court could fashion a practical protective order . . . that reconciles the agencies' interest in confidentiality with the plaintiff's potential need to introduce some or all of the subpoenaed documents (or information therefrom) into evidence at a public trial"); <u>Wilmington Trust</u>, 2016 WL 9753979 at *11 (finding that a protective order can provide adequate protection of confidentiality); <u>Principe</u>, 149 F.R.D. at 450 (finding no chilling effect where a protective order is entered ensuring that the documents produced will remain confidential, and further concluding that, to the extent an agency believes a protective order is insufficient, the proper remedy is to seek modification of the protective order as opposed to refusal to produce relevant documents).   As noted above, a Protective Order governing the production and exchange of discovery materials has been in place in this case since February 6, 2017.   Accordingly, upon consideration of the above, the Court concludes that the potential chilling effect factor of the good cause analysis does not weigh against disclosure here.[25]

---

[25] However, even if the Court viewed this factor as weighing against disclosure, the balance of factors weighs in favor of a finding of good cause to override the bank examination privilege in

Having found that each factor traditionally assessed in connection with the good cause exception weighs in favor of disclosure of the privileged material, the Court concludes that, to the extent the exemplar documents identified on Exhibit 11 to SEPTA's motion contain privileged information, good cause exists to override the privilege and order production of the exemplar documents, subject to the Protective Order previously entered in this case.   The Court must next assess how the Court's conclusion as to the exemplar documents informs the greater universe of approximately 2,000 documents (identified on Exhibit 12 to SEPTA's motion), over which the Regulators assert privilege.   While the FRB maintains that "exemplar procedures are an accepted method used by courts for resolving claims of privilege involving large numbers of documents, and that method was appropriately and reasonably used here," see (Doc. No. 257 at 23), the Court notes that the cases cited by the FRB in support of that proposition involve the parties selecting exemplars for a court to review in connection with a claim of privilege, but do not appear to involve an agency's use of the exemplar procedure to select a limited universe of documents to review in connection with a decision regarding the assertion of privilege over a larger population of documents.[26]   The Court has not located any authority wherein an agency utilized an exemplar procedure to review potentially privileged documents, and then a court later reviewed those exemplars in connection with the agency's assertion of privilege over a larger population of documents.   However, based upon the FRB's representation that it "made clear to the parties that the exemplar procedure was to 'enable the Board to complete its review of the

---

this case.

[26] The FRB cites In re: 3M Combat Arms Earplug Products Liability Litigation, No. 3:19-md-2885, 2020 WL 1321522, at *2 (N.D. Fl. Mar. 20, 2020), and Blackrock Balanced Capital Portfolio (Fi) v. Deutsche Bank National Trust Company, No. 14-cv-09367, 2018 WL 3584020, at *1 (S.D.N.Y. July 23, 2018), in support of its use of exemplars here.

CSI,' and was not simply a precursor to review of the entire population of documents," <u>see</u> (Doc. No. 257 at 21) (quoting Doc. No 241-8, Exh. 8 to Mathews Declaration at 3), and its apparent intention that this Court make a determination regarding its assertion of the bank examination privilege over the greater universe of documents based on the Court's review of and conclusions regarding the fifty exemplar documents, the Court similarly concludes that good cause exists to override the privilege and order production of the approximately 2,000 documents identified on Exhibit 12 to SEPTA's motion.

## IV.    CONCLUSION

For all of the reasons discussed above, the Court will grant SEPTA's Renewed Motion to Compel.   An Order consistent with this Memorandum follows.