**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
Nicholas E. Chimicles, Pa. Id. No. 17928
Kimberly Donaldson Smith, Pa. Id. No. 84116
Timothy N. Mathews, Pa. Id. No. 91430
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Phone (610) 642-8500
Fax (610) 649-3633

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, on behalf of itself and all others similarly situated, | Civil Action No. 1:12-cv-00993 CLASS ACTION |
| Plaintiff, | |
| v. | |
| ORRSTOWN FINANCIAL SERVICES, INC., ET AL, | |
| Defendants. | |

### DECLARATION OF KIMBERLY M. DONALDSON-SMITH IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

I, Kimberly M. Donaldson-Smith, declare under penalty of perjury, pursuant

to 28 U.S.C. § 1746:

1.     I am an attorney duly licensed to practice in the Commonwealth of Pennsylvania and I am admitted *pro hac vice* to the United States District Court for the Middle District of Pennsylvania to appear in this matter.

2.     I am a partner of the law firm of Chimicles Schwartz Kriner & Donaldson-Smith LLP ("CSKD" or "Lead Counsel"), Court-appointed Lead Counsel in this proposed class action ("Action") and counsel of record for Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Lead Plaintiff").

3.     I respectfully submit this Declaration in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement, and Motion for An Award of Attorneys' Fees and Reimbursement of Litigation Expenses.

4.     Unless otherwise defined, capitalized terms used herein have the same meaning as set forth in the December 5, 2022 Stipulation and Agreement of Settlement and exhibits thereto (the "Stipulation"), which was filed as Exhibit 1 to my Declaration submitted in support of Lead Plaintiff's Motion for Preliminary Approval at Dkt. 297.

5.     Among other things, this Declaration catalogues pertinent information concerning the investigation, initiation, prosecution, and resolution of the Action by Lead Plaintiff and Lead Counsel.

## I. SUMMARY OF THE INVESTIGATION, PROSECUTION AND SETTLEMENT OF THE ACTION

6.     On March 15, 2012, Orrstown Financial services, Inc. ("Orrstown") filed its 2011 Annual Report disclosing: that it had a "material weakness" in its internal controls; that throughout 2011 it had "failed to implement a structured process with appropriate controls to ensure that updated loan ratings were incorporated timely into the calculation of the Allowance for Loan Losses"; and, as of March 2012, it had failed to "fully remediate its material weakness in its internal control over financial reporting relating to loan ratings and its impact on the allowance for loan losses." Form 10-K 2011 Annual Report, filed 3/15/2012, at 74-75.

7.     Then, one week later, on March 23, 2012, Orrstown shareholders were told about the examination conducted by the Federal Reserve Bank of Philadelphia and the Pennsylvania Department of Banking (the "Regulators"), which had resulted in enforcement actions against the Bank. Among other things, the enforcement actions provided for continuing oversight of Orrstown and recommended review of various controls over underwriting, risk management and financial reporting.

8.     In light of these material disclosures and developments, and in light of the material decline in Orrstown's stock price from approximately $27.00 per share in March 2010 to $8.20 per share on April 5, 2012, Lead Counsel promptly began

its investigation of whether Orrstown shareholders had viable claims under the federal securities laws.

9. Lead Counsel identified that in March 2010 Orrstown had raised nearly $40 million in investor capital ("March 2010 Offering"), telling investors in the Offering Documents about its "enviable record regarding its control of loan losses," "loan loss history [that] has been much better than peer standards," and "ample" allowance for loan losses "given the current composition of the loan portfolio", and assuring investors that Orrstown maintained effective "internal control over financial reporting." Lead Counsel also identified similar public statements and other potential material omissions from Orrstown's filings with the SEC from early 2010.

10. Lead Counsel conducted a rigorous investigation prior to filing the initial complaint. Among other things, Lead Counsel:

    a. reviewed and analyzed Orrstown's SEC Filings, including Registration Statements, Prospectuses, Proxy Statements, Annual and Quarterly Reports, Form 8-Ks, and press releases;

    b. reviewed and analyzed Orrstown's formation documents, including the Charter and bylaws, and amendments thereto;

    c. identified, reviewed and analyzed analyst reports concerning Orrstown as well as comparable banks and banking industry

generally;

d. identified, reviewed and analyzed new articles and commentary concerning Orrstown, as well as comparable banks and banking industry generally;

e. analyzed Orrstown's financial statements to assess, among other things: disclosures and information about the capital raise, ability to raise capital, loan loss reserves, underwriting risks, lending policies, borrowers, internal controls, management, and, generally, Orrstown's financial condition;

f. analyzed and considered market conditions at the time of the March 2010 Offering; and,

g. analyzed and reviewed the practices of other regional banks with respect to, among other things, raising capital, lending policies, loan loss reserves, internal controls, and dividend payments/suspensions, during the relevant period.

11. Lead Counsel also thoroughly reviewed, researched and assessed, based on all public filings and publicly available information, the disclosures made by Orrstown in connection with the March 2020 Offering, the suspension of the dividend in 2011, and the Regulators' enforcement action.

12.     Based on Lead Counsel's investigation, on May 25, 2012, SEPTA, a purchaser of Orrstown common stock, commenced the Action by filing a Class Action Complaint for Violations of Federal Securities Laws ("Initial Complaint", Dkt. No. 1) in the United States District Court for the Middle District of Pennsylvania ("Court"), on behalf of itself and a proposed class of purchasers of Orrstown common stock from March 24, 2010 to October 27, 2011.

13.     The Initial Complaint asserted claims against Orrstown and certain Individual Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended ("Exchange Act") and United States Securities and Exchange Commission ("SEC") Rule 10b-5 (collectively, the "Exchange Act Claims"), and under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, as amended ("Securities Act" and "Securities Act Claims").

14.     As set forth in the Initial Complaint, the Exchange Act Claims and Securities Act Claims generally involved allegations that Orrstown's filings with the SEC, which include filings by Orrstown in March 2010 for a $45 million public offering of 1.7 million shares of its common stock at $27 per share (the "March 2010 Offering" and "Offering Documents") and Orrstown's periodic, quarterly, and annual SEC reports beginning with Orrstown's Form 10-K annual report for the fiscal year ended 2009 (the "Reports"): contained materially false and misleading statements about Orrstown's loan portfolio, its financial condition, and whether

Orrstown had taken adequate reserves to cover loan losses; concealed Orrstown's failures of internal controls over financial reporting; and, included false and misleading audit opinions. As of April 27, 2012, Orrstown's stock was trading at $7.94 per share.

15.    On August 20, 2012 the Court appointed SEPTA as Lead Plaintiff, and approved Chimicles Schwartz Kriner & Donaldson-Smith LLP ("CSKD") as Lead Counsel, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Dkt. No. 33.

16.    Subsequently, and during which time Lead Plaintiff secured tolling and preservation agreements from Defendants, the Parties engaged in substantive discussions about the Action, Lead Plaintiff's claims, and Defendants' defenses thereto, and discussed whether resolution of the Action at that time was possible.

17.    To aid Lead Plaintiff in its analyses of the claims, as well as the discussions with Orrstown as to whether an early-resolution was possible, Lead Counsel engaged GlenDevon Group, Inc. ("GDG"). Kathleen P. Chimicles, to whom Nicholas Chimicles is married, is the founder and President of GDG. After having been the Financial Specialist from 1992 through 2004 of Chimicles & Tikellis LLP (now known as CSKD), Ms. Chimicles established GDG in January 2005 to provide forensic investigation, damages analyses and expert services for complex litigation cases including structured allocation plans. Lead Counsel engaged GDG to provide

litigation support work, including specifically to aid in Lead Counsel's investigation and analyses of financial-related data and facts, and as of this time, to perform preliminary, but extensive, analyses concerning the potential range of damages for both the Securities Act and Exchange Act Claims.

18.     The Parties, however, did not reach a resolution.

19.     Lead Counsel conducted further investigation into the claims, which included (among other things):

    a.  Retaining a private investigator;

    b.  Gathering information from potential witnesses (both Orrstown former employees and borrowers);

    c.  Conducting banking industry-related research, including into the practices of other regional banks concerning capital raises, lending policies, loan loss reserves, internal controls and dividend payments/suspensions during the relevant period;

    d.  Researching auditing standards and regulations applicable to regional banks;

    e.  Communicating with Orrstown shareholders;

    f.  Preparing and serving FOIA requests directed to banking regulators;

    g.  Researching bankruptcy filings pertaining to certain of the Bank's borrowers; and,

h. Researching Orrstown borrowers, including county property records, for pertinent information about the borrowers and their commercial loans.

20. Lead Plaintiff prepared a detailed amended complaint ("AC", Dkt. No. 40), which was filed on March 4, 2013.

21. The 347-paragraph, 180-page AC added Exchange Act Claims against Orrstown's auditor, Smith, Elliott, Kearns & Company ("SEK"), and Securities Act Claims against SEK and the underwriters of Orrstown's March 2010 public offering, Piper Sandler & Co. and Janney Montgomery Scott LLC (collectively, the "Underwriters"), and added detailed factual allegations to support those additional claims as well as the Securities Act and Exchange Act Claims asserted against the Orrstown Defendants. The AC also extended the claims to Persons who purchased Orrstown Financial Services, Inc. common stock between March 15, 2010 and April 5, 2012, inclusive.

22. All Defendants moved to dismiss the AC, which motions Lead Plaintiff vigorously opposed. The motions were fully briefed and argued as of April 2014.

23. Subsequently, in April 2015, the parties submitted supplemental briefing to address the U.S. Supreme Court's decision in *Omnicare Inc. et al. v. Laborers District Council Construction Industry Pension Fund et al.,* Case Number 13-435, (U.S. October Term, 2014), which issued on March 24, 2015, and its

application to the issues raised in Defendants' motions to dismiss that were *sub judice*.

24.     In addition, to such briefing, while Defendants' motions were *sub judice*, Lead Plaintiff continued with its investigation, including to, for example, appeal the Federal Reserve's denial of FOIA requests, speak with confidential witnesses, and review public filings and information available about Orrstown.

25.     On June 22, 2015, the Court granted Defendants' motions to dismiss the AC in its entirety. Dkt. Nos. 92-93.

26.     Over Defendants' objection, Lead Plaintiff secured the right to file an amended complaint. *Id.*

27.     With the aim of addressing the concerns identified in the Court's order dismissing the AC, Lead Plaintiff thereafter further researched and prepared its Second Amended Complaint ("SAC"), which was deemed filed on February 6, 2016. Dkt. No. 101.

28.     Again, each group of Defendants moved to dismiss the SAC on March 18, 2016 (Dkt. Nos. 105–10). Lead Plaintiff spent a significant amount of time opposing, as reflected in its 50-page omnibus opposition brief. *Id.*

29.     While Defendants' motions were *sub judice*, on September 27, 2016, Defendants Orrstown, Quinn, Everly and Embly consented to the entry of an Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section

8A of the Securities Act, Sections 4C and 21C of the Exchange Act and Rule 102(e) of the SEC's Rules of Practice, Making Findings and Imposing Remedial Sanctions and Cease-and-Desist Orders ("SEC Order") that found, after an investigation into certain Defendants by the Securities and Exchange Commission, that, *inter alia*, Orrstown had under-reported its impaired loans beginning second quarter 2010 and through 2011 by as much as $69.5 million. Pursuant to the SEC Order, Orrstown was required to pay a civil monetary penalty of $1 million, and Quinn, Everly, and Embly were required to pay civil penalties of $100,000 each.

30.     The SEC Order did not provide any recovery for Orrstown investors.

31.     The Court was promptly apprised of the SEC Order by the parties. Dkt. No. 122.

32.     On December 7, 2016, the Court granted in part and denied in part Defendants' motions to dismiss the SAC. Dkt. Nos. 126–27. The Court upheld Exchange Act Claims against Orrstown, Quinn, Everly, and Embly, but dismissed the Exchange Act Claims against SEK, dismissed all Exchange Act Claims arising prior to the second quarter of 2010, and dismissed the Securities Act Claims against all Defendants.

33.     In the first quarter of 2017, with the motions to dismiss the SAC resolved, and the PSLRA-imposed stay of discovery lifted, Lead Plaintiff commenced discovery in earnest. In addition to the discovery propounded on

Defendants, Lead Plaintiff served over two dozen subpoenas directed to SEK, the Underwriters, 10 Orrstown consultants, and 13 borrowers, and thereafter conferred and negotiated document and ESI productions for each of the subpoenaed parties.

34.    The documents and categories of documents Lead Counsel requested, pursued, received and analyzed, included (among many others):

a.  The policies and protocols governing Orrstown's internal controls over loan initiation, review and approval, loan underwriting, risk management and financial reporting;

b.  Loan files;

c.  Documents from and information about Orrstown's Loan Committee, Credit Administration Committee and Credit Analyst Group;

d.  Documents from and information about key management, such as Orrstown's Chief Credit Officer and Loan Review Officer;

e.  Documents from and information about the Special Assets Group and other internal reviews, stress tests, etc. conducted by Orrstown concerning the Loans during the relevant time period;

f.  Minutes, consents, resolutions, presentations, analyses, exhibits, summaries, memoranda and reports and all documents reflecting communications to or from members of the Board or any of its

subcommittees (including the Audit Committee, the Credit Administration Committee, and the Enterprise Risk Management Committee) or the Loan Committee;

g. Information concerning Orrstown's advisors retained to review or advise Orrstown regarding issues concerning commercial lending;

h. Information and communications with analysts, rating agencies, or journalists regarding Orrstown, Orrstown's securities, or the commercial lending market;

i. Information concerning preparation, review and approval of Orrstown's SEC periodic, quarterly, and annual SEC filings, including all drafts and any exhibits thereof, including communications from or comments by the SEC;

j. Organizational and staffing charts for Orrstown's commercial lending, accounting and finance departments;

k. Public Company Accounting Oversight Board (PCAOB) related-Documents;

l. Audits and audit workpapers; and,

m. Documents related to the respective investigations by the Regulators.

35. Lead Plaintiff received and reviewed over a million pages of documents in discovery.

36. Due to the technical nature of many of the documents and issues, Lead Plaintiff also retained consultants with expertise in the field of banking and banking regulations to assist in Lead Plaintiff's analysis of the documents, including to put the evidence in the context of relevant operations of a financial institution and governing regulations. These consultants, by way of example only, provided insight and analysis into: the development and implementation of internal controls at financial institutions; the frameworks developed by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) for financial institutions, including with respect to internal controls; the calculation and reporting of Allowance of Loan and Lead Losses (ALLL) for banks; troubled debt restructurings (TDRs); and, loan review processes, rating systems, and policies.

37. In addition, Lead Counsel retained the services of Partners Advisory Services Corp. ("PASCORP"), an expert consultant, providing valuation and forensic accounting services to investors and their counsel. Under the direction of its founder and President, James Vodola, since 1992 PASCORP has provided valuation and forensic accounting services to investors, and their advisors and counsel. Among other things, PASCORP aided Lead Counsel with a detailed review of Orrstown's financial statements, SEK's workpapers, financial and regulator

documents, and conducted a loan-by-loan review of Orrstown's troubled commercial lending relationships.

38.     Lead Plaintiff also engaged in numerous discussions with federal and state banking regulators in an attempt to obtain production of documents that were withheld by certain Defendants and certain third parties based on the assertion of confidential supervisory information ("CSI") privilege.

39.     On August 9, 2018, Lead Plaintiff filed a motion to compel production of documents withheld as CSI (Dkt. Nos. 157–58), which the federal and state banking regulators opposed. Dkt. No. 173.  On February 12, 2019, this Court denied the motion without prejudice to Lead Plaintiff refiling after exhausting administrative procedures, which Lead Plaintiff thereafter did. Dkt. Nos. 176–77.

40.     Lead Plaintiff also responded to discovery propounded by Defendants, and deposed one representative from SEK and one of the Bank's consultants.

41.     While fact discovery was ongoing, Lead Plaintiff sought out and retained a testifying class certification and damages expert, H. Nejat Seyhun, Ph.D. Dr. Seyhun was retained to, among other things: determine and testify whether Orrstown common stock traded in an "efficient market" during the relevant period and whether the calculation of damages on a class-wide basis is subject to a common methodology; and provide rebuttal expert testimony on these topics.

42.     In December 2017 and January 2018, Lead Plaintiff and certain Defendants exchanged opening and rebuttal expert reports addressing whether the Action could be certified under Fed. R. Civ. P. 23 as a class action.

43.     On April 11, 2019, Plaintiff sought leave to file the Third Amended Complaint ("TAC") (Dkt. No. 182), which incorporated the substantial evidence and facts Lead Plaintiff secured in discovery. It also reflected and incorporated the work done by PASCORP, GDG, and the banking consulting experts retained by Lead Plaintiff, as discussed above.

44.     The TAC reasserted the previously dismissed claims which included the Securities Act Claims against all Defendants and the Exchange Act Claims as against SEK, and expanded the class period to assert claims on behalf of Persons who purchased Orrstown Financial Services, Inc. common stock from March 15, 2010 through April 26, 2012, inclusive ("Class Period").

45.     Defendants vigorously opposed Lead Plaintiff's motion for leave to file the TAC, asserting, *inter alia*, that claims were barred by the statute of repose.  Dkt. Nos. 184–86.

46.     On February 14, 2020 the Court granted Plaintiff leave to file the TAC. (Dkt. Nos. 197-198).

47.     In March 2020, Defendants moved the Court to certify for immediate interlocutory appeal the issue of whether the statutes of repose barred previously

dismissed claims that were re-asserted in the TAC. Dkt. Nos. 204–05. Then, in April 2020, all Defendants filed motions to dismiss the TAC in its entirety. Dkt. Nos. 213–19. On July 8, 2020, Plaintiff filed its omnibus response to the Defendants motions to dismiss the TAC. Dkt. No. 228.

48.     In April 2020, Defendants moved to dismiss the TAC in its entirety, and Lead Counsel filed extensive briefing in opposition.

49.     On July 17, 2020, the Court ruled on Defendants' motion for interlocutory appeal, finding that there existed substantial ground for difference of opinion on the issue of whether the reasserted claims were barred by the statute of repose, and certified the issue for interlocutory appeal (Dkt. Nos. 229- 230).

50.     On July 27, 2020, Defendants filed a petition to appeal pursuant to 28 U.S.C. §1292 in the United States Circuit Court for the Third Circuit, which SEPTA opposed on August 5, 2020. The Third Circuit granted the petition on August 13, 2020.

51.     With respect to the CSI, on August 24, 2020, having exhausted all administrative procedures, Lead Plaintiff filed a renewed motion to compel production of the documents withheld as CSI. Dkt. No. 239–41.

52.     With respect to Defendants' appeal, the Parties filed their principal appeal briefs in November and December 2020, filed supplemental briefs in January 2021, and appeared for argument on February 10, 2021 before the Third Circuit

Court of Appeals. On September 2, 2021, in a unanimous, precedential opinion, the Third Circuit affirmed the Court's ruling, holding that SEPTA could reassert the previously dismissed claims in the TAC. *SEPTA v. Orrstown Fin. Servs.*, 12 F.4th 337 (3d Cir. 2021).

53.    Soon thereafter, while the motions to dismiss the TAC and motion to compel production of CSI were pending, the Parties agreed to engage the services of Robert Meyer, Esquire, an experienced and nationally recognized mediator with JAMS.

54.    In late 2021, while the motions to dismiss the TAC and motion to compel production of CSI were pending, the Parties engaged the services of Robert Meyer, Esquire, an experienced and nationally recognized mediator with JAMS. *See* https://www.jamsadr.com/meyer/.

55.    In addition to extensive experience mediating settlements of complex litigation, Mr. Meyer has specifically mediated settlements in numerous securities lawsuits involving both Fortune 500 companies and start-ups, in actions that involve Securities Act and Exchange Act claims. *Id.*

56.    After preparing and exchanging mediation briefs, the Parties participated in an all-day mediation with Mr. Meyer on January 19, 2022, but were unsuccessful in reaching a resolution.

57.     The Parties so informed the Court, and the Court rescheduled to July 13, 2022, the previously-continued December 9, 2021 hearing and oral argument on Defendants' motions to dismiss the TAC.  The parties appeared in person before the Court on July 13, 2022 for the hearing on Defendants' motions to dismiss the TAC.

58.     On August 18, 2022, the Court issued its order denying in part and granting in part Defendants' motions to dismiss the TAC (Dkt. Nos. 276–77). The MTD Order, *inter alia*, upheld certain of the Securities Act Claims asserted in the TAC against SEK, the Underwriters, Orrstown, and certain Individual Defendants, and upheld certain of the Exchange Act Claims against SEK, Orrstown, and certain Individual Defendants. The MTD Order granted Defendants' motions to dismiss with respect to certain of Plaintiff's Securities Act Claims and Exchange Act Claims that were based on five out of the seven alleged false and misleading statements in the Offering Documents and Annual Reports.

59.     In a separate order issued by the Court on August 18, 2022, the Court granted SEPTA's motion to compel production of the withheld CSI, giving SEPTA access to over 3,000 documents concerning or reflecting the Regulators' examinations and findings about Orrstown from 2010 through 2012. (Dkt. Nos. 278–79.)

60.     Orrstown promptly produced the CSI, and Plaintiff reviewed the produced CSI.

61.     On October 3, 2022, Defendants filed their answers to the TAC.

62.     During an October 5, 2022 Court-scheduled status conference, the Parties informed the Court that they were re-engaging in settlement discussions with the aid of Mr. Meyer; and, conferring regarding a proposed case schedule to set deadlines for key events through the date of trial.

63.     In the following weeks, the Parties separately engaged with Mr. Meyer to discuss their respective positions, and on October 28, 2022 the Parties participated in a scheduled all-day mediation session with Mr. Meyer.

64.     The October 28, 2022 mediation concluded without a settlement-in-principle, but the Parties agreed to continue discussing a potential resolution with Mr. Meyer's assistance.

65.     In early November 2022, after additional discussions, Mr. Meyer presented the Parties with a mediator's proposal to assist them in forging an agreement-in-principle to resolve the Action.

66.     The parties accepted the mediator's proposal, and on November 7, 2022 the Parties executed a memorandum of understanding, which set forth their agreement-in-principle to resolve and settle the Action in exchange for a total payment of $15 million to the Class, inclusive of fees and costs.

67.     Accordingly, the Settlement resulted from extensive arm's-length negotiations between experienced counsel with an understanding of their respective positions in this litigation, assisted by Mr. Meyer, a highly experienced mediator.

68.     The Parties then negotiated the terms of the Stipulation.

## II.     THE SETTLEMENT

### A.     *The Stipulation of Settlement*

69.     The Settlement provides that Defendants shall pay a total of $15 million (the "Settlement Amount") into a non-reversionary, interest-bearing qualified settlement fund (the "Settlement Fund"), in exchange for the release of all claims that were or could have been asserted relating to Defendants' conduct set forth in the TAC.  Dkt. 297, Stipulation, ¶¶ 4.1-4.4.  Of the total, Orrstown will pay $13 million and SEK will pay $2 million. *Id.* at ¶ 2.1.

70.     The Parties' obligations are subject to approval by the Court and entry of the final proposed Judgment (Exhibit B to the Stipulation, Exhibit 1 hereto), resulting in full and final disposition of the Action with respect to the Released Parties and Released Claims. Stipulation, at ¶¶ 4.1, 4.3. The pertinent definitions of Effective Date, Released Plaintiff's Claims, Unknown Claims, Defendants' Released Parties, Plaintiff's Released Parties, Released Claims, and Released Parties are set forth at paragraphs 1.9, 1.27, 1.38, 1.8, 1.21, 1.25, and 1.28, respectively, of the Settlement Stipulation, and were provided in the Notice at pg. 6.

71.    All costs of notice to the Class and the costs of settlement administration, court-approved attorneys' fees and litigation expenses, taxes, and any other Court-approved fees or expenses shall be paid from the Settlement Fund (which includes the Settlement Amount plus any interest earned thereon), and the balance (*i.e.,* the "Net Settlement Fund") shall be distributed pursuant to the proposed Plan of Allocation to Class Members who submit timely, valid claims, and whose payments would equal $10.00 or more. *Id.* at ¶ 5.13.

72.    The procedure for how Settlement Class Members' claims will be processed were detailed in the Notice at pp.7-10. Briefly, Settlement Class members will complete and submit (by mail or electronically) a Proof of Claim Form with documents identifying their relevant transactions in Orrstown stock. Because no party possessed the individual investor trading data necessary to distribute the Net Settlement Fund, this procedure (which is also used to prevent fraudulent claims) is necessary to identify Class Members, their Class Period stock purchases and sales, and to assign them a recognized loss for purposes of the Plan of Allocation and determining their payment from the Net Settlement Fund.

73.    Further, the claims process being utilized allows claimants an opportunity to cure any deficiencies with, or request Court review of a denial of, their claims. *See* Notice, at pp. 7–10.

74.     The Plan of Allocation, which is described in the Notice and was developed in consultation with Plaintiff's damages expert and consultant is set forth in detail in Section 8 of the Notice. The Plan of Allocation apportions the Net Settlement Fund among Class Member who submit timely, valid claims accepted by the Claims Administrator, in proportion to their losses calculated pursuant to the model developed in consultation with Plaintiff's experts. Notice, at pp. 7–10; Stipulation, at ¶ 5.10.

75.     The calculation of each Class Member's Recognized Loss under the Plan of Allocation is detailed in the Notice and, as disclosed therein (*id.*), will be based on several factors, including when the shares of Orrstown stock were purchased and sold, the purchase and sale price of the shares, and the estimated artificial inflation in the respective prices of the shares at the time of purchase and at the time of sale.

76.     The Plan of Allocation results in an equitable distribution of the Net Settlement Fund based on an authorized claimant's respective alleged economic losses as a result of Defendants' alleged misstatements and omissions, as opposed to losses caused by market- or industry-wide factors, or company-specific factors unrelated to the alleged misstatements and omissions.

77.     It reflects a reasonable allocation of the Net Settlement Fund based on the evaluation of the trading price of Orrstown Stock in relation to the alleged

revelation of previously concealed information alleged in the TAC and Action. The Plan of Allocation takes into account the dates on which the public disclosure of relevant information occurred and the market's reaction to this information. *See* Notice, Ex. A-1 to the Stipulation at pages 7-10.

78.     The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Loss.

79.     SEPTA, despite its years of service in this lawsuit, requests no incentive award, nor reimbursement of costs or expenses relating to the representation of the class as allowed by 15 U.S.C. §78u-4(a)(4), and will share in the recovery only in proportion to all other Class Members who submit valid, accepted claims.

### B.     *The Settlement is Fair and Reasonable*

80.     As demonstrated by the foregoing and the record in the Action, the Settlement was reached after Lead Counsel's extensive factual investigation, assessment and understanding of the law and facts underlying the claims and understanding of estimated recoverable damages.

81.     The Settlement was reached after Lead Counsel and Lead Plaintiff considered, broadly:

(a) the substantial benefits provided under the proposed Settlement;

(b) the uncertain outcome and the risk of any litigation, especially in complex actions such as this securities litigation, including the difficulties and delays

inherent in such litigation, and the defenses to the claims asserted by and available to Defendants;

(c) that before this Action would reach the Courthouse steps, a contested motion for class certification would need to be resolved, additional expert discovery and disclosures exchanged, including on class certification, liability and damages, additional deposition discovery and further motion practice needed to occur, all of which would delay reaching trial and securing a jury verdict and judgment, and require substantial additional expense and time;

(d) even if Lead Plaintiff would have recovered a larger judgment at trial, the Class' actual recovery would likely be postponed for years due to post-trial motions and appeals; and,

(e) the desirability of permitting the Settlement to be consummated as provided by the terms of the Stipulation.

82.    Lead Counsel also took into consideration the risks of continued litigation on key issues such as: the materiality of the alleged false and misleading statements; proof of whether the statements were made with scienter, recklessly, and/or negligently; any motive to deceive; and, even if each Defendant's mental state was not an issue, proving reliance, damages and loss causation depends on complicated and competing expert testimony (including about the impact of market and industry conditions on Orrstown's stock price, isolating the impact of

Defendants' false statements on Orrstown's stock price to derive damages, and whether Orrstown's shares traded on an efficient market).

83.     The $15,000,000 Settlement represents a recovery of approximately 29-36% of the maximum damages estimated by Lead Plaintiff's expert of $42-52.5 million.

84.     Lead Plaintiff's estimate of damages assumes that Plaintiff prevails on all of the claims. The range consists of the expert's most aggressive loss calculation for both the Securities Act and Exchange Act claims at the high end, and the same damages less an estimated amount for "negative loss causation" on the lower end. Defendants, however, have contended that the actual, recoverable damages, if any, are much lower.  Moreover, that estimated damages range does not deduct for the potential success of all affirmative defenses that Defendants might have been able to prove at trial, meaning the Settlement amount could represent a significantly higher percentage of the damages than would have been won at trial, which in theory could be zero.  The range reflects the expert's most aggressive loss calculation for both the Securities Act and Exchange Act Claims at the high end, and the same damages less an estimated amount for "negative loss causation" on the lower end. Defendants, however, have contended that the actual, recoverable damages, if any, are much lower.

85. In sum, SEPTA and Lead Counsel have relentlessly and effectively represented the interests of the Class Members. SEPTA has demonstrated its ability and willingness to pursue this action on the Class's behalf through more than a decade of vigilant involvement in the action. Throughout the litigation, SEPTA devoted significant time to reviewing filings, participating in discovery, overseeing the litigation, and, ultimately, approving the Settlement.

86. Lead Plaintiff's decision to settle this Action is the culmination of years of investigation; robust fact discovery; extensive briefing on the motions to dismiss and the motion to compel CSI; consultation with expert consultants; and, ardent participation in an arm's-length mediation process.

87. In sum, Lead Counsel believe that the proposed Settlement is an excellent recovery for Lead Plaintiff and the Settlement Class, and is in every respect fair, adequate, reasonable, and in the best interests of the Settlement Class.

## III. STATUS OF THE ADMINISTRATION OF THE NOTICE

88. Attached as Exhibit 3, hereto, is the Declaration of Justin R. Hughes Regarding Administration of the Notice ("Hughes Decl."). Mr. Hughes is a Senior Director at Kroll Settlement Administration LLC, which is the Court-appointed Claims Administrator pursuant to the February 1, 2023 Preliminary Approval Order.

89.     In accordance with the processes set forth in the Plan of Allocation (Section 8 of the Notice, pages 7–10) and in the Claim Form (Exhibit A-2 to the Stipulation), Lead Plaintiff implemented notice program.

90.     First, with respect to the Notice, the Claims Administrator: (i) timely mailed the Notice and Claim Form to the list of approximately 2,478 record holders of Orrstown common stock during the Class Period provided by Orrstown's former transfer agent, and to 1,482 brokers and other nominees; (ii)  mailed and emailed Notices and Claim Forms to beneficial holders identified by the nominees; (iii) provided unaddressed copies of the Notice and Claim Form to the nominees to be sent to their customers who are potential Class Members; and (iv) was informed by certain nominees that they electronically disseminated the Notice and Claim Forms (or links thereto) to their customers who are potential Class Members.  Hughes Decl. ¶¶1-8.

91.     Second, the Claims Administrator timely caused: (a) the Summary Notice to be published in Investor's Business Daily and transmitted over PRNewswire. Hughes Decl. ¶¶9.

92.     Third, the Claims Administrator: established the case-specific toll-free telephone helpline and established the website dedicated to the Settlement (www.OrrstownSecuritesSettlement.com), both of which were published in the Notice and Summary Notice. Hughes Decl. ¶¶10-11.

93.     The Notice also advised Settlement Class Members that by April 28, 2023 they could object to any part of the Settlement, including the Fee and Expense Application, and the process for doing so. Hughes Decl. ¶¶12-14.

94.     As of the date of the Hughes Declaration (April 13, 2023), Kroll's records indicate that it has not received any Requests for Exclusion and has not received any objections from Class Members. *Id.* ¶14.

95.     As of the time of the filing of this Declaration, Lead Counsel has not been notified of or been served with any objection to, or request to be excluded from, the Settlement.

## IV.     TIME AND EXPENSES INCURRED TO PROSECUTE AND SETTLE THE ACTION

96.     This Declaration has summarized the work undertaken by Lead Counsel in connection with the initiation, investigation, prosecution and settlement of this Action, which supports Lead Counsel's requested fee award and expense reimbursement.

97.     Lead Counsel and the attorneys at CSKD have decades of experience representing plaintiffs in securities and complex class action litigations prosecuted and settled in federal and state courts nationwide. Attached as Exhibit 4, hereto, is the Firm's current resume which contains information about the current CSKD attorneys who worked on this matter. *See also* www.chimicles.com.

98.     Lead Counsel worked diligently in their prosecution of the Action, and allocated their time and resources effectively and efficiently to advocate on the Class' and Plaintiff's behalves.

99.     For their work in litigating the claims and securing this substantial Settlement for the Settlement Class, Lead Counsel respectfully seek and request:

(i) a fee award of 35% of the Settlement Fund, which is $5,250,000 and,

(ii) reimbursement of their litigation expenses in the amount of $717,488.55,

(iii) plus the proportionate amount of interest that has accrued on the awarded amounts from the inception of the Settlement Fund, through the date of payment from the Settlement Fund.

100.    The Fee and Expense Application, and these amounts (*i.e.* 35% of the Settlement Fund, up to $800,000 of litigation expenses, and interest) were contemplated and agreed to in the Settlement Agreement (Dkt. No. 297-1, at ¶ 6, pg. 26) and disclosed to Class Members in the Notice (*Id.*, Exhibit B, Notice at PDF pg. 61-62/93).

101.    Lead Counsel lodestar (time x hourly rates), discussed below, is $8,972,785.50.    Therefore, the requested fee award of 35% of the Settlement Amount represents a fractional (or negative) multiplier of .585 on Lead Counsel's lodestar.

102. Lead Counsel has, at all times, assumed the responsibility of litigating this Action on a contingent-fee basis, such that any fee would be paid, and the expenses incurred reimbursed, only upon achieving a recovery for the benefit of the Class by settlement or judgment.

103. The award of fees and reimbursement of expenses will be paid from the Settlement Fund. Stipulation ¶6.5.

*A.* *Lodestar*

104. As detailed in the following chart, the total number of hours expended on this litigation by CSKD from May 2012 through February 28, 2023 is <u>13,975.30</u> hours, consisting of attorneys' time and other professional staff (paralegal and law clerk) time, for a lodestar of <u>$8,972,785.50</u>:

| NAME | STATUS | HOURLY RATE | HOURS | LODESTAR |
|---|---|---|---|---|
| Nicholas E. Chimicles | P | $1,100.00 | 1170.95 | $1,288,045.00 |
| Kimberly Donaldson Smith | P | $900 | 1336.40 | $1,202,760.00 |
| Timothy N. Mathews | P | $875.00 | 1967.60 | $1,721,650.00 |
| Beena McDonald | P | $750.00 | 92.60 | $69,450.00 |
| Anthony Geyelin | OC | $460.00 | 2735.70 | $1,258,422.00 |
| Alison Gushue | OC | $625.00 | 1792.60 | $1,120,375.00 |
| Mariah Heinzerling | A | $350.00 | 40.70 | $14,245.00 |
| Mariah Heinzerling | FLC | $280.00 | 75.00 | $21,000.00 |
| Tiffany Cramer | FSC | $700.00 | 743.30 | $520,310.00 |
| Samantha Holbrook | FA | $715.00 | 158.00 | $112,970.00 |
| Catherine Pratsinakis | FA | $600.00 | 83.25 | $49,950.00 |
| Christine Saler | FA | $575.00 | 2176.30 | $1,251,372.50 |
| Carlynne Wagner | FA | $260.00 | 155.60 | $40,456.00 |
| David Birch | FIT | $400.00 | 103.05 | $41,220.00 |

| | | | | |
|---|---|---|---|---|
| Madeline Landry | FPL | $200.00 | 77.40 | $15,480.00 |
| Corneliu Mastraghin | FPL | $250.00 | 74.20 | $18,550.00 |
| Patrick Musselman | FLC | $200.00 | 279.90 | $55,980.00 |
| Phuong Ngo | FLC | $100.00 | 120.00 | $12,000 |
| Aristotel Moumas | FLA | $200.00 | 792.75 | $158,550.00 |
| **TOTALS** | | | **13,975.3** | **$8,972,785.50** |

P = Partner; A = Associate; OC = Of Counsel; SC = Senior Counsel; FA = Former Associate; FSC = Former Senior Counsel; FLC = Former Law Clerk; FPL = Former Paralegal; FLA = Former Law Assistant; FIT = Former Information Technology Specialist

105. CSKD's lodestar was prepared from contemporaneous, daily time records regularly prepared and maintained by CSKD, which are available at the request of the Court.

106. CSKD excluded from its lodestar timekeepers who each expended less than 60 hours on this decade-long Action.

107. CSKD's lodestar reflected above is based upon the Firm's current billing rates, which rates do not include charges for expense items. For personnel who are no longer employed by CSKD, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by CSKD. Although not required, because of the longevity of the Action, CSKD determined to calculate and provide the Court with its lodestar using historical hourly rates (*i.e.* the timekeeper's rate for the year during which the work was conducted and billed); using such rates, CSKD's lodestar from May 2012 through February 28, 2023 is $7,804,399.60.

108. Further, CSKD's lodestar is as of February 28, 2023 and does not include time spent on preparing the Motion, this Declaration, preparation for and attendance at the upcoming Settlement Hearing, and, if the settlement is granted final approval, the time to be spent on responding to any class member inquiries related to, and addressing any, claims administration matters.

109. In addition, the hourly rates for CSKD's attorneys and professional legal staff included above are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted and approved in other securities or shareholder litigations, including *Gamburg, et al, v. Hines Real Estate Investment Trust, Inc. et al¸* Case No. 24-C-16-004496, Circuit Court for Baltimore City, Maryland (In a June 6, 2018 Order and Final Judgment, Court approved in full the requested fee and expenses); *Johnson et al. v. W2007 Grace Acquisition I Inc. et al.,* Case No. 2:13-cv-2777 (W.D. Tenn.)(In a December 4, 2015 Order, the Court approved in full the requested fee and expense request, and stated that "Both the hours spent and the hourly rates are reasonable given the nature and circumstances of the case…"); *Roth v. The Phoenix Companies, Inc.*, et al, Index No. 650634/2016 (Judge Kornreich of the Supreme Court of the State of NY, in her 2017 Order approving in full the fee and expense request, and she specifically characterized counsel's rates as reasonable); *Alessandro Demarco v. Avalon Bay Communities, Inc.*, No. 2:15-628 (D.N.J), July 11, 2017 Order ("The court, after

33

careful review of the time entries and rates requested by Class Counsel, and after applying the appropriate standards required by relevant case law, hereby grants Class Counsel's application for attorneys' fees …"); *Chambers v. Whirlpool Corp., et al.*, 11-1773 FMO (C.D. Cal.)(October 11, 2016)(reviewing the hourly rates of C&T counsel and holding, over Defendants' objections, that "the hourly rates sought by counsel are reasonable."); *Henderson v. Volvo Cars of N. Am., LLC,* 2013 U.S. Dist. LEXIS 46291 *4-47 (D.N.J. Mar. 22, 2013) (C&T's rates "are entirely consistent with hourly rates routinely approved by this Court in complex class action litigation."); *City of St. Clair Shores General Employees Ret. Sys. v. Inland Western Retail Real Estate Trust, Inc., et al.*, Case 07 C 6174 (U.S.D.C. N.D. Ill, 2011); *In re CNL Hotels & Resorts, Inc. Sec. Litig.*, Case No. 6:04-cv-1231-Orl-31KRS (USDC, MD Fla., 2006); and *In re Real Estate Associates Limited P'ship Litig.*, Case No. CV 98-7035 DDP, USDC, Central District of California (2003).

### B. Expenses

110.   CSKD has incurred a total of $717,488.55 in litigation expenses in investigating, prosecuting and settling the Action, including with respect to the retention of testifying and non-testifying experts and consultants (discussed above):

| Category | Amount |
|---|---|
| PASCORP | $267,255.93 |
| Dr. Seyhun/Testifying Expert Expenses | $138,754.64 |
| GlenDevon Group | $124,875.00 |
| Non-testifying industry experts /consultants | $42,894.70 |

| | |
|---|---|
| Technology Services/ Document Review Platform and Production Services | $40,264.34 |
| Internal Reproduction/Copies | $36,291.50 |
| Mediation Fees | $28,442.88 |
| Investigator | $15,858.00 |
| Computer Research / PACER Fees | $9,333.85 |
| Subpoena Service | $5,035.39 |
| Deposition Transcripts/Court Reporting | $2,589.65 |
| Travel, Meals & Related Travel Expenses | $2,569.11 |
| PSLRA Publication Notice | $1,715.00 |
| Postage/Express Delivery/Messenger | $989.70 |
| Filing Fees / Complaint and Pro Hac | $600.00 |
| Conference Calls | $18.86 |
| **TOTAL** | **$717,488.55** |

111.    These expenses incurred by CSKD are reflected on the books and records of my firm which are prepared from expense vouchers, check records and other source materials and represent an accurate recordation of the expenses CSKD incurred.

112.    The reported expenses, which consist primarily of the amounts paid to Lead Plaintiff's testifying and non-testifying experts, are reasonable and were necessary for the successful prosecution of the case and in achieving the Settlement as discussed above.

113.    The expenses do not include any future expenses, including for example, expenses related to attendance at the final approval hearing.

## X.     EXHIBIT INDEX

114.   Attached hereto are true and correct copies of the following:

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | [Proposed] Judgment and Order Granting Final Approval of Class Action Settlement (Ex. B to the Stipulation) |
| 2 | [Proposed] Order Granting Lead Plaintiff's Fee and Expense Application |
| 3 | Declaration of Justin R. Hughes Regarding Administration of the Notice |
| 4 | CSKD Firm Resume |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 14, 2023.

*/s/ Kimberly M. Donaldson-Smith*
KIMBERLY M. DONALDSON-SMITH